# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

In re:                                    CASE NO. 6:10-bk-16177-KSJ

**ISLAND ONE, INC.**, *et al.*                  CHAPTER 11

        Debtors.                    Jointly-administered with Cases No.
                                        6:10-bk-16179-KSJ; 6:10-bk-16180-KSJ;
                                        6-10-bk-16182-KSJ; 6-10-bk-16183-KSJ;
_____/          and 6:10-bk-16189-KSJ


## JOINT DISCLOSURE STATEMENT, PURSUANT TO 11 U.S.C. §1125, FOR ISLAND ONE, INC., CRESCENT ONE, LLC, ST. CROIX ONE, LLC, ISLAND ONE RESORTS MANAGEMENT, CORPORATION, NAVIGO <u>VACATION CLUB, INC., AND IOI FUNDING I, LLC</u>



COUNSEL FOR DEBTORS

JIMMY D. PARRISH. ESQ.
ELIZABETH A. GREEN, ESQ.
BAKER & HOSTETLER LLP
200 S. ORANGE AVE.
SUNTRUST CENTER, SUITE 2300
ORLANDO, FLORIDA  32801-3432



OCTOBER 5, 2010

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| **In re:** | **CASE NO. 6:10-bk-16177-KSJ** |
| **ISLAND ONE, INC.,** *et al.* | **CHAPTER 11** |
| **Debtors** | **Jointly-administered with Cases No. 6:10-bk-16179-KSJ; 6:10-bk-16180-KSJ; 6-10-bk-16182-KSJ; 6:10-bk-16183-KSJ; and 6:10-bk-16189-KSJ** |
| _____/ | |

## JOINT DISCLOSURE STATEMENT, PURSUANT TO 11 U.S.C. §1125, FOR ISLAND ONE, INC., CRESCENT ONE, LLC, ST. CROIX ONE, LLC, ISLAND ONE RESORTS MANAGEMENT, CORPORATION, NAVIGO VACATION CLUB, INC., AND IOI FUNDING I, LLC

## I.     INTRODUCTION AND SUMMARY

This Disclosure Statement (the "Disclosure Statement") is filed pursuant to the requirements of Section 1125 of Title 11 of the United States Code (the "Code"). This Disclosure Statement is intended to provide adequate information to enable holders of claims in the above-captioned jointly administered bankruptcy cases (the "Bankruptcy Cases") to make informed judgments about the Joint Plan of Reorganization/Liquidation (the "Plan") submitted by Island One, Inc. ("Island One"), Crescent One, LLC ("Crescent"), St. Croix One, LLC ("St. Croix One"), Island One Resorts Management, Corporation ("Island One Management"), Navigo Vacation Club, Inc. ("Navigo"), and IOI Funding I, LLC ("IOI Funding")(collectively, the "Debtors"). The overall purpose of the Plan is to  liquidate certain of the Debtors' assets and/or to restructure the Debtors' liabilities in a manner designed to maximize recoveries to all stakeholders. The Debtors believe the Plan is reasonably calculated to lead to the best possible outcome for all creditors in the shortest amount of time and preferable to all other alternatives.

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE PLAN. THIS INTRODUCTION AND SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE REMAINING PORTIONS OF THIS DISCLOSURE STATEMENT AND THIS DISCLOSURE STATEMENT IN TURN IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN. THE PLAN IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT AND ANY HOLDER OF ANY CLAIM OR INTEREST SHOULD READ AND CONSIDER THE PLAN CAREFULLY IN LIGHT OF THIS DISCLOSURE STATEMENT IN MAKING AN INFORMED JUDGMENT ABOUT THE PLAN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS. ALL CAPITALIZED TERMS USED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE DEFINITIONS ASCRIBED TO THEM IN THE PLAN UNLESS OTHERWISE DEFINED HEREIN.

NO REPRESENTATION CONCERNING THE DEBTORS IS AUTHORIZED OTHER THAN AS SET FORTH HEREIN. ANY REPRESENTATIONS OR INDUCEMENTS MADE, WHICH ARE OTHER THAN AS CONTAINED HEREIN, SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION ABOUT THE PLAN.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO AUDIT. FOR THAT REASON, AS WELL AS THE COMPLEXITY OF THE DEBTORS' BUSINESS AND FINANCIAL AFFAIRS, AND THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES, AND PROJECTIONS WITH COMPLETE ACCURACY, THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT INACCURACY, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT SUCH INFORMATION IS ACCURATE. THIS DISCLOSURE STATEMENT INCLUDES FORWARD LOOKING STATEMENTS BASED LARGELY ON THE DEBTORS' CURRENT EXPECTATIONS AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AND ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES, AND ASSUMPTIONS.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, CAUSES OF ACTION, AND OTHER ACTIONS, THE DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

Island One, Crescent, St. Croix One, Island One Management, Navigo, and IOI Funding are debtors under Chapter 11 of the Code in a jointly administered bankruptcy case pending in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division (the "Bankruptcy Court").

As prescribed by the Code and the Rules, Claims asserted against, and Equity Interests in, the Debtors are placed into "Classes". The Plan designates (32) separate classes of Claims and Interests. The Plan contains seven (7) Classes of Unsecured Claims. The classification of Claims and the treatment of each Class are discussed in detail below.

To the extent the legal, contractual, or equitable rights with respect to any Claim or Interest asserted against the Debtors are altered, modified, or changed by treatment proposed under the Plan, such Claim or Interest is considered "Impaired" and the holder of such Claim or Interest is entitled to vote in favor of or against the Plan. A Ballot for voting in favor of or against the Plan (the "Ballot") will be mailed along with the order approving this Disclosure Statement.

**THE VOTE OF EACH CREDITOR OR INTEREST HOLDER WITH AN IMPAIRED CLAIM OR INTEREST IS IMPORTANT. TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE ADDRESS AND BY THE DATE SET FORTH IN THE BALLOT.**

---

<u>**VOTING DEADLINE**</u>

The last day to vote to accept or reject the Plan is _____, 2010. All votes must be received by the Clerk of the United States Bankruptcy Court for the Middle District of Florida, 135 W. Central Boulevard, Suite 950, Orlando, FL 32801 by 5:00 p.m. (EST) on that day.

---

Upon receipt, the Ballots will be tabulated and the results of the voting will be presented to the Bankruptcy Court for its consideration. As described in greater detail in Section IV of this Disclosure Statement, the Code prescribes certain requirements for confirmation of a plan. The Bankruptcy Court will schedule a hearing (the "Confirmation Hearing") to consider whether the Debtors have complied with those requirements.

The Code permits a court to confirm a plan even if all Impaired Classes have not voted in favor of a plan. Confirmation of a plan over the objection of a Class is sometimes called "cramdown." As described in greater detail in Section IV of this Disclosure Statement, the Debtors have expressly reserved the right to seek "cramdown" in the event all Impaired Classes do not vote in favor of the Plan.

## II.   **DESCRIPTION OF DEBTOR'S BUSINESS**

A.   <u>In General.</u>

Island One has provided extraordinary timeshare vacation experiences through resort development and hospitality management since 1981 when it was founded by Deborah Linden and the Springer family.  Island One commenced construction of its first resort, Orbit One Vacation Villas ("Orbit Resort") in 1982 during the infancy of the timeshare industry and today owns and manages eight resorts in Florida and one resort in St. Croix U.S. Virgin Islands.  The Debtors are a fully integrated vacation ownership company with extensive in-house capabilities including construction, development, marketing, sales, customer financing, owner services, finance, accounting, and resort management.  The Debtors' resorts have earned acclaim because of their friendly and relaxed vacation environments as well as their diverse on-site activities, facilities and hospitality.  Reinforcing the Debtors' stature as an innovator in the timeshare industry is the continued success of Club Navigo, the Debtors' vacation club which includes

twenty-nine (29) resort destinations throughout the United States, the Caribbean, Latin America and Europe, and the Debtors' member rewards program, Club Navigo Rewards.

      B.      <u>Events Leading to Chapter 11 Filing.</u>

The dramatic deterioration of economic conditions in the third quarter of 2008 caused by the turmoil in the financial markets and global recession seriously affected many companies in the timeshare and tourism industries, including Island One. The financial crisis significantly affected the Debtors income producing assets, access to sufficient working capital necessary to operate, and its ongoing business model, unprecedented job losses throughout the United States immediately impaired the performance of the timeshare mortgage portfolio, causing consumer defaults to spike. Island One suffered an immediate decrease in its interest income and accompanying cash flows from its timeshare mortgage receivables portfolio. In addition, Island One was immediately confronted with a substantial borrowing base deficit to Textron Financial Corporation ("TFC") and Liberty Bank ("Liberty").

Facing increasing borrowing base deficits and no ability to cure, the Debtor commenced workout negotiations with TFC and Liberty. While the workout mitigated the immediate need for cash to cure current borrowing base deficits, it had three negative consequences that further restricted the Debtors' cash flow. First, TFC and Liberty required more stringent requirements for eligible collateral and suspended all mortgage modifications between the Debtors and their consumer obligors. Without the ability to enter into modification agreements with its consumer obligors, the Debtors faced an exponential increase in defaults from its customers. Second, TFC and Liberty required a daily sweep of all cash receipts from the portfolio, which eliminated the Debtors' interest arbitrage and a primary source of the Debtors' working capital. Finally, the workout negotiations, which have essentially been continuous since 2008, added significant legal

and restructuring costs to the Debtors. These three consequences only exacerbated the Debtors' cash flow problems.

In connection with the Debtors' workout negotiations and at the suggestion of the Debtors' lenders, the Debtors commenced a search for a potential equity partner in the latter part of 2009. To aid in their search for an equity partner, the Debtors, with the consent of the lenders, retained Western Reserve Partners LLC ("Western") as investment bankers. Western contacted 162 parties, 37 of whom requested confidentiality agreements, and 19 of whom executed confidentiality agreements. Significant discussions took place with five potential equity partners and in January of 2010, the Debtors signed a letter of intent ("Bay Harbour Letter of Intent") with Bay Harbour Management ("Bay Harbour"). Since the execution of the Bay Harbour Letter of Intent, the Debtors, Bay Harbour, TFC, Liberty, and BB&T have worked to reach a global resolution to the Debtors cash flow needs and over all restructuring of the Debtors' obligations to TFC, Liberty, and BB&T. Unfortunately, the negotiations have taken much longer than expected. During the process, a worsening economy, increased costs, rigid restrictions on new sales, and an inability to enter into modification agreements with existing customers, have made it increasingly difficult for the Debtors to meet their obligations. After seven months of negotiations and executing dozens of short term forbearance agreements, the Debtors were unable to access sufficient funding under their credit facilities with TFC and Liberty to continue operations in the normal course. Debtors, after consulting with TFC and Liberty, determined that the best avenue to finalize an agreement with Bay Harbour or other equity partner and preserve value for all stakeholders was to seek protection under Chapter 11 of the Code.

C.      Events Subsequent to Chapter 11 Filing.

Since the Petition Date, the Debtors have been continuing to operate their business as debtors-in-possession under Sections 1101(a) and 1108 of the Code. Pursuant to various

provisions of the Code, Island One has sought and obtained several orders from the Bankruptcy Court intended to facilitate the ongoing operations of the Debtors. Those orders authorized the Debtors to, among other things: (i) use cash collateral subject to secured liens; and (ii) pay its employees. The cash collateral order related to the TFC and Liberty loans ("TFC/Liberty Order") required that a "Chief Sale Officer" ("CSO") be appointed to facilitate a sale of assets or an equity bid. In addition the TFC/Liberty Order required the Debtors to file a plan and disclosure statement by October 1, 2010 and to obtain confirmation of their plan by December 17, 2010. TFC, Liberty and the Debtors agreed that the time to file a plan and disclosure statement under the TFC /Liberty Order would be extended to October 5, 2010.

## III. THE PLAN

**THE FOLLOWING SUMMARY IS INTENDED ONLY TO PROVIDE AN OVERVIEW OF THE DEBTORS' PLAN. ANY PARTY IN INTEREST CONSIDERING A VOTE ON THE PLAN SHOULD CAREFULLY READ THE PLAN IN ITS ENTIRETY BEFORE MAKING A DETERMINATION TO VOTE IN FAVOR OF OR AGAINST THE PLAN. THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN.**

A.      Overview.

In summary, the Plan contemplates a sale process (the "Sale Process") under which: (i) some or all of the Debtors' assets will be sold to the highest and/or best bidder followed by a distribution of the proceeds to creditors based upon the priorities set forth in the Code; and/or (ii) the equity interests in the Reorganized Debtors would be sold and transferred in connection with a confirmable reorganization plan outlined in the prevailing equity bid. The ultimate Plan treatment is completely dependent upon the outcome of the Sale Process. For example, if the Court determines that the highest and best offer for the Debtors' assets is a cash offer for all of the Debtors' assets, then the assets will be sold and the proceeds thereof will be distributed under

the Plan in accordance with the priorities outlined in the Code. Alternatively, if the Court determines that the highest and best offer for the Debtors' assets is an offer to acquire the equity in the Reorganized Debtors in connection with confirmable reorganization plan outlined in the equity bid, the Plan will be amended or modified to reflect the terms of such equity bid and Impaired Classes will be treated in accordance with the Plan as amended or modified. It is also possible that there could be some combination of both an asset sale and equity sale as part of the Sale Process. In such event, certain Classes may be paid from proceeds of the sale in accordance with the priorities set forth under the Code, and others may be subject to treatment outlined in the winning equity bid. Claim Holders are encouraged to pay close attention to all pleadings related to the Sale Process as it will be an integral part of the Plan and how Claim Holders are ultimately treated under the Plan.

All Claims against the Debtors shall be classified and treated pursuant to the terms of the Plan. As noted more fully below, the Plan contains thirty-two (32) Classes of Claims and Interests. There are twenty-one (21) Classes of Secured Claims, seven (7) Classes of Unsecured Claims, and six (6) Classes of Interests.

Overall, the Plan provides that holders of Allowed Administrative Claims will be paid in full on the Effective Date from proceeds of the sale of the Debtors' assets under any circumstance. In the event the Sale Process results in a cash sale of all the Debtors' assets, Holders of Allowed Priority Claims will be paid from the proceeds of such sale after payment in full of all other Allowed Claims with a higher priority under the Code. Alternatively, if Sale Process results in a sale of the Debtors' equity interests in connection with a confirmable reorganization plan outlining the winning equity bid, the Plan will be modified to provide for the proposed payment to Holders of Allowed Priority Claims.

Generally, the Plan provides that to the extent assets securing an Allowed Secured Claim are sold for cash as part of the Sale Process, the Holder of such Secured Claim shall be entitled to payment from the proceeds of such sale in accordance with the priorities set forth in the Code. In the event the assets securing an Allowed Secured Claim are sold in connection with an equity purchase, the Plan will be modified or amended to provide for the proposed payment to the Holder of such Allowed Secured Claim.

In the event the Assets securing an Allowed Secured Claim are not sold for cash or in connection with an equity purchase, the Debtors will transfer such collateral back to the Holder of such Allowed Secured Claim or into a liquidating trust for such Holder's benefit.

Generally, Holders of Allowed Unsecured Claims will be entitled to payment from the proceeds of any cash sale in accordance with the priorities set forth in the Code.  In the event the assets of the Debtors are sold in connection with an equity purchase, the Plan will be modified or amended to provide for the proposed payment to Holders of Allowed Unsecured Claims.  In the event the Debtors' assets are not sold, Allowed Unsecured Creditors will receive no distribution.

Generally, the Plan provides that Allowed Equity Interests will be cancelled.

B.      Classification and Treatment of Claims.

1.      Priority Claims.

a.      Administrative Expense Claims.

Holders of all Allowed Administrative Expense Claims of the Debtors shall be paid in full on the Effective Date from the proceeds of the Sale Process.

b.      Priority Tax Claims.

In the event the Sale Process results in a cash sale of all the Debtors' assets, Holders of Allowed Priority Claims will be paid from the proceeds of such sale after payment in full of all other Allowed Claims with a higher priority under the Code.

Alternatively, if Sale Process results in a sale of the Debtors' equity interests in connection with a confirmable reorganization plan outlined the winning equity bid, this Plan will be modified to provide for the proposed payment to Holders of Allowed Priority Claims.

2. <u>Secured Claims.</u>

a. <u>Class 1 — TFC (Island One Receivables Loan Obligations).</u>

Class 1 consists of the Allowed Secured Claim of TFC in connection with that certain Loan Agreement and Promissory Note by and between TFC and Island One dated March 14, 2001 (the "Island One/TFC Receivables Loan"). The Allowed Secured Claim is estimated in the amount of $67,543,660.11 and is secured by a first priority lien on all notes receivable generated by Island One from March 14, 2001 until October 30, 2009 ("Pledged Island One/TFC Receivables") together with such other or additional collateral as is provided for under the Island One/TFC Receivables Loan, including, but not limited to, by way of any applicable cross-collateralization provisions. The Class I Secured Claim is impaired and entitled to vote on the Plan.

In the event the Pledged Island One/TFC Receivables are sold for cash as part of the Sale Process, TFC shall be entitled to payment from the proceeds of such sale in accordance with the priorities set forth in the Code. If the Island One/TFC Receivables are sold in connection with an equity purchase, the Plan will be modified or amended to provide for the proposed payment to TFC outlined in the winning equity bid. If the Pledged Island One/TFC Receivables are not sold for cash or in connection with an equity purchase, the Debtors will transfer the Pledged IslandOne/TFC Receivables back to TFC or its assignee as the indubitable equivalent of its Allowed Class 1 Claim. TFC has informed the Debtors that it is TFC's view that the proposed terms of the subject collateral does not constitute the indubitable equivalent of its Allowed Class I Claim.

b.     Class 2 — TFC/Liberty (Island One Receivables Loan Obligations).

Class 2 consists of the Allowed Secured Claim of TFC and Liberty ("TFC/Liberty") in connection with that certain Loan Agreement and Promissory Note by and between TFC/Liberty and Island One dated October 30, 2009 (the "TFC/Liberty Receivables Loan").  The Allowed Secured Claim is estimated in the amount of $7,943,945.89 and is secured by a first priority lien on all notes receivable generated by Island One from October 31, 2009 to the present ("Pledged TFC/Liberty Receivables") together with such other or additional collateral as is provided for under the TFC/Liberty Receivables Loan, including, but  not limited to, by way of any applicable cross-collateralization provisions.  The Class 2 Secured Claim is impaired and is allowed to vote on the Plan.

In the event the Pledged TFC/Liberty Receivables are sold for cash as part of the Sale Process, TFC /Liberty shall be entitled to payment from the proceeds of such sale in accordance with the priorities set forth in the Code.  If the TFC/Liberty Receivables are sold in connection with an equity purchase, the Plan will be modified or amended to provide for the proposed payment to TFC/Liberty outlined in the winning equity bid.  If the Pledged TFC/Liberty Receivables are not sold for cash or in connection with an equity purchase, the Debtors will transfer the TFC/Liberty Pledged Receivables back to TFC/Liberty or their assignee as the indubitable equivalent of its Allowed Class 2 Claim.  TFC and Liberty have informed the Debtors that it is their view that the proposed transfer of the subject collateral does not constitute the indubitable equivalent of their  Allowed Class 2 Claim.

c.    <u>Class 3 — TFC (Cove Inventory Loan Obligations).</u>

Class 3 consists of the Allowed Secured Claim of TFC in connection with those certain Loan Agreements and Promissory Notes by and between TFC and Island One dated July 12, 2004 and December 26, 2006 (the "Cove Inventory Loan"). The Allowed Secured Claim is estimated in the amount of $3,704,550.00 and is secured by a first priority lien on Island One's timeshare intervals at The Cove on Ormond Beach and Cove II on Ormond Beach ("Cove Inventory") together with such other or additional collateral as is provided for under the Core Inventory Loan, including, but not limited to, by way of any applicable cross-collateralization provisions. The Class 3 Secured Claim is impaired and is allowed to vote on the Plan.

In the event the Cove Inventory is sold for cash as part of the Sale Process, TFC shall be entitled to payment from the proceeds of such sale in accordance with the priorities set forth in the Code. If the Cove Inventory is sold in connection with an equity purchase, the Plan will be modified or amended to provide for the proposed payment to TFC outlined in the winning equity bid. If the Cove Inventory is not sold for cash or in connection with an equity purchase, the Debtors will transfer the Cove Inventory back to TFC or its assignee as the indubitable equivalent of its Allowed Class 3 Claim. TFC has informed Debtors that it is its view that the proposed transfer of the subject collateral does not constitute indubitable equivalent of its Allowed Class 3 Claim.

d.    <u>Class 4 — BB&T (Consolidated Inventory Loan Obligations).</u>

Class 4 consists of the Allowed Secured Claim of BB&T in connection with that certain Loan Agreement and Promissory Note by and between BB&T and Island One dated December 30, 2008(the "BB&T Consolidated Inventory Loan"). The BB&T Consolidated Inventory Loan is secured by a first priority lien on unsold timeshare intervals at

Liki Tiki Village I and II, the Cove on Ormond Beach, and the Charter Club at Naples Bay owned by Island One and a first mortgage on the LTV Building 1400 (collectively, the "BB&T Consolidated Collateral").

In the event the BB&T Consolidated Collateral is sold for cash as part of the Sale Process, BB&T shall be entitled to payment from the proceeds of such sale in accordance with the priorities set forth in the Code. If the BB&T Consolidated Collateral is sold in connection with an equity purchase, the Plan will be modified or amended to provide for the proposed payment to BB&T outlined in the winning equity bid. If the BB&T Consolidated Collateral is not sold for cash or in connection with an equity purchase, the Debtors will transfer the BB&T Consolidated Collateral into a liquidating trust for the benefit of BB&T or its assignee in full satisfaction of its Allowed Class 4 Claim.

e.      Class 5 — BB&T (LTV III Land Loan Obligations).

Class 5 consists of the Allowed Secured Claim of BB&T in connection with that certain Promissory Note by and between BB&T and Island One dated May 25, 2005 and that certain Future Advance Promissory Note dated September 11, 2007(the "BB&T LTV III Land Loan"). The BB&T LTV III Land Loan is secured by a first mortgage on approximately 59.2 acres of unimproved property with development entitlements of three hundred units that was to serve as Phase III of Liki Tiki Village ("LTV III Real Property").

In the event the LTV III Real Property is sold for cash as part of the Sale Process, BB&T shall be entitled to payment from the proceeds of such sale in accordance with the priorities set forth in the Code. If the LTV III Real Property is sold in connection with an equity purchase, the Plan will be modified or amended to provide for the proposed payment to BB&T outlined in the winning equity bid. If the LTV III Real Property is not sold for cash or in connection with an equity purchase, the Debtors will transfer the LTV III

Real Property into a liquidating trust for the benefit of BB&T or its assignee in full satisfaction of its Allowed Class 5 Claim.

f. <u>Class 6 — BB&T (LTV III Out Parcel Obligations).</u>

Class 6 consists of the Allowed Secured Claim of BB&T in connection with that certain Promissory Note by and between BB&T and Island One dated September 11, 2007 and that certain Promissory Note dated May 25, 2007(the "BB&T LTV III Out Parcel Loan").  The BB&T LTV III Land Loan is secured by a first mortgage on the 4.72 acres consisting of the unimproved property that was to become the Liki Tiki Welcome Center ("Welcome Center").

In the event the Welcome Center is sold for cash as part of the Sale Process, BB&T shall be entitled to payment from the proceeds of such sale in accordance with the priorities set forth in the Code.  If the Welcome Center is sold in connection with an equity purchase, the Plan will be modified or amended to provide for the proposed payment to BB&T outlined in the winning equity bid.  If the Welcome Center is not sold for cash or in connection with an equity purchase, the Debtors will transfer the Welcome Center into a liquidating trust for the benefit of BB&T or its assignee in full satisfaction of its Allowed Class 6 Claim.

g. <u>Class 7 — BB&T (Sales Center Loan Obligations).</u>

Class 7 consists of the Allowed Secured Claim of BB&T in connection with that certain Loan Agreement and Promissory Note by and between BB&T and Island One dated September 11, 2007 in the original principal amount of $4,850,000(the "Sales Center Loan").  The Sales Center Loan is secured by a first mortgage on approximately 4.72 acres consisting of two tracts of land-one consist of unimproved property known as the Welcome Center and the other consists of land on which the Sales center is located("Sales Center").

In the event the Sales Center and the Welcome Center are sold for cash as part of the Sale Process, BB&T shall be entitled to payment from the proceeds of such sale in accordance with the priorities set forth in the Code. If the Sales Center and Welcome Center are sold in connection with an equity purchase, the Plan will be modified or amended to provide for the proposed payment to BB&T outlined in the winning equity bid. If the Sales Center and Welcome Center are not sold for cash or in connection with an equity purchase, the Debtors will transfer the Sales Center and Welcome Center into a liquidating trust for the benefit of BB&T or its assignee in full satisfaction of its Allowed Class 7 Claim.

        h.      <u>Class 8 — BB&T (Barefootn Loan Obligations).</u>

Class 8 consists of the Allowed Secured Claim of BB&T in connection with that certain Promissory Note by and between BB&T and Island One dated February 1, 2006 in the original principal amount of $2,600,000 and the Promissory Note by and between BB&T and Island One dated March 19, 2008(the "Barefoot'n Loan"). The Barefoot'n Loan is secured by a first and second mortgage/lien on approximately 7.32 acres of propertylocated in Osceola County, Florida and includes one completed building and one building site ("Barefoot'n Property").

In the event the Barefoot'n Property is sold for cash as part of the Sale Process, BB&T shall be entitled to payment from the proceeds of such sale in accordance with the priorities set forth in the Code. If the Barefoot'n Property is sold in connection with an equity purchase, the Plan will be modified or amended to provide for the proposed payment to BB&T outlined in the winning equity bid. If the Barefoot'n Property is not sold for cash or in connection with an equity purchase, the Debtors will transfer the Barefoot'n Property into a liquidating trust for the benefit of BB&T or its assignee in full satisfaction of its Allowed Class 8 Claim.

i. <u>Class 9 — BB&T (Equipment Loan Obligations).</u>

Class 9 consists of the Allowed Secured Claim of BB&T in connection with those five loans that are evidenced by: (i) Note #80254397230005; (ii) Note #80254397230006; (iii) Note #8025439723008; (iv) Note #80254397230009; and (v) Note #80254397230010 by and between BB&T and Island One (the "Equipment Loan"). The Equipment Loan is secured by a first lien on certain equipment of Island One ("Island One Equipment").

In the event the Island One Equipment is sold for cash as part of the Sale Process, BB&T shall be entitled to payment from the proceeds of such sale in accordance with the priorities set forth in the Code. If the Island One Equipment is sold in connection with an equity purchase, the Plan will be modified or amended to provide for the proposed payment to BB&T outlined in the winning equity bid. If the Island One Equipment is not sold for cash or in connection with an equity purchase, the Debtors will transfer the Island One Equipment into a liquidating trust for the benefit of BB&T or its assignee in full satisfaction of its Allowed Class 9 Claim.

j. <u>Class 10 — BB&T (2008 Dodge Ram  Loan Obligations).</u>

Class 10 consists of the Allowed Secured Claim of BB&T in connection with that certain Loan Agreement and Promissory Note by and between BB&T and Island One dated February 4, 2008 (the "2008 Dodge Ram Loan"). The 2008 Dodge Ram Loan is secured by a first priority lien on a 2008 Dodge Ram Pick-up Truck (VIN 3D6WG38AX86179735) ("2008 Dodge Truck").

In the event the 2008 Dodge Truck is sold for cash as part of the Sale Process, BB&T shall be entitled to payment from the proceeds of such sale in accordance with the priorities set forth in the Code. If the 2008 Dodge Truck is sold in connection with an

equity purchase, the Plan will be modified or amended to provide for the proposed payment to BB&T outlined in the winning equity bid. If the 2008 Dodge Truck is not sold for cash or in connection with an equity purchase, the Debtors will transfer the 2008 Dodge Truck into a liquidating trust for the benefit of BB&T or its assignee in full satisfaction of its Allowed Class 10 Claim.

k.      Class 11 — H.J.C. Floridian (Ormond Beach Loan Obligations).

Class 11 consists of the Allowed Secured Claim of H.J.C. in connection with that certain Loan Agreement and Promissory Note by and between H.J.C. and Island One dated March 30, 1999 (the "Ormond Beach Loan"). The Ormond Beach Loan is secured by a second mortgage on all real property located at 149 South Atlantic Avenue, Ormond Beach, FL ("Ormond Beach Real Property").

Because the Class 11 Claim of H.J.C. is completely undersecured, upon the Effective Date, the second mortgage of H.J.C. will be extinguished and the Class 11 Claim will be treated as a Class 13 general unsecured claim for distribution purposes.

l.      Class 15 — TFC (IOI Funding I, LLC Loan Obligations).

Class 15 consists of the Allowed Secured Claim of TFC in connection with that certain Loan Agreement and Promissory Note by and between TFC and IOI Funding, dated September 27, 2002 ("IOI Funding Receivables Loan") together with such other or additional collateral as is provided for under the IOI Funding Receivables Loan, including, but not limited to, by way of any applicable cross-collateralization provisions. The Allowed Class 15 Secured Claim is estimated in the amount of $3,632,580.25 and is secured by a first priority lien on all notes receivable of IOI Funding ("IOI Funding Receivables"). The Class 15 Secured Claim is impaired and is entitled to vote on the Plan.

In the event the IOI Funding Receivables are sold for cash as part of the Sale Process, TFC shall be entitled to payment from the proceeds of such sale in accordance with the priorities set forth in the Code. If the IOI Funding Receivables are sold in connection with an equity purchase, the Plan will be modified or amended to provide for the proposed payment to TFC outlined in the winning equity bid. If the IOI Funding Receivables are not sold for cash or in connection with an equity purchase, the Debtors will transfer the IOI Funding Receivables to TFC or its assignee as the indubitable equivalent of its Allowed Class 15 Claim. TFC has informed the Debtors that it is its view that the proposed transfer of the subject collateral does not constitute the indubitable equivalent of its Allowed Class 15 Claim.

m.     Class 18 — TFC (Crescent Inventory Loan Obligations).

Class 18 consists of the Allowed Secured Claim of TFC in connection with that certain Loan Agreement and Promissory Note by and between TFC and Crescent dated March 31, 2004 (the "Crescent Inventory Loan"). The Allowed Secured Class 18 Claim is estimated in the amount of $4,901,264.12 and is secured by a first priority lien on all Crescent owned timeshare intervals ("Crescent Inventory"). The Class 18 Secured Claim is impaired and is entitled to vote on the Plan.

In the event the Crescent Inventory is sold for cash as part of the Sale Process, TFC shall be entitled to payment from the proceeds of such sale in accordance with the priorities set forth in the Code. If the Crescent Inventory is sold in connection with an equity purchase, the Plan will be modified or amended to provide for the proposed payment to TFC outlined in the winning equity bid. If the Crescent Inventory is not sold for cash or in connection with an equity purchase, the Debtors will transfer the Crescent Inventory to TFC or its assignee as the indubitable equivalent of its Allowed Class 18 Claim. TFC has informed the Debtors that

it is its view that the proposed transfer of the subject collateral does not constitute the indubitable equivalent of its Allowed Class 18 Claim.

       n.    <u>Class 19 — TFC (Crescent Receivables Loan Obligations).</u>

Class 19 consists of the Allowed Secured Claim of TFC in connection with that certain Loan Agreement and Promissory Note by and between TFC and Crescent dated December 28, 2004 (the "Crescent Receivables Loan"). The Allowed Secured Claim is estimated in the amount of $6,515,497.37 and is secured by a first priority lien on all notes receivable of Crescent ("Crescent Receivables"). The Class 19 Secured Claim is impaired and is entitled to vote on the Plan.

In the event the Crescent Receivables are sold for cash as part of the Sale Process, TFC shall be entitled to payment from the proceeds of such sale in accordance with the priorities set forth in the Code. If the Crescent Receivables are sold in connection with an equity purchase, the Plan will be modified or amended to provide for the proposed payment to TFC outlined in the winning equity bid. If the Crescent Receivables are not sold for cash or in connection with an equity purchase, the Debtors will transfer the Crescent Receivables to TFC or its assignee as the indubitable equivalent of its Allowed Class 19 Claim. TFC has informed the Debtors that it is its view that the proposed transfer of the subject collateral does not constitute the indubitable equivalent of its Allowed Class 19 Claim.

       o.    <u>Class 22 — TFC (Island One Management Loan Obligations).</u>

Class 22 consists of the Allowed Secured Claim of TFC in connection with that certain Loan Agreement and Promissory Note by and between TFC and Island One Management (Island One Management") dated December 20, 2007 (the "Management Loan"). The Class 22 Allowed Secured Claim is estimated in the amount of $8,732,518.34 and is secured by a first priority lien on Island One Management's management

contracts and Club Navigo agreements ("Island One Management Collateral") together with such other or additional collateral as is provided for under the Management Loan, including, but not limited to, by way of any applicable cross-collateralization provisions. The Class 22 Secured Claim is impaired and is entitled to vote on the Plan.

        In the event the Island One Management Collateral is sold for cash as part of the Sale Process, TFC shall be entitled to payment from the proceeds of such sale in accordance with the priorities set forth in the Code. If the Island One Management Collateral is sold in connection with an equity purchase, this Plan will be modified or amended to provide for the proposed payment to TFC outlined in the winning equity bid. If the Island One Management Collateral is not sold for cash or in connection with an equity purchase, the Debtors will transfer the Island One Management Collateral to TFC or its assignee as the indubitable equivalent of its Allowed Class 22 Claim. TFC has informed the Debtors that it is its view that the proposed transfer of the subject collateral does not constitute the indubitable equivalent of its Allowed Class 22 Claim.

        p.      <u>Class 23 — Old Florida (Warehouse Loan Obligations).</u>

        Class 23 consists of the Allowed Secured Claim of Old Florida in connection with that certain Loan Agreement and Promissory Note by and between Old Florida and Island One Management dated October 21, 2008 (the "Old Florida Loan"). The Old Florida Loan is secured by a first mortgage on a 15,967 s.f. warehouse located at 17777 Boli Blvd., Orlando, FL 32787 ("Old Florida Real Property").

        In the event the Old Florida Real Property is sold for cash as part of the Sale Process, Old Florida shall be entitled to payment from the proceeds of such sale in accordance with the priorities set forth in the Code. If the Old Florida Real Property is sold in connection with an equity purchase, this Plan will be modified or amended to provide for the

proposed payment to Old Florida outlined in the winning equity bid. If the Old Florida Real Property is not sold for cash or in connection with an equity purchase, the Debtors will transfer the Old Florida Real Property to Old Florida or its assignee as the indubitable equivalent of its Allowed Class 23 Claim.

q.  Class 26 — BB&T (St. Croix Acquisition Loan Obligations).

Class 26 consists of the Allowed Secured Claim of BB&T in connection with that certain Loan Agreement and Promissory Note by and between BB&T and St. Croix One dated July 27, 2006 (the "Acquisition Loan"). The Acquisition Loan is secured by a first mortgage on all of St. Croix One's real property (the "St. Croix Real Property") and a first priority lien on all other assets of St. Croix One ("St. Croix Personal Property").

In the event the St. Croix Real Property and St. Croix Personal Property are sold for cash as part of the Sale Process, BB&T shall be entitled to payment from the proceeds of such sale in accordance with the priorities set forth in the Code. If the St. Croix Real Property and St. Croix Personal Property are sold in connection with an equity purchase, this Plan will be modified or amended to provide for the proposed payment to BB&T outlined in the winning equity bid. If the St. Croix Real Property and the St. Croix Personal Property are not sold for cash or in connection with an equity purchase, the Debtors will transfer the St. Croix Real Property and St. Croix Personal Property into a liquidating trust for the benefit of BB&T or its assignee in full satisfaction of its Allowed Class 26 Claim.

r.  Class 27 — BB&T (2007 Dodge Ram Loan Obligations).

Class 27 consists of the Allowed Secured Claim of BB&T in connection with that certain Loan Agreement and Promissory Note by and between BB&T and St. Croix One dated February 26, 2007 (the "2007 Dodge Ram Loan"). The 2007 Dodge Ram

Loan is secured by a first priority lien on a 2007 Dodge Ram Pick-up Truck (VIN 1D7HA16K97J548751) ("2007 Dodge Truck").

In the event the 2007 Dodge Truck is sold for cash as part of the Sale Process, BB&T shall be entitled to payment from the proceeds of such sale in accordance with the priorities set forth in the Code. If the 2007 Dodge Truck is sold in connection with an equity purchase, this Plan will be modified or amended to provide for the proposed payment to BB&T outlined in the winning equity bid. If the 2007 Dodge Truck is not sold for cash or in connection with an equity purchase, the Debtors will transfer the 2007 Dodge Truck into a liquidating trust for the benefit of BB&T or its assignee in full satisfaction of its Allowed Class 27 Claim.

s.     <u>Class 28 — BB&T (2008 Jeep Patriot Loan Obligations).</u>

Class 28 consists of the Allowed Secured Claim of BB&T in connection with that certain Loan Agreement and Promissory Note by and between BB&T and Island One dated November 28, 2007 (the "2008 Jeep Patriot Loan"). The 2008 Jeep Patriot Loan is secured by a first priority lien on a 2008 Jeep Patriot SUV (VIN 1J8FT28W28D593413) ("2008 Jeep Patriot").

In the event the 2008 Jeep Patriot is sold for cash as part of the Sale Process, BB&T shall be entitled to payment from the proceeds of such sale in accordance with the priorities set forth in the Code. If the 2008 Jeep Patriot is sold in connection with an equity purchase, this Plan will be modified or amended to provide for the proposed payment to BB&T outlined in the winning equity bid. If the 2008 Jeep Patriot is not sold for cash or in connection with an equity purchase, the Debtors will transfer the 2008 Jeep Patriot into a liquidating trust for the benefit of BB&T or its assignee in full satisfaction of its Allowed Class 28 Claim.

t.    <u>Class 29 — Virgin Islands Design (Acquisition Loan Obligations).</u>

Class 29 consists of the Allowed Secured Claim of Virgin Islands Design Build Group, LLC ("Virgin Islands Design") in connection with that certain Loan Agreement and Promissory Note by and between Virgin Islands Design and St. Croix One dated January 31, 2007 (the "Virgin Islands Design Green Cay Loan"). The Virgin Islands Design Green Cay Loan is secured by a junior mortgage on Plat 57, of Estate Green Coy, East End, Quarter "A", St. Croix, USVI, commonly known as Plot 57 Green Cay ("Green Cay Real Property").

Because the Class 29 Claim of Virgin Islands Design is completely undersecured, upon the Effective Date, the junior mortgage of Virgin Islands Design will be extinguished and the Class 29 Claim will be treated as a Class 31 general unsecured claim for distribution purposes.

u.    <u>Class 30 — Maple Leaf, LLC (Acquisition Loan Obligations).</u>

Class 30 consists of the Allowed Secured Claim of Maple Leaf, LLC ("Maple Leaf") in connection with that certain Loan Agreement and Promissory Note by and between Maple Leaf and St. Croix One dated January 31, 2007 (the "Maple Leaf Green Cay Loan"). The Maple Leaf Green Cay Loan is secured by a junior mortgage on the Green Cay Real Property.

Because the Class 30 Claim of Maple Leaf is completely undersecured, upon the Effective Date, the junior mortgage of Maple Leaf will be extinguished and the Class 30 Claim will be treated as a Class 31 general unsecured claim for distribution purposes.

3. <u>Unsecured Claims.</u>

    a.     <u>Class 12 – Island One Noteholders</u>

Class 12 consists of the Allowed Unsecured Claims against Island One on account of outstanding unsecured notes. In the event all of the assets of Island One are sold for cash as part of the Sale Process, Holders of the Allowed Class 12 Claims shall be entitled to payment from the proceeds of such sale in accordance with the priorities set forth in the Code on account of each such Holder's Allowed Class 12 Claim. If the assets of Island One are sold in connection with an equity purchase, the Plan will be modified or amended to provide for the proposed payment to the Holders of the Allowed Class 12 Claims. If the assets of Island One are not sold for cash or in connection with an equity purchase, Island One will transfer its assets back to its secured creditors or into a liquidating trust for the benefit of its secured creditors and Holders of Allowed Class 12 Claims will receive no distribution.

    b.     <u>Class 13 – Island One General Unsecured Claims (Trade Claims)</u>

Class 13 consists of the Allowed Unsecured Trade Claims against Island One. In the event all of the assets of Island One are sold for cash as part of the Sale Process, Holders of the Allowed Class 13 Claims shall be entitled to payment from the proceeds of such sale in accordance with the priorities set forth in the Code. If the assets of Island One are sold in connection with an equity purchase, the Plan will be modified or amended to provide for the proposed payment to the Holders of the Allowed Class 13 Claims. If the assets of Island One are not sold for cash or in connection with an equity purchase, Island One will transfer its assets back to its secured creditors or into a liquidating trust for the benefit of its secured creditors and Holders of Allowed Class 13 Claims will receive no distribution.

c.      Class 16 – IOI Funding General Unsecured Claims (Trade Claims)

Class 16 consists of the Allowed Unsecured Trade Claims against IOI Funding.  In the event all of the assets of IOI Funding are sold for cash as part of the Sale Process, Holders of the Allowed Class 16 Claims shall be entitled to payment from the proceeds of such sale in accordance with the priorities set forth in the Code.  If the assets of IOI Funding are sold in connection with an equity purchase, the Plan will be modified or amended to provide for the proposed payment to the Holders of the Allowed Class 16 Claims.  If the assets of IOI Funding are not sold for cash or in connection with an equity purchase, IOI Funding will transfer its assets back to its secured creditors and Holders of Allowed Class 12 Claims will receive no distribution.

d.      Class 20 – Cresent General Unsecured Claims (Trade Claims)

Class 20 consists of the Allowed Unsecured Trade Claims against Crescent.  In the event all of the assets of Crescent are sold for cash as part of the Sale Process, Holders of the Allowed Class 20 Claims shall be entitled to payment from the proceeds of such sale in accordance with the priorities set forth in the Code.  If the assets of Crescent are sold in connection with an equity purchase, the Plan will be modified or amended to provide for the proposed payment to the Holders of the Allowed Class 20 Claims.  If the assets of Crescent are not sold for cash or in connection with an equity purchase, Crescent will transfer its assets back to its secured creditors and Holders of Allowed Class 20 Claims will receive no distribution.

e.      Class 24 – Island One Management General Unsecured Claims (Trade Claims)

Class 24 consists of the Allowed Unsecured Trade Claims against Island One Management.  In the event all of the assets of Island One Management are sold for cash as part of the Sale Process, Holders of the Allowed Class 24 Claims shall be entitled to

payment from the proceeds of such sale in accordance with the priorities set forth in the Code. If the assets of Island One Management are sold in connection with an equity purchase, the Plan will be modified or amended to provide for the proposed payment to the Holders of the Allowed Class 24 Claims. If the assets of Island One Management are not sold for cash or in connection with an equity purchase, Island One Management will transfer its assets back to its secured creditors and Holders of Allowed Class 24 Claims will receive no distribution.

        f.        <u>Class 31 – St. Croix One General Unsecured Claims (Trade Claims)</u>

        Class 31 consists of the Allowed Unsecured Trade Claims against St. Croix One. In the event all of the assets of St. Croix One are sold for cash as part of the Sale Process, Holders of the Allowed Class 31 Claims shall be entitled to payment from the proceeds of such sale in accordance with the priorities set forth in the Code. If the assets of St. Croix One are sold in connection with an equity purchase, the Plan will be modified or amended to provide for the proposed payment to the Holders of the Allowed Class 31 Claims. If the assets of St. Croix One are not sold for cash or in connection with an equity purchase, St. Croix One will transfer its assets back to its secured creditors or into a liquidating trust for the benefit of its secured creditors and Holders of Allowed Class 31 Claims will receive no distribution.

        4.        <u>Equity Interests.</u>

        a.        <u>Class 14 – Island One Equity Interests</u>

        Class 14 consists of the Allowed Class 14 Interests of Island One. The Class 14 Interests will be cancelled on the Effective Date of the Plan.

        b.        <u>Class 17 – IOI Funding Equity Interests</u>

        Class 17 consists of the Allowed Class 17 Interests of IOI Funding. The Class 17 Interests will be cancelled on the Effective Date of the Plan.

c.  Class 21 – Crescent Equity Interests

Class 21 consists of the Allowed Class 21 Interests of Crescent. The Class 21 Interests will be cancelled on the Effective Date of the Plan.

d.  Class 25 – Island One Management Equity Interests

Class 25 consists of the Allowed Class 25 Interests of Island One Management. The Class 25 Interests will be cancelled on the Effective Date of the Plan.

e.  Class 32 – St. Croix One Equity Interests

Class 32 consists of the Allowed Class 32 Interests of St. Croix One. The Class 32 Interests will be cancelled on the Effective Date of the Plan.

C.  Means of Implementation.

1.  Sale Process and General Bidding Procedures.

The Plan is premised upon the sale of the Debtors' assets through the Sale Process. The Debtors intend to seek approval to retain Western as post petition investment bankers in order to assist in the search for a purchaser of some or all of the assets or for an equity partner. The Debtors, the CSO, and Western have already commenced updating a data room to facilitate the sale and has begun the process of marketing its assets to those parties reasonably known by the Debtors to have a potential interest in purchasing the Debtors' assets and/or making an equity investment in one or more of the Debtors. While the Debtors anticipate obtaining Court approval of more detailed bidding procedures for the Sale Process, the Debtors anticipate the general procedures outlined herein to be included in any approved bidding procedures  In addition, the Debtors may seek approval of a "stalking horse" bidder at any time after the filing of this Disclosure Statement and the Plan, but prior to the commencement of the auction as described herein below. Moreover, the Debtors, Bay Harbour Management, TFC, and Liberty are continuing discussions which may lead to a motion seeking approval of Bay Harbour

Management as a "stalking horse" bidder for the equity interests in the Debtors. In such event, the Debtors may seek to further amend or modify this Disclosure Statement and the Plan.

a.  Confidentiality Agreement.

All bidders will be required to execute a confidentiality agreement in a form acceptable to the Debtors. Upon execution of acceptable confidentiality agreement, interested parties will be permitted access to the data room to commence due diligence.

b.  Letter of Interest.

On or before November 22, 2010, any party with an interest in making a bid on the Debtors' equity interest under the Plan or otherwise bidding on the Debtors' assets in whole or part shall deliver to Debtors and Debtors' counsel a letter of interest, indicating its interest in purchasing: (i) the equity interest of the Debtor; or (ii) specific assets of the Debtors ("Letter of Interest"). To the extent the bidder is only interested in specific assets of the Debtors, the Letter of Interest should identify such assets. The Letter of Interest should identify a minimum total bid amount ("Minimum Bid"). Finally, the Letter of Interest must include enough information to demonstrate such bidder's financial wherewithal and credit worthiness to consummate the transaction proposed in the Letter of Interest.

c.  Bid Deposit.

On or before November 22, 2010, any party with an interest in making a bid on the Debtors' equity interest under the Plan or otherwise bidding on the Debtors' assets in whole or in part must wire to Debtors' counsel a deposit equal to the lesser of: ten percent (10%) of the Minimum Bid; or $500,000.00 ("Bid Deposit"). Bid Deposits will be held in escrow by Debtors' counsel and shall be returned to all unsuccessful bidders within three days following the close if the auction, unless such unsuccessful bidder is a back up bidder.

  d. <u>Purchase Agreement.</u>

  On or before December 3, 2010, any bidder who has previously submitted a Letter of Interest and Bid Deposit as required herein shall deliver to Debtors and Debtors' counsel an executed purchase agreement (a form of which will be provided to any party that submits a timely Letter of Interest and Bid Deposit) for the purchase of the Debtors equity or assets identified in such bidder's Letter of Interest ("Purchase Agreement").

  e. <u>Qualified Bidder Minimum Requirements.</u>

  Only bidders that that have timely delivered a Letter of Interest, a Bid Deposit, and a Purchase Agreement will be deemed a qualified bidder eligible to participate in the auction ("Qualified Bidder"). Any party who fails to provide upon request adequate information to demonstrate such bidder's wherewithal to consummate the transaction contemplated in the Purchase Agreement may be disqualified and no longer considered a Qualified Bidder.

  f. <u>Auction Procedures Meeting.</u>

  If there is at least one Qualified Bidder, counsel for the Debtors, counsel for the Lenders, and counsel to the Official Committee of Unsecured Creditors will meet on or before December 8, 2010 to determine whether and on what terms an auction should be held. To the extent an auction is necessary, it will be held on December 10, 2010 or such other date as selected by the Court.

  g. <u>Combination Bids.</u>

  The Debtors may consider a combination of multiple Qualified Bids.

h.    Determination of Successful Bidder(s).

The Qualified Bidder(s) that is determined by the Court to have made the highest and best offer for the Debtors' assets shall be deemed the Successful Bidder(s).  In the event the Court determines that the highest and best value for the Debtors is a sale of multiple components of assets, there may be multiple Successful Bidders.

i.    Modification of the Plan After Selection of Successful Bidder(s).

The Plan may be modified as needed to reflect the results of the auction. In the event the Successful Bidder's bid is for the Debtors' equity interests, the Plan will provide for the Successful Bidder to become the owner of the new equity in the Reorganized Debtors.  In the event the Successful Bidder(s) bid is for component assets of the Debtors, the Plan will provide for the distribution of the proceeds of the sale to creditors of the Debtors in accordance with the priorities set forth in the Code.

2.    Funds Generated During Chapter 11.

Funds generated from operations until the Effective Date will be distributed in accordance with the priorities set forth in the Code.

3.    Management and Control of the Reorganized Debtors.

It is unknown at this time whether any of the Debtors will exist after the Effective Date.  In the event the Court determines that the highest and best offer for some or all of the Debtors' assets is an equity offer, the Debtors will amend or modify this Plan to reflect the management of the Reorganized Debtor(s).

D.    Other Provisions.

To the extent the Debtors assume any executory contract or unexpired lease prior to the Confirmation Date, any party asserting a Claim, pursuant to Section 365 of the Code,

arising from the rejection of an executory contract or lease shall file a proof of such Claim within thirty (30) days after the entry of an Order rejecting such contract or lease, and any Allowed Claim resulting from rejection shall be a Class 13, Class 16, Class 20, Class 24, or Class 31 Claim depending on the rejecting Debtor. The Debtors shall have through and including the hearing on Confirmation within which to assume or reject any unexpired lease or executory contract; and, further, that in the event any such unexpired lease or executory contract is not assumed (or subject to a pending motion to assume) by such date, then such unexpired lease or executory contract shall be deemed rejected as of the Confirmation Date. The Plan also provides for the Bankruptcy Court to retain jurisdiction as to certain matters as stated in the Plan, including, without limitation, prosecution of all causes of action and objection to Claims.

## IV. <u>CONFIRMATION</u>

### A. <u>Confirmation Hearing.</u>

Section 1128 of the Code requires the Court, after notice, hold a Confirmation Hearing on the Plan at which time any party in interest may be heard in support of or in opposition to Confirmation. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement to be made at the Confirmation Hearing. Any objection to Confirmation must be made in writing and filed with the Clerk, and delivered to the following persons, at least seven (7) days prior to Confirmation Hearing:

Counsel for Debtors:

Jimmy D. Parrish, Esquire
Baker & Hostetler LLP
200 S. Orange Ave.
SunTrust Center, Suite 2300
Orlando, FL  32801-3432

Island One, Inc., et al.:

Deborah Linden
8680 Commodity Circle
Orlando, FL  32819


United States Trustee:

Attn: Miriam Suarez, Esquire
135 W. Central Blvd., Suite 620
Orlando, FL  32801

B.       Financial Information Relevant to Confirmation.

Because the Plan contemplates a liquidation of the Debtors a pro forma and

liquidation analysis is not necessary at this time.  In the event the Court determines that the

highest and best offer for some or all of the Debtors' assets is an equity offer, the Debtors will

amend or modify the Plan to provide financial documents relevant to confirmation.

C.       Confirmation Standards.

For a plan of reorganization to be confirmed the Code requires, among other

things, that a plan be proposed in good faith and comply with the applicable provisions of

Chapter 11 of the Code.  Section 1129 of the Code also imposes requirements that at least one

class of Impaired Claims accept a plan, that confirmation of a plan is not likely to be followed by

the need for further financial reorganization, that a plan be in the best interests of creditors, and

that a plan be fair and equitable with respect to each class of Claims or Interests which is

Impaired under the plan.

The Bankruptcy Court shall confirm a plan only if it finds that all of the

requirements enumerated in Section 1129 of the Code have been met. The Debtor believes that

the Plan satisfies all of the requirements for Confirmation.

1. <u>Best Interests Test.</u>

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each holder of an Allowed Claim or Interest of such Class either: (a) has accepted the Plan; or (b) will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were, on the Effective Date, liquidated under Chapter 7 of the Code. Because the Plan contemplates a sale of the Debtors' assets and a subsequent distribution, the Debtors believe this best interest test and the liquidation test will be met. In the event the Court determines that the highest and best offer for some or all of the Debtors' assets is an equity offer, such offer would have to satisfy the best interest test.

2. <u>Financial Feasibility.</u>

The Code requires, as a condition to Confirmation, that Confirmation of a plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless the liquidation is proposed in the Plan. Because the Plan proposes a liquidation of the Debtors' assets, the Debtors assert that feasibility of the Plan is not relevant. In the event the Court determines that the highest and best offer for some or all of the Debtors' assets is an equity offer, such offer would have to satisfy the feasibility requirement under the Code.

3. <u>Acceptance by Impaired Classes.</u>

The Code requires as a condition to Confirmation that each Class of Claims or Interests that is Impaired under the Plan accept such plan, with the exception described in the following section. A Class of Claims has accepted the Plan if the Plan has been accepted

by Creditors that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class who vote to accept or to reject the Plan.

A Class of Interests has accepted the Plan if the Plan has been accepted by holders of Interests that hold at least two-thirds (2/3) in amount of the Allowed Interests of such Class that vote to accept or reject the Plan. Holders of Claims or Interests who fail to vote are not counted as either accepting or rejecting the Plan.

A Class that is not Impaired under a Plan is deemed to have accepted such Plan; solicitation of acceptances with respect to such Class is not required. A Class is Impaired unless: (i) the legal, equitable, and contractual rights to which the Claim or Interest entitles the holder of such Claim or Interest are not modified; (ii) with respect to Secured Claims, the effect of any default is cured and the original terms of the obligation are reinstated; or (iii) the Plan provides that on the Effective Date the holder of the Claim or Interest receives on account of such claim or interest, Cash equal to the Allowed Amount of such Claim or, with respect to any Interest, any fixed liquidation preference to which the holder is entitled.

4.      Confirmation Without Acceptance by all Impaired Classes; "Cramdown."

The Code contains provisions that enable the Court to confirm the Plan, even though all Impaired Classes have not accepted the Plan, provided that the Plan has been accepted by at least one Impaired Class of Claims Section 1129(b)(1) of the Code states:

> "Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

This section makes clear that the Plan may be confirmed, notwithstanding the failure of an Impaired Class to accept the Plan, so long as the Plan does not discriminate unfairly and it is fair and equitable with respect to each Class of Claims that is Impaired under and has not accepted the Plan.

**THE DEBTORS BELIEVE THAT, IF NECESSARY, THEY WILL BE ABLE TO MEET THE STATUTORY STANDARDS SET FORTH IN THE CODE WITH RESPECT TO NONCONSENSUAL CONFIRMATION OF THE PLAN AND WILL SEEK SUCH RELIEF.**

D.      <u>Consummation.</u>

The Plan will be consummated and Payments made if the Plan is Confirmed pursuant to a Final Order of the Court and Plan Distributions commence. It will not be necessary for the Reorganized Debtors to await any required regulatory approvals from agencies or departments of the United States to consummate the Plan. The Plan will be implemented pursuant to its provisions and the Code.

E.      <u>Effects of Confirmation</u>.

1.      <u>Authority to Effectuate the Plan</u>

Upon the entry of the Confirmation Order by the Bankruptcy Court, the Plan provides all matters provided under the Plan will be deemed to be authorized and approved without further approval from the Bankruptcy Court. The Reorganized Debtors shall be authorized, without further application for an order of the Bankruptcy Court, to take whatever action is necessary to achieve consummation and carry out the Plan in accordance with this Plan and the Code.

2.      <u>Binding Effect of Confirmation</u>

Confirmation of the Plan will legally bind the Debtor, all Creditors, Interest Holders, and other Parties in Interest to the provisions of the Plan whether or not the

Claim or Interest Holder is impaired under the Plan and whether or not such Creditor or Interest Holder voted to accept the Plan.

        3.       <u>Discharge of Claims</u>

To the fullest extent permitted by applicable law, and except as otherwise provided in the Plan, the operative documents implementing the Plan, or the Confirmation Order: (a) on the Effective Date the Confirmation Order shall operate as a discharge under 11 U.S.C. §1140(d)(1) of the Bankruptcy Code, and as a release of any and all Claims, Debts, Liens, Security Interests, and encumbrances of and against the Reorganized Debtors and all Property that arose before Confirmation, including without limitation, any Claim of a kind specified in §§ 502(g), 502(h), or 502(i) of the Bankruptcy Code, and all principal and interest, whether accrued before, on, or after the Petition Date, regardless of whether (i) a Proof of Claim has been filed or deemed filed, (ii) such Claim has been Allowed pursuant to §502 of the Bankruptcy Code, or (iii) the Holder of such Claim has voted on the Plan or has voted to reject the Plan; and (b) from and after the Effective Date (i) all Holders of Claims shall be barred and enjoined from asserting against the Reorganized Debtors and its property any Claims, Debts, Liens, Security Interests, and encumbrances of and against all Property of the Estate, and (iii) the Debtor shall be fully and finally discharged of any liability or obligation on a Disallowed Claim or an Interest. Except as otherwise specifically provided herein, nothing in the Plan shall be deemed to waive, limit, or restrict in any manner the discharge granted upon Confirmation of the Plan pursuant to §1141 of the Bankruptcy Code.

In the event the result of the Sale Process is a cash purchase of the Debtors assets, this Section will not apply and the Debtors will not be entitled to a discharge. In the event the Court

determines that the highest and best offer for some or all of the Debtors' assets is an equity offer, this Section will apply and all Claims will be discharged as provided herein.

4.      Judicial Determination of Discharge

As of the Confirmation Date, except as provided in the Plan, all Persons shall be precluded from asserting against the Debtor any other or further Claims, debts, rights, causes of action, liabilities, or equity interests based on any act, omission, transaction, or other activity of any kind or nature that occurred before the Confirmation Date and the Confirmation Order shall be a judicial determination of discharge of all Claims against Debtor, pursuant to Sections 524 and 1141 of the Bankruptcy Code, and shall void any judgment obtained or entered against Debtor at any time to the extent the judgment relates to discharged Claims.

5.      Injunction

As part of the Confirmation Order, the Bankruptcy Court shall permanently enjoin and prohibit all Holders of Claims, Liens, Security Interests, Liens, encumbrances rights and Interest in, to or against the Debtor or any of its assets from asserting, prosecuting or collecting such Claims, Liens, Security Interests (other than Liens or Security Interests expressly continued pursuant to the terms of the Plan or the operative documents between the Debtor and the Holder of a Claim regarding the treatment of the Claim under the Plan), encumbrances, rights and Interests against the Reorganized Debtors provided, however, that such injunction shall not apply to any Claim asserted against the Debtor by a claimant based upon a default by the Debtor in performance of its obligations to the claimant under the Plan.  In the event the result of the Sale Process is a cash purchase of the Debtors assets, this Section will not apply and the Debtors will not be entitled to a discharge.  In the event the Court determines that the highest and best offer for some or all of the Debtors' assets is an equity offer, this

Section will apply and all Claims, Liens, Security Interests, encumbrances, rights and Interests against the Reorganized Debtors will be enjoined as provided herein.

6.     <u>Post-Confirmation Status Report</u>

Pursuant to the Plan, within 120 days of the entry of the Confirmation Order, the Reorganized Debtors will file status reports with the Bankruptcy Court explaining what progress has been made toward consummation of the confirmed Plan. The status report will be served on the United States Trustee and those parties who have requested special notice post-confirmation. The Bankruptcy Court may schedule subsequent status conferences in its discretion.

## V.    <u>ALTERNATIVE TO THE PLAN.</u>

If the Plan is not confirmed and consummated, the Debtors believe that the most likely alternative is a sale of the Debtors or a liquidation of the Debtors under Chapter 7 of the Code. The Debtors believe that a liquidation in a Chapter 7 is a much less attractive alternative to Creditors because of the increased administrative expenses associated with such a sale.

## VI.    <u>CONCLUSION.</u>

The Debtors recommend that holders of Claims vote to accept the Plan.

DATED this 5th day of October 2010, in Orlando, Florida.

/s/ Jimmy D. Parrish
_____
Jimmy D. Parrish, Esquire
Florida Bar No. 526401
BAKER & HOSTETLER, LLP
200 S. Orange Avenue
SunTrust Center, Suite 2300
Orlando, Florida 32801
Tel: (407)649-4000
Fax: (407)841-0168
Attorneys for the Debtors