# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

In re:                                        CASE NO. 6:10-bk-16177-KSJ

**ISLAND ONE, INC.**, *et al.*                CHAPTER 11

      Debtors.                         Jointly-administered with Cases No.
                                              6:10-bk-16179-KSJ; 6:10-bk-16180-KSJ;
                                              6-10-bk-16182-KSJ; 6-10-bk-16183-KSJ;
_____/            and 6:10-bk-16189-KSJ


**FIRST AMENDED JOINT DISCLOSURE STATEMENT, PURSUANT TO 11 U.S.C.
§1125, FOR ISLAND ONE, INC., CRESCENT ONE, LLC, ST. CROIX ONE, LLC,
ISLAND ONE RESORTS MANAGEMENT, CORPORATION, NAVIGO
VACATION CLUB, INC., AND IOI FUNDING I, LLC**


COUNSEL FOR DEBTORS

ELIZABETH A. GREEN, ESQ.
JIMMY D. PARRISH, ESQ.
BAKER & HOSTETLER LLP
200 S. ORANGE AVE.
SUNTRUST CENTER, SUITE 2300
ORLANDO, FLORIDA  32801-3432


MARCH 22, 2011

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| **In re:** | **CASE NO. 6:10-bk-16177-KSJ** |
| **ISLAND ONE, INC.,** *et al.* | **CHAPTER 11** |
| **Debtors** | **Jointly-administered with Cases No. 6:10-bk-16179-KSJ; 6:10-bk-16180-KSJ; 6-10-bk-16182-KSJ; 6-10-bk-16183-KSJ; and 6:10-bk-16189-KSJ** |
| _____/ | |

### FIRST AMENDED JOINT DISCLOSURE STATEMENT, PURSUANT TO 11 U.S.C. §1125, FOR ISLAND ONE, INC., CRESCENT ONE, LLC, ST. CROIX ONE, LLC, ISLAND ONE RESORTS MANAGEMENT, CORPORATION, NAVIGO VACATION CLUB, INC., AND IOI FUNDING I, LLC

## I.  INTRODUCTION AND SUMMARY

This Amended Disclosure Statement (the "Disclosure Statement") is filed pursuant to the requirements of Section 1125 of Title 11 of the United States Code (the "Code"). This Disclosure Statement is intended to provide adequate information to enable Holders of Claims in the above-captioned jointly administered bankruptcy cases (the "Bankruptcy Cases") to make informed judgments about the First Amended Joint Plan of Reorganization/Liquidation (the "Plan") submitted by Island One, Inc. ("Island One"), Crescent One, LLC ("Crescent"), St. Croix One, LLC ("St. Croix One"), Island One Resorts Management, Corporation ("Island One Management"), Navigo Vacation Club, Inc. ("Navigo"), and IOI Funding I, LLC ("IOI Funding")(collectively, the "Debtors"). The overall purpose of the Plan is to restructure the Debtors' liabilities in a manner designed to maximize recoveries to all stakeholders. The Debtors believe the Plan is reasonably calculated to lead to the best possible outcome for all creditors in the shortest amount of time and is preferable to all other alternatives.

THE PLAN PROVIDES FOR RELEASES OF, AND INJUNCTIVE RELIEF TO PROTECT, CERTAIN PERSONS OR ENTITIES WHO ARE EITHER (1) PROVIDING CONSIDERATION TO THE ESTATES AND REORGANIZED DEBTORS, (2) SUBSTANTIALLY COMPROMISING THEIR CLAIMS, OR (3) WILL BE CRITICAL LENDERS OR PARTICIPANTS OF REORGANIZED DEBTORS. THE PERSONS AND ENTITIES SO PROTECTED, AND THE SCOPE OF THE RELEASES AND INJUNCTION ARE DEFINED IN ARTICLE VIII OF THE PLAN AND ARTICLE V OF THE DISCLOSURE STATEMENT. IF THE PLAN IS CONFIRMED ALL PERSONS AND ENTITIES SPECIFIED IN THESE PROVISIONS OF THE PLAN WILL BE RELEASED FROM THE CLAIMS OF THE DEBTORS AND ANY CREDITOR AND PARTY IN INTEREST IN THESE CASES.

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE PLAN. THIS INTRODUCTION AND SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE REMAINING PORTIONS OF THIS DISCLOSURE STATEMENT AND THIS DISCLOSURE STATEMENT IN TURN IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN. THE PLAN IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT AND ANY HOLDER OF ANY CLAIM OR INTEREST SHOULD READ AND CONSIDER THE PLAN CAREFULLY IN LIGHT OF THIS DISCLOSURE STATEMENT IN MAKING AN INFORMED JUDGMENT ABOUT THE PLAN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS. ALL CAPITALIZED TERMS USED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE DEFINITIONS ASCRIBED TO THEM IN THE PLAN UNLESS OTHERWISE DEFINED HEREIN.

NO REPRESENTATION CONCERNING THE DEBTORS IS AUTHORIZED OTHER THAN AS SET FORTH HEREIN. ANY REPRESENTATIONS OR INDUCEMENTS MADE, WHICH ARE OTHER THAN AS CONTAINED HEREIN, SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION ABOUT THE PLAN.

103755566.10

**THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO AUDIT. FOR THAT REASON, AS WELL AS THE COMPLEXITY OF THE DEBTORS' BUSINESS AND FINANCIAL AFFAIRS, AND THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES, AND PROJECTIONS WITH COMPLETE ACCURACY, THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT INACCURACY, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT SUCH INFORMATION IS ACCURATE. THIS DISCLOSURE STATEMENT INCLUDES FORWARD LOOKING STATEMENTS BASED LARGELY ON THE DEBTORS' CURRENT EXPECTATIONS AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AND ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES, AND ASSUMPTIONS.**

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, CAUSES OF ACTION, AND OTHER ACTIONS, THE DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS**.

Island One, Crescent, St. Croix One, Island One Management, Navigo, and IOI Funding are debtors under Chapter 11 of the Code in a jointly administered bankruptcy case pending in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division (the "Bankruptcy Court").

As prescribed by the Code and the Rules, Claims asserted against, and Equity Interests in, the Debtors are placed into "Classes". The Plan designates (34) separate classes of Claims and Interests. The Plan contains eight (8) Classes of Unsecured Claims. The classification of Claims and the treatment of each Class are discussed in detail below.

103755566.10

To the extent the legal, contractual, or equitable rights with respect to any Claim or Interest asserted against the Debtors are altered, modified, or changed by treatment proposed under the Plan, such Claim or Interest is considered "Impaired" and the Holder of such Claim or Interest is entitled to vote in favor of or against the Plan. A Ballot for voting in favor of or against the Plan (the "Ballot") will be mailed to Impaired Creditors and Interest Holders along with the order approving this Disclosure Statement.

**THE VOTE OF EACH CREDITOR OR INTEREST HOLDER WITH AN IMPAIRED CLAIM OR INTEREST IS IMPORTANT. TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE ADDRESS AND BY THE DATE SET FORTH IN THE BALLOT.**

---

### VOTING DEADLINE

The last day to vote to accept or reject the Plan is <u>April 13, 2011</u>. All votes must be received by the Clerk of the United States Bankruptcy Court for the Middle District of Florida, 135 W. Central Boulevard, Suite 950, Orlando, FL 32801 by 5:00 p.m. (EST) on that day.

---

Upon receipt in a timely manner, the Ballots will be tabulated and the results of the voting will be presented to the Bankruptcy Court for its consideration. As described in greater detail in Section IV of this Disclosure Statement, the Code prescribes certain requirements for confirmation of a plan. The Bankruptcy Court will schedule a hearing (the "Confirmation Hearing") to consider whether the Debtors have complied with those requirements.

The Code permits a court to confirm a plan even if all Impaired Classes have not voted in favor of a plan. Confirmation of a plan over the objection of a Class is sometimes called "cramdown." As described in greater detail in Section IV of this Disclosure Statement, the Debtors have expressly reserved the right to seek "cramdown" in the event all Impaired Classes do not vote in favor of the Plan.

103755566.10

II.     **DESCRIPTION OF DEBTORS' BUSINESS**

    A.     <u>In General.</u>

        Island One has provided extraordinary timeshare vacation experiences through resort development and hospitality management since 1981 when it was founded by Deborah Linden and the Springer family.  Island One commenced construction of its first resort, Orbit One Vacation Villas ("Orbit Resort"), in 1982 during the infancy of the timeshare industry and today owns and manages eight resorts in Florida and one resort in St. Croix in the U.S. Virgin Islands.  The Debtors are a fully integrated vacation ownership company with extensive in-house capabilities including construction, development, marketing, sales, customer financing, owner services, finance, accounting, and resort management.  The Debtors' resorts have earned acclaim because of their friendly and relaxed vacation environments as well as their diverse on-site activities, facilities and hospitality.  Reinforcing the Debtors' stature as an innovator in the timeshare industry is the continued success of Club Navigo, the Debtors' vacation club which includes twenty-nine (29) resort destinations throughout the United States, the Caribbean, Latin America and Europe, and the Debtors' member rewards program, Club Navigo Rewards.

    B.     <u>Events Leading to Chapter 11 Filing.</u>

        The dramatic deterioration of economic conditions in the third quarter of 2008 caused by the turmoil in the financial markets and global recession seriously affected many companies in the timeshare and tourism industries, including Island One.  The financial crisis significantly affected the Debtors' income producing assets, access to sufficient working capital necessary to operate, and its ongoing business model.  Unprecedented job losses throughout the United States immediately impaired the performance of the timeshare mortgage portfolio, causing consumer defaults to spike.  Island One suffered a precipitous decrease in its interest

income and accompanying cash flows from its timeshare mortgage receivables portfolio. In addition, Island One was immediately confronted with a substantial borrowing base deficit to Textron Financial Corporation ("TFC") and Liberty Bank ("Liberty").

Facing increasing borrowing base deficits and no ability to cure, the Debtors commenced workout negotiations with TFC and Liberty. While the workout mitigated the immediate need for cash to cure current borrowing base deficits, it had three negative consequences that further restricted the Debtors' cash flow. First, TFC and Liberty required more stringent requirements for eligible collateral and limited the Debtors' ability to effectuate mortgage modifications between the Debtors and their consumer obligors without the lenders' prior consent. The Debtors also experienced a significant increase in defaults from its customers. Second, TFC and Liberty implemented a daily sweep of all cash receipts from the portfolio, which eliminated the Debtors' interest arbitrage and a primary source of the Debtors' working capital. Finally, the workout negotiations, which have been essentially continuous since 2008, added significant legal and restructuring costs to the Debtors. These three consequences exacerbated the Debtors' cash flow problems.

In connection with the Debtors' workout negotiations and as required by the express terms of the workout documents, the Debtors commenced a search for a potential equity partner in the latter part of 2009. To aid in their search for an equity partner, the Debtors, with the consent of the lenders, retained Western Reserve Partners LLC ("Western") as their investment bankers. Western contacted 162 parties, 37 of whom requested confidentiality agreements, and 19 of whom executed confidentiality agreements. Significant discussions took place with five potential equity partners and in January of 2010, the Debtors signed a letter of intent ("Bay Harbour Letter of Intent") with Bay Harbour Management ("Bay Harbour"). Since

the execution of the Bay Harbour Letter of Intent, the Debtors, Bay Harbour, TFC, Liberty, and BB&T have worked to reach a global resolution to the Debtors' cash flow needs and an overall restructuring of the Debtors' obligations to TFC, Liberty, and BB&T. Unfortunately, the negotiations took much longer than expected. During the process, a worsening economy, increased costs, new sales challenges, and a more limited ability to enter into modification agreements with existing customers, made it increasingly difficult for the Debtors to meet their obligations. After seven months of negotiations and executing dozens of short term forbearance agreements, the Debtors were unable to access sufficient funding under their credit facilities with TFC and Liberty to continue operations in the normal course. Debtors, after consulting with TFC and Liberty, determined that the best avenue to finalize an agreement with Bay Harbour or some other equity partner and preserve value for all stakeholders was to seek protection under Chapter 11 of the Code.

   C.  <u>Events Subsequent to Chapter 11 Filing.</u>

    Since the Petition Date, the Debtors have been continuing to operate their business as debtors-in-possession under Sections 1101(a) and 1108 of the Code. Pursuant to various provisions of the Code, Island One has sought and obtained several orders from the Bankruptcy Court intended to facilitate the ongoing operations of the Debtors. Those orders authorized the Debtors to, among other things,: (i) use cash collateral subject to secured liens and (ii) pay its employees. The Interim Order Granting Debtors' Emergency Motion for Use of Cash Collateral dated September 15, 2010 ("First Interim Cash Collateral Order")(Doc. No. 35) which related to the TFC and Liberty loans required that a "Chief Sale Officer" ("CSO") be appointed to facilitate a sale of assets or an equity bid. In conformity with the First Interim Cash Collateral Order, Robert Krawczyk of Mackinac Partners has served in the capacity of CSO, and in that

capacity has assisted with the Debtors' efforts to attract either a buyer or equity investor. In addition, the First Interim Cash Collateral Order required specific timeframes for the Debtors to solicit and accept offers to purchase some or all of the Debtors' assets as well as to file a plan and disclosure statement. As set forth below, the Debtors, TFC and Liberty agreed to extend these deadlines in order to assist the sales process and the Debtors' reorganization efforts.

On November 14, 2010 the Debtors filed a motion for an order establishing bid procedures in connection with the sale of the equity interests in some or all of the Debtors and/or the sale of some or all of the property and assets of the Debtors ("Bid Procedures Motion") (Doc. No. 170). The Bid Procedures Motion was granted on December 1, 2010 and an Order Granting Debtors' Motion to Approve Bid and Sales Procedures was entered on December 15, 2010 (Doc. No. 256) ("Bid Procedures Order"). Pursuant to the terms of the Bid Procedures Motion and Bid Procedures Order, the bid requirements provided that a letter of interest ("LOI") be provided to the Debtors on or before November 24, 2010, and that a bid deposit of $500,000.00 ("Bid Deposit") and a executed purchase agreement be delivered to the Debtors by December 23, 2010. Three parties, Timeshare Acquisitions, LLC ("TAC")[1], Vacations Innovations, LLC and NPA, LLC ("NPA") submitted Bid Deposits on or before December 23, 2010. Unfortunately, none of the bids were qualified bids under the Bid Procedures Order. As a result, the Debtors, their Lenders, and the Committee attempted to work with the bidders to qualify the bids. When it was determined that it was impossible to qualify any of the bids prior to the auction set on January 12, 2011, the Debtors, the Lenders and the Committee resolved that it was in the best interest of the estates to file a motion to Modify the Bid Procedures, Extend the Sale and Auction Date, Reschedule the Confirmation Hearing, Reset Certain Related Dates and Deadlines, and

---

[1] TAC is a newly formed entity managed by investment professionals formerly associated with Bay Harbour.

Extend Exclusivity (Doc. No. 285) ("Modification Motion"). The Debtors filed the Modification Motion on January 7, 2011 and an Order Granting the Modification Motion ("Modification Order") was entered on February 23, 2011 (Doc. No. 337). The Modification Order extended the date for LOI's to February 24, 2011, the bid deadline to March 4, 2011, the Evaluation of bids deadline to March 8, 2011, and the Auction to March 10, 2011. From the time of the filing of the Modification Motion, the Debtors, TFC and Liberty worked in a joint and cooperative effort to qualify the existing bids and sought other possible bidders, including fee for service providers. Prior to the LOI deadline, Vacation Innovations, LLC requested that its Bid Deposit be returned. The Debtors continued to work with NPA and TAC in order to qualify their bids submitted on December 23, 2010. NPA requested return of its bid deposit on March 7, 2011.

On March 9, 2011, TAC modified its prior bid and submitted an executed Plan Sponsor Agreement, dated March 9, 2011 ("Plan Sponsor Agreement") and accompanying Debt Restructuring Term Sheet ("Restructuring Term Sheet," and together with the Plan Sponsor Agreement, the "TAC Agreements"). The Debtors immediately disseminated the TAC modified bid (in the form of the TAC Agreements) to the Lenders and the Committee. The Debtors consulted with TFC, Liberty, BB&T and the Committee before formally qualifying TAC's modified bid for auction purposes. Following such consultation, the Debtors determined to qualify the modified TAC bid (in the form of the TAC Agreements) for participation in the auction. The Auction was held on March 10, 2011 among the Qualified Bidders, as set forth in the Modification Order.

Pursuant to the Bid Procedures Order, the only Qualified Bidders entitled to participate in the Auction were TFC, Liberty, BB&T and TAC. TFC, Liberty, BB&T, TAC, the Committee and the Debtors attended the Auction; no other potential bidder was in attendance at

9

the Auction. After the Debtors opened the auction with the TAC Agreements as the opening bid, each of TFC, Liberty and BB&T declined to exercise their rights under the Bid Procedures Order to credit bid and thus, the Debtors determined that TAC was the successful bidder at the Auction. The Debtors consulted with TFC, Liberty, BB&T and the Committee before formally accepting TAC's bid and determining TAC to be the successful bidder. TFC and Liberty concurred with the Debtors' determination that the TAC bid was in fact a qualified bid and in the best interest of the estates; BB&T and the Committee preserved certain objections to the qualification of the TAC modified bid. After consultation with the Lenders and the Committee, and recognizing that the Debtors had been through a prepetition sales process and two postpetition sales processes, and the TAC bid was the only qualified bid (other than the respective bids of the Lenders), and that the TAC bid was the highest and best bid, the Debtors accepted the TAC bid because the Debtors determined that it was in the best interest of the Debtors, their creditors, and all parties in interest. The Plan and this Disclosure Statement incorporate the TAC Agreements. A copy of the Plan Sponsor Agreement and Restructuring Term Sheet is attached to the filed copy of this Disclosure Statement as composite Exhibit "A" and is available to any party in interest upon request to Debtors' counsel.

## III.   THE PLAN

THE FOLLOWING SUMMARY IS INTENDED ONLY TO PROVIDE AN OVERVIEW OF THE DEBTORS' PLAN. ANY PARTY IN INTEREST CONSIDERING A VOTE ON THE PLAN SHOULD CAREFULLY READ THE PLAN IN ITS ENTIRETY BEFORE MAKING A DETERMINATION TO VOTE IN FAVOR OF OR AGAINST THE PLAN. THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN.

103755566.10

A. Overview.

In summary, the Plan contemplates implementation of the TAC Plan Sponsor Agreement and Restructuring Term Sheet, under which, upon the Effective Date, all of the capital stock and rights to purchase or otherwise acquire capital stock of Island One prior to the Effective Date shall be cancelled, and reorganized Island One shall issue, sell, transfer and deliver to TAC, 1,000,000 newly issued shares of the common stock of reorganized Island One (the "Reorganized Securities"), free and clear of all Liens or other interests other than those created by TAC. Upon consummation of the Plan pursuant to and in accordance with the Confirmation Order, the Reorganized Securities will be fully paid and nonassessable and shall constitute all of the issued and outstanding capital stock of the reorganized Island One. TAC shall pay not less than $13,000,000.00 for all equity in the Reorganized Debtors. In the event that Island One exercises its option in Section 6.12 of the Plan Sponsor Agreement, TAC (or its designee) shall purchase, acquire and accept from a reorganized Crescent One, and a reorganized Crescent One shall issue, sell, transfer and deliver to TAC (or its designee), one hundred percent (100%) of the membership interests of a reorganized Crescent One, free and clear of all Liens or other interests other than those created by TAC. As more specifically set forth in the Restructuring Term Sheet and Plan Sponsor Agreement, the TFC and Liberty debt will be recapitalized, and certain obligations of the Debtors to TFC and/or Liberty shall be restructured. The Plan contemplates that certain collateral will be transferred to a trust for the benefit of BB&T. The Reorganized Debtors will receive a forward financing line from TFC and Liberty in order to provide additional funding for the operation of the Reorganized Debtors and support their timeshare sales efforts. The TAC Agreements also contemplate that the Reorganized Debtors will enter into a series of agreements with Diamond Resorts International ("Diamond")

11

on the Effective Date. Diamond will support the Reorganized Debtors' timeshare sales and marketing efforts, resort management and consumer account services functions. The Debtors' obligations to BB&T, Old Florida, and to all other Estate creditors shall be treated as provided in the Plan.

      B.      <u>Classification and Treatment of Claims.</u>

          1.      <u>Priority Claims.</u>

              a.      <u>Administrative Expense Claims.</u>

Holders of all Allowed Administrative Expense Claims against the Debtors shall be paid in full on the Effective Date from the Cash Consideration.

              b.      <u>Priority Tax Claims.</u>

Holders of Allowed Priority Claims against the Debtors shall be paid in full on the Effective Date from the Cash Consideration. The Debtors do not believe that there are any Priority Tax Claims that will be Allowed Claims.

          2.      <u>Secured Claims.</u>

              a.      <u>Class 1 — TFC (Island One Receivables Loan Obligations).</u>

Class 1 consists of the Allowed Secured Claim of TFC in connection with that certain Loan Agreement and Promissory Note by and between TFC and Island One dated March 14, 2001 (the "Island One/TFC Receivables Loan"). The Allowed Secured Claim is estimated as of the Petition Date in the amount of $67,469,397.29 (plus interest accruing both prior to and after the Petition Date and all fees, costs, expenses, and costs of collection (including without limitation, reasonable attorneys' fees) heretofore or hereafter incurred by TFC in connection therewith) and is secured by: (a) a first priority Lien on all notes receivable generated by Island One from March 14, 2001 until October 30, 2009 ("Island

One/TFC Receivables"); (b) such other or additional collateral as is provided for under the Island One/TFC Receivables Loan, including, but not limited to, by way of any applicable cross-collateralization provisions; and (c) such other or additional collateral as provided in the Second Supplemental Final Order Extending Debtors' Use of Cash Collateral dated February 22, 2011 (Doc. No. 333) ("Cash Collateral Order"). The Class I Secured Claim is impaired and entitled to vote on the Plan.

Subject in all respects to the TAC Agreements, on the Effective Date the Reorganized Debtors shall indefeasibly transfer, assign and convey to the TFC Designee all of their rights, title and interests in and to: (a) all of the Island One/TFC Receivables; provided that, the foregoing notwithstanding, any Island One/TFC Receivables that are greater than 120 days and less than 365 days past due shall be excluded from the aforementioned transfer to the TFC Designee and instead shall be retained by the Reorganized Debtors, free and clear of any Lien or security interest of TFC; and (b) 75% of the face value of any note receivable collateral generated by the Debtors during the Bankruptcy Cases (determined as of the Effective Date and on an equitable basis). In consideration of the transfer of the Island One/TFC Receivables to the TFC Designee, TFC shall forgive all amounts owed by the Debtors or any of their Affiliates and all other obligations of the Debtors and their Affiliates with respect to the Island One/TFC Receivables Loan, and shall release any and all claims that TFC may have as against the Debtors and any of their Affiliates with respect to the Island One/TFC Receivables Loan, except to the extent of the Majority Lenders' retention of any Replacement Lien and/or Superpriority Administrative Claim granted to TFC and Liberty under the Cash Collateral Order that are necessary to consummate the TAC Agreements (subject to the agreement by the

Majority Lenders to waive and release such Liens and Claims in favor of the Unsecured Creditor Trust upon the satisfaction of the preconditions to such waiver as provided in the Plan).

In consideration of the foregoing, on the Effective Date each of the Debtors and their respective Affiliates and Representatives shall release all Claims it/they may have against TFC, TFC's Representatives, Liberty and Liberty's Representatives relating to, among other things: (A) the Island One/TFC Receivables Loan; (B) the TAC Agreements; or (C) any matter with respect to the Bankruptcy Cases.

b. <u>Class 2 — TFC/Liberty (Island One Receivables Loan Obligations).</u>

Class 2 consists of the Allowed Secured Claim of TFC and Liberty ("TFC/Liberty") in connection with that certain Loan Agreement and Promissory Note by and between TFC/Liberty and Island One dated October 30, 2009 (the "TFC/Liberty Receivables Loan"). The Allowed Secured Claim is estimated as of the Petition Date in the amount of $7,954,072.46 (plus interest accruing both prior to and after the Petition Date and all indemnification obligations, fees, costs, expenses, and costs of collection (including, without limitation, reasonable attorneys' fees and disbursements) heretofore or hereafter in connection therewith), and is secured by: (a) a first priority Lien on all notes receivable generated by Island One from October 31, 2009 to the present ("TFC/Liberty Receivables"); (b) such other or additional collateral as is provided for under the TFC/Liberty Receivables Loan, including, but not limited to, by way of any applicable cross-collateralization provisions; and (c) such other or additional collateral as provided for in the Cash Collateral Order. The Class 2 Secured Claim is impaired and is entitled to vote on the Plan.

Subject in all respects to the TAC Agreements, on the Effective Date the Debtors' obligations under the TFC/Liberty Receivables Loan shall be assumed by the

14

Reorganized Debtors at an interest rate of the Prime Rate plus two percent (2%) with a floor of seven percent (7%) per annum, subject to the segregation of the TFC/Liberty Receivables Loan into two separate tranches: the "Interim Line Tranche"; and the "New Financing Tranche" (each as defined in the TAC Agreements, and are collectively defined as the "Forward Financing Lines"). The Interim Line Tranche and the New Financing Tranche shall be cross-collateralized, and shall contain such other and further terms and provisions as are set forth in the TAC Agreements. TFC/Liberty shall retain any Replacement Lien and/or Superpriority Administrative Claim granted to TFC/Liberty under the Cash Collateral Order that is/are necessary to consummate the TAC Agreements (subject to the agreement by TFC/Liberty to waive and release such Liens and Claims in favor of the Unsecured Creditor Trust upon the satisfaction of the preconditions to such waiver as provided in the Plan).

In consideration of the foregoing, on the Effective Date each of the Debtors and their respective Affiliates and Representatives shall release all Claims it/they may have against TFC, TFC's Representatives, Liberty and Liberty's representatives relating to, among other things: (A) the TFC/Liberty Receivables Loan; (B) the TAC Agreements; or (C) any matter with respect to the Bankruptcy Cases.

c.      Class 3 — TFC  (Cove Inventory Loan Obligations).

Class 3 consists of the Allowed Secured Claim of TFC in connection with those certain Loan Agreements and Promissory Notes by and between TFC and Island One dated July 12, 2004 and December 26, 2006 (the "Cove Inventory Loan"). The Allowed Secured Claim is estimated as of the Petition Date in the amount of $3,704,550.00 (plus interest accruing both prior to and after the Petition Date and all fees, costs, expenses, and costs of collection (including, without limitation, reasonable attorneys' fees) heretofore or hereafter

15

incurred by TFC in connection therewith), and is secured by: (a) a first priority Lien on Island One's timeshare intervals at The Cove on Ormond Beach and Cove II on Ormond Beach ("Cove Inventory"); and (b) such other or additional collateral as is provided for under the Core Inventory Loan, including, but not limited to, by way of any applicable cross-collateralization provisions. The Class 3 Secured Claim is impaired and is entitled to vote on the Plan.

Subject in all respect to the TAC Agreements, on the Effective Date the Reorganized Debtors shall pay to TFC the TAC/Lender Cash Consideration, which payment shall be in full settlement and satisfaction of any and all claims that TFC may have under and pursuant to the Cove Inventory Loan. Upon the Effective Date, TFC shall forgive all amounts owed by the Debtors or any of their affiliates and all other obligations of the Debtors and/or their affiliates with respect to the Cove Inventory Loan, and shall release any and all claims that TFC may have against the Debtors or any of their affiliates with respect to the Cove Inventory Loan.

In further consideration of the foregoing, on the Effective Date each of the Debtors and their respective Affiliates and Representatives shall release all Claims it/they may have against TFC, TFC's Representatives, Liberty and Liberty's representatives relating to, among other things: (A) the Cove Inventory Loan; (B) the TAC Agreements; or (C) any matter with respect to the Bankruptcy Cases.

d.      Class 4 — BB&T (Consolidated Inventory Loan Obligations).

Class 4 consists of the Allowed Secured Claim of BB&T in connection with that certain Loan Agreement and Promissory Note by and between BB&T and Island One dated December 30, 2008 (the "BB&T Consolidated Inventory Loan"). The Allowed Secured claim is estimated as of the Petition Date in the amount of $11,635,120.61, and is

secured by a first priority lien on unsold timeshare intervals at Liki Tiki Village I and II, the Cove on Ormond Beach, and the Charter Club at Naples Bay owned by Island One and a first mortgage on the LTV Building 1400 (collectively, the "BB&T Consolidated Collateral"). The Class 4 Claim is impaired and is entitled to vote on the Plan.

On the Effective Date, the Debtors will transfer the BB&T Consolidated Collateral to the BB&T Liquidating Trust for the benefit of BB&T or its assignee. The BB&T Liquidating Trust shall sell, transfer, assign, convey and/or dispose of the BB&T Consolidated Collateral as shall be determined by the BB&T Liquidating Trustee as shall be provided under the BB&T Liquidating Trust Agreement. In the event the sale, transfer, assignment, conveyance and/or disposition of the BB&T Consolidated Collateral by the BB&T Liquidating Trustee shall yield sufficient net proceeds (after payment and/or reimbursement, as the case may be, of all costs and expenses incurred by the BB&T Liquidating Trust in maintaining, preserving and/or disposing of the BB&T Consolidated Collateral) to satisfy the Allowed Class 4 Secured Claim in full, then any remaining net proceeds after payment in full of the Allowed Class 4 Secured Claim shall be paid to the Island One Unsecured Creditors Trust for distribution to Holders of Allowed Class 12, 13, 18, 21 and 33Unsecured Claims. In the event the sale, transfer, assignment, conveyance and/or disposition of the BB&T Consolidated Collateral does not yield sufficient net proceeds to satisfy the Allowed Class 4 Secured Claim in full, then any remaining deficiency Claim shall be an Allowed Class 13 Unsecured Claim.

Alternatively, the Debtors' may determine, in their business judgment, that the BB&T Consolidated Collateral, is unduly burdensome to the Estate, or of inconsequential value and benefit of the Estate, thus BB&T's Consolidated Collateral may be abandoned by the Debtors.

17

Alternatively, the Debtors may transfer the BB&T Consolidated Collateral to BB&T.

e.     Class 5 — BB&T (LTV III Land Loan Obligations).

Class 5 consists of the Allowed Secured Claim of BB&T in connection with that certain Promissory Note by and between BB&T and Island One dated May 25, 2005 and that certain Future Advance Promissory Note dated September 11, 2007(the "BB&T LTV III Land Loan"). The Allowed Secured claim is estimated as of the Petition Date in the amount of $4,747,988.88, and is secured by a first mortgage on approximately 59.2 acres of unimproved property with development entitlements of three hundred units that was to serve as Phase III of Liki Tiki Village ("LTV III Real Property"). The Class 5 Claim is impaired and is entitled to vote on the Plan.

On the Effective Date, the Debtors will transfer the LTV III Real Property to the BB&T Liquidating Trust for the benefit of BB&T or its assignee. The BB&T Liquidating Trust shall sell, transfer, assign, convey and/or dispose of the LTV III Real Property as shall be determined by the BB&T Liquidating Trustee as shall be provided under the BB&T Liquidating Trust Agreement. In the event the sale, transfer, assignment, conveyance and/or disposition of the LTV III Real Property by the BB&T Liquidating Trustee shall yield sufficient net proceeds (after payment and/or reimbursement, as the case may be, of all costs and expenses incurred by the BB&T Liquidating Trust in maintaining, preserving and/or disposing of the LTV III Real Property) to satisfy the Allowed Class 5 Secured Claim in full, then any remaining net proceeds after payment in full of the Allowed Class 5 Secured Claim shall be paid to the Island One Unsecured Creditors Trust for distribution to Holders of Allowed Class 12, 13, 18, 21 and 33Unsecured Claims. In the event the sale, transfer, assignment, conveyance and/or disposition

of the LTV III Real Property does not yield sufficient net proceeds to satisfy the Allowed Class 5 Secured Claim in full, then any remaining deficiency claim shall be an Allowed Class 13 Unsecured Claim.

Alternatively, the Debtors' may determine, in their business judgment, that the LTV III Real Property, is unduly burdensome to the Estate, or of inconsequential value and benefit of the Estate, thus LTV III Real Property may be abandoned by the Debtors.

Alternatively, the Debtors may transfer the LTV III Real Property to BB&T.

  f. <u>Class 6 — BB&T (LTV III Out Parcel Obligations).</u>

Class 6 consists of the Allowed Secured Claim of BB&T in connection with that certain Promissory Note by and between BB&T and Island One dated September 11, 2007 and that certain Promissory Note dated May 25, 2007 (the "BB&T LTV III Out Parcel Loan"). The Allowed Secured claim is estimated as of the Petition Date in the amount of $1,822,762.00, and is secured by a first mortgage on the 4.72 acres consisting of the unimproved property that was to become the Liki Tiki Welcome Center ("Welcome Center"). The Class 6 Claim is impaired and is entitled to vote on the Plan.

On the Effective Date, the Debtors will transfer the Welcome Center to the BB&T Liquidating Trust for the benefit of BB&T or its assignee. The BB&T Liquidating Trust shall sell, transfer, assign, convey and/or dispose of the Welcome Center as shall be determined by the BB&T Liquidating Trustee as shall be provided under the BB&T Liquidating Trust Agreement. In the event the sale, transfer, assignment, conveyance and/or disposition of the Welcome Center by the BB&T Liquidating Trustee shall yield sufficient net

proceeds (after payment and/or reimbursement, as the case may be, of all costs and expenses incurred by the BB&T Liquidating Trust in maintaining, preserving and/or disposing of the Welcome Center to satisfy the Allowed Class 6 Secured Claim in full, then any remaining net proceeds after payment in full of the Allowed Class 6 Secured Claim shall be paid to the Island One Unsecured Creditors Trust for distribution to Holders of Allowed Class 12, 13, 18, 21 and 33Unsecured Claims.  In the event the sale, transfer, assignment, conveyance and/or disposition of the Welcome Center does not yield sufficient net proceeds to satisfy the Allowed Class 6 Secured Claim in full, then any remaining deficiency Claim shall be an Allowed Class 13 Unsecured Claim.

Alternatively, the Debtors' may determine, in their business judgment, that the Welcome Center, is unduly burdensome to the Estate, or of inconsequential value and benefit of the Estate, thus the Welcome Center may be abandoned by the Debtors.

Alternatively, the Debtors may transfer the Welcome Center to BB&T.

g.    Class 7 — BB&T (Sales Center Loan Obligations).

Class 7 consists of the Allowed Secured Claim of BB&T in connection with that certain Loan Agreement and Promissory Note by and between BB&T and Island One dated September 11, 2007 in the original principal amount of $4,850,000 (the "Sales Center Loan").  The estimated Allowed Secured claim is $4,750,804.97, and is secured by a first mortgage on approximately 4.72 acres consisting of two tracts of land-one consist of unimproved property known as the Welcome Center and the other consists of land on which the Sales center is located("Sales Center").The Class 7 Claim is impaired and is entitled to vote on the Plan.

On the Effective Date, the Debtors will transfer the Sales Center to the BB&T Liquidating Trust for the benefit of BB&T or its assignee. The BB&T Liquidating Trust shall sell, transfer, assign, convey and/or dispose of the Sales Center as shall be determined by the BB&T Liquidating Trustee as shall be provided under the BB&T Liquidating Trust Agreement. In the event the sale, transfer, assignment, conveyance and/or disposition of the Sales Center by the BB&T Liquidating Trustee shall yield sufficient net proceeds (after payment and/or reimbursement, as the case may be, of all costs and expenses incurred by the BB&T Liquidating Trust in maintaining, preserving and/or disposing of the Sales Center to satisfy the Allowed Class 7 Secured Claim in full, then any remaining net proceeds after payment in full of the Allowed Class 7 Secured Claim shall be paid to the Island One Unsecured Creditors Trust for distribution to Holders of Allowed Class 12, 13, 18, 21 and 33Unsecured Claims. In the event the sale, transfer, assignment, conveyance and/or disposition of the Sales Center does not yield sufficient net proceeds to satisfy the Allowed Class 7 Secured Claim in full, then any remaining deficiency Claim shall be an Allowed Class 13 Unsecured Claim.

Alternatively, the Debtors' may determine, in their business judgment, that the BB&T Consolidated Collateral, is unduly burdensome to the Estate, or of inconsequential value and benefit of the Estate, thus the Sales Center may be abandoned by the Debtors.

Alternatively, the Debtors may transfer the Sales Center to BB&T.

h.      Class 8 — BB&T (Barefootn Loan Obligations).

Class 8 consists of Allowed Secured Claims of BB&T in connection with that certain Promissory Note by and between BB&T and Island One dated February 1, 2006 and the Promissory Note by and between BB&T and Island One dated March

21

19, 2008 in the original principal amounts of $8,900,000.00 and $2,600,000.00 (the "Barefoot'n Loan"). The Allowed Secured Claims are estimated as of the Petition Date in the amounts of $8,900,000.00 and $2,600,000.00, respectively, and are secured by a first and second mortgage/lien on approximately 7.32 acres of property located in Osceola County, Florida and includes one completed building and one building site ("Barefoot'n Property"). The Class 8 Claim is impaired and is entitled to vote on the Plan.

On the Effective Date, the Debtors will transfer the Barefoot'n Property to the BB&T Liquidating Trust for the benefit of BB&T or its assignee. The BB&T Liquidating Trust shall sell, transfer, assign, convey and/or dispose of the Barefoot'n Property as shall be determined by the BB&T Liquidating Trustee as shall be provided under the BB&T Liquidating Trust Agreement. In the event the sale, transfer, assignment, conveyance and/or disposition of the Barefoot'n Property by the BB&T Liquidating Trustee shall yield sufficient net proceeds (after payment and/or reimbursement, as the case may be, of all costs and expenses incurred by the BB&T Liquidating Trust in maintaining, preserving and/or disposing of the Barefoot'n Property to satisfy the Allowed Class 8 Secured Claim in full, then any remaining net proceeds after payment in full of the Allowed Class 8 Secured Claim shall be paid to the Island One Unsecured Creditors Trust for distribution to Holders of Allowed Class 12, 13, 18, 21 and 33 Unsecured Claims. In the event the sale, transfer, assignment, conveyance and/or disposition of the Barefoot'n Property does not yield sufficient net proceeds to satisfy the Allowed Class 8 Secured Claim in full, then any remaining deficiency Claim shall be an Allowed Class 13 Unsecured Claim.

103755566.10

Alternatively, the Debtors' may determine, in their business judgment, that the Barefoot'n Property, is unduly burdensome to the Estate, or of inconsequential value and benefit of the Estate, thus Barefoot'n Property may be abandoned by the Debtors.

Alternatively, the Debtors may transfer the Barefoot'n Property to BB&T.

i.  <u>Class 9 — BB&T (Equipment Loan Obligations).</u>

Class 9 consists of the Allowed Secured Claim of BB&T in connection with those five loans that are evidenced by: (i) Note #80254397230005; (ii) Note #80254397230006; (iii) Note #8025439723008; (iv) Note #80254397230009; and (v) Note #80254397230010 by and between BB&T and Island One (the "Equipment Loan"). The Allowed Secured Claim is estimated as of the Petition Date in the amount of $73,987.20, and is secured by a first lien on certain equipment of Island One ("Island One Equipment"). The Class 9 Claim is impaired and is entitled to vote on the Plan.

On the Effective Date, the Debtors will transfer the Island One Equipment to the BB&T Liquidating Trust for the benefit of BB&T or its assignee. The BB&T Liquidating Trust shall sell, transfer, assign, convey and/or dispose of the Island One Equipment as shall be determined by the BB&T Liquidating Trustee as shall be provided under the BB&T Liquidating Trust Agreement. In the event the sale, transfer, assignment, conveyance and/or disposition of the Island One Equipment by the BB&T Liquidating Trustee shall yield sufficient net proceeds (after payment and/or reimbursement, as the case may be, of all costs and expenses incurred by the BB&T Liquidating Trust in maintaining, preserving and/or disposing of the Island One Equipment to satisfy the Allowed Class 9 Secured Claim in full, then any remaining net proceeds after payment in full of the Allowed Class 9 Secured Claim shall be paid to the

103755566.10

Island One Unsecured Creditors Trust for distribution to Holders of Allowed Class 12, 13, 18, 21 and 33Unsecured Claims.  In the event the sale, transfer, assignment, conveyance and/or disposition of the Island One Equipment does not yield sufficient net proceeds to satisfy the Allowed Class 9 Secured Claim in full, then any remaining deficiency Claim shall be an Allowed Class 13 Unsecured Claim.

Alternatively, the Debtors' may determine, in their business judgment, that the Island One Equipment, is unduly burdensome to the Estate, or of inconsequential value and benefit of the Estate, thus the Island One Equipment may be abandoned by the Debtors.

Alternatively, the Debtors may transfer the Island One Equipment to BB&T.

j.      Class 10 — BB&T (2008 Dodge Ram  Loan Obligations).

Class 10 consists of the Allowed Secured Claim of BB&T in connection with that certain Loan Agreement and Promissory Note by and between BB&T and Island One dated February 4, 2008 (the "2008 Dodge Ram Loan").  The Allowed Secured Claim is estimated as of the Petition Date in  the amount of $19,111.00, and is secured by a first priority lien on a 2008 Dodge Ram Pick-up Truck (VIN 3D6WG38AX86179735) ("2008 Dodge Truck").  The Class 10 Claim is impaired and is entitled to vote on the Plan.

On the Effective Date, the Debtors will transfer the 2008 Dodge Truck to the BB&T Liquidating Trust for the benefit of BB&T or its assignee.  The BB&T Liquidating Trust shall sell, transfer, assign, convey and/or dispose of the 2008 Dodge Truck as shall be determined by the BB&T Liquidating Trustee as shall be provided under the BB&T Liquidating Trust Agreement.  In the event the sale, transfer, assignment, conveyance and/or

disposition of the 2008 Dodge Truck by the BB&T Liquidating Trustee shall yield sufficient net proceeds (after payment and/or reimbursement, as the case may be, of all costs and expenses incurred by the BB&T Liquidating Trust in maintaining, preserving and/or disposing of the 2008 Dodge Truck to satisfy the Allowed Class 10 Secured Claim in full, then any remaining net proceeds after payment in full of the Allowed Class 10 Secured Claim shall be paid to the Island One Unsecured Creditors Trust for distribution to Holders of Allowed Class 12, 13, 18, 21 and 33Unsecured Claims.  In the event the sale, transfer, assignment, conveyance and/or disposition of the 2008 Dodge Truck does not yield sufficient net proceeds to satisfy the Allowed Class 10 Secured Claim in full, then any remaining deficiency Claim shall be an Allowed Class 13 Unsecured Claim.  In the event the 2008 Dodge Truck is sold for cash as part of the Sale Process, BB&T shall be entitled to payment from the proceeds of such sale in accordance with the priorities set forth in the Code.

Alternatively, the Debtors' may determine, in their business judgment, that the 2008 Dodge Truck, is unduly burdensome to the Estate, or of inconsequential value and benefit of the Estate, thus 2008 Dodge Truck may be abandoned by the Debtors.

Alternatively, the Debtors may transfer the 2008 Dodge Truck to BB&T.

k.      Class 11 — H.J.C. Floridian (Ormond Beach Loan Obligations).

Class 11 consists of the Allowed Secured Claim of H.J.C. in connection with that certain Loan Agreement and Promissory Note by and between H.J.C. and Island One dated March 30, 1999 (the "Ormond Beach Loan").  The Allowed Claim is estimated as of the Petition Date in  the amount of $278,000.00 and is secured by a second mortgage on all

real property located at 149 South Atlantic Avenue, Ormond Beach, FL ("Ormond Beach Real Property").

Because the Class 11 Claim of H.J.C. is completely under-secured, upon the Effective Date, the second mortgage of H.J.C. will be extinguished and the Class 11 Claim will be treated as a Class 13 general Unsecured Claim for Distribution purposes.

l.      Class 14 — TFC (IOI Funding I, LLC Loan Obligations).

Class 14 consists of the Allowed Secured Claim of TFC in connection with that certain Loan Agreement and Promissory Note by and between TFC and IOI Funding, dated September 27, 2002 ("IOI Funding Receivables Loan") together with such other or additional collateral as is provided for under the IOI Funding Receivables Loan, including, but not limited to, by way of any applicable cross-collateralization provisions. The Allowed Class 14 Secured Claim is estimated as of the Petition Date in  the amount of $3,560,705.98 (plus interest accruing both prior to and after the Petition Date and all fees, costs, expenses, and costs of collection (including, without limitation, reasonable attorneys'fees) heretofore or hereafter incurred by TFC in connection therewith), and is secured by: (a) a first priority lien on all notes receivable of IOI Funding ("IOI Funding Receivables"); (b) such other or additional collateral as is provided for under the IOI Funding Receivables Loan, including, but not limited to, by way of any applicable cross collateralization provisions; and (c) such other or additional collateral as provided for under the Cash Collateral Order. The Class 14 Secured Claim is impaired and is entitled to vote on the Plan.

Subject in all respects to the TAC Agreements, on the Effective Date the Debtors' obligations under the IOI Funding Receivables Loan shall be assumed by the Reorganized Debtors and TFC shall retain all of its Liens upon and security interests in any and

26

all collateral securing the IOI Funding Receivables Loan.  From and after the Effective Date, IOI Funding, as a Reorganized Debtor, shall pay from the balance of collections derived from the collateral securing the IOI Funding Receivables Loan: (i) principal and interest obligations to TFC in the manner currently required pursuant to the IOI Funding Receivables Loan; (ii) following such required principal and interest payments, twenty-five percent (25%) of the residual cash collections will be remitted to TFC, and the remaining seventy-five percent (75%) shall be distributed to the Reorganized Debtors.  Existing collateral for the IOI Funding Receivables Loan as of the Closing Date that does not constitute eligible collateral pursuant to the terms of the IOI Funding Receivables Loan ("Conduit Pledged Collateral") shall be released by TFC and reassigned to the Reorganized Debtors on the Effective Date, without payment of any further consideration by the Reorganized debtors therefore, except to the extent of the TFC's retention of any Replacement Lien and/or Superpriority Administrative Claim granted to TFC under the Cash Collateral Order that are necessary to consummate the TAC Agreements (subject to the agreement by TFC to waive and release such Liens and Claims in favor of the Unsecured Creditor Trust upon the satisfaction of the preconditions to such waiver as provided in the Plan).

In further consideration of the foregoing, on the Effective Date each of the Debtors and their respective Affiliates and Representatives shall release all Claims it/they may have against TFC and TFC's Representatives relating to, among other things: (A) the IOI Funding Receivables Loan; (B) the TAC Agreements; or (C) any matter with respect to the Bankruptcy Cases.

m.      Class 16 — TFC (Crescent Inventory Loan Obligations).

Class 16 consists of the Allowed Secured Claim of TFC in connection with that certain Loan Agreement and Promissory Note by and between TFC and

27

Crescent dated March 31, 2004 (the "Crescent Inventory Loan"). The Allowed Secured Class 16 Claim is estimated as of the Petition Date in the amount of $4,901,264.12 (plus interest accruing both prior to and after the Petition Date and all fees, costs, expenses, and costs of collection (including, without limitation, reasonable attorneys' fees) heretofore or hereafter incurred by TFC in connection therewith), and is secured by a first priority lien on all Crescent owned timeshare intervals ("Crescent Inventory"). The Class 16 Secured Claim is impaired and is entitled to vote on the Plan.

The Class 16 Allowed Secured Claim shall be treated in one of the following manners, as and to the extent applicable:

(a)     In the event the Crescent Inventory is sold prior to the Effective Date pursuant to the terms of the Crescent Sale Agreement, as same shall have been approved by a Crescent Sale Order, the net proceeds of such sale transaction shall be paid to TFC in accordance with the terms of any such Crescent Sale Agreement and/or Crescent Sale Order, as and to the extent applicable; or

(b)     Subject in all respects to the TAC Agreements, on the Effective Date the Reorganized Debtors shall pay to TFC the TAC/Lender Cash Consideration, which payment shall be in full satisfaction of any and all claims that TFC may have under and pursuant to the Crescent Inventory Loan. Upon the Effective Date, TFC shall forgive all amounts owed by the Debtors or any of their affiliates and all other obligations of the Debtors and/or their affiliates with respect to the Crescent Inventory Loan, and shall release any and all claims that TFC may have against the Debtors or any of their affiliates with respect to the Crescent Inventory Loan; or

(c)     Subject in all respects to the TAC Agreements, on the Effective Date Crescent One shall indefeasibly transfer, assign and convey all of its rights, title and interests in and to the Crescent Inventory to the TFC Inventory Designee, which transfer, assignment and conveyance shall be in full settlement and satisfaction of any and all claims that TFC may have under and pursuant to the Crescent Inventory Loan.  In consideration for the transfer of the Crescent Inventory to the TFC Inventory Designee, TFC shall forgive all amounts owed by the Debtors or any of their affiliates and all other obligations of the Debtors and/or their affiliates with respect to the Crescent Inventory Loan, and shall release any and all claims that TFC may have against the Debtors or any of their affiliates with respect to the Crescent Inventory Loan.

In consideration of the foregoing, on the Effective Date each of the Debtors and their respective Affiliates and Representatives shall release all Claims it/they may have against TFC and TFC's Representatives relating to, among other things, (A) the Crescent Inventory Loan, (B) any Crescent Sale Agreement, (C) the TAC Agreements, or (D) any matter with respect to the Bankruptcy Cases.

n.     <u>Class 17 — TFC (Crescent Receivables Loan Obligations).</u>

Class 17 consists of the Allowed Secured Claim of TFC in connection with that certain Loan Agreement and Promissory Note by and between TFC and Crescent dated December 28, 2004 (the "Crescent Receivables Loan").  The Class 17 Allowed Secured Claim is estimated as of the Petition Date in  the amount of $6,511,263.25 (plus interest accruing both prior to and after the Petition Date and all fees, costs, expenses, and costs of collection (including, without limitation, reasonable attorneys' fees) heretofore or hereafter incurred by TFC in connection therewith), and is secured by (a) a first priority Lien on all notes

receivable of Crescent ("Crescent Receivables"), and (b) such other or additional collateral as provided for under the Cash Collateral Order. The Class 17 Secured Claim is impaired and is entitled to vote on the Plan.

The Class 17 Allowed Secured Claim shall be treated in one of the following manners, as and to the extent applicable:

(a)      In the event the Crescent Receivables are sold prior to the Effective Date pursuant to the terms of a Crescent Sale Agreement, as same shall have been approved by a Crescent Sale Order, the net proceeds of such sale transaction shall be paid to TFC in accordance with the terms of any such Crescent Sale Agreement and/or Crescent Sale Order, as and to the extent applicable; or

(b)      Subject in all respects to the TAC Agreements, on the Effective Date Island One shall indefeasibly transfer, assign and convey all of its rights, title and interests in and to the Crescent Receivables to the TFC Designee, which transfer, assignment and conveyance shall be in full settlement and satisfaction of any and all claims that TFC may have under and pursuant to the Crescent Receivables Loan. In consideration for the transfer of the Crescent Receivables to the TFC Designee, TFC shall forgive all amounts owed by the Debtors or any of their affiliates and all other obligations of the Debtors and/or their affiliates with respect to the Crescent Receivables Loan, and shall release any and all claims that TFC may have against the Debtors or any of their affiliates with respect to the Crescent Receivables Loan, except to the extent of TFC's retention of any Replacement Lien and/or Superpriority Administrative Claim granted to TFC under the Cash Collateral Order that are necessary to consummate the TAC Agreements (subject to the agreement by TFC to waive and release such

30

Liens and Claims in favor of the Unsecured Creditor Trust upon the satisfaction of the preconditions to such waiver as provided in the Plan); or

(c)     Subject in all respects to the TAC Agreements, on the Effective Date Crescent One shall indefeasibly transfer, assign and convey all of its rights, title and interests in and to the Crescent Receivables to the TFC Inventory Designee, which transfer, assignment and conveyance shall be in full settlement and satisfaction of any and all claims that TFC may have under and pursuant to the Crescent Receivables Loan.  In consideration for the transfer of the Crescent Receivables to the TFC Designee, TFC shall forgive all amounts owed by the Debtors or any of their affiliates and all other obligations of the Debtors and/or their affiliates with respect to the Crescent Receivables Loan, and shall release any and all claims that TFC may have against the Debtors or any of their affiliates with respect to the Crescent Receivables Loan, except to the extent of TFC's retention of any Replacement Lien and/or Superpriority Administrative Claim granted to TFC under the Cash Collateral Order that are necessary to consummate the TAC Agreements (subject to the agreement by TFC to waive and release such Liens and Claims in favor of the Unsecured Creditor Trust upon the satisfaction of the preconditions to such waiver as provided in the Plan).  The transfer of the Crescent Receivables shall be on a nonrecourse basis with respect to the Reorganized Debtors and TAC, and neither the Reorganized Debtors nor TAC shall have any liability with respect to Crescent after the Confirmation or  the Sale.

In consideration of the foregoing, on the Effective Date each of the Debtors and their respective affiliates and Representatives shall release all Claims it/they may have against TFC and TFC's Representatives relating to, among other things, (A) the Crescent

Receivables Loan, (B) any Crescent Sale Agreement, (C) the TAC Agreements, or (D) any matter with respect to the Bankruptcy Cases.

   o. <u>Class 19 — TFC (Island One Management Loan Obligations).</u>

   Class 19 consists of the Allowed Secured Claim of TFC in connection with that certain Loan Agreement and Promissory Note by and between TFC and Island One Management dated December 20, 2007 (the "Management Loan"). The Class 19 Allowed Secured Claim is estimated as of the Petition Date in the amount of $8,732,518.34 (plus interest accruing both prior to and after the Petition Date and all fees, costs, expenses, and costs of collection (including, without limitation, reasonable attorneys' fees) heretofore or hereafter incurred by TFC in connection therewith), and is secured by (a) a first priority Lien on Island One Management's management contracts and Club Navigo agreements ("Island One Management Collateral"), (b) such other or additional collateral as is provided for under the Management Loan, including, but not limited to, by way of any applicable cross collateralization provisions, and (c) such other or additional collateral as provided for under the Cash Collateral Order. The Class 19 Secured Claim is impaired and is entitled to vote on the Plan.

   Subject in all respects to the TAC Agreements, on the Effective Date the Reorganized Debtors shall pay to TFC the TAC/Lender Cash Consideration, which payment shall be in full settlement and satisfaction of any and all claims that TFC may have under and pursuant to the Management Loan. Upon the Effective Date, TFC shall forgive all amounts owed by the Debtors or any of their affiliates and all other obligations of the Debtors and/or their affiliates with respect to the Management Loan, and shall release any and all claims that TFC may have against the Debtors or any of their affiliates with respect to the Management

32

Loan, except to the extent of TFC's retention of any Replacement Lien and/or Superpriority Administrative Claim granted to TFC under the Cash Collateral Order that are necessary to consummate the TAC Agreements (subject to the agreement by TFC to waive and release such Liens and Claims in favor of the Unsecured Creditor Trust upon the satisfaction of the preconditions to such waiver as provided in the Plan).

In further consideration of the foregoing, on the Effective Date each of the Debtors and their respective affiliates and Representatives shall release all Claims it/they may have against TFC and TFC's Representatives relating to, among other things, (A) the Management Loan, (B) the TAC Agreements, or (C) any matter with respect to the Bankruptcy Cases.

p.      Class 20 — Old Florida (Warehouse Loan Obligations).

Class 20 consists of the Allowed Secured Claim of Old Florida in connection with that certain Loan Agreement and Promissory Note by and between Old Florida and Island One Management dated October 21, 2008 (the "Old Florida Loan").  The Allowed Secured Claim is estimated as of the Petition Date in  the amount of  $744,196.46, and is secured by a first mortgage on a 15,967 s.f. warehouse located at 17777 Boli Blvd., Orlando, FL 32787 ("Old Florida Real Property").  Class 20 is impaired and is entitled to vote on the Plan.

Subject in all respects to the TAC Agreements, on the Effective Date the Debtors' obligations under the Old Florida Loan shall be assumed by the Reorganized Debtors, and Old Florida shall retain all of its liens upon and security interests in any and all collateral securing the Old Florida Loan, including, without limitation, the Old Florida Real Property.  Subject in all respects to the TAC Agreements, on the Effective Date the terms of the Old Florida Loan shall be amended to cure any default existing as of the Effective Date, continue

33

the 20 year amortization under the existing loan agreements, and further provide that such loan shall mature on the fifth (5th) anniversary of the Effective Date.

      q.      <u>Class 22 — BB&T (St. Croix Acquisition and Construction Loans Obligation).</u> Class 22 consists of the Allowed Secured Claim of BB&T in connection with that certain Loan Agreement and Promissory Note by and between BB&T and St. Croix One dated July 27, 2006 (the "Acquisition Loan"). The Allowed Secured claim is estimated as of the Petition Date in the amount of $4,428,952.35, and is secured by (a) a first mortgage on all of St. Croix One's real property (the "St. Croix Real Property"), (b) a first priority lien on all other personal property assets of St. Croix One (except to the extent subject to a superseding Lien in favor of TFC ("St. Croix Personal Property"), and (c) such other or additional collateral as provided for under the St. Croix Cash Collateral Order. The Class 22 Claim is impaired and is entitled to vote under the Plan.

      On the Effective Date, the Debtors will transfer the St. Croix One Real Property and St. Croix One Personal Property collateral to the BB&T Liquidating Trust for the benefit of BB&T or its assignee. The BB&T Liquidating Trust shall sell, transfer, assign, convey and/or dispose of the St. Croix One Real Property and St. Croix One Personal Property collateral as shall be determined by the BB&T Liquidating Trustee as shall be provided under the BB&T Liquidating Trust Agreement. In the event the sale, transfer, assignment, conveyance and/or disposition of the St. Croix One Real Property and St. Croix One Personal Property collateral by the BB&T Liquidating Trustee shall yield sufficient net proceeds (after payment and/or reimbursement, as the case may be, of all costs and expenses incurred by the BB&T Liquidating Trust in maintaining, preserving and/or disposing of the St. Croix One Real Property and St. Croix One Personal Property collateral) to satisfy the Allowed Class 22 Secured Claim in

full, then any remaining net proceeds after payment of the Allowed Class 22 Secured Claim in full shall be paid as follows: first, to the Holder of any junior Allowed Secured Claim as against St. Croix One until paid in full; second, to the Holders of any Allowed Class 27 Unsecured Claim until such Unsecured Claim(s) are paid in full; third, to the Unsecured Creditor Trust for Distribution to the Holders of Allowed Class 12, 13, 18, 21 and 33Unsecured Claims until paid in full; and fourth, should there by any remaining net proceeds, to the Holders of Allowed St. Croix One Interests (as provided in Section 6.05 of the Plan). In the event the sale, transfer, assignment, conveyance and/or disposition of the St. Croix One Real Property and St. Croix One Personal Property collateral property by the BB&T Liquidating Trustee does not yield sufficient net proceeds to satisfy the Allowed Class 22 Secured Claim in full, then any remaining deficiency claim shall be a Class 27 Unsecured Claim.

Alternatively, the Debtors' may determine, in their business judgment, that the St. Croix One Real Property and St. Croix One Personal Property, is unduly burdensome to the Estate, or of inconsequential value and benefit of the Estate, thus St. Croix One Real Property and St. Croix One Personal Property, may be abandoned by the Debtors.

Alternatively, the Debtors may transfer the St. Croix One Real Property and St. Croix One Personal Property to BB&T.

r.      Class 23 — BB&T (2007 Dodge Ram Loan Obligations).

Class 23 consists of the Allowed Secured Claim of BB&T in connection with that certain Loan Agreement and Promissory Note by and between BB&T and St. Croix One dated February 26, 2007 (the "2007 Dodge Ram Loan"). The Allowed Secured Claim is estimated as of the Petition Date in the amount of $3,314.29 and is secured by a first

priority lien on a 2007 Dodge Ram Pick-up Truck (VIN 1D7HA16K97J548751) ("2007 Dodge Truck"). The Class 23 Claim is impaired and is entitled to vote on the Plan.

On the Effective Date, the Debtors will transfer the 2007 Dodge Truck to the BB&T Liquidating Trust for the benefit of BB&T or its assignee. The BB&T Liquidating Trust shall sell, transfer, assign, convey and/or dispose of the 2007 Dodge Truck as shall be determined by the BB&T Liquidating Trustee as shall be provided under the BB&T Liquidating Trust Agreement. In the event the sale, transfer, assignment, conveyance and/or disposition of the 2007 Dodge Truck by the BB&T Liquidating Trustee shall yield sufficient net proceeds (after payment and/or reimbursement, as the case may be, of all costs and expenses incurred by the BB&T Liquidating Trust in maintaining, preserving and/or disposing of the 2007 Dodge Truck to satisfy the Allowed Class 23 Secured Claim in full, then any remaining net proceeds after payment of the Allowed Class 23 Secured Claim in full shall be paid as follows: first, to the Holder of any junior Allowed Secured Claim as against St. Croix One until paid in full; second, to the Holders of any Allowed Class 27 Unsecured Claim until such Unsecured Claim(s) are paid in full; third, to the Unsecured Creditor Trust for Distribution to the Holders of Allowed Class 12, 13, 18, 21 and 33Unsecured Claims until paid in full; and fourth, should there by any remaining net proceeds, to the Holders of Allowed St. Croix One Interests (as provided in Section 6.05 of the Plan). In the event the sale, transfer, assignment, conveyance and/or disposition of the 2007 Dodge Truck by the BB&T Liquidating Trustee does not yield sufficient net proceeds to satisfy the Allowed Class 23 Secured Claim in full, then any remaining deficiency claim shall be a Class 27 Unsecured Claim.

103755566.10

Alternatively, the Debtors' may determine, in their business judgment, that the 2007 Dodge Truck, is unduly burdensome to the Estate, or of inconsequential value and benefit of the Estate, thus the 2007 Dodge Truck may be abandoned by the Debtors.

Alternatively, the Debtors may transfer the 2007 Dodge Truck to BB&T.

s. <u>Class 24 — BB&T (2008 Jeep Patriot Loan Obligations).</u>

Class 24 consists of the Allowed Secured Claim of BB&T in connection with that certain Loan Agreement and Promissory Note by and between BB&T and Island One dated November 28, 2007 (the "2008 Jeep Patriot Loan"). The Allowed Secured Claim is estimated as of the Petition Date in the amount of $6,874.97 and is secured by a first priority lien on a 2008 Jeep Patriot SUV (VIN 1J8FT28W28D593413) ("2008 Jeep Patriot"). The Class 24 Claim is impaired and is entitled to vote on the Plan.

On the Effective Date, the Debtors will transfer the 2008 Jeep Patriot to the BB&T Liquidating Trust for the benefit of BB&T or its assignee. The BB&T Liquidating Trust shall sell, transfer, assign, convey and/or dispose of the 2008 Jeep Patriot as shall be determined by the BB&T Liquidating Trustee as shall be provided under the BB&T Liquidating Trust Agreement. In the event the sale, transfer, assignment, conveyance and/or disposition of the 2008 Jeep Patriot by the BB&T Liquidating Trustee shall yield sufficient net proceeds (after payment and/or reimbursement, as the case may be, of all costs and expenses incurred by the BB&T Liquidating Trust in maintaining, preserving and/or disposing of the 2008 Jeep Patriot to satisfy the Allowed Class 24 Secured Claim in full, then any remaining net proceeds after payment of the Allowed Class 24 Secured Claim in full shall be paid as follows: <u>first</u>, to the Holder of any junior Allowed Secured Claim as against St. Croix One until paid in

full; second, to the Holders of any Allowed Class 27 Unsecured Claim until such Unsecured Claim(s) are paid in full; third, to the Unsecured Creditor Trust for Distribution to the Holders of Allowed Class 12, 13, 18, 21 and 33Unsecured Claims until paid in full; and fourth, should there by any remaining net proceeds, to the Holders of Allowed St. Croix One Interests (as provided in Section 6.05 of the Plan). In the event the sale, transfer, assignment, conveyance and/or disposition of the 2008 Jeep Patriot by the BB&T Liquidating Trustee does not yield sufficient net proceeds to satisfy the Allowed Class 24 Secured Claim in full, then any remaining deficiency claim shall be a Class 27 Unsecured Claim.

Alternatively, the Debtors' may determine, in their business judgment, that the 2008 Jeep Patriot, is unduly burdensome to the Estate, or of inconsequential value and benefit of the Estate, thus the 2008 Jeep Patriot may be abandoned by the Debtors.

Alternatively, the Debtors may transfer the 2008 Jeep Patriot to BB&T.

      t.      <u>Class 25 — Virgin Islands Design (Acquisition Loan Obligations).</u>

Class 25 consists of the Allowed Secured Claim of Virgin Islands Design Build Group, LLC ("Virgin Islands Design") in connection with that certain Loan Agreement and Promissory Note by and between Virgin Islands Design and St. Croix One dated January 31, 2007 (the "Virgin Islands Design Green Cay Loan"). The Allowed Claim is estimated as of the Petition Date in the amount of $812,500.00 and is secured by a junior mortgage on Plat 57, of Estate Green Coy, East End, Quarter "A", St. Croix, USVI, commonly known as Plot 57 Green Cay ("Green Cay Real Property"). The Class 25 Claim is impaired and is entitled to vote on the Plan.

The Debtors believe that the Class 25 Claim of Virgin Islands Design is under-secured. In the event the sale, transfer, assignment, conveyance and/or disposition of the St. Croix One Real Property collateral by the BB&T Liquidating Trustee shall yield sufficient net proceeds (after payment and/or reimbursement, as the case may be, of all costs and expenses incurred by the BB&T Liquidating Trust in maintaining, preserving and/or disposing of the St. Croix One Real Property) to satisfy the Allowed Class 22 Secured Claim in full, then any remaining net proceeds after payment of the Allowed Class 22 Secured Claim in full shall be paid first to the Holder of any junior Allowed Secured Claim as against St. Croix One until paid in full. In the event the sale, transfer, assignment, conveyance and/or disposition of the St. Croix One Real Property by the BB&T Liquidating Trustee does not yield sufficient net proceeds to satisfy the Allowed Class 25 Secured Claim in full, then any remaining deficiency claim shall be a Class 27 Unsecured Claim.

u.      Class 26 — Maple Leaf, LLC (Acquisition Loan Obligations).

Class 26 consists of the Allowed Secured Claim of Maple Leaf, LLC ("Maple Leaf") in connection with that certain Loan Agreement and Promissory Note by and between Maple Leaf and St. Croix One dated January 31, 2007 (the "Maple Leaf Green Cay Loan"). The Allowed Clam is estimated as of the Petition Date in the amount of $362,500.00 and is secured by a junior mortgage on the Green Cay Real Property. The Class 26 Claim is impaired and is entitled to vote on the Plan.

The Debtors believe that the Class 26 Claim of Maple Leaf, LLC is under-secured. In the event the sale, transfer, assignment, conveyance and/or disposition of the St. Croix One Real Property collateral by the BB&T Liquidating Trustee shall yield sufficient net proceeds (after payment and/or reimbursement, as the case may be, of all costs and expenses

incurred by the BB&T Liquidating Trust in maintaining, preserving and/or disposing of the St. Croix One Real Property) to satisfy the Allowed Class 22 Secured Claim in full, then any remaining net proceeds after payment of the Allowed Class 22 Secured Claim in full shall be paid to the Holder of any junior Allowed Secured Claim as against St. Croix One until paid in full. In the event the sale, transfer, assignment, conveyance and/or disposition of the St. Croix One Real Property by the BB&T Liquidating Trustee does not yield sufficient net proceeds to satisfy the Allowed Class 26 Secured Claim in full, then any remaining deficiency claim shall be a Class 27 Unsecured Claim.

3.     Unsecured Claims.

a.     Class 12 – Island One Noteholders

Class 12 consists of the Allowed Unsecured Claims against Island One on account of outstanding unsecured notes issued by Island One in favor of the Island One Noteholders. The Class 12 Claims are impaired and are entitled to vote on the Plan.

The Holders of Allowed Class 12 Claims shall be entitled to receive their Pro Rata share of any and all distributions to be made from the Unsecured Creditor Trust.

Holders of an Allowed Class 12 Claims shall receive its/their Pro Rata share of the Unsecured Creditor Distribution at such times and as shall be determined by the Unsecured Creditor Trustee in accordance with the Unsecured Creditor Trust Agreement. The Unsecured Creditors Trust shall be responsible for all costs associated with the distribution of the Unsecured Creditors Distribution, and the Reorganized Debtors shall have no liability for any costs and expenses associated with distribution of the Unsecured Creditors Distribution.

b.      Class 13 – Island One General Unsecured Claims

Class 13 consists of the Allowed Unsecured Claims against Island One.  The Class 13 Claims are impaired and are entitled to vote on the Plan.

The Holders of Allowed Class 13 Claims shall be entitled to receive their Pro Rata share of any and all distributions to be made from the Unsecured Creditor Trust.

Holders of Allowed Class 13 Claims shall receive its/their Pro Rata share of the Unsecured Creditor Distribution at such times and as shall be determined by the Unsecured Creditor Trustee in accordance with the Unsecured Creditor Trust Agreement.  The Unsecured Creditors Trust shall be responsible for all costs associated with the distribution of the Unsecured Creditors Distribution, and the Reorganized Debtors shall have no liability for any costs and expenses associated with distribution of the Unsecured Creditors Distribution.

c.      Class 15 – IOI Funding General Unsecured Claims

Class 15 consists of the Allowed Unsecured Claims against IOI Funding.  The Class 15 Claims are impaired.

Holders of Allowed Class 15 Claims will receive no Distribution under the Plan, and are deemed to have rejected the Plan.

d.      Class 18 – Crescent General Unsecured Claims

Class 18 consists of the Allowed Unsecured Claims against Crescent.  The Class 18 Claims are impaired and are entitled to vote on the Plan.

The Holders of Allowed Class 18 Claims shall be entitled to receive their Pro Rata share of any and all distributions to be made from the Unsecured Creditor Trust.

Holders of Allowed Class 18 Claims shall receive its/their Pro Rata share of the Unsecured Creditors Distribution at such times and as shall be determined by the Unsecured Creditors Trustee in accordance with the Unsecured Creditor Trust Agreement. The Unsecured Creditors Trust shall be responsible for all costs associated with the distribution of the Unsecured Creditors Distribution, and the Reorganized Debtors shall have no liability for any costs and expenses associated with distribution of the Unsecured Creditors Distribution.

e.     <u>Class 21 – Island One Management General Unsecured Claims</u>

Class 21 consists of the Allowed Unsecured Claims against Island One Management.  The Class 21 Claims are impaired and are entitled to vote on the Plan.

The Holders of Allowed Class 21 Claims shall be entitled to receive their Pro Rata share of any and all distributions to be made from the Unsecured Creditor Trust.

Holders of Allowed Class 21 Claims shall receive its/their Pro Rata share of the Unsecured Creditors Distribution at such times and as shall be determined by the Unsecured Creditors Trustee in accordance with the Unsecured Creditor Trust Agreement.  The Unsecured Creditors Trust shall be responsible for all costs associated with the distribution of the Unsecured Creditors Distribution, and the Reorganized Debtors shall have no liability for any costs and expenses associated with distribution of the Unsecured Creditors Distribution.

f.     <u>Class 27 – St. Croix One General Unsecured Claims</u>

Class 27 consists of the Allowed Unsecured Claims against St. Croix One.  The Class 27 Claims are impaired and are entitled to vote on the Plan.

In the event the sale, transfer, assignment, conveyance and/or disposition of the St. Croix One Real Property (and as and to the extent applicable the St. Croix

42

One Personal Property with regard to the Class 22 Claim) by the BB&T Liquidating Trustee shall yield sufficient net proceeds (after payment and/or reimbursement, as the case may be, of all costs and expenses incurred by the BB&T Liquidating Trust in maintaining, preserving and/or disposing of the St. Croix One Real Property (and as and to the extent applicable the collateral St. Croix One Personal Property with regard to the Class 22 Claim) to satisfy the Allowed Class 22, 25 and 26 Secured Claims in full as provided in this Plan, then any remaining net proceeds realized from a disposition of the St. Croix One Real Property (and as and to the extent applicable the St. Croix One Personal Property) after payment of the Allowed Class 22, 25 and 26 Secured Claims in full shall be paid to the Holders of Allowed Unsecured Claims against St. Croix One until paid in full. In the event the sale, transfer, assignment, conveyance and/or disposition of the St. Croix One Real Property and/or the St. Croix One Personal Property by the BB&T Liquidating Trustee does not yield sufficient net proceeds to satisfy the Allowed Class 22, 25 and 26 Secured Claims in full, the Holders of Class 27 Unsecured Claims shall receive no Distribution under the Plan.

g.     Class 33 – Navigo General Unsecured Claims

Class 33 consists of the Allowed Unsecured Claims against Navigo. The Class 33 Claims are impaired and are entitled to vote on the Plan.

The Holders of Allowed Class 33 Claims shall be entitled to receive their Pro Rata share of any and all distributions to be made from the Unsecured Creditor Trust.

Holders of Allowed Class 33 Claims shall receive its/their Pro Rata share of the Unsecured Creditor Distribution at such times and as shall be determined by the Unsecured Creditor Trustee in accordance with the Unsecured Creditor Trust Agreement. The Unsecured Creditors Trust shall be responsible for all costs associated with the distribution of the

Unsecured Creditors Distribution, and the Reorganized Debtors shall have no liability for any costs and expenses associated with distribution of the Unsecured Creditors Distribution.

    4.    <u>Equity Interests.</u>

    a.    <u>Class 28 – Island One Equity Interests</u>

Class 28 consists of the Allowed Interests of Island One. The Class 28 Interests are impaired.

Subject in all respects to the TAC Agreements, on the Effective Date (a) all of the authorized, issued and outstanding Island One Interests shall be cancelled and extinguished and (b) Island One, as a Reorganized Debtor, shall issue new Equity Interests equal to one hundred percent (100%) of its authorized shares to TAC, which shares shall be fully paid and non-assessable when issued.

The Holders of the Island One Interests shall receive no Distribution under the Plan, and are deemed to reject the Plan.

    b.    <u>Class 29 – IOI Funding Equity Interests</u>

Class 29 consists of the Allowed Interests of IOI Funding.

Subject in all respects to the TAC Agreements, on the Effective Date all of the authorized, issued and outstanding IOI Funding Interests shall be cancelled and extinguished. Reorganized IOI Funding will issue new equity.

The Class 29 Interests are impaired. Since the Holders of the IOI Funding Interests shall receive no Distribution under the Plan, they are deemed to reject the Plan.

44

c.       Class 30 – Crescent Equity Interests

Class 30 consists of the Allowed Interests of Crescent One.

The Class 30 Allowed Interests of Crescent One shall be treated in one of the following manners, as and to the extent applicable:

(a)       In the event the Crescent Inventory and/or Crescent receivables are sold prior to the Effective Date pursuant to the terms of a Crescent Sale Agreement and Crescent Sale Order, on the Effective Date all of the authorized, issued and outstanding Crescent One Interests shall be cancelled and extinguished, and the Holders of the Crescent One Interests shall receive no Distribution under the Plan; or

(b)       If on the Effective Date the Reorganized Debtors shall (i) sell the Crescent Inventory to TAC and (ii) transfer, assign and convey to the TFC Designee the Crescent Receivables, all in accordance with and subject in all respects to the TAC Agreements, on the Effective Date (i) all of the authorized, issued and outstanding Crescent One Interests shall be cancelled and extinguished and (b) Crescent One, as a Reorganized Debtor, shall issue new Equity Interests equal to 100% of the authorized membership interests to TAC [or Island One, as a Reorganized Debtor], which membership interests shall be fully paid and non-assessable when issued, and the Holders of the Crescent One Interests shall receive no Distribution under the Plan; or

(c)       If on the Effective Date Crescent One shall indefeasibly transfer, assign and convey all of its rights, title and interests in and to the Crescent Inventory and Crescent Receivables to the TFC Inventory Designee and TFC Designee, respectively, all of the authorized, issued and outstanding Crescent One Interests shall be cancelled and

45

extinguished, and the Holders of the Crescent One Interests shall receive no Distribution under the Plan.

The Class 30 Interests are impaired. Since the Holders of the Crescent One Interests shall receive no Distribution under the Plan, they are deemed to reject the Plan.

d.　　Class 31 – Island One Management Equity Interests

Class 31 consists of the Allowed Interests of Island One Management.

Subject in all respects to the TAC Agreements, on the Effective Date all of the authorized, issued and outstanding Island One Management Interests shall be cancelled and extinguished. Reorganized Island One Management will issue new equity.

The Class 31 Interests are impaired. Since the Holders of the Island One Management shall receive no Distribution under the Plan, they are deemed to reject the Plan.

e.　　Class 32 – St. Croix One Equity Interests

Class 32 consists of the Allowed Interests of St. Croix One. The Class 32 Interests are impaired and are deemed to reject the Plan.

On the Effective Date, all of the authorized, issued and outstanding St. Croix One Interests shall be cancelled and extinguished, and the Holders of the St. Croix One Interests shall receive no Distribution under the Plan.

In the event the sale, transfer, assignment, conveyance and/or disposition of the St. Croix One Real Property and the St. Croix One Personal Property by the BB&T Liquidating Trustee shall yield sufficient net proceeds (after payment and/or

46

reimbursement, as the case may be, of all costs and expenses incurred by the BB&T Liquidating Trust in maintaining, preserving and/or disposing of the St. Croix One Real Property and St. Croix One Personal Property to satisfy the Allowed Class 22, 25, 26 and 27 Claims in full as provided in this Plan, then any remaining net proceeds shall be paid to the Holders of Allowed Class 32 Interests. In the event the sale, transfer, assignment, conveyance and/or disposition of the St. Croix One Real Property and/or the St. Croix One Personal Property by the BB&T Liquidating Trustee does not yield sufficient net proceeds to satisfy the Allowed Class 22, 25, 26 Claims in full, the Holders of Class 32 Interests shall receive no Distribution under the Plan.

      f.      <u>Class 34 – Navigo Equity Interests</u>

Class 34 consists of the Allowed Interests of Navigo.

Subject in all respects to the TAC Agreements, on the Effective Date all of the authorized, issued and outstanding Navigo Interests shall be cancelled and extinguished. Reorganized Navigo will issue new equity.

The Class 34 Interests are impaired. Since the Holders of the Navigo Interest shall receive no Distribution under the Plan, they are deemed to reject the Plan.

      C.      <u>Means of Implementation.</u>      On the Effective Date, and subject in all respects to the TAC Agreements, the Reorganized Debtors shall implement and effectuate the TAC Agreements. On or after the Effective Date, the Reorganized Debtors may, in their sole discretion, take such action as permitted by applicable law and their respective constituent documents as they determine is reasonable and appropriate. On the Effective Date, the Debtors shall cause the dissolution of Florida Vacation Station, Inc., a Florida corporation and Orlando Vacation Bureau, Inc., a Florida corporation pursuant to all applicable law. The Debtors shall be responsible for all fees, expenses, costs, taxes, and any other amounts associated with or

47

attendant to said dissolutions, as well as the dissolutions of any of the other Debtors entities. The Reorganized Debtors shall have no responsibility, obligation, or liability whatsoever for any fees, expenses, costs, taxes, or any other amounts associated with the dissolution or wind-down of any of the Debtor entities.

1.  Corporate Action.

On the Effective Date and automatically and without further action, (i) each existing member of the Board of Directors of the Debtors will resign or be terminated by the Reorganized Debtors and (ii) the Reorganized Debtors shall appoint such new officers and directors of the Reorganized Debtors as shall be determined by TAC. The Plan will be administered by the Reorganized Debtors and all actions taken thereunder in the name of the Reorganized Debtors shall be taken through the Reorganized Debtors and/or the BB&T Liquidating Trustee and the Trustee of the Unsecured Creditor Trust, as and to the extent applicable. In addition to the foregoing, from and after the Effective Date and without need for further order of the Bankruptcy Court, the Debtors shall be authorized and empowered to take such steps as they shall determine, in their discretion, to effectuate a orderly liquidation, disposition or dissolution of any Excluded Entity or Excluded Assets (each as defined in the TAC Agreements) other than the Excluded Assets encumbered by a lien of BB&T, and the BB&T Liquidating Trustee shall determine in its discretion, to effectuate a orderly liquidation or disposition of any Excluded Asset encumbered by BB&T's lien (each as defined in the TAC Agreements), and the Bankruptcy Court shall retain jurisdiction to hear and determine any of such matters in accordance with Article IX of this Plan. The Debtors will be responsible for all fees and expenses associated with the disposition of the Excluded Entities and the Excluded Assets, other than those encumbered by a BB&T lien, and the BB&T Liquidating Trust will be

103755566.10

responsible for all fees and expenses associated with the administration, disposition, or liquidation of the Excluded Assets encumbered by BB&T's liens. The Reorganized Debtors shall have no responsibility, obligation, or liability whatsoever for any fees, expenses, costs, taxes, or any other amounts associated with the liquidation, disposition, or administration of the Excluded Entities or Excluded Assets. On the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including, without limitation, (i) the execution and entry into the TAC Agreements, (ii) adoption and approval of those terms of the Debt Restructuring Transactions and TAC Agreements that have not already been approved pursuant to a Final Order of the Bankruptcy Court, (iii) the distribution of the Reorganized Securities (as defined in the Plan Sponsor Agreement), (iv) selection of the board and the officers of the Reorganized Debtors and (v) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors or any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect without any requirement of further action by the security holders, directors, or officers of the Debtors or the Reorganized Debtors. On the Effective Date or as soon as practicable thereafter, each of the applicable Reorganized Debtors shall adopt amended certificates of incorporation (or certificates of formation as limited liability companies) and shall file such certificates with the Secretary of State of the State of Florida. In addition, on or before the Effective Date, pursuant to and only to the extent required by section (1123(a)(6) of the Code, the amended certificates of incorporation shall satisfy the provisions of the Bankruptcy Code and shall include, among other things, pursuant to section 1123(a)(6) of the Code, (i) a provision prohibiting the issuance of non-voting equity securities and (ii) a provision setting

forth an appropriate distribution of voting power among classes of equity securities possessing voting power. On the Effective Date, the boards of directors or each of the Reorganized Debtors shall be deemed to have adopted amended bylaws for each Reorganized Debtor.

2.      Rights of Action.

(a)      Except as otherwise provided in subsection (b) below, on the Effective Date, any right, claim or cause of action, belonging to the Debtors or their estates against any Person or Entity, including without limitation, any claim to avoid a transfer under Section 544, 547, 548, 549 or 553(b) of the Code shall be transferred and assigned by the Reorganized Debtors to the Unsecured Creditor Trust for the ratable benefit of Holders of Allowed Class 12, 13, 18, 21 and 33Unsecured Claims, to the extent not previously assigned and/or released. The Trustee of the Unsecured Creditor Trust, in its reasonable discretion, shall pursue, settle or release all such rights of action, as appropriate, in accordance with the best interest of and for the benefit of the ratable benefit of Holders of Allowed Class 12, 13, 18, 21 and 33Unsecured Claims entitled to receive distributions from the Island One Unsecured Creditor Trust.

(b)      On the Effective Date, any right, claim or cause of action, belonging to St. Croix One or  its estate against any Person or Entity, including without limitation, any claim to avoid a transfer under Section 544, 547, 548, 549 or 553(b) of the Code shall be transferred and assigned by the Reorganized Debtors to the BB & T  Trust for the ratable benefit of Holders of Allowed Class 27  Unsecured Claims, to the extent not previously assigned and/or released. The BB&T Liquidating Trustee of the BB&T Liquidating Trust, in its reasonable discretion, shall pursue, settle or release all such rights of action, as appropriate, in accordance with the best interest of and for the benefit of the ratable benefit of Holders of

50

Allowed Class 27 Unsecured Claims entitled to receive distributions from the BB&T Liquidating Trust.

3.    Dissolution of Committee.

Upon the occurrence of the Effective Date, the Committee shall be dissolved, and each individual member and any retained Professional shall be discharged from any further activities in the Bankruptcy Cases. The professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for services rendered or expenses incurred after the Effective Date, except for reasonable fees for services rendered, and actual and necessary expenses incurred, in connection with any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed and served after the Effective Date pursuant to Section 8.05 of the Plan.

4.    Professional Fees and Expenses.

Each Professional retained or requesting a compensation in the Bankruptcy Cases, pursuant to §§ 327, 328, 330, 331 or 503(b) of the Code, in connection with fees incurred prior to the Effective Date shall file an application for allowance of final compensation and reimbursement of expenses in the Bankruptcy Cases on or before the thirtieth (30th) day after the Effective Date. Objections, if any, to such applications may be filed on or before the forty-fifth (45th) day after Effective Date.

5.    U.S. Trustee Fees.

On the Effective Date, the Debtors shall pay all fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code ("U.S. Trustee Fees"). Thereafter, the Unsecured Creditors Trust and the BB&T Liquidating Trust shall pay their pro rata portion of the all U.S. Trustee Fees.

6. Good Faith Determination in Respect of TAC.

As contemplated under and subject in all respects to the TAC Agreements, upon the Effective Date, TAC shall be deemed to be a "good faith purchaser" pursuant to section 363(m) of the Bankruptcy Code in connection with the approval and consummation of the transactions contemplated under the TAC Agreements.

7. Funds Generated During Bankruptcy Cases.

Funds generated from operations until the Effective Date will be distributed in accordance with the Orders entered in the Bankruptcy Cases and the priorities set forth in the Code, and in accordance with the Plan Sponsor Agreement and Restructuring Term Sheet.

8. Management and Control of the Reorganized Debtors.

The exact structure of the Reorganized Debtors' management is unknown at this time. Members of the management team of the Debtors may be offered employment with the Reorganized Debtors. At this time, there are no formal agreements related to the management team of the Reorganized Debtors.

Debtors will file the Plan supplement prior to the Confirmation Hearing to disclose the structure of the Reorganized Debtors' management.

9. Offices and Directors of the Reorganized Debtors.

The identity of the officers and directors of the Reorganized Debtors is unknown at this time. Debtors will file the Plan Supplement prior to the Confirmation Hearing to disclose the officers and directors of the Reorganized Debtors.

103755566.10

10. **Transfer Taxes.**

Pursuant to section 1146(a) of the Code, the issuance, transfer or exchange of a security, including documents and instruments with respect to the sale of property, or the making or delivery of an instrument of transfer, under the Plan shall not be taxed any law imposing a stamp tax or otherwise. Transfers into and out of the BB&T Liquidating Trust and Unsecured Creditors Trust are transfers pursuant to the Plan.

D. **Unexpired Leases and Executory Contracts.**

To the extent the Debtors assume any executory contract or unexpired lease prior to the Confirmation Date, any party asserting a Claim, pursuant to Section 365 of the Code, arising from the rejection of an executory contract or lease shall file a proof of such Claim within thirty (30) days after the entry of an Order rejecting such contract or lease, and any Allowed Claim resulting from rejection shall be a Class 13, 18, 21, 27 or 33 Claim depending on the rejecting Debtor. The Debtors shall have through and including the hearing on Confirmation within which to assume or reject any unexpired lease or executory contract; and, further, that in the event any such unexpired lease or executory contract is not assumed (or subject to a pending motion to assume) by such date, then such unexpired lease or executory contract shall be deemed rejected as of the Confirmation Date. The Plan also provides for the Bankruptcy Court to retain jurisdiction as to certain matters as stated in the Plan, including, without limitation, prosecution of all causes of action and objection to Claims.

The Debtors will assume and assign the contracts set forth on Exhibit B attached to this Disclosure Statement. In the event the Debtors determine that they desire to assume additional contracts, the Debtors will file separate motions to assume and assign the additional contracts.

103755566.10

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (i) the approval pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption, or the assumption and assignment. as applicable, of the executory contracts and unexpired leases assumed pursuant to Section 7.01 of the Plan and (ii) the approval, pursuant sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 7.01 of the Plan. Unless otherwise specified by the Debtors, each executory contract and unexpired lease assumed pursuant to Section 7.01 of the Plan shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease.

Except as may be otherwise may be agreed to by the counterparty to the executory contract or unexpired lease of an assumed executory contract or unexpired lease, as soon as practicable after the Effective Date, the Reorganized Debtors shall pay all undisputed cure amounts with respect to such assumed executory contract or unexpired lease. All disputed defaults with respect to any assumed executory contract or unexpired lease that are required to be cured shall be cured either within thirty (30) days of the entry of the Final Order determining the amount, if any, of the Debtors' liability with respect to such cure amount, or as may otherwise be agreed to with the counterparty to such executory contract or unexpired lease.

## IV. CONFIRMATION

### A. Confirmation Hearing.

Section 1128 of the Code requires the Court, after notice, hold a Confirmation Hearing on the Plan at which time any party in interest may be heard in support of or in

opposition to Confirmation. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement to be made at the Confirmation Hearing. Any objection to Confirmation must be made in writing and filed with the Clerk, and delivered to the following persons, at least seven (7) days prior to the Confirmation Hearing:

> Counsel for Debtors:
>
> Elizabeth A. Green, Esq.
> Jimmy D. Parrish, Esquire
> Baker & Hostetler LLP
> 200 S. Orange Ave.
> SunTrust Center, Suite 2300
> Orlando, FL 32801-3432
>
> Island One, Inc., et al.:
>
> Deborah Linden
> 8680 Commodity Circle
> Orlando, FL 32819
>
> United States Trustee:
>
> Attn: Miriam Suarez, Esquire
> 135 W. Central Blvd., Suite 620
> Orlando, FL 32801

B.     <u>Financial Information Relevant to Confirmation.</u>

The Plan contemplates a sale of the Reorganized Debtors' equity per the TAC transactions, recapitalization of the lion's share of the Debtors' secured debt, elimination of encumbered assets where an agreement on restructuring terms could not be reached, preservation of resort operations and consumer relationships, preservation of employee and vendor relationships, and a recovery for unsecured creditors (subject to satisfaction of certain conditions). The global financial impact of the transactions contemplated under the TAC Agreements and the attendant capitalization of the Reorganized Debtors is far better than would be the result if the Debtors were liquidated and dismantled (assuming a credit bid by the Lenders

for their respective collateral) and the absolute priority rule were strictly applied, leaving increased administrative expenses and unsecured creditors no recovery prospects.

## C. Confirmation Standards.

For a plan of reorganization to be confirmed the Code requires, among other things, that a plan be proposed in good faith and comply with the applicable provisions of Chapter 11 of the Code. Section 1129 of the Code also imposes requirements that at least one class of Impaired Claims accept a plan, that confirmation of a plan is not likely to be followed by the need for further financial reorganization, that a plan be in the best interests of creditors, and that a plan be fair and equitable with respect to each class of Claims or Interests which is Impaired under the plan.

The Bankruptcy Court shall confirm a plan only if it finds that all of the requirements enumerated in Section 1129 of the Code have been met. The Debtors believe that the Plan satisfies all of the requirements for Confirmation.

### 1. Best Interests Test.

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each holder of an Allowed Claim or Interest of such Class either: (a) has accepted the Plan; or (b) will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were, on the Effective Date, liquidated under Chapter 7 of the Code. Attached hereto as Exhibit "C" is a liquidation analysis which demonstrates that best interest test is met. In a liquidation scenario, the secured creditors would obtain relief from stay as to their collateral, and there would be no distribution to unsecured creditors.

103755566.10

2.      <u>Financial Feasibility.</u>

The Code requires, as a condition to Confirmation, that Confirmation of a plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless the liquidation is proposed in the Plan. The Debtors believe that the implementation and effectuation of the TAC Agreements and the Plan, which collectively contemplate the sale of the Reorganized Debtors' equity per the transactions contemplated under the TAC Agreements and attendant capitalization of the Reorganized Debtors, recapitalization of the lion's share of the Debtors' secured debt, elimination of encumbered assets where an agreement on restructuring terms could not be reached (thus eliminating the financial burden associated with maintaining such assets), preservation of resort operations and consumer relationships, and the preservation of employee and vendor relationships will create financially stability for the Reorganized Debtors post-confirmation, and will avoid the need for any further financial restructuring, and will further avoid a subsequent liquidation of the Debtors. The Debtors' will file a feasibility analysis with the Plan Supplement.

3.      <u>Acceptance by Impaired Classes.</u>

The Code requires as a condition to Confirmation that each Class of Claims or Interests that is Impaired under the Plan accept such plan, with the exception described in the following section. A Class of Claims has accepted the Plan if the Plan has been accepted by Creditors that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class who vote to accept or to reject the Plan.

A Class of Interests has accepted the Plan if the Plan has been accepted by holders of Interests that hold at least two-thirds (2/3) in amount of the Allowed Interests of such

Class that vote to accept or reject the Plan. Holders of Claims or Interests who fail to vote are not counted as either accepting or rejecting the Plan.

A Class that is not Impaired under a Plan is deemed to have accepted such Plan; solicitation of acceptances with respect to such Class is not required. A Class is Impaired unless: (i) the legal, equitable, and contractual rights to which the Claim or Interest entitles the holder of such Claim or Interest are not modified; (ii) with respect to Secured Claims, the effect of any default is cured and the original terms of the obligation are reinstated; or (iii) the Plan provides that on the Effective Date the holder of the Claim or Interest receives on account of such claim or interest, Cash equal to the Allowed Amount of such Claim or, with respect to any Interest, any fixed liquidation preference to which the holder is entitled.

4.      Confirmation Without Acceptance by all Impaired Classes; "Cramdown."

The Code contains provisions that enable the Court to confirm the Plan, even though all Impaired Classes have not accepted the Plan, provided that the Plan has been accepted by at least one Impaired Class of Claims Section 1129(b)(1) of the Code states:

> "Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

This section makes clear that the Plan may be confirmed, notwithstanding the failure of an Impaired Class to accept the Plan, so long as the Plan does not discriminate unfairly and it is fair and equitable with respect to each Class of Claims that is Impaired under and has not accepted the Plan.

**THE DEBTORS BELIEVE THAT, IF NECESSARY, THEY WILL BE ABLE TO MEET THE STATUTORY STANDARDS SET FORTH IN THE**

**CODE WITH RESPECT TO NONCONSENSUAL CONFIRMATION OF THE PLAN AND WILL SEEK SUCH RELIEF.**

D.     Consummation.

The Plan will be consummated and Payments made if the Plan is Confirmed pursuant to a Final Order of the Court and Plan Distributions commence. It will not be necessary for the Reorganized Debtors to await any required regulatory approvals from agencies or departments of the United States to consummate the Plan. The Plan will be implemented pursuant to its provisions and the Code.

E.     Effects of Confirmation.

1.     Authority to Effectuate the Plan

Upon the entry of the Confirmation Order by the Bankruptcy Court, the Plan provides all matters provided under the Plan will be deemed to be authorized and approved without further approval from the Bankruptcy Court. The Reorganized Debtors shall be authorized, without further application for an order of the Bankruptcy Court, to take whatever action is necessary to achieve consummation and carry out the Plan in accordance with this Plan and the Code.

2.     Binding Effect of Confirmation

Confirmation of the Plan will legally bind the Debtors, all Creditors, Interest Holders, and other Parties in Interest to the provisions of the Plan whether or not the Claim or Interest Holder is impaired under the Plan and whether or not such Creditor or Interest Holder voted to accept the Plan.

3.     Discharge of Claims

To the fullest extent permitted by applicable law, and except as otherwise provided in the Plan, the operative documents implementing the Plan, or the Confirmation Order:

(a) on the Effective Date the Confirmation Order shall operate as a discharge under 11 U.S.C. §1141(d) of the Bankruptcy Code, and as a release of any and all Claims, Debts, Liens, Security Interests, and encumbrances of and against the Reorganized Debtors and all Property that arose before Confirmation, including without limitation, any Claim of a kind specified in §§ 502(g), 502(h), or 502(i) of the Bankruptcy Code, and all principal and interest, whether accrued before, on, or after the Petition Date, regardless of whether (i) a Proof of Claim has been filed or deemed filed, (ii) such Claim has been Allowed pursuant to §502 of the Bankruptcy Code, or (iii) the Holder of such Claim has voted on the Plan or has voted to reject the Plan; and (b) from and after the Effective Date (i) all Holders of Claims shall be barred and enjoined from asserting against the Reorganized Debtors and its property any Claims, Debts, Liens, Security Interests, and encumbrances of and against all Property of the Estate, and (iii) the Debtors shall be fully and finally discharged of any liability or obligation on a Disallowed Claim or an Interest. Except as otherwise specifically provided herein, nothing in the Plan shall be deemed to waive, limit, or restrict in any manner the discharge granted upon Confirmation of the Plan pursuant to §1141 of the Bankruptcy Code.

Since the Plan contemplates the implementation and effectuation of the TAC Agreements, including the formation of the Reorganized Debtors, this Section will apply and all Claims will be discharged as provided herein.

4.      Judicial Determination of Discharge

As of the Confirmation Date, except as provided in the Plan, all Persons shall be precluded from asserting against the Debtors any other or further Claims, debts, rights, causes of action, liabilities, or equity interests based on any act, omission, transaction, or other activity of any kind or nature that occurred before the Confirmation Date and the Confirmation

Order shall be a judicial determination of discharge of all Claims against Debtors, pursuant to Sections 524 and 1141 of the Bankruptcy Code, and shall void any judgment obtained or entered against Debtors at any time to the extent the judgment relates to discharged Claims.

5. Injunction

As part of the Confirmation Order, the Bankruptcy Court shall permanently enjoin and prohibit all Holders of Claims, Liens, Security Interests, Liens, encumbrances rights and Interest in, to or against the Debtors or any of their assets from asserting, prosecuting or collecting such Claims, Liens, Security Interests (other than Liens or Security Interests expressly continued pursuant to the terms of the Plan or the operative documents between the Debtors and the Holder of a Claim or Equity Interest regarding the treatment of the Claim or Interest under the Plan), encumbrances, rights and Interests against the Reorganized Debtors; provided, however, that such injunction shall not apply to any Claim asserted against the Debtors by a claimant based upon a default by the Debtors in performance of its obligations to the claimant under the Plan. Since the Plan contemplates the implementation and effectuation of the TAC Agreements, including the reorganization of the Debtors, this Section will apply and all Claims, Liens, Security Interests, encumbrances, rights and Interests against the Reorganized Debtors will be enjoined as provided herein.

6. Post-Confirmation Status Reports

Pursuant to the Plan, within 120 days of the entry of the Confirmation Order, the Debtors, the Unsecured Creditors Trust and the BB&T Liquidating Trust will file status reports with the Court explaining what progress has been made toward consummation of the confirmed Plan. The Reorganized Debtors will not have any responsibility to file Post Confirmation Status Reports. The status report will be served on the United States Trustee and those parties who

103755566.10

have requested special notice post-confirmation. The Bankruptcy Court may schedule subsequent status conferences in its discretion.

## V.    RELEASES.

### A.    *Releases/Injunctions.*

The Plan is premised upon the releases contained below.  The Debtors assert the releases are being given as fair consideration for the Cash Consideration paid by TAC, the continuity of the Debtors, and the release of certain claims by TFC and Liberty, the voluntary release of certain collateral by TFC and Liberty in favor of the Reorganized Debtors in accordance with the TAC Agreements, the agreement by TFC and Liberty to provide additional financing to the Reorganized Debtors post-Effective Date pursuant to TAC Agreements. Moreover, the Debtors believe any Claims or Causes of Action against the Released Parties are subject to substantial defenses and extensive litigation costs and risks.  The Debtors further believe that any recovery from such Claims or Causes of Action would be minimal (at best), would require protracted and costly litigation, and the Debtors would not be restructured and reorganized.

From and after the Confirmation Date, the Releases, described in Article IX in the Plan and Article V herein, shall become effective and the Debtors and all parties-in-interest shall be enjoined from commencing or continuing any actions to enforce Released Claims against the Released Parties.

*a.    Rule 3016(c) Declaration.  In accordance with the requirements of Rule 3016(c), the provisions of Article IX in the plan and this Article V, operate to specifically release the Released Parties from all claims and enjoin certain acts in connection with such releases. Such releases and injunctions cover the Released Parties whose contributions are so critical to*

the reorganization effort that without them the reorganization would fail. From and after the Confirmation Date, the Releases described herein shall become effective and the Debtors, All Interested Parties, Unsecured Creditors, and Equity Security Holders shall be enjoined from commencing or continuing any action to enforce Released Claims against the Released Parties. Within this Section **bold print and italics** are used to identify the exact nature of releases and to identify the parties subject to the release.

        b.      <u>**General Releases by the Debtors and Interested Parties.**</u>

On the Effective Date, **the Debtors, their Estates, all persons or entities who have held, hold or may hold Claims against or Interests in the Debtors, and all parties in interest, and any of their successors, assigns or Representatives** shall be deemed to have waived, released and discharged all claims, obligations, rights, causes of action and liabilities whether based in tort, fraud, contract or otherwise, which they possessed, possess or may possess prior to entry of the Confirmation Order against the Released Parties, except as otherwise provided in the Plan or the Confirmation Order. The foregoing releases are enforceable only to the extent permitted by applicable law.

        c.      <u>**Injunction Related to Releases.**</u>  Except as expressly provided in the Plan or to otherwise enforce the terms of the Plan as of the Confirmation Date, **the Debtors, their Estates, all persons or entities who have held, hold or may hold Claims against or Interests in the Debtors, and all parties in interest, and any of their successors, assigns or Representatives** to the fullest extent permitted by applicable law, are permanently enjoined from taking any of the following actions on account of any such discharged Claims, debts, liabilities, terminated Interests, or rights: (i) commencing or continuing in any manner any action or proceeding against the Released Parties or their respective property, other than to enforce any right,

63

*pursuant to the Plan, to a distribution; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Released Parties; (iii) creating, perfecting, or enforcing any lien or encumbrance against property of the Released Parties; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability, or obligation due to the Released Parties; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.*

        *d.* **__Exculpation__**. *Except as otherwise provided by the Plan or the Confirmation Order, on the Effective Date, the Debtors, their respective officers, directors, employees, Representatives, members, attorneys, financial advisors, successors or assigns shall be deemed released by each of them against the other, and by all holders of Claims or Interests, of and from any claims, obligations, rights, causes of action and liabilities for any act or omission in connection with, or arising out of, the Bankruptcy Cases, including, without limiting the generality of the foregoing, all sales of assets, the Disclosure Statement, the pursuit of approval of the Disclosure Statement, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions that constitute willful misconduct or gross negligence, and all such Persons, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and under the Code. Notwithstanding anything herein to the contrary, as of the Effective Date, none of the Debtors, the Reorganized Debtors, the Majority Lenders, TAC, and their respective Representatives (but solely in their capacities as such) shall have or incur any liability for any claim, cause of action or other assertion of liability for any act taken or omitted to be taken since the Petition Date in connection with, or arising out of, the Bankruptcy Cases, the formulation, dissemination, confirmation, consummation, or*

administration of the Plan, property to be distributed under the Plan, or any other act or omission in connection with the Bankruptcy Cases, the Plan, the Disclosure Statement, the TAC Agreements or any contract, instrument, document or other agreement related thereto, provided, however, that the foregoing shall not affect the liability of any person that would otherwise result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, fraud or criminal that causes damages.

## VI. ALTERNATIVE TO THE PLAN.

As described herein, the Plan contemplates a sale of the Reorganized Debtors' equity in accordance with the TAC transactions, infusion of badly needed equity capital by TAC, recapitalization of the lion's share of the Debtors' secured debt, elimination of encumbered assets where an agreement on restructuring terms could not be reached, preservation of resort operations and consumer relationships, preservation of employee and vendor relationships, and a recovery for unsecured creditors (subject to satisfaction of certain conditions).

If the Plan is not confirmed and consummated, the Debtors believe that the most likely alternative is a sale of the Debtors or a liquidation of the Debtors under Chapter 7 of the Code, likely following the transition of the Lenders' collateral to the respective Lenders (either through the Lenders exercising their respective credit bid rights, or through abandonment to the Lenders). In either case, the Debtors believe that the global financial impact of the TAC transactions is far better than would be the result if the Debtors were liquidated and dismantled and the absolute priority rule were strictly applied, leaving increased administrative expenses and unsecured creditors no recovery prospects, thus making a liquidation either in a Chapter 11 or in a Chapter 7 is a much less attractive alternative to Creditors because of the increased administrative expenses associated with such a wind down.

103755566.10

# VII.   CONCLUSION.

The Debtors recommend that all Holders of Claims vote to accept the Plan.

DATED this 22<u>nd</u> day of March, 2011 in Orlando, Florida.

/s/ Elizabeth A. Green
Elizabeth A. Green, Esq.
Florida Bar No.: 0600547
egreen@bakerlaw.com
Jimmy D. Parrish, Esquire
Florida Bar No. 526401
jparrish@bakerlaw.com
BAKER & HOSTETLER, LLP
200 S. Orange Avenue
SunTrust Center, Suite 2300
Orlando, Florida 32801
Tel: (407)649-4000
Fax: (407)841-0168
*Attorneys for the Debtors*

103755566.10