UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

ISLAND ONE, INC, *et al.*

Debtors.

_____/

Chapter 11
Case No.: 6:10-bk-16177-KSJ
**Jointly Administered with Case Nos.:**
**6:10-bk-16179-KSJ; 6:10-bk-16180-KSJ**
**6:10-bk-16182-KSJ; 6:10-bk-16183-KSJ**
**and 6:10-bk-16189-KSJ**

**THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS' OBJECTION TO (A) APPROVAL OF
DISCLOSURE STATEMENT, (B) CONFIRMATION OF
PLAN OF REORGANIZATION, AND (C) APPROVAL OF SALE OF
SUBSTANTIALLY ALL OF THE ASSETS OR EQUITY OF THE DEBTORS**

The Official Committee of Unsecured Creditors (the "**Committee**"), by and through

the undersigned counsel, hereby files this Objection to (A) Approval of Disclosure Statement,

(B) Confirmation of Plan of Reorganization, and (C) Approval of Sale of Substantially All of

the Assets or Equity of the Debtors[1] (the "**Objection**") and, in support thereof, respectfully

states as follows:

**PRELIMINARY STATEMENT**

The Committee objects to approval of the Debtors' amended disclosure statement and

confirmation of the Debtors' amended plan of reorganization because they are the product of

a fundamentally flawed process that has been pursued for the sole benefit of the Debtors'

insiders and majority lenders, Textron Financial Corporation ("**Textron**") and Liberty Bank,

N.A. ("**Liberty**" and, together with Textron, the "**Majority Lenders**").  From the outset of

these bankruptcy cases, the Majority Lenders have abused the bankruptcy process by

orchestrating events for their benefit without any regard for the interests of unsecured

---

[1] Island One, Inc., Crescent One, LLC, St. Croix One, LLC, Island One Resorts Management Corporation, Navigo Vacation Club, Inc., and IOI Funding I, LLC are hereinafter referred to as the "**Debtors**."

creditors or the Debtors' estates. Moreover, the Debtors' management has been essentially doing the bidding of the Majority Lenders inasmuch as the Debtors' principal officer, Deborah Linden, is beholden to the Majority Lenders as a result of her substantial personal guaranty. Accordingly, the current plan and disclosure statement are the result of the Debtors' and the Majority Lenders' absolute failure to provide due process to interested parties throughout these Chapter 11 cases and are proposed in bad faith. Furthermore, the plan and disclosure statement fail to meet the requirements of Title 11 of the United States Code (the "**Bankruptcy Code**"). As such, the Court should disapprove the disclosure statement, deny confirmation of the plan, and deny the Debtors' attempt to sell substantially all of the assets or equity of the Debtors.

## BACKGROUND

Prior to the commencement of these Chapter 11 cases, the Debtors and the Majority Lenders had been in negotiations with Bay Harbour Management, L.C. ("**Bay Harbour**") to purchase the Debtors' business operations for almost a year. Despite such negotiations, the parties had not executed definitive sale documents prior to the filing of these Chapter 11 cases.

On September 10, 2010, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors are in the business of selling and managing timeshare properties and interests in vacations clubs. No trustee or examiner has been appointed in these cases.

As of the petition date, the Debtors owed the Majority Lenders approximately $104 million. As security for such obligations, the Majority Lenders assert a first-priority security

interest in substantially all of the Debtors' receivables, certain timeshare intervals owned by the Debtors, and substantially all of the Debtors' non-real estate assets.[2]

On September 30, 2010, the United States Trustee appointed the members of the Committee. (Doc. No. 63.)  After the Committee and its counsel became involved in these cases, it quickly became apparent that the Majority Lenders desired to enter into a deal with Bay Harbour that would enable the Majority Lenders to recover substantially all of their secured claims, while ignoring the interests of other parties, including Branch Banking & Trust ("**BB&T**"), and providing virtually no return to unsecured creditors.

**1)**      **The Flawed Sale Process**

At the very outset of these cases, the Majority Lenders conditioned the Debtors' use of cash collateral on the filing of a plan and disclosure statement proposing to sell substantially all of the Debtors' assets or equity by no later than December 17, 2010.  (Doc. No. 35.)  In furtherance of the Majority Lenders' demands, less than one month after the commencement of these Chapter 11 cases, on October 5, 2010, the Debtors filed a joint Chapter 11 plan of reorganization (the "**Initial Plan**") (Doc. No. 73) and a joint disclosure statement with respect thereto (the "**Initial Disclosure Statement**") (Doc. No. 72) proposing to sell substantially all of the Debtors' assets or equity on or before December 17, 2010.

Despite the Initial Plan and Initial Disclosure Statement having no specific provisions as to how a sale of the Debtors' assets or equity would be conducted, on November 12, 2010, the Court conditionally approved the Initial Disclosure Statement and scheduled an

---

[2] The Committee has filed a motion seeking derivative authority to file a complaint to challenge the extent, validity, and priority of the Majority Lenders' liens in, among other things, certain time share intervals, certain alcoholic beverage licenses, certain motor vehicles and certain deposit accounts.  (Doc. No. 298.) Such motion is scheduled to be heard at the Continued Confirmation Hearing (as hereafter defined).

evidentiary hearing to consider confirmation of the Initial Plan for December 15, 2010 at 11:00 a.m. (the "**Initial Confirmation Hearing**"). (Doc. No. 172.)

On November 14, 2010, the Debtors filed a Motion to Approve Bid and Sale Procedures (the "**Bid Procedures Motion**") (Doc. No. 170) proposing to sell substantially all of the Debtors' assets or equity in a three-week process with the following significant deadlines:

| | |
|---|---|
| Letter of Interest Deadline | November 24, 2010 |
| Bid Deposit and Submission of Purchase Documents Deadline | December 3, 2010 |
| Evaluation of Qualifying Bids Deadline | December 8, 2010 |
| Auction | December 10, 2010 |
| Sale/Confirmation Hearing | December 15, 2010 |

On November 16, 2010, the Court noticed an evidentiary hearing on the Bid Procedures Motion for December 1, 2010. (Doc. No. 173.) Thus, the letter of interest deadline proposed by the Debtors and Majority Lenders was to occur prior to the Court's consideration of the Bid Procedures Motion.

The Committee informed the Debtors and the Majority Lenders that it objected to the Bid Procedures Motion because the short timeframe proposed by the Debtors and Majority Lenders did not constitute a fair sales process. However, the Debtors and the Majority Lenders refused the Committee's request to extend the proposed bid procedures deadlines.

At an unrelated hearing on November 17, 2010, the Debtors requested that the Court consider the Bid Procedures Motion despite having just filed the motion on November 14, 2010 and the Court having already noticed the motion for a hearing on December 1, 2010. The Court denied the Debtors' request stating:

> [The Bid Procedures Motion] will not be considered. It was filed on November the 14th. There has to be notice to parties and I'm not going to hear the bid procedures motion today. . . . If you file it two days before court, it needs to be noticed. It was noticed, it is going to be heard December the 1st.

Thus, the Court properly refused to consider the Debtors' and the Secured Lenders' efforts to have the Bid Procedures Motion approved without due process to interested parties.

After the November 17, 2010 hearing, the parties continued to discuss a possible extension of the bid procedures deadlines but were unable to reach a consensual resolution. As such, on November 23, 2010, BB&T filed an Expedited Motion to Continue Hearing on Confirmation of Plan of Reorganization, Final Approval of Disclosure Statement and Extend All Associated Deadlines (the "**BB&T Motion to Continue**") (Doc. No. 190) asserting that the Debtors' proposed bidding procedures and plan confirmation deadlines were overly ambitious, provided insufficient notice to creditors, and failed to address a sale of BB&T's collateral in any meaningful way. On November 24, 2010, the Committee filed a joinder in the BB&T Motion to Continue (the "**Committee Joinder**") (Doc. No. 192) in which the Committee joined in the arguments raised by BB&T and asserted that the Debtors' proposed sale and confirmation schedule inured solely to the benefit of the Majority Lenders. As set forth in the BB&T Motion to Continue and the Committee Joinder, the Debtors' proposal to solicit votes on the Initial Plan without creditors having any information as to the bids submitted or the outcome of the proposed auction certainly could not provide creditors with adequate information with which to make an informed vote on the Initial Plan.

Despite the objections by the Committee and BB&T, as well as the fact that none of the proposed bid procedures were yet to be approved by the Court, the Debtors and Majority Lenders required prospective bidders to submit their letters of interest by November 24, 2010. On November 24, 2010, the Committee was provided with seven letters of interest submitted by (i) Bay Harbour, through an entity called Timeshare Acquisitions, LLC ("**TAC**"), (ii) Vacation Innovations, LLC ("**Vacation Innovations**"), (iii) Raintree Resorts

International ("**Raintree**"), (iv) Bluegreen Corporation ("**Bluegreen**"), (v) NPA Investment Group, LLC ("**NPA**"), (vi) Mid-Town Suites, LLC ("**Mid-Town**"), and (vii) Intrawest Resort Ownership U.S. Corporation ("**Intrawest**"). The TAC and NPA letters of interest expressed a desire to purchase substantially all of the Debtors' assets or equity. The Mid-Town letter of interest only offered to purchase the assets of Crescent One, LLC ("**Crescent One**") located in Miami Beach, Florida. The remaining letters of interest from Vacation Innovations, Raintree, Bluegreen, and Intrawest were offers to operate the Debtors' business on a fee-for-services basis.

Further ignoring the fact that the Court had not yet approved the Bid Procedures Motion, on November 30, 2010, the Debtors filed a modified plan (the "**Modified Plan**") and a modified disclosure statement (the "**Modified Disclosure Statement**") incorporating the bid deadlines proposed in the Bid Procedures Motion. (Doc. Nos. 216 and 217.) Accordingly, the Debtors' Modified Plan and Modified Disclosure Statement contained numerous *unapproved* deadlines associated with the Debtors' proposed sale that were scheduled to occur prior to the Court's approval of the Modified Disclosure Statement or confirmation of the Modified Plan.

After conferring with BB&T and the Committee regarding their objections to the proposed sale and confirmation process, on November 30, 2010, the Debtors and the Majority Lenders initially agreed to an extension of the proposed bidding procedures and confirmation schedule and agreed to present the extended deadlines to the Court for approval at the December 1, 2010 hearing on the Bid Procedures Motion. However, *at approximately 10:30 p.m. the night before the hearing*, the Debtors' counsel emailed counsel for the Committee and BB&T that the Debtors would not agree to the extensions requested by the

Committee and BB&T (and originally agreed to by all parties) and would be going forward with the Bid Procedures Motion as filed.

As specifically set forth in the November 30, 2010 email, the Debtors would not agree to an extension of the deadlines because "Bay Harbour conditioned its offer upon the Debtor's compliance with the bid deadlines set forth in the two interim cash collateral orders, the final cash collateral order and the bid procedures motion." Thus, it was apparent that the Debtors and the Majority Lenders desired to push through a rushed sale process that would favor Bay Harbour at the expense of other prospective bidders and the interests of the Debtors' unsecured creditors.

2)    **The December 1, 2010 Bid Procedures Hearing**

At the December 1, 2010 hearing on the Bid Procedures Motion, BB&T's Motion to Continue, and the Committee Joinder, the Debtors indicated to the Court that they had received seven letters of intent for the assets or equity of the Debtors, including the TAC offer. Specifically, the Debtors asserted that, unless the Court approved the procedures proposed in the Bid Procedures Motion, TAC would withdraw its bid for the equity of the Debtors. BB&T and the Committee argued that the threat that TAC would withdraw its bid was unlikely and that various parties had detrimentally relied on the prior agreement reached with the Debtors and the Majority Lenders to seek to extend the proposed bid procedures and confirmation related deadlines.

In support of BB&T's objection to the Bid Procedures Motion, the Court heard the testimony of Nelson Cienfuegos ("**Mr. Cienfuegos**") as the representative of NPA most involved with its preparation to submit a bid for the assets or equity of the Debtors. Mr. Cienfuegos testified that NPA was a large timeshare property developer in Mexico looking to

gain an entry into the United States timeshare market and that NPA was ready and willing to enter into a transaction to purchase the assets of the Debtors. Mr. Cienfuegos testified that NPA was given *only eighteen days* to engage in due diligence in order to submit a letter of interest prior to the November 24, 2010 deadline imposed by the Debtors (even though such deadline was never approved by the Court). Mr. Cienfuegos further testified that certain individuals who were working to develop the NPA bid for the Debtors' assets had left Orlando, Florida on the day before the December 1, 2010 hearing after being informed by the Debtors' investment banker, Western Reserve Partners, LLC ("**Western Reserve**"), that the Debtors had agreed to extend the deadline for submission of bids until December 23, 2010. Moreover, Mr. Cienfuegos testified that NPA was willing to post the $500,000 bid deposit required by the proposed bid procedures; however, NPA did not post the deposit because the bid procedures had not yet been approved by the Court. Mr. Cienfuegos also testified that the compressed timeline set forth in the unapproved Bid Procedures Motion made it impossible for NPA to prepare the executable purchase documents in accordance with the deadline required therein.

After hearing the evidence presented and the arguments of counsel, the Court concluded that the sales process was not being properly pursued by the Debtors or the Majority Lenders. Specifically, the Court stated as to the fairness of the process being proposed that:

> This has not been a process that dovetails well with Chapter 11 procedures or allows constituencies other than perhaps purchasers that have been working with the debtor for a long period of time, insiders and others intricately involved in the debtors' operation to participate. The job of the Chapter 11 process is to give parties the opportunity to participate fairly and fully with adequate opportunity to express opinions and to review the adequacy of each party's positions and absolutely negotiate a result.

The Court further concluded that it was unlikely that TAC would withdraw its letter of intent despite its threat that it would do so. As such, the Court determined that it was appropriate to extend the requested bid procedures and confirmation deadlines in order to "maximize values for all the various constituencies in this case . . . for not only Textron but also for all the other creditors and parties in this case . . . ."

With respect to the fact that the Debtors and the Majority Lenders were pushing to enforce the unapproved deadlines that were provided to potential bidders and contained in the Modified Plan, the Court admonished the parties that "you can negotiate until the cows go home, but unless and until you get the court approval for the bid process and procedures and the confirmation schedules, you're just talking to yourselves." Indeed, the Court made it clear that "certain formalities and procedures inherent in the Chapter 11 process" would be followed in these cases to ensure "a full and fair process."

Accordingly, the Court granted the Committee's and BB&T's request to extend the confirmation hearing and all associated confirmation deadlines. (Doc. No. 227.) On December 9, 2010, the Court entered an order continuing the Initial Confirmation Hearing until February 16, 2011 and directing the Debtors to file an amended plan and disclosure statement on or before January 18, 2011. (Doc. No. 248.) Thereafter, on December 15, 2010, five days after the letter of interest deadline, an order establishing bid procedures associated with the proposed sale of the Debtors' assets or equity (the "**Initial Bid Procedures Order**") (Doc. No. 256) was entered containing the following significant dates and deadlines:

| | |
|---|---|
| Letter of Interest Deadline | November 24, 2010 but subject to extension until December 10, 2010 by the Debtors in consultation with the Majority Lenders and the Committee |
| Bid Deadline and Submission of Purchase Documents | December 23, 2010 |
| Evaluation of Qualifying Bids Deadline | January 3, 2011 |
| Auction | January 12, 2011 |
| Deadline for the prevailing bidder (and back-up bidder) to complete and execute the necessary documents to consummate the transaction | January 14, 2011 |
| Sale/Confirmation Hearing | February 16, 2011 |

3)    **The Extended Bid Procedures**

After no qualifying bids were submitted in accordance with the Bid Procedures Motion, the Debtors filed a motion to modify the bid procedures on January 7, 2011 (the "**Motion to Extend**") (Doc. No. 285), which the Court scheduled for hearing on February 16, 2010.  (Doc. No. 293.)  Despite the Court's prior statements that the Debtors and Majority Lenders needed to work with the Committee in the sales process, the Committee was not provided with a draft of the Motion to Extend or the proposed extended bidding procedures deadlines until just a few hours before the Debtors filed the Motion to Extend.

At the February 16, 2011 hearing on the Motion to Extend, counsel for the Debtors, Textron and the Committee all informed the Court that *none* of the submitted bids were "Qualifying Bids" as defined in the Initial Bid Procedures Order.  Moreover, all parties consented to the extensions of the deadlines requested in the Motion to Extend.  As such, at the February 16, 2011 hearing, the Court continued the Initial Confirmation Hearing to April 20, 2011 (the "**Continued Confirmation Hearing**") and approved the following extended dates and deadlines associated with the proposed sale of the Debtors' assets or equity:

| Letter of Interest Deadline | February 24, 2011 |
|---|---|
| Bid Deadline | March 4, 2011 |
| Evaluation of Qualifying Bids Deadline | March 8, 2011 |
| Auction | March 10, 2011 |
| Deadline for the prevailing bidder (and back-up bidder) to complete and execute the necessary documents to consummate the transaction | March 14, 2011 |
| (i) Exclusivity Deadline for Debtors to file amended joint plan and disclosure statement (ii) Deadline for return of deposits to bidders who are not selected as either the prevailing or back-up bidder | March 17, 2011 |
| Deadline of Debtors' Exclusivity for Acceptance | April 20, 2011 at 10:15 a.m. |
| Sale/Confirmation Hearing | April 20, 2011 at 10:15 a.m. |

Notwithstanding the Court's oral approval of the foregoing deadlines on February 16, 2011, a written order was not entered with respect to the foregoing extended bid procedures deadlines until February 23, 2011 (the "**Modified Bid Procedures Order**" and, together with the Initial Bid Procedures Order, the "**Bid Procedures Orders**") (Doc. No. 337), one day prior to the letter of interest deadline.

4)      **No Qualifying Bids Were Ever Submitted**

Under the Modified Bid Procedures Order, March 4, 2011 was the deadline for bids to be submitted and March 8, 2011 was the deadline for the Debtors to consult with the Majority Lenders, BB&T and the Committee to determine whether submitted bids were "Qualifying Bids," as such term is defined in the Initial Bid Procedures Order. *However, no revised bids were received on or before the March 4, 2011 deadline.* Given that (a) counsel for the Debtors and counsel for Textron acknowledged at the February 16, 2011 hearing that none of the previously submitted bids were "Qualifying Bids" and (b) no additional or revised bids were submitted before the March 4, 2011 deadline, it is undisputed that no "Qualifying Bids" were submitted by the March 4, 2011 Court-established deadline.

Specifically, the letters of interest previously submitted by Vacation Innovations, Raintree, Bluegreen, and Intrawest were all offers to operate the Debtors' business on a fee-for-services basis and not offers to purchase any of the assets or equity of the Debtors. Additionally, none of these fee-for-services offers were subsequently followed up with the necessary "Purchase Documents" or "Bid Deposit" required by the Bid Procedures Orders to be deemed a "Qualifying Bid." As such, none of the fee-for-services offers were Qualifying Bids. Moreover, the bid previously submitted by Mid-Town for the purchase of the assets of Crescent One was not a Qualifying Bid for several reasons, including that Mid-Town did not provide the necessary Purchase Documents.

Finally, the bid previously submitted by TAC was not a Qualifying Bid pursuant to the terms of the Bid Procedures Orders. Specifically, (a) the TAC bid did not state that the offer was irrevocable until the closing of the proposed sale transaction if TAC was selected as the prevailing bidder, violating paragraph 8(c) of the Initial Bid Procedures Order, (b) the TAC bid did not specify with particularity each and every executory contract and unexpired lease that TAC wished to have the Debtors assume or assign as a condition to closing, violating paragraph 8(d) of the Initial Bid Procedures Order, (c) the TAC bid required that TAC be provided with up to $2 million in stalking horse protections in the event that TAC was not selected as the Prevailing Bidder, violating paragraph 8(f) of the Initial Bid Procedures Order, and (d) TAC expressly refused to be considered as back-up bidder, violating paragraph 8(k) of the Initial Bid Procedures Order. *As such, the TAC bid was not a Qualifying Bid under the terms of either of the Bid Procedures Orders*.

Even though TAC did not submit a Qualifying Bid, in anticipation of the March 10, 2011 auction (the "**Auction**"), the Committee made numerous requests for the Purchase

Documents relating to the TAC bid. On February 18, 2011, the Committee was provided with a draft of the Plan Sponsor Agreement (the "**TAC PSA**") between TAC and the Debtors. However, the draft TAC PSA failed to include either the schedules to the agreement (the "**TAC Schedules**") or a copy of the Restructuring Term Sheet (the "**TAC Term Sheet**") that was supposed to be included as an exhibit to the TAC PSA. The majority of the substance of the TAC bid was contemplated to be set forth in the TAC Schedules and TAC Term Sheet. As such, the Committee requested a copy of the TAC Term Sheet only to be informed by the Debtors' counsel on February 25, 2011 that the TAC Term Sheet did not yet exist but might be available by February 28, 2011.

*Counsel for the Debtors did not send counsel for the Committee the TAC Term Sheet or an executed TAC PSA until March 9, 2011 (the day before the auction) at 2:44 p.m.* Moreover, the TAC PSA provided to the Committee the day prior to the auction still did not include the TAC Schedules that are necessary to any understanding of the terms of the TAC bid. *In fact, the 54 pages of schedules to the TAC PSA were not provided to the Committee until 9:00 a.m. on March 10, 2011, one hour before the scheduled Auction.* Thus, not only was the TAC bid a non-qualifying bid under the terms of the Bid Procedures Orders, the substance of the TAC bid was only provided to the Committee on the day of the Auction.

**5)**     <u>**The March 10, 2011 Auction**</u>

Even though no Qualifying Bids were submitted, the Debtors and Majority Lenders made it clear to the Committee that they intended to move forward with the Auction on March 10, 2011 in order to accept the non-qualifying bid previously submitted by TAC. As such, on March 9, 2011, counsel for the Committee sent an email to counsel for the Debtors stating, among other things, that "[b]ecause none of the bids that were previously submitted

were qualified bids and no new or revised bids were submitted by last Friday's extended deadline, there are no qualified bidders." The March 9, 2011 email further stated that:

> While we understand that the Debtors, Textron and Liberty are in discussions with [TAC] to document a deal based upon the bid that [TAC] previously submitted, which all parties previously agreed was not a qualified bid under the terms of the Court's orders, the Committee has not been included in such negotiations even though we have made numerous requests for drafts of the term sheet between the parties and notwithstanding the Court's admonition that the sales process needs to be a collaborative process that includes the Committee. Inasmuch as neither the letter nor the spirit of the Court-ordered sales process have been followed, absent an arrangement satisfactory to the Committee, the Committee will object to any attempt by the Debtors to seek approval of a sale of the Debtors' assets or equity to [TAC].

On March 9, 2011, BB&T's counsel also sent an email to counsel for the Debtors indicating that BB&T concurred with the Committee's objection to the Auction.

Notwithstanding the objections of the Committee and BB&T and the lack of any Qualifying Bids, on March 10, 2011, the Debtors and Majority Lenders went forward with the Auction. The only buyer present at the Auction was TAC.[3] At the outset of the Auction, the Committee and BB&T announced their various objections to the Auction, including but not limited to the fact that no "Qualifying Bids" were submitted in accordance with the Bid Procedures Orders. Nevertheless, the Debtors and the Majority Lenders ignored the Committee's and BB&T's objections and selected TAC's bid as the highest and best bid for the Debtors' equity.

Following the Auction, pursuant to the terms of the Modified Bid Procedures Order, TAC was required to complete and execute all of the documents necessary to consummate the purchase transaction on or before March 14, 2011. However, on March 16, 2011, counsel

---

[3] NPA and Mr. Cienfuegos chose to refrain from participating in the Auction in large part due to the fundamentally flawed sales process orchestrated by the Debtors and the Majority Lenders.

for the Debtors indicated to the Committee that certain additional documents relating to the TAC bid were yet to be finalized or signed but that such documents would be provided prior to the Continued Confirmation Hearing on April 20, 2011. As such, on March 16, 2011, counsel for the Committee sent an email to counsel for the Debtors restating the Committee's position that TAC failed to comply with the terms of the Modified Bid Procedures Order. To date, these additional TAC related agreements have not been provided to the Committee.[4]

**6)** **The Crescent One Auction**

The Bid Procedures Motion, the Initial Bid Procedures Order, and the Modified Bid Procedures Order all contemplate that the assets or equity of Crescent One would be auctioned for sale together with, and at the same time as, substantially all of the other Debtors' assets or equity. However, despite no Qualifying Bids having been submitted for the assets or equity of Crescent One, the Debtors announced at the March 10, 2011 Auction that the assets of Crescent One would be separately auctioned on March 29, 2011 at 10:00 a.m. The Debtors and the Majority Lenders unilaterally postponed the auction for Crescent One without any consultation with the Committee or notice to potential purchasers.

On March 24, 2011 (five days prior to the unilaterally rescheduled Crescent One auction), the Committee requested that the Debtors provide the Committee with all documents that reflect the terms of any bids made for the Crescent One assets or equity. On March 28, 2011, counsel for the Committee again requested any bid documents in advance of the Crescent One auction. Instead of sending bid documents, counsel for the Debtors

---

[4] Pursuant to the Amended Plan (as hereinafter defined), the Debtors were required to file a Plan Supplement by no later than April 8, 2011 (see definition of Plan Supplement contained in the Amended Plan). However, the Debtors failed to timely file their Plan Supplement and instead filed it three days late on April 11, 2011. Importantly, the late-filed Plan Supplement fails to include any of the missing TAC related agreements. Rather, the Plan Supplement simply states that "this document is currently under negotiation between the Lenders and TAC and will be provided upon its completion."

informed the Committee that the Crescent One auction was being rescheduled *for a second time* to April 4, 2011. The Committee was not consulted prior to the Debtors' unilateral decision to continue the Crescent One auction and no notice was provided to any potential bidders. Moreover, the Debtors still had not provided the Committee with any Qualifying Bids or purchase documents for the assets or equity of Crescent One.

At 3:23 a.m. on April 4, 2011 (the day of the second continued Crescent One auction), counsel for the Committee emailed counsel for the Debtors again requesting copies of any bids relating to Crescent One:

> It is now the morning of the rescheduled auction and I have yet to receive any documents (including the "existing Crescent offer" that you refer to in your email) that reflect the terms of any bids relating to the Crescent One auction. As such, please be advised that the Committee intends to object to the auction.
>
> As requested in my March 24th email set forth below, please provide me with the call in number for the Crescent One auction that is scheduled for 10:00 a.m. today. Thanks.

In response to such request, at 10:08 a.m. on April 4, 2011 (*i.e.*, after the scheduled auction time), Debtors' counsel informed counsel for the Committee that the Debtors were unilaterally continuing the Crescent One auction *for a third time* until April 8, 2011 at 10:00 a.m. Later on April 4, 2011, counsel for the Debtors emailed counsel for the Committee an incomplete draft asset purchase agreement submitted by Mid-Town through an entity called First Cabin, LLC ("**First Cabin**") for the Crescent One assets. However, at no point was there any consultation with the Committee as to whether the bid submitted by First Cabin was a Qualifying Bid (as required by the various bid procedures orders) or whether the Crescent One auction should be continued.

On April 7, 2011, in advance of the third continued Crescent One auction, counsel for the Committee again requested that the Debtors provide the Committee with the final asset purchase agreement with respect to the proposed purchase of Crescent One's assets by First Cabin. At 6:10 p.m. on April 7, 2011 (the evening prior to the third continued Crescent One auction), counsel for the Debtors informed counsel for the Committee that the asset purchase agreement had not been finalized and the auction was being rescheduled *for a fourth time* until April 8, 2011 at 4:00 p.m.

When counsel for the Committee again requested the purchase documentation for the proposed Crescent One bid on April 8, 2011, counsel for the Debtors indicated that such documentation was still not finalized. Moreover, instead of holding the fourth continued Crescent One auction at 4:00 p.m. on April 8, 2011, counsel for the Debtors informed the Committee at 4:06 p.m. (again, after the scheduled auction time) that the Crescent One auction was being rescheduled *for a fifth time* until Tuesday, April 12, 2011 at 4:00 p.m.

In response to being informed that the Crescent One auction was being rescheduled for a fifth time, on April 8, 2011, counsel for the Committee sent an email to counsel for the Debtors reasserting the Committee's objections to the auction process being conducted by the Debtors, stating:

> For the record, please note that the auction has been continued on at least three prior occasions with minimal notice provided to the Committee (usually less than 24 hours notice). Moreover, the continuances were without any Court approval or notice to interested parties. As required under the Court's February 23, 2011 order modifying the bid procedures, the auction of all of the Debtors' assets or equity was to occur March 10, 2011. The Court has not authorized a separate auction for Crescent One, let alone an auction nearly one month after the auction deadline established by the Court. The bidding procedures approved by the Court did not contemplate the sale of the Debtors' assets in lots and there has not been any attempt to market Crescent One's assets or obtain a competing bid for Mid-Town's offer for such assets. Moreover, there has been no consultation with the Committee regarding the

numerous continuances of this auction even though such consultation is required under the bid procedures order. Moreover, to date, there has not been a single qualified bid for any of the assets or equity of Crescent One (much less any consultation with the Committee to determine if any bid should be considered a qualified bid) as required by the bid procedures order. Indeed, it is approximately 3:00 p.m. on the day of the unilaterally continued auction for Crescent One's assets or equity and the Committee has not yet been provided with the final purchase documents or final schedules that were required to be provided by no later than March 4, 2011 under the modified bid procedures order. To simply move the auction to a time convenient for the Debtors, the proposed purchaser and certain of the Debtors' lenders only highlights the problems inherent in this process.

On April 12, 2011, in advance of the fifth continued Crescent One auction, counsel for the Committee again requested that counsel for the Debtors provide the Committee with the final purchase agreement and schedules and that the Debtors confirm that the auction was still scheduled for April 12, 2011 at 4:00 p.m. Despite the fact that on April 12, 2011, counsel for the Committee sent two additional emails to counsel for the Debtors requesting information concerning the 4:00 p.m. scheduled auction, it was not until 4:12 p.m. that counsel for the Debtors sent an email to counsel for the Committee stating "Sorry for the late response. The parties have not yet signed a contract. So the auction can't be held today, and we will advise you of when it will be rescheduled." As such, the Debtors unilaterally continued the Crescent One auction *for a sixth time* to an unspecified date and time.

The auction of the assets or equity of Crescent One, which was originally to take place on March 10, 2011 in accordance with this Court's Modified Bid Procedures Order, has already been rescheduled *six times for over one month*. At no time during this process did either the Debtors or the Majority Lenders ever consult with the Committee to determine (a) whether any Qualifying Bids had been submitted for the assets or equity of Crescent One or (b) whether the auction should be continued, despite the fact that they were required to do so

under the Bid Procedures Orders.  Moreover, the Debtors failed to seek any Court approval for the numerous unilateral continuances of the Crescent One auction.

Essentially, the bid procedures process contemplated by this Court's orders has been ignored in all respects by the Debtors and the Majority Lenders.  Indeed, it does not appear that the Debtors have made any attempt to provide notice of the multiple unilaterally continued auctions of the Crescent One assets to potential purchasers.  Moreover, the Committee has been effectively shut out of the entire sales process.  The contemplated Crescent One auction is not an auction of assets having an insignificant value.  Indeed, First Cabin is apparently willing to pay approximately $5.8 million to acquire the Crescent One assets.  If this auction process was an open process where competitive bids were sought, substantial additional value might be recovered for the benefit of Crescent One's estate.

The auction of the Crescent One assets or equity is indicative of the Debtors' and Majority Lenders' actions with respect to these cases.  In effect, all aspects of these cases have been run solely for the benefit of the Majority Lenders with little or no input being sought from the other constituents, including the Committee, and with no meaningful attempt to comply with the auction process approved by the Court.  Indeed, it is as if the Debtors and the Majority Lenders have simply ignored the Court's statements at the December 1, 2010 hearing that "the formalities and procedures inherent in the Chapter 11 process" must be followed in these cases to ensure "a full and fair process."

**7)**      **Improper Solicitation of Modified Plan and Modified Disclosure Statement**

On November 12, 2010, the Court entered an order (the "**First Conditional Approval Order**") (Doc. No. 172) conditionally approving the Initial Disclosure Statement filed by the Debtors on October 5, 2010 (Doc. No. 72) and authorizing the Debtors to solicit

votes on the Initial Plan filed by the Debtors on October 5, 2010. (Doc. No. 73.) Notwithstanding the terms of the First Conditional Approval Order, on November 17 and 18, 2010, the Debtors instead sent out a solicitation package to all creditors that included a "**Modified Disclosure Statement**" and "**Modified Plan of Reorganization**" that had neither been filed with the Court nor conditionally approved for solicitation. (Doc. No. 207.)

Because it appeared that the Debtors solicited votes under an unfiled, unapproved disclosure statement, on November 18 and 19, 2010, counsel for the Committee requested that counsel for the Debtors provide the Committee with copies of the actual plan and disclosure statements that were sent to creditors along with redlines showing any modifications made to the Initial Disclosure Statement and Initial Plan. On November 23, 2010, Debtors' counsel provided the Committee with the requested redlines which revealed that the unfiled, unapproved modified plan documents that were sent out with the initial solicitation package contained numerous material changes from the plan and disclosure statement that were actually filed with the Court.

Specifically, the Modified Disclosure Statement contained the following material changes from the Initial Disclosure Statement:

1) The Modified Disclosure Statement was changed to include descriptions of certain detailed bid procedures that were neither included in the Initial Disclosure Statement nor approved by the Court and the Modified Disclosure Statement attached an Exhibit "A" containing the unapproved bid procedures that was not included with the Initial Disclosure Statement;

2) The treatment of the secured claims of the Majority Lenders in Classes 1, 2, 3, 15, 18, 19, 22 were all modified to include a provision that, in the event that the Majority Lenders' collateral was not sold under the plan, such collateral would be transferred back to the Majority Lenders "free and clear of all liens, claims, and encumbrances" even though the Initial Plan and Disclosure Statement did not include such a provision;

3)      The descriptions of Classes 1, 2, 3, 15 and 22 were changed to include additional collateral not included in the Initial Disclosure Statement;

4)      Numerous definitions in the Initial Plan were changed in the Modified Plan that was sent out with the solicitation package; and

5)      The dates of the Modified Plan and Modified Disclosure Statement reflect that they were filed with the Court on November 17, 2010 even though the modified documents were not actually filed with the Court until November 30, 2010.

Thus, notwithstanding the provisions of Section 1125(b) of the Bankruptcy Code, which prohibit the solicitation of votes unless a disclosure statement has been approved by the Court as containing adequate information, the Debtors nevertheless solicited votes using the Modified Disclosure Statement that was neither filed with or conditionally approved by the Court.

**8)      The Amended Plan and Disclosure Statement**

The Modified Bid Procedures Order required the Debtors to file their amended plan and disclosure statement based upon the results of the Auction by no later than March 17, 2011. However, it was not until March 22, 2011 that the Debtors filed their First Amended Joint Plan of Reorganization (the "**Amended Plan**") and First Amended Joint Disclosure Statement (the "**Amended Disclosure Statement**"). The terms of the Amended Plan were not in any way negotiated with the Committee. Moreover, the Amended Disclosure Statement does not disclose any of the numerous flaws in the sales process or the specific objections to the Auction made by the Committee and BB&T.[5]

Notwithstanding the extensive procedural deficiencies in the Amended Plan, the Debtors and Majority Lenders propose in the Amended Plan that the Majority Lenders will

---

[5]  As set forth more fully in footnote 4, the Debtors also failed to timely file a Plan Supplement and when the Debtors finally filed it three days late, the Debtors failed to include several important documents that were required to be part of the Plan Supplement.

recover significant distributions on account of their claims while providing only $100,000 to unsecured creditors (conditioned on the acceptance of the Amended Plan by such creditors) and essentially abandoning the collateral of BB&T, resulting in deficiency claims that could easily dwarf the more than $18 million in unsecured claims that have already been asserted. Indeed, the Majority Lenders will recover in excess of $74 million on their secured claims as a result of the TAC deal (based upon the Debtors' own investment banker's calculations, which equates to over a 71% recovery), while unsecured creditors with claims potentially exceeding $18 million may share a mere $100,000, resulting in a recovery of approximately 0.5% of their claims at best. Such recovery will certainly be reduced by unsecured deficiency claims asserted by secured creditors and rejection damages claims asserted by parties to rejected unexpired leases and executory contracts.

Based upon the facts stated above and for all the reasons stated below, the Court should not approve the Amended Disclosure Statement, should deny confirmation of the Amended Plan and should not approve the sale of substantially all of the assets or equity of the Debtors.

## OBJECTIONS

I. **OBJECTIONS TO CONFIRMATION OF AMENDED PLAN**

A. *The Amended Plan Does Not Meet the Best Interests of Creditors Test*

Because the value of the Debtors' unencumbered assets would inure to the benefit of unsecured creditors in a Chapter 7, the Amended Plan cannot be confirmed under § 1129(a)(7) of the Bankruptcy Code. Specifically, the Committee has filed a motion seeking derivative authority to challenge the extent, priority and validity of liens asserted by the

Majority Lenders (the "**Motion to Challenge Liens**"). (Doc. No. 298.) [6] The Committee asserts that the Majority Lenders do not have perfected liens in, among other things, (a) certain timeshare intervals owned by the Debtors, (b) certain alcoholic beverage licenses held by the Debtors, (c) certain motor vehicles owned by the Debtors, and (d) certain deposit accounts maintained by the Debtors. However, all of these assets are proposed to be vested in the Reorganized Debtors under the Amended Plan.

Likewise, the Amended Plan transfers all of the purported collateral of BB&T to the BB&T Liquidating Trust (as defined in the Amended Plan). However, the Committee asserts that BB&T does not have perfected liens in, among other things, (a) any of the personal property of St. Croix One, LLC ("**St. Croix**"), (b) certain of the Debtors' personal property that was pledged as collateral for certain BB&T credit facilities, (c) any deposit accounts at Spiff Bank, Premium Bank, Wachovia Bank, Old Florida National Bank, JP Morgan Chase Bank, or St. Croix Christiansted VI, (d) certain titled vehicles owned by St. Croix, (e) real property owned by Island One, Inc. known as "Plantation Cove" and "The Charter Club of Naples Bay," and (f) any reacquired timeshare intervals owned by the Debtors.

If the Committee is successful in its challenges, the value of any unencumbered assets would need to be distributed to unsecured creditors under the Amended Plan in order to be confirmable under Section 1129(a)(7) of the Bankruptcy Code. However, the Amended Plan does not distribute any property to unsecured creditors on account of the value of the Debtors' unencumbered assets, even though the Amended Plan proposes to revest such unencumbered assets in the Reorganized Debtors on the Effective Date (as defined in the Amended Plan). Moreover, as discussed in more detail in section III(B) of the Objections

---

[6] The Committee will be amending its Motion to Challenge Liens to seek derivative authority to challenge the extent, validity and priority of BB&T's liens.

below, the Debtors' liquidation analysis attached to the Amended Disclosure Statement does not provide any information to permit the Court to conclude that the Amended Plan satisfies the best interests of creditors test under Section 1129(a)(7) of the Bankruptcy Code.

Instead, under the Amended Plan, the Debtors are proposing to fund an Unsecured Creditor Trust (as defined in the Amended Plan) with a contribution from the Majority Lenders of $100,000 to be distributed for the benefit of unsecured creditors. However, the $100,000 contribution is expressly conditioned on "the Holders of Allowed Claims in each of Classes 12, 13, 18 and 21 vote to accept the Plan." *See* § 1.129 of the Amended Plan. This provision of the Amended Plan is indicative of the Majority Lenders' bad faith in these Chapter 11 cases. Regardless, the Amended Plan cannot be confirmed unless it satisfies the best interests of creditors test.

Moreover, the Amended Plan proposes to "transfer and assign to the Unsecured Creditor Trust all of the Debtors' rights to pursue any and all claims, actions and causes of action arising under and pursuant to Chapter 5 of the [Bankruptcy] Code." However, this grant is illusory because the releases and injunctions provided for in Section 9.03 of the Amended Plan propose to release the Majority Lenders and the Debtors' insiders from any liability for such claims. *See* Objections § I(F) below. Moreover, there is no discussion in the Amended Disclosure Statement as to whether any such claims or causes of action actually exist or, if they do exist, there is no discussion of the estimated value of such claims or causes of action. Accordingly, there is no basis to conclude that unsecured creditors will receive *any*

recovery under the Amended Plan, let alone more than what they would receive in a Chapter 7 liquidation.[7]

> B. *The Chapter 11 Process Should Not Be Employed Solely to Liquidate the Collateral of the Majority Lenders*

Chapter 11 should not be used for the purposes of selling estate assets solely for the benefit of secured creditors. *See In re Encore Healthcare Assocs.*, 312 B.R. 52, 57 n.10 (Bankr. E.D. Pa. 2004) ("most secured creditors understand the necessity of making some distribution available to other creditors as the price of a court-approved sale"). In effect, the Majority Lenders have utilized the bankruptcy process in these cases to maximize their own return, while ignoring the interests of and providing no meaningful return to unsecured creditors. The Majority Lenders have essentially controlled the Debtors throughout the entire bankruptcy process. Indeed, only by agreeing to the demands of the Majority Lenders would the Debtors' principal, Deborah Linden, receive the significant personal releases and injunctions provided in the Amended Plan.

The Amended Plan is the result of the Majority Lenders' overreaching and improper control over the Debtors, as the Majority Lenders are slated to recover approximately 71% of their claims by orchestrating a sale of substantially all of the Debtors' assets or equity free and clear of all liens, claims and encumbrances pursuant to the broad powers afforded to debtors under Chapter 11, while the Amended Plan leaves only nominal, if any, value for the unsecured creditors, who may at best recover a fraction of one percent of their asserted claims. This distribution scheme is clearly contrary to the purposes and goals of Chapter 11.

---

[7] Moreover, as set forth more fully in section I(E) of the Objections below, the best interests of creditors test must be satisfied on a Debtor by Debtor basis and yet the Debtors' liquidation analysis improperly treats all Debtors as one.

As discussed in section 8 of the Background, the Amended Plan provides a total of $100,000 to unsecured creditors, and such distribution is conditioned on the acceptance of the Amended Plan by such creditors. Thus, if the unsecured creditors do not accept the Amended Plan and the Amended Plan is confirmed over their objection under Section 1129(b), unsecured creditors have the potential to receive no distribution at all. Even if the unsecured creditors accept the Amended Plan, as of yet unasserted unsecured deficiency claims and rejection damages claims will materially reduce any recovery by the remaining unsecured creditors. The Majority Lenders have utilized the bankruptcy process solely for their own benefit but have not provided any benefit to unsecured creditors. Essentially, the Majority Lenders have not "paid to play" even though they will receive a significant benefit from the sale of their collateral in these Chapter 11 cases.

C.    *The Amended Plan Is Not Proposed in Good Faith and Is Proposed Solely for the Benefit of the Debtors' Insiders and the Majority Lenders*

The Debtors have proposed the Amended Plan for the benefit of the Majority Lenders and the Debtors' insiders. However, Section 1129(a)(3) of the Bankruptcy Code requires that a plan proponent establish that a plan of reorganization is proposed in "good faith." The Debtors' and the Majority Lenders' actions in these cases demonstrate a profound lack of good faith in both the complete denial of due process during the sales process and the proposal of an Amended Plan that inures solely to the benefit of the Majority Lenders and the Debtors' insiders.

Among other things, the Majority Lenders have foreclosed the ability for any meaningful competing bidding for the assets or equity of the Debtors. Despite the Court's admonishment that "the formalities and procedures inherent in the Chapter 11 process" must be followed in these cases to ensure "a full and fair process," the Debtors and Majority

Lenders have failed to consult with the Committee on virtually every aspect of the sales process:

- The Bidding Procedures Orders required that the Majority Lenders and the Debtors consult with the Committee to determine if any bids were Qualifying Bids, yet no consultation has ever taken place with respect to either the TAC bid or the bid for the Crescent One assets;

- The Bidding Procedures Orders required certain documentation to be provided to the Committee in order for bids to be considered Qualifying Bids, yet on numerous occasions such information was never provided to the Committee or was only provided to the Committee on the day of the scheduled auction;

- The Committee was afforded little or no ability to find competing bidders inasmuch as the substantive terms of the Bay Harbour/TAC bids have been kept from the Committee until the day of the auction; and

- The assets of Crescent One have *never* been adequately marketed for sale as a separate lot and, instead, the Debtors and Majority Lenders unilaterally decided to segregate such assets from the March 10, 2011 auction in order to pursue a deal with Mid-Town/First Cabin.

In sections 1 through 6 of the Background, the Committee has detailed the numerous due process problems with the sales process. It is readily apparent that these cases have been orchestrated by the Majority Lenders to consummate a sale of the Debtors' equity to TAC in order to recover on the Majority Lenders' collateral without giving any credence to the other constituents in these cases, including the Committee and unsecured creditors.

D.  *The Amended Plan Improperly and Unfairly Classifies Claims in Violation of 11 U.S.C. § 1122*

The Amended Plan improperly classifies separate classes of unsecured claims and provides for different treatment for claims in such classes even though the claims are similar in nature and should be afforded similar treatment. Specifically, among other things, the Amended Plan includes the following improper classifications:

1)     Class 11 of the Amended Plan includes the allowed claim of H.J.C. Floridian in connection with an entirely undersecured claim based upon a promissory note given to H.J.C. Floridian ("**H.J.C.**") by Island One, Inc. ("**Island One**").  Inasmuch as such claim is entirely undersecured, this claim is an unsecured claim under Section 506 of the Bankruptcy Code and it should be included in Class 13 as a general unsecured creditor of Island One.  Indeed, even though the Debtors have provided that the Class 11 claim will be treated as a Class 13 general unsecured claim for distribution purposes, it is telling that H.J.C. will not be voting as a Class 13 creditor;

2)     The Debtors have improperly classified holders of unsecured promissory notes from Island One in Class 12.  Inasmuch as such noteholders hold general unsecured claims against Island One, their claims should likewise be included in Class 13 as general unsecured creditors of Island One.  Indeed, even though the Debtors have provided that the Class 12 claims will receive the same treatment as Class 13 general unsecured claims, the Debtors have improperly classified such claims separately;

3)     The Amended Plan provides for no distribution to holders of unsecured claims against IOI Funding I, LLC  ("**IOI Funding**"); however, the Amended Plan makes no distinction why these unsecured creditors will not receive any distributions while other similarly situated unsecured creditors will receive distributions from the Unsecured Creditor Trust;

4)     The Amended Plan provides that unsecured creditors of St. Croix One, LLC ("**St. Croix**") in Class 27 will only receive a distribution from the BB&T Liquidating Trust (as defined in the Amended Plan) after the secured claims in Classes 22, 25 and 26 are fully satisfied.  However, the Amended Plan fails to address the unencumbered

assets of St. Croix that would otherwise be distributed to the allowed Class 27 unsecured claimants if the assets of St. Croix were liquidated in a Chapter 7.

E.    *The Amended Plan Improperly Consolidates the Unsecured Claims*

The Amended Plan improperly consolidates all of the unsecured creditors of the Debtors (except for the unsecured creditors of IOI Funding) into one pot to receive payments from the Unsecured Creditor Trust.  Because each of the Debtors is a distinct legal entity, creditors of one of the Debtors should not necessarily share in the distribution from another of the Debtors.

F.    *The Amended Plan Releases and Injunctions Are Overly Broad and Are Not Permissible Under Applicable Law*

The Amended Plan defines the "Released Parties" to include the Debtors' directors, officers, employees, agents, representatives, successors and assigns as well as TAC, Textron and Liberty and their respective directors, officers, employees, agents, representatives, successors and assigns.  Section 9.03(2)(a) of the Amended Plan provides that "the Debtors, All Interested Parties, Unsecured Creditors, and Equity Security Holders shall be enjoined from commencing or continuing any actions to enforce Released Claims against the Released Parties."  The term Released Claims does not appear to be defined in the Amended Plan, however, Section 9.03(2)(b) of the Amended Plan provides for the following releases (the "**Plan Releases**"):

> *On the Effective Date,* **the Debtors, their Estates, all persons or entities who have held, hold or may hold Claims against or Interests in the Debtors, and all parties in interest and any of their successors, assigns or Representatives** *shall be deemed to have waived, released and discharged all claims, obligations rights, causes of action and liabilities whether based in tort, fraud, contract or otherwise, which they possesses, possess or may possess prior to entry of the Confirmation Order against the Released Parties . . . .*

Likewise, the Amended Plan fails to define the term "All Interested Parties" as used in Section 9.03(2)(a) of the Amended Plan but, presumably, this would include the Committee inasmuch as creditors' committees are "parties in interest" with standing to be heard on matters pertaining to Chapter 11 cases in which they are appointed.

Even more problematic is that the Plan Releases purport to release the Majority Lenders from the lien challenges that the Committee has requested derivative standing to pursue in order to recover funds for the benefit of unsecured creditors. (Doc. No. 298.)

Moreover, the broad Plan Releases and injunctions proposed under the Amended Plan are not limited to claims relating to the Debtors. In fact, as set forth in Section 9.03(2)(b) of the Amended Plan, the Released Parties are released from "all claims, obligations rights, causes of action and liabilities whether based in tort, fraud, contract or otherwise," that any creditor or interest holder "possessed, possess or may possess prior to entry of the Confirmation Order against the Released Parties." Among other things, *this overly-broad language would release the Released Parties from claims entirely unrelated to the Debtors or their bankruptcy cases*. Indeed, if Deborah Linden's mortgage holder happened to be a creditor of the Debtors, under the Plan Releases, such mortgage holder is forever barred from pursuing Ms. Linden if she fails to make her mortgage payments. Such broad third-party releases are simply not permissible under any circumstances, let alone the extraordinary circumstances under which limited third-party releases are approved under applicable law.

Precedent in this Court has established that third-party releases and injunctions are only permitted where a debtor can demonstrate (1) unusual circumstances exist and (2) the non-debtor release is fair and necessary. *See In re Transit Group, Inc.*, 286 B.R. 811 (Bankr.

M.D. Fla. 2002).  Specifically, the court in *Transit Group* relied upon the following factors, which have been relied upon by other courts as relevant in determining whether to grant third-party injunctions in a plan of reorganization:

> (1)    Whether the debtor and the third party share an identity of interest, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;

> (2)    Whether the non-debtor has contributed substantial assets to the reorganization;

> (3)    Whether the injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor;

> (4)    Whether the impacted class, or classes, has overwhelmingly voted to accept the plan;

> (5)    Whether the plan provides a mechanism to pay for all, or substantially all, of the class, or classes, affected by the injunction;

> (6)    Whether the plan provides an opportunity for those claimants who choose not to settle to recover in full, and;

> (7)    Whether the bankruptcy court made a record of specific factual findings that support its conclusions.

*Id*. at 816 (citing *In re Dow Corning Corp.*, 280 F.3d 648 (6th Cir. 2002); *In re Continental Airlines*, 203 F.3d 203 (3rd Cir. 2000); *In re Specialty Equip. Co., Inc.*, 3 F.3d 1043 (7th Cir. 1993); *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285 (2nd Cir. 1992); *In re A.H. Robins Co., Inc.*, 880 F.2d 694 (4th Cir. 1989)).

Applying the foregoing factors to this case, the proposed releases in the Amended Plan are not fair and necessary to the Reorganized Debtors' ability to consummate the Amended Plan.  With respect to the first *Transit Group* factor, not all of the Released Parties share "an identity of interest" with the Debtors such that a suit against any of the non-debtor Released Parties would deplete assets of the estate.

Similarly, the third *Transit Group* factor has not been met as the proposed Plan Releases are simply not necessary to the proposed reorganization. Indeed, inasmuch as Deborah Linden and the Majority Lenders are not necessary to the continued management of the affairs of the Reorganized Debtors, it is irrelevant whether they are subjected to claims post-confirmation from the Committee or others. Moreover, the Majority Lenders' paltry contribution of $100,000 to fund the Unsecured Creditor Trust should not be deemed sufficient to justify the broad Plan Releases and injunctions contemplated in the Amended Plan.

The fourth *Transit Group* factor has not been established inasmuch as the holders of claims and interests that would be affected under the proposed Plan Releases have not yet voted for the Amended Plan.

In addition, the fifth *Transit Group* factor is not satisfied because the Amended Plan does not seek to pay *any* of the claims that the Committee may assert against the non-debtor Released Parties. Moreover, to the extent that the Debtors held claims against the Majority Lenders, such claims have already been waived by the Debtors as part of their agreement with the Majority Lenders to the use of cash collateral. Thus, the unsecured creditors holding in excess of $18 million in asserted claims, who are the real parties being affected by the Plan Releases, are not receiving material compensation for releasing their claims.

Nor does the Amended Plan provide any mechanism for affected parties to opt-out of the proposed Plan Releases to pursue their claims against the Released Parties outside of the Amended Plan. As such, the sixth *Transit Group* factor is not satisfied.

Accordingly, the proposed Plan Releases and injunctions should not be approved by the Court and the Amended Plan should not be confirmed containing the Plan Releases and injunctions.

G.    *The Amended Plan Improperly Confers § 363(m) Purchaser Protections to TAC*

The Plan improperly confers "good faith purchaser" protections under Section 363(m) of the Bankruptcy Code to TAC. *See* Amended Plan at § 9.01(8). Because TAC has not purchased any of the Debtors' assets pursuant to a sale under Section 363, TAC is not entitled to the protections afforded by Section 363(m). In fact, TAC is purchasing the equity in the Reorganized Debtors and is not purchasing any of the assets of the Debtors, which assets are instead being vested in the Reorganized Debtors. *See In re Charter Co.*, 81 B.R. 90, 93 (Bankr. M.D. Fla. 1987) (finding that Section 363(m) applies only to sales and leases under Section 363).

H.    *The Amended Plan Fails to Provide Any Treatment for Priority Claims*

The Amended Plan defines a "Priority Claim" as "a Claim, other than an Administrative Claim, to the extent such Claim is entitled to priority in payment under Section 507 of the Code." However, the Amended Plan is silent as to the classification and treatment of holders of priority claims for either deposits paid to the Debtors by individuals for the purchase of timeshare interests under Section 507(a)(7) or unpaid wages, salaries, commissions, vacation pay or severance under Section 507(a)(4). The Amended Plan only provides treatment for the following priority claims: (a) Non-Ordinary Course Administrative Claims; (b) Administrative Expense Claims; and (c) Tax Claims.

In order to confirm a plan, holders of priority claims must be paid in full on the effective date unless such holders have agreed to be paid in deferred cash payments.   11

U.S.C. § 1129(a)(9)(B); *see In re KA & KM Dev. Inc.*, 2010 WL 6440118, at *4 (Bankr. M.D. Fla. April 23, 2010) (confirming chapter 11 plan after verifying that priority claims were properly treated pursuant to 11 U.S.C. § 1129(a)(9)). Moreover, a "plan must classify all claims and interests . . . in a manner consistent with section 1122, irrespective of whether the proponent of the plan intends to modify the rights of a particular class of claims or interests." 7 Collier on Bankruptcy, ¶ 1123.01[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2011). Priority claims under Sections 507(a)(4) and (7) should be separately classified because such claims are not substantially similar to either general unsecured claims or secured claims. *Id.* at ¶ 1122.03[3][b].

Because the Amended Plan does not classify or provide *any* treatment for the priority claimants under Sections 507(a)(4) or (7), the Amended Plan cannot be confirmed.

I.    *The Debtors Failed to Timely File the Plan Documents*

In the Amended Plan, the Debtors indicate that certain documents, including the TAC Agreements, the Forward Line Agreements, the BB&T Liquidating Trust Agreement, the Unsecured Creditor Trust Agreement, and a schedule setting forth the names of the officers and directors of the Reorganized Debtors (collectively, the "**Plan Supplement**") will be filed with the Court "on or before the date that is 10 days prior to the Confirmation Hearing." However, the Debtors failed to timely file the Plan Supplement. The Continued Confirmation Hearing is set for Wednesday, April 20, 2011. Pursuant to Rule 9006 of the Federal Rules of Bankruptcy Procedure, the deadline for the Debtors to file the Plan Supplement was Friday, April 8, 2011 inasmuch as the tenth day prior to the Continued Confirmation Hearing was a Sunday. Rule 9006(a)(5) clearly states that "The 'next day' is determined by continuing to count forward when the period is measured after an event and

backward when measured before an event." As such, the Debtors failed to timely file the Plan Supplement.

J. *The Amended Plan Fails to Include the BB&T Liquidating Trust Agreement*

Although the Amended Plan defines the BB&T Liquidating Trust Agreement in Section 1.3, no copy of the BB&T Liquidating Trust Agreement is attached to the Amended Plan or the Amended Disclosure Statement. Instead, the BB&T Liquidating Trust Agreement was apparently supposed to be included in the Plan Supplement that was to be filed on or before April 8, 2011 pursuant to Section 1.94 of the Amended Plan. *However, the Plan Supplement, which was untimely filed on April 11, 2011, does not include a copy of the BB&T Liquidating Trust Agreement.* Instead, the Plan Supplement filed by the Debtors on April 11, 2011 states that the BB&T Trust Agreement "*is currently under negotiation between the Debtors, TAC and BB & T and will be provided upon its completion.*" (Doc. No. 399) (emphasis in original).

K. *The Amended Plan Improperly Distributes New Equity to Former Equity Holders*

The List of Officers of the Reorganized Debtors included with the late-filed Plan Supplement (Doc. No. 399) reflects that Deborah Linden and Sulyn Stumbras are anticipated to receive new equity in the Reorganized Debtors. However, inasmuch as the holders of classes of unsecured claims are not being paid in full under the Amended Plan, unless the holders of unsecured claims in such classes accept the Amended Plan, any distribution of new equity in the Reorganized Debtors to Deborah Linden and Sulyn Stumbras would violate the absolute priority rule codified in Section 1129(b)(2)(B)(ii) of the Bankruptcy Code. The Committee further submits that, to the extent that any new equity is being issued to Deborah Linden and Sulyn Stumbras on account of their anticipated management roles with the

Reorganized Debtors, it is well-settled that their "sweat equity" would not constitute "new value" to permit them to receive any equity interest in the Reorganized Debtors. As such, the Amended Plan is not fair and equitable under Section 1129(b)(1) of the Bankruptcy Code and cannot be confirmed over the rejection of any class of unsecured creditors.

**II.** **Objections to Sale of Substantially All of the Assets or Equity of the Debtors**

    A. *The Debtors and the Majority Lenders Chilled Bidding by Imposing Bid Deadlines that Were Not Approved by the Court*

In the interests of fairness and due process, this Court approved bid procedures that were designed to maximize sale proceeds for the benefit of the Debtors' estates. However, the Debtors and the Majority Lenders, in their attempt to orchestrate events for their sole benefit, chose to create, disseminate, and enforce numerous bid related deadlines that had *not* been approved by the Court. For example, as set forth more fully in section 1 of the Background, the Debtors filed the Bid Procedures Motion (and served such motion on prospective bidders) containing various bid deadlines that occurred *prior* to the scheduled hearing on approval of the Bid Procedures Motion. The Debtors also filed the Modified Plan and Modified Disclosure Statement that incorporated proposed bid deadlines that had not yet been approved (and were ultimately never approved) by the Court. *See* Background § 1. Importantly, the Debtors and the Majority Lenders represented to potential purchasers that such unapproved deadlines would need to be complied with in order to participate in the sales process.

At the December 1, 2010 Bid Procedures Hearing, Nelson Cienfuegos, as a representative of NPA (a prospective bidder), testified that the compressed timeline set forth in the *unapproved* Bid Procedures Motion made it difficult for potential bidders (other than

TAC, the bidder favored by the Debtors and the Majority Lenders) to participate in the sales process. *See* Background § 2. As a result, at such hearing, the Court admonished the Debtors and the Majority Lenders and stressed that Court approval must be obtained for the bid procedures before such deadlines can be disseminated and enforced.[8] Unfortunately, the damage was already done given that the Debtors' and Majority Lenders' actions of imposing non-approved bid deadlines effectively chilled bidding by disenfranchising potential bidders such as NPA.

B.     *The Debtors and the Majority Lenders Made a Mockery of the Bid Procedures*

Despite the importance of bid procedures to ensure a fair and open sales process, the Debtors and Majority Lenders unilaterally chose to ignore the deadlines set forth in the Modified Bid Procedures Order. For example, even though no Qualifying Bids were received by the March 4, 2011 bid deadline, the Debtors proceeded with the March 10, 2011 Auction. Likewise, the deadline to evaluate bids to determine whether they were Qualifying Bids was March 8, 2011 which deadline was also not complied with. *See* Background §§ 3, 4. In addition, the Modified Bid Procedures Order set the Auction for March 10, 2011 and yet the Debtors and Majority Lenders have not even conducted their contemplated auction of the Crescent One assets. *See* Background § 6. The Modified Bid Procedures Order also required that the Amended Plan and Amended Disclosure Statement be filed on March 17, 2011 and yet this deadline was also not complied with. *See* Background § 8. The Court

---

[8] Indeed, the Court expressly stated that the bid procedures process pursued by the Debtors and Majority Lenders up to that point had "not been a process that dovetails well with Chapter 11 procedures or allows constituencies other than perhaps purchasers that have been working with the debtor for a long period of time, insiders and others intricately involved in the debtors' operation to participate." *See* Background § 2.

should not countenance the Debtors' and the Majority Lenders' complete and utter disregard of the Modified Bid Procedures Order and the overall sales process established by the Court.

### C. *No Qualifying Bids Were Submitted*

As set forth in section 4 of the Background, pursuant to the Modified Bid Procedures Order, bids were required to be submitted by March 4, 2011 and the deadline for the Debtors to consult with the Majority Lenders, BB&T and the Committee to determine whether the bids were Qualifying Bids was March 8, 2011. Pursuant to Paragraph 8 of the Initial Bid Procedures Order, "[t]o be deemed a Qualifying Bid, the Purchase Documents or other submitted documents must:

> c)      state such Qualifying Bidder's offer is irrevocable until the closing of the proposed sale transaction if such Qualifying Bidder is the Prevailing Bidder (as defined below);
>
> d)      identify with particularity each and every executory contract and unexpired lease, the assumption and, as applicable, assignment of which is a condition to closing;
>
> ***
>
> f)      not request or entitle such Qualifying Bidder to any break-up fee, expense reimbursement, or similar type of payment;
>
> ***
>
> k)      provide that, if the Qualifying Bidder is designated as a Back-Up Bidder (as defined below), in the event the Prevailing Bidder fails to close the transaction contemplated by the Prevailing Bid, the Qualifying Bidder agreed to close the transaction on the terms set forth in the Back-Up Bid as provided below.

As set forth in section 4 of the Background, the TAC bid did not comply with any of the foregoing provisions of the Initial Bid Procedures Order. Similarly, the bids submitted by all other bidders (including Mid-Town's bid for the Crescent One assets) were not Qualifying

Bids for the reasons set forth in section 4 of the Background. Accordingly, the Debtors should not have proceeded with the Auction given the absence of Qualifying Bids.

      D.     *The Debtors and the Majority Lenders Failed to Consult With the Committee With Respect to Whether Bids Were Qualifying Bids or With Respect to Diverging From the Bid Procedures*

Paragraph 10 of the Initial Bid Procedures Order provides that "[t]he Debtors (following consultation with their secured lenders and the Creditors' Committee) shall make a determination regarding whether a bid is a Qualifying Bid . . . ." Unfortunately, the Debtors failed to consult with the Committee with respect to whether the TAC bid and the Crescent One bid (both of which form the basis of the Amended Plan) are Qualifying Bids. *See* Background § 4. Had the Debtors complied with the terms of the Initial Bid Procedures Order and consulted with the Committee, the Committee would have informed the Debtors that such bids could not possibly be Qualifying Bids because they failed to comply with the express provisions of the Initial Bid Procedures Order including Paragraph 5(c), (d), (f) and (k). *See* Background § 4.

Moreover, Paragraph 17 of the Initial Bid Procedures Order provides that "[t]he Debtors reserve the right, following consultation with their secured lenders and the Creditors' Committee, to modify and/or diverge from the foregoing bid procedures, if appropriate to further the purposes of the auction." Although the Debtors certainly chose to "diverge" from the requirements of the Initial Bid Procedures Order, the Committee submits that such divergence was not "appropriate to further the purposes of the auction" and was instead nothing more than the Debtors and the Majority Lenders orchestrating events for their sole benefit. Regardless, the Debtors failed to consult with the Committee prior to modifying or diverging from the Court-approved bid procedures, in violation of Paragraph 17 of the Initial

Bid Procedures Order. *See* Background § 4; *see also* Background § 6 (discussing how the Debtors have continued the Crescent One auction *six times* without any consultation with the Committee).

      E.       *The TAC Bid and Related Auction Failed to Comply With the Court-Approved Bid Procedures*

The TAC bid and related March 10, 2011 Auction failed to comply with the Bid Procedures Orders and should not be approved by the Court for the following reasons, among others.

      1.       The TAC Bid Was Not Submitted By the March 4, 2011 Bid Deadline and Was Not a Qualifying Bid

As discussed, the TAC bid was not submitted prior to the March 4, 2011 bid deadline established in the Modified Bid Procedures Order. In addition, the terms of the TAC bid were not in compliance with the requirements of the Bid Procedures Orders and, as such, the TAC bid was not a Qualifying Bid. *See* section 4 of the Background and section II(C) of the Objections above.

      2.       The TAC Bid Was Never Shared With the Committee Until Shortly Before the Auction

The Committee was not provided with the TAC Term Sheet and an executed TAC PSA until March 9, 2011, the day prior to the Auction. *See* Background § 4. Moreover, it was not until one hour before the scheduled Auction that the Committee was given a copy of the 54 pages of schedules to the TAC PSA. *Id.* The Court should not condone such a failure to comply with the Bid Procedures Orders.

3. The TAC Bid Improperly Contained Stalking Horse Protections Effectively Chilling Competitive Bidding

As set forth in section 4 of the Background, the TAC bid contained stalking horse protections in the form of expense reimbursements in the event that TAC was not selected as the prevailing bidder. Specifically, section 3.3 of the TAC PSA provided for the following expense reimbursement to TAC in the event that TAC was not the prevailing bidder:

> Section 3.3 Expense Reimbursement.
> (a) In the event that the Bankruptcy Court has entered the Bid Protections Order and this Agreement is terminated pursuant to Section 9.1(k), the Company shall pay to Purchaser an amount equal to the Expense Reimbursement. The Expense Reimbursement will be due and payable by wire transfer of immediately available funds within five (5) days of the closing of the Competing Transaction.
> (b) The Company shall use commercially reasonable efforts to cause the Bankruptcy Court to enter the Bid Protections Order which shall (i) authorize the Company to pay the Expense Reimbursement in accordance with this Agreement and such Bid Protections Order and (ii) cause the Expense Reimbursement to be treated as an allowed super-priority administrative expense claim against the Debtors with priority over all administrative expense claims and unsecured claims against the Debtors, including any adequate protection-related claims and any administrative expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, and 1114 of the Bankruptcy Code, to the extent permitted by Applicable Law.
> (c) The Company acknowledges that the agreements contained in this Section 3.3 are an integral part of the transactions contemplated by this Agreement, and that, without these agreements, the Purchaser would not enter into this Agreement.

Importantly, the TAC PSA defined "Expense Reimbursement" to mean an expense reimbursement *not to exceed $2 million*. However, the Initial Bid Procedures Order expressly provided that a Qualifying Bid could not entitle the bidder to any break-up fee or expense reimbursement.[9] Indeed, at such a late stage in the auction process, any such

---

[9] Paragraph 8(f) of the Initial Bid Procedures Order provides that, in order to be a Qualifying Bid, any bid submitted must "not request or entitle such Qualifying Bidder to any break-up fee, expense reimbursement, or similar type of payment." (Doc. No. 256.)

stalking horse protection would chill competitive bidding. As such, the TAC bid containing substantial stalking horse protections (up to $2 million) was in express violation of the Initial Bid Procedures Order and the Court should not tolerate such violation.

      4.      <u>TAC Failed to Timely Document the Purchase Transaction and, thus, Violated the Court-Approved Bid Procedures</u>

As set forth more fully in section 5 of the Background, following the Auction, TAC was required to complete and execute all documents necessary to consummate the purchase transaction on or before March 14, 2011. *See* Modified Bid Procedures Order ¶ 3. However, TAC failed to meet this deadline. *See* Background § 5. Indeed, as set forth in footnote 4, TAC is still currently negotiating key agreements with the Debtors.

      *F.*      *<u>The Crescent One Bid and Contemplated Auction Failed to Comply With the Court-Approved Bid Procedures</u>*

As set forth more fully in section 6 of the Background, the Debtors' attempt to sell the Crescent One assets to Mid-Town/First Cabin has made a mockery of the bid procedures approved by the Court. The Bid Procedures Orders never contemplated that individual assets would be auctioned off at separate times. Rather, the Bid Procedures Orders contemplated that there would be one auction on March 10, 2011 for substantially all of the Debtors' assets or equity. Nevertheless, the Debtors and Majority Lenders unilaterally decided to separately "auction" the Crescent One assets. The term "auction" is used in its broadest sense because no competitive bids were sought and the Crescent One assets were never separately marketed or noticed for sale. Instead, the Debtors and Majority Lenders hand-picked Mid-Town/First Cabin as the one and only bidder. Then, to make matters worse, the Debtors unilaterally continued the Crescent One auction *six times* with limited notice to the Committee and no notice to prospective bidders. As set forth in section 6 of the Background, the auction of the

Crescent One assets is indicative of the Debtors' and the Majority Lenders' disregard for the Bid Procedures Orders and due process. The Court should not tolerate such behavior.

**III.**     **Objections to Approval of the Amended Disclosure Statement**

Pursuant to Section 1125(b) of the Bankruptcy Code, votes on a plan of reorganization may not be solicited unless a written disclosure statement is transmitted to holders of claims or interest entitled to vote, which disclosure statement has been approved by the court as containing adequate information. The term "adequate information" is defined in Section 1125(a) as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . . .

Because the Amended Disclosure Statement fails to provide adequate information, the Court should disapprove the Amended Disclosure Statement and not confirm the Amended Plan.

    *A.*     *The Amended Disclosure Statement Fails to Provide Adequate Information*

The Amended Disclosure Statement contains numerous materially misleading statements as well as numerous omissions that make it unlikely that holders of claims could discern the proposed treatment of their claims under the Amended Plan. The Amended Disclosure Statement fails to provide adequate information in the following respects:

        1)     The Amended Disclosure Statement incorrectly discloses the existence of certain non-debtor releases and injunctions that are provided for in the Amended Plan. In particular, the Amended Disclosure Statement states on page 2 that the plan provides for releases and injunctions in favor of certain persons or entities as discussed in

"Article VIII of the Plan." However, the releases and injunctions are actually contained in Article IX of the Amended Plan. The disclaimer in boldface and capital letters on the first page of the Amended Plan likewise improperly references the section of the Amended Plan that describes the scope of the releases and injunctions. As such, holders of claims were not properly notified of the existence and scope of non-debtor releases and injunctions.

2)      The Amended Disclosure Statement fails to disclose who will receive the new equity that is proposed to be issued by certain of the Reorganized Debtors. Specifically, the Amended Disclosure Statement discloses that the equity interests in IOI Funding (Class 29), Island One Resorts Management Corporation (Class 31), and Navigo Vacation Club, Inc. (Class 34) will all be extinguished and new equity will be issued; however, the Amended Disclosure Statement fails to identify to whom such new equity interests will be issued.

3)      The Amended Disclosure Statement states that TAC will appoint the officers and directors of the Reorganized Debtors, which are defined in the Amended Plan to include St. Croix. As such, even though the assets of St. Croix are proposed to be transferred to the BB&T Liquidating Trust, the Amended Disclosure Statement is misleading in that it appears to provide that the administration of the assets of St. Croix will be performed by unnamed officers and directors to be appointed by TAC.

4)      The Amended Disclosure Statement improperly discloses that "upon the Effective Date, TAC shall be deemed to be a 'good faith purchaser' pursuant to section 363(m) of the Bankruptcy Code in connection with the approval and consummation of the transactions contemplated under the TAC Agreements." As discussed above in section I(G) of the Objections, TAC is not entitled to the protections afforded by Section 363(m) because

such protections only apply to asset sales under Section 363 of the Bankruptcy Code and because TAC is not a good faith purchaser.

5) The Amended Disclosure Statement does not make adequate disclosure of certain benefits that will be provided to former employees of the Debtors, including that (a) TAC is paying approximately $400,000 in retention bonuses to certain insiders of the Debtors, (b) TAC has agreed to employ the Debtors' President and CEO, Deborah Linden, as an employee or consultant to the Reorganized Debtors, (c) Deborah Linden may be provided an equity stake in the Reorganized Debtors, and (d) Deborah Linden will be released from significant guarantees that she gave to the Majority Lenders. Absent such disclosures, unsecured creditors cannot make a determination as to whether the Amended Plan is proposed for the benefit of the Debtors' estates or instead, as the Committee believes, for the benefit of the Debtors' management and insiders.

6) The Amended Disclosure Statement fails to include any description of the Committee's potential challenges to the liens of Textron and Liberty (as set forth in the Motion to Challenge Liens), which, if successful, would materially affect the liquidation analysis included as an exhibit to the Amended Disclosure Statement. *See* Objections § I(A). As such, neither the Court nor holders of claims can make a determination whether the proposed plan meets the best interests of creditors test under Section 1129(a)(7) of the Bankruptcy Code.

7) The Amended Disclosure Statement fails to provide any information to owners of timeshare interests in the Debtors' properties as to their rights under the Amended Plan. Specifically, the Amended Plan fails to disclose whether the purchasers of the Debtors' assets or equity will assume all of the Debtors' obligations under the relevant

timeshare plans.  Putting aside the fact that timeshare plans may be executory contracts, the Amended Disclosure Statement should, at a minimum, inform such owners as to how the Amended Plan will affect them.  In addition, with respect to St. Croix, although the Amended Disclosure Statement states that "On the Effective Date, the Debtors will transfer the St. Croix One Real Property and St. Croix One Personal Property collateral to the BB&T Liquidating Trust for the BB&T or its assignee" (Amended Disclosure Statement at III.2.q), the Amended Disclosure Statement does not disclose to St. Croix timeshare owners how the plan will affect their timeshare interests.

8)      In addition to the foregoing deficiencies in the Amended Disclosure Statement, as set forth in section 7 of the Background, the Debtors previously solicited votes under the unfiled and unapproved Modified Plan and Modified Disclosure Statement.  This improper solicitation of the Modified Plan and Modified Disclosure Statement has essentially "poisoned the well" with respect to the subsequent solicitation of the Amended Plan and the Amended Disclosure Statement.   Creditors were asked to read nearly 200 pages of unapproved documentation and then the Debtors resent even more documents with the solicitation of the Amended Plan.  No explanation was provided to creditors in the Amended Disclosure Statement with respect to why an unapproved disclosure statement was previously sent to them.  Moreover, the Amended Disclosure Statement fails to disclose the differences between the Amended Plan and the previously send Modified Plan.

B.      *The Amended Disclosure Statement Fails to Include Appropriate Liquidation Analyses*

The Initial Disclosure Statement did not include any liquidation analyses.  Moreover, the Modified Disclosure Statement did not include any liquidation analyses.  Even though these disclosure statements are not directly relevant to the Amended Plan that the Debtors

and Majority Lenders are currently seeking to confirm, the Court should take into consideration that these prior disclosure statements, which had been filed with the Court or transmitted to the numerous unsecured creditors in this case, have never included any disclosure of either the value of the various Debtors' assets or the amount that would be distributed to unsecured creditors in the event each of the Debtors' assets were separately liquidated in Chapter 7 proceedings. This fundamental lack of disclosure has not been remedied in the Amended Disclosure Statement currently before the Court for final approval.

Indeed, the single "Liquidation Analysis" attached as Exhibit C to the Amended Disclosure Statement makes no disclosure of the value of the various Debtors' assets. Instead, the Liquidation Analysis discloses the secured claims asserted by the Majority Lenders and the "present value" that the Debtors project the Majority Lenders will recover if the Debtors are liquidated in Chapter 7 proceedings. In no way whatsoever does the information presented permit the Court or any holder of an unsecured claim to determine the amount that would otherwise be recovered if each of the Debtors' assets were liquidated separately in Chapter 7 proceedings. At a minimum, a liquidation analysis for *each* of the Debtors should have been included with the Amended Disclosure Statement.

Although the Debtors and Majority Lenders may argue that the TAC bid provides the greatest recovery for the Debtors' assets, that is not the inquiry required by Section 1129(a)(7) of the Bankruptcy Code. Rather, the "best interest of creditors" test requires the Court to analyze whether each class of creditors is receiving more than it would receive if the Debtors' assets were to be liquidated in a Chapter 7. Among other things, this analysis would, at a minimum, require the plan proponent to disclose (1) the value of the assets in a liquidation and (2) the amount distributed to each class of creditors from the liquidation of

such assets. Neither of these items is disclosed in the liquidation analysis attached to the Amended Disclosure Statement.

Because the Debtors' liquidation analysis fails to disclose the value of the assets in a liquidation (or even disclose the type of assets that exist), it is no surprise that the liquidation analysis also ignores the value of any unencumbered assets that would be sold for the benefit of unsecured creditors in a Chapter 7. Indeed, the "Recovery Amount (Present Value)" presented in the right hand most column of the liquidation analysis attached to the Amended Disclosure Statement states that $0 would be recovered for the benefit of "Subordinated & Unsecured Debt." No assumptions are given to support this conclusion. Moreover, the Debtors do not even attempt to disclose the amount of the "Unsecured Claims" asserted against the Debtors. Rather, the liquidation analysis simply says "TBD" in disclosing such amounts (confusingly, the "TBD" is listed under the heading "Secured Claim" so it is actually anyone's guess as to what the liquidation analysis means). Thus, the liquidation analysis attached to the Disclosure Statement fails in all respects to provide even the most basic of information that the Court and creditors would need to determine if the Amended Plan is in the best interests of creditors as required by Section 1129(a)(7) of the Bankruptcy Code.

### RELIEF REQUESTED

Consistent with the foregoing, the Court should disapprove the Amended Disclosure Statement because it fails to provide adequate information as required by Section 1125 of the Bankruptcy Code. Moreover, the Court should deny confirmation of the Amended Plan and deny approval of the sale of the Debtors' equity interests and assets.

WHEREFORE, the Committee respectfully requests that the Court enter an order (a) sustaining the Objection, (b) disapproving the Amended Disclosure Statement, (c) denying confirmation of the Amended Plan, (d) denying approval of the sale of the Debtors' equity interests and assets, and (e) granting such other relief as is just and proper.

Dated:  April 13, 2011

BUSH ROSS, P.A.
Post Office Box 3913
Tampa, Florida 33601
(813) 224-9255 (telephone)
(813) 223-9620 (telecopy)
Counsel for the Official Committee of
Unsecured Creditors

By:     /s/ H. Bradley Staggs
        H. Bradley Staggs
        Florida Bar No. 980773
        *bstaggs@bushross.com*
        Adam Lawton Alpert
        Florida Bar No. 0490857
        *aalpert@bushross.com*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 13, 2011, I electronically filed a true and correct copy of the Official Committee of Unsecured Creditors' Objection to (A) Approval of Disclosure Statement, (B) Confirmation of Plan of Reorganization, and (C) Approval of Sale of Substantially All of the Assets or Equity of the Debtors with the Clerk of the United States Bankruptcy Court for the Middle District of Florida by using the CM/ECF system and I furnished a copy of the foregoing document(s) to the following parties in the manner of service indicated below:

/s/ H. Bradley Staggs
ATTORNEY

**Via the CM/ECF system which will send a Notice of Electronic Filing to:**

Kenneth E. Aaron, Esq.
Assistant United States Trustee
Stewart Cohen, Esq.
Denise D. Dell-Powell, Esq.
Daniel M. Eliades, Esq.
Steven E. Fox, Esq.
GE Money Bank
Elizabeth A. Green, Esq.
Mark D. Hildreth, Esq.
Peter N. Hill, Esq.
Robert S. Hoofman, Esq.
Roger A. Kelly, Esq.
Lawrence M. Kosto, Esq.
Mindy Y. Kubs, Esq.

Andrew W. Lennox, Esq.
Kevin E. Mangum, Esq.
Frank F. McGinn, Esq.
Kathleen S. McLeroy, Esq.
Jimmy D. Parrish, Esq.
Tiffany D. Payne, Esq.
Geoffrey J. Peters, Esq.
Jason A. Rosenthal, Esq.
R. Scott Shuker, Esq.
Steven J. Solomon, Esq.
Frank P. Terzo, Esq.
Melinda S. Thornton, Esq.
United States Trustee
Diane Noller Wells, Esq.

**Via first class United States Mail, postage prepaid, to:**

Island One, Inc., Attn: Deborah L. Linden, 8680 Commodity Circle, Orlando, Florida 32819

946547.1