# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

In re:

ISLAND ONE, INC., *et al.*

Debtors

_____/

CASE NO. 6:10-bk-16177-KSJ

CHAPTER 11

Jointly-administered with Cases No.
6:10-bk-16179-KSJ; 6:10-bk-16180-KSJ;
6-10-bk-16182-KSJ; 6-10-bk-16183-KSJ;
and 6:10-bk-16189-KSJ

---

## MODIFICATION OF THE FIRST AMENDED JOINT PLAN OF REORGANIZATION FOR ISLAND ONE, INC., CRESCENT ONE, LLC, ST. CROIX ONE, LLC, ISLAND ONE RESORTS MANAGEMENT, CORPORATION, NAVIGO VACATION CLUB, INC., AND IOI FUNDING I, LLC

COUNSEL FOR DEBTORS

ELIZABETH GREEN, ESQ.
JIMMY D. PARRISH. ESQ.
BAKER & HOSTETLER LLP
200 S. ORANGE AVE.
SUNTRUST CENTER, SUITE 2300
ORLANDO, FLORIDA 32801-3432

May 4, 2011

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| **In re:** | **CASE NO. 6:10-bk-16177-KSJ** |
| **ISLAND ONE, INC.,** *et al.* | **CHAPTER 11** |
| **Debtors** | **Jointly-administered with Cases No. 6:10-bk-16179-KSJ; 6:10-bk-16180-KSJ; 6-10-bk-16182-KSJ; 6-10-bk-16183-KSJ; and 6:10-bk-16189-KSJ** |
| _____/ | |

**MODIFICATION OF THE FIRST AMENDED JOINT PLAN OF REORGANIZATION
FOR ISLAND ONE, INC., CRESCENT ONE, LLC, ST. CROIX ONE, LLC,
ISLAND ONE RESORTS MANAGEMENT, CORPORATION,
NAVIGO VACATION CLUB, INC., AND IOI FUNDING I, LLC**

This modification (the "BB&T Modification") to the First Amended Joint Plan of Reorganization (the "Plan")[1] hereby corrects the definition under Section 1.19 of the Plan. Section 1.19 shall now read as follows "BB&T" shall mean Branch Banking and Trust Company, a North Carolina corporation, and as successor in interest to Colonial Bank.

This BB&T Modification is also hereby filed to more particularly describe the treatment to Classes 4, 5, 6, 7, 8, 9, 10, 22, 23, 24, 27 and 32 and for purposes of adding a new Class 34.

A.  Classification and Treatment of Claims of Classes 4, 7, 8 and 34.

Classes 4, 7, 8 and 34 consist of the following:

(i)  Class 4 - The Allowed Secured Claim of BB&T in connection with that certain Loan Agreement and Promissory Note by and between BB&T and Island One dated December 30, 2008, as amended, concerning certain timeshare interests at Liki Tiki Village I and II, the Cove on Ormond Beach, and The Charter Club of Naples Bay (collectively the "BB&T

---

[1]     As modified by (i) this BB&T Modification, (ii) that certain "Second Modification of the First Amended Joint Plan of Reorganization Submitted By Island One, Inc., Crescent One, LLC, St. Croix One, LLC, Island One Resorts Management Corporation, Navigo Vacation Club, Inc., and IOI Funding I, LLC (the "UCC Modification"), and (iii) the Confirmation Order (collectively defined as the "Plan"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the Plan.

Timeshare Interests"), and a First Mortgage for the benefit of BB&T on the LTV 1400 Building, including both timeshare interests and any whole units (the "LTV 1400");

(ii)    Class 7 - The Allowed Secured Claim of BB&T in connection with that certain Loan Agreement and Promissory Note by and between BB&T and Island One dated September 11, 2007, as amended, in the original principal amount of $4,850,000 concerning that certain property used as a sales center (the "Sales Center").

(iii)    Class 8 - The Allowed Secured Claims of BB&T in connection with that certain Promissory Note by and between BB&T and Island One dated February 1, 2006, as amended, and the Promissory Notes by and between BB&T and Island One dated March 19, 2008, as amended, in the original principal amounts of $8,900,000.00 and $2,600,000.00 concerning certain property and improvements that are not subject to the existing adjacent timeshare regime and referred to as the Barefoot'n II Property (the "Barefoot'n II Property").

(iv)    Class 34 – The Allowed Unsecured Claims against the Debtors created for any unsecured deficiency claim arising out of any BB&T's Allowed Claims, including the Allowed Secured Claims from Classes 4, 5, 6, 7, 8, 9, 10, 22, 23 and 24.  Notwithstanding anything to the contrary contained in the Plan, on the Effective Date, BB&T shall receive no Distribution under the Plan (and such Holder shall have no claims against or rights to distribution from the Unsecured Creditor Trust).

B.    Treatment

The Debtors and BB&T have agreed to transfer the BB&T Timeshare Interests, LTV 1400, the Sales Center, and the Barefoot'n II Property to a liquidating trust ("Trust I") for the benefit of BB&T, its successors and assigns, and to the extent BB&T is paid in full, the

general unsecured creditors with the same treatment that has already been articulated under the Plan, and modify the treatment of these Classes in the following manner:

(i)    Barry E. Mukamal will be named as the trustee for Trust I ("Trustee I");

(ii)    The trust agreement for Trust I (the "Trust I Agreement") will be filed on or before May 19, 2011;

(iii)    Pursuant to the Plan and a subsequent Order confirming the Plan, the Court shall retain jurisdiction over Trust I, including all claims, disputes or issues related to the administration, management, rental and sale of the assets identified in Classes 4, 7, and 8 (referred to independently and collectively as the "Trust I Assets") for the benefit of both BB&T, its successors and assignees and the general unsecured creditors, and enforce a Concurrent Operating Agreement by and between Trust I and the Reorganized Debtors;

(iv)    All quarterly United States Trustee fees pursuant to 28 U.S.C. § 1930 ("UST Fees") related to disbursements of Trust I shall be paid by Trust I and the Court shall retain jurisdiction over all duties and responsibilities assigned to Trustee I under the Trust I Agreement;

(v)    Trust I, by and through Trustee I, will have responsibility for maintaining, preserving, managing, operating, renting, and selling the Trust I Assets. In the event Trust I sells or otherwise disposes of some or all of the Trust I Assets, BB&T, in its sole and absolute discretion, shall retain its right to credit bid its Allowed Secured Claim(s) against the Trust I Assets, or alternatively, in whole or in part, apply the net proceeds from sale of any Trust I Assets against its Allowed Class 4, 7, and 8 Secured Claims until such claims are paid in full before any remaining net proceeds are paid to the Unsecured Creditor Trust for distribution to the Holders of Allowed Unsecured Claims as provided in the Plan. Notwithstanding anything to

the contrary in the Plan, any assets transferred to the Unsecured Creditor Trust pursuant to the Plan shall be administered by the Unsecured Creditor Trustee for the benefit of all Allowed Unsecured Claims entitled to distributions from the Unsecured Creditor Trust regardless of the respective classes for such claims;

(vi) Trust I shall be funded for any maintenance fee and tax deficits with respect to BB&T Timeshare Interests by BB&T and may be funded with respect to any operational deficits by BB&T, and BB&T shall receive pursuant to the Plan a superpriority claim only against Trust I for any protective advances made to cover deficiencies as well as the right to include such advances in any credit bid, while carving out the necessary and reasonable operating expenses to run the operations including payments to Trustee I and its agents;

(vii) As more specifically articulated in the Trust I Agreement, Trustee I by way of overview shall have, *inter alia*, the following rights:

a. In connection with the sales, marketing and rental of timeshare interests, either:

(1) Negotiate and execute an agreement with the Reorganized Debtors pursuant to which the BB&T Timeshare Interests and any timeshare interests of BB&T at LTV 1400 (provided such timeshare interests are subject to multisite timeshare plan known as Club Navigo) and the timeshare interests of the Reorganized Debtors will be mutually marketed, sold and rented under mutually acceptable terms and conditions (the "Mutual Distribution Agreement"); provided, however, that the negotiation and execution of a Mutual Distribution Agreement shall not be a condition to the Plan, as modified hereby; or

(2) As an alternative to the Mutual Distribution Agreement, negotiate and execute exclusive or semi-exclusive sales and marketing or rental agreements with

one or more timeshare sales, marketing or rental companies (each a "Third Party Timeshare Company") providing such services to market, sell or rent BB&T Timeshare Interests and any timeshare interests or units at LTV 1400 or the Barefoot'n II Property.

b.     Trustee I may negotiate and execute an agreement or agreements with one or more buyers or the Reorganized Debtors for the purchase and sale of the BB&T Timeshare Interests, LTV 1400 and/or the Barefoot'n II Property.

c.     The right to sell and rent the BB&T Timeshare Interests as well as any timeshare interests or whole units at LTV 1400 and the Barefoot'n II Property in dual track with the Reorganized Debtors; provided, that the Third Party Timeshare Company shall be responsible for registration pursuant to Chapter 721, *Florida Statutes*, from the Division of Florida Condominiums, Timeshares and Mobile Homes (the "Division") so that the Third Party Timeshare Company will be able to market and sell the BB&T Timeshare Interests, and timeshare interests at LTV 1400 or the Barefoot'n II Property, if applicable, on behalf of Trustee I simultaneously with the Reorganized Debtors selling its own unsold and unencumbered timeshare interests. Trust I, at its sole expense, may acquire additional project registrations as may be appropriate through the Division and such regulatory agencies in other jurisdictions as Trustee I and a Third Party Timeshare Company, if any, may reasonable determine, so that Trust I will be able to market and sell its BB&T Timeshare Interests. The Reorganized Debtors shall cooperate with Trustee I and the Third Party Timeshare Company, if any, and Trustee I and the Third Party Timeshare Company, if any, shall cooperate with the Reorganized Debtors to accomplish registrations necessary for any of them to implement their respective sales and marketing plans. As part of such cooperation, the Reorganized Debtors shall provide Trustee I

copies of all project documents, in its possession, that must be filed with the Division and any such documents that must be amended in connection with such filing shall be in Word format.

d.　　If Trust I and Reorganized Debtors do not enter a Mutual Distribution Agreement or other form of common sales, marketing and rental agreement(s), Trust I, by and through Trustee I, shall have the right, with the approval of BB&T, to file a notice in the Public Records which will terminate the multisite timeshare plan known as Club Navigo as to the BB&T Timeshare Interests only and on a go forward basis only and to provide for the right to include, all or any portion of the BB&T Timeshare Interests in another multisite timeshare plan or reservation system;

e.　　Trust I shall have the right to procure services from providers of its choice related to the billing, servicing and collecting of receivables obtained in connection with the financing of sales to consumers of the BB&T Timeshare Interests and timeshare interests at LTV 1400 or the Barefoot'n II Property, if applicable;

f.　　Trust I shall enter into an agreement (the "Concurrent Operating Agreement") with Reorganized Debtors, which Concurrent Operating Agreement, in the form annexed hereto as Exhibit "A" and incorporated herein, will address the issues arising out the concurrent sales, marketing and rental activities that each will engage in with respect to their respective timeshare interests on or near Liki Tiki Village, The Charter Club of Naples Bay and Cove On Ormond Beach. The following provisions shall apply generally to the efforts of Trustee I and Reorganized Debtors to sell, rent and market their respective timeshare interests and may be incorporated into the Concurrent Operating Agreement which will substantially address, *inter alia*, the following:

(1) Provide for a sixty (60) day transition period commencing on the date of the transfer of the Trust I Assets to Trust I ("Transition Period"), which may be extended by the agreement of Trustee I and the Reorganized Debtors for up to two (2) additional thirty (30) day periods or may be terminated at any time during the Transition Period by Trustee I with thirty (30) days advance written notice to Reorganized Debtors, and during which the BB&T Timeshare Interests will continue to be marketed, sold and rented and LTV 1400 will continue to be managed and rented in the same manner as the Debtors were managing, marketing, selling and renting prior to the issuance of the Confirmation Order. During the Transition Period only, Reorganized Debtors shall submit net rent receipts for the BB&T Timeshare Interests and rental of LTV 1400 inventory monthly in an amount of not less than the following: June, 2011 in the amount of $49,511; July, 2011 in the amount of $63,211; August, 2011 in the amount of $45,817; and September, 2011 in the amount $1,795 for each such month as occurs in the Transition Period and subject to proration for any partial month that occurs at the expiration or early termination of the Transition Period. Release fees for those BB&T Timeshare Interests sold during the Transition Period shall be paid weekly with the release fee in the amount set out in the applicable BB&T loan document for the respective BB&T Timeshare Interest.

(2) Use of discreet physical property at the timeshare resorts at which Reorganized Debtors and Trustee I are marketing, selling or renting timeshare interests, the location of which shall be determined by Reorganized Debtors and Trustee I;

(3) Confirm substantially identical access for both the Trustee I and the Reorganized Debtors and their respective customers on the master property at

Liki Tiki Village including the property declared to the timeshare regimes at Liki Tiki Village (other than as to mutually agreed upon exclusive areas);

(4)     Discreet and uniform procedures for protecting the Reorganized Debtors' and the Trustee I's respective efforts to market and sell to their own timeshare owners, customers, guests and prospective purchasers; offer upgrades and reloads to their respective existing owners; and the ability to monitor activities at all applicable locations to ensure that the Concurrent Operating Agreement is properly enforced, including an agreement not to solicit each other's owners, customers, guests and prospective purchasers and a non-disparagement agreement;

(5)     Provide a transparent mechanism to permit both the Reorganized Debtors' and the Trustee I's to engage in simultaneous rental activities at Liki Tiki Village, The Charter Club of Naples Bay and Cove On Ormond Beach, including developing mutually-beneficial procedures to reserve the use of accommodations at Liki Tiki Village, The Charter Club of Naples Bay and Cove On Ormond Beach in accordance with the Club Navigo reservation procedures, if applicable, and any applicable floating use plan rules and regulations. In furtherance thereof, Reorganized Debtors, in their capacity as the management company for the HOAs (as defined below), will make an automatic reservation of BB&T's Timeshare Interests in Trust I's name at the opening of the applicable reservation window in any applicable floating use plan and based on the legal description of the timeshare interest; provided, however, that Trustee I and Reorganized Debtors will file a notice in the Public Records to amend any applicable floating use plan rules and regulations, if necessary, to facilitate such automatic reservations.

(6)     Provide both Trust I and the Reorganized Debtors an opportunity to negotiate to purchase timeshare interests from each other by way of either monetary transactions or like kind exchanges;

(7)     Recognize Trust I's right to enter into agreements with Reorganized Debtors or Third Party Timeshare Companies to rent any timeshare interests and whole units at LTV 1400 (after the Transition Period) and at Barefoot'n II Property;

(8)     Provide for an agreement between Reorganized Debtors and Trustee I, respecting Trust I's allocable maintenance fee and tax obligations to the timeshare owners associations for Liki Tiki Village I and Liki Tiki Village II (each an "HOA") in accordance with the approved annual HOA budget for each HOA (each an "HOA Budget") which agreement is intended to limit the contribution of Trust I to its allocable share of the operating cash shortfall of the HOA in proportion to the timeshare interests Trust I is entitled to rent as compared to the timeshare interests the Reorganized Debtors are entitled to rent. Pursuant to this agreement, for the calendar years 2011 through 2014 (but prorated on a monthly basis in the years 2011 and 2014 and limited to the months that Trust I is in existence in those years), the Reorganized Debtors agree to make a payment (the "Trust I Adjusted Obligation Credit") to Trust I with respect to a particular HOA in accordance with the following:

(a)     Reorganized Debtors and Trust I will each timely pay the HOA maintenance fees, inclusive of reserves, budget bad debt expenses and any deficit reduction line items assessed by the HOA (the "Full Obligation" as to each the Reorganized Debtors and Trust I) due on their respective timeshare interests at Liki Tiki Village I and Liki Tiki Village II pursuant to the governing documents of the applicable HOA and the applicable

HOA budget.

(b) On a quarterly basis Trust I's Full Obligation shall be alternatively calculated (the "Trust I Adjusted Obligation") as the greater of:

1. The "Trust I Ratable Share" (defined below) times the "Actual HOA Member Cash Operating Shortfall" (defined below) arising from the "Trust I Ratable Assessment" (defined below) but not to exceed Trust I's Full Obligation; or

2. Trust I's Full Obligation less that portion of its maintenance fee assessment applicable to Budgeted HOA Bad Debt Expenses and any deficit reduction line items in the HOA Budget (the "Trust I Minimum Assessment").

(c) Reorganized Debtors will remit or credit to Trust I any positive difference between the Trust I Full Obligation and the Trust I Adjusted Obligation (the "Trust I Adjusted Obligation Credit") within 30 days after the end of the quarter.

(d) The components used in determining the Trust I Adjusted Obligation and Trust I Adjusted Obligation Credit are as follows:

1. "Aggregate HOA Maintenance Assessment" is the aggregate maintenance fee assessment for the entire HOA as reflected in the approved HOA Budget.

2. "Actual HOA Bad Debt Expense" is the bad debt expense as reflected on the audited HOA financial statements for the applicable calendar year.

3. "Actual HOA Member Cash Operating Shortfall" is the HOA Cash Operating Budget minus the Actual HOA Member Collections.

4. "Actual HOA Member Collections" is the

Aggregate HOA Maintenance Assessment minus the Actual HOA Bad Debt Expense minus Trust I's Full Obligation minus Reorganized Debtors' Full Obligation.

5.    "Adjusted Uncollected Assessment" shall be equal to the Actual HOA Bad Debt Expense multiplied by the Resort Occupancy Factor.

6.    "Budgeted HOA Bad Debt Expense" is the bad debt expense line item plus any deficit reduction line item as reflected in the approved HOA Budget.

7.    "Combined Ratable Basis" is the amount of Trust I Ratable Basis plus the amount of Reorganized Debtors Ratable Basis.

8.    "HOA Bad Debt Experience Ratio" is a fraction, the numerator of which is the Budgeted HOA Bad Debt Expense and the denominator of which is the Aggregate HOA Maintenance Assessment.

9.    "HOA Cash Operating Budget" is the amount of the Aggregate HOA Maintenance Assessment minus the amount of the Budgeted HOA Bad Debt Expense.

10.    "Reorganized Debtors Ratable Basis" shall be equal to the Reorganized Debtors' Full Obligation plus the amount of the Adjusted Uncollected Assessment.

11.    "Reorganized Debtors Ratable Share" is a fraction, the numerator of which is the amount of Reorganized Debtors Ratable Basis and the denominator of which is the amount of the Combined Ratable Basis.

12.    "Resort Occupancy Factor" is set to seventy percent (70%).

13. "Trust I Minimum Assessment" is Trust I's Full Obligation multiplied by the quantity of 1 minus the HOA Bad Debt Expense Ratio.

14. "Trust I Ratable Assessment" is the Trust I Ratable Share multiplied by Actual HOA Member Cash Operating Shortfall.

15. "Trust I Ratable Basis" shall be equal to the Trust I's Full Obligation.

16. "Trust I Ratable Share" is a fraction, the numerator of which is the amount of Trust I Ratable Basis and the denominator of which is the amount of the Combined Ratable Basis.

(d)     For the avoidance of doubt in determining the Trust I Adjusted Obligation Credit, Schedule "1" attached hereto and incorporated herein by this reference, contains an "Trust I Adjusted Obligation Credit Calculation Worksheet" detailing the individual components and their usage in the calculation as well as an estimate for the 2011 fiscal year.

(9)     Recognize Trust I's right to negotiate a rental agreement with Reorganized Debtors or with one or more Third Party Timeshare Companies selected by Trustee I;

(10)    Recognize Trust I's right to list LTV 1400, Barefoot'n II Property and the Sales Center for sale;

(11)    Provide for an agreement among Trust I, any Third Party Timeshare Company, the Reorganized Debtors and any third party sales agent acting on behalf of the Reorganized Debtors not to solicit for hire or actually hire the personnel of the other without the prior written consent of the other;

(12) Provide Trustee I with a copy of any future reserve studies for the HOAs; and

(13) Provide Trustee I with all the same information provided to members of the board of directors of each of the HOAs (and on the same time frame as so provided to the board members) and a representative of the Reorganized Debtors will meet with a representative of Trustee I prior to mailing of the proposed annual budget to the HOA members.

C.     <u>Classification and Treatment of Classes 5 and 6</u>

(i) Class 5 consists of the Allowed Secured Claim of BB&T in connection with that certain Promissory Note by and between BB&T and Island One dated May 25, 2005 and that certain Future Advance Promissory Note dated September 11, 2007. The Allowed Secured claim is estimated as of the Petition Date in the amount of $4,747,988.88 and is secured by a first mortgage on approximately 59.2 acres of unimproved property with development entitlements of three hundred timeshare units that was to serve as Phase III of Liki Tiki Village ("LTV III Land"). No construction has been made to date and the property remains as bare land, with the exception of limited construction of a small number of parking spaces dedicated to the use of the Sales Center. Pursuant to the Plan and Bid Procedures Order, BB&T is entitled to credit bid the full amount of its secured claim in order that the Debtors on the Effective Date shall transfer free and clear of all liens and encumbrances, pursuant to 11 U.S.C. § 363, the LTV III Land to BB&T and/or its assigns. BB&T shall be entitled to a deficiency claim upon the sale of such property to a third party as a Class 34 BB&T (Unsecured Deficiency Claim).

(ii) Class 6 consists of the Allowed Secured Claim of BB&T in connection with that certain Promissory Note by and between BB&T and Island One dated September 11, 2007

and that certain Promissory Note dated May 25, 2007. The Allowed Secured claim is estimated as of the Petition Date in the amount of $1,822,762.00, and is secured by a first mortgage on approximately 4.7 acres consisting of unimproved property that was to become commercial space know as the Liki Tiki Welcome Center ("Welcome Center"). Pursuant to the Plan and the Bid Procedures Order, BB&T shall exercise its right to credit bid the amount of its secured claim and the Debtors shall convey title to the Welcome Center to BB&T and/or its assigns free and clear of all liens and encumbrances pursuant to 11 U.S.C. § 363. BB&T shall be entitled to a deficiency claim upon the sale of such property to a third party as a Class 34 BB&T (Unsecured Deficiency Claim).

D.     <u>Classification and Treatment of Classes 9, 10, 23 and 24</u>

(i)     Class 9 consists of the Allowed Secured Claim of BB&T in connection with those five loans that are evidenced by: (I) Note #80254397230005; (II) Note #80254397230006; (III) Note #8025439723008; (IV) Note #80254397230009; and (V) Note #80254397230010 by and between BB&T and Island One. The Allowed Secured Claim is estimated as of the Petition Date in the amount of $54,876.20, and is secured by a first lien on certain equipment of Island One ("Island One Equipment") and certain equipment located at the Sales Center (the "Sales Center Equipment"). Pursuant to the Plan and the Bid Procedures Order, BB&T shall exercise its rights to credit bid the full amount of its secured claim and the Debtors shall transfer to BB&T and/or its assigns the Sales Center Equipment free and clear of all liens. Any deficiency claim that is created upon the sale of the Sales Center Equipment shall be an Allowed Class 34 BB&T (Unsecured Deficiency Claim). With respect to the Island One Equipment, on the Effective Date, the Debtors shall pay BB&T the sum of $10,952.07 to purchase the Island One Equipment

for value equivalent to its replacement value. In turn, any deficiency claim that is created by the sale shall be an Allowed Class 34 BB&T (Unsecured Deficiency Claim).

(ii)     Class 10 consists of the Allowed Secured Claim of BB&T in connection with that certain Loan Agreement and Promissory Note by and between BB&T and Island One dated February 4, 2008. The Allowed Secured Claim is estimated as of the Petition Date in the amount of $19,088.69, and is secured by a first priority lien on a 2008 Dodge Ram Pick-up Truck (VIN 3D6WG38AX86179735) ("2008 Dodge Truck"). On the Effective Date, the Debtors shall pay the full amount of BB&T's claim for the 2008 Dodge Truck. Thereafter, BB&T shall have no unsecured claim.

(iii)    Class 23 consists of the Allowed Secured Claim of BB&T in connection with that certain Loan Agreement and Promissory Note by and between BB&T and St. Croix One dated February 26, 2007. The Allowed Secured Claim is estimated as of the Petition Date in the amount of $3,314.29 and is secured by a first priority lien on a 2007 Dodge Ram Pick-up Truck (VIN 1D7HA16K97J548751) ("2007 Dodge Truck"). Pursuant to the Plan and the Bid Procedures Order, BB&T shall exercise its rights to credit bid the full amount of its secured claim and the Debtors shall transfer to BB&T and/or its assigns the 2007 Dodge Truck free and clear of all liens pursuant to 11 U.S.C. § 363. Any deficiency claim that is created upon the sale of the 2007 Dodge Truck shall be an allowed Class 34 BB&T (Unsecured Deficiency Claim).

(iv)    Class 24 consists of the Allowed Secured Claim of BB&T in connection with that certain Loan Agreement and Promissory Note by and between BB&T and Island One dated November 28, 2007. The Allowed Secured Claim is estimated as of the Petition Date in the amount of $6,874.97 and is secured by a first priority lien on a 2008 Jeep Patriot SUV (VIN 1J8FT28W28D593413) ("2008 Jeep Patriot"). Pursuant to the Plan and the Bid Procedures

Order, BB&T shall exercise its rights to credit bid the full amount of its secured claim and the Debtors shall transfer to BB&T and/or its assigns the 2008 Jeep Patriot free and clear of all liens pursuant to 11 U.S.C. § 363. Any deficiency claim that is created upon the sale of the 2008 Jeep Patriot shall be an allowed Class 34 BB&T (Unsecured Deficiency Claim).

        E.      <u>Classification and Treatment of Class 22</u>

        (i)    Class 22 consists of the Allowed Secured Claim of BB&T in connection with that certain Loan Agreement and Promissory Note by and between BB&T and St. Croix One, LLC dated July 27, 2006. The Allowed Secured Claim is estimated as of the Petition Date in the amount of $4,428,952.35, and is secured by the following, which shall be collectively referred to as the "St. Croix Timeshare Interests:" (a) a first mortgage on all of St. Croix One's real property, including, but not limited to, unsold timeshare interests and vacant lots comprising approximately 15 acres and referred to as "Residences at Banyan Hill," (b) a first priority lien on all other personal property assets of St. Croix One, and (c) such other or additional collateral as provided for under the St. Croix Cash Collateral Order. In addition, BB&T asserts that it has an Allowed Secured Claim in all timeshare purchase money receivables generated by, held or otherwise assigned to St. Croix One in connection with the sale or transfer of timeshare interests at Chenay Bay Beach Resort (the "St. Croix Receivables" and together with the St. Croix Timeshare Interests, the "Trust II Assets"). Pursuant to that certain (a) "Interim Order Granting St. Croix One LLC's, One of the Jointly Administered Debtors, Emergency Motion for Use of Cash Collateral, Approving Interim Adequate Protection Payments with Island One, Inc., entered November 30, 2010 (D.R. 215) ("Interim BB&T Cash Collateral Order"), and (b) "Final Order Granting St. Croix One LLC's, One of the Jointly Administered Debtors, Emergency Motion for Use of Cash Collateral, Approving Interim Adequate Protection Payments with Island One, Inc.,

entered January 7, 2011 (D.R. 284) ("Final BB&T Cash Collateral Order"), TFC has reserved certain rights with respect to its asserted liens and security interests in certain such St. Croix Receivables (the "TFC Reservation").

(ii)    On the Effective Date, the Debtors shall transfer the St. Croix Timeshare Interests to a second liquidating trust ("Trust II") for the benefit of BB&T, its successors and assigns, and after the BB&T Class 22 Allowed Secured Claim has been paid in full, for the benefit of the Holders of Allowed Class 25 and/or 26 Secured Claims, if any, and thereafter the general unsecured creditors.  Also on the Effective Date, in connection with the consummation and implementation of the TAC Agreements, the Debtors shall transfer to Trust II all existing and subsequently created St. Croix Receivables, including but not limited to those described on Exhibit "B" attached hereto, with such transfer being free and clear of any claim in favor of TFC, Liberty or TAC, and the St. Croix Receivables shall no longer be subject in any respect to the TFC Reservation and shall thereby render the TFC Reservation provided under the Interim BB&T Cash Collateral Order and the Final BB&T Cash Collateral Order withdrawn.

(iii)    The trustee for Trust II ("Trustee II"), in addition to the duties and obligations provided for under the Plan, shall be responsible for maintaining, preserving, managing, operating, renting and listing for sale the Trust II Assets.  At time of sale of Trust II Assets, BB&T shall retain its right to credit bid the total amount of its Secured Claim including protective advances (including any capital or operational expenditures).  If a sale occurs in which BB&T does not credit bid the total amount of its Secured Claim, including any protective advances (including capital or operational expenditures), and such sale yields sufficient net proceeds to cover the full amount of BB&T's claim, any excess net proceeds shall be distributed as provided in subclause E.(ii) above and otherwise as provided in the Plan (as modified)

Notwithstanding anything to the contrary in the Plan, any assets transferred to the Unsecured Creditor Trust pursuant to the Plan shall be administered by the Unsecured Creditor Trustee for the benefit of all Allowed Unsecured Claims entitled to distributions from the Unsecured Creditor Trust regardless of the respective classes for such claims.

        (iv)    Barry E. Mukamal will be named as Trustee II

        (v)    The trust agreement for Trust II (the "Trust II Agreement") will be filed on or before May 19, 2011. As provided in Article VIII, Section 8.03(c) of the Plan, and subject to the terms of this BB&T Modification, Trust II shall be vested with all Chapter 5 Causes of Action with respect to the Trust II Assets and any and all other claims or rights of any value whatsoever at law or in equity which would otherwise constitute an asset of St. Croix One, LLC's bankruptcy estate relating to the Trust II Assets and/or against any creditor or third party with respect to Trust II Assets not otherwise released. The foregoing causes of action shall exclude any claims against TFC and Liberty and any of their respective officers, directors, employees, agents, attorneys, representatives and successors and assigns, and any member, officer, director, manager, employee, present or past, of any of the Debtors acting in their capacity as a member, officer, director, manager or employee of any of the Debtors. Notwithstanding the foregoing, no one acting as closing agent or disbursing agent in connection with the sale or transfer of timeshare interests at Chenay Bay Beach Resort shall be released from any claim related to disbursement of funds in connection with such sales or transfers.

        (vi)    All quarterly UST Fees related to disbursements of Trust II shall be paid by Trustee II and the Court shall retain jurisdiction over all duties and responsibilities assigned to Trustee II under the Trust II Agreement.

(vii)   Trust II may be funded with respect to any operational deficits by BB&T and BB&T shall receive pursuant to the Plan a superpriority claim only against Trust II for any protective advances made to cover deficiencies as well as the ability to include such advances in its credit bid and/or its secured claim, while carving out the necessary and reasonable operating expenses to run the operations including payments to Trustee II.

(viii)   The Bankruptcy Court will retain jurisdiction to administer the Trust II Assets and any and all claims objections and/or adversary proceedings related to the Trust II Assets.

(ix)   Additionally, Trustee II shall have the right, *inter alia*, to:

a.   Sign an exclusive or semi-exclusive management agreement with either a Third Party Timeshare Company or a hotel management company for the continued sale of the unsold St. Croix Timeshare Interests and the continued management of the hotel operations;

b.   Negotiate and sign a mutually acceptable letter agreement with the Reorganized Debtors to provide for a sixty (60) day transition period commencing on the date of the transfer of the Trust II Assets to Trust II, which period may be extended by the agreement of Trust II and the Reorganized Debtors for up to two (2) additional thirty (30) day periods or may be terminated at any time during the transition period by Trust II with fifteen (15) days advance written notice to Reorganized Debtors, and during which transition period Reorganized Debtor will provide rental, operational, management and administration assistance to Trust II;

c.   Sell the Trust II Assets free and clear of all liens and encumbrances including the interests of any purchaser of a St. Croix Timeshare Interest who purchased a St. Croix Timeshare Interest from St. Croix One, LLC after 2007;

d. With the approval of BB&T, file a notice in the Public Records to terminate the multisite timeshare plan known as Club Navigo as to the St. Croix Timeshare Interests on a go forward basis only and to provide for the right to include, all or any portion of such St. Croix Timeshare Interests in another multisite timeshare plan or reservation system

e. Assume or reject any executory contracts relating to the Trust II Assets;

f. Upon the ultimate disposition of the Trust II Assets, file a motion for final decree and close the St. Croix One LLC Chapter 11 case.

F. The Plan shall be modified to add a new Class 34 – BB&T (Unsecured Deficiency Claim).

Class 34 consists of BB&T's potential unsecured deficiency claims related to the BB&T Consolidated Inventory Loan (Class 4), the Sales Center (Class 7), the Barefoot'n Loan Obligations (Class 8), the BB&T LTV III Land Loan (Class 5), the BB&T LTV III Out Parcel Loan (Class 6), the Equipment Loan (Class 9), the St. Croix Timeshare Interests (Class 22), the 2007 Dodge Ram Loan (Class 23), and the 2008 Jeep Patriot Loan (Class 24).

In the event the sale, transfer, assignment, conveyance and/or disposition of the BB&T Consolidated Inventory, the Sales Center, the Barefoot'n Property, the BB&T LTV III Land, the BB&T LTV III Out Parcel, the Equipment, the St. Croix Timeshare Interests, the 2007 Dodge Ram or the 2008 Jeep Patriot does not yield sufficient net proceeds to satisfy the Allowed Secured Claims in full, then any remaining deficiency claim shall be an allowed Class 34 BB&T (Unsecured Deficiency Claim).  The Holder of Class 34 BB&T (Unsecured Deficiency Claim) shall receive no Distribution under the Plan.

G. Article IX of the Plan Section 9.03 shall be modified to add the following:

 **5.** **Exclusions from Discharges, Releases, Injunctions and Exculpations.** *Notwithstanding anything to the contrary under the Plan, Deborah L. Linden ("Linden") is excluded from any discharge, release, injunction or exculpation from any claim or cause of action of the Unsecured Creditors Committee, the Unsecured Creditors Trust, BB&T, the Debtors and their Estates.  Without limiting the foregoing, Linden's*

obligations to BB&T relating to the SCO Claims and arising under that certain Amended, Consolidated and Restated Guaranty Agreement executed in conjunction with the Amended and Restated Master Loan Agreement, effective as of October 30, 2009 (the "Master Loan Agreement") and any other loan in favor of BB&T in which Linden is a borrower or a guarantor shall not be released and all legal remedies in favor of BB&T against Linden shall survive the Confirmation Date. In addition, with respect to BB&T only, the definition of "Released Claims" shall exclude, solely to the extent provided herein, any claim of BB&T relating to both SCO and either (i) the failure to tender release prices to BB&T upon the sale of BB&T Timeshare Intervals; (ii), the sale of BB&T Timeshare Intervals without obtaining the consent of BB&T or the release of BB&T's mortgage lien against the real property owned by SCO; or (iii) timeshare receivables which were originally included in the BB&T Collateral and allegedly improperly pledged to TFC (collectively, the "SCO Claims"). Consequently, the definition of Released Parties shall also be modified to exclude all persons or entities against whom BB&T may pursue the SCO Claims, with the exception of TFC and Liberty and any of their respective officers, directors, employees, agents, attorneys, representatives and successors and assigns, and any member, officer, director, manager, employee, present or past, of any of the Debtors acting in their capacity as a member, officer, director, manager or employee of any of the Debtors, each of whom shall remain Released Parties with respect to the SCO Claims. Notwithstanding the foregoing, no one acting as closing agent or disbursing agent in connection with the sale or transfer of timeshare interests at Chenay Bay Beach Resort shall be released from any claim related to disbursement of funds in connection with such sales or transfer.*

H.     The definition of Released Parties pursuant to 1.100 of the Plan shall be modified to add BB&T as follows:

1.100   **Released Parties** shall mean the Debtors, their estates, directors, officers, employees, agents, representatives, successors and assigns of any of the foregoing who served in such capacities on the confirmation date, TAC, TFC, Liberty and BB&T, and each of their respective directors, officers, employees, agents, representatives, successors and assigns but specifically excluding Linden from any claim or cause of action of the Unsecured Creditors Committee, the Unsecured Creditors Trust, BB&T, the Debtors and their Estates.

I.     Section 8.03 Rights of Action shall be modified as follows:

(b)     Except as otherwise provided in the BB&T Modification, on the Effective Date, any right, claim or cause of action, belonging to St. Croix One, LLC or its estate not otherwise excluded under Section 8.03(c), *infra* against any Person or Entity, including without limitation, any claim to avoid a transfer under Section 544, 547, 548, 549 or 553(b) of the Code shall be transferred and assigned by the Debtors to the Unsecured Creditor Trust.

J.     Section 8.03 Rights of Action Under the Plan shall be modified to add the following:

(c)     Notwithstanding the assignment provided under Section 8.03(b), *supra*, and subject in all respects to Article IX of the Plan, as modified by the BB&T Modification, on the Effective Date, any rights, claim or Cause of Action belonging to Debtors or their estates against any Person or Entity: (i) relating to the Trust I Assets shall be transferred and assigned by the Debtors to Trust I for the benefit of BB&T; and

22

(ii) relating to the Trust II Assets shall be transferred and assigned by the Debtor to Trust II for the benefit of BB&T. Trustee I and Trustee II, in their respective reasonable discretion, shall pursue, settle or release all such rights of action concerning the Trust I Assets or Trust II Assets, as appropriate, in accordance with the best interest of and for the benefit of BB&T.

K.    Section 9.01 Effects of Confirmation shall be modified to add the following:

9. <u>Retention of Remedies</u>. To the extent not otherwise released, discharged or altered in the Plan, Confirmation Order or by virtue of the Bankruptcy Code, BB&T shall retain all of its rights, remedies and actions contained in the Master Loan Agreement.


RESPECTFULLY SUBMITTED this 4th day of May, 2011.

ISLAND ONE, INC.,
CRESCENT ONE, LLC,
ST. CROIX ONE, LLC,
ISLAND ONE RESORTS MANAGEMENT
CORPORATION,
NAVIGO VACATION CLUB, INC.,
IOI FUNDING I, LLC
*Debtors and Debtors in Possession*

By: _____
Deborah L. Linden
President

/s/ Elizabeth A. Green
_____
Elizabeth A. Green, Esq.
Florida Bar No.: 0600547
egreen@bakerlaw.com
Jimmy D. Parrish, Esquire
Florida Bar No. 526401
jparrish@bakerlaw.com
BAKER & HOSTETLER, LLP
200 S. Orange Avenue
SunTrust Center, Suite 2300
Orlando, Florida 32801
Tel: (407)649-4000
Fax: (407)841-0168
*Attorneys for the Debtors*

**CONCURRENT OPERATING AGREEMENT**

BY THIS **CONCURRENT OPERATING AGREEMENT** ("**Agreement**") **ISLAND ONE, INC.**, a Florida corporation ("**Island One**"); **ISLAND ONE RESORTS MANAGEMENT CORPORATION**, a Florida corporation and wholly owned subsidiary of Island One ("**IORMC**"); **NAVIGO VACATION CLUB, INC.**, a Florida corporation d/b/a Club Navigo and wholly owned subsidiary of Island One ("**NVC**") (collectively, the "**Reorganized Debtor**"); and **BB&T LIQUIDATING TRUST**, as defined in the Plan ("**Trust I**"), established pursuant to action of the Bankruptcy Court (defined as set forth below) (the Reorganized Debtor and Trust I to be collectively referred to as the "**Parties**" and individually as a "**Party**" in this Agreement) confirm and agree as follows:

**RECITALS:**

WHEREAS, on September 10, 2010, Island One, and certain of its affiliates including IORMC, NVC, Crescent One, LLC, a Florida limited liability company, St. Croix One, LLC, a U.S. Virgin Islands limited liability company and IOI Funding I, LLC, a Florida limited liability company (collectively the "**Debtors**") commenced the cases (the "**Bankruptcy Cases**") under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") by filing Voluntary Petitions for Relief with the United States Bankruptcy Court for the Middle District of Florida, Orlando Division (the "**Bankruptcy Court**");

WHEREAS, Branch Banking & Trust Company, a North Carolina Corporation ("**BB&T**"), is Successor in Interest to Colonial Bank ("**Colonial**") by Asset Acquisition from FDIC as Receiver for Colonial Bank; and

WHEREAS, one or more of the Debtors entered into various loans with Colonial, which loans were subsequently acquired by BB&T ("**BB&T Loans**"); and

WHEREAS, BB&T and the Debtors entered into a restructuring of certain notes, debts and obligations through agreements effective October 30, 2009 ("**Restructuring Agreements**"); and

WHEREAS, the Debtors filed the *First Amended Joint Plan of Reorganization submitted by Island One, Inc., Crescent One, LLC, St. Croix One, LLC, Island One Resorts Management Corporation, Navigo Vacation Club, Inc. and IOI Funding I, LLC* as its proposed joint plan of reorganization, and that certain *Modification of the First Amended Plan of Reorganization for Island One, Inc., Crescent One, LLC, St. Croix One, LLC, Island One Resorts Management Corporation, Navigo Vacation Club, Inc., and IOI Funding I, LLC* (the "**Modification**"), (all of which shall be collectively referred to herein as the "**Plan**") pursuant to Chapter 11 of the Code, 11 USC, §101, *ex seq*.; and

WHEREAS, pursuant to the Confirmation Order of the Bankruptcy Court, the Debtors transferred, assigned and delivered all of the right, title and interest in and to certain of its assets (the "**Trust I Assets**") to Trust I and all such Trust I Assets were deemed to vest in Trust I for



EXHIBIT
A

the trustee of Trust I (the "**Trustee I**") to manage, sell and rent for the beneficiaries of the Trust I; and

WHEREAS, the Trust I Assets include: (i) Timeshare Interests (defined below) owned by Trust I (the "**BB&T Timeshare Interests**") in those certain timeshare regimes commonly referred to as Liki Tiki Village I, Liki Tiki Village II, the Cove on Ormond Beach and The Charter Club of Naples Bay (collectively referred to as "**IOI Resorts**"); (ii) the units and Timeshare Interests in that certain timeshare regime known as LTV 1400 ("**LTV 1400**"); (iii) that certain land and improvements (the "**Barefoot'n II Property**") located adjacent to but not included as part of that certain timeshare regime known as Barefoot'n in the Keys at Old Town (the "**Barefoot'n Resort**"); and (iv) certain property located near Liki Tiki Village and used as a sales center (the "**Sales Center**"); and

WHEREAS, Reorganized Debtor owns or controls Timeshare Interests at the IOI Resorts and the Barefoot'n Resort separate and distinct from the BB&T Timeshare Interests (the "**Reorganized Debtor Timeshare Interests**"); and

WHEREAS, some of the BB&T Timeshare Interests and the Reorganized Debtor Timeshare Interests are subject to that certain multisite timeshare plan known as Club Navigo (the "**Club**") which is managed and controlled by the Reorganized Debtor; and

WHEREAS, the Reorganized Debtor provides site management services ("**Site Management Services**") to each of the IOI Resorts and the Barefoot'n Resort pursuant to management agreements between IORMC and each of the owners' associations at the IOI Resorts and the Barefoot'n Resort; and

WHEREAS, each of the Reorganized Debtor and Trust I may determine individually to enter into one or more sales, marketing, rental or management agreements with one or more timeshare companies (each a "**Third Party Timeshare Company**") for the purpose of selling, marketing, renting or managing their respective assets; and

WHEREAS, the Reorganized Debtor and Trust I wish to establish clear guidelines that will allow the Parties to simultaneously, effectively, and efficiently market, sell and rent their respective assets by providing each Party with access to certain resources and property required by the Parties to conduct their respective marketing, sales and rental activities without interference from, or impairment by the other, or any Third Party Timeshare Company acting on their behalf; and

WHEREAS, pursuant to the Plan, Trustee I and Reorganized Debtor have an obligation to attempt to negotiate a concurrent operating agreement;

WHEREAS, Reorganized Debtor and Trust I desire to enter into this Agreement as contemplated in the Plan, which Agreement shall be subject to the consummation of the transactions contemplated by the TAC Purchase and Sale Agreements and any further definitive documentations (if necessary) and shall provide for the monitoring and enforcement of this Agreement by the Bankruptcy Court; and

WHEREAS, this Agreement will be effective as of the Effective Date of the Plan (the "**Effective Date**").

NOW THEREFORE, for and in consideration of the mutual promises and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

The Recitals are incorporated as part of this Agreement by this reference and the terms defined in the preamble and Recitals shall have the meaning provided therein. Terms not defined in this Agreement shall have the meaning ascribed to them in the Plan. The following additional definitions shall apply to and constitute part of this Agreement along with Exhibit "A" attached hereto:

1.1    **"Person"** shall mean an individual, partnership, joint venture, limited liability company, corporation, trust, unincorporated organization, syndicate, governmental authority, and the successors and assigns thereof or the heirs, executors, administrators or other legal representatives of an individual, as well as any group of Persons that act jointly or in concert for the purpose of acquiring, holding, or disposing of, assets or interests in another.

1.2    **"Resort Documents"** shall mean all documents that establish each IOI Resort and the Barefoot'n Resort and concern the sale, marketing, use and operation, each IOI Resort and the Barefoot'n Resort, including, but not limited to, their respective declarations of condominium, declarations of covenants, conditions and restrictions, owners' association documents, and resort rules and regulations. In the case of Barefoot'n Resort, the term Resort Documents shall include the Declaration of Covenants, Conditions and Restrictions and Grant of Easements recorded December 9, 1999 at O.R. Book 1682, Page 1480 of the Official Records of Osceola County, and all amendments and other documents related thereto.

1.3    **"Timeshare Interest"** shall have the meaning provided in Section 721.05(36), *Florida Statutes* (2010).

## ARTICLE II
## PURPOSE OF AGREEMENT

The purpose of this Agreement is to establish guidelines that will allow the Parties to simultaneously, effectively, and efficiently market, sell and rent the Trust I Assets and the Reorganized Debtor Timeshare Interests, respectively, by providing each Party with access to certain resources and property required by the Parties to conduct their respective marketing, sales and rental activities without interference from, or impairment by, the other.

## ARTICLE III
## TRANSITION PERIOD

3.1     Transition Period Defined.   Commencing on the Effective Date and continuing until 5:00 PM local Orlando, Florida time on the sixtieth (60th) day after Effective Date ("**Transition Period**"), Reorganized Debtor shall continue to market, sell and rent the BB&T Timeshare Interests and manage and rent LTV 1400 for the account of Trust I in the same manner as the Debtor was managing, marketing, selling and renting prior to the issuance of the Confirmation Order.   During the Transition Period only, Reorganized Debtor shall submit net rent receipts for the BB&T Timeshare Interests and rental of LTV 1400 inventory monthly in an amount of not less than the following:  June, 2011 in the amount of $49,511; July, 2011 in the amount of $63,211; August, 2011 in the amount of $45,817; and September, 2011 in the amount $1,795 for each such month as occurs in the Transition Period and subject to proration for any partial month that occurs at the expiration or early termination of the Transition Period.  Release fees for those BB&T Timeshare Interests sold during the Transition Period shall be paid weekly with the release fee in the amount set out in the applicable BB&T loan document for the respective BB&T Timeshare Interest.

3.2     Extension of Transition Period; Termination of Transition Period.

(i)     The Transition Period may be extended by the written agreement of Trustee I and the Reorganized Debtor for up to two (2) additional thirty (30) day periods.

(ii)     The Transition Period, or any extension of the Transition Period, may be terminated by Trustee I upon thirty (30) days' advance written notice to Reorganized Debtor.

3.3     Rental of Barefoot'n II Property.   If Trustee I desires to engage Reorganized Debtor to manage, operate or rent Barefoot'n II Property on behalf of Trustee I during the Transition Period, the Parties agree to negotiate in good faith to agree on mutually acceptable terms for such engagement.

## ARTICLE IV
## SALES, MARKETING AND RENTAL OF TIMESHARE INTERESTS

4.1     Direct Marketing and Sales Activities.

(i)     By Trustee I.   Trustee I and/or any Third Party Timeshare Company retained by Trustee I and their respective employees, independent contractors, agents, representatives and others acting on their behalf, may engage in sales, marketing, solicitation, gift promotions and other efforts to generate leads, prospects, customers and prospective buyers, tenants and users of the Trust I Assets.

(ii)     By Reorganized Debtor.   Reorganized Debtor and/or any Third Party Timeshare Company retained by Reorganized Debtor and its respective employees, independent contractors, agents, representatives and others acting on their behalf, may engage in sales, marketing, solicitation, gift promotions and other efforts to generate leads, prospects, customers and prospective buyers, tenants and users of Reorganized Debtor Assets.

4.2     Customers' Access to Property at Liki Tiki Village.  Except as provided in paragraphs 6.1 and 6.2 below, the customers of Reorganized Debtor, Trustee I and/or any Third Party Timeshare Company on behalf of Reorganized Debtor or Trustee I shall have substantially identical, complete, full, and open access to all areas of the commonly-used property at Liki Tiki Village, including the common areas or common elements property declared to the timeshare regimes at Liki Tiki Village, to tour their respective customers, prospects, tenants or Timeshare Interest purchasers or the owner of record of any Timeshare Interest ("**Owners**") in conjunction with their respective marketing, sales and rental efforts.

4.3     Use of Club Navigo in Sales, Marketing and Rental of BB&T Timeshare Interests.  If Trust I determines to not terminate Club Navigo with respect to the BB&T Timeshare Interests, Trust I, or any authorized Person marketing the BB&T Timeshare Interests on behalf of Trust I, other than the Reorganized Debtor during the Transition Period to the extent applicable, shall not reference or utilize any aspect of Club Navigo in the sales, marketing and rental of the BB&T Timeshare Interests unless the Parties agree on the terms under which Trustee I may include Club Navigo in connection with its marketing, sales and rental program.  Reorganized Debtor and Trust I shall negotiate in good faith to approve the terms under which Trust I, or any authorized Person sells, markets or rents the BB&T Timeshare Interests subject to Club Navigo.  Trustee I and the Reorganized Debtor shall receive authorization pursuant to the Confirmation Order to allow Trustee I to terminate the Club Navigo affiliation on Trust I Assets by recording a Notice of Termination in the Official Records in the respective counties in which the Trust I Assets are located.  To the extent that Trust I terminates Club Navigo with respect to any of the BB&T Timeshare Interests, Trustee I shall not use Club Navigo for any part of its marketing, sales and rental efforts.

## ARTICLE V
## REGISTRATION OF TIMESHARE INTERESTS

Trustee I on its own right or by and through its Third Party Timeshare Company shall be responsible for registration pursuant to Chapter 721, *Florida Statutes*, so that the Trustee I or its Third Party Timeshare Company will be able to market and sell the BB&T Timeshare Interests, and timeshare interests at LTV 1400 or the Barefoot'n II Property, if applicable, simultaneously with the Reorganized Debtor selling its Reorganized Debtor Timeshare Interests.  Trustee I, at its sole expense, may acquire additional project registrations as may be appropriate through the Division of Florida Condominiums, Timeshares and Mobile Homes (the "**Division**") and such regulatory agencies in other jurisdictions as Trustee I and a Third Party Timeshare Company, if any, may reasonably determine, so that  Trustee I will be able to market and sell its BB&T Timeshare Interests.  The Reorganized Debtor shall cooperate with Trustee I and the Third Party Timeshare Company, if any, and Trustee I and the Third Party Timeshare Company, if any, shall cooperate with the Reorganized Debtor to complete their respective registrations.  As part of such cooperation, the Reorganized Debtor shall provide Trustee I copies of all project documents, in its possession, that must be filed with the Division and any such documents that must be amended in connection with such filing shall be in Word format.

## ARTICLE VI
## EXCLUSIVE AND NON-EXCLUSIVE SALES, MARKETING AND RENTAL AREAS

6.1     Exclusive Trust I (Third Party Timeshare Companies) Sales and Marketing Areas. Trust I, and any Third Party Timeshare Company or Companies engaged by Trust I, responsible for the sale, marketing (which includes, without limitation, offering upgrades and reloads to existing customers), rental and operation of the BB&T Timeshare Interests, and their respective employees, contractors, agents or representatives, shall have the exclusive use of the Sales Center and LTV 1400 for sales, marketing and rental activities (**"Trust I Exclusive Areas"**). Reorganized Debtor, and any Third Party Timeshare Company or Companies engaged by Reorganized Debtor, responsible for the sale, marketing, rental and operation of the Reorganized Debtor Timeshare Interests, and their respective employees, contractors, agents or representatives, shall have no right to use or occupy the Trust I Exclusive Areas for sales, marketing and rental activities, and shall not interfere with Trustee I's or its Third Party Timeshare Company's such use of the Trust I Exclusive Areas.

6.2     Exclusive Reorganized Debtor Sales, Marketing and Rental Areas. Reorganize Debtor, and any Third Party Timeshare Company or Companies engaged by Reorganized Debtor, responsible for the sale, marketing (which includes, without limitation, offering upgrades and reloads to existing customers), rental and operation of the Reorganized Debtor Timeshare Interests, and their respective employees, contractors, agents or representatives, shall have the exclusive use of the administrative building located at Liki Tiki Village I for sales, marketing and rental activities except for the Interval International exchange desk, gift shop and registration desk used for check-in purposes (**"Reorganized Debtor Exclusive Area"**). Trust I, and any Third Party Timeshare Company or Companies engaged by Trust I, responsible for the sale, marketing, rental and operation of the Reorganized Debtor Timeshare Interests, and their respective employees, contractors, agents or representatives, shall have no right to use or occupy the Reorganized Debtor Exclusive Area for sales, marketing and rental activities, and shall not interfere with Reorganized Debtor's or its Third Party Timeshare Company's such use of the Trust I Exclusive Areas.

6.3     Non-Exclusive Areas. All other areas of the commonly-used property at the IOI Resorts, LTV 1400, the Barefoot'n Resort and the Barefoot'n II Property, i.e. other than the respective Exclusive Areas, shall be available for the use, occupancy and enjoyment of the Parties, and any Third Party Timeshare Company engaged by the Parties, responsible for the marketing, rental, sale, and operation of their respective Timeshare Interests. Nothing in this Agreement is intended to, or shall, abrogate or expand the rights of the Parties, and their Owners, guests, exchangers, or invitees to have access to or enjoy the use of any portion of the IOI Resorts, LTV 1400, Barefoot'n Resort or the Barefoot'n II Property as set forth in the applicable Resort Documents.

6.4     Prohibited Activities in Exclusive Areas. At no point shall any Party, or any Third Party Timeshare Company engaged by a Party (or their respective employees, contractors, agents or representatives), solicit, approach or attempt to sell, lease, rent or offer for occupancy any of the BB&T Timeshare Interests or the Reorganized Debtor Timeshare Interests, as applicable, in the Exclusive Area of the other to the other's customer, prospect, purchaser or Owner.

6.5     Prohibited Activities in Non-Exclusive Areas. At no point shall any Party, or any Third Party Timeshare Company engaged by a Party (or their respective employees, contractors, agents or representatives), solicit, approach or attempt to sell, lease, rent or offer for occupancy

any of the BB&T Timeshare Interests or the Reorganized Debtor Timeshare Interests, as applicable, in any non-Exclusive Areas to the other's customer, prospect, purchaser or Owner, except where specifically allowed hereunder and then only in the manner and to the extent as described herein.

6.6     Management Company. IORMC, a wholly owned subsidiary of Island One, is the management company for the IOI Resorts. Management company responsibilities include handling front desk activities, reservations, upgrades (to a better unit, if the unit reserved or requested is not available), unit cleaning and preparation for the next user and responding to any complaints or concerns of the tenant, Owner or user of a Timeshare Interest. In addition, with respect to the BB&T Timeshare Interests, Trust I may separately engage a third party or use any Third Party Timeshare Company engaged by Trust I, to provide similar customer service activities, exclusive of check in (as provided in paragraph 7.1 below), unit cleaning, preparation of a unit for the next user and responding to complaints and concerns pertaining to issues related to physical plant, equipment, furniture and amenities, which matters shall remain the responsibility of IORMC or its successors or assigns as part of the Site Management Services. These interactions and others that engage the IORMC or any company engaged by Trust to perform similar customer service activities in the ordinary pursuit of their business, present unsolicited marketing opportunities ("**Unsolicited Marketing Opportunities**").

6.7     Prohibited Activities Generally. Neither Party, nor any Third Party Company engaged by such Party (or their respective employees, contractors, agents or representatives), shall attempt, at either an Exclusive Area or a Non-Exclusive Area, to solicit approach, steal away or divert any Owner, customer, prospect, tenant or touring individual of the other Party in an effort to make a sale, lease, or exchange to such Owner, customer, prospect tenant or touring individual from their own BB&T Timeshare Interest or Reorganized Debtor Timeshare Interest, as applicable, or any associated timeshare plan, multisite timeshare plan, exchange program, vacation product or related or similar products. Such prohibition shall extend to any Unsolicited Marketing Opportunity.

6.8     Solicitation of Employees and Contractors Prohibited. Neither Party, nor any Third Party Timeshare Company engaged by either Party (or their respective employees, contractors, agents or representatives), shall seek to solicit, offer, recruit, employ or contract with the personnel of the other Party including, but not limited to, the employees, agents, contractors or representatives of any Third Party Timeshare Company, without the prior notice and written consent of the other Party.

6.9     Non-Disparagement. Neither Party, nor any Third Party Timeshare Company engaged by either Party (or their respective employees, contractors, agents or representatives), during the term of this Agreement shall criticize, ridicule or make any statement which disparages or is derogatory of the other Party, a Third Party Timeshare Company, or any of their affiliates or related entities, in any communications with (i) any Owner, customer, prospect, tenant or touring individual of the other Party, (ii) the press or other media, or (iii) any client or supplier.

6.10     Separate Identifier. The Parties agree that if Reorganized Debtor is not the exclusive provider of Trustee I's sales and marketing services, Trustee I will establish a separate

and distinct resort identifier for purposes of identifying the BB&T Timeshare Interests, LTV 1400 and Barefoot'n II Property in connection with any rental and marketing activity. Neither Trustee I nor any Third Party Timeshare Company on behalf of Trustee I shall use "Liki Tiki" or "Liki Tiki Village" or anything confusingly similar for its BB&T Timeshare Interests at Liki Tiki Village or for LTV 1400; shall not use "Cove on Ormond" or "Cove on Ormond Beach" or anything confusingly similar for its BB&T Timeshare Interests at the Cove at Ormond Beach; shall not use "Charter Club Resort of Naples Bay" or "Charter Club Resort" or anything confusingly similar for its BB&T Timeshare Interests at The Charter Club of Naples Bay; and shall not use "Barefootn in the Keys" or "Barefoot'n Resort" or anything confusingly similar for its Barefoot'n II Property. For purposes of this Agreement, the Parties agree that the "Villas at Liki Tiki Village," the "Villas at Cove On Ormond Beach," the "Villas at Charter Club Resort," and the "Villas at Barefoot'n Resort" are acceptable names for Trustee I to use to refer to the respective BB&T Timeshare Interests at these resorts and, as such, are not confusingly similar to the names used by Reorganized Debtor for these resorts.

## ARTICLE VII
## RESERVATIONS AND USE

7.1     Separate Reservation Systems. Except with regard to the automatic reservation of BB&T Timeshare Interests described in paragraph 7.4 below, it is the intent of the Parties that there will be separate reservation systems for the use and rental of the Timeshare Interests of each Party. It is further the intent of the Parties that the Owners, customers, prospects, tenants or touring individuals of the respective Parties are solely the Owners, customers, prospects, tenants or touring individuals and shall not be solicited, sold or rented units or upgrades by such other Party and that neither Party shall take advantage of any Unsolicited Marketing Opportunities by virtue of such prospect contacting the wrong reservation agent or system. Provided, however, notwithstanding the operation of any separate reservation system, Reorganized Debtor shall accommodate the check-in of any of Owner, renter, exchanger or guest of Trust I in accordance with its obligations as the management company. With respect to the accommodation of the check-in of any of Owner, renter, exchanger or guest of Trust I, Trustee I agrees to provide Reorganized Debtor a weekly report that lists all of the reservations confirmed during the prior week, all of the reservations cancelled during the prior week, and all arrivals scheduled for the upcoming week and such other information as is commercially reasonable to facilitate the check-in and confirming of reservations.

7.2     Contact Referrals. Both Parties agree that if they are contacted by an Owner, customer, prospect, tenant or touring individual of the other, that they will promptly and clearly refer such Person to a designated point of contact for the other Party whose Owner, customer, prospect, tenant or touring individual it is and will not solicit such Person to buy, rent, use or exchange any of its Timeshare Interests or otherwise divert such Owner, customer, prospect, tenant or touring individual from the other Party as long as the Reorganized Debtor receives written information or is otherwise notified by email to the designated point of contact as to the identity of such Owner, renter, exchanger or guest. Such designated point of contact will initially be designated by each of the Parties, and may be substituted or replaced by each of the Parties, by delivering prior written notice of such designation, or substitution or replacement, to the other Party.

- 8 -

7.3 <u>Rental Referrals</u>. The Parties acknowledge that either Party may refer a rental prospect to the other if they do not have the requisite inventory to accommodate the prospect.

7.4 <u>Automatic Reservation of BB&T Timeshare Interests</u>. In order to allow Trustee I to rent or otherwise utilize its BB&T Timeshare Interests in its marketing, sales and rental program, Reorganized Debtor, in its capacity as the management company, will make an automatic reservation of BB&T's Timeshare Interests in Trustee I's name at the opening of the applicable reservation window in any applicable reservation or floating use plan and based on the legal description of the Timeshare Interest to the extent permitted by the applicable reservation or floating use plan rules and regulations. Trustee I and Reorganized Debtor shall receive authorization pursuant to the Confirmation Order from the Court to amend any applicable reservation or floating use plan rules and regulations, if necessary, to facilitate such automatic reservations.

## ARTICLE VIII
## SALES PROTOCOL, SOLICITATIONS AND RESTRICTIONS

8.1 <u>Restrictions</u>. All Parties agree that they will abide by the limitations on sales and solicitations as set forth in this Agreement and shall conduct all marketing, sales, and rental efforts strictly in accordance with the terms, provisions and covenants contained in this Agreement.

8.2 <u>Permitted Sales Activities</u>. Notwithstanding the foregoing, each Party shall be permitted to have sales brochures and other written materials in their respective Exclusive Areas, and any visitor or user of the property shall be free to come into such Exclusive Area as long as they are not doing so pursuant to an action in violation of the requirements of paragraphs 6.1 or 6.2 above, as applicable.

8.3 <u>Sale or Exchange of Timeshare Interests</u>. Each Party shall be free to negotiate for the purchase, sale or exchange of one or more Timeshare Interests from the other Party pursuant to terms and conditions acceptable to both parties.

8.4 <u>Sale of LTV 1400, Barefoot'n II Property and the Sales Center</u>. Reorganized Debtor acknowledges that Trustee I is authorized to list LTV 1400, Barefoot'n II Property and the Sales Center for sale.

## ARTICLE IX
## TIMESHARE INTEREST RENTAL

9.1 <u>Separate Rental Prospects</u>. It is the intent of the Parties that all rental prospects or customers shall be subject to the same separation of treatment, non-interference and referral back to the appropriate Party as described above.

9.2 <u>Rental of Timeshare Interests</u>. If a rental prospect is unable to obtain the appropriate time period or unit type and needs to be assigned or located in a Timeshare Interest owned by the other Party, the first Party agrees to use commercially reasonable efforts to cooperate with the other Party to fulfill the reservation for the prospect.

9.3     Rental Agreement. Reorganized Debtor acknowledges that Trustee I is expressly authorized to negotiate a rental services or rental brokerage agreement with one or more Third Party Timeshare Companies selected by Trustee I or with the Reorganized Debtor in connection with the rental of the Trust I Assets.

9.4     Rental of Timeshare Interests at LTV 1400 and Barefoot'n II Property. If Trustee I desires to engage Reorganized Debtor to rent any Timeshare Interests or whole units at LTV 1400 or the Barefoot'n II Property, the Parties agree to negotiate in good faith to reach a mutually satisfactory agreement as to the terms of any such engagement.

9.5     Guest Inquiries.    If either Party receives an inquiry from the other Party's customer (whether a rental prospect, guest, prospective purchaser or an Owner), the Party receiving such inquiry shall refer the customer to a designated point of contact for the other Party as soon as practicable to facilitate each Party's ability to service their own customers.    Such designated point of contact will initially be designated by each of the Parties, and may be substituted or replaced by each of the Parties, by delivering prior written notice of such designation, or substitution or replacement, to the other Party.

9.6     Separate Identifier.    The Parties agree that if Reorganized Debtor is not the exclusive provider of Trustee I's rental services, Trustee I will establish a separate and distinct resort identifier for purposes of identifying the BB&T Timeshare Interests, LTV 1400 and Barefoot'n II Property in connection with any rental and marketing activity, including with respect to entering into any rental distribution agreements. Neither Trustee I nor any Third Party Timeshare Company on behalf of Trustee I shall use "Liki Tiki" or "Liki Tiki Village" or anything confusingly similar for its BB&T Timeshare Interests at Liki Tiki Village or for LTV 1400; shall not use "Cove on Ormond" or "Cove on Ormond Beach" or anything confusingly similar for its BB&T Timeshare Interests at the Cove at Ormond Beach; shall not use "Charter Club Resort of Naples Bay" or "Charter Club Resort" or anything confusingly similar for its BB&T Timeshare Interests at The Charter Club of Naples Bay; and shall not use "Barefootn in the Keys" or "Barefoot'n Resort" or anything confusingly similar for its Barefoot'n II Property. For purposes of this Agreement, the Parties agree that the "Villas at Liki Tiki Village," the "Villas at Cove On Ormond Beach," the "Villas at Charter Club Resort," and the "Villas at Barefoot'n Resort" are acceptable names for Trustee I to use to refer to the respective BB&T Timeshare Interests at these resorts and, as such, are not confusingly similar to the names used by Reorganized Debtor for these resorts.


## ARTICLE X
## COST AND REVENUE ACCOUNTING

10.1     Obligation to Account.    With respect to any transaction with respect to which payment is due from one Party to the other pursuant to the terms of this Agreement, each Party shall have the obligation to promptly notify the other that it has entered into such transaction with the Owner, customer, prospect, tenant or touring individual of the other as permitted in this Agreement and shall account for the revenues and expenses associated with such accommodation on a monthly basis.

10.2 Reconciliation. Any owner association payments or rental revenues due to BB&T from Reorganized Debtor that accrued during the pendency of the Bankruptcy prior to the Effective Date shall be paid to BB&T on or before the Effective Date. Each Party at the end of each quarter during the Transition Period, and after the expiration or earlier termination of the Transition Period, shall reconcile the amounts due to the other Party as a result of any transactions entered into hereunder by a Party with the customer, prospect, tenant or unit owner of a Timeshare Interest of the other Party. Such reconciliation shall be completed and e-mailed to the other, together with a supporting evidence, within fifteen (15) days of the end of each quarter and a check along with such reconciliation shall be sent to the other no later than thirty (30) days after the end of each quarter.

## ARTICLE XI
## REQUIRED DELIVERY OF INFORMATION

11.1 Board of Director Information. Reorganized Debtor shall provide Trustee I with all of the same information, and on the same timeframe, as provided to members of the board of directors of each of the owners association for Liki Tiki Village I and Liki Tiki Village II (each an "HOA"). A representative of the Reorganized Debtor will meet with a representative of Trustee I to review proposed annual budgets and HOA financial information prior to mailing of the proposed annual budget (each an "HOA Budget") to the HOA members.

11.2 Reserves. Reorganized Debtor shall provide Trustee I with a copy of any future reserve studies for each of the HOAs.

## ARTICLE XII
## ASSESSMENTS AND ASSOCIATION EXPENSES

12.1 Reorganized Debtor and Trustee I, agree that with respect to Trust I's maintenance fee and tax obligations to the HOA in accordance with the approved annual HOA Budget, to limit the contribution of Trust I to its share of the operating cash shortfall of the HOA in proportion to the Timeshare Interests Trust 1 is entitled to rent as compared to the Timeshare Interests the Reorganized Debtor is entitled to rent.

12.2 Pursuant to this agreement, for the calendar years 2011 through 2014 (but prorated on a monthly basis in the years 2011 and 2014 and limited to the months that Trust I is in existence in those years), the Reorganized Debtor agrees to make a payment (the "Trust I Adjusted Obligation Credit") to Trust I with respect to a particular HOA in accordance with the following:

(a) Reorganized Debtor and Trustee I will each timely pay the HOA maintenance fees, inclusive of reserves, budget bad debt expenses and any deficit reduction line items assessed by the HOA (the "Full Obligation" as to each the Reorganized Debtor and Trustee I) due on their respective timeshare interests at Liki Tiki Village I and Liki Tiki Village II pursuant to the governing documents of the applicable HOA and the applicable HOA budget.

(b) On a quarterly basis Trust I's Full Obligation shall be alternatively calculated (the "Trust I Adjusted Obligation") as the greater of:

1. The "Trust I Ratable Share" (defined below) times the "Actual HOA Member Cash Operating Shortfall" (defined below) arising from the "Trust I Ratable Assessment" (defined below) but not to exceed Trust I's Full Obligation; or

2. Trust I's Full Obligation less that portion of its maintenance fee assessment applicable to Budgeted HOA Bad Debt Expenses and any deficit reduction line items in the HOA Budget (the "Trust I Minimum Assessment").

(c) Reorganized Debtor will remit or credit to Trust I any positive difference between the Trust I Full Obligation and the Trust I Adjusted Obligation (the "Trust I Adjusted Obligation Credit") within 30 days after the end of the quarter.

(d) The components used in determining the Trust I Adjusted Obligation and Trust I Adjusted Obligation Credit are as follows:

1. "Aggregate HOA Maintenance Assessment" is the aggregate maintenance fee assessment for the entire HOA as reflected in the approved HOA Budget.

2. "Actual HOA Bad Debt Expense" is the bad debt expense as reflected on the audited HOA financial statements for the applicable calendar year.

3. "Actual HOA Member Cash Operating Shortfall" is the HOA Cash Operating Budget minus the Actual HOA Member Collections.

4. "Actual HOA Member Collections" is the Aggregate HOA Maintenance Assessment minus the Actual HOA Bad Debt Expense minus Trust I's Full Obligation minus Reorganized Debtor's Full Obligation.

5. "Adjusted Uncollected Assessment" shall be equal to the Actual HOA Bad Debt Expense multiplied by the Resort Occupancy Factor.

6. "Budgeted HOA Bad Debt Expense" is the bad debt expense line item plus any deficit reduction line item as reflected in the approved HOA Budget.

7. "Combined Ratable Basis" is the amount of Trust I Ratable Basis plus the amount of Reorganized Debtor Ratable Basis.

8. "HOA Bad Debt Experience Ratio" is a fraction, the numerator of which is the Budgeted HOA Bad Debt Expense and the denominator of which is the Aggregate HOA Maintenance Assessment.

9. "HOA Cash Operating Budget" is the amount of the Aggregate HOA Maintenance Assessment minus the amount of the Budgeted HOA Bad Debt Expense.

10. "Reorganized Debtor Ratable Basis" shall be equal to the Reorganized Debtor's Full Obligation plus the amount of the Adjusted Uncollected Assessment.

11. "Reorganized Debtor Ratable Share" is a fraction, the numerator of which is the amount of Reorganized Debtor Ratable Basis and the denominator of which is the amount of the Combined Ratable Basis.

12. "Resort Occupancy Factor" is set to seventy percent (70%).

13. "Trust I Minimum Assessment" is Trust I's Full Obligation multiplied by the quantity of 1 minus the HOA Bad Debt Expense Ratio.

14. "Trust I Ratable Assessment" is the Trust I Ratable Share multiplied by Actual HOA Member Cash Operating Shortfall.

15. "Trust I Ratable Basis" shall be equal to the Trust I's Full Obligation.

16. "Trust I Ratable Share" is a fraction, the numerator of which is the amount of Trust I Ratable Basis and the denominator of which is the amount of the Combined Ratable Basis.

(e)  For the avoidance of doubt in determining the Trust I Adjusted Obligation Credit, Exhibit "A" attached hereto and incorporated herein by this reference, contains an "Trust I Adjusted Obligation Credit Calculation Worksheet" detailing the individual components and their usage in the calculation as well as an estimate for the 2011 fiscal year.

## ARTICLE XIII
## EVENTS OF DEFAULT

13.1  <u>Immediate Default by Reorganized Debtor and/or Trust I</u>.  It shall be an immediate event of default for either party to violate the requirements of paragraphs 4.2, 4.3, 6.1, 6.2, 6.3, 6.4, 6.5, 6.7, 6.8, 6.9, 6.19, 9.1, 9.5, 9.6, 10.1 and 11.1; provided, however, that each Party agrees to provide written notice to the allegedly defaulting Party of the occurrence of a claimed default pursuant to this paragraph prior to pursuing any remedy pursuant to Article IX.

13.2  <u>Curable Default by Reorganized Debtor</u>.  Other than with respect to the provisions listed in paragraph 13.1 above, the following, if not cured within five (5) days of delivery of written notice to Reorganized Debtor:

(a)  <u>Failure to Timely Deliver or Pay</u>.  Failure by Reorganized Debtor to timely deliver all items, payments and documents provided for herein.

(b)  <u>Breach of Related Documents</u>.  Any breach by Reorganized Debtor of the terms, provisions or covenants that it or any of its Affiliates are to perform or to abstain from performing under the Resort Documents.

(c)     <u>Violation of Affirmative Covenants</u>.  Failure to take any and all action required by it to be taken hereunder, in the manner and within the time period specified.

(d)     <u>Violation of Negative Covenants</u>.  The taking of any action specifically prohibited from being taken hereunder or otherwise proscribed as provided herein.

13.3   <u>Curable Default by Trust I</u>.  Other than with respect to the provisions listed in paragraph 13.1 above, the following, if not cured within five (5) days of delivery of written notice to Trustee I:

(a)     <u>Failure to Timely Deliver or Pay</u>.  Failure by Trust I to timely deliver all items, payments and documents provided for herein.

(b)     <u>Breach of Related Documents</u>.  Any breach by of the terms, provisions or covenants by Trust I that Trust I is to perform or to abstain from performing under the Resort Documents.

(c)     <u>Violation of Affirmative Covenants</u>.  Failure to take any and all action required by it to be taken hereunder, in the manner and within the time period specified.

(d)     <u>Violation of Negative Covenants</u>.  The taking of any action specifically prohibited from being taken hereunder or otherwise proscribed as provided herein.

**ARTICLE XIV**
**REMEDIES UPON DEFAULT**

14.1   <u>Remedies Available to Either Party</u>.  Upon an Event of Default by either Party hereunder the non-defaulting Party shall have the following remedies within the jurisdiction of the Bankruptcy Court:

(a)     <u>Specific Performance</u>.  Pursue specific performance hereunder, including an action for injunction to enforce or protect the non-defaulting Party's rights hereunder, it being agreed that the ability to calculate damages for such default is in many cases incapable of being calculated.

(b)     <u>Damages</u>.  Action for damages to the extent the consequence of any such breach is capable of being calculated in terms of monetary damages.

(c)     <u>General</u>.  Any and all other actions at law and equity to enforce the provisions hereof or bring an action for damages pursuant to the beach or default by the defaulting Party.

14.2   <u>Remedies Cumulative</u>.  The Parties hereto agree that these remedies shall be cumulative and to the maximum extent possible.  Either Party shall have the right to pursue any and all remedies whether simultaneously or sequentially to the maximum extent provided by applicable Florida law.

14.3    No Waiver.  Any delay or failure by the non-defaulting Party to exercise its remedies as provided herein, shall not constitute a waiver or act as an estoppel against such Party of against subsequent exercise of those remedies, unless such Party has provided an explicit written waiver to the other and then only as specified and strictly limited to the basis as set forth in such written waiver.

## ARTICLE XV
## MUTUAL COOPERATION

15.1    Mutual Cooperation.  The Parties hereto and at all times subsequent to the Effective Date agree to meet the intent of this Agreement in order to allow both Parties to utilize the resort properties as provided herein subject to the covenants and restrictions intended to result in the mutual maximization of the sales, rental, use and reservation of their respective assets.

15.2    Further Assurances.  The Parties hereto agree, in furtherance of the purposes set forth herein to execute and deliver, or to cause to be executed and/or delivered, such documents and to do, or cause to be done, such other acts and things as might reasonably be requested to assure that the benefits of this Agreement to facilitate the sale, reservation and rental of their respective assets and thereby achieve the benefits of such ownership interest therein.

## ARTICLE XVI
## MISCELLANEOUS PROVISIONS

16.1    Paragraph Headings.  The paragraph headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning, content, or interpretation of such paragraphs.

16.2    Assignment.  This Agreement and the rights hereunder, may be assigned by Trustee I to any Person that markets, rents, or sells BB&T Timeshare Interests.

16.3    Binding Effect; Modification.  This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns.  The terms of this Agreement may not be changed, waived, discharged, or terminated orally, but only by an instrument or instruments in writing, signed by the Party against which enforcement of the change, waiver, discharge, or termination is asserted.

16.4    Incorporation of Recitals; Construction.  The Parties hereby mutually agree that the recitals to this Agreement are true and correct and are hereby incorporated as terms of this Agreement.  This Agreement shall not be construed more strongly against any Party regardless of which Party was more responsible for its preparation.

16.5    Counterparts.  The Parties hereto hereby mutually agree that this Agreement, and the attachments hereto, may be executed in counterparts, and when so executed, all such counterparts shall constitute one and the same Agreement.

16.6    Bankruptcy Court Jurisdiction.  It is specifically the intent of the Parties hereto that the Bankruptcy Court shall retain jurisdiction for the purpose of interpreting, clarifying and enforcing the provisions of this Agreement to accomplish the purposes as set forth herein.

16.7    Governing Law; Venue; Attorneys Fees.  This Agreement and the transactions contemplated hereby shall be construed under, interpreted, governed and enforced in accordance with the laws of the State of Florida.  Jurisdiction and venue for any dispute arising out of or relating to this Agreement shall be in the Bankruptcy Court.  In the event of any action or litigation by either Party against the other arising out of or resulting from a breach or alleged breach of this Agreement, or the enforcement hereof, the prevailing Party shall be entitled to reimbursement of its costs in connection therewith, including, without limitation, reasonable attorneys' fees and expenses incurred in negotiation, at trial or on appeal.

16.8    WAIVER OF TRIAL BY JURY.  ALL OF THE PARTIES HERETO, HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT ANY OF THEM MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON THIS AGREEMENT, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, OR ANY RELATED DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO, OR TO ANY RELATED DOCUMENT.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT.

16.9    Severability.  If any clause or provision of this Agreement is determined to be illegal, invalid or unenforceable under any present or future law by the final judgment of a court of competent jurisdiction, the remainder of this Agreement will not be affected thereby. It is the intention of the Parties that if any such provision is held to be illegal, invalid or unenforceable, there will be added in lieu thereof a provision as similar in terms to such provision as is possible and be legal, valid and enforceable.

16.10   Time.  Time is of the essence of this Agreement and each provision hereof.

16.11   Notices.  Notices required pursuant to any notice provision of this Agreement will be deemed to have been given with delivered personally to the Party designated to receive such notice, or on the third (3rd) business day after the same is sent by certified mail, postage and charges prepaid, or on the next business day after the same is sent by overnight delivery service (e.g., Federal Express), charges prepaid, directed to the following addresses or to such other or additional addresses as any Party might designate by written notice to the other Parties:

To Trustee I:        Barry Mukamal
                     Marcum LLP
                     One S.E. 3rd Avenue, 10th Floor
                     Miami, FL 33131

With a copy to:      John E. Beasley
                     Senior Vice President
                     Branch Banking and Trust Company

Asset Resolution Group
2000 Interstate Park Drive, Suite 400
Montgomery, AL 36109

With a copy to:    GrayRobinson, P.A.
Attn: Frank P. Terzo, Esq.
1221 Brickell Avenue, Suite 1600
Miami, Florida 33131

To Reorganized    Island One, Inc.
Debtor:           Island One Resorts Management Corporation
Navigo Vacation Club, Inc.
8680 Commodity Circle
Orlando, FL 32819

With a copies to:  Baker & Hostetler, LLP
Attn: Elizabeth A. Green, Esq. and
Kurt P. Gruber, Esq.
200 S. Orange Avenue
SunTrust Center, Suite 2300
Orlando, Florida 32801

16.12  No Partnership. The Parties are not joint venturers, partners, or joint owners with respect to the property which is the subject of this Agreement, and nothing contained in this Agreement shall be construed as creating a partnership, joint venture, or similar relationship between the Parties.

16.13  No Third Party Beneficiaries.  The Parties hereto agree that no provision of this Agreement or any related documents create any obligation on the part of the Parties hereto to any third parties which might have claims of any kind whatsoever against the Parties hereto. That is, no person not a Party to this Agreement will be a third-party beneficiary or acquire any rights hereunder.

IN WITNESS WHEREOF, the Parties have executed this Agreement effective as of the Effective Date.

**REORGANIZED DEBTOR**              **TRUST I**

By: _____      By: _____
                                       Barry Mukamal
                                       Trustee I

\351021\4 - # 460049 v5              - 17 -