UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:                                          CASE NO. 6:10-bk-16177-KSJ

ISLAND ONE, INC.,  *et al.*                     CHAPTER 11

             Debtors.                           Jointly Administered with Case Nos.
                                                6:10-bk-16179-KSJ, 6:10-bk-16180-KSJ,
                                                6:10-bk-16182-KSJ, 6:10-bk-16183-KSJ,
                                                and 6:10-bk-16189-KSJ

_____/

## ORDER CONFIRMING AMENDED JOINT PLAN OF REORGANIZATION, AS MODIFIED, SUBMITTED BY ISLAND ONE, INC., ET AL.

**THIS CASE** came on for hearing on May 4, 2011 (the "Hearing") to consider: (1) approval of the First Amended Joint Disclosure Statement ("Disclosure Statement") submitted by ISLAND ONE, INC., CRESCENT ONE, LLC, ST. CROIX ONE, LLC, ISLAND ONE RESORTS MANAGEMENT CORPORATION, NAVIGO VACATION CLUB, INC., and IOI FUNDING I, LLC (collectively the "Debtors"), dated March 22, 2011 (D.R. 367); and (2) confirmation of the Debtors' First Amended Joint Plan of Reorganization, dated March 22, 2011 (D.R. 366), as modified by that certain (a) Modification of the First Amended Plan Of Reorganization For Island One, Inc., Crescent One, LLC, St. Croix One, LLC, Island One Resorts Management, Corporation, Navigo Vacation Club, Inc., and IOI Funding I, LLC, which includes that certain Concurrent Operating Agreement attached thereto as Exhibit "A" and made a part thereof (the "COA"), filed on May 4, 2011 (D.R. 450) and corrected on May 17, 2011 (D.R. 492) (as corrected and, together with the COA, in the form attached hereto as Exhibit "A", the "BB&T Modifications"); (d) Second Modification of the First Amended Plan of

Reorganization for Island One, Inc., Crescent One, LLC, St. Croix One, LLC, Island One Resorts Management, Corporation, Navigo Vacation Club, Inc., and IOI Funding I, LLC, filed on May 4, 2011 (D.R. 451), together with Exhibit A thereto filed on May 4, 2011 (D.R. 452) (in the form attached hereto as Exhibit "B", the "UCC Modifications", and together with the BB&T Modifications, the "Modifications") (collectively the "Plan") [1].

In connection with the Confirmation of the Plan, the Court has considered (a) the Confirmation Affidavit of Sterling F. Stoudenmire IV, Debtors' Chief Operating Officer, submitted in support of confirmation of the Plan (D.R. 418); (b) the Debtors' motions for cramdown as to Classes 11, 13, 15, 21, 25, 26, 27, 28, 30, and 33 ("Cramdown Motions"), filed on April 19, 2011 (D.R. 428) and May 3, 2011 (D.R. 449); (c) the BB&T Modifications; (d) the UCC Modifications; (e) the Ballot Tabulation (the "Ballot Tabulation"), filed by the Debtors on April 15, 2011 (D.R. 419); (f) the Amended Ballot Tabulation (the "Amended Ballot Tabulation"), filed by the Debtors on May 3, 2011 (D.R. 448); (g) the objection to the Disclosure Statement, the Plan and the sale of the Debtors' assets and/or equity, filed by the Official Committee of Unsecured Creditors (the "Committee") on April 13, 2011 (D.R. 402) (the "Committee Objection"); (h) BB&T Acquired Asset Group's Limited Objection to First Amended Joint Plan of Reorganization Submitted By Island One, Inc., Crescent One, LLC, St. Croix One, LLC, Island One Resorts Management Corporation, Navigo Vacation Club, Inc., and IOI Funding I, LLC. and Limited Joinder to Committee Objection (D.R. 430) (the "BB&T Objection"); (i) the renewed objection to the Disclosure Statement and the Plan, filed by the

---

[1]    Capitalized terms used herein and not otherwise defined shall have the respective meanings ascribed to them in the Plan.

Miami-Dade County Tax Collector on April 11, 2011 (the "Tax Objection") (D.R. 396), (j) the Affidavit of John Lancet filed on May 3, 2011 (D.R. 447) as to valuation of the Class 11 Claim of H. J. C. Florida, Inc. ("Class 11 Claim"), and (k) the Amended and Restated Plan Sponsor Agreement by and among Island One, Crescent and TAC in the form attached hereto as Exhibit "C" ("Amended PSA"). At the Hearing, the Debtors moved to amend the Cramdown Motions *ore tenus* to include Class 35, the Allowed Unsecured Deficiency Claim of BB&T (the "Amended Cramdown Motions").

On March 22, 2011, the Court entered an Order Conditionally Approving Disclosure Statement, Scheduling Final Hearing on Joint Amended Disclosure Statement and Confirmation of Joint Amended Plan of Reorganization, Fixing Time for Filing Fee and Other Administrative Expense Applications, and Fixing Time for Filing Acceptances or Rejections of Plan (D.R. 368) (the "Balloting Order"). The Disclosure Statement, Plan, Balloting Order, and ballots were distributed to creditors and parties-in-interest on March 23, 2011.

The Court, having considered the Disclosure Statement, the Plan, the Confirmation Affidavit, the Ballot Tabulation, the Amended Ballot Tabulation, the Cramdown Motions, the Modifications, the Committee Objection, the BB&T Objection, the Tax Objection, the testimony of Sterling F. Stoudenmire IV, documentary evidence presented at the Hearing and the documents and materials attached hereto, and the arguments of all counsel present at the Hearing, makes the following findings of fact and conclusions of law pursuant to Rule 7052(a) of the Federal Rules of Bankruptcy Procedure made applicable to this matter pursuant to Rule 9016 of the Federal Rules of Bankruptcy Procedure:

## Findings of Fact and Conclusions of Law

A.    Pursuant to § 1125 of the Bankruptcy Code, the Disclosure Statement contains "adequate information".

B.    Debtors, as proponents of the Plan, have provided good and sufficient notice of: (a) the filing of the Plan and Disclosure Statement; (b) the deadline to file and serve objections to confirmation of the Plan and Disclosure Statement; (c) the deadline and procedures for voting on the Plan; (d) the hearing date and time with respect to Confirmation of the Plan, and (e) of the Modifications.

C.    Debtors have afforded all parties-in-interest with an adequate opportunity to be heard regarding the Plan and Disclosure Statement, and the Plan complies with Bankruptcy Code § 1127 and Federal Rule of Bankruptcy Procedure 3019. All parties received adequate notice in accordance with applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Balloting Order.

D.    The Court has jurisdiction to conduct the Hearing and to confirm the Plan pursuant to 28 U.S.C. §1334.

E.    Confirmation of the Plan is a "core" proceeding pursuant to 28 U.S.C. §157(b) (2) (L), and this Court has jurisdiction to enter a final order with respect thereto.

F.    The Debtors are proper debtors under § 109 of the Bankruptcy Code.

G.    The Amended Ballot Tabulation validly and correctly sets forth the tabulation of votes on the Plan, as required by the Bankruptcy Code, Bankruptcy Rules, the Local Rules and the Balloting Order.

H.    The following Classes of Claims and Equity Interests voted to accept the Plan: 1, 2, 3, 12, 14, 16, 17, 18, 19, 20, 28, 29, 30, 31, 32, and 34. As of the Ballot Date, the following Classes of Claims and Equity Interests voted to reject the Plan:  13, 21, 25 and 27. As of the Ballot Date, the following Classes of Claims and Equity Interests failed to vote on the Plan, and therefore are deemed to have rejected the Plan: 11, 15, 26, 33 and 35. The deadline for BB&T to cast its Ballots with respect to the acceptance or rejection of the Plan for the following Classes of Claims was extended through the Confirmation Hearing: 4, 5, 6, 7, 8, 9, 10, 22, 23, 24 and 35. At the Confirmation Hearing, BB&T presented timely Ballots accepting the Plan with respect to each of the following Classes of Claims: 4, 5, 6, 7, 8, 9, 10, 22, 23 and 24 but not as to Class 35.

I.    The Debtors have solicited the votes and tabulated the Ballots in respect of the Plan in good faith and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and the Balloting Order.

J.    The ballots of Larry Fey, Nicholas Stimac, Rosalie Stimac, Automated Merchant Systems, Inc., Louran Alkoka, Cary Erfurth, Kenneth Campbell, and Grand Seas Resort Partners (collectively, the "Contested Claimants") were properly excluded because there are pending objections to such claims, and, as such, the votes are not to be counted as set forth in Bankruptcy Code § 1126.  Additionally, none of the Contested Claimants filed a motion pursuant to F.R.B.P. 3018 to estimate their claims for voting purposes.

K.    The Plan was voted on by all Classes of Impaired Claims that were entitled to vote pursuant to the Bankruptcy Code and the Bankruptcy Rules.

L.     The Plan, with the addition of the Modifications, has been accepted in writing by the requisite majorities of all Impaired Classes of Claims, except as to Classes 11, 13, 15, 21, 25, 26, 27, 33 and 35. The Debtors have sought "cramdown" with respect to Classes 11, 13, 15, 21, 25, 26, 27, 28, 30, 33 and 35 in accordance with § 1129(b) of the Bankruptcy Code.

M.     The Plan satisfies all of the applicable provisions of the Bankruptcy Code, and, as required by Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtors as the proponents. Pursuant to Bankruptcy Rule 3016(c), both the Plan and Disclosure Statement have described in specific and conspicuous language all acts proposed to be enjoined and identified all entities subject to the injunction contained in the Plan.

N.     In accordance with § 1122(a) of the Bankruptcy Code, Article II of the Plan classifies each Claim against and Interest in the Debtors that is substantially similar to such Claims or Interests. The Plan, therefore, satisfies § 1122(a) of the Bankruptcy Code.

O.     The Plan adequately and properly classifies all Claims and Interests required to be classified, and, accordingly, satisfies § 1123(a) (l) of the Bankruptcy Code.

P.     Pursuant to Article IV and V of the Plan, all Classes of Claims are identified as unimpaired or impaired. Accordingly, the Plan satisfies § 1123(a) (2) of the Bankruptcy Code.

Q.     Article V of the Plan specifies the treatment of each Impaired Class of Claims and Interests. Accordingly, the Plan satisfies § 1123(a) (3) of the Bankruptcy Code.

R.     The Plan provides the same treatment for each Claim or Interest in a particular Class unless the holder of such a Claim or Interest agreed to less favorable treatment. Accordingly, the Plan satisfies § 1123(a) (4) of the Bankruptcy Code.

S.     Article VIII of the Plan sets forth the means by which the Plan will be implemented. The Plan makes adequate means for its implementation, and accordingly satisfies § 1123(a) (5) of the Bankruptcy Code.

T.     The Debtors have disclosed the identities of those persons who will serve as officers and directors of the Reorganized Debtors and the trustees under each of Trust I, Trust II, and the Unsecured Creditor Trust (collectively, the "Trusts") to be established pursuant to the Plan. Accordingly, the Plan satisfies § 1123(a) (7) of the Bankruptcy Code.

U.     The Plan provides that the Debtors shall have through and including the hearing on Confirmation within which to assume or reject any unexpired lease or executory contract that has not previously been assumed or rejected; and, further, that in the event any such unexpired lease or executory contract is not assumed (or subject to a pending motion to assume) by such date, then such unexpired lease or executory contract shall be deemed rejected as of the Confirmation Date. All parties to rejected contracts or leases shall have thirty (30) days from the entry of this Confirmation Order to file a rejection damages claim.

V.     In addition to the terms above, and in accordance with the terms of the TAC Agreements and § 365 of the Bankruptcy Code, the Debtors have determined to assume the executory contracts and/or unexpired leases set forth on Exhibit "B" attached to the Disclosure Statement.

W.     The Debtors have complied with all of the provisions of the Bankruptcy Code and the Bankruptcy Rules governing notice, disclosure, and solicitation in connection with the Plan, the Disclosure Statement, the assumption and rejection of executory contracts and unexpired

leases, and all other matters considered by this Court in connection with these Chapter 11 cases. The Debtors have satisfied § 1129(a) (1) of the Bankruptcy Code.

X.   The Debtors have properly solicited votes with respect to the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, as well as the Balloting Order. The Debtors have satisfied § 1129(a) (2) of the Bankruptcy Code.

Y.   This Court has examined the totality of the circumstances surrounding the formulation of the Plan and finds that the Plan has been proposed in good faith by the Debtors. The Debtors have acted in good faith in formulating and proposing the Plan and have properly performed their fiduciary duties. All parties have acted in good faith and received no unfair advantage. The primary purpose of the Plan is to provide the highest possible return to creditors. Accordingly, the Debtors have satisfied § 1129(a) (3) of the Bankruptcy Code.

Z.   TAC is a good faith purchaser pursuant to § 363(m) of the Bankruptcy Code in connection with the approval and consummation of the transactions contemplated under the TAC Agreements.  TAC, its Representatives, equity holders, directors, officers, employees, attorneys, financial advisors, investment bankers and other professionals have acted in good faith in connection with the Plan, these Chapter 11 cases, the TAC Agreements and the formulation and consummation of the Plan, and accordingly, have satisfied §1125(e) of the Bankruptcy Code.

AA.   Neither TAC nor any Reorganized Debtor shall be a successor to any of the Debtors or their estates, and the transactions contemplated under the TAC Agreements and the

Plan do not amount to a consolidation, merger or de facto merger of TAC or any of the Reorganized Debtors with or into any of the Debtors.

BB. Neither TFC, Liberty, nor BB&T shall be a successor to any of the Debtors or their estates, and none of the transactions contemplated under the Plan, the TAC Agreements, Trust I or Trust II amount to a consolidation, merger or *de facto* merger of TFC, Liberty, or BB&T with or into any of the Debtors or the Reorganized Debtors.

CC. Except as may be specifically set forth in the Plan, the Modifications, and/or the Confirmation Order, nothing in the Plan (as modified by the Modifications), the Disclosure Statement, the Confirmation Order or any order in aid of Confirmation, shall constitute, or be deemed to constitute, a waiver or release of any Claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the commencement of the Bankruptcy Case, against or with respect to any Claim or Equity Interest. Except as set forth in the Plan (as modified by the Modifications), upon Confirmation, the Debtors, the Unsecured Creditor Trust, and/or BB&T Trust II, as may be applicable, shall have, retain, reserve and be entitled to assert all such Claims, Causes of Action, rights of setoff and other legal or equitable defenses that the Debtors had immediately prior to the commencement of the Chapter 11 cases as if the Chapter 11 cases had not been commenced.

DD. All payments to be made by the Reorganized Debtors to professionals retained by Order of the Court for services or for costs and expenses in or in connection with these Chapter 11 cases, through the Confirmation Date, have been or are subject to review and approval by this

Court upon the pending, and any supplemental, applications filed under §§ 330, 331 or 503(b) of the Bankruptcy Code. Accordingly, the Plan satisfies § 1129(a) (4) of the Bankruptcy Code.

EE.    The Plan, Trust I, Trust II and the Unsecured Creditor Trust Agreement each provide for post-confirmation payment of certain fees and expenses of professionals employed by the Reorganized Debtors, or the trustees of each of the Trusts (the "Trustees"), as the case may be, without prior Court order, and the Court shall have jurisdiction over this matter only as provided under the Plan and this Order.

FF.    The Debtors have disclosed the identities, and affiliations, of the individuals who will serve as officers and/or directors of the Reorganized Debtors, as set forth in the Plan Supplement filed on April 11, 2011 (D.R. 398).  The appointment or continuation in office, of such individuals is consistent with the interests of creditors and with public policy. Accordingly, the Plan satisfies § 1129(a) (5) of the Bankruptcy Code.

GG.    The Plan does not provide for any changes in rates that require regulatory approval of any governmental agency. Section 1129(a) (6) of the Bankruptcy Code is accordingly not applicable.

HH.    Each Holder of a Claim that is Impaired within the meaning of § 1124 of the Bankruptcy Code that has not accepted the Plan will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. Thus, the Plan satisfies the "best interests" test under § 1129(a) (7) (A) (ii) of the Bankruptcy Code.

II.     Pursuant to the Amended Ballot Tabulation, the following Classes of Claims and Equity Interests voted to reject the Plan: 13, 21, 25, and 27, and the following Classes of Claims and Equity Interests failed to vote on the Plan, and therefore are deemed to have rejected the Plan: 11, 15, 26, 33 and 35. As a result, the Plan does not meet § 1129(a) (8) with respect to Classes 11, 13, 15, 21, 25, 26, 27, 33 and 35.  Accordingly, the Debtors seek confirmation pursuant to Bankruptcy Code §1129(b) (2) (B) with respect to each of the aforementioned Classes.

JJ.     Article III of the Plan provides that all Allowed Administrative Claims shall be paid by in full on the Effective Date from the Cash Consideration. The Debtors represented in the Plan that they are not aware of any Priority Tax Claims, nor have any Priority Tax Claims been filed since the date on which the Debtors filed the Plan.

KK.     The Plan satisfies § 1129(a)(10) of the Bankruptcy Code because at least one Impaired Class has voted to accept the Plan by the requisite majority, determined without including any acceptance of the Plan by Insiders.

LL.     Through the Confirmation Affidavit and the testimony of Sterling F. Stoudenmire IV, the Debtors have presented competent unrebutted evidence that Debtors have the ability to make all payments under the Plan. As such, the Court finds that Confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors. The Debtors have satisfied the requirements of § 1129(a) (11) of the Bankruptcy Code.

MM.    The Plan provides for the payment on the Effective Date (or as soon as practicable thereafter) of all fees payable under § 1930, Title 28, United States Code. The Plan satisfies § 1129(a) (12) of the Bankruptcy Code.

NN.    The Debtors have no benefit plans and, thus, § 1129(a) (13) of the Bankruptcy Code has been satisfied by the Plan.

OO.    It is not the principal purpose of the Plan to avoid taxes or the application of § 5 of the Securities Act of 1933, as amended.

PP.    The Majority Lenders and BB&T have acted in good faith and provided valuable consideration to the Debtors, their estates and creditors, and the Reorganized Debtors, in the form of additional post-Confirmation financing, releases, cash consideration and, in the case of the Majority Lenders, claim waivers in order for the Debtors to effectuate and consummate the TAC Agreements, the Plan and related transactions, in exchange for which the Majority Lenders and BB&T are entitled to the releases and other consideration provided for under the Plan and this Order.

QQ.    Subject to the limitations and exceptions under the Modifications, the Plan and these Chapter 11 cases present unusual circumstances that justify the granting of certain third-party releases in favor of the Debtors, their estates, officers, directors, employees, agents, representatives, successors and assigns who served in such capacity on the Confirmation Date, TAC, TFC, Liberty, BB&T and each of their respective directors, officers, employees, agents, representative, successors and assigns (as defined in the Plan and subject to the Modifications, the "Released Parties"). The releases under the Plan are in consideration for the Cash

Consideration paid by TAC and other value as contemplated by the Plan, the Majority Lenders Contribution, the continuity of the Debtors, the release of certain claims and collateral by TFC and Liberty in favor of the Reorganized Debtors, the use of cash collateral and other financial accommodations provided by BB&T, as well as BB&T's withdrawal of its *Notice of Election Pursuant to Section 1111(b)(1)(A) of the Bankruptcy Code* (D.R. 401) ( the "BB&T 1111(b) Election") and the agreement by TFC and Liberty to provide additional financing to the Reorganized Debtors. In addition, TAC has required the releases under the Plan to assure continuity of business of the Reorganized Debtors post-Confirmation uninterrupted by risk, cost or exposure of third party suits. Confirmation would not be possible without the contributions of the Released Parties.

RR.    The omission of any reference or specific discussion of all or part of any particular provision of the Plan herein shall have no effect on the validity, binding effect and enforceability of every other provision of the Plan. To the extent of any inconsistencies between the terms of this Confirmation Order and the Plan, the terms of this Confirmation Order shall control, except as otherwise provided herein.

SS.    If any provision of this Confirmation Order is hereafter modified, vacated, or reversed by subsequent Order of this Court or any other court of competent jurisdiction, such reversal, modification, or vacation shall not affect the validity of the obligations incurred or undertaken under or in connection with the Plan prior to the Debtors' receipt of written notice of any such order; nor shall such reversal, modification or vacation hereof affect the validity or enforceability of such obligations. Notwithstanding any reversal, modification or vacation

hereof, any such obligations incurred or undertaken pursuant to and in reliance on this Confirmation Order prior to the effective date of such reversal, modification or vacation shall be governed in all respects by the provisions hereof and of the Plan, and all documents, instruments and agreements related thereto, or any amendments or modifications thereto.

TT. The Modifications do not constitute substantial or adverse modifications, and, thus, pursuant to Bankruptcy Code § 1127(a), no further solicitation is required. The Modifications are deemed incorporated into the Plan.

UU. The Debtors have presented competent unrebutted testimony of John Lancet, as to the value of the Cove II inventory, and the court finds that the Class 11 Claim is completely unsecured, and any resulting deficiency claim shall appropriately be treated as a Class 13 Claim under the Plan.

VV. The Plan provides that with respect to the Class 11, 13, 15, 21, 25, 26, 27, 33 and 35 claims, the Holder of any Claims or Interests that are junior to Claims in such Classes will not receive or retain any property under the Plan. As a result, the provisions of §1129(b) (2) (B) are satisfied with respect to each such Class.

For the foregoing reasons, the Court determines that the Plan should be confirmed. Accordingly, it is hereby

**ORDERED:**

1. The Plan, as modified by the Modifications, is in all respects confirmed, pursuant to § 1129 of the Bankruptcy Code and all of its terms and provisions are approved. The Trusts are each approved, in all respects. The Debtors, Reorganized Debtors and each of the Trustees

under the Trusts are authorized and directed to take any and all actions contemplated to be taken by them under the Plan, the Modifications and the trust agreements relative to the Trusts.

2.      The BB&T Objection, the BB&T 1111(b) Election and the Committee Objection have each been withdrawn or are deemed withdrawn effective as of the entry of this Confirmation Order. BB&T and the Committee now affirmatively consent to Confirmation of the Plan and entry of this Order. The Tax Objection has been resolved, as follows:

a.      The Secured Claim of Miami-Dade County for Ad Valorem Real Estate Taxes as to Crescent includes certain prepetition claims for ad valorem real property taxes accrued during 2010 that are secured and constitute first priority liens against the Project pursuant to applicable nonbankruptcy law.     The portion of the Miami Dade Secured Claim relating to the 2010 real estate taxes has been paid.   The portion of the Miami Dade Secured Claim relating to 2010 personal property taxes remains due and owing, and Crescent will pay said taxes in full, with statutory interest, by the Effective Date, or at the closing of the sale of said property, whichever is earlier.

b.      Crescent has challenged before the Miami-Dade County Value Adjustment Board the 2010 assessment of real property owned in Miami-Dade County by Crescent, and, as of the date of the Confirmation Order, the hearing on Crescent's petition has not been heard. In the event that an interim reduction to the assessment is made, and a refund is issued by the Tax Collector to Crescent, said refund will not be processed by Crescent and will be returned to Tax Collector, through counsel for Tax Collector's Office, to be held in escrow pending the final disposition of the interim reduction, which may include a challenge to such

reduction by the Property Appraiser pursuant to Florida law. Alternatively, if in the event of such interim reduction, Crescent authorizes the Tax Collector, if administratively feasible, to refrain from issuing a refund pending such final disposition of the interim reduction. Any interim reduction made by the Value Adjustment Board shall be deemed final if it is not challenged by the Property Appraiser, or the taxpayer, prior to the deadline for filing of such challenges pursuant to Florida law. If the final disposition of the interim reduction results in an assessment less than the Property Appraiser's initial assessment, the Tax Collector shall issue the refund to Crescent as expeditiously as administratively feasible.

        c.      Post-petition taxes for the years 2011 forward, if applicable, shall be paid in the ordinary course pursuant to Florida law, and in a manner consistent with the provisions above with respect to payment based on the assessments of the Miami-Dade County Property Appraiser and with respect to refunds in the event that Value Adjustment Board petitions are filed. Notwithstanding any Plan provision to the contrary, the Miami-Dade Tax Collector shall not be required to petition for payment of a post-petition ad valorem tax as an Administrative Expense Claim.

        3.      The Amended Cramdown Motions as to Classes 11, 13, 15, 21, 25, 26, 27, 33 and 35 Claims and Equity Interests are hereby granted.

        4.      The executory contracts and unexpired leases set forth on Exhibit "B" to the Disclosure Statement, are deemed assumed effective as of the Effective Date of the Plan.

        5.      Each term and provision of the Plan, as it may have been altered or interpreted by this Bankruptcy Court, is valid and enforceable pursuant to its terms.

6.    The Plan shall not become effective unless and until the conditions set forth in Section 9.02 of the Plan have been satisfied or waived pursuant to Section 9.02 of the Plan. In the event the conditions precedent specified in Section 9.02 of the Plan have not been satisfied or waived pursuant to Section 9.02 of the Plan on or prior to the sixtieth (60th) day after the date of this Confirmation Order, then (i) this Confirmation Order shall be vacated, (ii) no distributions under the Plan shall be made, (iii) the Debtors and all holders of Claims and Equity Interests shall be restored to the status quo ante as of the day immediately preceding the date of this Confirmation Order as though such Confirmation Order had never been entered, (iv) all of the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any other Entity in any further proceedings involving the Debtors, and (v) nothing contained herein or in the Plan shall prejudice in any manner the rights of the Debtors, including, without limitation, the right to seek a further extension of the exclusive periods under section 1121(d) of the Bankruptcy Code.

7.    The Debtors shall comply with all terms and conditions of the Plan as modified, and the Reorganized Debtors shall comply with the obligations applicable to the Reorganized Debtors with respect to the TAC Agreements pursuant to their terms and conditions.

8.    Each Reorganized Debtor shall continue to exist from and after the Effective Date as a separate legal entity, with all of the powers of a corporation or a legal entity under

applicable law in the jurisdiction in which each Reorganized Debtor is incorporated or otherwise formed and pursuant to its Reorganized Debtor constituent documents.

9. In accordance with §§ 1141(b) and (c) of the Bankruptcy Code and the Plan, and except as may be provided otherwise in the TAC Agreements (including the Debt Restructuring Transaction and documents executed in connection therewith) and the Modifications, title to the Debtors' assets shall vest in the Reorganized Debtors on the Effective Date, free and clear of all liens, claims, and interests of creditors, equity security holders, and of general partners in the Debtors. Until the Effective Date, the Debtors shall continue to perform their duties under the Bankruptcy Code.

10. Pursuant to the Plan, upon the occurrence of the Effective Date it is the intent of the Debtors to transfer all of the collateral pledged to BB&T prior to the Petition Date to either BB&T, Trust I, Trust II, or Eagle FL I SPE, LLC, a Florida limited liability company, as directed by BB&T, unless the Plan otherwise provides to the contrary (for instance, on the Effective Date, the Debtors shall pay the full amount of BB&T's claim for the 2008 Dodge Truck and the agreed-upon amount of $10,952.07 to purchase the Island One Equipment). In connection with such transfers and conveyances, the Debtors and the Reorganized Debtors agree to provide or execute corrective instruments as may be reasonably requested, from time to time, by BB&T or the Trustees of Trust I and Trust II.

11. Pursuant to § 363 of the Bankruptcy Code, on the Effective Date, the Debtors shall transfer the LTV III Real Property, 2007 Dodge Truck, 2008 Jeep Patriot and the Welcome Center, along with all tangible and intangible personal property related thereto and encumbered

by the mortgage(s) and or security agreement(s) thereon, to BB&T or Eagle FL I SPE, LLC, a Florida limited liability company, at the direction of BB&T free and clear of all claims, liens and encumbrances other than the liens and security interests being retained thereon by BB&T; provided that anything herein to the contrary notwithstanding, any such conveyance shall be subject in all respects to the provisions of the Plan (including the TAC Agreements) providing for (i) the conveyance of certain collateral assets to or for the benefit of the Majority Lenders, (ii) the assumption and/or restructuring of certain pre-petition credit facilities between and among the Majority Lenders and the Reorganized Debtors, and (iii) the conveyance of Causes of Action to the Unsecured Creditor Trust. The Debtors shall convey the LTV III Real Property and the Welcome Center by Special Warranty Deed reasonably acceptable to BB&T. BB&T and/or its assigns are hereby deemed a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code in connection with the credit bid provided (in the absence of any other bidders present) and the consummation of the transfers required hereunder. BB&T reserves its right to pursue an unsecured deficiency claim pursuant to Class 35 of the Plan, pursuant to which BB&T shall neither receive any distribution under the Plan nor have any claim against or right to distribution from the Unsecured Creditor Trust. A legal description of the LTV III Real Property, and the Welcome Center is attached hereto as Exhibit "D".

12.     Pursuant to the Plan, the St. Croix Property, and all tangible and intangible personal property related thereto and encumbered by the mortgage(s) and or security agreement(s) thereon, other than the conveyance of Causes of Action to the Unsecured Creditor Trust, the St. Croix Receivables and the SCO Claims shall be transferred to Trust II free and

clear of all claims, liens and encumbrances other than the liens and security interests being retained thereon by BB&T; provided that anything herein to the contrary notwithstanding, any such conveyance shall be subject in all respects to the provisions of the Plan providing for the conveyance of Causes of Action to the Unsecured Creditor Trust. A legal description of the St. Croix Property is attached hereto as Exhibit "E".

13.    Pursuant to the Plan, the BB&T Timeshare Interests, LTV 1400, the Sales Center, and the Barefoot'n II Property, and all tangible and intangible personal property related thereto and encumbered by the mortgage(s) and or security agreement(s) thereon, shall be transferred to Trust I for the benefit of BB&T, its successors and assigns, free and clear of all claims, liens and encumbrances other than the liens and security interests being retained thereon by BB&T; provided that anything herein to the contrary notwithstanding, any such conveyance shall be subject in all respects to the provisions of the Plan (including the TAC Agreements) providing for (i) the conveyance of certain collateral assets to or for the benefit of the Majority Lenders, (ii) the assumption and/or restructuring of certain pre-petition credit facilities between and among the Majority Lenders and the Reorganized Debtors, and (iii) the conveyance of Causes of Action to the Unsecured Creditor Trust. A legal description of the BB&T Real Property, LTV 1400, the Sales Center, and the Barefoot'n II Property is attached hereto as Exhibit "F".

14.    In accordance with § 1141 (a) of the Bankruptcy Code, the provisions of the Plan and this Confirmation Order are binding on the Debtors, the Reorganized Debtors, each Creditor, and every other party-in-interest in this case and each of their respective successors and assigns (whether or not such Creditors or parties-in-interest voted to accept the Plan, whether or not they

are impaired under the Plan, and whether or not any such Holder has filed, or is deemed to have filed, a proof of Claim or proof of Interest), and any other Person giving, acquiring, or receiving property under the Plan, and any lessor or lessee of Property to or from the Debtors. The rights afforded in the Plan and the treatment of all Claims and Interests therein shall be in exchange for and in complete satisfaction of all Claims and Interests of any nature whatsoever, known or unknown, including, except as expressly provided in the Plan, interest accrued on or expenses incurred in connection with such Claims from and after the Order for Relief, against, the Reorganized Debtors or their property or interests in property.

15.     Pursuant to § 1141(d)(l), except as otherwise provided in the Plan, the TAC Agreements, or in this Order, the Confirmation of the Plan: (A) discharges the Debtors from any debt that arose before the date of Confirmation, and any debt of any kind specified in §§ 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not: (i) a proof of the claim based on such debt is filed or deemed filed under § 501 of the Bankruptcy Code; (ii) such claim is allowed under § 502 of the Bankruptcy Code; or (iii) the holder of such claim has accepted the Plan; and (B) terminates all rights and interests of equity security holders and general partners provided for by the Plan. As provided in section 524 of the Bankruptcy Code, such discharge shall void any judgment against the Debtors, their estates, or any successor thereto at any time obtained to the extent it relates to a Claim discharged. Except as otherwise provided in the TAC Agreements, the Plan or this Order, upon the Effective Date, all persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any discharged Claim against the Debtors, the estates, or any successor thereto.

16. The Debtors or the Reorganized Debtors are authorized to liquidate, dispose of or administer the Excluded Entities (as defined in the TAC Agreements), with the exception of St. Croix, and the distribution of items 2, 3 and 4 as set forth on schedule 1.1(a) of the Amended PSA (as defined in the TAC Agreements), in each case, as set forth in the Plan; provided, that no Excluded Entity shall be liquidated to the extent that the Plan does not provide for satisfaction and discharge in full of all of the Claims against such Excluded Entity.

17. All of the existing capital stock and other ownership interests (including any derivative or contractual rights relating thereto) of each Debtor is hereby cancelled. Pursuant to Section 8.02 of the Plan, Orlando Vacation Bureau, Inc. and Florida Vacation Station, Inc. are hereby dissolved. The transfer of all of the membership interests in Island One Leasing, LLC from Island One Resorts Management Corporation to Deborah Linden, as of the Effective Date, is hereby authorized.

18. The transactions contemplated by the TAC Agreements, the Plan and the Modifications are hereby authorized.

19. TAC is hereby deemed a good faith purchaser pursuant to § 363(m) of the Bankruptcy Code in connection with the approval and consummation of the transactions contemplated under the TAC Agreements. TAC, its Representatives, equity holders, directors, officers, employees, attorneys, financial advisors, investment bankers and other professionals have acted in good faith in connection with the Plan, these Chapter 11 Cases, the TAC Agreements and the formulation and consummation of the Plan, and accordingly, have satisfied §1125(e) of the Bankruptcy Code.

20.     The Debtors, the Reorganized Debtors and the trustees of each of the Trusts are each hereby authorized and directed to execute any necessary documents to meet the statutory requirements, if any, for filing necessary papers with the State of Florida or any other jurisdiction to effectuate the terms of the Plan and the TAC Agreement. This Confirmation Order (a) is and shall be effective as a determination that, on the Effective Date, all Claims and Equity Interests existing prior to such date have been unconditionally released, discharged, and terminated, except as otherwise provided in the TAC Agreements and the Plan. and (b) is and shall he binding upon and shall govern the acts of all entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required, by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any document or instrument. In accordance with § 1146(a) of the Bankruptcy Code, each and every federal, state, and local government agency is hereby directed to accept any and all documents and instruments necessary, useful, or appropriate (including Uniform Commercial Code financing statements) to effectuate, implement, and consummate the transactions contemplated by the Plan, the Disclosure Statement, the TAC Agreements and this Confirmation Order without payment of any recording tax, stamp tax, transfer tax, or similar tax imposed by state or local law.

21.     Pursuant to Section 9.03 of the Plan, except as otherwise expressly provided in the Plan, the TAC Agreements, or any other Order of this Court, all persons or entities who have

- 23 -

held, hold or may hold Claims against or Equity Interests in the Debtors, along with their respective present and former employees, agents, officers, directors, principals and affiliates, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against the Debtors, the Reorganized Debtors, their respective estates, any Released Party, or any of their respective property with respect to such Claim or Equity Interest (other than actions brought to enforce any rights or obligations under the Plan):

    a) commencing or continuing in any manner any action or other proceeding of any kind,

    b) enforcing, attaching, collecting or recovering by any manner or means, whether directly or indirectly, of any judgment, award, decree or order,

    c) creating, perfecting, or enforcing, in any manner, directly or indirectly, any encumbrance of any kind,

    d) asserting any right of setoff, subrogation or recoupment of any kind, or

    e) pursuing any Claim released pursuant to Section 9.03 of the Plan.

22.    Such injunction shall extend to any successors of the Debtors and the Reorganized Debtors and their respective properties and interests in properties. Additionally, upon the entry of this Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present and former employees, agents, officers, directors, principals and affiliates are hereby enjoined (from taking any actions other than by or in connection with an appeal of this Confirmation Order) to interfere with the implementation or consummation of the Plan. Pursuant to Section 9.03 of the Plan, unless otherwise provided in the Plan, this Confirmation Order, or a separate order of the Bankruptcy Court, all injunctions or

stays arising under or entered during the Chapter 11 cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the date of this Confirmation Order shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay; provided, however, that on the Effective Date, the stay shall be replaced to the extent provided in this Confirmation Order, with an injunction set forth in Section 9.03 of the Plan (as modified by the Modifications) and/or sections 524 and 1141 of the Bankruptcy Code.

23.     Payment of all Allowed Claims of professionals for fees and/or expenses, as provided herein, shall be paid on the date on which any Order authorizing the payment of such fees and/or expenses to such professional becomes a Final Order, unless other provisions have been made between the professional and the applicable Reorganized Debtor.

24.     Except for the unsecured deficiency claim of BB&T under Class 35 or as otherwise provided in the Plan, any holder of a timely filed or previously scheduled Secured Claim that also wishes to assert an unsecured deficiency Claim is required to file a proof of claim with the Bankruptcy Court for the liquidated amount of any asserted deficiency Claim within one hundred and eighty (180) days from the entry of this Confirmation Order or such deficiency Claim shall be forever barred.

25.     Upon the Effective Date, all executory contracts and unexpired leases of the Debtors (a) not previously assumed by Order of this Court, (b) not subject to a pending motion to assume, or (c) not identified in Exhibit "B" to the Disclosure Statement, shall be deemed rejected, unless such contracts or leases were or are otherwise assumed pursuant to the Plan and

this Confirmation Order. Parties to such rejected leases and contracts are required to file a proof of claim with the Bankruptcy Court for rejection damages, if any, pursuant to the provisions of § 502(g) of the Bankruptcy Code, within thirty (30) days from the entry of this Confirmation Order or such Claim shall be forever barred. All of the Debtors' right, title and interest in any contracts, leases or agreements entered into by the Debtors after the Petition Date, and/or not subject to assumption or rejection under § 365 of the Bankruptcy Code, shall vest in the Reorganized Debtors without further action on the Effective Date.

26.     Except as set forth in the Plan, the Unsecured Creditor Trust is hereby vested with the rights and powers granted to the Debtors pursuant to § 1107(a) of the Bankruptcy Code with respect to the allowance, treatment, or avoidance of Liens or Claims which remain unresolved as of the Effective Date.

27.     Subject to any applicable limitations contained in the Plan (as modified by the Modifications), the Trusts shall each have one hundred and eighty days (180) from the Effective Date to commence any claims objections; provided, however, that the Trusts shall have the longer of 180 days after the Effective Date or 90 days after the filing of any unsecured deficiency Claims to file any objection to any unsecured deficiency Claims ("Objection Deadline"). The Trusts, upon motion and a hearing, may request the entry of an order of this Court extending the Objection Deadline.

28.     With the approval of BB&T, the Trustee of each of Trust I and Trust II shall file a notice in the Public Records of Florida or USVI, as applicable, to terminate the multi-state timeshare plan known as Club Navigo as to the St. Croix Timeshare Interests and the BB&T

Consolidated Collateral on a go-forward basis only and to provide for the right to include, all or any portion of such St. Croix Timeshare Interests or BB&T Consolidated Collateral in another multisite timeshare plan or reservation system.

29.     The transfer of notes receivable to TFC or the TFC Designee pursuant to the TAC Agreements and the Plan shall be free and clear of all liens, claims, defenses or offsets that may arise as a result of the creation of, ownership and/or collection of the notes receivable by the Debtors.   Textron Business Services, Inc. or such other entity as may be designated by TFC as the "TFC Designee" pursuant to the TAC Agreements and the Plan, is authorized to collect from the respective consumers the notes receivable assigned to TFC pursuant to the TAC Agreements.

30.     In accordance with §§ 524 and 105(a) of the Bankruptcy Code, and except as otherwise provided in the Plan, the Modifications, and this Confirmation Order on and after the Effective Date, all Persons are permanently enjoined and restrained from, commencing or continuing in any court any suit, action, or other proceeding, or otherwise asserting any Claim or Interest, seeking to hold liable the Reorganized Debtors, the Released Parties, or the property of either, for any claim, obligation, right, interests, debt or liability that has been treated pursuant to the Plan and for any and all claims arising under bankruptcy or non-bankruptcy law relating in any way to the Debtors, the Reorganized Debtors or their businesses.

31.     In accordance with § 105(a) of the Bankruptcy Code, and except as otherwise provided in the Plan, the Modifications, and this Confirmation Order, all individuals or entities are stayed, restrained, and enjoined from commencing, enforcing, perfecting, or setting off any claim, judgment, or interest against Debtors, the Released Parties, any of their past or current

officers or directors, or any property thereof, or against any of Debtors' transferees including Reorganized Debtors, for the purposes of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to, any Claim or Equity Interest and effecting the releases of the Released Claims under Article VIII of the Plan; provided, however, that such injunctive provision shall not prevent any governmental unit from enforcing such governmental unit's police or regulatory power.

32.     The Reorganized Debtor, or its property, shall not be in any way responsible or liable for any claim, obligation, right, interest, debt, cost or liability arising from or associated with the Debtors' employee pension or retirement benefit plans, including, without limitation, any amounts as determined in connection with any investigation by the Department of Labor or any other regulatory agency.

33.     Deborah Linden shall not be treated as an unsecured creditor for purposes of receiving distributions from the Unsecured Creditor Trust. She shall, however, retain all defenses, including (without limitation) defenses of setoff and recoupment, in any action brought by the Unsecured Creditor Trust against her. Nothing herein shall preclude her recovery of fees or costs awarded to her in her defense of any action brought by the Unsecured Creditor Trust against her.

34.     Pursuant to § 1146(a) of the Bankruptcy Code and the Plan, the issuance, transfer, or exchange of notes or securities under the Plan; the creation of any mortgage, deed of trust, or other security interest; the making or assignment of any lease or sublease; or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection

with the Plan (including transfers of the Excluded Assets, and transfers into and out of the Unsecured Creditor Trust, Trust I and Trust II) shall not be subject to any stamp, real estate transfer, documentary, registration, sales, added-value, mortgage release, mortgage recording, or similar tax.

35.     All entities holding Claims against or Interests in the Debtors that are treated under the Plan are hereby directed to execute, deliver, file, or record any document, and to take any action necessary to implement, consummate, and otherwise effect the Plan in accordance with their respective terms, and all such entities shall be bound by the terms and provisions of all documents executed and delivered by them in connection with the Plan.

36.     In accordance with § 1142 of the Bankruptcy Code, the Debtors, the Reorganized Debtors and any other entity designated pursuant to the Plan are hereby authorized, empowered, and directed to issue, execute, deliver, file, and record any document, and to take any action necessary or appropriate to implement, consummate, and otherwise effectuate the Plan in accordance with its terms, and all such entities shall be bound by the terms and provisions of all documents issued, executed, and delivered by them as necessary or appropriate to implement or effectuate the transactions contemplated by the Plan.

37.     The Debtors are hereby authorized, upon subsequent Order of the Court, to amend or modify the Plan at any time prior to substantial consummation, but only in accordance with § 1127 of the Bankruptcy Code and the Plan.

38. On the Effective Date, and subject to the closing of the transactions contemplated by the TAC Agreements, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

39. The Debtors shall pay to the United States Trustee the fees imposed pursuant to 28 U.S.C. § 1930(a) (6) within ten (10) days of the entry of this Order for pre-Effective Date periods.

40. Except as otherwise provided in the Plan and/or the Modifications, the Reorganized Debtors shall further pay to the United States Trustee the fees imposed pursuant to 28 U.S.C. § 1930(a)(6) for post-Confirmation periods within the time period set forth in 28 U.S.C. § 1930(a)(6). The Reorganized Debtors shall provide to the United States Trustee, upon the payment of each post-Confirmation payment, an appropriate affidavit indicating all the cash disbursements for the relevant period. The Unsecured Creditor Trust, Trust I and Trust II shall pay the fees imposed pursuant to 28 U.S.C. § 1930(a)(6) related to each Trust's respective disbursements until the earlier of the closing of these Chapter 11 cases by the issuance of a Final Decree by the Court, or until the entry of Orders by this Court dismissing these Chapter 11 cases or converting these Chapter 11 cases to another chapter under the Bankruptcy Code

41. The Standby Letter of Credit No. BB10058/AR30 dated November 25, 2009 and extended to May 31, 2011, issued by BB&T to Korshak & Associates, P.A. ("Escrow Agent") and the Director of the Division of Condominium, Timeshares and Mobile Homes (the "Division"), as beneficiaries, which Standby Letter of Credit serves as the purchase deposit alternate assurance pursuant to that certain Purchaser Deposit Escrow Agreement dated January

21, 2005, as amended, between Escrow Agent and Island One, Inc. ("Island One"), as developer, shall remain in full force and effect through and including May 31, 2011. As a replacement alternate assurance after May 31, 2011, if Island One fails to return any funds (a "Deposit") paid to it by a purchaser of a timeshare interest (a "Purchaser") as required pursuant to Chapter 721, Florida Statutes, such Purchaser shall have a post-confirmation claim for the return of the Deposit. The Reorganized Debtor shall post a new alternate assurance with the Division on or before July 30, 2011, and upon posting of the new alternate assurance, the provisions of this paragraph related to post-confirmation claims shall terminate. Pursuant to this Confirmation Order, all post-confirmation claims related to the failure to return Purchaser Deposits shall be paid in full by the Reorganized Debtor.

42. Within five (5) days after the entry of this Confirmation Order, the Debtors shall mail to all known Creditors and Holders of Interest and all other parties-in-interest (including professionals) copies of this Confirmation Order (including only Exhibits "A" and "B" hereof; all other Exhibits shall be annexed to the original of this Confirmation Order as docketed and shall be available through ECF or upon written request to counsel to the Debtors at the address provided in Paragraph 45 below), and proof of such service shall be filed in accordance with the provisions of Local Rule 7005-1.

43. Until these Chapter 11 cases are closed through the entry of a Final Decree, the Court shall retain jurisdiction pursuant to Bankruptcy Rule 3020(d) to ensure that the provisions and the intent of the Plan and the Modifications are carried out. The Court shall also retain jurisdiction to hear and determine all claims against the Debtors, to hear, determine, and enforce

all Causes of Action arising in, arising under, or related to these Chapter 11 Cases and which may exist on behalf of the Debtors; and to hear and resolve all objections to the fees or expenses of professionals or others as provided for in the Plan. Nothing contained herein shall prevent the Debtors, the Reorganized Debtors, the Unsecured Creditor Trustee, BB&T Trustee I and/or BB&T Trustee II, as the case may be, from taking such action as may be necessary in the prosecution of any Cause of Action which may exist on behalf of the applicable party or on the Debtors' behalf and as to which their respective interests lie, and nothing contained herein shall prevent any Creditor from enforcing any claim it may have against third parties who may be liable as a result of the Debtors' obligation to such Creditor except as specifically provided for herein, in the Plan or the Modifications.

44. In the event the Debtors have not filed the pleadings referenced in M.D. Fla. L.B.R. 3022-1, Debtors shall file a report within ninety (90) days from the date of the Confirmation Order, setting forth the progress made in consummating the Plan. The report shall include:

  (a) a statement of distribution by Class, name of Creditor, date of distribution, and amounts paid;

  (b) a statement of transfer of property; and

  (c) a statement of affirmation that the Debtors have substantially complied with the provisions of the confirmed Plan.

45. Hereafter, the only parties to whom notices of matters and proceedings shall be given, and on whom service of pleadings is required shall be limited to the Debtors, the Reorganized Debtors, the Unsecured Creditor Trust via the Unsecured Creditor Trustee and his/her counsel, BB&T Trust I and BB&T Trust II via Trustee I and Trustee II, respectively and

his/her respective counsel, TFC and its counsel, and Liberty and its counsel, by notifying or serving them and their respective counsel of record at the following addresses:

If to TAC, to:

> Timeshare Acquisitions, LLC
> 900 Third Avenue, Suite 1100
> New York, NY 10022
> Attn: Scott Sozio

with a copy given in like manner to (which shall not constitute notice):

> Cadwalader, Wickersham & Taft LLP
> One World Financial Center
> New York, NY 10281
> Attention: John J. Rapisardi, Esq.
>              Eric Rytter, Esq.
>              Zachary H. Smith, Esq.

If to the Reorganized Debtors, to:

> Island One, Inc.
> 8680 Commodity Circle
> Orlando, FL 32819
> Attn: Sterling F. Stoudenmire

with a copy given in like manner to (which shall not constitute notice):

> Baker & Hostetler LLP
> SunTrust Center, Suite 2300
> 200 South Orange Avenue
> Orlando, FL 32801
> Attention: Elizabeth A. Green

If to the Debtors, to:

> Island One, Inc.
> 8680 Commodity Circle
> Orlando, FL 32819
> Attn: Sterling F. Stoudenmire

with a copy given in like manner to (which shall not constitute notice):

Baker & Hostetler LLP
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL 32801
Attention: Elizabeth A. Green

If to TFC/Liberty, to:

Textron Financial Corporation
40 Westminster Street
Providence, RI 02903
Attn:  RFD Counsel

Liberty Bank
315 Main Street
Middletown, CT 06457
Attn:  Donald Peruta

with a copy given in like manner to (which shall not constitute notice):

Riemer & Braunstein, LLP
Times Square Tower
Seven Times Square Suite 2506
New York, NY 10036
Attn: Steven E. Fox, Esq.

Bingham McCutchen, LLP
One State Street
Hartford, CT 06103
Attn:  Jonathan B. Alter, Esq.

If to BB&T, to:

Branch Banking & Trust
2000 Interstate Park Dr.
Montgomery, AL.  36109
Attn: John E. Bealsey, Esq.

with a copy given in like manner to (which shall not constitute notice):

GrayRobinson, P.A.
1221 Brickell Avenue
Miami, Florida 33131
Attn: Frank P. Terzo, Esq.

If to the Trustee of Trust I and Trust II to:

Marcum Rachlin LLP
SunTrust International Center
One SE Third Avenue 10th Floor
Miami, FL 33131
Attn: Barry E. Mukamal, Liquidating Trustee

If to Unsecured Creditor Trustee, to:

Larry S. Hyman
Island One Unsecured Creditor Trustee
106 S. Tampania Avenue
Suite 200
Tampa, Florida 33609

with a copy given in like manner to (which shall not constitute notice):

Bush Ross, P.A.
1801 N. Highland Avenue
Tampa, Florida 33602
Facsimile (813) 223-9620
Attn: H. Bradley Staggs, Esq.

46.     This Confirmation Order shall be deemed to constitute all approvals and consents required, if any, by the laws, rules or regulations of any state or other governmental authority, whether foreign or domestic, or judicial or administrative body, whether foreign or domestic, with respect to the implementation or consummation of the Plan.

- 35 -

47.     Except as otherwise provided in this Confirmation Order, if any or all of the provisions of this Confirmation Order are hereafter reversed, modified, vacated, or stayed by subsequent order of the Bankruptcy Court, or any other court, such reversal, stay, modification or vacatur shall not affect the validity or enforceability of any act, obligation, indebtedness, liability, priority, or lien incurred or undertaken by the Debtors or Reorganized Debtors, as applicable, prior to the effective date of such reversal, stay, modification, or vacatur. Notwithstanding any such reversal, stay, modification, or vacatur of this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, or in reliance on, this Confirmation Order prior to the effective date of such reversal, stay, modification, or vacatur shall be governed in all respects by the provisions of this Confirmation Order and the Plan including all documents, instruments and agreements related thereto.

48.     The failure to specifically include any particular provision of the Plan in this Confirmation Order or any further order of the Bankruptcy Court contemplated by this Confirmation Order will not diminish the effectiveness of such provision, it being the intent of the Bankruptcy Court that the Plan is confirmed in its entirety and incorporated herein by this reference. The provisions of the Plan Documents, this Confirmation Order, and any further order of the Bankruptcy Court contemplated by this Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; provided, however, that if there is any inconsistency between the provisions of the Plan and the documents entered into by the Debtors or Reorganized Debtors pursuant thereto and this Confirmation Order or any further order of the Bankruptcy Court contemplated by this Confirmation Order, the terms and

conditions contained in this Confirmation Order or such further order of the Bankruptcy Court shall govern and shall be deemed a modification to the Plan and shall control and take precedence. The provisions of this Confirmation Order are integrated with each other and are non-severable and mutually dependent unless expressly stated by further order of the Bankruptcy Court.

49.     The Court's retention of jurisdiction under Section 9.04 of the Plan shall be expanded in all respects to vest the Trustees of each of the Trusts with the same rights, powers and standing as the Debtors or Reorganized Debtors.

50.     In the event the Trustee of either Trust I or Trust II enters into a Mutual Distribution Agreement with TAC, the Court shall retain jurisdiction to ratify and enforce such agreement. The Court also retains jurisdiction to interpret and enforce the COA.

51.     The Reorganized Debtors shall use commercially reasonable efforts to provide the Trustees with (a) access to and assistance in locating any books and records of the Debtors that may reasonably be requested by the Trustees and (b) access to and assistance from employees of the Reorganized Debtors who may reasonably be expected to have knowledge regarding the Debtors' books and records or factual information relevant to any Causes of Action or objections to Claims that may be brought by the Trusts; provided, however, that (i) any assistance from such employees of the Reorganized Debtors shall be provided during normal business hours and shall not unreasonably interfere with such employees' performance of their respective duties to the Reorganized Debtors, and (ii) the Reorganized Debtors shall not be required to fund or otherwise bear any of the expenses of the Trusts, including, without limitation, expenses

associated with the preparation or prosecution of any Causes of Action, or objections to Claims, that may be brought by the Trusts, or bear any out-of-pocket costs in connection with provision of the access and assistance contemplated hereby. Nothing in the section shall be construed to limit any obligation of any parties, including but not limited to the Reorganized Debtors, to pay any expenses or bear any out-of-pocket costs in connection with responding to any discovery requested pursuant to the Federal Rules of Civil Procedure, or any similar rules, in any action brought in a court of competent jurisdiction.

52. Notwithstanding anything to the contrary appearing in that certain "Third Amended and Restated Intercreditor and Non-Disturbance Agreement" dated as of October 30, 2009, executed by and between TFC, Liberty (in its capacity as agent and "Intercreditor Master Agent" thereunder), BB&T, Island One and certain affiliates thereof, a memorandum of which was recorded in the public records of Orange County, Florida and in the public records of Volusia County, Florida (the "Third Amended Intercreditor Agreement"), upon entry of this Confirmation Order:

  a. Termination of Intercreditor Agreement. The Third Amended Intercreditor Agreement shall be, and the same hereby is terminated effective as of the Effective Date; provided, however, the provisions of the Third Amended Intercreditor Agreement providing for lien validity and priority acknowledgement among the Creditors (as defined in the Third Amended Intercreditor Agreement) shall survive such termination.

  b. Discharge of Intercreditor Master Agent. The Intercreditor Master Agent (as such term is defined in the Third Amended Intercreditor Agreement) shall be, and hereby is released and discharged from any and all duties and responsibilities under the Third Amended Intercreditor Agreement, with such release and discharge being effective as of the Effective Date. Additionally, the provisions of Section 2.3 of the Third Amended Intercreditor Agreement (applicable to the

resignation/replacement of the Intercreditor Master Agent) shall be of no further force or effect from and after the Effective Date.

c.    Termination of CRO. Upon the occurrence of the Effective Date, the requirement that the position of CRO (as such term is defined in the Third Amended Intercreditor Agreement) be established and maintained by Island One shall be terminated. The upon the termination of the Third Amended Intercreditor Agreement, any rights provided for under Section 2.4(b) and (c) of the Third Amended Intercreditor Agreement (with respect to the replacement of the CRO and/or the modification of its duties) shall likewise be terminated on the Effective Date.

d.    Indemnification of Intercreditor Master Agent.    Notwithstanding the termination of the Third Amended Intercreditor Agreement, and the discharge and release of the Intercreditor Master Agent as provided herein, to the extent Intercreditor Master Agent is not reimbursed and indemnified by Island One or any Guarantor, the reimbursement and indemnification obligations arising under Section 2.3 of the Third Amended Intercreditor Agreement with respect to events, actions or costs occurring or having been incurred for or during periods that pre-date the Effective Date shall survive the termination of the Third Amended Intercreditor Agreement and the occurrence of the Effective Date.

e.    Release of Officer/Director Resignations; Termination of Resignation Escrow Agreement. Upon the occurrence of the Effective Date, the Resignation Escrow Agreement (as such term is defined in the Third Amended Intercreditor Agreement) shall be and the same here by is terminated, and the Intercreditor Master Agent is hereby authorized and directed to  release the Resignations (as such term is defined in the Third Amended Intercreditor Agreement) from the provisions of such escrow arrangement. Upon the termination of the Resignation Escrow Agreement as provided herein, the Intercreditor Master Agent shall, at its election, return or destroy the Resignations.

f.    Termination of Guarantor Stock Pledge.  Because all of the stock of IOI issued and outstanding pre-confirmation shall be cancelled in accordance with the terms of the Plan, upon the occurrence of the Effective Date, such stock shall have no value and effect with respect to the Reorganized Debtors. Therefore, upon the occurrence of the Effective Date, the Linden Pledge and Security Agreement (as such term is defined in the Third Amended Intercreditor Agreement) shall be and the same hereby is terminated, and the Intercreditor Master Agent is hereby authorized and directed to release the Linden IOI Stock (as such term is defined in the Third Amended Intercreditor Agreement) once cancelled from the encumbrance of the Linden Pledge and Security Agreement.

g.    Termination of Voting Agreement.  Upon the occurrence of the Effective Date, the Voting Agreement (as such term is defined in the Third Amended Intercreditor Agreement) shall be and the same hereby is terminated.

h.    Termination of Demand Note Subordination Agreement.  Upon the occurrence of the Effective Date, the Demand Note Subordination Agreement, by and among Island One, IOI Funding and Liberty (individually and in its capacity as Intercreditor Master Agent), made effective as of October 30, 2009, shall be and the same hereby is terminated.

i.    Rental Property Mortgage Termination.  Upon the occurrence of the Effective Date, Mortgage, Security Agreement and Fixture Filing, recorded in the real property record of Orange County, Florida on January 21, 2010, document No. 20100041941, Book 9991, Page 2543, shall be and the same hereby is terminated.

Notwithstanding the (i) termination of the Third Amended Intercreditor Agreement and (ii) discharge and release of Liberty from its role as the Intercreditor Master Agent thereunder, each as provided above, Liberty shall be and it hereby is authorized and empowered to execute and deliver such documents and instruments as shall be necessary or desirable, determined in the reasonable discretion of Liberty, to effectuate the terminations provided for herein.

53.    Section 9.01, Paragraph 9 of the Plan as created pursuant to the BB&T Modifications is deleted in its entirety and replaced with the following:

9.    Retention of Remedies.  Subject to the provisions of the Plan providing for the conveyance of Causes of Action to the Unsecured Creditor Trust, and subject further to the provisions of this Confirmation Order providing for the termination of the Third Amended Intercreditor Agreement, nothing in the Plan or Confirmation Order shall alter, amend or modify any of BB&T's rights or remedies pursuant to any agreement, contract or pledge to which (i) BB&T is a party, signatory or beneficiary (third party, intended or otherwise) and (ii) either any of the Debtors or Deborah L. Linden is also a party including, but not limited to, that certain Amended, Restated and Consolidated Guaranty Agreement by and between Deborah L. Linden and BB&T, effective October 30, 2009 ("BB&T

- 40 -

Agreement"). Likewise, subject to the provisions of the Plan providing for the conveyance of Causes of Action to the Unsecured Creditor Trust, and subject further to the provisions of this Confirmation Order providing for the termination of the Third Amended Intercreditor Agreement, no counterparty to any BB&T Agreement may look to the Plan or Confirmation Order to alter, amend or modify any duties, obligations, waivers, commitments or pledges to BB&T.

54.     In connection with the implementation of the Plan, Island One, the Reorganized Debtors and the Majority Lenders shall enter into that certain Wind Down Agreement, to be dated and effective as of the Effective Date ("Wind Down Agreement"). In accordance with the Wind Down Agreement, Island One shall establish and designate account # 6820 at BB&T (the "Wind-Down Account"), as the account which shall be used solely for the purpose of satisfying obligations of the Debtors arising prior to the Effective Date and set forth in the budget attached as Exhibit "A" (the "Wind-Down Budget") to the Wind Down Agreement that may be paid on behalf of the applicable Debtor by the Reorganized Debtors after the Effective Date. The Wind Down Account, and any funds deposited therein, shall not be subject to the claims of any Creditor or Interest holder of any of the Debtors, including, but not limited to, any setoff rights of BB&T (except for usual and customary bank charges incurred in connection with the Wind Down Account). As provided in the Wind Down Agreement, such agreement shall terminate on August 31, 2011 or such earlier date as Island One, the Reorganized Debtors and the Majority Lenders may determine that no expenses remain to be paid from the Wind Down Account ("Wind Down Agreement Termination Date"). Any funds remaining in the Wind Down Account as of the close of business on the Wind Down Agreement Termination Date shall be paid to Majority Lenders, in such respective amounts as specified jointly by the Majority

Lenders, within two (2) Business Days after the Wind Down Termination Date, by wire transfer of immediately available funds, to such accounts as specified by the Majority Lenders.

55.     This Confirmation Order is and shall be deemed a separate Confirmation Order with respect to each of the Debtors in each Debtor's separate Chapter 11 case for all purposes. The Clerk of the Bankruptcy Court is directed to file and docket this Confirmation Order in the Chapter 11 case of each of the Debtors.

56.     Notwithstanding Bankruptcy Rules 3020(e), 6004(g), 6006(d), 7062 or otherwise, the Confirmation Order shall take effect on at 12:01 a.m. (ET) on the date that this Order is entered on the official docket of this Court.

**DONE AND ORDERED** on May 26, 2011.

_____
**KAREN S. JENNEMANN**
**United States Bankruptcy Judge**

Copies to:

All Creditors to be served by Debtor.

# Exhibit "A"

1. Modification of the First Amended Plan Of Reorganization For Island One, Inc., Crescent One, LLC, St. Croix One, LLC, Island One Resorts Management, Corporation, Navigo Vacation Club, Inc., and IOI Funding I, LLC, with the Concurrent Operating Agreement.

2. SCO Liquidating Trust Agreement

3. LTV I Liquidating Trust Agreement

# Exhibit "A"-1

Modification of the First Amended Plan Of Reorganization For Island One, Inc., Crescent One, LLC, St. Croix One, LLC, Island One Resorts Management, Corporation, Navigo Vacation Club, Inc., and IOI Funding I, LLC, with the Concurrent Operating Agreement.

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:                                          CASE NO. 6:10-bk-16177-KSJ

**ISLAND ONE, INC.,** *et al.*                   CHAPTER 11

      Debtors                                  Jointly-administered with Cases No.
                                                6:10-bk-16179-KSJ; 6:10-bk-16180-KSJ;
                                                6-10-bk-16182-KSJ; 6-10-bk-16183-KSJ;
_____/                   and 6:10-bk-16189-KSJ


# MODIFICATION OF THE FIRST AMENDED JOINT PLAN OF REORGANIZATION FOR ISLAND ONE, INC., CRESCENT ONE, LLC, ST. CROIX ONE, LLC, ISLAND ONE RESORTS MANAGEMENT, CORPORATION, NAVIGO VACATION CLUB, INC., AND IOI FUNDING I, LLC


### COUNSEL FOR DEBTORS

**ELIZABETH GREEN, ESQ.**
**JIMMY D. PARRISH. ESQ.**
**BAKER & HOSTETLER LLP**
**200 S. ORANGE AVE.**
**SUNTRUST CENTER, SUITE 2300**
**ORLANDO, FLORIDA 32801-3432**


**May 4, 2011**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:                                    CASE NO. 6:10-bk-16177-KSJ

ISLAND ONE, INC., *et al.*                CHAPTER 11

    Debtors                       Jointly-administered with Cases No.
                                          6:10-bk-16179-KSJ; 6:10-bk-16180-KSJ;
                                          6-10-bk-16182-KSJ; 6-10-bk-16183-KSJ;
_____/               and 6:10-bk-16189-KSJ

**MODIFICATION OF THE FIRST AMENDED JOINT PLAN OF REORGANIZATION
FOR ISLAND ONE, INC., CRESCENT ONE, LLC, ST. CROIX ONE, LLC,
ISLAND ONE RESORTS MANAGEMENT, CORPORATION,
NAVIGO VACATION CLUB, INC., AND IOI FUNDING I, LLC**

This modification (the "BB&T Modification") to the First Amended Joint Plan of

Reorganization (the "Plan")[1] hereby corrects the definition under Section 1.19 of the Plan.

Section 1.19 shall now read as follows "BB&T" shall mean Branch Banking and Trust

Company, a North Carolina corporation, and as successor in interest to Colonial Bank.

This BB&T Modification is also hereby filed to more particularly describe the treatment

to Classes 4, 5, 6, 7, 8, 9, 10, 22, 23, 24, 27 and 32 and for purposes of adding a new Class 34.

    A.    <u>Classification and Treatment of Claims of Classes 4, 7, 8 and 34.</u>

Classes 4, 7, 8 and 34 consist of the following:

    (i)    Class 4 - The Allowed Secured Claim of BB&T in connection with that

certain Loan Agreement and Promissory Note by and between BB&T and Island One dated

December 30, 2008, as amended, concerning certain timeshare interests at Liki Tiki Village I and

II, the Cove on Ormond Beach, and The Charter Club of Naples Bay (collectively the "BB&T

---

[1]    As modified by (i) this BB&T Modification, (ii) that certain "Second Modification of the First Amended
Joint Plan of Reorganization Submitted By Island One, Inc., Crescent One, LLC, St. Croix One, LLC, Island One
Resorts Management Corporation, Navigo Vacation Club, Inc., and IOI Funding I, LLC (the "UCC Modification"),
and (iii) the Confirmation Order (collectively defined as the "Plan"). Capitalized terms used herein and not
otherwise defined herein shall have the meanings ascribed thereto in the Plan.

Timeshare Interests"), and a First Mortgage for the benefit of BB&T on the LTV 1400 Building, including both timeshare interests and any whole units (the "LTV 1400");

(ii)     Class 7 - The Allowed Secured Claim of BB&T in connection with that certain Loan Agreement and Promissory Note by and between BB&T and Island One dated September 11, 2007, as amended, in the original principal amount of $4,850,000 concerning that certain property used as a sales center (the "Sales Center").

(iii)     Class 8 - The Allowed Secured Claims of BB&T in connection with that certain Promissory Note by and between BB&T and Island One dated February 1, 2006, as amended, and the Promissory Notes by and between BB&T and Island One dated March 19, 2008, as amended, in the original principal amounts of $8,900,000.00 and $2,600,000.00 concerning certain property and improvements that are not subject to the existing adjacent timeshare regime and referred to as the Barefoot'n II Property (the "Barefoot'n II Property").

(iv)     Class 34 – The Allowed Unsecured Claims against the Debtors created for any unsecured deficiency claim arising out of any BB&T's Allowed Claims, including the Allowed Secured Claims from Classes 4, 5, 6, 7, 8, 9, 10, 22, 23 and 24.  Notwithstanding anything to the contrary contained in the Plan, on the Effective Date, BB&T shall receive no Distribution under the Plan (and such Holder shall have no claims against or rights to distribution from the Unsecured Creditor Trust).

B.     Treatment

The Debtors and BB&T have agreed to transfer the BB&T Timeshare Interests, LTV 1400, the Sales Center, and the Barefoot'n II Property to a liquidating trust ("Trust I") for the benefit of BB&T, its successors and assigns, and to the extent BB&T is paid in full, the

general unsecured creditors with the same treatment that has already been articulated under the Plan, and modify the treatment of these Classes in the following manner:

(i)     Barry E. Mukamal will be named as the trustee for Trust I ("Trustee I");

(ii)     The trust agreement for Trust I (the "Trust I Agreement") will be filed on or before May 19, 2011;

(iii)     Pursuant to the Plan and a subsequent Order confirming the Plan, the Court shall retain jurisdiction over Trust I, including all claims, disputes or issues related to the administration, management, rental and sale of the assets identified in Classes 4, 7, and 8 (referred to independently and collectively as the "Trust I Assets") for the benefit of both BB&T, its successors and assignees and the general unsecured creditors, and enforce a Concurrent Operating Agreement by and between Trust I and the Reorganized Debtors;

(iv)     All quarterly United States Trustee fees pursuant to 28 U.S.C. § 1930 ("UST Fees") related to disbursements of Trust I shall be paid by Trust I and the Court shall retain jurisdiction over all duties and responsibilities assigned to Trustee I under the Trust I Agreement;

(v)     Trust I, by and through Trustee I, will have responsibility for maintaining, preserving, managing, operating, renting, and selling the Trust I Assets. In the event Trust I sells or otherwise disposes of some or all of the Trust I Assets, BB&T, in its sole and absolute discretion, shall retain its right to credit bid its Allowed Secured Claim(s) against the Trust I Assets, or alternatively, in whole or in part, apply the net proceeds from sale of any Trust I Assets against its Allowed Class 4, 7, and 8 Secured Claims until such claims are paid in full before any remaining net proceeds are paid to the Unsecured Creditor Trust for distribution to the Holders of Allowed Unsecured Claims as provided in the Plan. Notwithstanding anything to

4

the contrary in the Plan, any assets transferred to the Unsecured Creditor Trust pursuant to the Plan shall be administered by the Unsecured Creditor Trustee for the benefit of all Allowed Unsecured Claims entitled to distributions from the Unsecured Creditor Trust regardless of the respective classes for such claims;

(vi)     Trust I shall be funded for any maintenance fee and tax deficits with respect to BB&T Timeshare Interests by BB&T and may be funded with respect to any operational deficits by BB&T, and BB&T shall receive pursuant to the Plan a superpriority claim only against Trust I for any protective advances made to cover deficiencies as well as the right to include such advances in any credit bid, while carving out the necessary and reasonable operating expenses to run the operations including payments to Trustee I and its agents;

(vii)    As more specifically articulated in the Trust I Agreement, Trustee I by way of overview shall have, *inter alia*, the following rights:

a.       In connection with the sales, marketing and rental of timeshare interests, either:

(1)       Negotiate and execute an agreement with the Reorganized Debtors pursuant to which the BB&T Timeshare Interests and any timeshare interests of BB&T at LTV 1400 (provided such timeshare interests are subject to multisite timeshare plan known as Club Navigo) and the timeshare interests of the Reorganized Debtors will be mutually marketed, sold and rented under mutually acceptable terms and conditions (the "Mutual Distribution Agreement"); provided, however, that the negotiation and execution of a Mutual Distribution Agreement shall not be a condition to the Plan, as modified hereby; or

(2)       As an alternative to the Mutual Distribution Agreement, negotiate and execute exclusive or semi-exclusive sales and marketing or rental agreements with

one or more timeshare sales, marketing or rental companies (each a "Third Party Timeshare Company") providing such services to market, sell or rent BB&T Timeshare Interests and any timeshare interests or units at LTV 1400 or the Barefoot'n II Property.

    b.  Trustee I may negotiate and execute an agreement or agreements with one or more buyers or the Reorganized Debtors for the purchase and sale of the BB&T Timeshare Interests, LTV 1400 and/or the Barefoot'n II Property.

    c.  The right to sell and rent the BB&T Timeshare Interests as well as any timeshare interests or whole units at LTV 1400 and the Barefoot'n II Property in dual track with the Reorganized Debtors; provided, that the Third Party Timeshare Company shall be responsible for registration pursuant to Chapter 721, *Florida Statutes*, from the Division of Florida Condominiums, Timeshares and Mobile Homes (the "Division") so that the Third Party Timeshare Company will be able to market and sell the BB&T Timeshare Interests, and timeshare interests at LTV 1400 or the Barefoot'n II Property, if applicable, on behalf of Trustee I simultaneously with the Reorganized Debtors selling its own unsold and unencumbered timeshare interests.  Trust I, at its sole expense, may acquire additional project registrations as may be appropriate through the Division and such regulatory agencies in other jurisdictions as Trustee I and a Third Party Timeshare Company, if any, may reasonable determine, so that Trust I will be able to market and sell its BB&T Timeshare Interests.  The Reorganized Debtors shall cooperate with Trustee I and the Third Party Timeshare Company, if any, and Trustee I and the Third Party Timeshare Company, if any, shall cooperate with the Reorganized Debtors to accomplish registrations necessary for any of them to implement their respective sales and marketing plans.  As part of such cooperation, the Reorganized Debtors shall provide Trustee I

copies of all project documents, in its possession, that must be filed with the Division and any such documents that must be amended in connection with such filing shall be in Word format.

        d.      If Trust I and Reorganized Debtors do not enter a Mutual Distribution Agreement or other form of common sales, marketing and rental agreement(s), Trust I, by and through Trustee I, shall have the right, with the approval of BB&T, to file a notice in the Public Records which will terminate the multisite timeshare plan known as Club Navigo as to the BB&T Timeshare Interests only and on a go forward basis only and to provide for the right to include, all or any portion of the BB&T Timeshare Interests in another multisite timeshare plan or reservation system;

        e.      Trust I shall have the right to procure services from providers of its choice related to the billing, servicing and collecting of receivables obtained in connection with the financing of sales to consumers of the BB&T Timeshare Interests and timeshare interests at LTV 1400 or the Barefoot'n II Property, if applicable;

        f.      Trust I shall enter into an agreement (the "Concurrent Operating Agreement") with Reorganized Debtors, which Concurrent Operating Agreement, in the form annexed hereto as Exhibit "A" and incorporated herein, will address the issues arising out the concurrent sales, marketing and rental activities that each will engage in with respect to their respective timeshare interests on or near Liki Tiki Village, The Charter Club of Naples Bay and Cove On Ormond Beach. The following provisions shall apply generally to the efforts of Trustee I and Reorganized Debtors to sell, rent and market their respective timeshare interests and may be incorporated into the Concurrent Operating Agreement which will substantially address, *inter alia*, the following:

(1) Provide for a sixty (60) day transition period commencing on the date of the transfer of the Trust I Assets to Trust I ("Transition Period"), which may be extended by the agreement of Trustee I and the Reorganized Debtors for up to two (2) additional thirty (30) day periods or may be terminated at any time during the Transition Period by Trustee I with thirty (30) days advance written notice to Reorganized Debtors, and during which the BB&T Timeshare Interests will continue to be marketed, sold and rented and LTV 1400 will continue to be managed and rented in the same manner as the Debtors were managing, marketing, selling and renting prior to the issuance of the Confirmation Order. During the Transition Period only, Reorganized Debtors shall submit net rent receipts for the BB&T Timeshare Interests and rental of LTV 1400 inventory monthly in an amount of not less than the following: June, 2011 in the amount of $49,511; July, 2011 in the amount of $63,211; August, 2011 in the amount of $45,817; and September, 2011 in the amount $1,795 for each such month as occurs in the Transition Period and subject to proration for any partial month that occurs at the expiration or early termination of the Transition Period. Release fees for those BB&T Timeshare Interests sold during the Transition Period shall be paid weekly with the release fee in the amount set out in the applicable BB&T loan document for the respective BB&T Timeshare Interest.

(2) Use of discreet physical property at the timeshare resorts at which Reorganized Debtors and Trustee I are marketing, selling or renting timeshare interests, the location of which shall be determined by Reorganized Debtors and Trustee I;

(3) Confirm substantially identical access for both the Trustee I and the Reorganized Debtors and their respective customers on the master property at

Liki Tiki Village including the property declared to the timeshare regimes at Liki Tiki Village (other than as to mutually agreed upon exclusive areas);

(4)     Discreet and uniform procedures for protecting the Reorganized Debtors' and the Trustee I's respective efforts to market and sell to their own timeshare owners, customers, guests and prospective purchasers; offer upgrades and reloads to their respective existing owners; and the ability to monitor activities at all applicable locations to ensure that the Concurrent Operating Agreement is properly enforced, including an agreement not to solicit each other's owners, customers, guests and prospective purchasers and a non-disparagement agreement;

(5)     Provide a transparent mechanism to permit both the Reorganized Debtors' and the Trustee I's to engage in simultaneous rental activities at Liki Tiki Village, The Charter Club of Naples Bay and Cove On Ormond Beach, including developing mutually-beneficial procedures to reserve the use of accommodations at Liki Tiki Village, The Charter Club of Naples Bay and Cove On Ormond Beach in accordance with the Club Navigo reservation procedures, if applicable, and any applicable floating use plan rules and regulations. In furtherance thereof, Reorganized Debtors, in their capacity as the management company for the HOAs (as defined below), will make an automatic reservation of BB&T's Timeshare Interests in Trust I's name at the opening of the applicable reservation window in any applicable floating use plan and based on the legal description of the timeshare interest; provided, however, that Trustee I and Reorganized Debtors will file a notice in the Public Records to amend any applicable floating use plan rules and regulations, if necessary, to facilitate such automatic reservations.

(6)     Provide both Trust I and the Reorganized Debtors an opportunity to negotiate to purchase timeshare interests from each other by way of either monetary transactions or like kind exchanges;

(7)     Recognize Trust I's right to enter into agreements with Reorganized Debtors or Third Party Timeshare Companies to rent any timeshare interests and whole units at LTV 1400 (after the Transition Period) and at Barefoot'n II Property;

(8)     Provide for an agreement between Reorganized Debtors and Trustee I, respecting Trust I's allocable maintenance fee and tax obligations to the timeshare owners associations for Liki Tiki Village I and Liki Tiki Village II (each an "HOA") in accordance with the approved annual HOA budget for each HOA (each an "HOA Budget") which agreement is intended to limit the contribution of Trust I to its allocable share of the operating cash shortfall of the HOA in proportion to the timeshare interests Trust I is entitled to rent as compared to the timeshare interests the Reorganized Debtors are entitled to rent. Pursuant to this agreement, for the calendar years 2011 through 2014 (but prorated on a monthly basis in the years 2011 and 2014 and limited to the months that Trust I is in existence in those years), the Reorganized Debtors agree to make a payment (the "Trust I Adjusted Obligation Credit") to Trust I with respect to a particular HOA in accordance with the following:

(a)     Reorganized Debtors and Trust I will each timely pay the HOA maintenance fees, inclusive of reserves, budget bad debt expenses and any deficit reduction line items assessed by the HOA (the "Full Obligation" as to each the Reorganized Debtors and Trust I) due on their respective timeshare interests at Liki Tiki Village I and Liki Tiki Village II pursuant to the governing documents of the applicable HOA and the applicable

10

HOA budget.

(b)     On a quarterly basis Trust I's Full Obligation shall be alternatively calculated (the "Trust I Adjusted Obligation") as the greater of:

1.     The "Trust I Ratable Share" (defined below) times the "Actual HOA Member Cash Operating Shortfall" (defined below) arising from the "Trust I Ratable Assessment" (defined below) but not to exceed Trust I's Full Obligation; or

2.     Trust I's Full Obligation less that portion of its maintenance fee assessment applicable to Budgeted HOA Bad Debt Expenses and any deficit reduction line items in the HOA Budget (the "Trust I Minimum Assessment").

(c)     Reorganized Debtors will remit or credit to Trust I any positive difference between the Trust I Full Obligation and the Trust I Adjusted Obligation (the "Trust I Adjusted Obligation Credit") within 30 days after the end of the quarter.

(d)     The components used in determining the Trust I Adjusted Obligation and Trust I Adjusted Obligation Credit are as follows:

1.     "Aggregate HOA Maintenance Assessment" is the aggregate maintenance fee assessment for the entire HOA as reflected in the approved HOA Budget.

2.     "Actual HOA Bad Debt Expense" is the bad debt expense as reflected on the audited HOA financial statements for the applicable calendar year.

3.     "Actual HOA Member Cash Operating Shortfall" is the HOA Cash Operating Budget minus the Actual HOA Member Collections.

4.     "Actual HOA Member Collections" is the

Aggregate HOA Maintenance Assessment minus the Actual HOA Bad Debt Expense minus Trust I's Full Obligation minus Reorganized Debtors' Full Obligation.

5.    "Adjusted Uncollected Assessment" shall be equal to the Actual HOA Bad Debt Expense multiplied by the Resort Occupancy Factor.

6.    "Budgeted HOA Bad Debt Expense" is the bad debt expense line item plus any deficit reduction line item as reflected in the approved HOA Budget.

7.    "Combined Ratable Basis" is the amount of Trust I Ratable Basis plus the amount of Reorganized Debtors Ratable Basis.

8.    "HOA Bad Debt Experience Ratio" is a fraction, the numerator of which is the Budgeted HOA Bad Debt Expense and the denominator of which is the Aggregate HOA Maintenance Assessment.

9.    "HOA Cash Operating Budget" is the amount of the Aggregate HOA Maintenance Assessment minus the amount of the Budgeted HOA Bad Debt Expense.

10.    "Reorganized Debtors Ratable Basis" shall be equal to the Reorganized Debtors' Full Obligation plus the amount of the Adjusted Uncollected Assessment.

11.    "Reorganized Debtors Ratable Share" is a fraction, the numerator of which is the amount of Reorganized Debtors Ratable Basis and the denominator of which is the amount of the Combined Ratable Basis.

12.    "Resort Occupancy Factor" is set to seventy percent (70%).

13. "Trust I Minimum Assessment" is Trust I's Full Obligation multiplied by the quantity of 1 minus the HOA Bad Debt Expense Ratio.

14. "Trust I Ratable Assessment" is the Trust I Ratable Share multiplied by Actual HOA Member Cash Operating Shortfall.

15. "Trust I Ratable Basis" shall be equal to the Trust I's Full Obligation.

16. "Trust I Ratable Share" is a fraction, the numerator of which is the amount of Trust I Ratable Basis and the denominator of which is the amount of the Combined Ratable Basis.

(d)    For the avoidance of doubt in determining the Trust I Adjusted Obligation Credit, Schedule "1" attached hereto and incorporated herein by this reference, contains an "Trust I Adjusted Obligation Credit Calculation Worksheet" detailing the individual components and their usage in the calculation as well as an estimate for the 2011 fiscal year.

(9)    Recognize Trust I's right to negotiate a rental agreement with Reorganized Debtors or with one or more Third Party Timeshare Companies selected by Trustee I;

(10)    Recognize Trust I's right to list LTV 1400, Barefoot'n II Property and the Sales Center for sale;

(11)    Provide for an agreement among Trust I, any Third Party Timeshare Company, the Reorganized Debtors and any third party sales agent acting on behalf of the Reorganized Debtors not to solicit for hire or actually hire the personnel of the other without the prior written consent of the other;

(12)    Provide Trustee I with a copy of any future reserve studies for the HOAs; and

(13)    Provide Trustee I with all the same information provided to members of the board of directors of each of the HOAs (and on the same time frame as so provided to the board members) and a representative of the Reorganized Debtors will meet with a representative of Trustee I prior to mailing of the proposed annual budget to the HOA members.

C.    Classification and Treatment of Classes 5 and 6

(i)    Class 5 consists of the Allowed Secured Claim of BB&T in connection with that certain Promissory Note by and between BB&T and Island One dated May 25, 2005 and that certain Future Advance Promissory Note dated September 11, 2007. The Allowed Secured claim is estimated as of the Petition Date in the amount of $4,747,988.88 and is secured by a first mortgage on approximately 59.2 acres of unimproved property with development entitlements of three hundred timeshare units that was to serve as Phase III of Liki Tiki Village ("LTV III Land"). No construction has been made to date and the property remains as bare land, with the exception of limited construction of a small number of parking spaces dedicated to the use of the Sales Center. Pursuant to the Plan and Bid Procedures Order, BB&T is entitled to credit bid the full amount of its secured claim in order that the Debtors on the Effective Date shall transfer free and clear of all liens and encumbrances, pursuant to 11 U.S.C. § 363, the LTV III Land to BB&T and/or its assigns. BB&T shall be entitled to a deficiency claim upon the sale of such property to a third party as a Class 34 BB&T (Unsecured Deficiency Claim).

(ii)    Class 6 consists of the Allowed Secured Claim of BB&T in connection with that certain Promissory Note by and between BB&T and Island One dated September 11, 2007

14

and that certain Promissory Note dated May 25, 2007. The Allowed Secured claim is estimated as of the Petition Date in the amount of $1,822,762.00, and is secured by a first mortgage on approximately 4.7 acres consisting of unimproved property that was to become commercial space know as the Liki Tiki Welcome Center ("Welcome Center"). Pursuant to the Plan and the Bid Procedures Order, BB&T shall exercise its right to credit bid the amount of its secured claim and the Debtors shall convey title to the Welcome Center to BB&T and/or its assigns free and clear of all liens and encumbrances pursuant to 11 U.S.C. § 363. BB&T shall be entitled to a deficiency claim upon the sale of such property to a third party as a Class 34 BB&T (Unsecured Deficiency Claim).

        D.     <u>Classification and Treatment of Classes 9, 10, 23 and 24</u>

        (i)     Class 9 consists of the Allowed Secured Claim of BB&T in connection with those five loans that are evidenced by: (I) Note #80254397230005; (II) Note #80254397230006; (III) Note #8025439723008; (IV) Note #80254397230009; and (V) Note #80254397230010 by and between BB&T and Island One. The Allowed Secured Claim is estimated as of the Petition Date in the amount of $54,876.20, and is secured by a first lien on certain equipment of Island One ("Island One Equipment") and certain equipment located at the Sales Center (the "Sales Center Equipment"). Pursuant to the Plan and the Bid Procedures Order, BB&T shall exercise its rights to credit bid the full amount of its secured claim and the Debtors shall transfer to BB&T and/or its assigns the Sales Center Equipment free and clear of all liens. Any deficiency claim that is created upon the sale of the Sales Center Equipment shall be an Allowed Class 34 BB&T (Unsecured Deficiency Claim). With respect to the Island One Equipment, on the Effective Date, the Debtors shall pay BB&T the sum of $10,952.07 to purchase the Island One Equipment

for value equivalent to its replacement value. In turn, any deficiency claim that is created by the sale shall be an Allowed Class 34 BB&T (Unsecured Deficiency Claim).

(ii)    Class 10 consists of the Allowed Secured Claim of BB&T in connection with that certain Loan Agreement and Promissory Note by and between BB&T and Island One dated February 4, 2008. The Allowed Secured Claim is estimated as of the Petition Date in the amount of $19,088.69, and is secured by a first priority lien on a 2008 Dodge Ram Pick-up Truck (VIN 3D6WG38AX86179735) ("2008 Dodge Truck"). On the Effective Date, the Debtors shall pay the full amount of BB&T's claim for the 2008 Dodge Truck. Thereafter, BB&T shall have no unsecured claim.

(iii)    Class 23 consists of the Allowed Secured Claim of BB&T in connection with that certain Loan Agreement and Promissory Note by and between BB&T and St. Croix One dated February 26, 2007. The Allowed Secured Claim is estimated as of the Petition Date in the amount of $3,314.29 and is secured by a first priority lien on a 2007 Dodge Ram Pick-up Truck (VIN 1D7HA16K97J548751) ("2007 Dodge Truck"). Pursuant to the Plan and the Bid Procedures Order, BB&T shall exercise its rights to credit bid the full amount of its secured claim and the Debtors shall transfer to BB&T and/or its assigns the 2007 Dodge Truck free and clear of all liens pursuant to 11 U.S.C. § 363. Any deficiency claim that is created upon the sale of the 2007 Dodge Truck shall be an allowed Class 34 BB&T (Unsecured Deficiency Claim).

(iv)    Class 24 consists of the Allowed Secured Claim of BB&T in connection with that certain Loan Agreement and Promissory Note by and between BB&T and Island One dated November 28, 2007. The Allowed Secured Claim is estimated as of the Petition Date in the amount of $6,874.97 and is secured by a first priority lien on a 2008 Jeep Patriot SUV (VIN 1J8FT28W28D593413) ("2008 Jeep Patriot"). Pursuant to the Plan and the Bid Procedures

Order, BB&T shall exercise its rights to credit bid the full amount of its secured claim and the Debtors shall transfer to BB&T and/or its assigns the 2008 Jeep Patriot free and clear of all liens pursuant to 11 U.S.C. § 363. Any deficiency claim that is created upon the sale of the 2008 Jeep Patriot shall be an allowed Class 34 BB&T (Unsecured Deficiency Claim).

      E.    <u>Classification and Treatment of Class 22</u>

      (i)    Class 22 consists of the Allowed Secured Claim of BB&T in connection with that certain Loan Agreement and Promissory Note by and between BB&T and St. Croix One, LLC dated July 27, 2006. The Allowed Secured Claim is estimated as of the Petition Date in the amount of $4,428,952.35, and is secured by the following, which shall be collectively referred to as the "St. Croix Timeshare Interests:" (a) a first mortgage on all of St. Croix One's real property, including, but not limited to, unsold timeshare interests and vacant lots comprising approximately 15 acres and referred to as "Residences at Banyan Hill," (b) a first priority lien on all other personal property assets of St. Croix One, and (c) such other or additional collateral as provided for under the St. Croix Cash Collateral Order. In addition, BB&T asserts that it has an Allowed Secured Claim in all timeshare purchase money receivables generated by, held or otherwise assigned to St. Croix One in connection with the sale or transfer of timeshare interests at Chenay Bay Beach Resort (the "St. Croix Receivables" and together with the St. Croix Timeshare Interests, the "Trust II Assets"). Pursuant to that certain (a) "Interim Order Granting St. Croix One LLC's, One of the Jointly Administered Debtors, Emergency Motion for Use of Cash Collateral, Approving Interim Adequate Protection Payments with Island One, Inc., entered November 30, 2010 (D.R. 215) ("Interim BB&T Cash Collateral Order"), and (b) "Final Order Granting St. Croix One LLC's, One of the Jointly Administered Debtors, Emergency Motion for Use of Cash Collateral, Approving Interim Adequate Protection Payments with Island One, Inc.,

entered January 7, 2011 (D.R. 284) ("Final BB&T Cash Collateral Order"), TFC has reserved certain rights with respect to its asserted liens and security interests in certain such St. Croix Receivables (the "TFC Reservation").

(ii)    On the Effective Date, the Debtors shall transfer the St. Croix Timeshare Interests to a second liquidating trust ("Trust II") for the benefit of BB&T, its successors and assigns, and after the BB&T Class 22 Allowed Secured Claim has been paid in full, for the benefit of the Holders of Allowed Class 25 and/or 26 Secured Claims, if any, and thereafter the general unsecured creditors. Also on the Effective Date, in connection with the consummation and implementation of the TAC Agreements, the Debtors shall transfer to Trust II all existing and subsequently created St. Croix Receivables, including but not limited to those described on Exhibit "B" attached hereto, with such transfer being free and clear of any claim in favor of TFC, Liberty or TAC, and the St. Croix Receivables shall no longer be subject in any respect to the TFC Reservation and shall thereby render the TFC Reservation provided under the Interim BB&T Cash Collateral Order and the Final BB&T Cash Collateral Order withdrawn.

(iii)    The trustee for Trust II ("Trustee II"), in addition to the duties and obligations provided for under the Plan, shall be responsible for maintaining, preserving, managing, operating, renting and listing for sale the Trust II Assets. At time of sale of Trust II Assets, BB&T shall retain its right to credit bid the total amount of its Secured Claim including protective advances (including any capital or operational expenditures). If a sale occurs in which BB&T does not credit bid the total amount of its Secured Claim, including any protective advances (including capital or operational expenditures), and such sale yields sufficient net proceeds to cover the full amount of BB&T's claim, any excess net proceeds shall be distributed as provided in subclause E.(ii) above and otherwise as provided in the Plan (as modified)

Notwithstanding anything to the contrary in the Plan, any assets transferred to the Unsecured Creditor Trust pursuant to the Plan shall be administered by the Unsecured Creditor Trustee for the benefit of all Allowed Unsecured Claims entitled to distributions from the Unsecured Creditor Trust regardless of the respective classes for such claims.

(iv)    Barry E. Mukamal will be named as Trustee II

(v)    The trust agreement for Trust II (the "Trust II Agreement") will be filed on or before May 19, 2011. As provided in Article VIII, Section 8.03(c) of the Plan, and subject to the terms of this BB&T Modification, Trust II shall be vested with all Chapter 5 Causes of Action with respect to the Trust II Assets and any and all other claims or rights of any value whatsoever at law or in equity which would otherwise constitute an asset of St. Croix One, LLC's bankruptcy estate relating to the Trust II Assets and/or against any creditor or third party with respect to Trust II Assets not otherwise released. The foregoing causes of action shall exclude any claims against TFC and Liberty and any of their respective officers, directors, employees, agents, attorneys, representatives and successors and assigns, and any member, officer, director, manager, employee, present or past, of any of the Debtors acting in their capacity as a member, officer, director, manager or employee of any of the Debtors. Notwithstanding the foregoing, no one acting as closing agent or disbursing agent in connection with the sale or transfer of timeshare interests at Chenay Bay Beach Resort shall be released from any claim related to disbursement of funds in connection with such sales or transfers.

(vi)    All quarterly UST Fees related to disbursements of Trust II shall be paid by Trustee II and the Court shall retain jurisdiction over all duties and responsibilities assigned to Trustee II under the Trust II Agreement.

(vii)   Trust II may be funded with respect to any operational deficits by BB&T and BB&T shall receive pursuant to the Plan a superpriority claim only against Trust II for any protective advances made to cover deficiencies as well as the ability to include such advances in its credit bid and/or its secured claim, while carving out the necessary and reasonable operating expenses to run the operations including payments to Trustee II.

(viii)   The Bankruptcy Court will retain jurisdiction to administer the Trust II Assets and any and all claims objections and/or adversary proceedings related to the Trust II Assets.

(ix)   Additionally, Trustee II shall have the right, *inter alia*, to:

a.   Sign an exclusive or semi-exclusive management agreement with either a Third Party Timeshare Company or a hotel management company for the continued sale of the unsold St. Croix Timeshare Interests and the continued management of the hotel operations;

b.   Negotiate and sign a mutually acceptable letter agreement with the Reorganized Debtors to provide for a sixty (60) day transition period commencing on the date of the transfer of the Trust II Assets to Trust II, which period may be extended by the agreement of Trust II and the Reorganized Debtors for up to two (2) additional thirty (30) day periods or may be terminated at any time during the transition period by Trust II with fifteen (15) days advance written notice to Reorganized Debtors, and during which transition period Reorganized Debtor will provide rental, operational, management and administration assistance to Trust II;

c.   Sell the Trust II Assets free and clear of all liens and encumbrances including the interests of any purchaser of a St. Croix Timeshare Interest who purchased a St. Croix Timeshare Interest from St. Croix One, LLC after 2007;

d.       With the approval of BB&T, file a notice in the Public Records to terminate the multisite timeshare plan known as Club Navigo as to the St. Croix Timeshare Interests on a go forward basis only and to provide for the right to include, all or any portion of such St. Croix Timeshare Interests in another multisite timeshare plan or reservation system

e.       Assume or reject any executory contracts relating to the Trust II Assets;

f.       Upon the ultimate disposition of the Trust II Assets, file a motion for final decree and close the St. Croix One LLC Chapter 11 case.

F.       The Plan shall be modified to add a new Class 34 – BB&T (Unsecured Deficiency Claim).

Class 34 consists of BB&T's potential unsecured deficiency claims related to the BB&T Consolidated Inventory Loan (Class 4), the Sales Center (Class 7), the Barefoot'n Loan Obligations (Class 8), the BB&T LTV III Land Loan (Class 5), the BB&T LTV III Out Parcel Loan (Class 6), the Equipment Loan (Class 9), the St. Croix Timeshare Interests (Class 22), the 2007 Dodge Ram Loan (Class 23), and the 2008 Jeep Patriot Loan (Class 24).

In the event the sale, transfer, assignment, conveyance and/or disposition of the BB&T Consolidated Inventory, the Sales Center, the Barefoot'n Property, the BB&T LTV III Land, the BB&T LTV III Out Parcel, the Equipment, the St. Croix Timeshare Interests, the 2007 Dodge Ram or the 2008 Jeep Patriot does not yield sufficient net proceeds to satisfy the Allowed Secured Claims in full, then any remaining deficiency claim shall be an allowed Class 34 BB&T (Unsecured Deficiency Claim). The Holder of Class 34 BB&T (Unsecured Deficiency Claim) shall receive no Distribution under the Plan.

G.       Article IX of the Plan Section 9.03 shall be modified to add the following:

5.       **Exclusions from Discharges, Releases, Injunctions and Exculpations.** *Notwithstanding anything to the contrary under the Plan, Deborah L. Linden ("Linden") is excluded from any discharge, release, injunction or exculpation from any claim or cause of action of the Unsecured Creditors Committee, the Unsecured Creditors Trust, BB&T, the Debtors and their Estates. Without limiting the foregoing, Linden's*

*obligations to BB&T relating to the SCO Claims and arising under that certain Amended, Consolidated and Restated Guaranty Agreement executed in conjunction with the Amended and Restated Master Loan Agreement, effective as of October 30, 2009 (the "Master Loan Agreement") and any other loan in favor of BB&T in which Linden is a borrower or a guarantor shall not be released and all legal remedies in favor of BB&T against Linden shall survive the Confirmation Date. In addition, with respect to BB&T only, the definition of "Released Claims" shall exclude, solely to the extent provided herein, any claim of BB&T relating to both SCO and either (i) the failure to tender release prices to BB&T upon the sale of BB&T Timeshare Intervals; (ii), the sale of BB&T Timeshare Intervals without obtaining the consent of BB&T or the release of BB&T's mortgage lien against the real property owned by SCO; or (iii) timeshare receivables which were originally included in the BB&T Collateral and allegedly improperly pledged to TFC (collectively, the "SCO Claims"). Consequently, the definition of Released Parties shall also be modified to exclude all persons or entities against whom BB&T may pursue the SCO Claims, with the exception of TFC and Liberty and any of their respective officers, directors, employees, agents, attorneys, representatives and successors and assigns, and any member, officer, director, manager, employee, present or past, of any of the Debtors acting in their capacity as a member, officer, director, manager or employee of any of the Debtors, each of whom shall remain Released Parties with respect to the SCO Claims. Notwithstanding the foregoing, no one acting as closing agent or disbursing agent in connection with the sale or transfer of timeshare interests at Chenay Bay Beach Resort shall be released from any claim related to disbursement of funds in connection with such sales or transfer.*

H.    The definition of Released Parties pursuant to 1.100 of the Plan shall be modified to add BB&T as follows:

1.100    **Released Parties** shall mean the Debtors, their estates, directors, officers, employees, agents, representatives, successors and assigns of any of the foregoing who served in such capacities on the confirmation date, TAC, TFC, Liberty and BB&T, and each of their respective directors, officers, employees, agents, representatives, successors and assigns but specifically excluding Linden from any claim or cause of action of the Unsecured Creditors Committee, the Unsecured Creditors Trust, BB&T, the Debtors and their Estates.

I.    Section 8.03 Rights of Action shall be modified as follows:

(b)    Except as otherwise provided in the BB&T Modification, on the Effective Date, any right, claim or cause of action, belonging to St. Croix One, LLC or its estate not otherwise excluded under Section 8.03(c), *infra* against any Person or Entity, including without limitation, any claim to avoid a transfer under Section 544, 547, 548, 549 or 553(b) of the Code shall be transferred and assigned by the Debtors to the Unsecured Creditor Trust.

J.    Section 8.03 Rights of Action Under the Plan shall be modified to add the following:

(c)    Notwithstanding the assignment provided under Section 8.03(b), *supra*, and subject in all respects to Article IX of the Plan, as modified by the BB&T Modification, on the Effective Date, any rights, claim or Cause of Action belonging to Debtors or their estates against any Person or Entity: (i) relating to the Trust I Assets shall be transferred and assigned by the Debtors to Trust I for the benefit of BB&T; and

(ii) relating to the Trust II Assets shall be transferred and assigned by the Debtor to Trust II for the benefit of BB&T. Trustee I and Trustee II, in their respective reasonable discretion, shall pursue, settle or release all such rights of action concerning the Trust I Assets or Trust II Assets, as appropriate, in accordance with the best interest of and for the benefit of BB&T.

K.    Section 9.01 Effects of Confirmation shall be modified to add the following:

9.    Retention of Remedies.  To the extent not otherwise released, discharged or altered in the Plan, Confirmation Order or by virtue of the Bankruptcy Code, BB&T shall retain all of its rights, remedies and actions contained in the Master Loan Agreement.


RESPECTFULLY SUBMITTED this 4th day of May, 2011.

ISLAND ONE, INC.,
CRESCENT ONE, LLC,
ST. CROIX ONE, LLC,
ISLAND ONE RESORTS MANAGEMENT
CORPORATION,
NAVIGO VACATION CLUB, INC.,
IOI FUNDING I, LLC
*Debtors and Debtors in Possession*

By: _____
Deborah L. Linden
President

/s/ Elizabeth A. Green
_____
Elizabeth A. Green, Esq.
Florida Bar No.: 0600547
egreen@bakerlaw.com
Jimmy D. Parrish, Esquire
Florida Bar No. 526401
jparrish@bakerlaw.com
BAKER & HOSTETLER, LLP
200 S. Orange Avenue
SunTrust Center, Suite 2300
Orlando, Florida 32801
Tel: (407)649-4000
Fax: (407)841-0168
*Attorneys for the Debtors*

23

# CONCURRENT OPERATING AGREEMENT

BY THIS **CONCURRENT OPERATING AGREEMENT** ("**Agreement**") **ISLAND ONE, INC.**, a Florida corporation ("**Island One**"); **ISLAND ONE RESORTS MANAGEMENT CORPORATION**, a Florida corporation and wholly owned subsidiary of Island One ("**IORMC**"); **NAVIGO VACATION CLUB, INC.**, a Florida corporation d/b/a Club Navigo and wholly owned subsidiary of Island One ("**NVC**") (collectively, the "**Reorganized Debtor**"); and **LTV I LIQUIDATING TRUST**, as established pursuant to the Plan ("**Trust I**"), established pursuant to action of the Bankruptcy Court (defined as set forth below) (the Reorganized Debtor and Trust I to be collectively referred to as the "**Parties**" and individually as a "**Party**" in this Agreement) confirm and agree as follows:

## RECITALS:

WHEREAS, on September 10, 2010, Island One, and certain of its affiliates including IORMC, NVC, Crescent One, LLC, a Florida limited liability company, St. Croix One, LLC, a U.S. Virgin Islands limited liability company and IOI Funding I, LLC, a Florida limited liability company (collectively the "**Debtors**") commenced the cases (the "**Bankruptcy Cases**") under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") by filing Voluntary Petitions for Relief with the United States Bankruptcy Court for the Middle District of Florida, Orlando Division (the "**Bankruptcy Court**");

WHEREAS, Branch Banking & Trust Company, a North Carolina Corporation ("**BB&T**"), is Successor in Interest to Colonial Bank ("**Colonial**") by Asset Acquisition from FDIC as Receiver for Colonial Bank; and

WHEREAS, one or more of the Debtors entered into various loans with Colonial, which loans were subsequently acquired by BB&T ("**BB&T Loans**"); and

WHEREAS, BB&T and the Debtors entered into a restructuring of certain notes, debts and obligations through agreements effective October 30, 2009 ("**Restructuring Agreements**"); and

WHEREAS, the Debtors filed the *First Amended Joint Plan of Reorganization submitted by Island One, Inc., Crescent One, LLC, St. Croix One, LLC, Island One Resorts Management Corporation, Navigo Vacation Club, Inc. and IOI Funding I, LLC* as its proposed joint plan of reorganization, and that certain *Modification of the First Amended Plan of Reorganization for Island One, Inc., Crescent One, LLC, St. Croix One, LLC, Island One Resorts Management Corporation, Navigo Vacation Club, Inc., and IOI Funding I, LLC* (the "**Modification**"), (all of which shall be collectively referred to herein as the "**Plan**") pursuant to Chapter 11 of the Code, 11 USC, §101, *ex seq.*; and

WHEREAS, pursuant to the Confirmation Order of the Bankruptcy Court, the Debtors transferred, assigned and delivered all of the right, title and interest in and to certain of its assets (the "**Trust I Assets**") to Trust I and all such Trust I Assets were deemed to vest in Trust I for

the trustee of Trust I (the "**Trustee I**") to manage, sell and rent for the beneficiaries of the Trust I; and

WHEREAS, the Trust I Assets include: (i) Timeshare Interests (defined below) owned by Trust I (the "**Trust I Timeshare Interests**") in those certain timeshare regimes commonly referred to as Liki Tiki Village I, Liki Tiki Village II, the Cove on Ormond Beach (the "**Cove I**") and The Charter Club of Naples Bay ("**Charter Club**") (all such timeshare regimes to be collectively referred to as "**IOI Resorts**"); (ii) the units and Timeshare Interests in that certain timeshare regime known as LTV 1400 ("**LTV 1400**"); (iii) that certain land and improvements (the "**Barefoot'n II Property**") located adjacent to but not included as part of that certain timeshare regime known as Barefoot'n in the Keys at Old Town (the "**Barefoot'n Resort**"); and (iv) certain property located near Liki Tiki Village and used as a sales center (the "**Sales Center**"); and

WHEREAS, Reorganized Debtor owns or controls Timeshare Interests at the IOI Resorts and the Barefoot'n Resort separate and distinct from the Trust I Timeshare Interests (the "**Reorganized Debtor Timeshare Interests**"); and

WHEREAS, some of the Trust I Timeshare Interests and the Reorganized Debtor Timeshare Interests are subject to that certain multisite timeshare plan known as Club Navigo (the "**Club**") which is managed and controlled by the Reorganized Debtor; and

WHEREAS, the Reorganized Debtor provides site management services ("**Site Management Services**") to each of the IOI Resorts and the Barefoot'n Resort pursuant to management agreements between IORMC and each of the owners' associations at the IOI Resorts and the Barefoot'n Resort; and

WHEREAS, each of the Reorganized Debtor and Trust I may determine individually to enter into one or more sales, marketing, rental or management agreements with one or more timeshare companies (each a "**Third Party Timeshare Company**") for the purpose of selling, marketing, renting or managing their respective assets; and

WHEREAS, the Reorganized Debtor and Trust I wish to establish clear guidelines that will allow the Parties to simultaneously, effectively, and efficiently market, sell and rent their respective assets by providing each Party with access to certain resources and property required by the Parties to conduct their respective marketing, sales and rental activities without interference from, or impairment by the other, or any Third Party Timeshare Company acting on their behalf; and

WHEREAS, pursuant to the Plan, Trustee I and Reorganized Debtor have an obligation to attempt to negotiate a concurrent operating agreement;

WHEREAS, Reorganized Debtor and Trust I desire to enter into this Agreement as contemplated in the Plan, which Agreement shall be subject to the consummation of the transactions contemplated by the TAC Purchase and Sale Agreements and shall provide for the monitoring and enforcement of this Agreement by the Bankruptcy Court; and

WHEREAS, this Agreement will be effective as of the Effective Date of the Plan (the "**Effective Date**").

NOW THEREFORE, for and in consideration of the mutual promises and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

The Recitals are incorporated as part of this Agreement by this reference and the terms defined in the preamble and Recitals shall have the meaning provided therein. Terms not defined in this Agreement shall have the meaning ascribed to them in the Plan. The following additional definitions shall apply to and constitute part of this Agreement along with Exhibit "A" attached hereto:

1.1 **"Person"** shall mean an individual, partnership, joint venture, limited liability company, corporation, trust, unincorporated organization, syndicate, governmental authority, and the successors and assigns thereof or the heirs, executors, administrators or other legal representatives of an individual, as well as any group of Persons that act jointly or in concert for the purpose of acquiring, holding, or disposing of, assets or interests in another.

1.2 **"Resort Documents"** shall mean all documents that establish each IOI Resort and the Barefoot'n Resort and concern the sale, marketing, use and operation, each IOI Resort and the Barefoot'n Resort, including, but not limited to, their respective declarations of condominium, declarations of covenants, conditions and restrictions, owners' association documents, and resort rules and regulations. In the case of Barefoot'n Resort, the term Resort Documents shall include the Declaration of Covenants, Conditions and Restrictions and Grant of Easements recorded December 9, 1999 at O.R. Book 1682, Page 1480 of the Official Records of Osceola County, and all amendments and other documents related thereto.

1.3 **"Timeshare Interest"** shall have the meaning provided in Section 721.05(36), *Florida Statutes* (2010).

## ARTICLE II
## PURPOSE OF AGREEMENT

The purpose of this Agreement is to establish guidelines that will allow the Parties to simultaneously, effectively, and efficiently market, sell and rent the Trust I Assets and the Reorganized Debtor Timeshare Interests, respectively, by providing each Party with access to certain resources and property required by the Parties to conduct their respective marketing, sales and rental activities without interference from, or impairment by, the other.

## ARTICLE III
## TRANSITION PERIOD

3.1     Transition Period Defined.  Commencing on the Effective Date and continuing until 5:00 PM local Orlando, Florida time on the sixtieth (60th) day after Effective Date ("**Transition Period**"), Reorganized Debtor shall continue to market, sell and rent the Trust I Timeshare Interests and manage and rent LTV 1400 for the account of Trust I in the same manner as the Debtor was managing, marketing, selling and renting prior to the issuance of the Confirmation Order.  During the Transition Period only, Reorganized Debtor shall submit net rent receipts for the Trust I Timeshare Interests and rental of LTV 1400 inventory monthly in an amount of not less than the following:  June, 2011 in the amount of $49,511; July, 2011 in the amount of $63,211; August, 2011 in the amount of $45,817; and September, 2011 in the amount $1,795 for each such month as occurs in the Transition Period and subject to proration for any partial month that occurs at the expiration or early termination of the Transition Period.  Release fees for those Trust I Timeshare Interests sold during the Transition Period shall be paid weekly with the release fee in the amount set out in the applicable BB&T loan document for the respective Trust I Timeshare Interest.

3.2     Extension of Transition Period; Termination of Transition Period.

(i)     The Transition Period may be extended by the written agreement of Trustee I and the Reorganized Debtor for up to two (2) additional thirty (30) day periods.

(ii)     The Transition Period, or any extension of the Transition Period, may be terminated by Trustee I upon thirty (30) days' advance written notice to Reorganized Debtor.

3.3     Rental of Barefoot'n II Property.  If Trustee I desires to engage Reorganized Debtor to manage, operate or rent Barefoot'n II Property on behalf of Trustee I during the Transition Period, the Parties agree to negotiate in good faith to agree on mutually acceptable terms for such engagement.

## ARTICLE IV
## SALES, MARKETING AND RENTAL OF TIMESHARE INTERESTS

4.1     Direct Marketing and Sales Activities.

(i)     By Trustee I.  Trustee I and/or any Third Party Timeshare Company retained by Trustee I and their respective employees, independent contractors, agents, representatives and others acting on their behalf, may engage in sales, marketing, solicitation, gift promotions and other efforts to generate leads, prospects, customers and prospective buyers, tenants and users of the Trust I Assets.

(ii)     By Reorganized Debtor.  Reorganized Debtor and/or any Third Party Timeshare Company retained by Reorganized Debtor and its respective employees, independent contractors, agents, representatives and others acting on their behalf, may engage in sales, marketing, solicitation, gift promotions and other efforts to generate leads, prospects, customers and prospective buyers, tenants and users of Reorganized Debtor Assets.

4.2     <u>Customers' Access to Property at Liki Tiki Village</u>.  Except as provided in paragraphs 6.1 and 6.2 below, the customers of Reorganized Debtor, Trustee I and/or any Third Party Timeshare Company on behalf of Reorganized Debtor or Trustee I shall have substantially identical, complete, full, and open access to all areas of the commonly-used property at Liki Tiki Village, including the common areas or common elements property declared to the timeshare regimes at Liki Tiki Village, to tour their respective customers, prospects, tenants or Timeshare Interest purchasers or the owner of record of any Timeshare Interest ("**Owners**") in conjunction with their respective marketing, sales and rental efforts.

4.3     <u>Use of Club Navigo in Sales, Marketing and Rental of Trust I Timeshare Interests</u>.  If Trust I determines to not terminate Club Navigo with respect to the Trust I Timeshare Interests, Trust I, or any authorized Person marketing the Trust I Timeshare Interests on behalf of Trust I, other than the Reorganized Debtor during the Transition Period to the extent applicable, shall not reference or utilize any aspect of Club Navigo in the sales, marketing and rental of the Trust I Timeshare Interests unless the Parties agree on the terms under which Trustee I may include Club Navigo in connection with its marketing, sales and rental program. Reorganized Debtor and Trust I shall negotiate in good faith to approve the terms under which Trust I, or any authorized Person sells, markets or rents the Trust I Timeshare Interests subject to Club Navigo.  Trustee I and the Reorganized Debtor shall receive authorization pursuant to the Confirmation Order to allow Trustee I to terminate the Club Navigo affiliation on Trust I Assets by recording a Notice of Termination in the Official Records in the respective counties in which the Trust I Assets are located.  To the extent that Trust I terminates Club Navigo with respect to any of the Trust I Timeshare Interests, Trustee I shall not use Club Navigo for any part of its marketing, sales and rental efforts.

## ARTICLE V
## REGISTRATION OF TIMESHARE INTERESTS

Trustee I on its own right or by and through its Third Party Timeshare Company shall be responsible for registration pursuant to Chapter 721, *Florida Statutes*, so that the Trustee I or its Third Party Timeshare Company will be able to market and sell the Trust I Timeshare Interests, and Timeshare Interests at LTV 1400 or the Barefoot'n II Property, if applicable, simultaneously with the Reorganized Debtor selling its Reorganized Debtor Timeshare Interests. Trustee I, at its sole expense, may acquire additional project registrations as may be appropriate through the Division of Florida Condominiums, Timeshares and Mobile Homes (the "**Division**") and such regulatory agencies in other jurisdictions as Trustee I and a Third Party Timeshare Company, if any, may reasonably determine, so that   Trustee I will be able to market and sell its Trust I Timeshare Interests.  The Reorganized Debtor shall cooperate with Trustee I and the Third Party Timeshare Company, if any, and Trustee I and the Third Party Timeshare Company, if any, shall cooperate with the Reorganized Debtor to complete their respective registrations.  As part of such cooperation, the Reorganized Debtor shall provide Trustee I copies of all project documents, in its possession, that must be filed with the Division and any such documents that must be amended in connection with such filing shall be in Word format.

# ARTICLE VI
## EXCLUSIVE AND NON-EXCLUSIVE SALES, MARKETING AND RENTAL AREAS

6.1 <u>Exclusive Trust I (Third Party Timeshare Companies) Sales and Marketing Areas</u>. Trust I, and any Third Party Timeshare Company or Companies engaged by Trust I, responsible for the sale, marketing (which includes, without limitation, offering upgrades and reloads to existing customers), rental and operation of the Trust I Timeshare Interests, and their respective employees, contractors, agents or representatives, shall have the exclusive use of the Sales Center and LTV 1400 for sales, marketing and rental activities ("**Trust I Exclusive Areas**"). Reorganized Debtor, and any Third Party Timeshare Company or Companies engaged by Reorganized Debtor, responsible for the sale, marketing, rental and operation of the Reorganized Debtor Timeshare Interests, and their respective employees, contractors, agents or representatives, shall have no right to use or occupy the Trust I Exclusive Areas for sales, marketing and rental activities, and shall not interfere with Trustee I's or its Third Party Timeshare Company's such use of the Trust I Exclusive Areas.

6.2 <u>Exclusive Reorganized Debtor Sales, Marketing and Rental Areas</u>. Reorganize Debtor, and any Third Party Timeshare Company or Companies engaged by Reorganized Debtor, responsible for the sale, marketing (which includes, without limitation, offering upgrades and reloads to existing customers), rental and operation of the Reorganized Debtor Timeshare Interests, and their respective employees, contractors, agents or representatives, shall have the exclusive use of the administrative building located at Liki Tiki Village I for sales, marketing and rental activities except for the Interval International exchange desk, gift shop and registration desk used for check-in purposes ("**Reorganized Debtor Exclusive Area**"). Trust I, and any Third Party Timeshare Company or Companies engaged by Trust I, responsible for the sale, marketing, rental and operation of the Trust I Timeshare Interests, and their respective employees, contractors, agents or representatives, shall have no right to use or occupy the Reorganized Debtor Exclusive Area for sales, marketing and rental activities, and shall not interfere with Reorganized Debtor's or its Third Party Timeshare Company's such use of the Trust I Exclusive Areas. Notwithstanding the foregoing, since the administrative building is part of the common elements of Liki Tiki Village I, Trust I and any Third Party Timeshare Company or Companies engaged by Trust I shall have the non-exclusive right to show and demonstrate the use of all of the amenities of the administrative building to its prospects, tenants or owners, including, but not limited to, the owners' lounge, business center and other common elements located therein; provided, however, that such show and demonstration activities shall not be disruptive of the activities of Reorganized Debtor or its Owners, guests, exchangers or invitees conducted in those areas.

6.3 <u>Non-Exclusive Areas</u>. All areas of the commonly-used property at the IOI Resorts, LTV 1400, the Barefoot'n Resort and the Barefoot'n II Property, i.e. other than the respective Exclusive Areas (the "**Non-Exclusive Areas**"), shall be available for the use, occupancy and enjoyment of the Parties, and any Third Party Company engaged by the Parties, responsible for the marketing, rental, sale, and operation of their respective Timeshare Interests. Nothing in this Agreement is intended to, or shall, abrogate or expand the rights of the Parties, and their Owners, guests, exchangers, or invitees to have access to or enjoy the use of any portion of the IOI Resorts, LTV 1400, Barefoot'n Resort or the Barefoot'n II Property as set forth in the applicable Resort Documents.

6.4 <u>Prohibited Activities in Exclusive Areas</u>. At no point shall any Party, or any Third Party Timeshare Company engaged by a Party (or their respective employees, contractors, agents or representatives), solicit, approach or attempt to sell, lease, rent or offer for occupancy any of the Trust I Timeshare Interests or the Reorganized Debtor Timeshare Interests, as applicable, in the Exclusive Area of the other to the other's customer, prospect, purchaser or Owner.

6.5 <u>Prohibited Activities in Non-Exclusive Areas</u>. At no point shall any Party, or any Third Party Timeshare Company engaged by a Party (or their respective employees, contractors, agents or representatives), solicit, approach or attempt to sell, lease, rent or offer for occupancy any of the Trust I Timeshare Interests or the Reorganized Debtor Timeshare Interests, as applicable, in any Non-Exclusive Areas, including at any IOI Resorts, to the other's customer, prospect, purchaser or Owner, except where specifically allowed hereunder and then only in the manner and to the extent as described herein.

6.6 <u>Management Company</u>. IORMC, a wholly owned subsidiary of Island One, is the management company for the IOI Resorts. Management company responsibilities include handling front desk activities, reservations, upgrades (to a better unit, if the unit reserved or requested is not available), unit cleaning and preparation for the next user and responding to any complaints or concerns of the tenant, Owner or user of a Timeshare Interest. In addition, with respect to the Trust I Timeshare Interests, Trust I may separately engage a third party or use any Third Party Timeshare Company engaged by Trust I, to provide similar customer service activities, exclusive of check in (as provided in paragraph 7.1 below), unit cleaning, preparation of a unit for the next user and responding to complaints and concerns pertaining to issues related to physical plant, equipment, furniture and amenities, which matters shall remain the responsibility of IORMC or its successors or assigns as part of the Site Management Services. These interactions and others that engage the IORMC or any company engaged by Trust to perform similar customer service activities in the ordinary pursuit of their business, present unsolicited marketing opportunities ("**Unsolicited Marketing Opportunities**").

6.7 <u>Prohibited Activities Generally</u>. Neither Party, nor any Third Party Company engaged by such Party (or their respective employees, contractors, agents or representatives), shall attempt, at either an Exclusive Area or a Non-Exclusive Area, to solicit approach, steal away or divert any Owner, customer, prospect, tenant or touring individual of the other Party in an effort to make a sale, lease, or exchange to such Owner, customer, prospect tenant or touring individual from their own Trust I Timeshare Interest or Reorganized Debtor Timeshare Interest, as applicable, or any associated timeshare plan, multisite timeshare plan, exchange program, vacation product or related or similar products. Such prohibition shall extend to any Unsolicited Marketing Opportunity.

6.8 <u>Solicitation of Employees and Contractors Prohibited</u>. Neither Party, nor any Third Party Timeshare Company engaged by either Party (or their respective employees, contractors, agents or representatives), shall seek to solicit, offer, recruit, employ or contract with the personnel of the other Party including, but not limited to, the employees, agents, contractors or representatives of any Third Party Timeshare Company, without the prior notice and written consent of the other Party.

6.9    Non-Disparagement.  Neither Party, nor any Third Party Timeshare Company engaged by either Party (or their respective employees, contractors, agents or representatives), during the term of this Agreement shall criticize, ridicule or make any statement which disparages or is derogatory of the other Party, a Third Party Timeshare Company, or any of their affiliates or related entities, in any communications with (i) any Owner, customer, prospect, tenant or touring individual of the other Party, (ii) the press or other media, or (iii) any client or supplier.

6.10    Separate Identifier.  The Parties agree that if Reorganized Debtor is not the exclusive provider of Trustee I's sales and marketing services, Trustee I will establish a separate and distinct resort identifier for purposes of identifying the Trust I Timeshare Interests, LTV 1400 and Barefoot'n II Property in connection with any rental and marketing activity.  Neither Trustee I nor any Third Party Timeshare Company on behalf of Trustee I shall use "Liki Tiki" or "Liki Tiki Village" or anything confusingly similar for its Trust I Timeshare Interests at Liki Tiki Village or for LTV 1400; shall not use "Cove on Ormond" or "Cove on Ormond Beach" or anything confusingly similar for its Trust I Timeshare Interests at the Cove at Ormond Beach; shall not use "Charter Club Resort of Naples Bay" or "Charter Club Resort" or anything confusingly similar for its Trust I Timeshare Interests at The Charter Club of Naples Bay; and shall not use "Barefootn in the Keys" or "Barefoot'n Resort" or anything confusingly similar for its Barefoot'n II Property.  For purposes of this Agreement, the Parties agree that the "Villas at Liki Tiki Village," the "Villas at Cove On Ormond Beach," the "Villas at Charter Club Resort," and the "Villas at Barefoot'n Resort" are acceptable names for Trustee I to use to refer to the respective Trust I Timeshare Interests at these resorts and, as such, are not confusingly similar to the names used by Reorganized Debtor for these resorts.

6.11    Charter Club Sales Space.  Reorganized Debtor agrees to grant Trust I the non-exclusive right to use a portion of the Charter Club property consisting of the office space located on the second floor of the administration building (the "**Charter Club Sales Space**") for the purpose of conducting sales of Trust I Timeshare Interests and to the extent that Reorganized Debtor has such rights to grant; provided, however, that such right to use the Charter Club Sales Space shall be subject to the following:  (i) Trust I shall only use the Charter Club Sales Space to sell Trust I Timeshare Interests; (ii) Trust I's rights to use the Charter Club Sales Space is subject to any required approval by The Charter Club of Naples Bay Owners' Association, Inc., which approval Reorganized Debtor agrees to use commercially reasonably efforts, excluding the payment of monies, to assist Trust I to obtain; (iii) the term of Trust I's use shall expire no later than May 31, 2014; (iv) Trust I shall pay all costs and expenses associated with its use of the Charter Club Sales Space, if any; (v) Trust I and Reorganized Debtor shall agree to share the Charter Club Sales Space, and costs and expenses associated with their respective use of the Charter Club Sales Space, on a commercially reasonable basis if both Trust I and Reorganized Debtor conduct sales of Timeshare Interests at Charter Club; (vi) Trust I's right to conduct sales and use the Charter Club Sales Space shall be limited by and in accordance with the provisions of the Charter Club governing and restrictive documents as they pertain to the "Developer" thereunder; and (vii) Reorganized Debtor shall have the right to approve the person or entity engaged or employed by Trust I to use the Charter Club Sales Space, which approval shall not be unreasonably withheld and provided such person or entity is reputable or such person managing, directing, controlling or performing the sales activity at Charter Club is not a former employee or agent of Reorganized Debtor.

6.12    Cove I Sales Space. Reorganized Debtor agrees to grant Trust I the right to use a portion of the Cove I property consisting of the room located directly across from the check-in desk on the left side of the lobby upon entering the lobby from the front of the building, but excluding the adjoining executive offices (the "**Cove I Sales Space**") for the purpose of conducting sales of Trust I Timeshare Interests and to the extent that Reorganized Debtor has such rights to grant; provided, however, that such right to use the Cove I Sales Space shall be subject to the following: (i) Trust I and Reorganized Debtor shall agree on reasonable provisions concerning Trust I's use of the Cove I Sales Space, which provisions shall include, at a minimum, that Trust I shall pay commercially reasonable rent for the use of the Cove I Sales Space, the term of the use shall expire no later than May 31, 2014 and Trust I shall pay all costs and expenses associated with its use of the Cove I Sales Space, if any; (ii) Trust I shall only use the Cove I Sales Space to sell Trust I Timeshare Interests; (iii) Trust I's rights to use the Cove I Sales Space is subject to any required approval by the Plantation Cove Condominium Association, Inc., which approval Reorganized Debtor agrees to use commercially reasonably efforts, excluding the payment of monies, to assist Trust I to obtain; (iv) Trust I agrees that Reorganized Debtor shall have access to the Cove I Sales Space at all times to access the adjoining executive offices and conduct Reorganized Debtor's management and operational activities; (v) Trust I's right to conduct sales and use the Cove I Sales Space shall be limited by and in accordance with the provisions of the Cove I governing and restrictive documents as they pertain to the "Developer" thereunder; and (vi) Reorganized Debtor shall have the right to approve the person or entity engaged or employed by Trust I to use the Cove I Sales Space, which approval shall not be unreasonably withheld and provided such person or entity is reputable or such person managing, directing, controlling or performing the sales activity at Cove I is not a former employee or agent of Reorganized Debtor.

## ARTICLE VII
## RESERVATIONS AND USE

7.1    Separate Reservation Systems. Except with regard to the automatic reservation of Trust I Timeshare Interests described in paragraph 7.4 below, it is the intent of the Parties that there will be separate reservation systems for the use and rental of the Timeshare Interests of each Party.  It is further the intent of the Parties that the Owners, customers, prospects, tenants or touring individuals of the respective Parties are solely the Owners, customers, prospects, tenants or touring individuals and shall not be solicited, sold or rented units or upgrades by such other Party and that neither Party shall take advantage of any Unsolicited Marketing Opportunities by virtue of such prospect contacting the wrong reservation agent or system.  Provided, however, notwithstanding the operation of any separate reservation system, Reorganized Debtor shall accommodate the check-in of any of Owner, renter, exchanger or guest of Trust I in accordance with its obligations as the management company.  With respect to the accommodation of the check-in of any of Owner, renter, exchanger or guest of Trust I, Trustee I agrees to provide Reorganized Debtor a weekly report that lists all of the reservations confirmed during the prior week, all of the reservations cancelled during the prior week, and all arrivals scheduled for the upcoming week and such other information as is commercially reasonable to facilitate the check-in and confirming of reservations.

7.2    Contact Referrals. Both Parties agree that if they are contacted by an Owner, customer, prospect, tenant or touring individual of the other, that they will promptly and clearly

refer such Person to a designated point of contact for the other Party whose Owner, customer, prospect, tenant or touring individual it is and will not solicit such Person to buy, rent, use or exchange any of its Timeshare Interests or otherwise divert such Owner, customer, prospect, tenant or touring individual from the other Party as long as the Reorganized Debtor receives written information or is otherwise notified by email to the designated point of contact as to the identity of such Owner, renter, exchanger or guest. Such designated point of contact will initially be designated by each of the Parties, and may be substituted or replaced by each of the Parties, by delivering prior written notice of such designation, or substitution or replacement, to the other Party.

7.3 <u>Rental Referrals</u>. The Parties acknowledge that either Party may refer a rental prospect to the other if they do not have the requisite inventory to accommodate the prospect.

7.4 <u>Automatic Reservation of Trust I Timeshare Interests</u>. In order to allow Trustee I to rent or otherwise utilize its Trust I Timeshare Interests in its marketing, sales and rental program, Reorganized Debtor, in its capacity as the management company, will make an automatic reservation of BB&T's Timeshare Interests in Trustee I's name at the opening of the applicable reservation window in any applicable reservation or floating use plan and based on the legal description of the Timeshare Interest to the extent permitted by the applicable reservation or floating use plan rules and regulations. Trustee I and Reorganized Debtor shall receive authorization pursuant to the Confirmation Order from the Court to amend any applicable reservation or floating use plan rules and regulations, if necessary, to facilitate such automatic reservations.

**ARTICLE VIII**
**SALES PROTOCOL, SOLICITATIONS AND RESTRICTIONS**

8.1 <u>Restrictions</u>. All Parties agree that they will abide by the limitations on sales and solicitations as set forth in this Agreement and shall conduct all marketing, sales, and rental efforts strictly in accordance with the terms, provisions and covenants contained in this Agreement.

8.2 <u>Permitted Sales Activities</u>. Notwithstanding the foregoing, each Party shall be permitted to have sales brochures and other written materials in their respective Exclusive Areas, and any visitor or user of the property shall be free to come into such Exclusive Area as long as they are not doing so pursuant to an action in violation of the requirements of paragraphs 6.1 or 6.2 above, as applicable.

8.3 <u>Sale or Exchange of Timeshare Interests</u>. Each Party shall be free to negotiate for the purchase, sale or exchange of one or more Timeshare Interests from the other Party pursuant to terms and conditions acceptable to both parties.

8.4 <u>Sale of LTV 1400, Barefoot'n II Property and the Sales Center</u>. Reorganized Debtor acknowledges that Trustee I is authorized to list LTV 1400, Barefoot'n II Property and the Sales Center for sale.

## ARTICLE IX
## TIMESHARE INTEREST RENTAL

9.1     Separate Rental Prospects.  It is the intent of the Parties that all rental prospects or customers shall be subject to the same separation of treatment, non-interference and referral back to the appropriate Party as described above.

9.2     Rental of Timeshare Interests.  If a rental prospect is unable to obtain the appropriate time period or unit type and needs to be assigned or located in a Timeshare Interest owned by the other Party, the first Party agrees to use commercially reasonable efforts to cooperate with the other Party to fulfill the reservation for the prospect.

9.3     Rental Agreement. Reorganized Debtor acknowledges that Trustee I is expressly authorized to negotiate a rental services or rental brokerage agreement with one or more Third Party Timeshare Companies selected by Trustee I or with the Reorganized Debtor in connection with the rental of the Trust I Assets.

9.4     Rental of Timeshare Interests at LTV 1400 and Barefoot'n II Property. If Trustee I desires to engage Reorganized Debtor to rent any Timeshare Interests or whole units at LTV 1400 or the Barefoot'n II Property, the Parties agree to negotiate in good faith to reach a mutually satisfactory agreement as to the terms of any such engagement.

9.5     Guest Inquiries.  If either Party receives an inquiry from the other Party's customer (whether a rental prospect, guest, prospective purchaser or an Owner), the Party receiving such inquiry shall refer the customer to a designated point of contact for the other Party as soon as practicable to facilitate each Party's ability to service their own customers.  Such designated point of contact will initially be designated by each of the Parties, and may be substituted or replaced by each of the Parties, by delivering prior written notice of such designation, or substitution or replacement, to the other Party.

9.6     Separate Identifier.  The Parties agree that if Reorganized Debtor is not the exclusive provider of Trustee I's rental services, Trustee I will establish a separate and distinct resort identifier for purposes of identifying the Trust I Timeshare Interests, LTV 1400 and Barefoot'n II Property in connection with any rental and marketing activity, including with respect to entering into any rental distribution agreements.  Neither Trustee I nor any Third Party Timeshare Company on behalf of Trustee I shall use "Liki Tiki" or "Liki Tiki Village" or anything confusingly similar for its Trust I Timeshare Interests at Liki Tiki Village or for LTV 1400; shall not use "Cove on Ormond" or "Cove on Ormond Beach" or anything confusingly similar for its Trust I Timeshare Interests at the Cove at Ormond Beach; shall not use "Charter Club Resort of Naples Bay" or "Charter Club Resort" or anything confusingly similar for its Trust I Timeshare Interests at The Charter Club of Naples Bay; and shall not use "Barefootn in the Keys" or "Barefoot'n Resort" or anything confusingly similar for its Barefoot'n II Property. For purposes of this Agreement, the Parties agree that the "Villas at Liki Tiki Village," the "Villas at Cove On Ormond Beach," the "Villas at Charter Club Resort," and the "Villas at Barefoot'n Resort" are acceptable names for Trustee I to use to refer to the respective Trust I Timeshare Interests at these resorts and, as such, are not confusingly similar to the names used by Reorganized Debtor for these resorts.

## ARTICLE X
## COST AND REVENUE ACCOUNTING

10.1    Obligation to Account.  With respect to any transaction with respect to which payment is due from one Party to the other pursuant to the terms of this Agreement, each Party shall have the obligation to promptly notify the other that it has entered into such transaction with the Owner, customer, prospect, tenant or touring individual of the other as permitted in this Agreement and shall account for the revenues and expenses associated with such accommodation on a monthly basis.

10.2    Reconciliation.  Any owner association payments or rental revenues due to BB&T from Reorganized Debtor that accrued during the pendency of the Bankruptcy prior to the Effective Date shall be paid to BB&T on or before the Effective Date.  Each Party at the end of each quarter during the Transition Period, and after the expiration or earlier termination of the Transition Period, shall reconcile the amounts due to the other Party as a result of any transactions entered into hereunder by a Party with the customer, prospect, tenant or unit owner of a Timeshare Interest of the other Party.  Such reconciliation shall be completed and e-mailed to the other, together with a supporting evidence, within fifteen (15) days of the end of each quarter and a check along with such reconciliation shall be sent to the other no later than thirty (30) days after the end of each quarter.

## ARTICLE XI
## REQUIRED DELIVERY OF INFORMATION

11.1    Board of Director Information.  Reorganized Debtor shall provide Trustee I with all of the same information, and on the same timeframe, as provided to members of the board of directors of each of the owners association for Liki Tiki Village I and Liki Tiki Village II (each an "HOA").  A representative of the Reorganized Debtor will meet with a representative of Trustee I to review proposed annual budgets and HOA financial information prior to mailing of the proposed annual budget (each an "HOA Budget") to the HOA members.

11.2    Reserves.  Reorganized Debtor shall provide Trustee I with a copy of any future reserve studies for each of the HOAs.

## ARTICLE XII
## ASSESSMENTS AND ASSOCIATION EXPENSES

12.1    Reorganized Debtor and Trustee I, agree that with respect to Trust I's maintenance fee and tax obligations to the HOA in accordance with the approved annual HOA Budget, to limit the contribution of Trust I to its share of the operating cash shortfall of the HOA in proportion to the Timeshare Interests Trust 1 is entitled to rent as compared to the Timeshare Interests the Reorganized Debtor is entitled to rent.

12.2    Pursuant to this agreement, for the calendar years 2011 through 2014 (but prorated on a monthly basis in the years 2011 and 2014 and limited to the months that Trust I is in existence in those years), the Reorganized Debtor agrees to make a payment (the "Trust I Adjusted Obligation Credit") to Trust I with respect to a particular HOA in accordance with the following:

(a)     Reorganized Debtor and Trustee I will each timely pay the HOA maintenance fees, inclusive of reserves, budget bad debt expenses and any deficit reduction line items assessed by the HOA (the "Full Obligation" as to each the Reorganized Debtor and Trustee I) due on their respective Timeshare Interests at Liki Tiki Village I and Liki Tiki Village II pursuant to the governing documents of the applicable HOA and the applicable HOA budget.

(b)     On a quarterly basis Trust I's Full Obligation shall be alternatively calculated (the "Trust I Adjusted Obligation") as the greater of:

1.     The "Trust I Ratable Share" (defined below) times the "Actual HOA Member Cash Operating Shortfall" (defined below) arising from the "Trust I Ratable Assessment" (defined below) but not to exceed Trust I's Full Obligation; or

2.     Trust I's Full Obligation less that portion of its maintenance fee assessment applicable to Budgeted HOA Bad Debt Expenses and any deficit reduction line items in the HOA Budget (the "Trust I Minimum Assessment").

(c)     Reorganized Debtor will remit or credit to Trust I any positive difference between the Trust I Full Obligation and the Trust I Adjusted Obligation (the "Trust I Adjusted Obligation Credit") within 30 days after the end of the quarter.

(d)     The components used in determining the Trust I Adjusted Obligation and Trust I Adjusted Obligation Credit are as follows:

1.     "Aggregate HOA Maintenance Assessment" is the aggregate maintenance fee assessment for the entire HOA as reflected in the approved HOA Budget.

2.     "Actual HOA Bad Debt Expense" is the bad debt expense as reflected on the audited HOA financial statements for the applicable calendar year.

3.     "Actual HOA Member Cash Operating Shortfall" is the HOA Cash Operating Budget minus the Actual HOA Member Collections.

4.     "Actual HOA Member Collections" is the Aggregate HOA Maintenance Assessment minus the Actual HOA Bad Debt Expense minus Trust I's Full Obligation minus Reorganized Debtor's Full Obligation.

5.     "Adjusted Uncollected Assessment" shall be equal to the Actual HOA Bad Debt Expense multiplied by the Resort Occupancy Factor.

6.     "Budgeted HOA Bad Debt Expense" is the bad debt expense line item plus any deficit reduction line item as reflected in the approved HOA Budget.

7. "Combined Ratable Basis" is the amount of Trust I Ratable Basis plus the amount of Reorganized Debtor Ratable Basis.

8. "HOA Bad Debt Experience Ratio" is a fraction, the numerator of which is the Budgeted HOA Bad Debt Expense and the denominator of which is the Aggregate HOA Maintenance Assessment.

9. "HOA Cash Operating Budget" is the amount of the Aggregate HOA Maintenance Assessment minus the amount of the Budgeted HOA Bad Debt Expense.

10. "Reorganized Debtor Ratable Basis" shall be equal to the Reorganized Debtor's Full Obligation plus the amount of the Adjusted Uncollected Assessment.

11. "Reorganized Debtor Ratable Share" is a fraction, the numerator of which is the amount of Reorganized Debtor Ratable Basis and the denominator of which is the amount of the Combined Ratable Basis.

12. "Resort Occupancy Factor" is set to seventy percent (70%).

13. "Trust I Minimum Assessment" is Trust I's Full Obligation multiplied by the quantity of 1 minus the HOA Bad Debt Expense Ratio.

14. "Trust I Ratable Assessment" is the Trust I Ratable Share multiplied by Actual HOA Member Cash Operating Shortfall.

15. "Trust I Ratable Basis" shall be equal to the Trust I's Full Obligation.

16. "Trust I Ratable Share" is a fraction, the numerator of which is the amount of Trust I Ratable Basis and the denominator of which is the amount of the Combined Ratable Basis.

(e) For the avoidance of doubt in determining the Trust I Adjusted Obligation Credit, Exhibit "A" attached hereto and incorporated herein by this reference, contains an "Trust I Adjusted Obligation Credit Calculation Worksheet" detailing the individual components and their usage in the calculation as well as an estimate for the 2011 fiscal year.

## ARTICLE XIII
## EVENTS OF DEFAULT

13.1 <u>Immediate Default by Reorganized Debtor and/or Trust I</u>. It shall be an immediate event of default for either party to violate the requirements of paragraphs 4.2, 4.3, 6.1, 6.2, 6.3, 6.4, 6.5, 6.7, 6.8, 6.9, 6.19, 9.1, 9.5, 9.6, 10.1 and 11.1; provided, however, that each Party agrees to provide written notice to the allegedly defaulting Party of the occurrence of a claimed default pursuant to this paragraph prior to pursuing any remedy pursuant to Article IX.

13.2     Curable Default by Reorganized Debtor.     Other than with respect to the provisions listed in paragraph 13.1 above, the following, if not cured within five (5) days of delivery of written notice to Reorganized Debtor:

(a)     Failure to Timely Deliver or Pay.  Failure by Reorganized Debtor to timely deliver all items, payments and documents provided for herein.

(b)     Breach of Related Documents.    Any breach by Reorganized Debtor of the terms, provisions or covenants that it or any of its Affiliates are to perform or to abstain from performing under the Resort Documents.

(c)     Violation of Affirmative Covenants.  Failure to take any and all action required by it to be taken hereunder, in the manner and within the time period specified.

(d)     Violation of Negative Covenants.    The taking of any action specifically prohibited from being taken hereunder or otherwise proscribed as provided herein.

13.3     Curable Default by Trust I.  Other than with respect to the provisions listed in paragraph 13.1 above, the following, if not cured within five (5) days of delivery of written notice to Trustee I:

(a)     Failure to Timely Deliver or Pay.   Failure by Trust I to timely deliver all items, payments and documents provided for herein.

(b)     Breach of Related Documents.    Any breach by of the terms, provisions or covenants by Trust I that Trust I is to perform or to abstain from performing under the Resort Documents.

(c)     Violation of Affirmative Covenants.  Failure to take any and all action required by it to be taken hereunder, in the manner and within the time period specified.

(d)     Violation of Negative Covenants.    The taking of any action specifically prohibited from being taken hereunder or otherwise proscribed as provided herein.

## ARTICLE XIV
## REMEDIES UPON DEFAULT

14.1     Remedies Available to Either Party.  Upon an Event of Default by either Party hereunder the non-defaulting Party shall have the following remedies within the jurisdiction of the Bankruptcy Court:

(a)     Specific Performance.    Pursue specific performance hereunder, including an action for injunction to enforce or protect the non-defaulting Party's rights hereunder, it being agreed that the ability to calculate damages for such default is in many cases incapable of being calculated.

(b)     Damages.  Action for damages to the extent the consequence of any such breach is capable of being calculated in terms of monetary damages.

(c)    General.  Any and all other actions at law and equity to enforce the provisions hereof or bring an action for damages pursuant to the beach or default by the defaulting Party.

14.2    Remedies Cumulative.  The Parties hereto agree that these remedies shall be cumulative and to the maximum extent possible.  Either Party shall have the right to pursue any and all remedies whether simultaneously or sequentially to the maximum extent provided by applicable Florida law.

14.3    No Waiver.  Any delay or failure by the non-defaulting Party to exercise its remedies as provided herein, shall not constitute a waiver or act as an estoppel against such Party of against subsequent exercise of those remedies, unless such Party has provided an explicit written waiver to the other and then only as specified and strictly limited to the basis as set forth in such written waiver.

## ARTICLE XV
## MUTUAL COOPERATION

15.1    Mutual Cooperation.  The Parties hereto and at all times subsequent to the Effective Date agree to meet the intent of this Agreement in order to allow both Parties to utilize the resort properties as provided herein subject to the covenants and restrictions intended to result in the mutual maximization of the sales, rental, use and reservation of their respective assets.

15.2    Further Assurances.  The Parties hereto agree, in furtherance of the purposes set forth herein to execute and deliver, or to cause to be executed and/or delivered, such documents and to do, or cause to be done, such other acts and things as might reasonably be requested to assure that the benefits of this Agreement to facilitate the sale, reservation and rental of their respective assets and thereby achieve the benefits of such ownership interest therein.

## ARTICLE XVI
## MISCELLANEOUS PROVISIONS

16.1    Paragraph Headings.  The paragraph headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning, content, or interpretation of such paragraphs.

16.2    Assignment.  This Agreement and the rights hereunder, may be assigned by Trustee I to any Person that markets, rents, or sells Trust I Timeshare Interests.

16.3    Binding Effect; Modification.  This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns.  The terms of this Agreement may not be changed, waived, discharged, or terminated orally, but only by an instrument or instruments in writing, signed by the Party against which enforcement of the change, waiver, discharge, or termination is asserted.

16.4    Incorporation of Recitals; Construction.  The Parties hereby mutually agree that the recitals to this Agreement are true and correct and are hereby incorporated as terms of this

Agreement. This Agreement shall not be construed more strongly against any Party regardless of which Party was more responsible for its preparation.

16.5    Counterparts. The Parties hereto hereby mutually agree that this Agreement, and the attachments hereto, may be executed in counterparts, and when so executed, all such counterparts shall constitute one and the same Agreement.

16.6    Bankruptcy Court Jurisdiction. It is specifically the intent of the Parties hereto that the Bankruptcy Court shall retain jurisdiction for the purpose of interpreting, clarifying and enforcing the provisions of this Agreement to accomplish the purposes as set forth herein.

16.7    Governing Law; Venue; Attorneys Fees. This Agreement and the transactions contemplated hereby shall be construed under, interpreted, governed and enforced in accordance with the laws of the State of Florida. Jurisdiction and venue for any dispute arising out of or relating to this Agreement shall be in the Bankruptcy Court. In the event of any action or litigation by either Party against the other arising out of or resulting from a breach or alleged breach of this Agreement, or the enforcement hereof, the prevailing Party shall be entitled to reimbursement of its costs in connection therewith, including, without limitation, reasonable attorneys' fees and expenses incurred in negotiation, at trial or on appeal.

16.8    WAIVER OF TRIAL BY JURY. ALL OF THE PARTIES HERETO, HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT ANY OF THEM MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON THIS AGREEMENT, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, OR ANY RELATED DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO, OR TO ANY RELATED DOCUMENT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT.

16.9    Severability. If any clause or provision of this Agreement is determined to be illegal, invalid or unenforceable under any present or future law by the final judgment of a court of competent jurisdiction, the remainder of this Agreement will not be affected thereby. It is the intention of the Parties that if any such provision is held to be illegal, invalid or unenforceable, there will be added in lieu thereof a provision as similar in terms to such provision as is possible and be legal, valid and enforceable.

16.10    Time. Time is of the essence of this Agreement and each provision hereof.

16.11    Notices. Notices required pursuant to any notice provision of this Agreement will be deemed to have been given with delivered personally to the Party designated to receive such notice, or on the third (3rd) business day after the same is sent by certified mail, postage and charges prepaid, or on the next business day after the same is sent by overnight delivery service (e.g., Federal Express), charges prepaid, directed to the following addresses or to such other or additional addresses as any Party might designate by written notice to the other Parties:

| To Trustee I: | Barry E. Mukamal, Trustee |
| | Marcum LLP |
| | One S.E. 3rd Avenue, 10th Floor |
| | Miami, FL 33131 |
| | |
| With a copy to: | John E. Beasley |
| | Senior Vice President |
| | Branch Banking and Trust Company |
| | Asset Resolution Group |
| | 2000 Interstate Park Drive, Suite 400 |
| | Montgomery, AL 36109 |
| | |
| With a copy to: | GrayRobinson, P.A. |
| | Attn: Frank P. Terzo, Esq. |
| | 1221 Brickell Avenue, Suite 1600 |
| | Miami, Florida 33131 |
| | |
| To Reorganized Debtor: | Island One, Inc. |
| | Island One Resorts Management Corporation |
| | Navigo Vacation Club, Inc. |
| | 8680 Commodity Circle |
| | Orlando, FL 32819 |
| | |
| With a copies to: | Baker & Hostetler, LLP |
| | Attn: Elizabeth A. Green, Esq. and |
| | Kurt P. Gruber, Esq. |
| | 200 S. Orange Avenue |
| | SunTrust Center, Suite 2300 |
| | Orlando, Florida 32801 |

16.12  No Partnership. The Parties are not joint venturers, partners, or joint owners with respect to the property which is the subject of this Agreement, and nothing contained in this Agreement shall be construed as creating a partnership, joint venture, or similar relationship between the Parties.

16.13  No Third Party Beneficiaries.  The Parties hereto agree that no provision of this Agreement or any related documents create any obligation on the part of the Parties hereto to any third parties which might have claims of any kind whatsoever against the Parties hereto. That is, no person not a Party to this Agreement will be a third-party beneficiary or acquire any rights hereunder.

[Remainder of Page Intentionally Left Blank; Signature Page To Follow]

IN WITNESS WHEREOF, the Parties have executed this Agreement effective as of the Effective Date.

**REORGANIZED DEBTOR**                    **TRUST I**

By: _____        By: _____
                                         Barry E. Mukamal, Trustee, as
    _____               Trustee of the LTV I Liquidating
    (print name)                         Trust

As its: _____

# Exhibit "A"-2

SCO Liquidating Trust Agreement

# SCO LIQUIDATING TRUST AGREEMENT

This Liquidating Trust Agreement, dated as of June ____, 2011, is established pursuant to the First Amended Joint Plan of Reorganization, as modified (the "Plan") for St. Croix One LLC ("SCO") and its affiliated chapter 11 debtors (collectively, the "Debtors"), and is accepted by the Liquidating Trustee on behalf of the Liquidating Trust beneficiaries for the purpose of liquidating the Liquidating Trust Assets, including the Debtors' Assets transferred to the Liquidating Trust on the Effective Date pursuant to the Plan, which are deemed transferred to and vested in the Liquidating Trust pursuant to the Plan, and distributing the proceeds of the Liquidating Trust Assets to the Liquidating Trust beneficiaries pursuant to the terms of the Plan.

## RECITALS:

WHEREAS, the Debtors filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court") on September 10, 2010, and their bankruptcy cases remains pending (the "Chapter 11 Cases");

WHEREAS, the Debtors filed the Plan on March 22, 2011;

WHEREAS, the Debtors filed a First Modification to the Plan on May 4, 2011;

WHEREAS, the Plan and First Modification were confirmed by the Bankruptcy Court on May ___, 2011 which contemplated the formation of the SCO Liquidating Trust Agreement and SCO Trust.

WHEREAS, pursuant to the Plan, a grantor trust is to be established for the purpose of liquidating the Liquidating Trust Assets for the benefit of the Liquidating Trust beneficiaries, who are the beneficiaries of the Liquidating Trust to be formed herein;

WHEREAS, the SCO Trust is "Trust II" as such term is referred to by the Plan;

WHEREAS, the Plan provides that, as of the Effective Date, by their execution of this Agreement, SCO shall transfer, assign and deliver all of their rights, title and interests in and to the St. Croix Real Property, the St. Croix Personal Property, the St. Croix Receivables, the SCO Claims, and such other or additional pledged by SCO in favor of BB&T Acquired Asset Group ("BB&T"), in its capacity as successor-in-interest to the rights of Colonial Bank, N.A. (collectively, the "SCO Trust Assets") to the Liquidating Trust and all such SCO Trust Assets shall vest in the SCO Trust by way of such transfer, assignment and delivery as of the Effective Date;

WHEREAS, the Plan provides that the Liquidating Trustee, not in his individual capacity, but solely as trustee of the SCO Trust for the benefit of the SCO Trust beneficiaries,

shall acquire all right, title and interest in the SCO Trust Assets for the benefit of the SCO Trust beneficiaries for the purpose of monetizing such assets and distributing the net proceeds thereof to the SCO Trust beneficiaries in accordance with the terms of the Plan and this Liquidating Trust Agreement;

WHEREAS, from and after the Effective Date, the Liquidating Trustee shall be authorized and directed, on behalf of the SCO Trust beneficiaries, to take all steps necessary to execute any documents or other instruments as may be necessary or appropriate to transfer or confirm transfer of the SCO Trust Assets to the Liquidating Trust;

WHEREAS, the Liquidating Trustee shall also manage the SCO Trust and liquidate the SCO Trust Assets for the benefit of the SCO Trust beneficiaries in accordance with the terms and conditions of the Plan and this Liquidating Trust Agreement;

WHEREAS, the net proceeds of the SCO Trust Assets are to be distributed by the Liquidating Trustee to the SCO Trust beneficiaries in accordance with the Plan, applicable law and this Liquidating Trust Agreement;

WHEREAS, the following individual has agreed to serve as the Liquidating Trustee in accordance with the terms of this Liquidating Trust Agreement and the Plan:

> Barry E. Mukamal, C.P.A.
> Marcum Rachlin LLP
> 1 S. E. 3rd Avenue, 10th Floor
> Miami, FL, 33131

WHEREAS, the Liquidating Trustee and SCO wish to form the SCO Trust in accordance with the Plan; and

WHEREAS, the SCO Trust created by this Agreement is (i) a distinct legal entity from the Debtors, each of which shall have no liability whatsoever for any obligations of the SCO Trust pursuant to the Plan, this Agreement or otherwise, and is intended to (i) qualify as a trust governed and construed in all respects as a liquidating trust pursuant to Treas. Reg. §301.7701-4(d) of the United States Treasury Regulations and as a grantor trust in favor of the SCO Trust beneficiaries pursuant to Treas. Reg. §1.671-4(a); and (ii) comply with the requirements of a liquidating trust, which is a grantor trust, as set forth in Revenue Procedure 94-45, 1994-2 C.B. 684.

NOW, THEREFORE, in consideration of the recitals and promises set forth herein, and in exchange for other good and valuable consideration, the receipt and sufficiency of which is hereby mutually acknowledged, the parties hereto agree as follows:

1. <u>Definitions</u>. When used in this Liquidating Trust Agreement, unless otherwise defined herein, capitalized terms shall have the meanings set forth in the Plan.

2.  Creation of the Trust.

(a)  Purpose of the Trust.  The Liquidating Trustee and SCO, in compliance
with the Plan, hereby constitute and create the SCO Trust for the purpose of: (i) receiving the
SCO Trusts Assets; (ii) holding, administering, managing and effecting an orderly liquidation of
the SCO Trust Assets for the benefit of the SCO Trust beneficiaries and in accordance with the
terms of this Agreement and the Plan; and (iii) distributing to the SCO Trust beneficiaries the net
proceeds of the SCO Trust Assets in accordance with the terms of the Plan and applicable law.
The SCO Trust shall be a grantor trust, and the SCO Trust beneficiaries shall be the grantors.
The SCO Trust shall only engage in the business activities contemplated by this Agreement and
as authorized by a majority (in terms of dollar amount of Allowed Claims, not in terms of
number of claim holders) of the SCO Trust beneficiaries.

(b)  SCO Trust Assets.  As of the Effective Date, without further act or deed
by the Debtors, their estates, or order of the Bankruptcy Court (unless the Liquidating Trustee
believes a separate conveyance document is necessary or advisable), the SCO Trust Assets shall
be deemed transferred by the Debtors, on behalf of all SCO Trust beneficiaries, to and vested in,
the Liquidating Trust.  The Liquidating Trustee agrees that these assets and their net proceeds
shall be held by him in trust under this Liquidating Trust Agreement.  From and after the
Effective Date, the Liquidating Trustee shall be authorized and directed, on behalf of the SCO
Trust beneficiaries, to take all steps necessary and to execute any documents or other instruments
as may be necessary or appropriate to transfer or confirm the transfer of the Liquidating Trusts
Assets to the Liquidating Trust.  A bond shall be posted in favor of the SCO Trust beneficiaries
to secure the SCO Trust Assets in an amount of $250,000.  The Liquidating Trustee in
consultation with the Liquidating Trust's beneficiaries shall review the bonding requirement
contained herein quarterly based on historical disbursements.

(c)  Appointment of Liquidating Trustee.  Barry E. Mukamal has agreed to
serve as Liquidating Trustee and to assume the rights, powers and duties of the Liquidating
Trustee hereunder, subject to the conditions set forth herein and in the Plan.

(d)  Acceptance by Trustee.  The Liquidating Trustee is willing and does
hereby accept the appointment to serve, prosecute, hold and administer the SCO Trust Assets and
to carry out each of his duties under this Liquidating Trust Agreement.

(e)  Name of Trust.  The SCO Trust shall bear the name "SCO Trust
Liquidating Trust."  In connection with the exercise of his powers, the Liquidating Trustee may
use his name or such variation thereof as he sees fit.

3.  Rights, Powers and Duties of Trustee.

(a)  Declaration Acknowledging Beneficial Interest.  The Liquidating Trustee
hereby acknowledges that, after the Effective Date, the SCO Trust beneficiaries, and their

successors and assigns, will have and hold the beneficial interests in the SCO Trust Assets. The Liquidating Trustee agrees to give such notices to the SCO Trust beneficiaries as may be necessary or appropriate in accordance with applicable law and this Agreement.

(b)   General Powers. The duties of the Liquidating Trustee shall be governed solely by the terms of this Agreement and the Plan, and may only be modified with the consent of the majority (in terms of dollar amount of Allowed Claims, not in terms of number of claim holders) of the SCO Trust beneficiaries. Except as otherwise provided in the Plan and this Agreement, immediately upon the Effective Date, the Liquidating Trustee shall have the power to perform the acts necessary to fulfill his obligations to the SCO Trust and to the SCO Trust beneficiaries, under the terms of the Plan and this Agreement, including without limitation: (i) to perfect and secure the right, title, and interest of the SCO Trust in the SCO Trust Assets; (ii) to reduce all SCO Trust Assets to the possession of the SCO Trust and to hold the same; (iii) to manage and protect the SCO Trust Assets pending their prosecution or sale and conversion into Cash; (iv) to pay and discharge any costs, expenses, Liquidating Trustee's fees or obligations deemed necessary to preserve the SCO Trust Assets or any part thereof or to preserve the Liquidating Trust; (v) to employ such professionals, including without limitation, attorneys, accountants, engineers, agents, real estate brokers, and tax specialists, and such other consultants and independent contractors, as may be deemed necessary, and pay from the liquidation proceeds the reasonable costs and expenses of such persons -- the Liquidating Trustee shall be entitled to hire professionals of his choosing, notwithstanding that the Liquidating Trustee may be a partner or associate of, or otherwise affiliated with, a particular firm to be retained; (vi) to sue and be sued and to settle, compromise or adjust by mediation, arbitration or otherwise any disputes, claims, or controversies in favor of or against the Liquidating Trust; (vii) to prepare and file tax returns and other filings on behalf of the Liquidating Trust, the Debtors and any corporations for whom the Liquidating Trustee has responsibility; (viii) to release, convey or assign any right, title or interest in or about the SCO Trust Assets; (ix) to sell and otherwise convert the SCO Trust Assets into Cash and to maintain the Cash proceeds of such sales in demand and short term deposits in any federal insured bank until such time as said funds are distributed as specified under the Plan and this Agreement; (x) to authorize and make distributions to Holders of Allowed Claims as described under the Plan and this Agreement; (xi) to take any other action reasonably necessary to cause the liquidation of all of the SCO Trust Assets to Cash pursuant to the Plan, or to abandon any assets deemed burdensome or of inconsequential value to the Liquidating Trust; (xii) to institute on behalf of the SCO Trust any objections to Claims, proceedings to estimate Claims, or the filing of Causes of Action which could be brought by a trustee or debtor in possession under the Bankruptcy Code; (xiii) pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, to prosecute any Causes of Action, and to commence or continue, in any appropriate court or tribunal, any suit or other proceeding for the enforcement of such Causes of Action, and if deemed appropriate by the Liquidating Trustee, to compromise or settle such litigation in accordance with this Agreement; (xiv) to seek entry of a final decree closing the Chapter 11 Cases at the appropriate time upon the full administration of the SCO Trust and payment of the final distribution pursuant to the terms of the Plan; (xv) to pay any fees to or file any reports with the United States Trustee, without further order of the Bankruptcy Court; (xvi) pending transfer of the SCO Trust Assets to the Liquidating Trust, and subject to

any necessary regulatory approvals and/or servicing consents, the Liquidating Trustee, in his sole discretion, may take actions as are necessary to protect the Liquidating Trust's interests pursuant to the terms of this Agreement.

(c)     Specific Powers Reserved for the Liquidating Trustee.  The following rights are vested in the Liquidating Trustee in addition to those rights which may also be provided under the Plan, this Agreement or as otherwise modified, from time to time:

(i)     In connection with the sales, marketing and rental of SCO Trust Assets, either:

a.     Negotiate and execute an agreement with the Reorganized Debtor pursuant to which the SCO Trust Assets (provided such timeshare interests are subject to multisite timeshare plan known as Club Navigo) will be mutually marketed, sold and rented under mutually acceptable terms and conditions (the "Mutual Distribution Agreement"); or

b.     As an alternative to the Mutual Distribution Agreement, negotiate and execute exclusive or semi-exclusive sales and marketing or rental agreements with one or more timeshare sales, marketing or rental companies (each a "Third Party Timeshare or Real Estate Company") providing such services to market, sell or rent the SCO Trust Assets.

(ii)     Liquidating Trustee may negotiate and execute an agreement or agreements with one or more buyers for the purchase and sale of the SCO Trust Assets.

(iii)     Liquidating Trustee shall have the right, with the approval of BB&T, to file a notice in the Public Records to terminate the multisite timeshare plan known as Club Navigo as to the SCO Trust Assets only and on a go forward basis only and to provide for the right to include, all or any portion of the SCO Trust Assets in another multisite timeshare plan or reservation system.

(iv)     After an agreed upon transition period, Liquidating Trustee shall have the right to procure services from providers of its choice related to the billing, servicing and collecting of receivables obtained in connection with the financing of sales to consumers of the SCO Trust Assets, if applicable.

4.     Compensation of Liquidating Trustee and Professionals.  The Liquidating Trustee shall be compensated at a fee equal to the greater of (i) 1.75% of the net distribution to the SCO Trust beneficiaries (not including distributions to professionals or the Liquidating Trustee) and (ii) the Liquidating Trustee's prevailing standard hourly rate, less a 20% courtesy discount, plus the reimbursement of his actual and necessary out-of-pocket expenses.  No more frequently than once every 30 days, the Liquidating Trustee shall serve his statement(s) for services rendered and expenses incurred upon the majority holder (in terms of dollar amount of Allowed Claims, not in terms of number of claim holders) of the SCO Trust beneficiaries.  The statements do not need to

conform to the U.S. Trustee's guidelines for fee applications, but must contain adequate information to enable parties in interest to review the reasonableness of the statements. Any objection must be served on the Liquidating Trustee and his counsel within fifteen (15) days from receipt. Notwithstanding whether BB&T objects to a fee request, its right to fund deficits remains discretionary. The Bankruptcy Court shall retain jurisdiction to adjudicate any dispute with respect to such statements or the Liquidating Trustee's compensation request.

The Liquidating Trustee may retain such professionals, and other consultants or independent contractors, as he deems appropriate without Order of the Bankruptcy Court. No more frequently that once every 30 days, the Liquidating Trustee's counsel and any other professional retained by the Liquidating Trustee shall submit his, her or its statement(s) for services rendered and costs incurred to the Liquidating Trustee for review and approval. The statements do not need to conform to the U.S. Trustee's guidelines for fee applications, but must contain adequate information to enable the Liquidating Trustee to review the reasonableness of the statements. The Liquidating Trustee shall have 10 days to object to any such statement. If no objection is timely served upon the professional in respect of any such statement, then the Liquidating Trustee shall promptly serve such statements of the fees and costs to BB&T. The Bankruptcy Court shall retain jurisdiction to adjudicate any dispute with respect to such statements or any professional's compensation request.

5.    SCO Trust Expenses.  In accordance with the Plan, BB&T may fund any operational deficits, including those arising out of fees and costs incurred by the Liquidating Trustee and his professionals. To the extent of such funding, BB&T shall receive a Superpriority claim against the SCO Trust and the SCO Trust Assets for any such protective advance.

6.    SCO Trust Distributions.  The Liquidating Trustee, subject to Bankruptcy Court approval where appropriate, shall deposit the Cash proceeds of the SCO Trust Assets at a depository institution listed as an approved institution of the United States Trustee for the Middle District of Florida. In his sole and absolute discretion, the Liquidating Trustee may make initial and subsequent interim distributions to the Holders of Allowed Secured Claims entitled to distributions from the SCO Trust Assets under the Plan first and then, once the Holders of such Allowed Secured Claims have been paid in full, to the Unsecured Creditor Trust, consistent with the terms of the Plan, from the net proceeds of the liquidation of the SCO Trust Assets, after payment of all SCO Trust expenses. The Liquidating Trustee shall use his continuing best efforts to dispose of the SCO Trust Assets, make timely distributions, and shall not unduly prolong the duration of the Liquidating Trust.    Upon the termination of the Liquidating Trust, the Liquidating Trustee shall make a final distribution to Holders of Allowed Secured Claims entitled to distributions from the SCO Trust Assets under the Plan first and then, once the Holders of such Allowed Secured Claims have been paid in full, to the Unsecured Creditor Trust, of all remaining SCO Trust Assets after payment in full of the outstanding SCO Trust Expenses. Upon payment in full of any Allowed Claim held by a SCO Trust beneficiary, the Holder of such Claim shall no longer have any claim, lien, encumbrance, or interest in the SCO Trust Assets or be a beneficiary of the SCO Trust with respect to such paid Claim.

7.    Tax Returns and Payments.  The transfer of the Debtors' Assets to the SCO Trust shall be treated for all purposes of the Internal Revenue Code, as amended, as a deemed transfer to the SCO Trust beneficiaries by the Debtors' Estates, followed by a deemed transfer by the SCO Trust beneficiaries to the Liquidating Trust.  At the time of the deemed transfer, each of the SCO Trust beneficiaries will recognize a taxable gain or loss to the extent that the fair market value of the SCO Trust Assets that the SCO Trust beneficiaries are deemed to receive is greater than, or less than, the SCO Trust beneficiaries' tax basis in such assets.  The Liquidating Trustee shall value the SCO Trust Assets without the approval of the Bankruptcy Court at the time the Assets are transferred to the Liquidating Trust, and the Liquidating Trustee and the SCO Trust beneficiaries agree that they shall treat such valuation as controlling and use it consistently for all federal and state tax purposes, unless required to use a different valuation by a federal or state agency.  The SCO Trust beneficiaries shall be treated as the grantors and deemed owners of the SCO Trust Assets that they are deemed to transfer to the SCO Trust subject to the terms of the Plan governing distributions.

Each SCO Trust beneficiary shall be provided with IRS 1099 or W-9 forms by the Liquidating Trustee.  Each SCO Trust beneficiary shall be required, before any distribution of net proceeds of the SCO Trust Assets is made to such beneficiary, to return to the Liquidating Trustee executed IRS 1099 or W-9 forms, or such other appropriate taxpayer identification information necessary to allow the Liquidating Trustee to file the appropriate tax return on behalf of the Liquidating Trust.  If a SCO Trust beneficiary fails to return to the Liquidating Trustee any requested taxpayer identification information within 60 days after a request for this information, this failure shall be deemed a waiver of all claims against the Liquidating Trust, including the right to distributions, and the funds that would otherwise have been distributed to such beneficiary shall revert to the SCO Trust to be distributed to other beneficiaries who have provided the requested taxpayer identification information.

The responsibilities of the Liquidating Trustee shall include the filing of an annual grantor trust return and providing the SCO Trust beneficiaries with valuations used by the Liquidating Trustee with regard to the trust *res*.  The SCO Trust beneficiaries shall be responsible for the payment of taxes in connection with any distributions from the SCO Trust Assets made by the Liquidating Trustee to such claimants as beneficiaries of the Liquidating Trust.  Whether or not the Liquidating Trustee establishes reserves to pay future expenses, all SCO Trust income shall be treated as subject to tax on a current basis.  The Liquidating Trustee shall allocate to the SCO Trust income for each taxable year among the SCO Trust beneficiaries in accordance with their respective interests in the Liquidating Trust, as determined from time to time by the Liquidating Trustee, and the SCO Trust beneficiaries shall be responsible for any tax liability that results from such income.

8.    SCO Trust Reporting.  The Liquidating Trustee shall keep an accounting of receipts and disbursements, and shall provide to any beneficiary that requests such information, at least every 120 days, a summary of receipts and disbursements of the Liquidating Trust.  Each such summary shall identify receipts and disbursements in reasonable detail, and shall identify

the source of all receipts and the recipients of all disbursements. As soon as practicable after termination of the Liquidating Trust, the Liquidating Trustee shall provide to SCO Trust beneficiaries and the U.S. Trustee, and file with the Bankruptcy Court, a final account and report of SCO Trust administration.

9. <u>Limitations on Powers of Liquidating Trustee</u>. The Liquidating Trustee shall only engage in business activity related to the SCO Trust Assets and for the purpose of maximizing the value of the SCO Trust Assets and as otherwise contemplated hereunder. Actions taken by the Liquidating Trustee to defend and pursue claims or Causes of Action held as SCO Trust Assets shall be deemed consistent with such liquidating purpose. In addition., actions taken to collect the SCO Receivables and dispose of any SCO Trust Assets shall also be consistent with such purpose. The Liquidating Trustee's authority to invest the SCO Trust Assets pending distribution shall be limited to demand and time deposits in banks or savings institutions, or other temporary, liquid investments such as short-term certificates of deposit or treasury bills.

10. <u>Limitations of Liability of Liquidating Trustee</u>. Except in the case of fraud, willful misconduct, bad faith or gross negligence, the Liquidating Trustee shall not be liable for any loss or damage by reason of any action taken or omitted by him, or for any act or omission made in reliance upon the books and records of the SCO Trust or upon information or advice given by his professionals; <u>provided, however,</u> that nothing herein or in the Plan shall relieve the Liquidating Trustee from his duty and responsibility to liquidate the SCO Trust Assets and make the distributions required under this Agreement and the Plan. The Liquidating Trustee is required to furnish a bond as more fully described by Section 2(b). In addition, the Liquidating Trustee shall be indemnified by and receive reimbursement from the SCO Trust Assets against and on account of any and all loss, liability, expense or damage which he may incur or sustain, without fraud, willful misconduct, bad faith or gross negligence, in the exercise and performance of any of his powers and duties hereunder. In the absence of fraud, willful misconduct, bad faith or gross negligence, the Liquidating Trustee may rely, and shall be fully protected personally in acting, upon any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document that he has no reason to believe to be other than genuine and to have been signed or presented other than by the proper party or parties or, in the case of facsimile transmissions, to have been sent other than by the proper party or parties, in each case without obligation to satisfy himself that the same was given in good faith and without responsibility for errors in delivery, transmission or receipt. The obligation of the Liquidating Trustee to hold the SCO Trust Assets in trust for the SCO Trust beneficiaries in accordance with the Liquidating Trust Agreement and to make the distributions mandated herein shall not be deemed to be SCO Trust liabilities. The Liquidating Trustee may at any time seek instructions from the Bankruptcy Court concerning the acquisition, management or disposition of the Cash and/or other property held by the Liquidating Trust.

11. <u>Liquidating Trustee not Personally Liable</u>. Persons dealing with the Liquidating Trustee shall look only to the SCO Trust to satisfy any liability incurred by the Liquidating Trustee to such Person in carrying out the terms of this Liquidating Trust, and the Liquidating Trustee shall have no personal or individual obligation to satisfy any such liability.

12.     Rights, Powers and Duties of SCO Trust Beneficiaries.   Each SCO Trust beneficiary shall hold a percentage beneficial interest in the SCO Trust Assets equal to his, her or its Pro Rata share in the Available Cash and proceeds from the liquidation of the SCO Trust Assets pursuant to the terms of the Plan.   Each Holder of a Disputed Claim or Pending Claim shall receive a distribution from Available Cash only when and to the extent that any such Disputed Claim or Pending Claim becomes an Allowed Claim.   The SCO Trust beneficiaries' interest in the SCO Trust Assets may be transferred or assigned.   Ownership of a beneficial interest hereunder shall not entitle any SCO Trust beneficiary to any title in or to the SCO Trust Assets as such, or to any right to prosecute or liquidate individually the SCO Trust Assets.

13.     Liquidating Trustee's Right of Access to Information.   The Debtors and the Reorganized Debtor agree that the Liquidating Trustee shall be granted reasonable access to all books, records and other financial or operational information relative to the SCO Trust Assets. Such access includes electronically stored information and files maintained relative to the SCO Assets.

14.     Notice. Any consent, certificate, notification, demand, instruction or notice whatsoever, to be sent by any of the parties hereto, pursuant to the terms hereof, shall be in writing and signed by the party executing such consent, certificate, notification, demand, instruction or notice, and shall be delivered or sent by U.S. mail and e-mail to the following:

> Counsel to BB&T:
>
> Frank P. Terzo, Esq.
> GrayRobinson, P.A.
> 1221 Brickell Avenue
> Miami, Florida 33131
> Frank.Terzo@gray-robinson.com
>
>          -and-
>
> Liquidating Trustee:
>
> Barry E. Mukamal
> MarcumRachlin LLP
> 1 S. E. 3rd Avenue, 10th Floor
> Miami, FL, 33131
> barry.mukamal@marcumrachlin.com

or such other address as either party hereto may specify in a notice to the other.  For purpose of this Liquidating Trust Agreement, consents, certificates, notifications, demands, instructions and notices shall be deemed to be effective when actually received.

15.     Resignation and Removal of Liquidating Trustee.  The Liquidating Trustee may resign and be discharged of his responsibilities created under this Agreement by giving 30 days' prior written notice to the SCO Trust beneficiaries and filing such notice with the Bankruptcy Court.  In addition, the Liquidating Trustee may be removed by a vote of the majority (in terms of dollar amount of Allowed Claims, not in terms of number of claim holders) of SCO Trust beneficiaries, and subject to Bankruptcy Court approval.  The U.S. Trustee may, by motion filed with the Bankruptcy Court, also seek removal of the Liquidating Trustee for cause and upon notice and a hearing.  In the event of the resignation or removal of the Liquidating Trustee, a successor trustee shall be appointed upon a vote of the majority (in terms of amount of Allowed Claims, not in terms of number of claim holders) of SCO Trust beneficiaries.  The resignation or removal of the Liquidating Trustee shall not be effective, unless otherwise ordered by the Bankruptcy Court, until a successor Liquidating Trustee has been elected and accepts such appointment.  The Liquidating Trustee shall be entitled to payment of any unpaid compensation and unreimbursed expenses upon resignation or removal.  The rights, duties and powers of any successor trustee shall be governed by the Liquidating Trust Agreement.  No successor trustee shall be liable for any act or omission of any previous trustee.

16.     SCO Trust Termination.  Upon full administration of the SCO Trust Assets, and the satisfaction as far as possible of all remaining liabilities of the Liquidating Trust, in accordance with the Plan, the Liquidating Trustee, subject to Bankruptcy Court approval, shall: (i) terminate the Liquidating Trust, by filing written notice of termination with the Bankruptcy Court and providing such notice to the SCO Trust beneficiaries and the U.S. Trustee; and (ii) thereupon be forever discharged of and released from all power, duties and responsibilities under this Agreement and the Plan.  Every effort shall be made to effectuate such termination no later than the time reasonably necessary to accomplish the Liquidating Trust's purpose of liquidating the SCO Trust Assets and distributing the proceeds thereof to the SCO Trust beneficiaries in accordance with this Agreement and the Plan, and in no event shall the SCO Trust continue for more than five (5) years after the Effective Date without further order of the Bankruptcy Court.

17.     Court Approval.  The Liquidating Trustee upon consultation with BB&T shall file a motion with the Bankruptcy Court, if necessary,  and serve the motion upon the Office of the U.S. Trustee, by United States mail, whenever he intends to sell or otherwise dispose of any of the SCO Trust Assets or settle claims or controversies relating to SCO Trust Assets, including any Causes of Action, if the action involves a sale, claim or controversy which has a face value in the aggregate of $100,000 or more.   Such actions shall be subject to approval by the Bankruptcy Court.  The motion for Court approval shall describe with reasonable particularity the action proposed to be taken and why such action is in the best interests of the Trust II beneficiaries.  Nothing herein shall restrict the Liquidating Trustee's right to submit any other matter regarding the Liquidating Trust, the SCO Trust Assets or the Chapter 11 Cases for Court approval, in his sole discretion, consistent with the Bankruptcy Court's retained jurisdiction.

18.     Objections to Actions by Liquidating Trustee.  With respect to proposed actions by the Liquidating Trustee that are submitted by motion for Bankruptcy Court approval, pursuant to the Plan or otherwise, any party in interest seeking to object to any such proposed action must

follow the procedures set forth in the Local Rules of the Bankruptcy Court. In the event any party in interest objects to any other action proposed to be taken by the Liquidating Trustee, such party shall: (i) file an objection with the Bankruptcy Court; (ii) request a hearing from the Bankruptcy Court; and (iii) serve a copy of the objection and notice of hearing on the Liquidating Trustee and the U.S. Trustee, so as to be received no later than 10 days after the Liquidating Trustee gives notice of such proposed action. If no timely objection is made in strict compliance herewith, the Liquidating Trustee shall be deemed authorized to take such proposed action without further notice or order of the Bankruptcy Court.

19. <u>Conflicting Claims to Liquidating Trust</u>. In the event that the Liquidating Trustee becomes aware of any disagreement or conflicting claims with respect to the SCO Trust Assets, or if the Liquidating Trustee, in good faith, is in doubt as to any action which should be taken under this Agreement, the Liquidating Trustee shall have the right, at his discretion, to withhold performance under this Agreement until such conflict is resolved, he receives direction from the Liquidating Trust, he files a suit in the Bankruptcy Court, or other court or tribunal of competent jurisdiction, to obtain an order requiring all persons involved to litigate their respective claims to the SCO Trust Assets, and/or he files any other appropriate request for relief before the Bankruptcy Court, or other court or tribunal of competent jurisdiction.

20. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall constitute an original but all of which, when taken together, shall constitute but one agreement. This Agreement shall be deemed to be effective when counterparts which, when taken together, bear the signatures of all the parties hereto have been delivered to the Proponents.

21. <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, except as limited by the terms herein.

22. <u>Conflicts with Plan</u>. Notwithstanding any provision in this Agreement to the contrary, to the extent that the terms of this Agreement are inconsistent with the terms of the Plan, the terms of this Agreement shall control.

23. <u>Amendment to Agreement</u>. This Agreement may only be amended, altered or modified with the express written consent of the majority (in terms of amount of Allowed Claims, not in terms of number of claim holders) of the SCO Trust beneficiaries.

24. <u>Governing Law; Entire Agreement</u>. This Agreement shall be construed in accordance with and governed by the laws of the State of Florida, without reference to any conflict of laws principles, and may not be waived, modified or amended to any extent except by a writing signed by the party against which such waiver, modification or amendment is sought to be enforced and approved by the Bankruptcy Court. The Liquidating Trustee shall be deemed to have no notice of, or duties with respect to, any agreement or agreements with respect to the Liquidating Trust, or funds therein other than as set forth in this Agreement and the Plan. This

Agreement and the Plan to which it is subject set forth the entire agreement between the parties hereto. Notwithstanding any provision to the contrary contained in any other agreement (excluding any subsequent waiver, modification or amendment to this Agreement) between the parties hereto, the Liquidating Trustee shall have no interest in the SCO Trust or funds therein except as provided in this Agreement and the Plan. In the event that any of the terms and provisions of any other agreement (excluding the Plan or any subsequent waiver, amendment or modification to this Agreement) between the parties hereto, conflict or are inconsistent with any of the terms and provisions of this Agreement, the terms and provisions of this Agreement shall govern and control in all respects.

Dated: May _____, 2011

LIQUIDATING TRUSTEE, on behalf of the
SCO TRUST BENEFICIARIES and not
Individually,


By: _____
      Barry E. Mukamal

ST. CROIX ONE, LCC


By: _____
      Deborah Linden
      as Chief Executive Officer

\3510 21\4 - # 483794 v1

# Exhibit "A"-3

LTV I Liquidating Trust Agreement

# LTV I LIQUIDATING TRUST AGREEMENT

This Liquidating Trust Agreement, dated as of June _____, 2011 (the "Effective Date"), is established pursuant to the First Amended Joint Plan of Reorganization, as modified (the "Plan") for Island One, Inc. and its affiliated chapter 11 debtors (collectively, the "Debtors"), and is accepted by the Liquidating Trustee on behalf of the LTV Trust beneficiaries for the purpose of liquidating the LTV Trust Assets transferred by the Debtors to the LTV Trust on the Effective Date pursuant to the Plan, which are deemed transferred to and vested in the Liquidating Trust pursuant to the Plan, and distributing the proceeds of the LTV Trust Assets to the LTV Trust beneficiaries pursuant to the terms of the Plan.

## RECITALS:

WHEREAS, the Debtors filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court") on September 10, 2010, and their bankruptcy cases remains pending (the "Chapter 11 Cases");

WHEREAS, the Debtors filed the Plan on March 22, 2011;

WHEREAS, the Debtors filed a First Modification to the Plan on May 4, 2011;

WHEREAS, the Plan and First Modification were confirmed by the Bankruptcy Court on May ___, 2011 which contemplated the formation of the LTV I Liquidating Trust Agreement and LTV Trust.

WHEREAS, pursuant to the Plan, a grantor trust is to be established for the purpose of liquidating the LTV Trust Assets for the benefit of the Liquidating Trust beneficiaries, who are the beneficiaries of the LTV Trust to be formed herein;

WHEREAS, the LTV Trust is "Trust I" as such term is referred to by the Plan;

WHEREAS, the Plan provides that, as of the Effective Date, by their execution of this Agreement, the Debtors shall transfer, assign and deliver all of their rights, title and interests in and to the BB&T Timeshare Interests, LTV 1400, the Sales Center, and the Barefoot'n II Property (collectively, the "LTV Trust Assets") for the benefit of Branch Banking and Trust Company, a North Carolina corporation, as successor-in-interest to Colonial Bank, its successors and assigns ("BB&T") to the LTV Trust and all such LTV Trust Assets shall vest in the LTV Trust by way of such transfer, assignment and delivery as of the Effective Date;

WHEREAS, the Plan provides that the Liquidating Trustee, not in his individual capacity, but solely as trustee of the LTV Trust for the benefit of the LTV Trust beneficiaries, shall acquire all right, title and interest in the LTV Trust Assets for the benefit of the LTV Liquidating Trust beneficiaries for the purpose of monetizing such assets and distributing the net proceeds thereof to the LTV Trust beneficiaries in accordance with the terms of the Plan and this LTV Agreement;

WHEREAS, from and after the Effective Date, the Liquidating Trustee shall be authorized and directed, on behalf of the LTV Trust beneficiaries, to take all steps necessary to execute any documents or other instruments as may be necessary or appropriate to transfer or confirm transfer of the LTV Trust Assets to the LTV Trust;

WHEREAS, the Liquidating Trustee shall also manage the LTV Trust and liquidate the LTV Trust Assets for the benefit of the LTV Trust beneficiaries in accordance with the terms and conditions of the Plan and this Liquidating Trust Agreement;

WHEREAS, the net proceeds of the LTV Trust Assets are to be distributed by the Liquidating Trustee to the LTV Trust beneficiaries in accordance with the Plan, applicable law and this Liquidating Trust Agreement;

WHEREAS, the following individual has agreed to serve as the Liquidating Trustee in accordance with the terms of this Liquidating Trust Agreement and the Plan:

> Barry E. Mukamal, C.P.A.
> Marcum Rachlin LLP
> 1 S. E. 3rd Avenue, 10th Floor
> Miami, FL, 33131

WHEREAS, the Liquidating Trustee and the Debtors wish to form the LTV Trust in accordance with the Plan; and

WHEREAS, the LTV Trust created by this Agreement is (i) a distinct legal entity from the Debtors, each of which shall have no liability whatsoever for any obligations of the LTV Trust pursuant to the Plan, this Agreement or otherwise, and is intended to (i) qualify as a trust governed and construed in all respects as a liquidating trust pursuant to Treas. Reg. §301.7701-4(d) of the United States Treasury Regulations and as a grantor trust in favor of the LTV Trust beneficiaries pursuant to Treas. Reg. §1.671-4(a); and (ii) comply with the requirements of a liquidating trust, which is a grantor trust, as set forth in Revenue Procedure 94-45, 1994-2 C.B. 684.

NOW, THEREFORE, in consideration of the recitals and promises set forth herein, and in exchange for other good and valuable consideration, the receipt and sufficiency of which is hereby mutually acknowledged, the parties hereto agree as follows:

1.    <u>Definitions</u>.  When used in this Liquidating Trust Agreement, unless otherwise defined herein, capitalized terms shall have the meanings set forth in the Plan.

2.    <u>Creation of the Trust</u>.

(a)    <u>Purpose of the Trust</u>.  The Liquidating Trustee and the Debtors, in compliance with the Plan, hereby constitute and create the LTV Trust for the purpose of: (i) receiving the LTV Trusts Assets; (ii) holding, administering, managing and effecting an orderly

liquidation of the LTV Trust Assets, for the benefit of the LTV Trust beneficiaries and in accordance with the terms of this Agreement and the Plan, through the Liquidating Trustee; and (iii) distributing to the LTV Trust beneficiaries the net proceeds of the LTV Trust Assets in accordance with the terms of the Plan. The LTV Trust shall be a grantor trust, and the LTV Trust beneficiaries shall be the grantors. The LTV Trust shall only engage in the business activities contemplated by this Agreement.

(b)  <u>LTV Trust Assets</u>. As of the Effective Date, without further act or deed by the Debtors or their estates or order of the Bankruptcy Court, the LTV Trust Assets shall be deemed transferred by the Debtors, on behalf of all LTV Trust beneficiaries, and vested in, the Liquidating Trust. The Liquidating Trustee agrees that these assets and their net proceeds shall be held by him in trust under this Liquidating Trust Agreement. From and after the Effective Date, the Liquidating Trustee shall be authorized and directed, on behalf of the LTV Trust beneficiaries, to take all steps necessary and to execute any documents or other instruments as may be necessary or appropriate to transfer or confirm the transfer of the Liquidating Trusts Assets to the Liquidating Trust. A bond shall be posted in favor of the LTV Trust beneficiaries to secure the LTV Trust Assets in an amount of $1.0 million. The Liquidating Trustee in consultation with the Liquidating Trust's beneficiaries shall review the bonding requirement contained herein quarterly based on historical disbursements.

(c)  <u>Appointment of Liquidating Trustee</u>. Barry E. Mukamal has agreed to serve as Liquidating Trustee and to assume the rights, powers and duties of the Liquidating Trustee hereunder, subject to the conditions set forth herein and in the Plan.

(d)  <u>Acceptance by Trustee</u>. The Liquidating Trustee is willing and does hereby accept the appointment to serve, prosecute, hold and administer the LTV Trust Assets and to carry out each of his duties under this Liquidating Trust Agreement.

(e)  <u>Name of Trust</u>. The LTV Trust shall bear the name "LTV I Liquidating Trust." In connection with the exercise of his powers, the Liquidating Trustee may use his name or such variation thereof as he sees fit.

3.  <u>Rights, Powers and Duties of Trustee</u>.

(a)  <u>Declaration Acknowledging Beneficial Interest</u>. The Liquidating Trustee hereby acknowledges that, after the Effective Date, the LTV Trust beneficiaries, and their successors and assigns, will have and hold the beneficial interests in the LTV Trust Assets. The Liquidating Trustee agrees to give such notices to the LTV Trust beneficiaries as may be necessary or appropriate in accordance with applicable law and this Agreement.

(b)  <u>General Powers</u>. The duties of the Liquidating Trustee shall be governed solely by the terms of this Agreement and the Plan, and may only be modified with the consent of the majority (in terms of amount of Allowed Claims, not in terms of number of claim holders) approval of the LTV Trust beneficiaries. Except as otherwise provided in the Plan and this Agreement, immediately upon the Effective Date, the Liquidating Trustee shall have the power to perform the acts necessary to fulfill his obligations to the LTV Trust and to the LTV Trust

beneficiaries, under the terms of the Plan and this Agreement, including without limitation: (i) to perfect and secure the right, title, and interest of the LTV Trust in the LTV Trust Assets; (ii) to reduce all LTV Trust Assets to the possession of the LTV Trust and to hold the same; (iii) to manage and protect the LTV Trust Assets pending their prosecution or sale and conversion into Cash; (iv) to pay and discharge any costs, expenses, Liquidating Trustee's fees or obligations deemed necessary to preserve the LTV Trust Assets or any part thereof or to preserve the Liquidating Trust; (v) to employ such professionals, including without limitation, attorneys, accountants, engineers, agents, real estate brokers, and tax specialists, and such other consultants and independent contractors, as may be deemed necessary, and pay from the liquidation proceeds the reasonable costs and expenses of such persons -- the Liquidating Trustee shall be entitled to hire professionals of his choosing, notwithstanding that the Liquidating Trustee may be a partner or associate of, or otherwise affiliated with, a particular firm to be retained; (vi) to sue and be sued and to settle, compromise or adjust by mediation, arbitration or otherwise any disputes, claims, or controversies in favor of or against the Liquidating Trust; (vii) to prepare and file tax returns and other filings on behalf of the Liquidating Trust, the Debtors and any corporations for whom the Liquidating Trustee has responsibility; (viii) to release, convey or assign any right, title or interest in or about the LTV Trust Assets; (ix) to sell and otherwise convert the LTV Trust Assets into Cash and to maintain the Cash proceeds of such sales in demand and short term deposits in any federal insured bank until such time as said funds are distributed as specified under the Plan and this Agreement; (x) to authorize and make distributions to Holders of Allowed Claims as described under the Plan and this Agreement; (xi) to take any other action reasonably necessary to cause the liquidation of all of the LTV Trust Assets to Cash pursuant to the Plan; and (xii) if deemed appropriate by the Liquidating Trustee, to compromise or settle any litigation in accordance with approval by the majority (in terms of amount of Allowed Claims, not in terms of number of holders) of the LTV Trust Beneficiaries; (xiii) to pay any fees to or file any reports with the United States Trustee, without further order of the Bankruptcy Court; (xiv) pending transfer of the LTV Trust Assets to the Liquidating Trust, and subject to any necessary regulatory approvals and/or servicing consents, the Liquidating Trustee, in his sole discretion, may take actions as are necessary to protect the Liquidating Trust's interests pursuant to the terms of this Agreement.

      (c)   <u>Specific Powers Reserved for the Liquidating Trustee</u>.  The following rights are vested in the Liquidating Trustee in addition to those rights which may also be provided under the Plan, this Agreement or as otherwise modified, from time to time:

      (i)   In connection with the sales, marketing and rental of timeshare interests, either:

      a.   Negotiate and execute an agreement with the Reorganized Debtor pursuant to which the BB&T Timeshare Interests and any timeshare interests of BB&T at LTV 1400 (provided such timeshare interests are subject to multisite timeshare plan known as Club Navigo) and the timeshare interests of the Reorganized Debtor will be mutually marketed, sold and rented under mutually acceptable terms and conditions (the "Mutual Distribution Agreement"); or

      b.   As an alternative to the Mutual Distribution Agreement, negotiate and execute exclusive or semi-exclusive sales and marketing or rental agreements with one or

more timeshare sales, marketing or rental companies (each a "Third Party Timeshare Company") providing such services to market, sell or rent BB&T Timeshare Interests and any timeshare interests or units at LTV 1400 or the Barefoot'n II Property.

(ii) Liquidating Trustee may negotiate and execute an agreement or agreements with one or more buyers or the Reorganized Debtor for the purchase and sale of the BB&T Timeshare Interests, LTV 1400 or the Barefoot'n II Property.

(iii) The right to sell and rent the BB&T Timeshare Interests as well as any timeshare interests or whole units at LTV 1400 and the Barefoot'n II Property in dual track with the Reorganized Debtor; provided, that the Third Party Timeshare Company shall be responsible for registration pursuant to Chapter 721, *Florida Statutes*, from the Division of Florida Condominiums, Timeshares and Mobile Homes (the "Division") so that the Third Party Timeshare Company will be able to market and sell the BB&T Timeshare Interests, and timeshare interests at LTV 1400 or the Barefoot'n II Property, if applicable, on behalf of Liquidating Trustee simultaneously with the Reorganized Debtor selling its own unsold and unencumbered timeshare interests. Liquidating Trustee, at its sole expense, may acquire additional project registrations as may be appropriate through the Division and such regulatory agencies in other jurisdictions as Liquidating Trustee and a Third Party Timeshare Company, if any, may reasonable determine, so that Liquidating Trustee will be able to market and sell its BB&T Timeshare Interests. The Reorganized Debtor shall cooperate with Liquidating Trustee and the Third Party Timeshare Company, if any, and Liquidating Trustee and the Third Party Timeshare Company, if any, shall cooperate with the Reorganized Debtor to accomplish registrations necessary for any of them to implement their respective sales and marketing plans. As part of such cooperation, the Reorganized Debtor shall provide Liquidating Trustee copies of all project documents, in its possession, that must be filed with the Division and any such documents that must be amended in connection with such filing shall be in Word format.

(iv) If Liquidating Trustee and Reorganized Debtor do not enter a Common Sales, Marketing and Rental Agreement, Liquidating Trustee shall have the right, with the approval of BB&T, to file a notice in the Public Records to terminate the multisite timeshare plan known as Club Navigo as to the BB&T Timeshare Interests only and on a go forward basis only and to provide for the right to include, all or any portion of the BB&T Timeshare Interests in another multisite timeshare plan or reservation system.

(v) Liquidating Trustee shall have the right to procure services from providers of its choice related to the billing, servicing and collecting of receivables obtained in connection with the financing of sales to consumers of the BB&T Timeshare Interests and timeshare interests at LTV 1400 or the Barefoot'n II Property, if applicable.

(vi) Liquidating Trustee shall have the right, with the approval of BB&T and pursuant to the Confirmation Order, to negotiate and execute an agreement (the "Concurrent Operating Agreement") with reorganized debtor in substantially a form attached as Exhibit "A" to the modification of the First Amended Joint Plan of Reorganization of Island One, Inc.,

Crescent One, LLC, St. Croix One, LLC, Island One Resorts Management Corporation, Navigo Vacation Club, Inc., and IOI Funding I, LLC [D.E.#450] and is incorporated by reference herein, which Concurrent Operating Agreement will address the issues arising out the concurrent sales, marketing and rental activities that each will engage in with respect to their respective timeshare interests on or near Liki Tiki Village, Charter Club at Naples Bay and Cove on Ormond Beach.

4.     Compensation of Liquidating Trustee and Professionals.  The Liquidating Trustee shall be compensated at a fee equal to the greater of (i) 1.75% of the net distribution to the LTV Trust beneficiaries (not including distributions to professionals or the Liquidating Trustee) and (ii) the Liquidating Trustee's prevailing standard hourly rate, less a 20% courtesy discount, plus the reimbursement of his actual and necessary out-of-pocket expenses.  No more frequently than once every 30 days, the Liquidating Trustee shall serve his statement(s) for services rendered and expenses incurred upon BB&T.  The statements do not need to conform to the U.S. Trustee's guidelines for fee applications, but must contain adequate information to enable parties in interest to review the reasonableness of the statements.  BB&T shall have fifteen (15) days from receipt to interpose any written objections to any such fee request to the Liquidating Trustee. Notwithstanding whether BB&T objects to a fee request, its right to fund deficits remains discretionary.  The Bankruptcy Court shall retain jurisdiction to adjudicate any dispute with respect to such statements or the Liquidating Trustee's compensation request.

The Liquidating Trustee may retain such professionals, and other consultants or independent contractors, as he deems appropriate without Order of the Bankruptcy Court.  No more frequently than once every 30 days, the Liquidating Trustee's counsel and any other professional retained by the Liquidating Trustee shall submit his, her or its statement(s) for services rendered and costs incurred to the Liquidating Trustee for review and approval.  The statements do not need to conform to the U.S. Trustee's guidelines for fee applications, but must contain adequate information to enable the Liquidating Trustee to review the reasonableness of the statements.  The Liquidating Trustee shall have 10 days to object to any such statement.  If no objection is timely served upon the professional in respect of any such statement, then the Liquidating Trustee shall promptly serve such statements of the fees and costs to BB&T.  The Bankruptcy Court shall retain jurisdiction to adjudicate any dispute with respect to such statements or any professional's compensation request.

5.     LTV Trust Expenses.  In accordance with the Plan, BB&T may fund any operational deficits, including those arising out of fees and costs incurred by the Liquidating Trustee and his professionls.  To the extent of such funding, BB&T shall receive a superpriority claim against the LTV Trust and the LTV Trust Assets for any such protective advance. However, with respect to any maintenance fee and tax deficits, BB&T shall fund the LTV Trust as required on a timely basis.  Additionally, the Liquidating Trustee shall have responsibility for assisting the Reorganized Debtor in calculating the Trust I Adjusted Obligation Credit each quarter.

6.     LTV Trust Distributions.  The Liquidating Trustee, subject to Bankruptcy Court approval where appropriate, shall deposit the Cash proceeds of the LTV Trust Assets at a depository institution listed as an approved institution of the United States Trustee for the Middle District of Florida.  In his sole and absolute discretion, the Liquidating Trustee may make initial

and subsequent interim distributions to the Holders of Allowed Secured Claims entitled to distributions from the LTV Trust Assets under the Plan first and then, once the Holders of such Allowed Secured Claims have been paid in full, to the Unsecured Creditor Trust, consistent with the terms of the Plan, from the net proceeds of the liquidation of the LTV Trust Assets, after payment of all LTV Trust expenses. The Liquidating Trustee shall use his continuing best efforts to dispose of the LTV Trust Assets, make timely distributions, and shall not unduly prolong the duration of the Liquidating Trust. Upon the termination of the Liquidating Trust, the Liquidating Trustee shall make a final distribution to Holders of Allowed Secured Claims entitled to distributions from the LTV Trust Assets under the Plan first and then, once the Holders of such Allowed Secured Claims have been paid in full, to the Unsecured Creditor Trust, of all remaining LTV Trust Assets after payment of the outstanding LTV Trust Expenses. Upon payment in full of any Allowed Claim held by a LTV Trust beneficiary, the Holder of such Claim shall no longer have any claim, lien, encumbrance, or interest in the LTV Trust Assets or be a beneficiary of the LTV Trust with respect to such paid Claim.

7. <u>Tax Returns and Payments</u>. The transfer of the Debtors' Assets to the LTV Trust shall be treated for all purposes of the Internal Revenue Code, as amended, as a deemed transfer to the LTV Trust beneficiaries by the Debtors' Estates, followed by a deemed transfer by the LTV Trust beneficiaries to the Liquidating Trust. At the time of the deemed transfer, each of the LTV Trust beneficiaries will recognize a taxable gain or loss to the extent that the fair market value of the LTV Trust Assets that the LTV Trust beneficiaries are deemed to receive is greater than, or less than, the LTV Trust beneficiaries' tax basis in such assets. The Liquidating Trustee shall value the LTV Trust Assets without the approval of the Bankruptcy Court at the time the Assets are transferred to the Liquidating Trust, and the Liquidating Trustee and the LTV Trust beneficiaries agree that they shall treat such valuation as controlling and use it consistently for all federal and state tax purposes, unless required to use a different valuation by a federal or state agency. The LTV Trust beneficiaries shall be treated as the grantors and deemed owners of the LTV Trust Assets that they are deemed to transfer to the LTV Trust subject to the terms of the Plan governing distributions.

Each LTV Trust beneficiary shall be provided with IRS 1099 or W-9 forms by the Liquidating Trustee at the appropriate time. Each LTV Trust beneficiary shall be required, before any distribution of net proceeds of the LTV Trust Assets is made to such beneficiary, to return to the Liquidating Trustee executed IRS 1099 or W-9 forms, or such other appropriate taxpayer identification information necessary to allow the Liquidating Trustee to file the appropriate tax return on behalf of the Liquidating Trust. If a LTV Trust beneficiary fails to return to the Liquidating Trustee any requested taxpayer identification information within 60 days after a request for this information, this failure shall be deemed a waiver of all claims against the Liquidating Trust, including the right to distributions, and the funds that would otherwise have been distributed to such beneficiary shall revert to the LTV Trust to be distributed to other beneficiaries who have provided the requested taxpayer identification information.

The responsibilities of the Liquidating Trustee shall include the filing of an annual grantor trust return and providing the LTV Trust beneficiaries with valuations used by the Liquidating Trustee with regard to the trust *res*. The LTV Trust beneficiaries shall be

responsible for the payment of taxes in connection with any distributions from the LTV Trust Assets made by the Liquidating Trustee to such claimants as beneficiaries of the Liquidating Trust. Whether or not the Liquidating Trustee establishes reserves to pay future expenses, all LTV Trust income shall be treated as subject to tax on a current basis. The Liquidating Trustee shall allocate to the LTV Trust income for each taxable year among the LTV Trust beneficiaries in accordance with their respective interests in the Liquidating Trust, as determined from time to time by the Liquidating Trustee, and the LTV Trust beneficiaries shall be responsible for any tax liability that results from such income.

8.    LTV Trust Reporting.  The Liquidating Trustee shall keep an accounting of receipts and disbursements, and shall provide to any beneficiary that requests such information, at least every 120 days, a summary of receipts and disbursements of the Liquidating Trust. Each such summary shall identify receipts and disbursements in reasonable detail, and shall identify the source of all receipts and the recipients of all disbursements.  As soon as practicable after termination of the Liquidating Trust, the Liquidating Trustee shall provide to LTV Trust beneficiaries and the U.S. Trustee, and file with the Bankruptcy Court, a final account and report of LTV Trust administration.

9.    Limitations on Powers of Liquidating Trustee.  The Liquidating Trustee shall only engage in business activity related to the LTV Trust Assets and for the purpose of maximizing the value of the LTV Trust Assets and as otherwise contemplated hereunder.  Actions taken by the Liquidating Trustee to defend and pursue claims or Causes of Action held as LTV Trust Assets shall be deemed consistent with such liquidating purpose.  In addition, actions taken to collect any accounts receivable and dispose of any LTV Trust Assets shall also be consistent with such purpose. The Liquidating Trustee's authority to invest the LTV Trust Assets pending distribution shall be limited to demand and time deposits in banks or savings institutions, or other temporary, liquid investments such as short-term certificates of deposit or treasury bills.

10.    Limitations of Liability of Liquidating Trustee.   Except in the case of fraud, willful misconduct, bad faith or gross negligence, the Liquidating Trustee shall not be liable for any loss or damage by reason of any action taken or omitted by him, or for any act or omission made in reliance upon the books and records of the LTV Trust or upon information or advice given by his professionals; provided, however, that nothing herein or in the Plan shall relieve the Liquidating Trustee from his duty and responsibility to liquidate the LTV Trust Assets and make the distributions required under this Agreement and the Plan.  The Liquidating Trustee is required to furnish a bond as more fully described by Section 2(b).  In addition, the Liquidating Trustee shall be indemnified by and receive reimbursement from the LTV Trust Assets against and on account of any and all loss, liability, expense or damage which he may incur or sustain, without fraud, willful misconduct, bad faith or gross negligence, in the exercise and performance of any of his powers and duties hereunder. In the absence of fraud, willful misconduct, bad faith or gross negligence, the Liquidating Trustee may rely, and shall be fully protected personally in acting, upon any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document that he has no reason to believe to be other than genuine and to have been signed or presented other than by the proper party or parties or, in the case of facsimile transmissions, to have been sent other than by the proper party or parties, in each case without obligation to satisfy himself that the same was given in good faith and without

8

responsibility for errors in delivery, transmission or receipt. The obligation of the Liquidating Trustee to hold the LTV Trust Assets in trust for the LTV Trust beneficiaries in accordance with the Liquidating Trust Agreement and to make the distributions mandated herein shall not be deemed to be LTV Trust liabilities. The Liquidating Trustee may at any time seek instructions from the Bankruptcy Court concerning the acquisition, management or disposition of the Cash and/or other property held by the Liquidating Trust.

11. <u>Liquidating Trustee not Personally Liable</u>. Persons dealing with the Liquidating Trustee shall look only to the LTV Trust to satisfy any liability incurred by the Liquidating Trustee to such Person in carrying out the terms of this Liquidating Trust, and the Liquidating Trustee shall have no personal or individual obligation to satisfy any such liability.

12. <u>Rights, Powers and Duties of LTV Trust Beneficiaries</u>. Each LTV Trust beneficiary shall hold a percentage beneficial interest in the LTV Trust Assets equal to his, her or its Pro Rata share in the Available Cash and proceeds from the liquidation of the LTV Trust Assets pursuant to the terms of the Plan. Each Holder of a Disputed Claim or Pending Claim shall receive a distribution from Available Cash only when and to the extent that any such Disputed Claim or Pending Claim becomes an Allowed Claim. The LTV Trust beneficiaries' interest in the LTV Trust Assets shall not be transferable except pursuant to the laws of descent and distribution or otherwise by operation of law. Ownership of a beneficial interest hereunder shall not entitle any LTV Trust beneficiary to any title in or to the LTV Trust Assets as such, or to any right to prosecute or liquidate individually the LTV Trust Assets.

13. <u>Liquidating Trustee's Right of Access to Information</u>. The Debtors and the Reorganized Debtor agree that the Liquidating Trustee shall be granted reasonable access to all books, records and other financial or operational information relative to the LTV Trust Assets. Such access includes electronically stored information and files maintained relative to the LTV Assets.

14. <u>Notice</u>. Any consent, certificate, notification, demand, instruction or notice whatsoever, to be sent by any of the parties hereto, pursuant to the terms hereof, shall be in writing and signed by the party executing such consent, certificate, notification, demand, instruction or notice, and shall be delivered or sent by U.S. mail to the following:

> Counsel to BB&T:
>
> Frank P. Terzo, Esq.
> GrayRobinson, P.A.
> 1221 Brickell Avenue, Suite 1650
> Miami, FL 33131
>
> -and-
>
> Liquidating Trustee:
>
> Barry E. Mukamal

MarcumRachlin LLP
1 S. E. 3rd Avenue, 10th Floor
Miami, FL, 33131

or such other address as either party hereto may specify in a notice to the other. For purpose of this Liquidating Trust Agreement, consents, certificates, notifications, demands, instructions and notices shall be deemed to be effective when actually received.

15. <u>Resignation and Removal of Liquidating Trustee</u>. The Liquidating Trustee may resign and be discharged of his responsibilities created under this Agreement by giving 30 days' prior written notice to the LTV Trust beneficiaries and filing such notice with the Bankruptcy Court. In addition, the Liquidating Trustee may be removed by a vote of the majority (in terms of amount of Allowed Claims, not in terms of number of claim holders) of LTV Trust beneficiaries, and subject to Bankruptcy Court approval. The U.S. Trustee may, by motion filed with the Bankruptcy Court, also seek removal of the Liquidating Trustee for cause and upon notice and a hearing. In the event of the resignation or removal of the Liquidating Trustee, a successor trustee shall be appointed upon a vote of the majority (in terms of amount of Allowed Claims, not in terms of number of claim holders) of LTV Trust beneficiaries. The resignation or removal of the Liquidating Trustee shall not be effective, unless otherwise ordered by the Bankruptcy Court, until a successor Liquidating Trustee has been elected and accepts such appointment. The Liquidating Trustee shall be entitled to payment of any unpaid compensation and unreimbursed expenses upon resignation or removal. The rights, duties and powers of any successor trustee shall be governed by the Liquidating Trust Agreement. No successor trustee shall be liable for any act or omission of any previous trustee.

16. <u>LTV Trust Termination</u>. Upon full administration of the LTV Trust Assets, and the satisfaction as far as possible of all remaining liabilities of the Liquidating Trust, in accordance with the Plan, the Liquidating Trustee, subject to Bankruptcy Court approval, shall: (i) terminate the Liquidating Trust, by filing written notice of termination with the Bankruptcy Court and providing such notice to the LTV Trust beneficiaries and the U.S. Trustee; and (ii) thereupon be forever discharged of and released from all power, duties and responsibilities under this Agreement and the Plan. Every effort shall be made to effectuate such termination no later than the time reasonably necessary to accomplish the Liquidating Trust's purpose of liquidating the LTV Trust Assets and distributing the proceeds thereof to the LTV Trust beneficiaries in accordance with this Agreement and the Plan, and in no event shall the LTV Trust continue for more than five (5) years after the Effective Date without further order of the Bankruptcy Court.

17. <u>Payment of Costs/Expenses</u>. Subject to the Plan and this Agreement, all costs, expenses and obligations incurred by the Liquidating Trustee in administering the LTV Trust or in any manner connected, incidental or related thereto shall be a charge against the Liquidating Trust. The Liquidating Trustee, upon being satisfied as to the correctness and reasonableness of any and all such costs, expensed and obligations, shall approve and direct the payment thereof prior to any Distribution to the LTV Trust beneficiaries as herein provided, or shall maintain an adequate reserve as part of the LTV Trust Reserve for such payments prior to the making of any Distributions to the LTV Trust beneficiaries.

18.     Court Approval. The Liquidating Trustee upon consultation with BB&T shall file a motion with the Bankruptcy Court, if necessary, and serve the motion upon the Office of the U.S. Trustee, by United States mail, whenever he intends to sell or otherwise dispose of any of the LTV Trust Assets or settle claims or controversies relating to LTV Trust Assets, including any Causes of Action, if the action involves a sale, claim or controversy which has a face value in the aggregate of $100,000 or more. Such actions shall be subject to approval by the Bankruptcy Court. The motion for Court approval shall describe with reasonable particularity the action proposed to be taken and why such action is in the best interests of the Trust 1 beneficiaries. Nothing herein shall restrict the Liquidating Trustee's right to submit any other matter regarding the Liquidating Trust, the LTV Trust Assets or the Chapter 11 Cases for Court approval, in his sole discretion, consistent with the Bankruptcy Court's retained jurisdiction.

19.     Objections to Actions by Liquidating Trustee. With respect to proposed actions by the Liquidating Trustee that are submitted by motion for Bankruptcy Court approval, pursuant to the Plan or otherwise, any party in interest seeking to object to any such proposed action must follow the procedures set forth in the Local Rules of the Bankruptcy Court. In the event any party in interest objects to any other action proposed to be taken by the Liquidating Trustee, such party shall: (i) file an objection with the Bankruptcy Court; (ii) request a hearing from the Bankruptcy Court; and (iii) serve a copy of the objection and notice of hearing on the Liquidating Trustee and the U.S. Trustee, so as to be received no later than 10 days after the Liquidating Trustee gives notice of such proposed action. If no timely objection is made in strict compliance herewith, the Liquidating Trustee shall be deemed authorized to take such proposed action without further notice or order of the Bankruptcy Court.

20.     Conflicting Claims to Liquidating Trust. In the event that the Liquidating Trustee becomes aware of any disagreement or conflicting claims with respect to the LTV Trust Assets, or if the Liquidating Trustee, in good faith, is in doubt as to any action which should be taken under this Agreement, the Liquidating Trustee shall have the right, at his discretion, to withhold performance under this Agreement until such conflict is resolved, he receives direction from the Liquidating Trust, he files a suit in the Bankruptcy Court, or other court or tribunal of competent jurisdiction, to obtain an order requiring all persons involved to litigate their respective claims to the LTV Trust Assets, and/or he files any other appropriate request for relief before the Bankruptcy Court, or other court or tribunal of competent jurisdiction.

21.     Counterparts. This Agreement may be executed in two or more counterparts, each of which shall constitute an original but all of which, when taken together, shall constitute but one agreement. This Agreement shall be deemed to be effective when counterparts which, when taken together, bear the signatures of all the parties hereto have been delivered to the Proponents.

22.     Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, except as limited by the terms herein.

23. <u>Conflicts with Plan</u>. Notwithstanding any provision in this Agreement to the contrary, to the extent that the terms of this Agreement are inconsistent with the terms of the Plan, the terms of this Agreement shall control.

24. <u>Amendment to Agreement</u>. This Agreement may only be amended, altered or modified with the express written consent of the majority (in terms of amount of Allowed Claims, not in terms of number of claim holders) of LTV Trust beneficiaries.

25. <u>Governing Law; Entire Agreement</u>. This Agreement shall be construed in accordance with and governed by the laws of the State of Florida, without reference to any conflict of laws principles, and may not be waived, modified or amended to any extent except by a writing signed by the party against which such waiver, modification or amendment is sought to be enforced and approved by the Bankruptcy Court. The Liquidating Trustee shall be deemed to have no notice of, or duties with respect to, any agreement or agreements with respect to the Liquidating Trust, or funds therein other than as set forth in this Agreement and the Plan. This Agreement and the Plan to which it is subject set forth the entire agreement between the parties hereto. Notwithstanding any provision to the contrary contained in any other agreement (excluding any subsequent waiver, modification or amendment to this Agreement) between the parties hereto, the Liquidating Trustee shall have no interest in the LTV Trust or funds therein except as provided in this Agreement and the Plan. In the event that any of the terms and provisions of any other agreement (excluding the Plan or any subsequent waiver, amendment or modification to this Agreement) between the parties hereto, conflict or are inconsistent with any of the terms and provisions of this Agreement, the terms and provisions of this Agreement shall govern and control in all respects.

Dated: May _____, 2011

LIQUIDATING TRUSTEE, on behalf of the LTV TRUST BENEFICIARIES and not Individually,

By: _____
Barry E. Mukamal

ISLAND ONE, INC.

By:_____
Deborah L. Linden
as Chief Executive Officer

\351021\4 - # 483796 v1

12

966959.1

# Exhibit "B"

1. Unsecured Creditor Committee Modifications

# UNSECURED CREDITOR TRUST AGREEMENT

**THIS UNSECURED CREDITOR TRUST AGREEMENT** (the "<u>Agreement</u>") is entered into this ___ day of May 2011, by and between ISLAND ONE, INC., CRESCENT ONE, LLC, ST. CROIX ONE, LLC, ISLAND ONE RESORTS MANAGEMENT CORPORATION, NAVIGO VACATION CLUB, INC., AND IOI FUNDING I, LLC (collectively, the "<u>Debtors</u>" or the "<u>Settlors</u>") in the Chapter 11 bankruptcy cases being jointly administered in Case No. 6:10-bk-16177-KSJ, pending in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division (the "<u>Bankruptcy Court</u>") and Larry S. Hyman (the "<u>Unsecured Creditor Trustee</u>"), pursuant to the First Amended Joint Plan of Reorganization proposed by the Debtors, dated March 22, 2011 (as modified by (a) the Modification of the First Amended Joint Plan of Reorganization for Island One, Inc., Crescent One, LLC, St. Croix One, LLC, Island One Resorts Management, Corporation, Navigo Vacation Club, Inc., and IOI Funding I, LLC (the "<u>BB&T Modification</u>"), (b) the Second Modification of the First Amended Joint Plan of Reorganization Submitted By Island One, Inc., Crescent One, LLC, St. Croix One, LLC, Island One Resorts Management Corporation, Navigo Vacation Club, Inc., and IOI Funding I, LLC (the "<u>UCC Modification</u>"), and (c) the Confirmation Order, the "<u>Plan</u>")[1], for those purposes set forth herein.

## W I T N E S S E T H

**WHEREAS**, on _____, 2011, the Bankruptcy Court entered an Order (the "<u>Confirmation Order</u>") [Doc. No. _____] confirming the Plan and approving the establishment of the Unsecured Creditor Trust (defined below) pursuant to the Plan and the Confirmation Order; and

**WHEREAS**, the Plan provides for the creation of a trust for the benefit of Holders of Allowed Unsecured Claims in Classes 12, 13, 15, 18, 21, 27 and 33 (collectively the "<u>Trust Beneficiaries</u>"); and

**WHEREAS**, the parties have executed this Agreement in order to establish a trust, to be known for all purposes as "The Island One Unsecured Creditor Trust" (the "<u>Unsecured Creditor Trust</u>") in accordance with Treas. Reg. §301.7701-4(d), for the sole purpose of liquidating and distributing the proceeds from the Majority Lenders Contribution, the Causes of Action and the Residual Net Proceeds, all in accordance with the terms set forth in the Plan; and

**WHEREAS**, pursuant to its authority under the Plan, the Debtors have appointed Larry S. Hyman as the Unsecured Creditor Trustee, and Larry S. Hyman is willing to accept such appointment and to perform the duties of the Unsecured Creditor Trustee under and in accordance with the terms of this Agreement as set forth below; and

**WHEREAS**, the corpus of the Unsecured Creditor Trust, and all income earned therefrom that remains after the payment of the U.S. Trustee's fees and administrative expenses related to the administration of the Unsecured Creditor Trust, shall be used solely for the purpose

---

[1]Capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in the Plan.

of discharging the legal obligations owed to the Trust Beneficiaries in accordance with the Plan; and

**WHEREAS**, the parties hereto desire that the Unsecured Creditor Trust created pursuant to this Agreement qualify as a liquidating trust in accordance with Treas. Reg. §301.7701-4(d) and that, as a result of such qualification, the Unsecured Creditor Trust shall be taxed as a Grantor Trust under and in accordance with the relevant provisions of the Internal Revenue Code of 1986, as amended (the "Code") and the Treasury Regulations pertaining thereto.

**NOW, THEREFORE**, in consideration of the property transferred to the Unsecured Creditor Trust and other valuable consideration, the receipt and sufficiency of which the parties hereby acknowledge, and subject to the terms and conditions of this Agreement and the Plan, the Settlors have executed this Agreement for the sole benefit of the Trust Beneficiaries and no other party, and do hereby agree as follows:

## ARTICLE I: DEFINITIONS

For the purposes of this Agreement, the following terms will have the meanings set forth below:

A.    **Residual Net Proceeds** shall mean any and all amounts payable to the Unsecured Creditor Trust pursuant to the Plan resulting from the sale, transfer, assignment, conveyance and/or disposition of, among other things, the BB&T Consolidated Collateral, the LTV III Real Property, the Welcome Center, the Sales Center, the Barefoot'n Property, the Island One Equipment, the 2008 Dodge Truck, the St. Croix One Real Property, the St. Croix One Personal Property, the 2007 Dodge Truck, or the 2008 Jeep Patriot.

B.    **Trust Advisory Board** shall mean the advisory board created pursuant to Article VIII hereof.

C.    **Trust Assets** shall mean the Majority Lenders Contribution, the Causes of Action, and the Residual Net Proceeds, and any proceeds therefrom.

D.    **Trust Estate** shall consist of all the Trust Assets.

## ARTICLE II: DECLARATION OF TRUST

A.    The Settlors, subject to the terms of this Agreement and the Plan, hereby irrevocably grant, assign, transfer, convey, deliver, delegate and set over the Trust Estate unto the Unsecured Creditor Trustee, IN TRUST, for the benefit of the Trust Beneficiaries.

B.    In addition, the Settlors hereby irrevocably grant, assign, transfer, convey, deliver, delegate and set over unto the Unsecured Creditor Trustee all of the authority, rights, powers and duties previously vested in the Settlors under the Bankruptcy Code or applicable non-bankruptcy law with respect to the Trust Estate, including Settlors' right to pursue any and all Causes of

Action transferred to this Unsecured Creditor Trust, which shall include pending adversary proceedings, which may have been commenced prior to the creation of this Unsecured Creditor Trust, or may be commenced hereafter, and the Unsecured Creditor Trustee is authorized to be substituted as the real party in interest in any such actions.

C.    To the extent that any law, regulation or contractual provision prohibits the transfer of ownership of any of the Trust Assets from the Settlors to the Unsecured Creditor Trust or the Unsecured Creditor Trustee, or if for any reason the Settlors shall retain or receive at any point any property which is included in, or intended under the Plan and this Agreement to be included in, the definition of Trust Estate, then the Settlors shall and are hereby deemed to hold such property (and any proceeds or products thereof) in trust for the Trust Beneficiaries, and Settlors shall promptly notify the Unsecured Creditor Trustee of the existence of such property and shall promptly take such actions with respect to such property as the Unsecured Creditor Trustee shall direct in writing. It is intended that the Trust Assets transferred pursuant to this paragraph shall provide the Trust Beneficiaries with distributions on account of their Allowed Claims pursuant to and in accordance with the Plan.

## ARTICLE III: UNSECURED CREDITOR TRUSTEE'S ACCEPTANCE

The Unsecured Creditor Trustee, having been duly appointed, willingly accepts such appointment and agrees to perform the duties of the Unsecured Creditor Trustee upon such terms and conditions as are hereinafter set forth.

## ARTICLE IV: NAME

The Unsecured Creditor Trust created pursuant to the terms hereof shall for all purposes be known as "The Island One Unsecured Creditor Trust." The Unsecured Creditor Trustee shall use this name when filing all taxation and other compliance information with federal or state governmental authorities and in correspondence with the Trust Beneficiaries.

## ARTICLE V: TRUST PURPOSE

The Unsecured Creditor Trust is created hereunder for the purpose of receiving the Trust Estate and liquidating and distributing the proceeds from the Trust Estate to the Trust Beneficiaries in an orderly fashion and in accordance with the terms of the Plan. In accomplishing this purpose, the Unsecured Creditor Trustee shall:

(a)    manage, conserve and protect the value of the Trust Estate for the benefit of the Trust Beneficiaries;

(b)    collect and liquidate the Trust Estate by, among other things, prosecuting the Causes of Actions vested in the Trust Estate; provided, however, the Unsecured Creditor Trustee, in his sole discretion, need only pursue those Causes of Action he deems have a reasonable likelihood of net recovery and the Unsecured Creditor Trustee may abandon and not pursue any Causes of Action he deems do not have a reasonable likelihood of net recovery;

(c)     prosecute objections to any unsecured Claims that would be entitled to a distribution from the Unsecured Creditor Trust if allowed, as applicable; and

(d)     distribute to the Trust Beneficiaries all net proceeds from the liquidation of the Trust Estate pursuant to the terms of the Plan.

Under no circumstances shall the Unsecured Creditor Trustee have any power to engage in or conduct any trade or business or any other activity except: (1) as specifically provided for in this Agreement or in the Plan; (2) in a manner consistent with Orders of the Bankruptcy Court; or (3) in a manner as is otherwise reasonably necessary and advisable for the orderly liquidation and distribution of the Trust Estate.

## ARTICLE VI:  ADMINISTRATION OF TRUST ESTATE

A.     **Disposition of Trust Estate**.  The Unsecured Creditor Trustee shall disburse the assets of the Trust Estate pursuant to the terms of the Plan.

Distributions shall be paid in the following order:

1.     To the U.S. Trustee for fees payable under 28 U.S.C. § 1930 calculated only based upon distributions made by the Unsecured Creditor Trust;

2.     For full payment of costs and expenses related to the administration of the Trust Estate, including reasonable fees and costs of the Unsecured Creditor Trustee and including reasonable attorneys' fees and costs; and

3.     To Holders of Allowed Class 12 Claims, Allowed Class 13 Claims, Allowed Class 15 Claims, Allowed Class 18 Claims, Allowed Class 21 Claims, Allowed Class 27 Claims and Allowed Class 33 Claims, all on a pro rata basis, until paid in full; provided however, that no Creditor will receive an amount greater than its Allowed Claim.

B.     **Distribution of Net Income**.  The Unsecured Creditor Trustee is required to distribute at least annually to the Trust Beneficiaries all of the Trust Estate net income (including net proceeds from the sale of assets), except that the Unsecured Creditor Trustee may, after consultation with the Trust Advisory Board, retain an amount of net proceeds or net income reasonably necessary to maintain the value of its assets or to meet Allowed Claims and contingent liabilities (including Disputed Claims) and that the Unsecured Creditor Trustee has discretion, after consultation with the Trust Advisory Board, to decline to make a yearly distribution if such a distribution would be otherwise imprudent or would result in a *de minimus* distribution.  The Unsecured Creditor Trustee shall make continuing efforts to dispose of the Trust Assets, make timely distributions, and not unduly prolong the duration of the Unsecured Creditor Trust.  The Unsecured Creditor Trustee will neither receive nor retain cash or cash equivalents in excess of a reasonable amount to meet Allowed Claims and contingent liabilities (including Disputed Claims) or to maintain the value of the Trust Assets during liquidation.

C.    **Payment of Interest to Trust Beneficiaries**.  The Unsecured Creditor Trustee shall hold the Trust Estate without provision for or the payment of interest to any Trust Beneficiary except to the extent prescribed under the Plan.

D.    **Reports to Trust Beneficiaries**.  Upon written request of a Trust Beneficiary, the Unsecured Creditor Trustee shall submit to the respective Trust Beneficiary a report on the Unsecured Creditor Trustee's activities, which report shall be similar in form and substance to quarterly reports filed by a reorganized debtor after confirmation of a plan of reorganization in a Chapter 11 case.  Unless otherwise ordered by the Bankruptcy Court, the Unsecured Creditor Trustee shall not be required to prepare the report more often than once per year.

## ARTICLE VII: DUTIES, RIGHTS AND POWERS OF UNSECURED CREDITOR TRUSTEE

A.    **Specific Powers of Unsecured Creditor Trustee.**  The Unsecured Creditor Trustee shall have the following specific powers in addition to any powers granted by law (including Florida Statutes Chapter 737.401, *et seq.*, except as may be considered inconsistent with the Plan, this Agreement or a trust created in accordance with Treas. Reg. §301.7701-4(d)), or conferred upon him by any other provision of this Agreement and the Plan; provided however, that enumeration of the following powers shall not be considered in any way to limit or control the power of the Unsecured Creditor Trustee to act as specifically authorized by any other provisions of this Agreement or the Plan and to act in such manner as the Unsecured Creditor Trustee may deem necessary or appropriate to discharge all obligations of or assumed by the Unsecured Creditor Trust or provided herein and to conserve and protect the Trust Estate or to confer on the Trust Beneficiaries the benefits intended to be conferred upon them by this Agreement and the Plan.  Subject to the enunciated power and authority in the Plan, the Unsecured Creditor Trustee shall have the right and power:

1.    To determine the terms on which Trust Assets comprising the Trust Estate should be sold, liquidated or otherwise disposed of; and

2.    To collect and receive any and all money and other property of any kind or nature due to or owing or belonging to the Unsecured Creditor Trust; and

3.    Pending sale or other disposition or distribution, to retain all or any Trust Assets constituting part of the Trust Estate regardless of whether or not such assets are, or may become, unproductive or a wasting asset.  The Unsecured Creditor Trustee shall not be under any duty to reinvest such part of the Trust Estate as may be in cash, or as may be converted into cash; nor shall the Unsecured Creditor Trustee be chargeable with interest thereon except to the extent that interest may be paid to the Unsecured Creditor Trust on such cash amounts; and

4.    To retain and set aside such funds out of the Unsecured Creditor Trust as the Unsecured Creditor Trustee shall deem necessary or expedient to pay, or provide for the amount of (i) unpaid claims, liabilities, debts or obligations of the Unsecured Creditor Trust; (ii) contingencies; (iii) any reserve amounts; and (iv) the expenses of administering the Trust Estate; and

5

5.	To do and perform any acts or things necessary or appropriate for the management, conservation and protection of the Trust Estate, including acts or things necessary or appropriate to maintain assets held by the Unsecured Creditor Trustee pending sale or other disposition thereof or distribution thereof to the Trust Beneficiaries, and in connection therewith to employ such agents, including professionals, and to confer upon them such authority as the Unsecured Creditor Trustee may deem necessary, and to pay fees and expenses therefor; and

6.	To prepare, file, assert, commence and prosecute, or continue to prosecute, settle, withdraw or release as appropriate, objections to Claims and Causes of Action; and

7.	To cancel, terminate, or amend any instruments, contracts or agreements relating to or forming a part of the Trust Estate to the full extent permitted by such instruments, contracts or agreements and to execute new instruments, contracts, or agreements; and

8.	To perform any act authorized, permitted, or required under any instrument, contract, agreement, or cause of action relating to or forming a part of the Trust Estate whether in the nature of an approval, consent, demand, or notice thereunder or otherwise; and

9.	To take all actions for and on behalf of the Trust Estate, including but not limited to, the preparation, execution and filing of documents, as the Unsecured Creditor Trustee shall deem necessary, desirable or appropriate in order to complete, conclude and finalize any filing, reporting or other obligations which the Unsecured Creditor Trust may have to any state or federal governmental authority, including but not limited to, the Internal Revenue Service; and

10.	To enter into such consulting or employment arrangements or otherwise retain such accountants, agents, attorneys, consultants or independent contractors as the Unsecured Creditor Trustee shall deem necessary, desirable and appropriate to enable the Unsecured Creditor Trust to accomplish the purposes enumerated in this Agreement and under the Plan; and

11.	To make the distributions provided for in the Plan and in Article VI hereof; and

12.	Notwithstanding anything contained in the Plan, to liquidate certain Trust Assets, as deemed appropriate and in the best interests of the Trust Beneficiaries and the Unsecured Creditor Trust, and to delay any distribution if deemed in the best interest of the Trust Beneficiaries; provided however, that if the Unsecured Creditor Trust has not been terminated on or before the third anniversary of the Trust Effective Date, the Unsecured Creditor Trustee shall arrange to have a status conference with the Bankruptcy Court within sixty days after the third anniversary of the Trust Effective Date. Such status conference shall be on notice to all Trust Beneficiaries; and

13.	As of the Trust Effective Date, to act as the sole signatory for the Unsecured Creditor Trust, and, as the signatory, have the sole power and authority on behalf of the Unsecured Creditor Trust to (a) open and close accounts with any banking, financial or

investment institution; (b) make deposits and withdrawals of cash and other property into or from any such account; (c) make or endorse checks with respect to any such account; (d) effectuate purchases and sales of securities and give security purchase and sale orders to brokers or any other third parties, and the exercise of such power and authority shall be deemed to be authorized by and to represent the decision of the Unsecured Creditor Trustee then entitled to make such decision; and

14. To invest in demand and time deposits, such as short-term certificates of deposit, in banks and other savings institutions, or other temporary, liquid investments such as Treasury Bills, to the extent reasonably necessary to maintain the value of the assets and to further the liquidating purpose of the Unsecured Creditor Trust; and

15. To maintain a register of names, addresses and amounts of outstanding claims for Trust Beneficiaries, as may be revised from time to time; and

16. Pursuant to the Plan, to request that the Bankruptcy Court estimate any contingent, disputed, or unliquidated Claim in Classes 12, 13, 15, 18, 21, 27 or 33, pursuant to Section 502(c) of the Code, regardless of whether the Debtors or the Unsecured Creditor Trustee have previously objected to such Claim, or whether the Bankruptcy Court has ruled on any such objection; the Bankruptcy Court will retain jurisdiction to estimate any Claim in Classes 12, 13, 15, 18, 21, 27 or 33 at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, disputed or unliquidated Claim in Classes 12, 13, 15, 18, 21, 27 or 33, that estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Unsecured Creditor Trustee may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim; and

17. To establish and maintain reserves for all Disputed Class 12, 13, 15, 18, 21, 27 and 33 Unsecured Claims. For purposes of establishing a reserve, Cash will be set aside equal to the amount that would have been distributed to the holders of Disputed Claims in such Class(es) had their Disputed Claims been deemed Allowed Claims on the Trust Effective Date or such other amount as may be approved by the Bankruptcy Court upon motion of the Unsecured Creditor Trustee or the Holder of the Disputed Claim. If, when, and to the extent any such Disputed Claim becomes an Allowed Claim, the relevant portion of the Cash held in reserve therefore shall be distributed by the Unsecured Creditor Trustee to the Creditor. The balance of such Cash, if any, remaining after all Disputed Claims have been resolved, shall be distributed pro rata to all Holders of Allowed Claims entitled to receive distributions from the Unsecured Creditor Trust.

## ARTICLE VIII: TRUST ADVISORY BOARD

A. **Trust Advisory Board.** An advisory board (the "Trust Advisory Board") shall be created for the Unsecured Creditor Trust and shall be comprised of up to three (3) members,

each of whom shall be designated by the Official Committee of Unsecured Creditors (the "Committee"). The Committee has designated the following the following three (3) initial members of the Trust Advisory Board: (1) Kenneth Campbell; (2) Virgin Islands Design Build Group, LLC; and (3) Peninsula Resort Management, LLC.

B. **Consultation.** The Trustee shall consult regularly with the Trust Advisory Board when carrying out the purpose and intent of the Unsecured Creditor Trust.

C. **Reimbursement of Expenses.** The members of the Trust Advisory Board shall be entitled to reimbursement of the reasonable and necessary expenses incurred by them in carrying out the purpose of the Trust Advisory Board, in accordance with this Unsecured Creditor Trust Agreement. Such reimbursement shall be payable solely from the Unsecured Creditor Trust.

D. **Vacancy.** In the case of an inability or unwillingness of any member of the Trust Advisory Board to serve, such member may be replaced by designation of the remaining members of the Trust Advisory Board. If any position on the Trust Advisory Board remains vacant for more than thirty (30) days, such vacancy may be filled within fifteen (15) days thereafter by the designation of the Unsecured Creditor Trustee without the requirement of a vote by the remaining members of the Trust Advisory Board or such vacancy may remain unfilled at the discretion of the Unsecured Creditor Trustee.

E. **Dissolution.** Upon the certification by the Unsecured Creditor Trustee that all Trust Assets have been liquidated, distributed, abandoned, or otherwise disposed of, the Trust Advisory Board shall be dissolved, whereupon the members of the Trust Advisory Board shall be discharged from further duties and responsibilities.

## ARTICLE IX: LIMITATIONS ON UNSECURED CREDITOR TRUSTEE'S LIABILITIES

A. **Liability; Indemnification**. The Unsecured Creditor Trustee shall not in any way be liable for any acts or omissions to act except by reason of his gross negligence or willful misconduct in the performance of his duties under the Plan or this Agreement. The Unsecured Creditor Trust shall indemnify the Unsecured Creditor Trustee and hold him harmless from and against any and all liabilities, expenses, claims, damages and losses incurred by him as a direct result of actions taken or omissions to act by him in such capacity.

B. **No Liability for Acts of Predecessor**. No successor Unsecured Creditor Trustee shall be in any way responsible for the acts or omissions of any preceding Unsecured Creditor Trustee in office prior to the date on which such person becomes an Unsecured Creditor Trustee, nor shall he, she, or it be obligated to inquire into the validity or propriety of any such act or omission, unless such successor Unsecured Creditor Trustee expressly assumes such responsibility. Any successor Unsecured Creditor Trustee shall be entitled to accept as conclusive any final accounting and statement of the Trust Estate furnished to such successor Unsecured Creditor Trustee by such predecessor Unsecured Creditor Trustee and shall further be responsible only for those assets of the Trust Estate included in such statement.

C.    **No Implied Obligations**.  The Unsecured Creditor Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth herein, and in the Plan and/or the Confirmation Order, and no other or further covenants or obligations shall be implied into this Agreement.  The Unsecured Creditor Trustee shall not be responsible in any manner whatsoever for the correctness of any recitals, statements, representations, or warranties herein or in any documents or instrument evidencing or otherwise constituting a part of the Trust Estate.  The Unsecured Creditor Trustee makes no representations as to the value of the Trust Estate or any part thereof, nor as to the validity, execution, enforceability, legality, or sufficiency of this Agreement, and the Unsecured Creditor Trustee shall incur no liability with respect to any such matters.

D.    **Reliance by Unsecured Creditor Trustee on Documents or Advice of Counsel or Other Persons**.  Except as otherwise provided herein, the Unsecured Creditor Trustee may rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document reasonably believed to be genuine and to have been signed or presented by the proper authorized party or parties, and shall have no liability or responsibility with respect to the form, execution, or validity thereof.  None of the provisions hereof shall require the Unsecured Creditor Trustee to expend or risk his own funds or otherwise incur financial liability or expense in the performance of any duties hereunder.  The Unsecured Creditor Trustee may consult with legal counsel and shall not be liable for any action taken or suffered in reliance upon the advice of such counsel.

E.    **No Personal Obligation for Debtors' Liabilities**.  Trust Beneficiaries and other persons dealing with the Unsecured Creditor Trustee in his capacity as Unsecured Creditor Trustee within the scope of this Agreement, shall look solely to the Trust Estate to satisfy any liability incurred by the Unsecured Creditor Trustee to such person in carrying out the terms of this Agreement, and the Unsecured Creditor Trustee shall have no personal or individual obligation to satisfy any such liability.

## ARTICLE X:  TAX MATTERS

A.    **Grantor Trust.**  In the event the IRS determines that for tax purposes the Unsecured Creditor Trust is not a liquidating trust, the Unsecured Creditor Trustee will apply for tax treatment as a partnership.  If the Unsecured Creditor Trust does not qualify for tax treatment as either a liquidating trust or a partnership, the Unsecured Creditor Trust will be treated as a corporation, and the earnings of the Unsecured Creditor Trust will be subject to double taxation, once when earned by the Unsecured Creditor Trust, and subsequently when the Trust Beneficiaries receive the distributed earnings.

B.    **Providing Taxpayer Identification Number**.  All Trust Beneficiaries to receive payment from the Unsecured Creditor Trustee must provide the Unsecured Creditor Trustee with their taxpayer identification number.

# ARTICLE XI: TRUST BENEFICIARIES

A. **Rights of Trust Beneficiaries**. Each Trust Beneficiary shall be entitled to participate in the rights and benefits due to a Trust Beneficiary hereunder. The interest of each Trust Beneficiary in the Unsecured Creditor Trust is hereby declared and shall be in all respects personal property of such Trust Beneficiary and upon the death of an individual Trust Beneficiary his, her or its interest shall pass to his, her or its legal representative and such death shall not terminate the Unsecured Creditor Trust or otherwise affect the validity of this Agreement. Each Trust Beneficiary shall have the rights with respect to the Trust Estate as are provided by this Agreement and the Plan. No (i) corporation, partnership, limited liability company, limited liability partnership or other entity, including any assignee or successor in interest of such entity, or (ii) widower, widow, heir, or devisee of any person who may be a Trust Beneficiary shall have any right of dower, elective share, homestead, inheritance, or of partition, or any other right, statutory or otherwise, in any property whatever forming a part of the Trust Estate, but the whole title to all the Trust Estate shall be vested in the Unsecured Creditor Trustee and the sole interest of the Trust Beneficiaries shall be the rights and benefits given to such persons under this Agreement.

B. **Termination of Trust Interest**. Once the Trust Beneficiaries have received distribution of all amounts payable hereunder and in accordance with the Plan, the Unsecured Creditor Trustee will be considered to have redeemed the interest of the entire class and may cancel the interests of the Trust Beneficiaries of the Unsecured Creditor Trust. Upon complete distribution of the funds available for all of the Trust Beneficiaries, the Unsecured Creditor Trustee may terminate the Trust interests. The Unsecured Creditor Trustee shall notify the Trust Beneficiaries in writing that their interests in the Unsecured Creditor Trust have been terminated.

C. **Transferability of Interests of Trust Beneficiaries in Unsecured Creditor Trust is Limited**. The Trust Beneficiaries acknowledge their special relationship in the creation and administration of the Unsecured Creditor Trust. Accordingly, no Trust Beneficiary may assign, transfer, encumber, or in any other manner alienate or dispose of all or any part of his, her or its interest in the Unsecured Creditor Trust without the written consent of the Unsecured Creditor Trustee. In the event a Trust Beneficiary desires to transfer his, her or its interest in the Unsecured Creditor Trust, he, she or it shall first notify the Unsecured Creditor Trustee in writing of the circumstances surrounding the intended transfer. Provided written consent is received from the Unsecured Creditor Trustee, the Trust Beneficiary intending to transfer his, her or its interest may transfer his, her or its interest in the Unsecured Creditor Trust by providing to the Unsecured Creditor Trustee such written documentation and other information as may be required to transfer the interest. In the event of a transfer of any interest of any Trust Beneficiary, as permitted by this Agreement, the transferee shall take and hold such interest subject to the terms and provisions of this Agreement and shall give written notice of such transfer to the Unsecured Creditor Trustee. The Unsecured Creditor Trustee shall not be liable to any transferee of an interest of a Trust Beneficiary for any distributions provided for hereunder unless and until the Unsecured Creditor Trustee receives written notice of such transfer together with appropriate assignment and transfer documents signed by the Trust Beneficiary.

## ARTICLE XII: DURATION OF TRUST ESTATE

A. **Duration**. This Unsecured Creditor Trust shall remain in existence and continue in full force and effect until all of the following shall have occurred: (a) the Trust Estate has been reduced to Cash or the Unsecured Creditor Trustee has determined that it is impracticable or not in the best interest of the Trust Beneficiaries of the Unsecured Creditor Trust to do so; (b) all costs, expenses and obligations incurred in administering the Unsecured Creditor Trust have been paid and discharged; (c) the Trust Estate has been distributed to the Trust Beneficiaries in accordance with the Plan; and (d) a Final Report has been filed and a Final Order of the Bankruptcy Court closing the Chapter 11 Case has been entered; provided, however, that the Trust shall not remain in existence for more than five (5) years from the Trust Effective Date of this Agreement, subject to extension as provided below.

B. **Extension of Trust Term**. If warranted by the facts and circumstances provided for in the Plan, and subject to the approval of the Bankruptcy Court, upon a finding that the extension is necessary to the purpose of this Unsecured Creditor Trust, the term of the Unsecured Creditor Trust may be extended for a finite term based on the particular circumstances. Each extension must be approved by the Bankruptcy Court within six months of the beginning of the extended term.

## ARTICLE XIII: AMENDMENTS

A. **Amendments**. The Unsecured Creditor Trustee may add any provisions to or change in any manner or eliminate any of the provisions of this Agreement or amendments hereto; provided however, that no such amendment shall permit the Unsecured Creditor Trustee to act in any manner which is inconsistent with the Plan, or engage in any activity prohibited by this Agreement.

B. **Notice and Effect of Amendment**. Upon any such amendment by the Unsecured Creditor Trustee, this Agreement shall be deemed to be modified and amended in accordance therewith and the respective rights, limitations of rights, obligations, duties and immunities of the Unsecured Creditor Trustee and the Trust Beneficiaries under this Agreement shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modification and amendment, and all the terms and conditions of this Agreement for any and all purposes.

## ARTICLE XIV: EFFECT OF AGREEMENT ON THIRD PARTIES

A. **Unsecured Creditor Trustee Not Personally Liable**. Third parties dealing with the Unsecured Creditor Trustee shall look only to the Trust Estate to satisfy any liability incurred by the Unsecured Creditor Trustee to such person in carrying out the terms of this Unsecured Creditor Trust, and the Unsecured Creditor Trustee shall have no personal or individual obligations to satisfy any such liability.

B. **Authority of Unsecured Creditor Trustee**. Any third party dealing with the Unsecured Creditor Trustee shall be fully protected in relying upon the Unsecured Creditor

Trustee's certificate signed by the Unsecured Creditor Trustee that such Unsecured Creditor Trustee has authority to take any action under this Agreement.

## ARTICLE XV: COMPENSATION OF UNSECURED CREDITOR TRUSTEE AND PROFESSIONALS

A. **Unsecured Creditor Trustee**. The Unsecured Creditor Trustee shall be compensated for his services as Unsecured Creditor Trustee hereunder. The Unsecured Creditor Trustee shall be paid hourly for his service, at his then applicable hourly rate (which rate is initially $300 per hour), for the time worked in performing his duties hereunder, subject to the terms of this Agreement, and shall not be limited to a statutory percentage of monies disbursed hereunder. In addition, the Unsecured Creditor Trustee shall be reimbursed for the ordinary and necessary out-of-pocket expenses he incurs in fulfilling his duties with respect to the Unsecured Creditor Trust. Such compensation shall be paid from assets of the Trust Estate when the Trustee deems appropriate without Bankruptcy Court approval.

B. **Payment of Professionals**. The Unsecured Creditor Trustee may retain and compensate professionals on such terms as the Unsecured Creditor Trustee deems reasonable, subject to the terms of this Agreement, without Bankruptcy Court approval. All costs and expenses and obligations incurred by the Unsecured Creditor Trustee in administering the Unsecured Creditor Trust or in any manner connected, incidental or related thereto shall be a charge against the Unsecured Creditor Trust, including but not limited to, payments to the Unsecured Creditor Trustee and any attorneys, accountants, brokers or other professionals employed by the Unsecured Creditor Trustee (collectively, the "Trust Professionals"). The Trust Professionals will submit copies of complete invoices, with time records, each month. Upon being satisfied as to the correctness and reasonableness of the cost, expenses and obligations, the Unsecured Creditor Trustee will approve and direct payment to the Trust Professionals on a timely basis without Bankruptcy Court approval.

## ARTICLE XVI: UNSECURED CREDITOR TRUSTEE AND SUCCESSOR TRUSTEE

A. **Resignation and Removal**. The Unsecured Creditor Trustee may:

1. resign and be discharged from the Unsecured Creditor Trust hereby created only by filing an appropriate motion in and obtaining a Final Order of the Bankruptcy Court; or

2. be removed for good cause (as defined under the common law of Florida) by Final Order of the Bankruptcy Court.

Such resignation or removal shall become effective upon the appointment of the Unsecured Creditor Trustee's successor by a Final Order of the Bankruptcy Court and such successor's acceptance of such appointment.

B.    **Appointment of Successor Unsecured Creditor Trustee**.  Should the Unsecured Creditor Trustee resign, be removed by Final Order of the Bankruptcy Court, die, or become incapacitated, a vacancy shall be deemed to exist.  The Bankruptcy Court shall appoint a successor trustee.  The Unsecured Creditor Trustee shall be required to continue to perform its duties until a successor is approved by Final Order of the Bankruptcy Court, unless the Unsecured Creditor Trustee is incapable of action.  The compensation, if any, of the successor Unsecured Creditor Trustee shall be as stated in the instrument evidencing such successor Unsecured Creditor Trustee's appointment.

C.    **Acceptance of Appointment by Successor Unsecured Creditor Trustee**.  Each successor Unsecured Creditor Trustee appointed hereunder shall execute an instrument accepting such appointment.  Thereupon such successor Unsecured Creditor Trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trust, and duties of his, her or its predecessor in the Unsecured Creditor Trust hereunder with like effect as if originally named therein; but the retiring Unsecured Creditor Trustee shall nevertheless, when requested in writing by the successor Unsecured Creditor Trustee, execute and deliver any instrument or instruments conveying and transferring to such successor Unsecured Creditor Trustee upon the Unsecured Creditor Trust herein expressed, all the estates, properties, rights, powers, and trusts of such retiring Unsecured Creditor Trustee, and shall duly assign, transfer, and deliver to such successor Unsecured Creditor Trustee all property and money held by him, hereunder.  Notwithstanding the appointment of a successor Unsecured Creditor Trustee, the retiring Unsecured Creditor Trustee shall, without limitation, continue to be entitled to the protection provided in Article IX hereof.

## ARTICLE XVII:  ACTIONS AGAINST THE TRUST ESTATE

A.    **Limitation on Suits by Trust Beneficiaries**.  No Trust Beneficiaries shall have any right by virtue of any provision of this Agreement to institute any action or proceeding at law or in equity against any party upon or under or with respect to the Trust Estate.

B.    **Requirement of Undertaking**.  The Unsecured Creditor Trustee may request any court to require, and any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Agreement, or in any suit against the Unsecured Creditor Trustee for any action taken or omitted by the Unsecured Creditor Trustee, that the filing party litigant in such suit of an undertaking pay the costs of such suit, and such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant.

## ARTICLE XVIII:  MISCELLANEOUS

A.    **Further Assurances**.  The Settlors and the Unsecured Creditor Trustee shall promptly execute and deliver such further instruments and do such further acts as may be necessary or proper to more effectively transfer to the Unsecured Creditor Trustee any portion of

the Trust Estate intended to be conveyed pursuant to the Plan and this Agreement to otherwise carry out the intentions of this Agreement and the Plan.

B. **Retention of Jurisdiction**. The Bankruptcy Court shall retain jurisdiction over this Agreement and the Unsecured Creditor Trust established hereby as set forth in the Confirmation Order. In the event the Bankruptcy Court does not have or accept jurisdiction over any issue relating to this Agreement, then the requirement for Bankruptcy Court approval provided in various sections of this Agreement shall be satisfied by approval from any court of competent jurisdiction.

C. **Severability**. If any one or more of the provisions herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect or for any reason, the validity, legality and enforceability of any such provision in every other respect, and of the remaining provisions, shall not in any way be impaired or affected. In such event, there shall be added as part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable. The effective date of the added provision shall be the date upon which the prior provision was held to be invalid, illegal or unenforceable.

D. **Filing Documents**. A copy of this Agreement and all amendments thereof shall be filed in the office of the Unsecured Creditor Trustee and shall be available during regular business hours for inspection by any Trust Beneficiary or his, her or its duly authorized representative. The Unsecured Creditor Trustee shall file any amendment of this Agreement in the same places where the original Agreement is filed. The Unsecured Creditor Trustee shall file any instrument which relates to any change in the office of the Unsecured Creditor Trustee in the same places where the original Agreement is filed.

E. **Laws as to Construction**. This Agreement shall be governed and construed in accordance with the laws of the State of Florida, without giving effect to the principles of conflicts of law.

F. **No Assignment**. Except as otherwise provided herein, the obligations, duties or rights of the Unsecured Creditor Trustee under this Agreement shall not be assignable, voluntarily, involuntarily or by operation of law, and any such attempted assignment shall be void.

G. **Trust Year**. The Trust will utilize the 12-month period selected by the Unsecured Creditor Trustee as its year for tax and financial accounting purposes.

H. **Effectiveness**. This Agreement shall become effective upon final execution of this Agreement and the occurrence of the Effective Date of the Plan (the "Trust Effective Date").

I. **Unclaimed Property**. Any property to be distributed under this Agreement that remains unclaimed or otherwise not deliverable to the Trust Beneficiary entitled thereto as of the later of (a) one (1) year after the Trust Effective Date or (b) one hundred twenty (120) calendar days after the distribution shall become vested in, and shall be transferred and delivered to, the

Unsecured Creditor Trust to be applied toward funding of the distributions under this Agreement. In such event, such Trust Beneficiary's interest in the Unsecured Creditor Trust shall no longer be deemed to exist, and such Trust Beneficiary shall be deemed to have waived its right to such distribution and shall not participate in any further distributions under this Agreement with respect to such interest.

J.    **Notices**.

1.    To Trust Beneficiaries.  Any notice or other communication hereunder to a Trust Beneficiary shall be deemed to have been sufficiently given, for all purposes, if given by facsimile or electronic transmission or by being deposited, postage prepaid, in a post office or letter box addressed to the Trust Beneficiary at his, her or its address or facsimile number, as appropriate, as shown on either the Debtors' schedules, a proof of claim filed by the Trust Beneficiary with the Bankruptcy Court, or the records of the Unsecured Creditor Trustee.

2.    To Unsecured Creditor Trustee.  Any notice or other communication hereunder to the Unsecured Creditor Trustee shall be deemed to have been sufficiently given, for all purposes, if given by facsimile or electronic transmission or by being deposited, postage prepaid, in a post office or letter box addressed to the Unsecured Creditor Trustee, with a copy provided to counsel, at:

> Larry S. Hyman
> Island One Unsecured Creditor Trustee
> 106 S. Tampania Avenue
> Suite 200
> Tampa, Florida  33609
> Facsimile (813) 875-2797
>
> With a copy to:
> H. Bradley Staggs, Esq.
> Bush Ross, P.A.
> 1801 N. Highland Avenue
> Tampa, Florida  33602
> Facsimile (813) 223-9620

3.    Effective Date of Notice.  Any notice given by mail in accordance with paragraphs (1) and (2) shall be deemed to be effective three (3) days following its deposit in the mail, and any notice given by facsimile in accordance with this paragraph shall be deemed to be effective upon receipt, as evidenced by a facsimile confirmation.

K.    **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute but one and the same instrument.

L.    **Entire Agreement**.  This Agreement (including the recitals and the schedules hereto), the Plan and the Confirmation Order constitute the entire agreement of the parties and there are no representations, warranties, covenants, or obligations except as set forth herein or therein.  This Agreement, the Plan, and the Confirmation Order supersede all prior and contemporaneous agreements, understandings, negotiations, and discussions, written or oral, of the parties hereto, relating to any transaction contemplated hereunder.  In the event of any inconsistency between this Agreement, the Plan, and the Confirmation Order, the Confirmation Order shall govern.  Except as otherwise specifically provided herein, nothing in this Agreement is intended or shall be construed to confer upon or to give any person other than the parties hereto and their respective heirs, administrators, executors, successors, and assigns any rights or remedies under or by reason of this Agreement.

**IN WITNESS WHEREOF**, the undersigned have caused this instrument to be executed as of this ___ day of May 2011, to evidence their consent and agreement with the terms and provisions of this Agreement.

*[SIGNATURES CONTINUED ON NEXT PAGE]*

**SETTLORS:**

ISLAND ONE, INC.

By: _____
Name:
Title:

CRESCENT ONE, LLC

By: _____
Name:
Title:

ST. CROIX ONE, LLC

By: _____
Name:
Title:

ISLAND ONE RESORTS MANAGEMENT
CORPORATION

By: _____
Name:
Title:

NAVIGO VACATION CLUB, INC.,

By: _____
Name:
Title:

IOI FUNDING I, LLC

By: _____
Name:
Title:

**UNSECURED CREDITOR TRUSTEE**

By: _____
Name:  Larry S. Hyman

17

STATE OF FLORIDA
COUNTY OF _____

      Personally appeared before me, an officer duly-authorized to administer oaths and accept acknowledgments within the State of Florida, _____, who, having produced a current Florida driver's license as adequate photographic identification, did execute the foregoing Unsecured Creditor Trust Agreement before me, did acknowledge such execution as his free act and deed before me and did not take an oath.

      Witness my hand and seal this ___ day of _____, 2011, at _____, _____ County, Florida.


My commission expires:

                                        Notary Public


STATE OF FLORIDA
COUNTY OF _____

      Personally appeared before me, an officer duly-authorized to administer oaths and accept acknowledgments within the State of Florida, _____, who, having produced a current Florida driver's license as adequate photographic identification, did execute the foregoing Unsecured Creditor Trust Agreement before me, did acknowledge such execution as his free act and deed before me and did not take an oath.

      Witness my hand and seal this ___ day of _____, 2011, at _____, _____ County, Florida.


My commission expires:

                                        Notary Public

18

950427.5

# Exhibit "C"

Amended PSA

**AMENDED AND RESTATED PLAN SPONSOR AGREEMENT**

BY AND AMONG

ISLAND ONE, INC.,

CRESCENT ONE LLC

-and-

TIMESHARE ACQUISITIONS, LLC

Dated as of May 25, 2011

**TABLE OF CONTENTS**

Page

Article I
DEFINITIONS

Section 1.1     Recitals................................................................................................. 2
Section 1.2     Definitions............................................................................................ 2

Article II
THE TRANSACTIONS

Section 2.1     Purchase and Sale ............................................................................ 13
Section 2.2     Purchase Price .................................................................................. 14
Section 2.3     Deposit ............................................................................................... 14

Article III
BANKRUPTCY MATTERS

Section 3.1     Bankruptcy Filings .......................................................................... 15
Section 3.2     Confirmation Order .......................................................................... 15
Section 3.3     Intentionally Omitted........................................................................ 17

Article IV
REPRESENTATIONS AND WARRANTIES OF THE COMPANY AND CRESCENT
ONE

Section 4.1     Organization and Good Standing ................................................... 17
Section 4.2     Authorization of Agreement ........................................................... 17
Section 4.3     Conflicts; Consents of Third Parties ............................................. 18
Section 4.4     Capitalization .................................................................................... 18
Section 4.5     Material Contracts ............................................................................ 19
Section 4.6     Real Property..................................................................................... 19
Section 4.7     Environmental Matters .................................................................... 19
Section 4.8     Intellectual Property ........................................................................ 20
Section 4.9     Labor................................................................................................... 20
Section 4.10    Permits ............................................................................................... 20
Section 4.11    Tax Matters ....................................................................................... 20
Section 4.12    Litigation ........................................................................................... 21
Section 4.13    Ownership .......................................................................................... 21
Section 4.14    Compliance with Law ...................................................................... 22
Section 4.15    Financial Statements........................................................................ 22
Section 4.16    Accounts Receivable ....................................................................... 22
Section 4.17    Timeshare Interests .......................................................................... 22
Section 4.18    Resort Documents ............................................................................ 22
Section 4.19    Financial Advisors............................................................................ 23
Section 4.20    Disclosure.......................................................................................... 23

Article V
REPRESENTATIONS AND WARRANTIES OF PURCHASER

Section 5.1    Organization and Good Standing ................................................................. 23
Section 5.2    Authorization of Agreement ......................................................................... 24
Section 5.3    Conflicts; Consents of Third Parties............................................................ 24
Section 5.4    Litigation........................................................................................................ 24
Section 5.5    Financial Advisors ........................................................................................ 25
Section 5.6    Financial Capability...................................................................................... 25
Section 5.7    Condition of the Business ............................................................................ 25

Article VI
COVENANTS AND AGREEMENTS

Section 6.1    Covenants of the Company and Crescent One.......................................... 25
Section 6.2    Covenants of Purchaser ............................................................................... 27
Section 6.3    Access to Information ................................................................................... 27
Section 6.4    Contracts ........................................................................................................ 28
Section 6.5    Consents; Further Assurances ..................................................................... 29
Section 6.6    Notice of Default ........................................................................................... 29
Section 6.7    Confidentiality............................................................................................... 30
Section 6.8    Conduct of Business Prior to the Closing .................................................. 30
Section 6.9    Post-Closing Employee Covenants ............................................................. 33
Section 6.10   Tax Returns & Compliance.......................................................................... 34
Section 6.11   Public Announcements ................................................................................. 34
Section 6.12   Acquisition of Crescent One ....................................................................... 35

Article VII
CONDITIONS TO CLOSING

Section 7.1    Conditions for Purchaser............................................................................. 35
Section 7.2    Conditions for the Company and Crescent One......................................... 36

Article VIII
CLOSING

Section 8.1    Closing Arrangements .................................................................................. 37
Section 8.2    Deliveries of the Company and Crescent One ........................................... 37
Section 8.3    Deliveries of the Purchaser ......................................................................... 38

Article IX
TERMINATION OF AGREEMENT

Section 9.1    Termination.................................................................................................... 38
Section 9.2    Procedure upon Termination........................................................................ 40
Section 9.3    Effect of Termination ................................................................................... 40

**TABLE OF CONTENTS**
**(continued)**

Page

Article X
MISCELLANEOUS

| | | |
|---|---|---|
| Section 10.1 | Construction | 40 |
| Section 10.2 | Headings | 41 |
| Section 10.3 | Interpretation | 41 |
| Section 10.4 | Obligations as Covenants | 42 |
| Section 10.5 | Notices | 42 |
| Section 10.6 | Specific Performance | 43 |
| Section 10.7 | Fees and Expenses | 44 |
| Section 10.8 | Governing Law; Jurisdiction; Service of Process | 44 |
| Section 10.9 | Further Assurances | 44 |
| Section 10.10 | Entire Agreement | 44 |
| Section 10.11 | Amendment; Waiver | 44 |
| Section 10.12 | Survival | 45 |
| Section 10.13 | Assignment | 45 |
| Section 10.14 | Successors and Assigns | 45 |
| Section 10.15 | No Third Party Beneficiaries | 45 |
| Section 10.16 | Non-Recourse | 45 |
| Section 10.17 | Severability of Provisions | 46 |
| Section 10.18 | Counterparts | 46 |

EXHIBIT A          RESTRUCTURING TERM SHEET

EXHIBIT B          DISCLOSURE SCHEDULES

<u>AMENDED AND RESTATED PLAN SPONSOR AGREEMENT</u>

AMENDED AND RESTATED PLAN SPONSOR AGREEMENT (as amended, the "**Agreement**"), dated as of May 25, 2011, by and among Island One, Inc., a Florida corporation (the "**Company**"), Crescent One, LLC, a Florida limited liability company ("**Crescent One**") and Timeshare Acquisitions, LLC, a Delaware limited liability company (the "**Purchaser**") (collectively, the "**Parties**" and individually, a "**Party**").

## RECITALS:

WHEREAS, the Company and its Affiliates historically have been in the business of operating a vacation ownership, hospitality and resort management operation, with capabilities relating to construction, development, marketing, sales, customer financing, owner services, finance, accounting, and resort management (the "**Business**");

WHEREAS, on September 10, 2010, the Company and certain of its Affiliates, including Crescent One, St. Croix One, LLC, a US Virgin Islands limited liability company ("**St. Croix**"), Island One Resorts Management Corporation, a Florida corporation ("**IORMC**"), Navigo Vacation Club, Inc., a Florida corporation, d/b/a Club Navigo ("**NVC**") and IOI Funding I, LLC, a Florida limited liability company ("**IOI Funding**", collectively, the "**Debtors**"), commenced cases (the "**Bankruptcy Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") by filing voluntary petitions for relief with the United States Bankruptcy Court for the Middle District of Florida, Orlando Division (the "**Bankruptcy Court**");

WHEREAS, Purchaser desires to assist the Debtors in their efforts to recapitalize and emerge from bankruptcy and has agreed to sponsor the implementation of a joint chapter 11 plan of reorganization based on and subject to the terms and conditions set forth in this Agreement and the restructuring term sheet attached hereto as <u>Exhibit A</u> (the "**Restructuring Term Sheet**");

WHEREAS, in connection with the Bankruptcy Cases, the Debtors intend to file the Amended Plan, pursuant to which the Debtors intend to seek the approval of the Bankruptcy Court of this Agreement and the transactions contemplated herein, and the authority to perform all of the Debtors' obligations under this Agreement and the other Transaction Documents;

WHEREAS, in connection with and as a condition to the consummation of the Amended Plan, the Island One Entities (as defined below) shall enter into certain debt restructuring transactions with their respective Lenders in order to amend the terms of, restructure or discharge, as applicable, the Indebtedness of the Island One Entities held by the Lenders, on the terms set forth on the Restructuring Term Sheet (the "**Debt Restructuring Transactions**");

WHEREAS, in connection with the Debt Restructuring Transactions, the transactions contemplated hereby and the filing of an Amended Plan subject to the terms and conditions herein, the Majority Lenders have agreed that provided the Amended Plan reflects the applicable terms of this Agreement and the Restructuring Term Sheet, they will support, and vote in favor of, such Amended Plan, and not to support, or vote in favor of, any other plan of reorganization;

WHEREAS, upon the consummation of the transactions contemplated herein (including Exhibit A attached hereto) and in the Amended Plan (including the cancellation of all of the existing capital stock and other ownership interests of the Company), Purchaser desires to purchase, and the Company desires to issue to the Purchaser, one hundred percent (100%) of the reorganized capital stock and other ownership interests of the Company and Crescent One, on the terms and subject to the conditions described herein;

WHEREAS, on March 9, 2011, the Purchaser and the Company entered into that certain Plan Sponsor Agreement (the "**Original Agreement**");

WHEREAS, on March 22, 2011, the Debtors filed the Amended Plan with the Bankruptcy Court;

WHEREAS, on April 20, 2011, pursuant to Section 6.12 of the Original Agreement, the Company exercised its option to cause the Original Agreement to be modified or supplemented to provide for the acquisition by Purchaser of the reorganized limited liability company and other ownership interests of Crescent One; and

WHEREAS, on the terms and subject to the conditions hereinafter set forth and pursuant to the Confirmation Order, the Parties desire to enter into this Agreement pursuant to which, among other things, (i) the Parties shall amend and restate the Original Agreement and (ii) enter into the transactions contemplated in this Agreement.

**NOW, THEREFORE,** in consideration of the premises and the mutual representations, warranties, covenants and agreements hereinafter contained, the receipt and sufficiency of which are acknowledged, and intending to be bound hereby, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.1** Recitals. The recitals set forth above are incorporated by reference and are expressly made part of this Agreement.

**Section 1.2** Definitions. The following definitions shall apply to and constitute part of this Agreement and all Exhibits and Schedules attached hereto:

"**2010 Financial Statements**" shall mean the unaudited balance sheet of the Island One Entities as of December 31, 2010 and the related consolidated statement of income and cash flows of the Island One Entities for the year ended December 31, 2010.

"**Accounts Receivable**" shall mean all accounts receivable, including, without limitation, all trade accounts receivable, notes receivable (other than Timeshare Receivables), vendor credits and all other obligations owed to an Island One Entity arising from the conduct of the Business before the Closing, whether or not evidenced by a note or arising in the ordinary course, together with any unpaid financing charges accrued thereon.

"**Added Contracts**" shall have the meaning set forth in Section 6.4(c).

"**Affiliate**" shall mean a person or entity that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, the person or entity specified. For purposes of this definition, "control" shall mean (a) a fifty percent (50%) or more common equity ownership or (b) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting Securities, by Contract or otherwise.

"**Agreement**" shall have the meaning set forth in the Preamble.

"**Amended Plan**" shall mean an amended joint plan of reorganization of the Debtors and any of the other Island One Entities that shall file chapter 11 bankruptcy cases pursuant to this Agreement, in form and substance reasonably acceptable to Purchaser and the Majority Lenders, including all documents and agreements that form part of such plan or related plan supplement or are related thereto, and as it may be amended, modified or supplemented from time to time.

"**Applicable Laws**" shall mean all domestic or foreign statutes, laws, by-laws, regulations, rules, ordinances and Orders of any Governmental Authority having jurisdiction with respect to such Person or property.

"**Assets**" shall mean the assets and properties of the Island One Entities, including the Tangible Personal Property, the Real Properties, the Permits and the Intellectual Property Rights, but excluding the Excluded Assets.

"**Assumption-Pending Pre-Petition Contracts**" means all Contracts that were entered into prior to the filing of the Bankruptcy Cases to which one of the Debtors is a party that, as of the date hereof, have not been assumed or rejected by the respective Debtor.

"**Assumption Schedule**" shall have the meaning set forth in <u>Section 6.4(b)</u>.

"**Bankruptcy Cases**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Code**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Court**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, and any Local Rules of the Bankruptcy Court, as applicable to the Bankruptcy Cases.

"**Benefit Plans**" means (i) all material employee benefit plans (as defined in ERISA Section 3(3)) and all material bonus, stock option, stock purchase, restricted stock, incentive, retention, change of control, deferred compensation, retiree medical or life insurance, health and welfare, supplemental retirement, severance, vacation, paid time-off or other material benefit plans, programs, policies or arrangements and all material employment, termination, severance or other contracts or agreements, to which any Island One Entity is a party and with respect to which any Island One Entity has any obligation, or which are maintained, contributed to or sponsored by an Island One Entity for the benefit of any current or former employee, officer,

independent contractor, consultant or director of any Island One Entity (ii) each employee benefit plan for which any Island One Entity could incur any material liability under Section 4069 or 4212(c) of ERISA, and (iii) any other material contracts, arrangements or understandings between any Island One Entity and any current or former employee, officer, independent contractor, consultant or director of any Island One Entity including any contracts, arrangements or understandings relating to the sale of the Island One Entities.

"**Bid Procedures**" shall mean the bid procedures, milestones and specific dates for certain actions established by the Bankruptcy Court in the Bidding Procedures Order, without any modification or amendment thereof absent the prior written consent of Purchaser and the Majority Lenders.

"**Bid Procedures Order**" shall mean the order of the Bankruptcy Court, dated December 15, 2010 and modified by order of the Bankruptcy Court dated February 23, 2011, approving, among other things, the bidding procedures for the sale of the equity and/or assets of the Debtors.

"**Books and Records**" shall mean all of files (including electronic files), documents, instruments, papers, books, and records (tangible or electronic, including computer files with historical operating data) relating to the business, operations, condition (financial or otherwise), results of operations, and assets and properties of the Island One Entities or any of the Timeshare Owners' Associations, in existence and in the possession or control of an Island One Entity, including, financial statements and related work papers and management letters from accountants, Tax Returns, budgets, ledgers, journals, Contracts, advertising materials related to the Business, licenses, documents containing technical support (including vendor documents), sales data, customer and ticketholder lists, mailing lists, supplier lists, environmental studies and plans, and development plans.

"**Business**" shall have the meaning set forth in the Recitals.

"**Business Day**" shall mean any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or obligated to close under Applicable Laws.

"**Business Employees**" shall mean all employees of the Island One Entities providing services to the Business in connection with the Assets immediately prior to the Closing Date.

"**Cash Collateral Budget**" means that certain budget in respect of the Debtors' use of cash during the pendency of the Bankruptcy Cases, as approved by the Bankruptcy Court on May 13, 2011, which shall not be subsequently modified or amended by the Debtors and the Majority Lenders without the prior written consent of the Purchaser, such consent not to be unreasonably withheld.

"**Cash Purchase Price**" shall mean thirteen million dollars ($13,000,000).

"**Claims**" shall mean claims, suits, proceedings, liabilities, obligations, losses, damages, penalties, judgments, costs, expenses, fines, disbursements, reasonable legal fees and disbursements, including in respect of investigation, interest, demands and actions of any nature or any kind whatsoever.

"**Closing**" has the meaning set forth in <u>Section 8.1</u>.

"**Closing Date**" has the meaning set forth in <u>Section 8.1</u>.

"**Closing Documents**" shall mean any agreements, instruments and other deliveries to be delivered at the Closing pursuant to <u>Section 8.2</u> and <u>Section 8.3</u>.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Company**" shall have the meaning set forth in the Preamble.

"**Competing Transaction**" shall have the meaning set forth in <u>Section 9.1(k)</u>.

"**Confidentiality Agreement**" shall have the meaning set forth in <u>Section 6.7</u>.

"**Confirmation Hearing**" means the hearing to be held by the Bankruptcy Court regarding confirmation of the Amended Plan in accordance with section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

"**Confirmation Order**" shall mean an order of the Bankruptcy Court, in form and substance reasonably acceptable to Purchaser and the Majority Lenders, including each of the matters set forth in <u>Section 3.2(b)</u>.

"**Contract**" shall mean any contract, arrangement, note, bond, commitment, purchase order, sales order, franchise, guarantee, indemnity, indenture, instrument, lease, license or other agreement, understanding, instrument or obligation, whether written or oral, all amendments, supplements and modifications of or for any of the foregoing and all rights and interests arising thereunder or in connection therewith, other than any Benefit Plans.

"**Crescent One**" shall have the meaning set forth in the Preamble.

"**Cure Costs**" means amounts that must be paid and obligations that otherwise must be satisfied, including pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of any Assumption-Pending Pre-Petition Contract as determined pursuant to a Final Order, which Order may be the Confirmation Order.

"**Debt Restructuring Transactions**" shall have the meaning set forth in the Recitals.

"**Deposit**" shall have the meaning set forth in <u>Section 2.3</u>.

"**Debtors**" shall have the meaning set forth in the Recitals.

"**Developer Rights**" means the rights as a developer of any real property or Resort.

"**Diamond**" shall mean Diamond Resorts Corporation and/or its Affiliates.

"**Diamond Documents**" shall have the meaning set forth in <u>Section 6.1(b)</u>.

"**Disclosure Schedules**" shall mean the disclosure schedules provided as of the date hereof by the Company and Crescent One or the Purchaser, as applicable, attached hereto as Exhibit B, organized by the particular Sections of this Agreement to which the disclosure schedule relates, as supplemented, modified or amended from time to time.

"**Diamond Services**" shall have the meaning set forth in Section 6.1(b).

"**Disclosure Statement**" shall mean the disclosure statement relating to the Amended Plan to be filed by the Debtors pursuant to section 1125 of the Bankruptcy Code (including all schedules and amendments thereto), as such disclosure statement may be amended or modified from time to time, in form and substance reasonably satisfactory to the Purchaser and the Majority Lenders.

"**Disclosure Statement Order**" means an order of the Bankruptcy Court approving, among other things, the Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Amended Plan, in form and substance satisfactory to the Purchaser and the Majority Lenders.

"**Environmental Laws**" shall mean all applicable federal, state, municipal and local laws, statutes, regulations and other legal requirements relating to the protection of the environment or natural resources.

"**Environmental Reports**" shall mean accurate and complete copies of any material reports, studies, analyses, evaluations, assessments or monitoring data that have been performed with regard to any Real Property or Resort and which are in the possession or control of any Island One Entity.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"**Escrow Agent**" shall have the meaning set forth in Section 2.3.

"**Excluded Assets**" means the assets of the Excluded Entities, and each other asset of the Island One Entities set forth on Disclosure Schedule 1.l(a), as Purchaser may update at any time and from time to time after the date hereof through the date that is ten (10) Business Days prior to the Confirmation Hearing; provided, that without the prior written consent of the Company and the Majority Lenders, which shall not be unreasonably withheld, Purchaser may not revise Disclosure Schedule 1.1(a) to (i) remove an asset from the list of Excluded Assets or (ii) add an asset to such list of Excluded Assets unless the asset to be added to such list primarily relates to an Excluded Entity (other than Crescent One to the extent acquired by Purchaser pursuant to Section 6.12) or is a Contract subject to rejection pursuant to Section 6.4(c).

"**Excluded Contracts**" means the Contracts set forth on Disclosure Schedule 1.l(b), as Purchaser may update at any time and from time to time after the date hereof, but in no event later than ten (10) Business Days prior to the Confirmation Hearing.

"**Excluded Entities**" shall mean St. Croix, Island One Leasing, LLC, a Florida limited liability company, Florida Vacation Station, Inc., a Florida corporation and Orlando Vacation Bureau, Inc., a Florida corporation.

"**Final Order**" means an Order of the Bankruptcy Court or other court of competent jurisdiction that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect.

"**Financial Statements**" means (i) the audited consolidated balance sheets of the Island One Entities as of December 31, 2007, and December 31, 2008, and the related audited statements of operations, and statements of income and cash flows of the Island One Entities for the years ended December 31, 2007 and December 31, 2008, (ii) the unaudited balance sheet of the Island One Entities as of December 31, 2009, and the related consolidated statement of income and cash flows of the Island One Entities for the year ended December 31, 2009 and (iii) the 2010 Financial Statements.

"**GAAP**" shall mean generally accepted accounting principles in the United States.

"**Governmental Authority**" shall mean any domestic, foreign or local government, quasi-governmental authority, regulatory authority, government department, agency, commission, board, arbitral or other tribunal or court.

"**Hazardous Materials**" means any substances, elements, mixtures, chemicals, constituents or materials, whether solid, liquid or gas, that are defined, listed or otherwise classified or regulated as pollutants, contaminants, hazardous wastes, hazardous substances, chemical substances, substances of very high concern, toxic substances, toxic materials, hazardous materials, extremely hazardous wastes under any present Environmental Laws (including petroleum and petroleum related substances, products, by products and wastes).

"**Indebtedness**" of any Person means, without duplication, (i) the principal of and premium (if any) in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bond or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, (iii) all conditional sale obligations of such Person; (iv) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (v) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (vi) all obligations of the type referred to in clauses (i) through (v) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (vii) all obligations of the type referred to in clauses (i) through (vi) of other Persons secured by any lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"**Intellectual Property Rights**" shall mean any right, title and interest in and to (i) patents, discoveries, innovations and improvements, (ii) trademarks, service marks, brand names, domain names, certification marks, logos, symbols, trade names, assumed names, fictitious names and d/b/a's, together with the goodwill associated therewith; (iii) published and

unpublished works of authorship; (iv) computer programs, software, firmware, middleware, user interface, source code, object code, databases and compilations, including any and all data and collections of data whether machine readable or otherwise, algorithms, development tools, servers; and (v) trade secrets, proprietary and confidential information, show-how and know-how, customer information, lists of customers, manufacturers and supplier, other intellectual property, and all intellectual property rights, including any causes of action, arising from or in respect of each of the foregoing.

"**Interest**" shall mean any interest of a person or entity other than the Purchaser in and to, or related to, any of the Assets to the fullest extent referred to in the Bankruptcy Code other than a Claim or Lien, including any option, right, claim of successor liability, ownership or other property interest of any type, voting or other restrictions, right-of-way, covenant, condition, leasehold, license, easement, encroachment, restriction, other third-party right or title defect or encumbrance of any nature whatsoever, whether legal or equitable in nature, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated and whether contractual, statutory or common law in origin.

"**IOI Funding**" shall have the meaning set forth in the Recitals.

"**IORMC**" shall have the meaning set forth in the Recitals.

"**IRS**" shall mean the Internal Revenue Service of the United States.

"**Island One Entities**" shall mean the Company, Crescent One, IORMC, NVC, IOI Funding, and Galaxy Exchange Company, a Florida corporation, and each other Person (whether or not a Debtor) with respect to which Purchaser shall acquire (directly or indirectly) Securities or other Interests in whatever form pursuant to Section 2.1, including each of their respective Subsidiaries (other than any Person the assets of which are expressly indicated as Excluded Assets). For the avoidance of doubt, the Island One Entities shall not include the Excluded Entities.

"**Knowledge**" shall mean with respect to the Company or Crescent One, the actual knowledge after reasonable inquiry of each of Deborah L. Linden, Sulyn M. Stumbras, Karen S. Holbrook, Sterling F. Stoudenmire IV, Pamela Gould and Harry Christenson.

"**Labor Schedule**" shall have the meaning set forth in Section 4.9.

"**Legal Proceedings**" shall mean any claim, suit, action, inquiry, investigation, arbitration, legal or judicial proceeding, administrative, quasi-administrative or enforcement proceeding or arbitration proceeding before any Governmental Authority.

"**Lenders**" means Textron Financial Corporation, Liberty Bank, BB&T Acquired Asset Group, Old Florida National Bank and any affiliate or subsidiary of any such lender which currently holds any Indebtedness of any Island One Entity.

"**Liability**" shall mean any debt, obligation, amount due or payable or liability of any nature, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

"**Liens**" shall mean all mortgages, pledges, charges, liens, debentures, trust deeds, claims, assignments by way of security or otherwise, security interests, conditional sales contracts or other title retention agreements or similar interests or instruments charging, or creating a security interest in the Assets or any part thereof or interest therein, and any agreements, leases, licenses, occupancy agreements, options, easements, rights of way, restrictions, executions or other encumbrances (including notices or other registrations in respect of any of the foregoing).

"**License**" shall mean any franchise, approval, permit, license, order, registration, certificate, variance, authorizations or similar right obtained from any Governmental Authority.

"**Majority Lenders**" means, as of any date, the Lenders holding a majority in interest based on the value of Claims of the Lenders with respect to the Debtors. For the avoidance of doubt, Textron Financial Corporation and Liberty Bank are the Majority Lenders as of the date of this Agreement.

"**Material Adverse Effect**" means a material adverse change in the business, operations, assets, liabilities, properties, client base, rights, results of operations or condition (financial or otherwise) of any of the Island One Entities, or any occurrence, circumstance, or combination thereof that reasonably could be expected to result in any such material adverse change or would be reasonably likely to materially and adversely effect the ability of the Company and/or Crescent One to consummate the Transaction or the Debt Restructuring Transactions; provided, however, that no effects or changes arising or related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, a Material Adverse Effect: (i) a change in general market, economic, or political conditions; (ii) a change in accounting policies, practices and principles, whether or not required by law or GAAP; (iii) a change in Applicable Law; (iv) a change in the banking, currency, financing, or capital markets in general; (v) the announcement, pendency, or consummation of the Transaction or any action taken by any of the Parties pursuant to this Agreement in connection with the Transaction; (vi) the filing of the Bankruptcy Cases and matters in respect thereof prior to the date of this Agreement and (vii) any natural disaster or act of war (whether or not declared), sabotage, terrorism, or armed hostility or any escalation or worsening thereof, whether occurring or starting or occurring before after the date of this Agreement.

"**Material Contracts**" means the following Contracts: (i) any option or purchase Contract which involves commitments to purchase, acquire property or assume any obligation by an Island One Entity in excess of $100,000 annually or in the aggregate; (ii) any agreement for the lease of personal property to or from any Person providing for payments in excess of $100,000 annually, in each case that cannot be terminated on not more than 60 days' notice without payment by an Island One Entity of any penalty; (iii) any Contract with a Timeshare Owners' Association; (iv) any Contract or agreement involving an Island One Entity in a partnership or joint venture with a third party; (v) Contracts relating to incurrence or guarantee of Indebtedness or the making of any loan or advance, in each case involving amounts in excess of $50,000; (vi) any Tax indemnification, sharing or allocation agreement to which any Island One Entity or Excluded Entity is a party; and (vii) Contracts which were entered into other than in the Ordinary Course of Business involving the Island One Entities, the Excluded Entities or their respective Subsidiaries and a Governmental Authority.

"**Material Island One Contracts**" shall have the meaning set forth in <u>Section 4.5</u>.

"**Notice**" shall mean any notice, request, consent, acceptance, waiver or other communication required or permitted to be given pursuant to this Agreement.

"**NVC**" shall have the meaning set forth in the Recitals.

"**Order**" means any decree, injunction, judgment, order, ruling, binding settlement agreement or writ entered, issued or rendered by any arbitrator or Governmental Authority.

"**Ordinary Course of Business**" shall mean the operation and conduct of the affairs of the Business of the Island One Entities in the ordinary course, consistent with past practice and the industry in which the Island One Entities and their Affiliates operate.

"**Organizational Documents**" shall have the meaning set forth in <u>Section 4.1</u>.

"**Original Agreement**" shall have the meaning set forth in the Recitals.

"**Outside Date**" shall have the meaning set forth in <u>Section 9.1(b)</u>.

"**Owner**" means the owner of record of any Timeshare Interest.

"**Party**" shall have the meaning set forth in the Preamble.

"**Permits**" shall mean all the right, title, benefit and interest of the Island One Entities in any and all licenses, franchises, governmental and other approvals, development rights and permits relating to the Island One Entities.

"**Permitted Liens**" means: (i) Liens relating to Taxes which are not due and payable as of the Closing Date and with respect to which adequate reserves have been established and maintained, in accordance with GAAP, in the Financial Statements; and (ii) as to Real Property owned by any Island One Entity, (a) leases and subleases to third party tenants, to the extent such leases or subleases have been assumed pursuant to <u>Section 6.4(a)</u> or may be assumed pursuant to <u>Section 6.4(b)</u>, (b) zoning requirements and other governmental land use limitations arising under Applicable Law with respect to the use, occupancy, subdivision or improvement of such real property and (c) all rights or easements, if any, of any Governmental Authority or any public or private utility company, to maintain telephone wires, pipes, conduits or other facilities which enter or cross such real property in each case in this clause (ii), that do not prevent the operation of the Business of the Island One Entities as is presently conducted; and (iii) any Liens disclosed on <u>Disclosure Schedule 4.3</u>.

"**Person**" shall mean an individual, partnership, joint venture, limited liability company, corporation, trust, unincorporated organization, syndicate, Governmental Authority, and the successors and assigns thereof or the heirs, executors, administrators or other legal representatives of an individual, as well as any group of Persons that act jointly or in concert for the purpose of acquiring, holding, or disposing of Securities, assets or interests in another.

"**Purchase Price**" shall mean (i) the Cash Purchase Price plus (ii) an amount determined on the date that is two (2) Business Days prior to the Closing Date equal to the positive difference, if any, between (x) one million, eight hundred thousand dollars ($1,800,000) minus (y) the amount of cash available to the Company immediately following the Closing, excluding any cash on the balance sheet of the Company prior to Closing, assuming that (A) the Purchaser has satisfied from the Cash Purchase Price all closing costs, expenses and other amounts which Purchaser is required to satisfy on the Closing Date, (B) the Transaction and the Debt Restructuring Transactions will be consummated on the Closing Date, in each case, in the manner contemplated in this Agreement, the Amended Plan and the Restructuring Term Sheet and (C) the balance of the Cash Purchase Price not paid or allocated pursuant to the terms of the Amended Plan will be cash available to the Company immediately following the Closing.

"**Purchaser**" shall have the meaning set forth in the Preamble.

"**Purchaser Documents**" shall have the meaning set forth in Section 5.2.

"**Real Properties**" shall mean the real property owned in fee simple by an Island One Entity and each real property to which an Island One Entity is a lessee other than any leased real property which relates to an Excluded Contract.

"**Reorganized Entities**" shall mean the reorganized entities that succeed to the Island One Entities upon the consummation of the Amended Plan.

"**Reorganized Crescent One**" shall mean the reorganized entity that succeeds to Crescent One upon the consummation of the Amended Plan.

"**Reorganized Crescent One Securities**" shall have the meaning set forth in Section 2.1.

"**Reorganized Island One**" shall mean the reorganized entity that succeeds to Island One upon the consummation of the Amended Plan.

"**Reorganized Island One Securities**" shall have the meaning set forth in Section 2.1.

"**Reorganized Securities**" shall have the meaning set forth in Section 2.1.

"**Representative**" shall mean with respect to a particular Person, its Affiliates, and any director, officer, member, equity holder, owner, manager, employee, agent, consultant, advisor, or other representative of that Person or its Affiliates, including legal counsel, accountants, and financial advisors.

"**Required Approvals**" shall mean the approval of each Person listed on Disclosure Schedule 4.3, and each other Consent or Order from a Governmental Authority listed on Disclosure Schedule 4.3, the failure of which to obtain would materially and adversely affect the operation of the Business of the Island One Entities by Purchaser and the Reorganized Entities.

"**Resort(s)**" the resort properties which are managed by an Island One Entity and/or to which the Timeshare Owners' Associations govern the operation of the common elements, each of which are identified on Disclosure Schedule 4.18.

"**Resort Documents**" shall mean all current agreements, public offering statements and documents in the possession of any Island One Entity relating to the establishment and regulatory approval of any sale of Timeshare Interests or units at any Resort or any of the Timeshare Owners' Associations, including the declarations with respect the Resorts, the affiliation agreements with respect to a Resort, any "Rules and Regulations" of any Timeshare Owners' Association or a Resort, any Timeshare Owners' Association governing documents relating to a Resort, including without limitation, the articles of incorporation and by-laws of a Timeshare Owners' Association.

"**Restructuring Term Sheet**" shall have the meaning set forth in the Recitals.

"**Securities**" shall mean any and all debt and equity securities and other ownership interests in whatever form, whether certificated or uncertificated, including, without limitation, common stock, preferred stock or other capital stock, membership, partnership or participation interests or units, and notes, bonds, debentures or other similar debt instruments, including, without limitation, any securities, warrants, options or rights convertible into or exercisable for any of the foregoing.

"**St. Croix**" shall have the meaning set forth in the Recitals.

"**Tangible Personal Property**" shall mean machinery, equipment, tools, supplies, furniture, fixtures, personalty, vehicles, rolling stock and other tangible personal property related to or used in connection with the Business of the Island One Entities.

"**Tax**" or "**Taxes**" shall mean (i) all federal, state, provincial, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, unclaimed property, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, and all interest, penalties, fines, additions to tax or additional amounts imposed in connection with any of the foregoing items; (ii) any liability for the payment of any Tax as a result of membership in any affiliated, consolidated, combined or unitary group of entities for federal, state, local or foreign Tax purposes with respect to which any Island One Entity or Excluded Entity has been a member on or prior to the Closing Date; and (iii) any transferee or secondary liability in respect of any Tax (whether imposed by law or contractual arrangement).

"**Tax Return**" or "**Tax Returns**" shall mean all returns, declarations of estimated payments, reports, estimates, claims for refunds, information returns and other statements, including any amendments thereof and any related or supporting information, disclosures, notices, elections, schedules or forms with respect thereto, filed or required to be filed in connection with the determination, assessment, collection or administration of any Taxes.

"**Timeshare Owners' Associations**" shall mean the timeshare owners' associations or entities serving similar functions which are managed by any of the Island One Entities including: (i) Bali Condominium Association, Inc., (ii) Isle of Bali II Condominium Association, Inc., (iii) Bryan's Spanish Cove Owners Association, Inc., (iv) O.R.B.I.T. Owners Association, Inc., (v) Parkway International Owners Association, Inc., (vi) Plantation Cove Condominium

Association, Inc., (vii) The Charter Club of Naples Bay Owners' Association, Inc., (viii) Barefoot'n in the Keys at Old Town Condominium Association, Inc., (ix) Cove II Owners Association, Inc. and (x) Crescent Resort Owners' Association, Inc.

"**Timeshare Interest**" means a timeshare real property ownership interest in an accommodation of a Resort as more particularly described, in the declaration relating to a Resort, together with all rights, benefits, privileges and interests appurtenant thereto, including rights in the common areas and common furnishings appurtenant to such Timeshare Interest.

"**Timeshare Receivable**" means each debt obligation of an owner of a Timeshare Interest to an Island One Entity with respect to the purchase of a Timeshare Interest which was financed by an Island One Entity (and whether or not such debt obligation is in default or subject to foreclosure), together with: (i) all guaranties and other documents or instruments evidencing or securing the obligations of the Owner or any other person primarily or secondarily liable on such Timeshare Receivable; (ii) all policies of insurance, if any, including but not limited to mortgagee policies of title insurance, related to each Timeshare Receivable delivered in connection therewith; (iii) all rights under escrow agreements and all impound or reserve accounts pertaining to the foregoing; (iv) all files, books and records of any Island One Entity pertaining to any of the foregoing; and (v) all proceeds from the foregoing.

"**Transaction**" shall have the meaning set forth in Section 2.1.

"**Transaction Documents**" shall mean this Agreement, the Restructuring Term Sheet, the Disclosure Schedules, the Labor Schedules, the Amended Plan and each other Contract or document which will be delivered, disclosed or entered into by the Purchaser or any Island One Entity pursuant to this Agreement.

"**Transfer Taxes**" shall mean any federal, state, county, local, foreign and other sales, use, transfer, value added, conveyance, documentary transfer, stamp, recording, registration or other similar Tax (including any notarial fee) imposed in connection with, or otherwise relating to, the transactions contemplated by this Agreement or the recording of any sale, transfer or assignment of property (or any interest therein) effected pursuant to this Agreement.

"**Treasury Regulations**" shall mean final or temporary regulations promulgated under the Code.

"**WARN Act**" shall mean the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (1988), as amended and any similar state or local "mass layoff" or "plant closing" laws.

### ARTICLE II
### THE TRANSACTIONS

**Section 2.1**      **Purchase and Sale.**  On the terms and subject to the conditions set forth in this Agreement and the Amended Plan, at the Closing, Purchaser shall purchase, acquire and accept from (i) Reorganized Island One, and Reorganized Island One shall issue, sell, transfer and deliver to Purchaser, 1,000,000 newly issued shares of the common stock of Reorganized Island One (the "**Reorganized Island One Securities**") and (ii) Reorganized Crescent One, and

Reorganized Crescent One shall issue, sell, transfer and deliver to Purchaser, one hundred percent (100%) of the limited liability company membership interests of Reorganized Crescent One (the "**Reorganized Crescent One Securities**" and together with the Reorganized Island One Securities, the "**Reorganized Securities**"), in each case, free and clear of all Liens or other interests other than those created by Purchaser. Upon consummation of the Amended Plan pursuant to and in accordance with the Confirmation Order, including the cancellation, prior to the Closing Date, pursuant to the Amended Plan of all of Island One's capital stock and rights to purchase or otherwise acquire capital stock of Island One, and all of Crescent One's membership interests and rights to purchase or otherwise acquire membership interests of Crescent One, the Reorganized Island One Securities will be fully paid and nonassessable and shall constitute all of the issued and outstanding capital stock of Reorganized Island One and the Reorganized Crescent One Securities will be fully paid and nonassessable and shall constitute all of the issued and outstanding membership interests of Reorganized Crescent One (the issuance and purchase of the Reorganized Securities, the "**Transaction**").

Section 2.2      **Purchase Price.**

(a)      On the terms and subject to the conditions herein, on the Closing Date, Purchaser shall pay the Purchase Price, to be applied in satisfaction of certain claims and interests set forth in the Amended Plan and to recapitalize and provide for the working capital needs of the Reorganized Entities, in each case, in the manner and to the extent provided in the Amended Plan. The Purchase Price allocable to the Reorganized Island One Securities and the Reorganized Crescent One Securities shall be acceptable to Purchaser in its sole discretion.

(b)      At the Closing, the Purchase Price shall be satisfied by payment of an amount equal to the Purchase Price, less the Deposit, by a wire transfer of immediately available funds to the accounts designated by the Company and the Deposit shall be applied to towards the Purchase Price and delivered to the Company at the Closing in accordance with Section 2.3(a), in each case, in order to facilitate the payments set forth in the Amended Plan upon the consummation of the Transaction.

Section 2.3      **Deposit**. Prior to the date hereof, Purchaser deposited into an account at SunTrust Bank of Central Florida, N.A. established by Baker & Hostetler LLP as escrow agent (the "**Escrow Agent**") five hundred thousand dollars ($500,000) (such amount, together with any interest accrued thereon prior to the Closing Date, the "**Deposit**"). The Deposit shall not be subject to any Lien, attachment, trustee process or any other judicial process of any creditor of any of the Island One Entities. The Deposit shall be held by the Escrow Agent in trust and distributed as follows:

(a)      if the Closing shall occur, then the Deposit shall be applied towards the Purchase Price payable by Purchaser to the Company under Section 2.2(b);

(b)      if this Agreement is terminated by the Company pursuant to Section 9.1(e), then the Deposit shall be delivered to the Company within five (5) days of such termination; and

(c)     if this Agreement is terminated (1) by Purchaser pursuant to Section 9.1(b), Section 9.1(c), Section 9.1(d), Section 9.1(f), Section 9.1(g), Section 9.1(h), Section 9.1(i), Section 9.1(j), Section 9.1(k), or Section 9.1(l), (2) by the Company and Crescent One pursuant to Section 9.1(b), Section 9.1(c), Section 9.1(f), or Section 9.1(k) or (3) by each of the Parties pursuant to Section 9.1(a), then, in each case, the Deposit shall be delivered to the Purchaser within five (5) days of such termination.

## ARTICLE III
## BANKRUPTCY MATTERS

**Section 3.1       Bankruptcy Filings.** The Company and Crescent One shall use commercially reasonable efforts to seek entry of the Confirmation Order. Purchaser agrees that it will promptly take such actions as are reasonably requested by the Company and Crescent One to assist in obtaining entry of the Confirmation Order, and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement. The Company and Crescent One shall use commercially reasonable efforts to (i) obtain any other Orders from the Bankruptcy Court that may be reasonably necessary to consummate the transactions contemplated in this Agreement, and (ii) oppose any objections by any party in interest to approval of the Disclosure Statement, confirmation of the Amended Plan, and consummation of the transactions contemplated herein.

**Section 3.2       Confirmation Order.**

(a)     The Company and Crescent One shall use commercially reasonable efforts to cause the Bankruptcy Court to enter the Disclosure Statement Order promptly following the date the Debtors file the Amended Plan. The Company and Crescent One shall further use commercially reasonable efforts to have the Bankruptcy Court enter the Confirmation Order, promptly upon the completion of the confirmation hearing with respect to the Amended Plan, but in any case, the Company and Crescent One shall submit within twenty-five (25) days following such hearing, the form of the Confirmation Order intended to be filed with the Bankruptcy Court, which shall be in form and substance reasonably acceptable to Purchaser and the Majority Lenders. The Company and Crescent One shall use commercially reasonable efforts to obtain a ruling that the Confirmation Order is immediately effective upon entry, and not subject to any stay.

(b)     The Confirmation Order shall be an Order of the Bankruptcy Court: (i) approving the Disclosure Statement, voting materials and procedures, and solicitation (to the extent the Disclosure Statement is not approved by the Bankruptcy Court prior to entry of the Confirmation Order); (ii) confirming the Amended Plan; (iii) finding that the Debtors, as proponents of the Amended Plan, have met their burden or proving the elements of sections 1129 of the Bankruptcy Code; (iv) finding that the Debtors, the Purchaser and their respective Representatives, and all other persons involved in the solicitation process, have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules in connection with all of their respective activities relating to the solicitation of acceptances to the Amended Plan and

their participation in the activities described in section 1125 of the Bankruptcy Code, and are entitled to the projections afforded by section 1125(e) of the Bankruptcy Code; (v) implementing each of the transactions set forth in the Amended Plan and in this Agreement; (vi) finding that the Purchaser, its Representatives, equity holders, directors, officers, employees, attorneys, financial advisors, investment bankers and other professionals have acted in good faith in connection with the Amended Plan, the Bankruptcy Cases, this Agreement and the formulation and consummation of the Amended Plan; (vii) finding that the Purchaser is a "good faith purchaser" and the Purchaser and the Debtors are entitled to the protections of section 363(m) of the Bankruptcy Code; (viii) effecting the rejection of each of the executory contracts and unexpired leases which the Purchaser has designated as Excluded Contracts, and that each assumption or rejection of an executory contract or unexpired leases shall be legal, valid and binding upon the applicable Reorganized Entity and all non-debtor counterparties to such contracts or leases, all to the same extent as if such assumption or rejection had been effected pursuant to an appropriate order of the Bankruptcy Court; (ix) authorizing the liquidation, disposition or administration of the Excluded Entities and the distribution of the Excluded Assets, in each case, as set forth in the Amended Plan; provided, that no Excluded Entity shall be liquidated to the extent that the Amended Plan does not provide for satisfaction and discharge in full of all of the Claims against such Excluded Entity; (x) cancelling all of the existing capital stock and other ownership interests (including any derivative or contractual rights relating thereto) of the Company; (xi) releasing all Claims against the Island One Entities, Purchaser, and each of Purchaser's Representatives from any and all Claims by the Lenders relating to (A) the Indebtedness of the Island One Entities as and to the extent set forth in the Restructuring Term Sheet, (B) the Debt Restructuring Transactions and the Transaction, or (C) any matter with respect to the Bankruptcy Cases or the Transaction Documents; provided, that each of the releases referenced in sub-clauses (A), (B) and (C) of this Section 3.2(b)(xi) shall apply only to Claims arising in any manner and at any time prior to the Closing; (xii) effecting each of the transactions contemplated in the Restructuring Term Sheet; (xiii) settling all outstanding Claims against each of the Debtors and finding that the Island One Entities shall not have assumed any Liabilities following the Closing Date relating to the Excluded Assets; (xiv) finding that, except to the extent otherwise provided herein with respect to certain Excluded Entities or Excluded Assets or as otherwise provided in the Amended Plan, all property of each Debtor's estate shall vest in the applicable Reorganized Island One Entity, free and clear of all Claims, Liens, Liabilities and other interests (other than Liens created by Purchaser, the Permitted Liens and any Liabilities specifically assumed by Purchaser pursuant to this Agreement), whether direct or indirect, absolute or contingent, choate or inchoate, known or unknown, matured or unmatured, liquidated or unliquidated, arising or imposed by agreement, understanding, law, equity, statute or otherwise and whether arising prior to, on or after the date of the petition date for the Bankruptcy Cases, including Claims or Liabilities otherwise arising under doctrines of successor liability, de facto merger or substantial continuity or liabilities or obligations arising under any Applicable Law; (xv) finding that neither the Purchaser nor any Reorganized Entity is a successor to any of the Debtors or their estates and that the Transaction does not amount to a consolidation, merger or de facto merger of the Purchaser or any of the Reorganized Entities with or into any of the Debtors; (xvi) finding that the consideration given by Purchaser shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of Purchaser, which releases shall be deemed to have been given in favor of Purchaser by all holders of Interests in the Debtors or any of the Assets; (xvii) to the extent applicable,

pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of the Reorganized Securities pursuant to this Agreement and under, in connection with and in furtherance of the Amended Plan, shall not be subject to any Transfer Taxes and (xviii) authorizing and empowering the Debtors to take such actions and to perform such acts as may be necessary, desirable, or appropriate to comply with or implement the Amended Plan.

(c)     The Disclosure Statement, the Confirmation Order, and the Amended Plan shall be, insofar as such documents relate to or concern this Agreement or the transactions contemplated herein, any of the other Transaction Documents, or the Debt Restructuring Transactions, in form and substance reasonably acceptable to the Purchaser. The Company and Crescent One shall consult and cooperate with the Purchaser with respect to all such filings, and each such filing relating to the Purchaser, the Agreement, the Transaction or the Debt Restructuring Transactions shall be in form and substance reasonably acceptable to Purchaser. Without the prior written consent of the Purchaser, neither the Company nor Crescent One shall seek to amend or modify any provision in the Disclosure Statement, the Amended Plan or the Confirmation Order to effect a change in the terms and conditions of the Transaction contemplated herein or the Debt Restructuring Transactions. In the event any party appeals or seeks to stay, alter, amend, modify, or request reconsideration of the Confirmation Order, the Company and Crescent One shall immediately notify Purchaser, and the Company and Crescent One shall use best efforts to promptly oppose and defend against any such appeal or request for a stay of the Confirmation Order or any such motion or application to alter, amend, modify or reconsider the Confirmation Order.

**Section 3.3     Intentionally Omitted.**

### ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF THE COMPANY AND CRESCENT ONE

The Company and Crescent One, jointly and severally, hereby represent and warrant to the Purchaser that, except as set forth in the Disclosure Schedules, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and correct as of the date of the Original Agreement and the date of this Agreement, as amended.

**Section 4.1     Organization and Good Standing.** Each Island One Entity (i) is duly formed, validly existing and in good standing under the laws of jurisdiction in which it was formed, is properly qualified to do business in such jurisdiction and in each other jurisdiction in which it is required to register as a result of the conduct of its business, and (ii) has the power, authority, right and capacity to own, operate and/or lease the Assets now owned, operated or leased by it, and to operate its respective portion of the Business in all respects as currently conducted. The Company has delivered or otherwise made available to Purchaser true, accurate and complete copies of the Books and Records and the organizational documents of the Island One Entities (the "**Organizational Documents**").

**Section 4.2     Authorization of Agreement.** Subject to the approval of the Bankruptcy Court, the Company and Crescent One each has the corporate power, authority, right and

capacity to enter into, execute and deliver this Agreement, each other Transaction Document and, subject to the entry of the Confirmation Order, to carry out the transactions contemplated in this Agreement (including Exhibit A attached hereto) in the manner contemplated by this Agreement. Subject to approval of the Bankruptcy Court, the execution, delivery and performance by the Company and Crescent One of this Agreement, each other Transaction Document and the consummation of the transactions contemplated in this Agreement (including Exhibit A attached hereto) has been duly and validly authorized by all requisite corporate or other proceedings of the Company and Crescent One. Subject to the entry of the Confirmation Order, upon execution and delivery by Purchaser, this Agreement, the other Transaction Documents and all other documents and agreements to be delivered by the Company pursuant to this Agreement shall constitute legal, valid and binding obligations of the Company and Crescent One, enforceable against each of the Company and Crescent One in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Applicable Laws relating to or affecting creditors' rights and remedies generally.

**Section 4.3** **Conflicts; Consents of Third Parties.** Except (i) with respect to the Required Approvals and required third party consents listed on Disclosure Schedule 4.3, (ii) the Liens listed on Disclosure Schedule 4.3, or (iii) as otherwise provided for pursuant to the Bankruptcy Code, the Confirmation Order or other Order of the Bankruptcy Court, neither the execution of this Agreement or any other Transaction Document nor the performance of any Transaction Document by the Island One Entities will result in the creation or imposition of any Lien upon the Assets (other than Liens created by Purchaser, the Permitted Liens and any Liabilities specifically assumed by Purchaser pursuant to this Agreement), a breach of any material term or material provision, or constitute a default (whether with notice or lapse of time or both) under, or conflict with or cause the acceleration of any material obligation of any Island One Entity under (A) their respective organizational documents, (B) any Material Contract to which any of them is a party, or by which any of them is bound or (C) any Applicable Law to which any Island One Entity or its assets or property is subject and no consent, approval, authorization, license, order, declaration or registration is necessary to enable the Island One Entities to complete the Transaction pursuant to this Agreement or any other Transaction Documents or, if any such consent, approval, authorization, license, order, declaration or registration is required, it has been obtained or will be obtained prior to the Closing.

**Section 4.4** **Capitalization.** The capitalization of each Island One Entity is set forth on Disclosure Schedule 4.4, listing for each Island One Entity its name, type of entity, the jurisdiction of its incorporation or organization, its authorized capital stock, partnership capital or equivalent, the number and type of its issued and outstanding shares of capital stock, partnership interests or similar ownership interests and the current ownership of such shares, partnership interests or similar ownership interests. All of the issued and outstanding shares of capital stock or other equity Securities of each of the Island One Entities were duly authorized for issuance and are validly issued, fully paid and non-assessable, were issued in compliance with all applicable federal and state securities laws and any preemptive rights or rights of first refusal of any Person, and are not listed on any stock exchange or regulated market. The capital stock or other equity interest of each of Island One Entity (other than the Company) is owned by the Company or by a direct or indirect wholly-owned Subsidiary of the Company, free and clear of any Liens. Except as set forth on Disclosure Schedule 4.4, no Island One Entity has any Subsidiaries, and no Island One Entity directly or indirectly, owns, of record or beneficially, any

Securities in any Person. Except as set forth on <u>Disclosure Schedule 4.4</u>, there is no existing option, warrant, call, right, or Contract of any character to which any Island One Entity is a party requiring, and there are no Securities of any Island One Entity outstanding which upon conversion or exchange would require, the issuance, of any Securities of any Island One Entity or other Securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase Securities of any Island One Entity. Upon the Closing, the Reorganized Securities will (i) be duly authorized and validly issued, (ii) fully paid and nonassessable, and (iii) constitute all of the issued and outstanding shares of capital stock of Reorganized Island One.

**Section 4.5** **Material Contracts.** <u>Disclosure Schedule 4.5</u> sets forth all of the Material Contracts of the Business of the Island One Entities and no Material Contract has been modified or amended, except as shown on <u>Disclosure Schedule 4.5</u>. The Company has delivered to Purchaser true and complete copies of all such Material Contracts. Subject only to the satisfaction of the Cure Costs applicable to such Contracts and the entry of the Confirmation Order, such Material Contracts and each of the other Contracts that are material to the operation and conduct of the Business of the Island One Entities, taken as a whole, and which are to be assumed pursuant to the Amended Plan (such Contracts, together with the Material Contracts, the "**Material Island One Contracts**"), are in full force and effect, and there are no event has occurred which with notice or lapse of time or both would constitute a breach or default in any material respect thereunder by the Island One Entities or permit termination, cancellation, material modification, or acceleration by the other party thereto. To the Knowledge of the Company, no event has occurred or circumstance exists that contravenes, conflicts with, or results in a violation or breach by any counterparty or third party of, or gives any of the Island One Entities the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to terminate, cancel, or materially modify, any Material Island One Contract. Each such Material Island One Contract is a valid and binding agreement, arrangement or commitment of an Island One Entity, enforceable against the parties thereto in accordance with its terms except in each case where enforceability may be limited by bankruptcy, insolvency or other similar laws affecting creditors' rights generally and except where enforceability is subject to the application of equitable principles or remedies or other Applicable Law.

**Section 4.6** **Real Property.** <u>Disclosure Schedule 4.6</u> sets forth a complete list of (i) all real property and interests in real property owned in fee (including a metes and bounds description) by any Island One Entity which is used or held for use in connection with the operation and conduct of the Business and (ii) all leases of real property by any Island One Entity, whether as lessee or lessor, which is used or held for use in connection with the operation and conduct of the Business. Except as set forth on <u>Disclosure Schedule 4.6</u>, no Person other than the Island One Entities is in possession of the Real Property or any portion thereof and there are no Material Contracts, written or oral, granting to any other Person the right to use or occupy the Real Property or any portion thereof. To the Knowledge of the Company, each Real Property and each Resort and all present uses and operations of the Real Property and the Resorts comply in all material respects with all Applicable Laws.

**Section 4.7** **Environmental Matters.** No Island One Entity has received written notice from any Governmental Authority that the Real Property or any Asset is not in material compliance with all Environmental Laws, except as provided on <u>Disclosure Schedule 4.7</u>.

Except as provided on <u>Disclosure Schedule 4.7</u>, there is no, and to the Knowledge of the Company, there has not previously been, any Hazardous Material stored, transported, released, disposed of, manufactured or generated in, upon or under any of the Real Properties, including buildings located thereon, except where such storage, transportation, release, disposal, manufacturing or generation is or was, as applicable, in compliance with Environmental Laws. To the Knowledge of the Company, no Real Property has any underground storage tanks of any kind or size located at such Real Property. The Company has made available to Purchaser copies of all Environmental Reports.

   **Section 4.8**    **Intellectual Property.**    Each Island One Entity has good, valid and marketable title, free and clear of all Liens other than Permitted Liens to, and the right to use and enforce, all of the Intellectual Property Rights used in connection with the Business of the Island One Entities.

   **Section 4.9**    **Labor.**    The Company has delivered to Purchaser lists of (i) all of the employees of the Island One Entities as of the date hereof, together with a notation of such employee's job title or department, base salary or hourly wage, as applicable, and benefits, together with all Liabilities associated with each employee; and (ii) all of the employees whose employment was terminated by any Island One Entity within the ninety (90) day period prior to the date of this Agreement (the "**Labor Schedules**"). The Labor Schedules and all of the information set forth thereon are true, correct and complete. The Company has furnished or made available to the Purchaser a complete and accurate copy of each written Benefit Plan and a complete and accurate copy of each material document prepared in connection with each such Benefit Plan. None of the Assets is the subject of any lien arising under Section 303(k) of ERISA or Section 430(k) of the Code, and, to the Knowledge of the Company, no fact or event exists which could reasonably be expected to give rise to any such Lien. In the three years prior to the date hereof, no Island One Entity has effectuated: (i) a "plant closing" (as defined in the WARN Act) affecting any site of employment or one or more facilities or operating units within any site of employment or facility; or (ii) a "mass layoff" (as defined in the WARN Act) affecting any site of employment or facility.

   **Section 4.10**    **Permits.**    The Island One Entities have obtained all material Licenses and Permits as are necessary in order for the Island One Entities to conduct the Business of the Island One Entities as it is now being conducted. All Licenses and Permits material to the operation of the Business of the Island One Entities are listed on <u>Disclosure Schedule 4.10</u> and the Company has delivered to Purchaser true and complete copies of all such Licenses and Permits. All Licenses and Permits material to the operation of the Business of the Island One Entities are in full force and effect, and no circumstance exists or event has occurred which by itself, or with the giving of notice, the passage of time, or both, may result in the non-renewal, suspension or revocation of any License or Permit. To the Knowledge of the Company, no Island One Entity has received notice of any violation, default, intended or threatened non-renewal, suspension or revocation of any of the Licenses or Permits and no such violation or default exists. Except as set forth on <u>Disclosure Schedule 4.10,</u> the transactions contemplated by this Agreement and the other Transaction Documents will not result in the non-renewal, suspension or revocation of, or require Purchase or any Island One Entity to re-apply for, any material License or material Permit.

**Section 4.11**     __Tax Matters.__   No Island One Entity has received any oral or written notice that it has been delinquent in the payment of any Tax, assessment, deposit or other charge with respect to any Island One Entity from any Governmental Authority. No Liability is pending or has been assessed, asserted or, to the Knowledge of the Company, threatened against any Island One Entity in connection with any such Tax and there is no basis for any such Liability. No Island One Entity has or will have as of the Closing, any Liability for the Taxes of any Excluded Entity. No Island One Entity has received any oral or written notice of assessment or proposed assessment and there are no pending Tax examinations of or Tax Claims asserted against any of the Island One Entities. All Tax Returns required to be filed by or relating to the Tax liability of any Island One Entity have been timely and properly filed (or, with respect to Tax Returns due between the date of this Agreement and the Closing Date, will be timely and properly filed) with the appropriate Governmental Authorities (after giving effect to any valid and properly obtained extensions of time in which to make such filings), and all such Tax Returns are (or, in the case of such Tax Returns that are not yet filed, will be) true, correct, and complete. All Taxes due, owing or otherwise payable with respect to any Island One Entity, Excluded Entity, the Business or the Assets (whether or not shown as due and payable on any Tax Return) have been timely and properly paid (or, in the case of Taxes the due date for payment of which is between the date of this Agreement and the Closing Date, will be timely and properly paid) to the relevant Governmental Authorities. At all times since the formation of Island One (or any predecessor thereof) through December 31, 2009, Island One (and, if applicable, any predecessor thereof) timely and validly elected to qualify for U.S. federal income Tax purposes as an "S Corporation" within the meaning of Sections 1361 and 1362 of the Code. None of the Island One Entities will be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date, in each case, as a result of an action taken on or prior to the Closing Date, including (i) a change in accounting method under Section 481 of the Code (or any corresponding or similar provision of state, local or foreign law), (ii) a "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign law), (iii) an installment sale or open transaction, or (iv) the consummation of the transaction contemplated by the Amended Plan (including the liquidation of the Excluded Entities and the distribution of the Excluded Assets). Aggregate accrued Tax Liabilities of the Island One Entities for all taxable periods ending on or before, or including, the Closing Date, shall not exceed $300,000.

**Section 4.12**     __Litigation.__   Except as set forth on <u>Disclosure Schedule 4.12</u>, there are no Legal Proceedings pending or, to the Knowledge of the Company, threatened against any Island One Entity or otherwise relating to the Business of the Island One Entities. Except as described on <u>Disclosure Schedule 4.12</u>, there is no Order outstanding against any Island One Entity or any properties or assets of any Island One Entity and no Island One Entity is in default under any such Order, except where such default would not reasonably result, individually or in the aggregate, in a Material Adverse Effect.

**Section 4.13**     __Ownership.__   The Company or another Island One Entity is the sole and exclusive owner of (a) fee simple title to all of the unsold Timeshare Interests; (b) the owned Real Property which is used or held for use in connection with the operation and conduct of the Business of the Island One Entities; (c) the Developer Rights with respect to the Resorts listed on <u>Disclosure Schedule 4.13</u>; and (d) the remainder of the Assets, with full right and authority to

convey said real and personal property. The Assets, together with the Excluded Assets, comprise one hundred percent (100%) of the assets owned by the Island One Entities and the Assets are sufficient for the operation of the Business of the Island One Entities as such Business is presently conducted (other than such portion of the Business exclusively relating to the Excluded Assets). Except as otherwise expressly provided herein to the contrary, all of the Assets are owned by the Island One Entities free and clear of any Liens of any type other than the Permitted Liens.

Section 4.14    **Compliance with Law.**  To the Knowledge of the Company, the Island One Entities are in compliance in all material respects with all with all Applicable Laws and Orders applicable to the Business of the Island One Entities. To the Knowledge of the Company, no written notices from any Governmental Authority with respect to any failure or alleged failure in any material respect of any Island One Entity to comply with any Applicable Law or Order have been received by any Island One Entity which have not been resolved, except as set forth on Disclosure Schedule 4.14.  There are no pending or, to the Knowledge of the Company, threatened investigations or inquiries by or before any Governmental Authority regarding any Island One Entity, the Assets or the Business of the Island One Entities.

Section 4.15    **Financial Statements.**  The Company has delivered copies of the Financial Statements to Purchaser. Each of the Financial Statements has been prepared from the Books and Records of the applicable Island One Entity in accordance with GAAP, consistently applied (other than with respect to the 2010 Financial Statements which lack footnotes as required by GAAP but have otherwise been prepared in accordance with GAAP, consistently applied), and presents fairly in all material respects the financial position, assets and liabilities, results of operations and cash flows of such Island One Entity as at the dates and for the periods indicated therein, subject to normal recurring year-end adjustments that are not material and consistent with prior years. Since the date of the latest Financial Statements, except as disclosed on Disclosure Schedule 4.15, as required in the Amended Plan or in the Debt Restructuring Transactions, each Island One Entity has conducted the Business only in the Ordinary Course of Business and has not taken action, or failed to act in any manner that would reasonably likely to result, individually or in the aggregate, in a Material Adverse Effect.

Section 4.16    **Accounts Receivable.** Except as otherwise reflected or disclosed in the last audited Financial Statements, the Accounts Receivable of the Island One Entities (a) are valid receivables incurred in the Ordinary Course of Business, except where the failure to be valid and incurred in the Ordinary Course of Business would not have a Material Adverse Effect, and (b) are reflected in all material respects on the Financial Statements in accordance with GAAP. Except as set forth on Disclosure Schedule 4.16, the Timeshare Receivables have been incurred in accordance with the terms of the Resort Documents, all Applicable Law, and are reflected in all material respects on the Financial Statements in accordance with GAAP.

Section 4.17    **Timeshare Interests.** Disclosure Schedule 4.17 hereto sets forth a true and correct listing of each and every Timeshare Interest owned by each Island One Entity as of the date of this Agreement, and setting forth with respect to each Timeshare Interest the unit type to which the Timeshare Interest relates. Disclosure Schedule 4.17 sets forth a true and correct list of all pending Contracts for the sale of any Timeshare Interest, setting forth with respect to

each, the date of such pending Contract, the parties thereto, the purchase price, the closing date, and the amount of any deposit made by such purchaser.

**Section 4.18**     **Resort Documents.** The Resort Documents are set forth on <u>Disclosure Schedule 4.18</u> and have not been modified or amended, except as shown on such Schedule. The Company has made available to Purchaser true and complete copies of all Resort Documents. All Resort Documents are in full force and effect, are in material compliance with all Applicable Laws applicable to such Resort Documents, and there are no material defaults by any Island One Entity or to the Knowledge of the Company, by any party other than purchasers of Timeshare Interests, under any Resort Document. No Resort Document includes any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.

**Section 4.19**     **Financial Advisors.** Except for Western Reserve Partners LLC and LCG Capital Group, LLC, no Person has acted, directly or indirectly, as an agent, broker, finder, financial advisor, investment or commercial banker for the Island One Entities or any of their Affiliates in connection with the Transactions, or has been engaged by or acting on behalf of any of the Island One Entities in connection with the negotiation, execution or performance of this Agreement or the transactions contemplated by this Agreement. No Person is entitled to any fee or commission or like payment from Purchaser in connection with the negotiation, execution or performance of this Agreement or the transactions contemplated by this Agreement.

**Section 4.20**     **Disclosure.** Except for the representations and warranties contained in this <u>Article IV</u>, neither the Company, Crescent One nor any other Person makes (and Purchaser acknowledges and agrees that Purchaser is not relying upon) any other express or implied representation or warranty with respect to the Island One Entities, the Business, the Assets, or the transactions contemplated by this Agreement, any other Transaction Document or in any other agreement, document or instrument to be delivered in connection herewith or therewith, it being understood that, subject to the representations and warranties set forth herein, the Business of the Island One Entities and the related Assets are being acquired as a result of the Transaction "as is, where is" on the Closing Date, and in their present condition. Except for the representations and warranties contained in this <u>Article IV</u>, each of the Company and Crescent One (i) expressly disclaims and negates any representation or warranty, express or implied, at common law, by statute or otherwise, relating to the condition of the Assets (including any implied or expressed warranty of title, merchantability or fitness for a particular purpose, or of the probable success or profitability of the ownership, use or operation of the Business of the Island One Entities and the Assets by Purchaser and its Affiliates after the Closing), and (ii) expressly disclaims all liability and responsibility for any projection, forecast, statement or information made, communicated or furnished to Purchaser or its Representatives. This <u>Section 4.20</u> shall survive the Closing.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

The Purchaser hereby represents and warrants to the Company and Crescent One that, except as set forth in the Disclosure Schedules, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and correct as of the date of the Original Agreement and the date of this Agreement, as amended.

**Section 5.1      Organization and Good Standing.**  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite limited liability company power, authority, right and capacity to enter into this Agreement, the other Transaction Documents and to carry out the transactions contemplated in this Agreement (including <u>Exhibit A</u> attached hereto) in the manner contemplated by this Agreement.

**Section 5.2      Authorization of Agreement.**  Purchaser has full limited liability company power and authority to execute and deliver this Agreement, the other Transaction Documents and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the **"Purchaser Documents"**), and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly authorized by all necessary limited liability company action on behalf of Purchaser.  This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 5.3      Conflicts; Consents of Third Parties.**

(a)      Except (i) as set forth on <u>Disclosure Schedule 5.3(a)</u>, or (ii) as otherwise provided for pursuant to the Bankruptcy Code, the Confirmation Order or other order of the Bankruptcy Court, none of the execution and delivery by Purchaser of this Agreement or Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any material violation of or material default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under, any provision of (i) the organizational documents of Purchaser; (ii) any Contract or permit to which Purchaser is a party or by which Purchaser or its properties or assets are bound; (iii) any Order of any Governmental Authority applicable to Purchaser or by which any of the properties or assets of Purchaser are bound; or (iv) any Applicable Law (in each case except as would not materially interfere with or prevent Purchaser from consummating the Transaction).

(b)      Except as set forth on <u>Disclosure Schedule 5.3(b)</u>, to the knowledge of Purchaser after due inquiry, no consent, waiver, approval, Order, permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of Purchaser in connection with the execution and delivery of this Agreement or Purchaser Documents, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or the taking by Purchaser of any other action contemplated hereby.

**Section 5.4**   **Litigation.**   Except as set forth on <u>Disclosure Schedule 5.4,</u> there are no Legal Proceedings pending or, to the knowledge of Purchaser, threatened that are reasonably likely to prohibit or restrain the ability of Purchaser to enter into this Agreement or consummate the transactions contemplated hereby.

**Section 5.5**   **Financial Advisors.**   Except as set forth on <u>Disclosure Schedule 5.5,</u> no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

**Section 5.6**   **Financial Capability.**   Purchaser will have at the Closing, sufficient internal funds available to pay the Purchase Price.

**Section 5.7**   **Condition of the Business.**   Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that neither the Company nor Crescent One is making any representations or warranties whatsoever, express or implied, beyond those expressly given by the Company and Crescent One in <u>Article IV</u> hereof, and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Assets and the Business are being transferred on a "where is" and, as to condition, "as is" basis.   Purchaser acknowledges that it has conducted to its satisfaction, its own independent investigation of the Business and, in making the determination to proceed with the transactions contemplated by this Agreement Purchaser has relied on the results of its own independent investigation.   This <u>Section 5.7</u> shall survive the Closing.

**ARTICLE VI**
**COVENANTS AND AGREEMENTS**

**Section 6.1**   <u>Covenants of the Company and Crescent One.</u>

(a)   To the extent they have not previously been delivered, the Company and Crescent One shall deliver to Purchaser for review and inspection the following:

(i)   copies of all Material Contracts and Benefit Plans and each notice of default, if any, received or sent by or on behalf of any Island One Entity in respect of any Material Contract or Benefit Plan if the default referred to in such notice remains outstanding;

(ii)   copies of the Books and Records; <u>provided,</u> that neither the Company nor Crescent One shall be required to deliver, but shall otherwise make available to Purchaser or its Representatives for their review and inspection the Books and Records relating to the Timeshare Owners' Associations;

(iii)   the most current surveys of the Real Properties, if any, in the possession of the Island One Entities, together with the most recent title reports, deeds and all underlying exceptions or Liens to or affecting title of record, and title insurance policies, if any, in respect of the Real Properties;

(iv)     a list of all Legal Proceedings and Claims affecting or relating to the Business of the Island One Entities, the Assets or the Real Properties to which any of the Island One Entities is a party or in respect of which any Island One Entity has been formally notified and of all threatened Legal Proceedings affecting or relating to the Business of the Island One Entities, the Assets or the Real Properties of which any of the Island One Entities has received written notice, together with any material correspondence relating thereto;

(v)     copies of any Environmental Report;

(vi)     the Labor Schedules; and

(vii)     any lists, documentation or other information provided by the Company and/or Crescent One pursuant to this <u>Section 6.1</u> shall be amended or supplemented, as necessary from time to time, until 5:00 p.m. on the Business Day immediately preceding the Closing.

For the avoidance of doubt, the delivery of any notice or documents pursuant to this <u>Section 6.1</u> shall not, in and of itself, affect or cure any breach of the representations, warranties, covenants or agreements of the Company (or remedies with respect thereto) under this Agreement. In addition, if the Company becomes aware of a failure to provide any document or other information that it is required to provide in accordance with this <u>Section 6.1</u> at any time prior to the Closing, it shall promptly advise Purchaser in writing of such failure and deliver such information to Purchaser.

(b)     On or prior to the date hereof, Purchaser or its Representatives shall have delivered to the Company and the Majority Lenders, substantially final versions of agreements relating to the provision of the Diamond Services (as defined below) to the Island One Entities (the "**Diamond Documents**"). Purchaser and the Majority Lenders shall use their commercially reasonable efforts to agree upon the final form of the Diamond Documents prior to the Closing Date. The Island One Entities shall enter into such agreements with Diamond prior to the Closing Date, contingent upon the Closing occurring and taking effect immediately after the Closing, providing that: (i) Diamond will be appointed as the exclusive broker and sales agent for the purpose of selling all Timeshare Interests owned by the Island One Entities, including those subject to the Club Navigo vacation club; (ii) Island One will enter into an Oversight, Consulting and Executive Management Agreement with Diamond pursuant to which Diamond shall render executive and strategic oversight of services provided by the Island One Entities to the Timeshare Owners' Associations, the scope of which services shall be jointly determined by Diamond and Reorganized Island One, including but not limited to management, supervision, advice and assistance concerning any and all aspects of the operations, planning and financing of the Timeshare Owners' Associations, as needed from time to time; and (iii) Diamond will be appointed to service the Island One Entities' existing Timeshare Receivables portfolios and future Timeshare Receivables originated by Diamond as sales agent and broker on behalf of the Island One Entities, with duties to include the provision of statements, distribution of remittances, collections and modifications; <u>provided,</u> that the Company shall engage Equiant Financial Services Inc. to service the Island One Entities' Timeshare Receivables portfolios, whether existing or produced as of or following the Closing, for a transitional period following the Closing (collectively, the "**Diamond Services**").

(c)    To the extent not previously delivered to the Purchaser, the Company and Crescent One shall, at their cost and expense, promptly deliver to the Purchaser copies of each Island One Entity's existing (to the extent it has previously obtained one) title insurance policy insuring its leasehold or other interest in and to the Real Properties. The Company and Crescent One shall cooperate with the Purchaser so that the Purchaser can obtain (at its expense) a commitment from a title insurance company to issue an extended coverage 2006 ALTA leasehold title insurance policy with respect to each of the Real Properties in the amount and in form requested by the Purchaser, together with a commitment to issue title endorsements requested by the Purchaser.

(d)    The Company and Crescent One shall use commercially reasonable efforts to obtain the Required Approvals on or prior to the Closing Date <u>provided</u> that the Company and Crescent One in so doing, shall not be obligated to (i) pay any fees in order to obtain any Required Approval, (ii) consent to or agree to be subject to any condition or restriction upon the Company or any of its Affiliates, including any requirement to raise additional capital, modify its capital structure or guarantee the continuing capital adequacy of the Company, Crescent One or any of their Affiliates that would materially and adversely impact the Company, Crescent One or the Business of the Island One Entities, or (iii) litigate or defend against any Legal Proceeding in order to obtain such Required Approval.  The Company and Crescent One shall also use commercially reasonable efforts to comply at all times with the Bid Procedures Order and the Confirmation Order.

(e)    The Organizational Documents of the Island One Entities as of the Closing Date shall be in forms mutually agreed to by the Company and Purchaser.

(f)    [Intentionally omitted]

### Section 6.2    Covenants of Purchaser.

(a)    Purchaser shall use its commercially reasonable efforts to obtain the Required Approvals on or prior to the Closing Date; provided that Purchaser in so doing, Purchaser shall not be obligated to (i) pay any fees in order to obtain any Required Approval, (ii) consent to or agree to be subject to any condition or restriction upon Purchaser or any of its Affiliates, including any requirement to raise additional capital, modify its capital structure or guarantee the continuing capital adequacy of Purchaser or any of its Affiliates that would materially and adversely impact Purchaser or the Business of the Island One Entities, (iii) otherwise take or commit to take any action or agree to any condition or restriction that would reasonably be expected to limit its freedom of action in any material respect, or (iv) litigate or defend against any Legal Proceeding in order to obtain such Required Approval.

### Section 6.3    Access to Information.

(a)    Prior to the Closing, Purchaser shall be entitled, through its Representatives, to make such investigation of the properties, businesses and operations of the Island One Entities (including environmental, engineering and other property level investigations, which may include Phase II environmental testing) and such examination of the Books and Records of the Island One Entities as it reasonably requests and to make extracts and copies of such books and

records. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under Applicable Law. The Company shall cause its Representatives to reasonably cooperate with Purchaser and Purchaser's Representatives in connection with such investigation and examination, and (i) Purchaser and its Representatives shall cooperate with the Company and its respective Representatives and shall use their reasonable efforts to minimize any disruption to the Business of the Island One Entities, (ii) a representative of the Company shall accompany Purchaser and its Representatives during all inspections if reasonably practicable, (iii) Purchaser and its Representatives shall not conduct any inspections or take any actions not permitted under any Contract applicable to any Island One Entity; and (iv) Purchaser shall repair or cause the repair and restoration of all damage caused by such inspection to the condition that existed prior to the inspection. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require any Island One Entity to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which any Island One Entity is bound.

(b)     In order to facilitate the resolution of any claims made against or incurred by the Company prior to the Closing, for a period of seven years after the Closing, the Purchaser shall retain the Books and Records relating to the Business of the Island One Entities, the Company and the other Island One Entities relating to periods prior to the Closing in a manner reasonably consistent with the prior practice of the Company and the other Island One Entities.

**Section 6.4     Contracts.**

(a)     Pursuant to the Amended Plan, all Contracts that are not listed as specifically assumed (either as a group or individually), including each Excluded Contact, shall be deemed rejected by the applicable Debtor as of the Closing Date. Disclosure Schedule 6.4(a) sets forth a list of the Contracts that have been specifically assumed or rejected in connection with the Bankruptcy Cases prior to the date hereof. The Purchaser acknowledges that any assumptions and rejections occurring prior to the date hereof, including any automatic rejections occurring as a result of the Bankruptcy Code, are final.

(b)     Attached hereto as Disclosure Schedule 6.4(b) is a schedule of all Assumption-Pending Pre-Petition Contracts listing the Contracts that shall be assumed by the Island One Entities on the Closing Date pursuant to the Amended Plan, subject to the approval of the Bankruptcy Court and the estimated amount of Cure Costs for each Assumption-Pending Pre-Petition Contract to be assumed on the Closing Date (the "**Assumption Schedule**"). The Company reasonably and in good faith believes that the amount of Cure Costs payable with respect to the Contracts set forth on the Assumption Schedule shall not exceed $100,000 in the aggregate.

(c)     At any time and from time to time after the date hereof, but in no event later than ten (10) Business Days prior to the Confirmation Hearing, the Purchaser may, by written notice to the Company, notify the Company that it wishes to amend the Assumption Schedule to include or exclude specific Contracts from the Assumption Schedule. Any such Contracts added to the Assumption Schedule at the request of Purchaser shall be referred to as "**Added Contracts**". The Purchaser shall have the right to make the final determination with respect to

whether any Contract shall be included on or excluded from the Assumption Schedule. Neither the Company nor any of its Subsidiaries shall assume or reject any unexpired lease or executory Contract which does not relate exclusively to an Excluded Asset without the prior written consent of Purchaser.

(d)     To the extent any counterparty to an Assumption-Pending Pre-Petition Contract files an objection to the cure amounts thereof and the alleged cure costs for such Contract exceeds the amount set forth on the Assumption Schedule with respect to such Contract, the Company shall notify the Purchaser of such objection. Within five days of receipt of such notification, the Purchaser may, by written notice to the Company, elect to participate in the resolution of such objection and the Company, Crescent One and the Purchaser shall use their respective commercially reasonable efforts to resolve such objection, including filing or supporting any brief(s) filed or requested to be filed by the Company, Crescent One or the Purchaser in respect thereof.

(e)     The Cure Costs and any other amounts necessary to cure all defaults as required by section 365 of the Bankruptcy Code under any and all Contracts to be assumed as set forth on the Assumption Schedule shall be paid by Purchaser in such manner as provided in the Amended Plan, Confirmation Order or other Order of the Bankruptcy Court applicable thereto.

Section 6.5     **Consents; Further Assurances.**

(a)     The Company and Crescent One shall use commercially reasonable efforts to obtain at the earliest practicable date all consents and approvals required to consummate the Transactions contemplated by this Agreement, including the Required Approvals, provided, however, that no party shall be obligated or required to pay any consideration to any third party from whom consent or approval is requested.

(b)     Each of the Parties shall use respective commercially reasonable efforts to cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

Section 6.6     **Notice of Default.**

(a)     The Company and Crescent One shall, within five (5) Business Days of receipt thereof, provide to Purchaser: (i) a copy of any notices of any material default that any Island One Entity receives in respect of any Material Contract and any notices of default under any Material Contract that it sends to another Person, in either case after the date of this Agreement and (ii) state or federal environmental orders that would reasonably be expected to result in a material liability issued by any Governmental Authorities having jurisdiction relating to any Island One Entity.

(b)     The Company and Crescent One, on the one hand, and Purchaser, on the other hand, shall promptly notify the other of:

(i)     any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Transaction, and

(ii)     any inaccuracy of any representation or warranty or breach of covenant or agreement contained in this Agreement at any time during the term hereof that would make any of such Party's representations under Articles IV or V of this Agreement, as applicable, false in any material respect,

provided, however, that delivery of any notice pursuant to this <u>Section 6.6(b)</u> shall not modify the representations, warranties, covenants, agreements or obligations of the parties (or remedies with respect thereto) or the conditions to the obligations of the parties under this Agreement. Furthermore, the failure to deliver any such notice required pursuant to this <u>Section 6.6(b)</u> shall not constitute a waiver by any Party of any right or condition to the consummation of the transactions contemplated in this Agreement.

**Section 6.7     <u>Confidentiality.</u>**  Purchaser acknowledges that the information provided to it in connection with this Agreement and the Transaction is subject to the terms of the confidentiality agreement between Purchaser and Western Reserve Partners LLC dated November 24, 2010 (the "**Confidentiality Agreement**"), the terms of which are incorporated herein by reference. The Confidentiality Agreement shall terminate pursuant to its terms.

**Section 6.8     <u>Conduct of Business Prior to the Closing.</u>**

(a)     Unless Purchaser otherwise agrees in writing, which approval of Purchaser shall not be unreasonably withheld or delayed, between the date of this Agreement and the Closing Date, the Company and Crescent One shall, and shall cause each other Island One Entity to, conduct its respective business in the Ordinary Course of Business (taking into account the pendency of the Bankruptcy Cases, the expenses authorized under the Cash Collateral Budget and that undertaking certain actions requires the approval of the Bankruptcy Court) and shall use commercially reasonable efforts to (i) continue in all material respects their advertising and promotional activities, and pricing and purchasing policies, in accordance with past practice; (ii) not shorten or lengthen in any material respect the customary payment cycles for any of their Account Receivables; (iii) use their commercially reasonable efforts to (A) preserve intact the Assets and the Business of the Island One Entities, (B) keep available to the Purchaser the services of key employees of the Island One Entities, (C) continue in full force and effect without material modification all existing material insurance policies currently maintained in respect of the Island One Entities and the Business of the Island One Entities, and (D) preserve their current relationships with their customers, suppliers and other Persons, in each case, with which they have had significant business relationships; (iv) exercise, but only after notice to the Purchaser and receipt of the Purchaser's prior written approval, any rights of renewal pursuant to the terms of any Material Contract which by its terms would otherwise expire; and (v) not engage in or seek Bankruptcy Court approval of any practice, take any action, fail to take any action or enter into any transaction which could reasonably be expected to cause any representation or warranty of the Company or Crescent One to be untrue, except where the failure of such representation or warranty to be true, individually or in the aggregate, would not have a Material Adverse Effect or result in a breach, in any material respect, of any covenant made by the Company or Crescent One in this Agreement.

(b)     Without limiting the generality of the foregoing, from and after the date hereof, each of the Company and Crescent One covenants and agrees that, between the date

hereof and the Closing, without the prior written consent of the Purchaser, such consent not to be unreasonably withheld, or to the extent provided for in the Cash Collateral Budget, neither the Company, Crescent One nor any other Island One Entity will undertake, commit to take, or cause any Island One Entity to take any of the following actions:

(i) sell, lease, license, transfer, or assign any Asset, tangible or intangible, other than in connection with the sale of Timeshare Interests in the Ordinary Course of Business;

(ii) make any new commitments for any capital expenditures in excess of $50,000 individually;

(iii) enter into any Contract (or series of related Contracts) involving more than $50,000 per annum (except those entered into in the Ordinary Course of Business) or any lease of real property;

(iv) accelerate, terminate, modify, or cancel (or permit to be accelerated, terminated, modified or cancelled) any Contract (or series of related Contract) involving more than $50,000 per annum to which any Island One Entity is a party or by which any of its assets is bound;

(v) assume or reject any executory contract or unexpired leases with respect to any Debtor pursuant to section 365 of the Bankruptcy Code;

(vi) delay or postpone the payment of accounts payable and other Liabilities outside the Ordinary Course of Business;

(vii) cancel, compromise, waive, settle or release any Claims or Legal Proceedings (or series of related Claims or Legal Proceedings) either involving more than $50,000 or outside the Ordinary Course of Business;

(viii) permit the loss, lapse or abandonment of, or transfer, assign, enter into or grant any license or sublicense of any rights under or with respect to any Intellectual Property Rights;

(ix) transfer or grant any rights under, or entered into any settlement regarding the breach or infringement of, any of the Intellectual Property Rights of any of the Island One Entities, or modify any existing rights with respect thereto;

(x) merge with, enter into a consolidation with or acquire an interest of 5% or more in any Person or acquire a substantial portion of the assets or business of any Person or any division or line of business thereof, or otherwise acquire any material assets;

(xi) enter into any employment contract or collective bargaining agreement, written or oral, or modified the terms of any existing such contract or agreement;

(xii) (A) except in the Ordinary Course of Business or as would be required by Applicable Law, increase in any material respect the compensation payable or to become

payable or the benefits provided to current or former officers, employees, directors, independent contractors or consultants of the Island One Entities; (B) grant any retention, severance or termination pay to (unless such Island One Entity was contractually obligated to make such grant), or enter into any employment, bonus, consulting, change of control or severance agreement, in each case providing for material compensation and benefits, with any current or former officers, employees, directors, independent contractors or consultants of the Island One Entities; (C) loan or advance any money or other property to any officers, employees, directors, independent contractors or consultants of the Island One Entities; (D) grant any equity or equity based awards; or (E) except in the Ordinary Course of Business or as would be required by Applicable Law, establish, adopt, enter into, terminate or amend in any way any Benefit Plan, or any plan or other arrangement that would be a Benefit Plan if it were in existence as of the date hereof;

(xiii)    terminate, discontinue, close or dispose of any plant, facility or other business operation, or lay off any employees or implement any early retirement or separation program, or any program providing early retirement window benefits within the meaning of Section 1.401(a)(4)-3(f)(4)(ii) of the Treasury Regulations or announce or plan any such action or program for the future;

(xiv)    hire employees with an annual salary of $50,000 or above, or terminate the employment of any Business Employee other than for "cause";

(xv)    fail to maintain the material plant, property and equipment of the Island One Entities in good repair and operating condition in all material respects, ordinary wear and tear excepted;

(xvi)    impose or permit to exist any Lien (other than a Permitted Lien) upon any of the Assets, tangible or intangible;

(xvii)    issue any note, bond or other debt security or create, incur, assume or guarantee any Indebtedness;

(xviii)    amend or revise its Organizational Documents;

(xix)    issue, sell or otherwise dispose of any of its Securities or grant any option, warrant, or other right to purchase or obtain (including upon conversion, exchange or exercise) any of its Securities;

(xx)    change any accounting methods or practices (including, without limitation, any change in depreciation or amortization policies or rates) or revalued any of their assets;

(xxi)    except as required under GAAP, revalue any of its assets, including writing down the value of inventory or writing off notes or Accounts Receivable, other than in the Ordinary Course of Business and other than in connection with any intercompany Contract between Island One Entities;

(xxii)    change any cash management practices;

(xxiii)   undertake any transaction outside the Ordinary Course of Business; or

(xxiv)    (A) make, change or revoke any Tax election or adopt or change any method of Tax accounting, (B) enter into any "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign law), settle, compromise or otherwise take any material action with respect to a potential liability for Taxes or surrender or otherwise take any material action with respect to any Claim for a refund of Taxes, (C) file any Tax Return, other than any such·Tax Return that is prepared on a basis consistent with past practice and filed, subject to Section 6.10, as required under Applicable Law or (D) consent to any extension or waiver of the limitations period applicable to any Claim with respect of Taxes.

**Section 6.9    Post-Closing Employee Covenants.**

(a)    The Company, Crescent One and the Purchaser each acknowledge and agree that the Purchaser is not obligated to cause any Island One Entity to continue to employ any of the Business Employees after Closing.  Nothing contained in this Agreement shall be construed to require, or prevent the termination of, employment of any individual, require minimum benefit or compensation levels, or prevent any change in the employee benefits provided to any individual employee of any Island One Entity.  No provision of this Agreement shall create any third-party beneficiary rights in any Business Employee or any other persons or entities (including any beneficiary or dependent thereof), in respect of continued employment (or resumed employment) for any specified period of any nature or kind whatsoever.  Purchaser shall not have any obligation to extend offers of employment to any Business Employee, or other service provider or employee of any Island One Entity or any of its Affiliates or to enter or continue any employment or other service relationship with any such Business Employee, service provider or employee.  Any employment opportunity offered by Purchaser hereunder shall be subject to the terms so offered by Purchaser in its sole discretion, and Purchaser may reserve the right to terminate such employment in accordance with applicable Law.

(b)    Following the date of this Agreement, the Company and Crescent One shall: (i) allow Purchaser reasonable access upon reasonable advance notice to meet with and interview the Business Employees who are members of executive management and other employees reasonably requested during normal business hours; provided, however, that such access shall not unduly interfere with the operation of the Business prior to the Closing; (ii) provide reasonable cooperation and information (including, but not limited to, updated Labor Schedules setting forth the name, title, position, original hire date, rehire dates, salary or hourly wage and earned and/or accrued vacation, sick, personal days and other leave of each Business Employee) to Purchaser as reasonably requested by Purchaser with respect to its determination of appropriate terms and conditions of employment for any Business Employee who Purchaser seeks to offer employment to following the Closing Date or otherwise; and (iii) cooperate with Purchaser to effect an orderly transition of any Business Employee offered employment by Purchaser, a Reorganized Entity or any of their respective Affiliates that accepts such offer of employment, effective as of the Closing Date and becomes an employee of Purchaser, a Reorganized Entity or any of their respective Affiliates following the Closing Date.  Following

the Closing, Purchaser shall be responsible for providing any required notice under and otherwise satisfy all Liabilities relating to the WARN Act with respect to (A) the termination of the employment of any Business Employee at the direction of the Purchaser following the date of this Agreement through the Closing; and (B) any event affecting Business Employees hired or employed by Purchaser or its Affiliates following the Closing Date.

(c)     Nothing in this Agreement shall be construed to grant any Business Employee or any other employee or service provider of any Island One Entity or any of their Affiliates a right to continued employment by, or to receive any payment or benefits from, the Company, Crescent One or Purchaser or through any Benefit Plan. This Agreement shall not limit Purchaser's or its Affiliates' ability or right to amend or terminate any benefit or compensation plan or program of Purchaser or its Affiliates and nothing contained herein shall be construed as an amendment to or modification of any such plan. Nothing contained in this <u>Section 6.9</u>, express or implied, shall constitute an amendment to any Benefit Plan, create any third party beneficiary rights or inure to the benefit of or be enforceable by any employee of the Purchaser or any of the Island One Entities or any Person representing the interest of employees.

### Section 6.10    <u>Tax Returns & Compliance.</u>

(a)     From the date of this Agreement until the Closing, and taking into account <u>Section 6.8(b)(xxiv)</u>, the Company and Crescent One shall prepare and file or otherwise furnish in proper form to the appropriate Governmental Authority (or cause to be prepared and filed or so furnished) in a timely manner (after giving effect to any applicable extensions) all Tax Returns relating to each of the Island One Entities and the Excluded Entities that are required to be filed on or before the Closing Date (after giving effect to any applicable extensions), and shall pay all Taxes required to be paid by or on behalf of the Island One Entities and the Excluded Entities on or before the Closing Date, provided that the Company, on behalf of the Island One Entities and the Excluded Entities, shall deliver to Purchaser (a) a copy of any material Tax Return and shall reflect on such Tax Return all comments submitted by Purchaser at least two (2) days prior to the due date for filing such Tax Return (after giving effect to any applicable extensions), and (b) written notice of any material Tax payment obligation at least ten (10) Business Days prior to the date on which such payment is required to be made. Notwithstanding anything to the contrary set forth herein, the Company, on behalf of the Island One Entities and the Excluded Entities, shall keep Purchaser fully informed with respect to all material Tax matters of each of the Island One Entities and the Excluded Entities between the date hereof and the Closing Date.

(b)     To the maximum extent permitted under Section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of the Reorganized Securities issued to Purchaser, or its assignee pursuant to <u>Section 10.13</u>, by Reorganized Island One and Reorganized Crescent One (and all related transactions) effected pursuant to this Agreement and under, in connection with and in furtherance of the Amended Plan, shall not be subject to any Transfer Taxes.   In connection therewith, the Confirmation Order shall direct the appropriate state or local government officials or agents to forgo the collection of any such Transfer Taxes and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such Transfer Taxes.

**Section 6.11  Public Announcements.**  Except as required by Applicable Law or in filings with (or proceedings before) the Bankruptcy Court in connection with the Bankruptcy Cases, no Party shall, on or prior to the Closing Date, issue or make any press release or other public announcement with respect to this Agreement or the Transactions, or otherwise make any public disclosures relating thereto, without the prior consultation in good faith with each other Party before issuing such press release or making such public announcement and providing each such Party a reasonable opportunity to comment thereon.

**Section 6.12  Acquisition of Crescent One.**  The Company's Affiliate Crescent One is also a Debtor in the Bankruptcy Cases, but is not a Subsidiary of the Company.  On April 20, 2011, the Company exercised its option to cause this Agreement to be modified or supplemented to provide for a transaction in which (i) Crescent One provides representations, warranties and covenants with respect to each of the matters that the Company has represented, warranted and covenanted herein; (ii) the indebtedness of Crescent One shall be restructured in the manner set forth in the Restructuring Term Sheet, and (iii) on the terms and subject to the conditions set forth in this Agreement (as amended or supplemented with respect to this Section 6.12 pursuant to Section 10.11) and the Amended Plan, at the Closing, Purchaser (or its assignee pursuant to Section 10.13) shall purchase, acquire and accept from Reorganized Crescent One, and Reorganized Crescent One shall issue, sell, transfer and deliver to Purchaser (or its designee), one hundred percent (100%) of the membership interests of Reorganized Crescent One, free and clear of all Liens or other interests other than those created by Purchaser.  The terms of the Crescent One transaction (including all amendments or supplements to this Agreement) must be acceptable to Purchaser, and shall not result in any adjustment or modification of the Purchase Price.

**ARTICLE VII**
**CONDITIONS TO CLOSING**

**Section 7.1  Conditions for Purchaser.**  Notwithstanding any other provision of this Agreement to the contrary, the obligation of Purchaser to complete the Transaction shall be subject to the satisfaction of each of the following conditions, at or prior to the Closing, as determined by Purchaser in its sole and absolute discretion:

(a)  All the covenants of this Agreement to be complied with or performed or satisfied by the Company and Crescent One shall have been complied with or performed or satisfied in all material respects, including all deliveries required to be made pursuant to Article VIII hereof; provided, however, that, in the case of any covenant qualified by "materiality" or other similar qualifications pursuant to the terms of this Agreement, such covenant shall have been complied with or performed in all respects;

(b)  The representations and warranties of the Company and Crescent One set forth in Article IV hereof shall be true and correct in all material respects as of the date of this Agreement and as of the Closing; provided, however, that, in the case of any representation or warranty qualified by "materiality" or other similar qualifications pursuant to the terms of this Agreement, such representation or warranty shall be true and correct in all respects;

(c)     No Government Authority shall have entered any Order that enjoins, restricts or prohibits the Closing, which has not, by the Closing Date, been dismissed, quashed or permanently stayed by the Bankruptcy Court pursuant to the Confirmation Order or another Order of a Governmental Authority;

(d)     The Debt Restructuring Transactions are consummated in accordance with the terms set forth on Exhibit A attached hereto;

(e)     The Debtors shall have adhered to the Bid Procedures without any modification thereof unless approved by Purchaser, such approval not to be unreasonably withheld;

(f)     The Amended Plan incorporating the terms set forth herein, including those set forth on Exhibit A attached hereto, shall have become effective, the Bankruptcy Court shall have entered a Confirmation Order no later than one (1) Business Day prior to the Closing Date and such order shall be a Final Order and there shall have been no amendment to the Amended Plan, or the Confirmation Order except as permitted hereby;

(g)     All of the Required Approvals shall have been obtained in form and substance reasonably acceptable to Purchaser and shall be in full force and effect at Closing;

(h)     To the extent that the Confirmation Order authorizes the Debtors to file, execute, deliver and/or file Uniform Commercial Code termination statements, lien releases, discharges, financing change statements and such other documents, notices or instruments absent the consent of the holder of a Lien, the Island One Entities shall have executed, delivered and/or filed or authorized Purchaser to file such termination statements, lien releases, discharges, financing change statements or other documents, notices or other instruments as Purchaser may reasonably deem necessary to release Liens (other than Permitted Liens) on the Assets, to the extent the Debtors are authorized to do so absent the consent of the holder of the Lien;

(i)     Since the date of this Agreement, there shall not have been any Material Adverse Effect; and

(j)     Purchaser shall have received copies of each of the Closing Documents required to be delivered by the Company pursuant to Section 8.2.

The conditions set forth in this Section 7.1 are for the sole benefit of Purchaser, and may be waived in whole or in part by Purchaser by notice to the Company in writing without prejudice to Purchaser's rights under this Agreement or at law, if any, in the event of the non-fulfillment of any other condition or conditions.

**Section 7.2     Conditions for the Company and Crescent One.**   The obligation of the Company and Crescent One to complete the Transaction shall be subject to the satisfaction of the following conditions, at or prior to the Closing:

(a)     All the covenants of this Agreement to be complied with or performed or satisfied by Purchaser shall have been complied with or performed or satisfied in all material respects, including all deliveries required to be made pursuant to Article VIII hereof; provided, however, that, in the case of any covenant qualified by "materiality" or other similar qualifications

pursuant to the terms of this Agreement, such covenant shall have been complied with or performed in all respects;

(b)      The representations and warranties of Purchaser set out in Article V hereof shall be true and correct in all material respects as of the date of this Agreement and as of the Closing; provided, however, that, in the case of any representation and/or warranty qualified by "materiality" or other similar qualifications pursuant to the provisions of Article V such representation and/or warranty shall be true and correct in all respects as of the date of this Agreement and as of the Closing;

(c)      No Government Authority shall have entered any Order that enjoins, restricts or prohibits the Closing, which has not, by the Closing Date, been dismissed, quashed or permanently stayed by the Bankruptcy Court pursuant to the Confirmation Order or another Order of a Governmental Authority;

(d)      The Confirmation Order shall have been entered by the Bankruptcy Court which, if not a Final Order, shall not have been stayed or postponed or prohibited in effect in whole or part by any court or Governmental Authority; and

(e)      The Company shall have received copies of each of the Closing Documents required to be delivered by the Purchaser pursuant to Section 8.3.

The conditions set forth in this Section 7.2 are for the sole benefit of the Company and Crescent One, and may be waived in whole or in part by the Company by notice to Purchaser in writing without prejudice to the Company's rights under this Agreement or at law, if any, in the event of non-fulfillment of any other condition or conditions.

## ARTICLE VIII
## CLOSING

**Section 8.1      Closing Arrangements.**   Upon all conditions precedent to Purchaser's and the obligations of the Company and Crescent One to close the transactions as set forth in this Agreement having been satisfied and fulfilled, or waived, as the case may be, the Closing shall take place at a closing (the "**Closing**") to be held at 10:00 a.m., local time at the offices of Baker & Hostetler LLP, SunTrust Center, Suite 2300, 200 South Orange Avenue, Orlando, FL 32801, on the first (1st) Business Day following satisfaction or waiver of all the conditions set forth in Article VII (excluding conditions that, by their nature, cannot be satisfied until the Closing Date, but subject to the fulfillment or waiver of those conditions), or at such other time or place as may be mutually agreed to by the Parties (the "**Closing Date**").

**Section 8.2      Deliveries of the Company and Crescent One.**   On or before the Closing Date, the Company and Crescent One shall deliver or cause to be delivered the following items and documents to Purchaser, with each such document to be effective as of the Closing:

(a)      a certificate of an authorized officer of the Company and Crescent One, substantially in the form attached hereto, certifying that the conditions set forth in Section 7.1 have been fulfilled;

(b)     a certificate of non-foreign status of the Company and Crescent One pursuant to Section 1445 of the Code and Section 1.1445-2(b) of the Treasury Regulations, in form and substance satisfactory to Purchaser;

(c)     a certified copy of the Confirmation Order;

(d)     the Transaction Documents, executed and delivered by the Company and Crescent One, as applicable;

(e)     a certificate of good standing of each of the Island One Entities; and

(f)     all other conveyances and other documents which are required and which Purchaser has reasonably requested on or before the Closing Date to give effect to this Transaction.

**Section 8.3     Deliveries of the Purchaser.**  On or before the Closing Date, Purchaser shall deliver or cause to be delivered the following items and documents to the Company, with each such document to be effective as of the Closing:

(a)     a certificate of an authorized officer of Purchaser representing and certifying that the conditions set forth in Section 7.2 have been fulfilled;

(b)     the Purchase Price, less an amount equal to the Deposit (together with all accrued investment income and interest thereon through the date immediately preceding the Closing Date), by wire transfer of immediately available funds to one or more bank accounts designated in writing by the Company to Purchaser prior to the Closing Date; and

(c)     the Transaction Documents, executed by Purchaser.

# ARTICLE IX
# TERMINATION OF AGREEMENT

**Section 9.1     Termination.**  This Agreement may be terminated prior to the Closing as follows:

(a)     by written mutual consent of the Company, Crescent One and Purchaser;

(b)     by Purchaser or the Company and Crescent One, if the Closing has not occurred on or prior to 5:00 p.m. on June 30, 2011 (the "**Outside Date**"); provided, however, that, if the Closing shall not have occurred on or before the Outside Date due to a breach of any representation, warranty, covenant or agreement contained in this Agreement by Purchaser or the Company and Crescent One, then the breaching party may not terminate this Agreement pursuant to this Section 9.1(b);

(c)     by Purchaser or the Company and Crescent One, if a court or other Governmental Authority of competent jurisdiction shall have issued a Final Order or taken any other nonappealable final action, in each case, having the effect of permanently restraining, enjoining or otherwise prohibiting the Transaction (it being agreed that the Parties hereto shall promptly

appeal any adverse determination which is subject to appeal, at no cost to Purchaser, and pursue such appeal with reasonable diligence);

(d)     by Purchaser, if the Company or Crescent One has breached in any respect any representation, warranty, covenant or agreement contained in this Agreement which breach (i) would result in a failure of a condition set forth in <u>Section 7.1</u> if occurring or continuing on the Closing Date, and (ii) is either incapable of being cured or, if capable of being cured, is not cured in all respects within the earlier of (x) thirty (30) calendar days after written notice thereof and (y) the Outside Date; <u>provided, however,</u> that Purchaser's right to terminate this Agreement under this <u>Section 9.1(d)</u> shall not be available if, at the time of such intended termination, Purchaser is in breach of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach shall have (or would have with the passage of time) caused a failure of a condition under <u>Section 7.2</u>;

(e)     by the Company and Crescent One, if Purchaser has breached in any respect any representation, warranty, covenant or agreement contained in this Agreement which breach (i) would result in a failure of a condition set forth in <u>Section 7.2</u> if occurring or continuing on the Closing Date and (ii) is either incapable of being cured or, if capable of being cured, is not cured in all respects within the earlier of (x) thirty (30) calendar days after written notice thereof and (y) the Outside Date; <u>provided, however,</u> that the right of the Company and Crescent One to terminate this Agreement under this <u>Section 9.1(e)</u> shall not be available if, at the time of such intended termination, the Company or Crescent One is in breach of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach shall have (or would have with the passage of time) caused a failure of a condition under <u>Section 7.1</u>;

(f)     by Purchaser or the Company and Crescent One, if the Bankruptcy Cases are dismissed in whole or in part or converted to Chapter 7 of the Bankruptcy Code for any reason or if a Chapter 11 trustee is appointed pursuant to section 1104 of the Bankruptcy Code with respect to any of the estates of the Debtors;

(g)     by Purchaser, if the Island One Entities fail to adhere to the Bid Procedures without any modification thereof unless approved by Purchaser, such approval not to be unreasonably withheld;

(h)     by the Purchaser, upon written notice to the Company, if the Amended Plan and the Disclosure Statement have not been filed prior to March 22, 2011;

(i)     by Purchaser, if this Agreement, including the Restructuring Term Sheet, the Bid Procedures Order or the Amended Plan, is revised or modified (except as otherwise permitted pursuant to this Agreement) by the Company, Crescent One or an order of the Bankruptcy Court or other court of competent jurisdiction in a manner that is not reasonably acceptable to Purchaser or a plan of reorganization with respect to the Island One Entities involving the Transactions that is not reasonably acceptable to Purchaser is filed by any of the Island Entities with the Bankruptcy Court or another court of competent jurisdiction;

(j)     by Purchaser, if any Governmental Authority issues a Final Order or takes any other action, in either case, denying the Company or Crescent One the Required Approvals;

(k)     by Purchaser or the Company and Crescent One, if the Bankruptcy Court shall enter an Order approving a transaction for all or any material portion of the assets, property or stock of the Island One Entities (other than any of the Excluded Assets) with any Person other than the Purchaser (the "**Competing Transaction**"); or

(l)     by Purchaser, if the Company or Crescent One withdraws or seeks authority to withdraw their motion seeking approval of the Transaction, announces any stand-alone plan of reorganization or liquidation (or supports any such plan filed by any other party) or takes any action or seeks any approval to take any other action that would, individually or in the aggregate, be reasonably likely to cause a Material Adverse Effect or prevent or materially delay the consummation of the Transaction on the terms and conditions pursuant hereto.

**Section 9.2     Procedure upon Termination.**  In the event of termination by Purchaser or the Company and Crescent, pursuant to Section 9.1 hereof, written notice thereof shall forthwith be given to the other party or parties, and this Agreement shall terminate, and the Transaction shall be abandoned, without further action by Purchaser, the Company or Crescent One.  If this Agreement is terminated as provided herein, the Deposit shall be delivered in the manner set forth in Section 9.3 and each Party shall redeliver all documents, work papers and other material of any other Party relating to the Transaction, whether so obtained before or after the execution hereof, to the Party furnishing the same.

**Section 9.3     Effect of Termination.**

(a)     Except as otherwise provided herein and subject to Section 2.3 and Section 3.3, in the event of termination of this Agreement, this Agreement (other than the terms and provisions set forth in this Section 9.3, which shall survive such termination) shall become null and void and be deemed of no force and effect, with no liability on the part of any party hereto (or of any of its Representatives), and no party hereto shall have any obligations to any other party hereto arising out of this Agreement other than with respect to the delivery of the Deposit pursuant to Section 2.3; provided, that no such termination shall relieve or release the Company or their Affiliates from any liabilities or damages resulting from any willful or intentional breach by the Company of any of its representations, warranties, covenants or agreements set forth in this Agreement.

(b)     If this Agreement is terminated by the Company and Crescent One pursuant to Section 9.1(e), then the Deposit shall be delivered to the Company within five (5) days of such termination.

(c)     If this Agreement is terminated (1) by Purchaser pursuant to Section 9.1(b), Section 9.1(c), Section 9.1(d), Section 9.1(f), Section 9.1(g), Section 9.1(h), Section 9.1(i), Section 9.1(j), Section 9.1(k), or Section 9.1(l), (2) by the Company and Crescent One pursuant to Section 9.1(b), Section 9.1(c), Section 9.1(f), or Section 9.1(k) or (3) by each of the Parties pursuant to Section 9.1(a), then, in each case, the Deposit shall be delivered to the Purchaser within five (5) days of such termination.

## ARTICLE X
## MISCELLANEOUS

**Section 10.1**     **Construction.**

(a)     The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa. The word "including" and "include" and other words of similar import will be deemed to be followed by the phrase "without limitation." The words "herein," "hereto" and "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement. References to Articles, Sections, clauses, subparagraphs, Annexes and Exhibits herein are references to Articles, Sections, clauses, subparagraphs, Annexes and Exhibits of this Agreement. The word "if" and other words of similar import will be deemed to be followed by the phrase "and only if." Any reference herein to law or to a law, statute, rule or regulation of any Governmental Authority (or any provision thereof) shall include all laws and such law, statute, rule or regulation promulgated thereunder (or provision thereof), including any successor thereto, as it may be amended from time to time. Any reference herein to "dollars" or "$" shall mean United States dollars. Any reference in this Agreement to "the date hereof" or "the date of this Agreement" shall mean the date of the Original Agreement, except where the words "as amended" follow "this Agreement", in which case the applicable date shall be date on which the Original Agreement was amended and restated.

(b)     Time shall be of the essence of this Agreement. Except as expressly set out in this Agreement, the computation of any period of time referred to in this Agreement shall exclude the first day and include the last day of such period. If the time limited for the performance or completion of any matter under this Agreement expires or falls on a day that is not a Business Day, the time so limited shall extend to the next following Business Day. Whenever action must be taken (including the giving of notice, the delivery of documents or the funding of money) under this Agreement, prior to the expiration of, by no later than or on a particular date, unless otherwise expressly provided in this Agreement, such action must be completed by 5:00 p.m. on such date. The time limited for performing or completing any matter under this Agreement may be extended or abridged by an agreement in writing by the Parties. All references herein to time are references to Eastern Standard time.

(c)     The Disclosure Schedules are hereby incorporated by reference into the sections in which they are directly referenced and nothing in the Disclosure Schedules shall be deemed adequate to disclose an exception to a representation or warranty made herein unless the Disclosure Schedules identify the exception with reasonable particularity and describes the relevant facts in reasonable detail. Without limiting the generality of the foregoing, the mere listing (or inclusion of a copy) of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein unless the representation or warranty has to do with the existence of the document or other item itself and the provision of monetary or other quantitative thresholds for disclosure on the Disclosure Schedules does not and shall not be deemed to create or imply a standard of materiality hereunder.

**Section 10.2**     **Headings.**   The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and are not part of this Agreement and do not in any way limit or modify the terms or provisions of this Agreement and shall not affect the interpretation hereof.

**Section 10.3**     **Interpretation.**   The Parties have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties hereto and no presumption or burden of proof will arise favoring or disfavoring any Party hereto because of the authorship of any provision of this Agreement.

**Section 10.4**     **Obligations as Covenants.**   Each agreement and obligation of each party hereto in this Agreement, even though not expressed as a covenant, shall be considered for all purposes to be a covenant.

**Section 10.5**     **Notices.**   Any Notice shall be in writing and shall be deemed to have been duly given or made when personally delivered or when mailed by (i) registered or certified mail, postage prepaid, return receipt requested, or (ii) email, addressed as follows, or to such other addresses as may be furnished hereafter by notice, in writing, to the other Party on at least three (3) Business Days' prior notice, to the following parties:

(a)     If to Purchaser, to:

Timeshare Acquisitions, LLC
900 Third Avenue, Suite 1100
New York, NY 10022
Attention:     Douglas Teitelbaum, douglas.teitelbaum@yucaipaco.com
                    Scott Sozio, scott.sozio@yucaipaco.com
Telecopy: (212) 610-2684

(b)     with a copy given in like manner to (which shall not constitute notice):

Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, NY  10281
Attention:  Eric Rytter, Esq., eric.rytter@cwt.com
Telecopy: (212) 504-6666

(c)     If to the Company or Crescent One, to:

Island One, Inc.
8680 Commodity Circle
Orlando, FL 32819
Attention: Deborah L. Linden, deborah.linden@islandone.com
Telecopy: (407) 240-9506

with a copy given in like manner to (which shall not constitute notice):

Baker & Hostetler LLP
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL 32801
Attention: John Melicharek, jmelicharek@bakerlaw.com
Telecopy: (407) 841-0168

(d)     If to the Lenders, to:

Textron Financial Corporation
40 Westminster Street
Providence, RI 02940

with a copy given in like manner to (which shall not constitute notice):

Riemer & Braunstein LLP
Seven Times Square, Suite 2506
New York, NY 10036
Attention: Steven E. Fox, sfox@riemerlaw.com
Telecopy: (212) 789-3195

Liberty Bank
315 Main Street
Middletown, CT 06457

with a copy given in like manner to (which shall not constitute notice):

Bingham McCutchen, LLP
One State Street
Hartford, CT 06103
Attention:      Jonathan B. Alter, jonathan.alter@bingham.com
                R. Jeffrey Smith, jeff.smith@bingham.com
Telecopy:  (860) 240-2569

Any Notice which is delivered or is sent by telecopy shall be deemed to have been validly and effectively given and received on the date it is delivered or sent, unless it is delivered or sent after 5:00 p.m. on any given day or on a day which is not a Business Day, in which case it shall be deemed to have been validly and effectively given and received on the Business Day next following the day it was delivered or sent, provided that, in the case of a Notice sent by telecopy it shall not be deemed to have been sent unless there has been confirmation of transmission. Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this Section 10.5.

**Section 10.6      Specific Performance.** It is understood and agreed by the parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party

and each non-breaching Party should be entitled to specific performance and injunctive or other equitable relief as a remedy of such a breach; provided, that notwithstanding the foregoing, the parties acknowledge that the Company shall be not entitled to enforce specifically the obligations of Purchaser to actually consummate the Closing. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law. Notwithstanding anything to the contrary elsewhere in this Agreement, no party shall, in any event, be liable to any other Person for any consequential, special or punitive damages of such other Person relating to the breach or alleged breach hereof.

Section 10.7    **Fees and Expenses.** Except as expressly provided in this Agreement, the Parties agree that all costs and expenses of the parties relating to the Transaction shall be paid by the Party incurring such expenses.

Section 10.8    **Governing Law; Jurisdiction; Service of Process.** This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without giving effect to any principles of conflicts of law. By its execution and delivery of this Agreement, each of the Parties irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the Bankruptcy Court for that purpose only, and, by execution and delivery of this Agreement, each hereby irrevocably accepts and submits itself to the jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding; provided, that if the Bankruptcy Cases have closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute. In the event any such action, suit or proceeding is commenced, the Parties hereby agree and consent that service of process may be made, and personal jurisdiction over any party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the party at the address of such Party set forth in Section 10.5 hereof, unless another address has been designated by such Party in a notice given to the other parties in accordance with the provisions of Section 10.5 hereof. Each Party waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

Section 10.9    **Further Assurances.** Each of the parties hereto shall, at its own cost, from time to time hereafter and upon any reasonable request of the other, execute and deliver, make or cause to be made all such further acts, deeds, assurances and things as may be required or necessary to more implement and carry out the intent and meaning of this Agreement.

Section 10.10    **Entire Agreement.** This Agreement and the other Transaction Documents constitute the full and entire agreement between the parties hereto with respect to the Transaction and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, with respect thereto made by any Party, and there are no other warranties or representations and no other agreements between the parties hereto in connection with the

Transaction except as specifically set forth in this Agreement and the other Transaction Documents.

**Section 10.11     Amendment; Waiver.** This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by each of the parties hereto. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision (whether or not similar) nor shall any waiver constitute a continuing waiver unless otherwise expressed or provided. All waivers hereunder must be in writing to be effective.

**Section 10.12     Survival.** None of the representations or warranties of any Party in this Agreement shall survive the Closing. All covenants and agreements contained in this Agreement shall survive the Closing in accordance with their respective terms; provided, that any covenant or agreement contained herein whose survival is not limited by its terms shall survive until fully performed in accordance with its terms.

**Section 10.13     Assignment.** No Party shall assign their respective rights and/or obligations hereunder (or agree to do so) without the prior written consent of the other Party, which consent may be withheld by such Party in its sole and absolute discretion, provided, however, that Purchaser may assign any or all of its rights, interests and obligations hereunder to (i) any wholly-owned subsidiary of the Purchaser (including Reorganized Island One and Reorganized Crescent One following Purchaser's acquisition of the Reorganized Securities); (ii) any post-Closing purchaser of all or a substantial part of the Business of any Island One Entity (whether by operation of law or otherwise), but no such assignment shall relieve Purchaser of its obligations hereunder and (iii) any of the Purchaser's lenders or other financing sources for collateral security purposes. Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires.

**Section 10.14     Successors and Assigns.** All of the covenants and agreements set forth in this Agreement are intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns and be enforceable by the Parties and their respective successors and their permitted assigns pursuant to the terms and conditions of this Agreement. For the avoidance of doubt, Purchaser is not a successor to any Island One Entity or any of their respective bankruptcy estates and the sale of the Reorganized Securities shall not amount to a consolidation, merger or de facto merger of Purchaser with or into any Island One Entity.

**Section 10.15     No Third Party Beneficiaries.** This Agreement shall be binding upon and inure solely to the benefit of the Parties and their respective successors and permitted assigns and except as set forth in Section 10.16, no provision of this Agreement, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, including any rights of employment for any specified period, under or by reason of this Agreement. For the avoidance of doubt, although the Parties acknowledge that

certain actions referenced herein require the consent of certain of the Lenders, none of the Lenders shall be third party beneficiaries to this Agreement or have any right, express of implied to enforce any of the terms of this Agreement. The Parties further acknowledge and agree that each Majority Lender is a party in interest with respect to the Bankruptcy Cases, and to the fullest extent permitted by Section 1109 of the Bankruptcy Code, each such Majority Lender shall be entitled to raise and appear before the Bankruptcy Court and be heard on any issue with respect to the Bankruptcy Cases, including the Transactions contemplated hereby.

Section 10.16    **Non-Recourse**. No past, present or future Representative of Purchaser, the Company or any of their respective Affiliates shall have any liability for any obligations or liabilities of Purchaser, Company or their respective Affiliates under this Agreement for any claim based on, in respect of, or by reason of, the transactions contemplated hereby.

Section 10.17    **Severability of Provisions.**  If any provision or any portion of any provision of this Agreement shall be held invalid or unenforceable, the remaining portion of such provision and the remaining provisions of this Agreement shall not be affected thereby so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. If the application of any provision or any portion of any provision of this Agreement to any Person or circumstance shall be held invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

Section 10.18    **Counterparts.**    This Agreement may be executed in multiple counterparts, each of which shall be deemed an original hereof, and all of which shall constitute a single agreement effective as of the date of this Agreement, as amended. Any delivery of an executed copy of this Agreement by way of electronic transmission shall constitute delivery hereof.

*[signature page follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

TIME SHARE ACQUISITIONS, LLC

By: _____
    Name: Scott Sozio
    Title: President

ISLAND ONE, INC.

By: _____
    Name: Deborah Linden
    Title: Chief Executive Officer

CRESCENT ONE, LLC

By: _____
    Name: Deborah Linden
    Title: President

**EXHIBIT A**
**RESTRUCTURING TERM SHEET**

# Restructuring Term Sheet

Pursuant to the terms and conditions of the Plan Sponsor Agreement, dated as of March 9, 2011 (as amended, the "Agreement") by and among Timeshare Acquisitions, LLC ("Buyer") and Island One, Inc. (the "Company") a debtor-in-possession in a chapter 11 case being jointly administered with bankruptcy cases (collectively, the "Bankruptcy Cases") of Crescent One, LLC ("Crescent One") and certain of the Company's other affiliated debtors (the "Debtors") pending before the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court"), Buyer shall, following the satisfaction of the conditions precedent set forth in the Agreement, including, without limitation, the consummation of the Debtors' amended plan of reorganization (as amended and as reasonably acceptable to the Buyer and Majority Lenders consistent with the terms of the Agreement and this Term Sheet, the "Amended Plan"), purchase one hundred percent (100%) of the capital stock of the reorganized Company (the "Reorganized Debtor," and together with reorganized Crescent One, LLC ("Reorganized Crescent") if Buyer purchases the membership interests of Reorganized Crescent pursuant to Section 6.12 of the Agreement, the "Reorganized Debtors") (the "Transaction").

A condition to the closing of the Transaction (the "Closing") shall be the simultaneous completion of certain debt restructuring transactions by and between the Company, the other Debtors and their respective Lenders (as defined below) in order to amend the terms of, restructure or discharge, as applicable, the indebtedness of the Debtors held by the Lenders, on the terms set forth in this Restructuring Term Sheet (the "Term Sheet").

Pursuant to the Amended Plan, a portion of Buyer's consideration payable in connection with the Transaction will be used to make certain payments to Textron Financial Corporation ("Textron") and Liberty Bank ("Liberty"), and all other secured indebtedness of the Debtors, will be restructured and/or satisfied and discharged (collectively, the "Debt Restructuring Transactions").

Set forth in this Term Sheet are the key terms concerning the Debtors' current indebtedness and the proposed Debt Restructuring Transactions related thereto. The Transaction shall be consummated pursuant to the terms of this Term Sheet, the Agreement and the Amended Plan. This Term Sheet shall serve as the basis for the negotiation and execution of the Amended Plan and the Definitive Documents (defined below) for the Debt Restructuring Transactions.

For purposes of this Term Sheet, references to the "Company" relating to a period post-Closing shall mean the Reorganized Debtor, and "Lenders" shall mean Textron, Liberty, BB&T, Old Florida, as well as any affiliate or subsidiary of any such lender which currently holds indebtedness of the Debtors, and "Majority Lenders" means, as of any date, the Lenders holding a majority in interest based on the value of claims of the Lenders with respect to the Debtors. For the avoidance of doubt, Textron and Liberty are the Majority Lenders as of the date of this Term Sheet.

The Buyer and the Majority Lenders shall use their commercially reasonable efforts to effect the transactions described below in a manner that is most tax efficient, provided that any alternative structure shall be no less favorable to the Majority Lenders than the structure described below.

| | | |
|---|---|---|
| 1. | **Plan Sponsor Transaction** | On the Closing Date, Buyer will purchase all of the equity interests of the Reorganized Debtor and Crescent, if applicable, for an amount not less than $13,000,000 (the "Cash Consideration") pursuant to the terms of the Agreement. The Company and the Majority Lenders shall use their best efforts to obtain an order of the Bankruptcy Court providing Buyer with the benefit of certain bid protections (the "Bid Protections"), payable by the Company, including coverage for Buyer's third party expenses in an amount not to exceed $2 million in the event that the Agreement is terminated pursuant to Section 9.1(k) of the Agreement by either Buyer or the Company upon the closing of a transaction for all or any material portion of the assets, property or stock of the Island One Entities (other than any Excluded Assets (as defined in the Agreement)) with any person other than Buyer.[1] |
| | | Pursuant to and in accordance with the Amended Plan, (i) $8,000,000 of the Cash Consideration will be distributed to Textron and Liberty in satisfaction of certain of their claims with respect to the Debtors' indebtedness (the "Lender Payment"); (ii) $400,000 of the Cash Consideration is expected to be paid as retention bonuses for certain employees of the Company to be identified by Buyer prior to the Closing Date; and (iii) the Reorganized Debtor will be capitalized by the Cash Consideration with an amount sufficient to provide for the following: (A) working capital of the Reorganized Debtor in an amount of not less than $2,000,000, (B) discharge of certain transaction fees and expenses including, without limitation, accrued but unpaid fees payable to Western Reserve Partners LLC, (C) satisfaction of cure costs required to assume executory contracts and unexpired leases as specified by Buyer pursuant to the Agreement and (D) discharge of Transfer Taxes (as defined in the Agreement), excluding those Transfer Taxes, if any, arising from or relating to any transfer of collateral to a designee of Textron (the "Textron Designee") as contemplated in connection with the Debt Restructuring Transactions described in sections 2 and 3 hereof, which shall be paid by the Majority Lenders. None of the Buyer, the Company, the Reorganized Debtor, or any of their affiliates, shall directly or indirectly have any membership interests in the Textron Designee. |
| | | Buyer shall not be required to provide any consideration to fund any administrative expenses of the Debtors except as specifically provided herein. |
| | | On the Closing Date, all of the outstanding equity interests in the Company (and Crescent One, if Buyer purchases the membership interests of Reorganized Crescent pursuant to Section 6.12 of the Agreement) shall be cancelled without consideration and such holders shall have no further rights with respect to such equity interests and shall receive no distribution under the Amended Plan on account thereof. |

---

[1] Unless Buyer indicates otherwise, on or before March 11, 2011 the Debtors will file a motion requesting approval of the Bid Protections, and the Majority Lenders will support such motion. To the extent the Bid Protections are not approved by the Bankruptcy Court, the Majority Lenders will refrain from submitting a credit bid based on the value and/or amount of their claims against the Debtors to acquire any material portion of the assets, properties or stock of the Debtors; provided, however, the Majority Lenders may credit bid against an overbid submitted at the auction by any qualified bidder other than Buyer.

| | | |
|---|---|---|
| 2. | **Textron Old Receivables Loan** | On the Closing Date, the Pledged Collateral against which advances were made or which was pledged to cure any borrowing base deficiencies[2] with respect to the Company's existing receivables facilities with Textron (the "Old Receivables Loan") shall be transferred to the Textron Designee. In consideration for the transfer of the Pledged Collateral to the Textron Designee, Textron shall forgive all amounts owed by the Company or any of its affiliates and all other obligations of the Company or any of its affiliates with respect to the Old Receivables Loan, and shall release any and all claims that Textron or any of its affiliates may have against the Company or any of its affiliates with respect to the Old Receivables Loan. Without limiting the foregoing, except as otherwise provided herein, neither the Company, Reorganized Debtor nor any of their respective affiliates will have any obligation or liability relating to the Old Receivables Loan, and Textron will not have any recourse to the Company, Reorganized Debtor nor any of their respective affiliates with respect thereto. |
| | | At the Closing, the Company shall (i) with respect to the Old Receivables Loan, transfer to the Textron Designee 75% of the face value of the note receivable collateral generated by the Company during the pendency of the Bankruptcy Cases, determined as of the Closing Date on an equitable basis (the "Post-Petition Receivables"), and (ii) with respect to the Interim Line Tranche (as defined below), pledge as collateral the remaining 25% of the face value of the Post-Petition Receivables. At the Closing, all notes receivable under the Old Receivables Loan that are (i) greater than 120 days but less than 365 days past due (the "Closing Defaulted Notes") shall be released by Textron and transferred by the Company to the Reorganized Debtor for no incremental consideration, (ii) at least 365 days past due shall be transferred by the Company to the Textron Designee, and (iii) equal to or less than 120 days past due shall be transferred by the Company to the Textron Designee. |
| | | Following the Closing, on a quarterly basis, the Textron Designee shall have the right to put all notes receivable that constitute Pledged Collateral and that subsequent to the Closing Date become greater than 120 days past due (the "Defaulted Notes") to the Reorganized Debtor for a cash payment equal to an amount per interval of $250, for each interval up to the "Projected Interval Defaults" set forth on a schedule to be agreed upon by Buyer, Textron and Liberty, and $1,000 per interval for all defaulted notes in excess of the Projected Interval Defaults. For the avoidance of doubt, all notes receivable that constitute Pledged Collateral and that are equal to or greater than 365 days past due as of the Closing Date shall be the property of the Textron Designee and shall not be subject to the put right described above. |
| | | The Reorganized Debtor shall be responsible for all costs of foreclosure, including the costs relating to the Closing Defaulted Notes and the Defaulted Notes  To the extent that the Reorganized Debtor upgrades any account that constitutes Pledged Collateral, the Reorganized Debtor shall pay the Textron Designee in full on account of such note receivable. |

---

[2] In connection with the preparation of definitive documents, an exhibit will be prepared describing the Pledged Collateral.

| | | |
|---|---|---|
| | | Notwithstanding the above-described allocation of the Post-Petition Receivables pursuant to the Transaction, nothing herein shall diminish the Majority Lenders' replacement liens and super-priority administrative claims granted pursuant to the Second Supplemental Final Order Extending Debtors' Use of Cash Collateral entered by the Bankruptcy Court, provided, that such liens and claims, with respect to the Reorganized Debtors, shall be discharged at the Closing pursuant to the Amended Plan. |
| | | For purposes of this Term Sheet, "Pledged Collateral" shall mean (i) any previously pledged notes receivable collateral with respect to the Old Receivables Loan (other than the Closing Defaulted Notes) and (ii) the Post-Petition Receivables transferred by the Company to the Textron Designee at Closing. |
| | | Diamond Resorts Corporation ("Diamond") shall replace Equiant as the servicer of the Pledged Collateral, as further described in Section 9. From and after the Closing, all servicing fees relating to the Pledged Collateral shall be the responsibility of the Textron Designee. The restructuring of the Old Receivables Loan shall occur in accordance with and pursuant to the Amended Plan and the Definitive Documents. |
| 3. | Crescent Receivables Loan | In the event that the Buyer acquires Reorganized Crescent pursuant to Section 6.12 of the Agreement, the indebtedness of Crescent One shall be restructured as follows. On the Closing Date, the Crescent Pledged Collateral with respect to the existing receivables facilities of Crescent One with Textron (the "Crescent Receivables Loan") shall be transferred to the Textron Designee. In consideration for the transfer of the Crescent Pledged Collateral to the Textron Designee, Textron shall forgive all amounts owed by Crescent One or any of its affiliates and all other obligations of Crescent One or any of its affiliates with respect to the Crescent Receivables Loan, and shall release any and all claims that Textron or any of its affiliates may have against Crescent One or any of its affiliates with respect to the Crescent Receivables Loan. Without limiting the foregoing, except as otherwise provided herein, neither Crescent One, Reorganized Crescent nor any of their respective affiliates will have any obligation or liability relating to the Crescent Receivables Loan, and Textron will have no recourse to Crescent One, Reorganized Crescent nor any of their respective affiliates with respect thereto. |
| | | At the Closing, all notes receivable under the Crescent Receivables Loan that are (i) greater than 120 days but less than 365 days past due (the "Crescent Closing Date Defaulted Notes") shall be released by Textron and transferred by Crescent One to Reorganized Crescent for no incremental consideration, (ii) at least 365 days past due shall be transferred by Crescent One to the Textron Designee, and (iii) equal to or less than 120 days past due shall be transferred by Crescent One to the Textron Designee. |
| | | Following the Closing, on a quarterly basis, the Textron Designee shall have the right to put all notes receivable that constitute Crescent Pledged Collateral and that subsequent to the Closing Date become greater than 120 days past due (the "Defaulted Crescent Notes") to Reorganized Crescent for a cash payment equal to an amount per interval of $250, for each interval up to the Projected Interval Defaults set forth set forth on a schedule to be agreed upon by Buyer and Textron, and $1,000 per interval for all Defaulted Crescent Notes in excess of the Projected Interval Defaults. For the avoidance of doubt, all notes receivable that constitute Crescent Pledged Collateral |

| | | |
|---|---|---|
| | | and that are equal to or greater than 365 days past due as of the Closing Date shall be the property of the Textron Designee and shall not be subject to the put right described above. |
| | | Reorganized Crescent shall be responsible for all costs of foreclosure, including the costs relating to the Crescent Closing Date Defaulted Notes and the Defaulted Crescent Notes. To the extent that the Reorganized Crescent upgrades any account that constitutes Crescent Pledged Collateral, Reorganized Crescent shall pay the Textron Designee in full on account of such note receivable. |
| | | For purposes of this Term Sheet, "Crescent Pledged Collateral" shall mean any pledged notes receivable collateral with respect to the Crescent Receivables Loan. |
| | | Diamond shall replace Equiant as the servicer of the Crescent Pledged Collateral, as further described in Section 9. From and after the Closing, all servicing fees relating to the Crescent Pledged Collateral shall be the responsibility of the Textron Designee. The restructuring of the Crescent Receivables Loan shall occur in accordance with and pursuant to the Amended Plan and the Definitive Documents. |
| 4. | **Conduit Loan** | Except with respect to certain events of default arising in connection with the filing of the Bankruptcy Cases, IOI Funding I, LLC ("IOI Funding") is currently in compliance with its obligations under the Conduit Loan. The Conduit Loan will be assumed on the Closing Date by IOI Funding as a Reorganized Debtor under its current terms, except as set forth below and as necessary to effectuate the Transaction, other than removal of the extraordinary terms added as part of the various forbearance and restructuring agreements culminating in the October 2009 restructuring of the Company's indebtedness (the "2009 Restructuring") (including by way of example and without limitation, removal of CRO provisions, removal of Trigger Event Performance Covenants, release of stock pledge, guaranty and voting rights agreements, waiver of accrued and unpaid interest and removal of cross collateralization and cross default provisions, such terms the "Extraordinary Terms") and curing any default existing as of the Closing. |
| | | From and after the Closing, following the payment of the Diamond servicing fees described below, IOI Funding as a Reorganized Debtor shall pay from the balance of collections derived from the collateral securing the Conduit Loan: (i) principal and interest obligations to Textron in the manner currently required pursuant to the Conduit Loan; and (ii) following such required principal and interest payments, 25% of the residual cash collections will be remitted to Textron, and the remaining 75% shall be distributed to the Reorganized Debtor. Existing collateral for the Conduit Loan as of the Closing Date that does not constitute eligible collateral pursuant to the terms of the Conduit Loan ("Conduit Pledged Collateral") shall be released by Textron and reassigned to the Reorganized Debtor on the Closing Date, without further consideration. Diamond shall replace Equiant as the servicer of the Conduit Pledged Collateral and IOI Funding as a Reorganized Debtor shall pay Diamond servicing fees as further described in Section 9. The restructuring of the Conduit Loan shall occur in accordance with and pursuant to the Amended Plan and the Definitive Documents. |

| | | |
|---|---|---|
| 5. | **Management Company Warehouse Loan** | Except with respect to certain events of default arising in connection with the filing of the Bankruptcy Cases, Island One Resorts Management Corporation is currently in compliance with its obligations under the Management Company Warehouse Loan with Old Florida National Bank. Buyer anticipates that on the Closing Date such loan shall be assumed by Island One Resorts Management Corporation as a Reorganized Debtor; provided, that the terms of the Management Company Warehouse Loan shall be amended to cure any default existing as of the Closing, provide that such loan shall mature on the fifth (5th) anniversary of the Closing Date, and such loan shall be principal and interest fully amortizing during the duration of such loan. The restructuring of the Management Company Warehouse Loan shall occur in accordance with and pursuant to the Amended Plan and the Definitive Documents. |
| 6. | **New Receivables Loan** | On the Closing Date the New Receivables Loan shall be assumed by the Company as a Reorganized Debtor at an interest rate of prime plus 2% with a floor of 7% per annum, subject to the segregation of the New Receivables Loan into two separate tranches, the Interim Line Tranche (defined below) and the new financing tranche of the New Receivables Loan (the "New Financing Tranche" and together with the Interim Line Tranche, the "Forward Financing Lines"). The Interim Line Tranche and the New Financing Tranche shall be cross-collateralized. |
| | | New advances under the New Financing Tranche shall be permitted during an 18 month advance period commencing on the Closing Date (the "Advance Period"). The Company shall be permitted to borrow and re-borrow amounts up to $15 million, in the aggregate, during the Advance Period (the "Commitment Amount"); provided, that the Company maintain an advance rate of no greater than 70% through either the pledge of new collateral or cash payments, as applicable (the "Advance Rate"). For the avoidance of doubt, the Advance Rate shall be at all times no greater than 70%. During the Advance Period, provided that there is no default under the Forward Financing Lines, cash collections from the New Financing Tranche shall be distributed as follows: (i) that portion of consumer interest payments equal to the interest rate payable to the Majority Lenders under the New Financing Tranche shall be remitted to the Majority Lenders, and the remainder of the consumer interest payments shall be retained by the Company; provided, however, that the Company shall remain obligated to pay to the Majority Lenders any interest due under the New Financing Tranche to the extent that consumer interest payments are insufficient to satisfy same, (ii) 70% of consumer principal payments shall be paid to the Majority Lenders, and (iii) the balance of collections in respect of consumer payments shall be retained by the Company. The Company shall be obligated to pay the Diamond servicing fee. As of the date that is 18 months following the Closing Date, no new borrowing will be permitted and 100% of the cash derived from the collateral pool relating to the New Financing Tranche shall be used to service and pay down all obligations in respect of the New Financing Tranche until satisfied in full. |
| | | If an event of default under the Forward Financing Lines occurs and remains uncured following any applicable cure period, 100% of the cash collections from the collateral pool securing the New Financing Tranche shall be remitted to the Majority Lenders and no further advances under the New Financing Tranche shall be permitted. |
| | | The New Financing Tranche will incorporate the pre-petition credit underwriting |

| | | |
|---|---|---|
| | | standards applicable to the New Receivables Loan, modified as follows: (i) a weighted average measured monthly FICO score of at least 650; (ii) a minimum FICO score of 600; and (iii) a minimum down-payment of 10% of the purchase price of the vacation ownership interest. Any amounts outstanding under the New Financing Tranche shall be paid from cash derived from the collateral pool securing the New Financing Tranche in accordance with and pursuant to the current terms of the New Receivables Loan subject to a maturity date of five (5) years after the Closing Date. |
| | | Subject to the $15 million Commitment Amount and maintenance of the Advance Rate, during the Advance Period, the Company shall be entitled to re-borrow upon pledging new receivable collateral. Once an advance has been made with respect to newly pledged receivable collateral, no additional advances shall be made thereafter on such note receivable collateral. Upon the expiration of the Advance Period, the New Financing Tranche shall be repaid by all cash collections from the notes receivable collateralizing the New Financing Tranche. After the Closing Date, the New Financing Tranche shall be in compliance with the Advance Rate. |
| | | The New Receivables Loan documents shall be amended to remove the Extraordinary Terms included as part of the 2009 Restructuring and to cure any defaults existing as of the Closing Date. The $500,000 deferred fee under the New Receivables Loan shall be waived. |
| | | Terms of the New Receivables Loan shall include a limitation on "restricted payments" as follows: (i) during the Advance Period, total restricted payments shall be limited to management fees of an aggregate of $250,000 per six month period; and (ii) after the Advance Period and through the maturity of the New Receivables Loan, restricted payments shall be limited to the sum of (x) management fees of an aggregate of $250,000 per six month period plus (y) 75% of cash flow in excess of the projected cash flow as reflected in Buyer's business plan provided to the Majority Lenders on March 2, 2011. No restricted payments shall be made to the extent that the Reorganized Debtor's available liquidity is less than $1 million on a pro forma basis, after giving effect to the restricted payment(s). |
| | | Diamond shall replace Equiant as servicer of the pledged collateral under the Forward Financing Lines of the New Receivables Loan, as further described in Section 9. The restructuring of the New Receivables Loan shall occur in accordance with and pursuant to the Amended Plan and the Definitive Documents. |
| 7. | Interim Line Tranche | The interim line outstanding as of the Closing Date under the New Receivables Loan shall be converted into a separate tranche of the New Receivables Loan (the "Interim Line Tranche"). The amount of the Interim Line Tranche shall be the outstanding interim line balance under the New Receivables Loan at Closing (assuming non-default interest rate). The Interim Line Tranche shall not include the deferred fee or any accrued legal expenses. As of January 31, 2011, the amount of such Interim Line Tranche was approximately $6.5 million. |
| | | In addition to the existing collateral supporting the Interim Line Tranche, the Company will pledge as collateral 25% of the Post-Petition Receivables in support of the Interim Line Tranche. The advance rate for the Interim Line Tranche shall be at all times no greater than 90% (the "Interim Line Advance Rate"). The Company shall have the option to maintain the Interim Line Advance Rate by funding incremental |

| | | |
|---|---|---|
| | | cash consideration or pledging additional receivables collateral to reduce the balance of the Interim Line Tranche. During the Advance Period, provided that there is no default under the Forward Financing Lines, cash collections from the Interim Line Tranche shall be distributed as follows: (i) that portion of consumer interest payments equal to the interest rate payable to the Majority Lenders under the Interim Line Tranche shall be remitted to the Majority Lenders, and the remainder of the consumer interest payments shall be retained by the Company; provided, however, that the Company shall remain obligated to pay to the Majority Lenders any interest due under the Interim Line Tranche to the extent that consumer interest payments are insufficient to satisfy same, (ii) 90% of consumer principal payments shall be paid to the Majority Lenders, and (iii) the balance of collections in respect of consumer payments shall be retained by the Company. The Company shall be obligated to pay the Diamond servicing fee. After the Closing Date, the Interim Line Tranche shall be in compliance with the Interim Line Advance Rate. On the date that is 18 months following the closing, 100% of collections from the consumer note portfolio collateralizing the Interim Line Tranche shall be used to pay interest, fees and principal of the Interim Line Tranche until such amounts are satisfied in full. The Interim Line Tranche shall mature on the fifth anniversary of the Closing Date. |
| | | If an event of default under the Forward Financing Lines occurs and remains uncured following any applicable cure period, 100% of the cash collections from the collateral pool securing the Interim Line Tranche shall be remitted to the Majority Lenders. |
| 8. | Textron Non-Receivables Loans | Except as set forth herein, in consideration for the Lender Payment by the Company on the Closing Date in accordance with the Amended Plan, Textron, Liberty and their respective subsidiaries and affiliates shall compromise and discharge all amounts owed by the Debtors or their affiliates, as applicable, to Textron, Liberty or any of their respective affiliates in connection with the Cove II Inventory Loan, the Crescent Inventory Loan (in the event that the Buyer purchases the membership interests of Reorganized Crescent pursuant to Section 6.12 of the Agreement) and Management Company Loan and such loans shall be deemed to be satisfied and discharged in accordance with and pursuant to the Amended Plan and the Definitive Documents. |
| 9. | Servicing and Collections Services | All servicing and collections services shall be provided by Diamond with respect to the Old Receivables Loan, the Crescent Receivables Loan (in the event that the Buyer purchases the membership interests of Reorganized Crescent pursuant to Section 6.12 of the Agreement), the Conduit Loan and the New Receivables Loan for an annual servicing fee with respect to each such loan payable by the applicable borrower of an amount equal to 2% per annum of the value of the collateral pledged with respect to such loan, payable on a monthly basis. |
| | | The lenders under the respective facilities and the Textron Designee, as applicable, shall have the right to replace Diamond as servicer and/or collector in connection with the Pledged Collateral, the Crescent Pledged Collateral, the Conduit Loan or the New Receivables Loan with a servicer/collector reasonably acceptable to those lenders in the event of specified breaches by Diamond. In addition, with respect to the Pledged Collateral and the Crescent Pledged Collateral, commencing on the first anniversary of the Closing Date, to the extent that actual cash collections from the Pledged Collateral or the Crescent Pledged Collateral, as applicable, fall below 90% of the |

| | | |
|---|---|---|
| | | projected aggregate cash collections with respect to the Pledged Collateral or the Crescent Pledged Collateral, as applicable (such projected cash collections to be agreed upon by Buyer, Diamond and Textron and Liberty shall be based on a quarterly test of the prior twelve months' collections determined in conjunction with the servicing audits), then Textron and Liberty, as applicable, shall have the right to cause the Textron Designee to terminate the servicing and collections agreement with respect to the applicable portfolio, and transfer such services to a servicer/collector reasonably acceptable to Textron and Liberty. |
| | | In the event that the lenders or the Textron Designee under the respective facilities exercise their right to cause the replacement of Diamond as servicer and/or collector with respect to any receivables portfolio, the lenders shall have the right to "put" each Defaulted Note from such portfolio to the Company at $250 per Defaulted Note. |
| 10. | Treatment of Other Credit Facilities and Borrowings of the Debtors | Buyer anticipates that on the Closing Date and in accordance with and pursuant to the Amended Plan, each of the credit facilities, secured borrowings, and all other secured indebtedness of the Debtors other than the indebtedness to be restructured, satisfied or discharged in the Debt Restructuring Transactions referenced in paragraphs 2, 3, 4, 5, 6, 7 or 8 herein, shall restructured and satisfied in accordance with the terms of the Amended Plan; provided, that the Amended Plan provides that the lenders in respect of such indebtedness shall not have any continuing interest in any of the property of the Reorganized Entities (as defined in the Agreement) with respect to such indebtedness, except as set forth herein. |
| 11. | Transition Services | Following the Closing, if necessary, the Reorganized Entities (as defined in the Agreement) shall provide to the Excluded Entities (as defined in the Agreement) and the Debtors' bankruptcy estates general and administrative services with respect to the business (the "Transition Services") for a limited transition period; provided, that the provision of such Transition Services shall not constitute or require a distraction for the directors, officers or management of the Buyer or the Reorganized Entities from their responsibilities with respect to the business of the Reorganized Entities. Neither the Buyer nor any of the Reorganized Entities shall be obligated to incur any expense in providing the Transition Services and shall not charge the Excluded Entities or any Debtors' bankruptcy estate any fee for the Transition Services. |
| 12. | Majority Lender Support of the Transaction | In consideration of Buyer's willingness to support the Debt Restructuring Transactions and enter into the Agreement, the Majority Lenders agree to (i) support the Bid Protections, (ii) refrain from submitting a credit bid based on the value and/or amount of their claims against the Debtors to acquire any material portion of the assets, properties or stock of the Debtors, and (iii) support and vote in favor of the Amended Plan, and not support, or vote in favor of, any other plan of reorganization other than a plan of reorganization of a higher and better bidder in accordance with the approved Bid Procedures Order. In the event of the non-fulfillment of any of the foregoing conditions, this Term Sheet shall terminate without further action by any party hereto. |

| | | |
|---|---|---|
| **13.** | **Timing of the Transaction** | Subject to the timely satisfaction of the dates specified by the Bankruptcy Court in the Bid Procedures Order (as defined in the Agreement), without modification, the Closing of the transactions described herein shall take place at the offices of the Company's counsel as soon as practicable following the satisfaction of the closing conditions set forth in the Agreement (the "<u>Closing Date</u>"); <u>provided</u>, that the Closing Date must occur prior to June 30, 2011. |
| **14.** | **Releases** | On the Closing Date, the Debtors, Buyer and the Majority Lenders shall exchange releases as described in Section 3.2 of the Agreement. In addition to the foregoing, the existing guaranties provided to Textron and Liberty executed by the Company's directors and officers, with respect to the Indebtedness (as defined in the Agreement) of the Company, Crescent One, Island One Resorts Management Corporation and any of their affiliates, will be terminated. In addition, on the Closing Date, Textron will cause its affiliate, Cessna Finance Corporation, to release the obligations of the Company's subsidiaries, IOI Leasing, LLC and Island One Resorts Management Corporation, under that certain Deficiency Agreement dated May 15, 2009 and the Promissory Note dated May 15, 2009 executed in connection therewith. Each of the parties hereto agree to support the inclusion in the Amended Plan of releases in favor of the Company's directors, officers and current employees (solely in connection with their actions in their respective capacities as directors, officers and employees of the Company), with respect to any and all claims, whether now known or unknown, vested or contingent, suspected or unsuspected, and whether or not concealed or hidden, which have existed or may have existed, or which do exist, through the Closing Date, as set forth in Section 3.2 of the Agreement. |
| **15.** | **Confidentiality** | Each of the parties hereto agrees that information received from any other party hereto or in respect of this Term Sheet or the matters contemplated hereby shall be held in strict confidence subject to the terms of this Section 15. Except as expressly permitted herein, or in the Agreement, no party shall make any public statement regarding or disclose to any third party (other than the undersigned party's own employees, directors, limited partners, advisors or representatives), the existence of or details of matters contemplated by this Term Sheet without the prior written consent of Buyer, the Majority Lenders and the Company (as the case may be). |
| | | The Company (on behalf of each of its undersigned affiliates), Buyer and the Majority Lenders will consult with each other upon any jointly-issued news release with respect to such arrangements; <u>provided</u> that a party may make disclosure of the matters set forth herein to Bankruptcy Court in connection with the Bankruptcy Cases and to the extent required by law, regulation, legal process or requested by any governmental or regulatory authority. To the extent reasonably practical and not prohibited by law, regulation, legal process or governmental or regulatory request, each party agrees to (i) promptly notify the other parties of such required or requested disclosure, (ii) take such commercially reasonable actions as may be requested to resist such disclosure, narrow the scope of the information to be disclosed, or prevent such information from becoming publicly available as a result of such disclosure, (iii) disclose only that portion of information that it is legally required to be produced, and (iv) exercise good faith efforts to obtain reliable assurances that confidential treatment will be accorded the disclosed information. |

| | | |
|---|---|---|
| 16. | **Expenses** | Buyer shall pay all recording fees, title insurance premiums and other title charges, documentary stamps, lien and judgment search costs (the "Out of Pocket Expenses") in respect of each of the Majority Lenders' loans restructured hereunder, including, but not limited to, any costs in respect of the reassignment and reconveyance of any collateral with respect to which such Majority Lender holds a security interest to any entity controlled by such Majority Lender; <u>provided</u> that the foregoing shall not include any (i) any Out of Pocket Expenses arising from or relating to the transfer of collateral to the Textron Designee under sections 2 and 3 hereof, which shall be paid by the Majority Lenders, or (ii) attorneys' or professionals' fees. Except as expressly provided in this Term Sheet, the parties hereto agree that all costs and expenses of the parties relating to the Transaction and the Debt Restructuring Transactions shall be paid by the party incurring such expenses. |
| 17. | **Miscellaneous** | In accordance with the terms of the Agreement, the sole remedy of the Company, Crescent One and the Majority Lenders with respect to a breach by Buyer of its obligations under this Term Sheet shall be the termination of the Agreement by the Company pursuant to Section 9.1(e) and the delivery of the Deposit (as defined in the Agreement) to the Company. Neither Buyer nor its Representatives (as defined in the Agreement) shall have any liability to the Company, Crescent One or the Majority Lenders for any breach of its obligations under this Term Sheet, other than in the case of fraud. |
| | | This Term Sheet may be executed in multiple counterparts, each of which shall be deemed an original hereof, and all of which shall constitute a single agreement effective as of the date hereof. Any delivery of an executed copy of this Term Sheet by way of electronic transmission shall constitute delivery hereof. |

The terms expressed in this Term Sheet are intended to form the basis for the negotiation and execution of the definitive amended and restated loan documents for the Debt Restructuring Transactions (the "<u>Definitive Documents</u>") and the Amended Plan. This Term Sheet does not attempt to describe all of the terms, conditions and requirements that would pertain to the Debt Restructuring Transactions or the Amended Plan, but is intended to outline certain basic terms around which the Debt Restructuring Transactions and the Amended Plan will be structured and the Definitive Documents will be finalized. The transactions contemplated in this Term Sheet are subject to and contingent upon (i) negotiation and execution of the Definitive Documents; and (ii) entry of an order by the Bankruptcy Court confirming the Amended Plan, which order shall be in form and substance reasonably acceptable to Buyer and the Majority Lenders.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

IN WITNESS WHEREOF, the parties have executed this Term Sheet as of the 9th day of March, 2011 (the "Execution Date").

TIMESHARE ACQUISITIONS, LLC

By: _____
    Name: Scott Sozio
    Title: President

ISLAND ONE, INC.

By: _____
    Name:
    Title:

CRESCENT ONE LLC

By: _____
    Name:
    Title:

TEXTRON FINANCIAL CORPORATION

By: _____
    Name:
    Title:

LIBERTY BANK

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the parties have executed this Term Sheet as of the 9th day of March, 2011 (the "Execution Date").

TIMESHARE ACQUISITIONS, LLC

By: _____
    Name: Scott Sozio
    Title: President

ISLAND ONE, INC.

By: _____
    Name: Deborah L. Linden
    Title: C.E.O.

CRESCENT ONE LLC

By: _____
    Name: Deborah L. Linden
    Title: C.E.O.

TEXTRON FINANCIAL CORPORATION

By: _____
    Name:
    Title:

LIBERTY BANK

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the parties have executed this Term Sheet as of the 9th day of March, 2011 (the "Execution Date").

TIMESHARE ACQUISITIONS, LLC

By: _____
    Name: Scott Sozio
    Title: President

ISLAND ONE, INC.

By: _____
    Name:
    Title:

CRESCENT ONE LLC

By: _____
    Name:
    Title:

TEXTRON FINANCIAL CORPORATION

By: _____
    Name: Steve Wolfard
    Title: SVP

LIBERTY BANK

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the parties have executed this Term Sheet as of the ____ day of March, 2011 (the "Execution Date").

TIMESHARE ACQUISITIONS, LLC

By: _____
    Name: Scott Sozio
    Title: President

ISLAND ONE, INC.

By: _____
    Name:
    Title:

CRESCENT ONE LLC

By: _____
    Name:
    Title:

TEXTRON FINANCIAL CORPORATION

By: _____
    Name:
    Title:

LIBERTY BANK

By: _____
    Name:
    Title:

DONALD S. PERUTA
VICE PRESIDENT

**EXHIBIT B**
**DISCLOSURE SCHEDULES**

**Disclosure Schedule 1.1(a)**
**Excluded Assets**

1.  All of the Securities of St. Croix One, LLC held by Island One Resorts Management Corporation or any other Island One Entity

2.  All of the Securities of Island One Leasing, LLC held by Island One Resorts Management Corporation or any other Island One Entity

3.  All of the Securities of Florida Vacation Station, Inc. held by Island One, Inc. or any other Island One Entity

4.  All of the Securities of Orlando Vacation Bureau, Inc., held by Island One, Inc. or any other Island One Entity

5.  All of the Assets encumbered by a Lien of BB&T Acquired Asset Group

## Disclosure Schedule 1.1(b)
## Excluded Contracts

1. Commercial lease, effective as of March 1, 2005, by and between Equity Row Partners, LLC and Island One, Inc. , as amended

2. Sublease of portion of Equity Row Partners Corporate Office leased to Korshak & Associates, as amended

3. Sublease of portion of Equity Row Partners Corporate Office leased to Strata Force Group, LLC, as amended

4. Club Navigo Preview Center – Bellaire Plaza Lease dated January 24, 2007, as amended

5. Galleria Palms Hotel OPC Space- Agreement dated June 11, 2010, as amended

6. Servicing Agreement, dated as of November 30, 2008 by and among Equiant Financial Services Inc. and Island One, Inc., as amended

7. Servicing Agreement, dated as of October 30, 2009 by and among Liberty Bank,, Equiant Financial Services Inc. and Island One, Inc. , as amended

8. [Intentionally Omitted]

9. Korshak and Associates, P.A. – Independent Contract Agreement dated January 1, 2010, as amended

10. Mackinac Partners, LLC, letter agreement dated October 15, 2009, as amended

11. LCG Capital Group, LLC, letter agreement dated May 31, 2009, as amended

12. Western Reserve Partners, LLC, letter agreement dated September 22, 2009, as amended

13. Amended and Restated Shareholders Agreement by and among Deborah L. Linden, Cary J. Erfurth; Stephen D. Korshak; John E. Springer; Rollin E. Kramer as Trustee; Louise M. Kramer as Trustee; Rosalie Stimac, as Trustee; Nicholas Stimac, as Trustee; and Sulyn M. Stumbras, dated November 29, 2006, as amended

14. Promissory Note in the initial principal amount of $724,439 made by Island One Leasing, LLC and Island One Resort Management Corporation, dated May 15, 2009 to Cessna Finance Corporation

# SCHEDULE 4.3

### Conflicts; Consent of Third Parties

Textron Financial – See Schedule 4.5 N
Liberty Bank – See Schedule 4.5 P
BB&T – See Schedule 4.5 L
Old Florida National Bank – See Schedule 4.5 O

Interval International – See Schedule 4.5 BBB
RCI – See Schedule 4.5 CCC

Equity Row Partners Corporate Office Lease – See Schedule 4.6 Q

## SCHEDULE 4.4
### Capitalization

| Entity | Par Value | Authorized Shares | Issued and Outstanding Shares or Membership Interests | Owned By |
|---|---|---|---|---|
| Island One, Inc., a Florida corporation | $0.01 | 12,000,000 | 1,399,894.50 | Individuals - see attached |
| Island One Resorts Management Corporation, a Florida corporation | $0.01 | 5,000,000 | 1,999,894.50 | 100% by IOI |
| Navigo Vacation Club, Inc., a Florida corporation | $1.00 | 7,500 | 1,000 | 100% by IORMC |
| Galaxy Exchange Company, a Florida corporation | $1.00 | 2,000 | 1,000 | 100% by IORMC |
| IOI Funding I, LLC, a Florida limited liability company | | | No ownership certificates issued | 100% by IOI |
| Crescent Onc, LLC, a Florida limited liability company | | Based on percentage | No ownership certificates issued | Individuals - see attached |
| **Subsidiaries (non IOI Entities)** | | | | |
| Island One Leasing, LLC, a Florida limited liability company | | Based on percentage | no certs issued | 100% by IORMC |
| St. Croix One, LLC, a USVI limited liability company | | Based on percentage | no certs issued | 100% by IOI |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

# SCHEDULE 4.4
## Capitalization

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| **ISLAND ONE, INC.** | | | |
| **OWNERSHIP SCHEDULE** | | | |
| | | | |
| **12,000,000 Authorized Shares, Par Value $0.01** | | | |
| | | | |
| | | | |
| **Investor** | **%** | | shares |
| | | | |
| Deborah L. Linden | 75.43% | | 1,056,002.50 |
| John E. Springer | 3.02% | | 42,315.00 |
| Cary Erfurth | 5.50% | | 77,000.00 |
| Stephen D. Korshak | 6.04% | | 84,525.00 |
| Rollin E. Kramer, Trustee | 1.50% | | 21,000.00 |
| Estate of Louise M. Kramer | 1.50% | | 21,000.00 |
| Rosalie Stimac, Trustee | 3.25% | | 45,552.50 |
| Nicholas Stimac | 2.75% | | 38.500.00 |
| Sulyn Stumbras | 1.00% | | 13,999.50 |
| | | | |
| Total | 100.00% | | 1,399,894.50 |

Subject to Amended and Restated Shareholders Agreement by and among Deborah L. Linden; Cary J. Erfurth; Stephen D. Korshak; John E. Springer; Rollin E. Kramer as Trustee; Louise M. Kramer, as Trustee; Rosalie Stimac, as Trustee; Nicholas Stimac, as Trustee; Sulyn M. Stumbras dated November 29, 2006

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| **Crescent One, LLC Ownership Schedule** | | | |
| | | | |
| **Investor** | **%** | | shares |
| | | | |
| Deborah L. Linden | 75.50% | | no shares issued |
| John E. Springer | 3.00% | | no shares issued |
| Cary Erfurth | 5.50% | | no shares issued |
| Stephen D. Korshak | 6.00% | | no shares issued |
| Rollin E. Kramer, Trustee | 1.50% | | no shares issued |
| Estate of Louise M. Kramer | 1.50% | | no shares issued |
| Rosalie Stimac, Trustee | 3.25% | | no shares issued |
| Nicholas Stimac | 2.75% | | no shares issued |
| Sulyn Stumbras | 1.00% | | no shares issued |
| | | | |
| Total | 100.00% | | |

## SCHEDULE 4.5

### Material Contracts

See attached list.

# ISLAND ONE, INC.

| | Contracts |
|---|---|
| A | Busch Entertainment—Corporation Guest Service Company or Time Share Company Agreement for Prepaid Tickets dated December 19, 2007; updated June 17, 2010; updated November 16, 2009; Discovery Cove Admission Package Agreement (EZ Ticket Program); Addendum dated August 13, 2008 |
| B | Datis Payroll Processing, Inc. – Datis Terms and Agreement dated December 24, 1998 |
| C | CIT Technology Fin Svcs, Inc.—Lease Agreement with Dex Imaging, Inc. dated September 24, 2008; Addendum dated September 24, 2008; Lease Agreement with Dex Imaging dated April 11, 2006; Lease Agreement with Dex Imaging, Inc. dated October 18, 2006; Lease Agreement with Dex Imaging, Inc. dated December 21, 2006; Lease Agreement with Dex Imaging, Inc. dated May 4, 2007; Lease Agreement with Dex, Imaging, Inc. dated May 29, 2007; Lease Agreement with Dex Imaging, Inc. dated July 9, 2007; Lease Agreement with Dex Imaging, Inc. dated November 26, 2007; Lease Agreement with Dex Imaging, Inc. dated December 20, 2007; Lease Agreement with Dex Imaging, Inc. dated March 12, 2008; Lease Agreement with Dex Imaging, Inc. dated March 12, 2008; Lease Agreement with Dex Imaging, Inc. dated April 14, 2008; Lease Agreement with Dex Imaging, Inc. dated March 31, 2008; Lease Agreement with Dex Imaging, Inc. dated December 7, 2009 |
| D | Equiant Financial Services, Inc.—Servicing Agreement (Island One, Inc.) dated November 2008; Servicing Agreement (Liberty/TFC Facility to Island One, Inc.) dated October 30, 2009 with Island One, Inc. letter adding certain receivables dated October 30, 2009; Servicing Agreement dated November 4, 2010 |
| E | Korshak And Associates, P.A.—Independent Contractor Agreement dated January 1, 2010 |
| F | Progress Software Corp—Maintenance Renewal Order Form dated November 1, 2010 |
| G | Universal Studios—Admission Media Agreement dated February 19, 2004; February 22, 2010 Amendment to Admission Media Agreement dated March 23, 2010 |
| H | Walt Disney World—Pre-Arrival Ticket Agreement (Disney Ticket Activation System Test) dated December 12, 2007; Amendments to Pre-Arrival Ticket Agreement (Disney Ticket Activation System Test) dated November 30, 2009; Guest Service Desk Ticket Agreement (Disney Ticket Activation System Test) dated December 12, 2007; Timeshare and Mini Vacation Ticket Agreement (Disney Ticket Activation System Test) dated December 12, 2007 |
| | |
| I | Mackinac Partners, LLC—untitled letter agreement dated October 15, 2009 |
| J | LCG Capital Group, LLC—untitled letter agreement dated May 31, 2009 |
| K | Western Reserve Partners, LLC—untitled letter agreement dated September 22, 2009 |
| | |
| | **Contracts for Indebtedness** |
| L | BB&T Acquired Asset Group |
| M | H.J. C. Floridian Corp.—Note in the initial principal amount of $700, 000 made by Island One, Inc. to H.J.C. Floridian Corp., an Illinois corporation, dated March 30, 1999, secured by a mortgage encumbering the Green House Parcel and the Vacant |

| | |
|---|---|
| | Parcel at the Cove in Volusia County, FL |
| N | Textron Financial Corp |
| O | Old Florida National Bank—Promissory Note in the initial principal amount of $800,000 made by Island One Resorts Management Corporation to Orlando National Bank (now Old Florida National Bank) dated October 21, 2008 secured by a mortgage encumbering the warehouse property |
| P | Liberty Bank |
| Q | Cessna Finance Corporation—Promissory Note in the initial principal amount of $724,439 made by Island One Leasing, LLC and Island One Resort Management Corporation dated May 15, 2009 to Cessna Finance Corporation pursuant to a Deficiency Agreement of the same date with the same parties in regard to the sale of an aircraft |
| | |
| R | Amended and Restated Shareholders Agreement by and among Deborah L. Linden; Cary J. Erfurth; Stephen D. Korshak; John E. Springer; Rollin E. Kramer as Trustee; Louise M. Kramer, as Trustee; Rosalie Stimac, as Trustee; Nicholas Stimac, as Trustee; Sulyn M. Stumbras dated November 29, 2006 |

## ISLAND ONE RESORTS MANAGEMENT CORPORATION

| | *Contracts* |
|---|---|
| AA | Management Agreement of Bali Condominium Assoc. Inc. dated 7/16/87 |
| BB | Assignment And Amended And Restated Management Agreement For Barefoot'n In The Keys At Old Town dated 2/1/06 |
| CC | Management Agreement of Bryan's Spanish Cove Owners Association, Inc. dated 3/1/87 |
| DD | Management Agreement of The Charter Club of Naples Bay Owners' Association, Inc. dated 12/2/02 |
| EE | Management Agreement For Cove II On Ormond Beach dated 9/5/06 |
| FF | Isle of Bali II Condominium Association, Inc. Management Agreement dated 10/20/95 |
| GG | Management Agreement Of O.R.B.I.T., A Condominium dated 6/1/83 |
| HH | Management Agreement Parkway International Owners Assoc. Inc dated 8/11/89 |
| II | Management Agreement For Plantation Cove Condominium dated 7/1/99 |
| JJ | Management Agreement For Crescent Resort On South Beach dated 1/14/05 |

## NAVIGO VACATION CLUB, INC.

| | *Contracts* |
|---|---|
| AAA | Club Navigo Resort Affiliation Agreement with Grand Seas Resort Partners, Grand Seas Resorts Owners Association, Inc. and Premier Hospitality Management, Inc. dated May 13, 2003 |
| BBB | Interval International Master Services Agreement dated November, 1999 and Master Affiliation Agreement dated November 5, 1999 |

| CCC | Resort Condominiums International, LLC – Master Club Affiliation Agreement dated April 11, 1999 and Sideletter Agreement dated April 12, 1999 |
|-----|-----|
| DDD | Club Navigo Resort Affiliation Agreement with Island One, Bryan's Spanish Cove Owners Association, Inc. and IORMC dated August 23, 2003 |
| EEE | Club Navigo Resort Affiliation Agreement with Island One, Charter Club of Naples Bay Owners' Association, Inc. and IORMC undated |
| FFF | Club Navigo Resort Affiliation Agreement with Island One, Plantation Cove Condominium Association, Inc., and IORMC undated |
| GGG | Club Navigo Resort Affiliation Agreement with Island One, Cove II Owners Association, Inc. and IORMC dated September 5, 2006 |
| HHH | Club Navigo Resort Affiliation Agreement with Island One, Bali Condominium Association, Inc., and IORMC dated June 20, 2003 |
| III | Club Navigo Resort Affiliation Agreement with Island One, Bali II Condominium Association, Inc. and IORMC undated |
| JJJ | Club Navigo Resort Affiliation Agreement with Island One, O.R.B.I.T. Owners Association, Inc. and IORMC dated August 13, 2003 |
| KKK | Club Navigo Resort Affiliation Agreement with Island One, Parkway International Owners Association, Inc. and IORMC dated August 15, 2003 |
| LLL | Club Navigo Resort Affiliation Agreement with Crescent One, Crescent Resort Owners Association, Inc. and IORMC dated January 31, 2005 |
| MMM | Club Navigo Resort Affiliation Agreement with St. Croix One, LLC, Chenay Bay Condominium Beach Club Association dated February 14, 2008 |

## CRESCENT ONE, LLC

| AAAA | Equiant Financial Services, Inc.—Servicing Agreement (Crescent One, LLC) dated November 2008 |
|------|-----|

**Schedule 4.5 – L**

**BB&T Loan Documents**

- All documents are dated as of October 30, 2009 unless otherwise noted -

Amended And Restated Master Loan Agreement among Island One, Inc., St Croix One, LLC, Deborah Linden, Island One Resorts Management Corporation, and Branch Banking & Trust Company and all agreements and notes referred to therein or amended thereby

Amended, Consolidated And Restated Guaranty Agreement from Deborah Linden for the benefit of Branch Banking & Trust Company and all agreements and notes referred to therein or amended thereby

Schedule 4.5 – N

**Textron Loan Documents**

– All documents are dated as of October 30, 2009 unless otherwise noted –

IOI Receivables Facility

Thirteenth Omnibus Amendment to Loan and Security Agreement and all agreements and notes referred to therein or amended thereby between Island One, Inc. and Textron Financial Corporation

Fifth Amended and Restated Guaranty Agreement by Deborah L. Linden in favor of Textron Financial Corporation

Collateral Assignment of Contract Rights, Notes and Mortgages (October, 2009 Inhouse Notes Receivable and Inhouse Notes Receivable) by Island One, Inc. in favor of Textron Financial Corporation

Letter agreement from Island One, Inc. to Korshak and Associates, P.A. regarding the Third Amended and Restated Document Escrow Agreement (Custodial Agreement) dated October 2, 2008, which is agreed and consented to by Textron Financial Corporation, Barefoot'n Development Company, LLC and Korshak and Associates, P.A.

Letter agreement from Island One, Inc. to Korshak and Associates, P.A. regarding the Second Amended and Restated Funds Escrow Agreement dated as of October 2, 2008, which is agreed and consented to by Textron Financial Corporation, Barefoot'n Development Company, LLC and Korshak and Associates, P.A.

Letter Agreement regarding Addendum to Funds Escrow Agreement, among Island One, Inc. and Korshak & Associates, P.A.

Letter Agreement regarding Addendum to Document Escrow Agreement, among Island One, Inc. and Korshak & Associates, P.A.

Custodial and Collateral Agency Agreement by and among Textron Financial Corporation, Island One, Inc., and Equiant Financial Services, Inc.

IORMC Facility

Third Omnibus Amendment to Management Company Loan and Security Agreement and Other Agreements, and all agreements and notes referred to therein or amended thereby, among Island One Resorts Management Corporation, Navigo Vacation Club, Inc., Deborah L. Linden, Island One, Inc., and Textron Financial Corporation

Third Amended and Restated Guaranty Agreement by Deborah L. Linden in favor of Textron Financial Corporation

Custodial and Collateral Agency Agreement by and among Textron Financial Corporation, Island One, Inc., and Equiant Financial Services, Inc.

## IOI Unsold Inventory

First Omnibus Amendment to Promissory Note, Mortgage and Security Agreement, Collateral Assignment of Purchase Agreements, Leases, Rents, Deposits, Construction Contracts, Plans and Other Development Rights Construction Loan Agreement, and all agreements and notes referred to therein or amended thereby, between Island One, Inc. and Textron Financial Corporation

Amendment to Promissory Note between Textron Financial Corporation and Island One, Inc., and all agreements and notes referred to therein or amended thereby

Amendment to Mortgage and Security Agreement between Textron Financial Corporation and Island One, Inc., and all agreements and notes referred to therein or amended thereby

Amendment to Collateral Assignment of Purchase Agreements, Leases, Rents, Deposits, Construction Contracts, Plans and Other Development Rights between Textron Financial Corporation and Island One, Inc., and all agreements and notes referred to therein or amended thereby

Amended and Restated Guaranty Agreement by Deborah L. Linden in favor of Textron Financial Corporation

022132, 000004, 102961331

**Textron Loan Documents**

Crescent Facilities

Receivables Loan and Security Agreement dated as of December 28, 2004 (as amended thru and including Fourth Omnibus Amendment to Receivables Loan and Security Agreement dated as of October 30, 2009) and all agreements, as amended, referred to therein between Crescent One LLC and Textron Financial Corporation

Secured Promissory Note, Loan Assumption, Restructure and Amended and Restated Loan Agreement and Amended and Restated Mortgage, Assumption and Security Agreement and Assignment of Leases, Rents and Profits and Notice and Receipt of Future Advances, each dated as of March 31, 2004 (as amended thru and including Omnibus Amendment to Secured Promissory Note, Amended and Restated Mortgage, Assumption and Security Agreement and Assignment of Leases, Rents and Profits and Notice and Receipt of Future Advances and Loan Assumption, Restructure and Amended and Restated Loan Agreement dated as of October 30, 2009) and all agreements, as amended, referred to therein between Crescent One LLC and Textron Financial Corporation

## Schedule 4.5 - P

### Liberty Loan Documents

- All documents are dated as of October 30, 2009 unless otherwise noted -

Receivables Loan Agreement among Island One, Inc., Liberty Bank, Textron Financial Corporation and Liberty Bank, as administrative and collateral agent

Receivables Loan Note by Island One, Inc. in favor of Liberty Bank

Receivables Loan Note by Island One, Inc. in favor of Textron Financial Corporation

Guaranty Agreement by Deborah L. Linden in favor of Liberty Bank, Textron Financial Corporation and Liberty Bank, as administrative and collateral agent

Environmental Indemnification Agreement between Island One, Inc., Liberty Bank, Textron Financial Corporation, and Liberty Bank, as administrative and collateral agent

Servicing Agreement among Liberty Bank, as administrative and collateral agent, Equiant Financial Services, Inc. and Island One, Inc.

Custodial Agreement among Equiant Financial Services, Inc., Island One, Inc. and Liberty Bank, as administrative and collateral agent.

Custodial and Escrow Agreement among Liberty Bank, as administrative and collateral agent, Island One, Inc., Korshak and Associates, P.A., and New Wellington Financial, LLC.

Subordination Agreements among Island One, Inc., IOI Funding I, LLC, Island One Resorts Management Corporation, Liberty Bank, Textron Financial Corporation, Branch Bank and Trust Company and Liberty Bank, as administrative and collateral agent and each of: Cary J. Erfurth, Kurt Gruber, Kenneth Campbell, Judith Williams, John Springer, Jr., Deborah L. Linden, John Springer, Sr., Roberta Springer, Larry Fey, Ronald S. Gibellina, Sulyn Stumbras, Rollin Kramer, Rosalie Stimac, Nicholas Stimac, Michael and Karen S. Holbrook

Escrow Agreement among Liberty Bank, as administrative and collateral agent, Island One, Inc. Island One Resorts Management Corporation, IOI Funding I, LLC, Navigo Vacation Club, Inc. and Crescent One, LLC

Stock Pledge Agreement between Deborah L. Linden and Liberty Bank, as administrative and collateral agent

Deborah L. Linden Stock Voting Agreement between Deborah L. Linden and Liberty Bank, as administrative and collateral agent

Irrevocable Proxy by Deborah L. Linden in favor of Liberty Bank, as administrative and collateral agent

Lockbox Agreement among Liberty Bank, as administrative and collateral agent, Equiant Financial Services, Inc., JPMorgan Chase Bank, N.A., Regulus Group II, LLC and Island One, Inc.

Third Amended and Restated Intercreditor and Non-Disturbance Agreement among Textron Financial Corporation, Liberty Bank, Branch Bank and Trust Company, Island One, Inc., Island One Resorts Management Corporation, Crescent One, LLC, IOI Funding I, LLC and St. Croix One, LLC

Confidentiality and Non-Competition Agreement among Deborah L. Linden in favor of Liberty Bank, Textron Financial Corporation; and Liberty Bank, as administrative and collateral agent.

Letter Agreement among Island One, Inc., Island One Resorts Management Corporation, IOI Funding I, LLC, Crescent One, LLC and Mackinac Partners, LLC.

022132, 000004, 102961346

## SCHEDULE 4.6
### Real Property

| | Property | Address | Legal Desc. |
|---|---|---|---|
| A | Barefoot'n In The Keys (land and improvements not part of existing timeshare condominium) | 2750 Florida Plaza, Kissimmee, FL 34746 | Attached |
| B | Orlando Sales Center (Liki Tiki Village III) | 17800 Bali Blvd., Winter Garden, FL 34787 | Attached |
| C | Leasehold Improvements Liki Tiki Village Admin Building | 17777 Bali Blvd., Winter Garden, FL 34787 | N/A |
| D | Misc Leasehold Improvements Liki Tiki Village | 17777 Bali Blvd., Winter Garden, FL 34787 | N/A |
| E | Leasehold Improvements Corporate Office | 8960 Commodity Circle, Orlando, FL 32819 | N/A |
| F | Misc Leasehold Improvements Orbit | 2950 Entry Point Blvd., Kissimmee, FL 34747 | N/A |
| G | Liki Tiki Village III Land | 17777 Bali Blvd., Winter Garden, FL 34787 | Attached |
| H | Out Parcel Land (Liki Tiki Village III) | 17800 Bali Blvd., Winter Garden, FL 34787 | Attached |
| I | Liki Tiki Village | 17777 Bali Blvd., Winter Garden, FL 34787 | Attached |
| J | Crescent Resort - owned by Crescent One, not an Island One Entity | 1420 Ocean Drive, Miami Beach, FL 33139 | Attached |
| K | The Cove On Ormond Beach/Cove II On Ormond Beach | 145 -149 N. Atlantic Ave., Ormond Beach, FL 32176 | Attached |
| L | Charter Club Of Naples Bay | 1000 10th Ave S., Naples, FL 34102 | Attached |
| M | Bryan's Spanish Cove | 13875 State Raod 535, Orlando, FL 32821 | Attached |
| N | O.R.B.I.T. | 2950 Entry Point Blvd., Kissimmee, FL 34747 | Attached |
| O | Parkway International | 6200 Safari Trail, Kissimmee, FL 34747 | Attached |
| | **Leases - All Excluded See Schedule 1.1(b)** | | |
| P | Club Navigo Preview Center - Bellair Plaza Lease dated 1/24/2007 | 2461 N. Atlantic Ave., Daytona Beach, FL 32118 | N/A |
| Q | Equity Row Partners Corporate Office – Commercial Lease dated 3/1/2005 | 8680 Commodity Circle, Orlando, FL 32819 | N/A |
| R | Galleria Palms Hotel OPC Space – Agreement dated 6/11/2010 | 3000 Maingate Lane, Kissimmee, Florida 3474 | N/A |
| | **Subleases - All Excluded See Schedule 1.1(b)** | | |
| S | Portion of Equity Row Partners Corporate Office leased to Korshak & Associates – oral agreement effective 7/1/2005 | 8680 Commodity Circle, Orlando, FL 32819 | N/A |
| T | Portion of Equity Row Partners Corporate Office leased to Strata Force Group, LLC – Section 5.9 of Telesales Agreement dated 3/29/2010 | 8680 Commodity Circle, Orlando, FL 32819 | N/A |

4.6

First American Title Insurance Company

## Schedule A (Continued)

EXHIBIT "A"

Issuing Office File No.:     Sale-Barefoot'n

BEING A PORTION OF THE N 1/2 OF THE SOUTHEAST 1/4 OF THE NORTHWEST 1/4 OF SECTION 9, TOWNSHIP 25 SOUTH, RANGE 28 EAST, OSCEOLA COUNTY, FLORIDA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE NORTHEAST CORNER OF THE SOUTHEAST 1/4 OF THE NORTHWEST 1/4 OF SAID SECTION 9, RUN THENCE S 89°31'30" W ALONG THE NORTH LINE OF THE N 1/2 OF THE SOUTHEAST 1/4 OF THE NORTHWEST 1/4 OF SAID SECTION 9 A DISTANCE OF 30.00 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE S 89°31'30" W ALONG SAID NORTH LINE A DISTANCE OF 410.32 FEET TO THE BEGINNING OF A CONSERVATION AREA; THENCE ALONG SAID CONSERVATION AREA THE FOLLOWING COURSES AND DISTANCES; S 00°28'33" E A DISTANCE OF 82.85 FEET; THENCE S 43°10'11" W A DISTANCE OF 92.44 FEET; THENCE S 06°53'58" W A DISTANCE OF 135.61 FEET; THENCE S 26°25'39" W A DISTANCE OF 93.97 FEET; THENCE S 00°57'28" E A DISTANCE OF 67.78 FEET; THENCE S 32°24'42" E A DISTANCE OF 95.60 FEET; THENCE S 02°06'07" E A DISTANCE OF 83.17 FEET; THENCE S 25°14'44" W A DISTANCE OF 50.59 FEET; THENCE S 00°27'23" E A DISTANCE OF 15.07 FEET TO THE SOUTH LINE OF THE NORTH 1/2 OF THE SOUTHEAST 1/4 OF THE NORTHWEST 1/4 OF SAID SECTION 9; THENCE DEPARTING SAID CONSERVATION AREA RUN N 89°32'30" E ALONG THE SOUTH LINE OF THE NORTH 1/2 OF THE SOUTHEAST 1/4 OF THE NORTHWEST 1/4 OF SAID SECTION 9 A DISTANCE OF 500.04 FEET TO THE WESTERLY RIGHT-OF-WAY LINE OF SAID HOLIDAY TRAIL; THENCE N 00°18'30" W ALONG THE WESTERLY RIGHT-OF-WAY LINE OF SAID HOLIDAY TRAIL A DISTANCE OF 661.71 FEET TO THE POINT OF BEGINNING.

BEING SUBJECT TO A FLORIDA GAS TRANSMISSION EASEMENT AS RECORDED IN OFFICIAL RECORDS BOOK 30, PAGE 107 OF THE PUBLIC RECORDS OF OSCEOLA COUNTY, FLORIDA.

Excluding that portion of the property declared as part of a timeshare condominium pursuant to that certain Declaration of Condominium For Barefoot'n In The Keys At Old Town, A Condominium, Section One, as recorded in Official Records Book 1682, Page 1359, Public Records of Osceola County, Florida, and all amendments to such instrument (the "Barefoot'n Condominium) *but* including those portions of the Barefoot'n Condominium not sold by Island One, Inc. to any third party, such as unsold timeshare interests, commercial units and developer rights.

Lot 1 in Liki Tiki Village III South, according to the Plat for Liki Tiki Village III South, as recorded in Plat Book 71, Page 104, Public Records of Orange County, Florida.

That portion of the East One-Half (1/2) of the Southwest One-Quarter (1/4) of Section 31, Township 24 South, Range 27 East, Orange County, Florida, lying North of the Public Road Right-of-Way for Bali Road (Old State Road No. 530) as recorded in O.R. Book 845, Page 454, of the Public Records of Orange County, Florida.

**Parent Tract (Official Records Book 7993, Page 4905)**

That portion of the East ½ of the Southwest ¼ of Section 31, Township 24 South, Range 27 East, Orange County Florida, lying South of the public road right-of-way for Bali Road (old State Road No. 530) as recorded in O.R. Book 845, Page 454, Public Records of Orange County, Florida and lying North of the public road right-of-way for U.S. Highway No. 192 (new State Road No. 530) as recorded in Official Records Book 1763, Page 272 and 273, Public Records of Orange County, Florida.

Less Lot 1 in Liki Tiki Village III South, according to the Plat for Liki Tiki Village III South, as recorded in Plat Book 71, Page 104, Public Records of Orange County, Florida.

<u>Overall Liki Tiki Village Legal Description</u>

The West ½ of the Southwest ¼ of Section 31, Township 24 South, Range 27 East, lying North of State Road 530, Orange County, Florida, more particularly described as follows: From the Southwest corner of Section 31, Township 24 South, Range 27 East, run N. 00°13'27" West 384.69 feet along the West line of said Section 31 to the Point of Beginning; thence continue N. 00°13'27" West along said West line 2,267.19 feet to the West ¼ corner of said Section 31; thence run N. 89°30'08" East along the North line of said West ½ of the Southwest ¼ of Section 31, 1,449.38 feet to the Northeast corner of the West ½ of the Southwest ¼ of Section 31; thence run S. 00°06'53" West 1,697.99 feet along the East line of said West ½ of the Southwest ¼ of Section 31 to a point on the Northerly Right of Way line State Road 530; thence run Westerly 586.33 feet along said Northerly right of way line and the arc of curve concave Southerly having a radius of 1,482.40 feet, a central angle of 22°39'44" and a chord of 582.52 feet that bears S. 75°03'27" West; thence continue along said Northerly right of way line S. 63°43'35" West 974.96 feet to the Point of Beginning.

Including all rights, title and interests in that certain timeshare resort known as LTV 1400, a Timeshare Resort, pursuant to the Declaration of Covenants, Conditions and Restrictions of LTV 1400, a Timeshare Resort, as recorded in Official Records Book 9827, Page 4654, Public Records of Orange County, Florida, and all amendments to such instrument, *and* including all timeshare interests, commercial units and developer rights.

But, excluding that portion of the property declared as part of a timeshare condominium pursuant to that certain Declaration of Condominium for Bali International Resort Club, a Condominium, as recorded in Official Records Book 3325, Page 521, Public Records of Orange County, Florida, and all amendments to such instrument (the "LTV 1 Condominium) *but* including those portions of the LTV I Condominium not sold by Island One, Inc. to any third party, such as unsold timeshare interests, commercial units and developer rights.

And, excluding that portion of the property declared as part of a timeshare condominium pursuant to that certain Declaration of Condominium for Isle of Bali II, a Condominium, as recorded in Official Records Book 4964, Page 3145, Public Records of Orange County, Florida, and all amendments to such instrument (the "LTV II Condominium), *but* including those portions of the LTV II Condominium not sold by Island One, Inc. to any third party, such as unsold timeshare interests, commercial units and developer rights.

Lot 5, Block 19, OCEAN BEACH, FLA ADDITION NO.2, according to the plat thereof, as recorded in Plat Book 2, Page 56, of the Public Records of Miami-Dade County, Florida.

Excluding that portion of the property declared as part of a timeshare resort known as Crescent Resort On South Beach, a Timeshare Resort, pursuant to the Declaration of Covenants, Conditions and Restrictions Crescent Resort On South Beach, a Timeshare Resort, as recorded in Official Records Book 23061, Page 2324, Public Records of Miami-Dade County, Florida, and all amendments to such instrument (the "Crescent Resort"); *but* including those portions of Crescent Resort not sold by Crescent One, LLC to any third party, such as all timeshare interests, commercial units and developer rights.

The Northerly 50 feet of the Southerly 100 feet of that part of Lot 15A lying Easterly of Atlantic Avenue, ASSESSOR'S ORMOND BEACH, according to map or plat thereof as recorded in Map Book 3, at Page 108, of the Public Records of Volusia County, Florida.

AND

The Northerly 100 of Lot 15A, ASSESSOR'S ORMOND BEACH, lying Easterly of Atlantic Avenue and/or Ocean Shore Boulevard as now laid out and used, according to map or plat thereof as recorded in Map Book 3, at Page 108, of the Public Records of Volusia County, Florida.

AND

The Southerly Fifty (50) feet of Lot Fifteen A (15-A), lying Easterly of Atlantic Avenue, and/or Oceanshore Boulevard, Assessor's Ormond Beach, as per map thereof in Map Book 3, at Page 108, of the Public Records of Volusia County, Florida.

AND

The Northerly 159.11 feet of Lot Seventeen A (17-A), lying Easterly of Atlantic Avenue, and/or Oceanshore Boulevard, Assessor's Ormond Beach, as per map thereof in Map Book 3, at Page 108, of the Public Records of Volusia County, Florida.

Excluding that portion of the property declared as part of a timeshare condominium pursuant to that certain Declaration of Condominium for Plantation Cove, a condominium, as recorded in Official Records Book 4059, Page 3277, Public Records of Volusia County, Florida, and all amendments to such instrument (the "Cove I Condominium) *but* including those portions of the Cove I Condominium not sold by Island One, Inc. to any third party, such as unsold timeshare interests, commercial units and developer rights.

And, excluding that portion of the property declared as part of a timeshare resort known as Cove II On Ormond Beach, a Timeshare Resort, pursuant to the Declaration of Covenants, Conditions and Restrictions For Cove II On Ormond Beach, a Timeshare Resort, as recorded in Official Records Book 5947, Page 926, Public Records of Volusia County, Florida, and all amendments to such instrument (the "Cove II Resort"), *but* including those portions of Crescent Resort not sold by Island One, Inc. to any third party, such as all timeshare interests, commercial units and developer rights.

All of Island One Inc.'s unsold rights, title and interests in that certain timeshare condominium known as The Charter Club Of Naples Bay, a condominium, pursuant to that certain Declaration of Condominium for The Charter Club Of Naples Bay, a condominium, as recorded in Official Records Book 857, Page 324, Official Records Book 950, Page 1562, and Official Records Book 1670, Page 736, Public Records of Collier County, Florida, and all amendments to such instrument (the "Charter Club" Condominium) including unsold timeshare interests, commercial units and developer rights.

All of Island One Inc.'s unsold rights, title and interests in that certain timeshare condominium known as Bryan's Spanish Cove, a condominium, pursuant to that certain Declaration of Condominium for Bryan's Spanish Cove, a condominium, as recorded in Official Records Book 3900, Page 4510, Public Records of Orange County, Florida, and all amendments to such instrument (the "Bryan's" Condominium) including unsold timeshare interests, commercial units and developer rights.

Schedule 4.6 N
O.R.B.I.T.

All of Island One Inc.'s unsold rights, title and interests in that certain timeshare condominium known as O.R.B.I.T, a condominium, pursuant to that certain Declaration of Condominium for O.R.B.I.T., a condominium, as recorded in Official Records Book 649, Page 040, Public Records of Osceola County, Florida, and all amendments to such instrument (the "ORBIT" Condominium) including unsold timeshare interests, commercial units and developer rights.

4.6 N

Any unsold timeshare interests in that certain timeshare condominium known as Parkway International, a condominium, pursuant to that certain Declaration of Condominium for Parkway International, a condominium, as recorded in Official Records Book 0943, Page 1541, Public Records of Osceola County, Florida, and all amendments to such instrument (the "Parkway I Condominium).

And any unsold timeshare interests in that certain timeshare condominium known as Parkway International II, a condominium, pursuant to that certain Declaration of Condominium for Parkway International II, a condominium, as recorded in Official Records Book 1182, Page 1119, Public Records of Osceola County, Florida, and all amendments to such instrument (the "Parkway II Condominium).

Together with any and all rights set forth in that certain Possibility of Reverter and Reservation of Rights Agreement respecting Lots 1, 2 and 3 of The Parkway Phase 1-C according to the plat thereof, recorded in Plat Book 5, Page 60 of the Public Records of Osceola County, Florida, less and except those lands subject to the Parkway I Condominium and the Parkway II Condominium, which Possibility of Reverter and Reservation of Rights Agreement is defined and described in that certain Warranty Deed (the "Conveyance") by Island One, Inc., as grantor ("IOI"), and Lando Resorts Corporation, as grantee, and recorded at Official Records Book 1352, Page 0122, Public Records of Osceola County, Florida; and, together, with all other rights of IOI related to or arising out of such Conveyance, if any.

**SCHEDULE 4.7**

Environmental Matters

Phase I Environmental Site Assessments:

Phase I Environmental Site Assessment Report – LTV III Property, NW Corner of State Road 545 & Highway 192 West, Orange County, Florida dated Feb. 7, 2005, prepared by David R. Giddens, Professional Geologist

Phase I Environmental Site Assessment Report – Plantation Cove Properties, 145 & 149 Atlantic Avenue, Ormond Beach, Florida dated March, 1999, prepared by Universal Engineering Sciences, Inc.

Phase I Environmental Site Assessment Report – Barefoot'n In the Keys At Old Town, A Condominium, 2750 Florida Plaza Boulevard, Kissimmee, Osceola County, Florida dated December 14, 2005, prepared by Andreyev Engineering, Inc.

Phase I Environmental Site Assessment Report – Crescent Resort & Spa on South Beach, located at 1420 Ocean Drive, Miami Beach, Florida dated August 11, 2004, prepared by Nodase & Associates, Inc.

## SCHEDULE 4.10
## PERMITS

| Type | IOI Entity | License Entity or State |
|------|-----------|-------------------------|
| *Debt Collection Agency Licence* | IOI/Resort Financial Specialists | New York |
| *Consumer Collection Agency* | IOI | Florida - Dept of Banking & Finance |
| *DNC Lists* | IOI | Florida |
| | IOI | Pennsylvania |
| | IOI | NeuStar Registry |
| | IOI | National DNC |
| *Master Commercial Solicitation Permit* | Club Navigo | Volusia County - in process |
| *Authorized to do business as foreign corporation* | IOI | Colorado |
| | IOI | Georgia |
| | IOI | New Jersey |
| | IOI | Tennessee |
| | IOI | Pennsylvania |
| *Telemarking/Telephone Solicitor* | IOI | Texas |
| | IOI/Club Navigo (CN) | Texas |
| | IOI/CN | Tennessee |
| | IOI/CN | Indiana |
| | IOI/CN | Pennsylvania |
| *IOI Timeshare Registrations* | LTV I | South Carolina |
| | LTV II | New Jersey |
| | LTV II | New York |
| | LTV II | Indiana |
| | Cove | New Jersey |
| | Cove | Tennessee |
| | LTV I | Pennsylvania |
| | BSC | Texas |
| | ORB | Texas |
| | LTV I, LTV II, Cove, Cove II, CCN, BSC, ORB, PKY, PII, CRM, Club Navigo, GEC | Florida |
| *Corporations* | Florida Vacation Station | Florida |
| | IOI | Florida |
| | NVC | Florida |
| | Orlando Vacation Bureau | Florida |
| | GEC | Florida |
| | IORMC | Florida |
| *LLC* | IOI Funding I | Florida |
| | Island One Leasing | Florida |
| | Crescent One | Florida |
| *CAM - Firm* | IORMC | Florida |
| *Insurance Agency License* | IORMC | Florida Dep of Financial Services - in process |
| *Business Tax Receipts (f/k/a Occupational licenses)* | IOI | Orange County |
| | IOI - Corp office - Massage Est | Orange County |
| | IOI - Corp office - Cosmetology Salon | Orange County |

| Type | IOI Entity | License Entity or State |
|---|---|---|
| | IOI - LTV Sales Center - Timeshare | Orange County |
| | IOI - LTV Sales Center - Real Estate Office | Orange County |
| | IOI - LTV Sales Center - Broker | Orange County |
| | IOI - LTV Sales Center - Restaurant | Orange County |
| | Florida Vacation Station | Orange County |
| *DBPR Cosmetology* | IOI - Corp office - Cosmetology Salon | Florida |
| *Dept of Health* | IOI - Corp office - Massage Est | Florida |
| *DBPR Real Estate* | IOI - RE Corp | Florida |
| | IOI -Roberta Springer as Broker | Florida |
| | IOI - LTV Sales Center - Branch Office | Florida |
| *DBPR -Food Service* | IOI - LTV Sales Center | Florida |
| *Retail Intstallment Seller* | IOI | Florida Office of Financial REg |
| *Elevator License* | IOI - Corp Office | Florida Bur of Elevator Safety |
| *Seller of Travel* | IOI dba Florida Vacation Station, Florida Ticket Station and Club Navigo Vacations | Florida Dep of Agriculture |
| *Amusement Machine Cert* | IOI - LTV Sales Center | Florida Dep of Revenue |
| *Fictitious Name* | Charter Club Resort of Naples Bay | Florida |
| | Club Navigo | Florida |
| | Club Navigo Vacations | Florida |
| | Cove on Ormond Beach (The) | Florida |
| | Crescent Resort & Spa on South Beach | Florida |
| | Crescent Resort on South Beach | Florida |
| | Florida Ticket Station | Florida |
| | Florida Vacation Station | Florida |
| | Galaxy Exchange Company | Florida |
| | Island One Café | Florida |
| | Island One Resorts | Florida |
| | Island One Resorts Hospitality Group | Florida |
| | Kenya Kafe | Florida |
| | Liki Tiki Village | Florida |
| | Liki Tiki Village I | Florida |
| | Liki Tiki Village II | Florida |
| | Orlando Ticket Outlet | Florida |
| | Orlando Vacation Bureau | Florida |
| | Parkway International Resort | Florida |
| | Resort Financial Specialists | Florida |
| | Shipwreck Sally's | Florida |
| | Travel Perkz | Florida |
| | | |
| | | |
| | | |

## PERMITS

| Type | IOI Entity | License Entity or State |
|---|---|---|
| | | |
| Resort | License Type | License Entity |
| Barefoot'n II | Business Tax Receipt | Osceola Co Tax Collector |
| IORMC | Food Service License – KK | DBPR, Div of Hotels & Rest |
| | Food Service License – SS | DBPR, Div of Hotels & Rest |
| | Food Service License – TT | DBPR, Div of Hotels & Rest |
| | Liquor License for Ship Wreck Sally's | DBPR, Div of Al Bev & Tob |
| | Liquor License for Kenya Kafe | DBPR, Div of Al Bev & Tob |
| IOI | Branch Office Registration-BII | DBPR, Div of Real Estate |
| | Branch Office Registration-BSC | DBPR, Div of Real Estate |
| | Branch Office Registration-CCN | DBPR, Div of Real Estate |
| | Branch Office Registration-CRM | DBPR, Div of Real Estate |
| | Branch Office Registration-PCR | DBPR, Div of Real Estate |
| | Branch Office Registration-CII | DBPR, Div of Real Estate |
| | Branch Office Registration-ORB | DBPR, Div of Real Estate |

**Schedule 4.12**
Litigation

**Island One, Inc., _et al._ Debtors,** Case No.: 6:10-bk-16177-KSJ, Jointly Administered with Case Nos.: 6:10-bk-16179-KSJ; 6:10-bk-16180-KSJ; 6:10-bk-16182-KSJ; 6:10-bk-16183-KSJ; and 6:10-bk-16189-KSJ, US Bankruptcy Court for the Middle District of Florida, Orlando Division.

All Orders issued in the Island One, Inc., _et al_, Debtors Bankruptcy case.

**IOI & Ransom v. Maher,** Index No. 23110-07 (N.Y. S. Ct., Queens County). NYC counsel handling case: Starr Associates, LLP, 245 Fifth Ave., Suite 1102, New York, NY 10013, (212) 620-2680. Claim is for breach of contract. The case is currently pending; counsel waiting for further instructions from IOI.

**IOI Baker Bankruptcy Violation,** Case No. 3:08-BK-5695-PMG (Bankr. M.D. Fla., Jacksonville Division). Accidental violation of Bankruptcy stay by IOI collection department. Opposing counsel accepted offer of $500.00 to settle. Waiting for executed settlement agreement to be returned from opposing counsel.

**Jenny Tobar v. Island One Resorts [sic],** EEOC Charge No. 510-2009-04325 (Miami Dist Off). On January 28, 2010 Korshak & Associates furnished response to EEOC request for information. On September 16, 2010 EEOC issued a determination of no finding.

**Bridgette Sanchez v. Island One Resorts [sic],** EEOC Charge No. 510-2010-02571 (Miami Dist Off). On July 22, 2010 Korshak & Associates furnished response to EEOC request for information. No response from EEOC to date.

**Edie Weinstein v. Island One, Inc.,** EEOC Charge No. 510-2010-02217 (Miami Dist Off). On April 23, 2010, Korshak & Associates furnished response to EEOC request for information. No response from EEOC to date.

**Diana Y. Baez v. Island One Resorts [sic],** EEOC Charge No. 510-2011-01640 (Miami Dist Off). Dated January 12, 2011, alleging retaliation. No action required at this time.

**Nydia E. Caceres v. Island One Corp [sic],** EEOC Charge No. 510-2011-01634 (Miami Dist Off). Dated January 11, 2011, alleging disability and retaliation. No action required at this time.

**Lisbeth K. Castro v. Island One Resorts [sic],** EEOC. Charge No. 510-2011-01639 (Miami Dist Off). Dated January 11, 2011 alleging retaliation. No action required at this time.

**Carmen M. Figueroa v. Island One Resorts [sic],** EEOC Charge No. 510-2011-01636 (Miami Dist Off). Dated January 11, 2011, alleging retaliation. No action required at this time.

**Sorliliana Guzman v. Island One Resorts [sic],** EEOC Charge No. 510-2011-01641 (Miami Dist Off). Dated January 12, 2011, alleging retaliation. No action required at this time.

**Maribel Hernandez v. Island One Resorts [sic],** EEOC Charge No. 510-2011-01638 (Miami Dist Off). Dated January 11, 2011, alleging sex and retaliation. No action required at this time.

**Milagros Samalot v. Island One Resorts [sic]**, EEOC Charge No. 510-2011-01635 (Miami Dist Off). Dated January 11, 2011, alleging retaliation. No action required at this time.

**Luisa Varga v. Island One Resorts [sic]**, EEOC Charge No. 510-2011-01642 (Miami Dist Off). Dated January 12, 2011, alleging retaliation. No action required at this time.

**Angela Esposito v. Island One Resorts Mgmt. Corp.**, Case No. 8:2010-AP-00103-CPM (Bankr. M.D. Fla., Tampa Division). Island One Resorts Mgmt Corp. was incorrectly named in adversary complaint on behalf of debtor. Agreed Final Order of Dismissal was filed on September 2, 2010.

**Joseph, Hornel v. Island One, Inc.**, Case No. 2009-CA-20820-O (Fla. 9th Jud. Cir., Orange County). IOI was sued for breach of contract, libel, and unjust enrichment by a unit owner. The case is currently in discovery, IOI recently answered interrogatories.

**David Iloanya v. Island One Resorts Mgmt Corp.**, Case No. 2009-CC-14791 (Fla. 13th Jud. Cir.). Small Claims complaint. Order was granted to transfer venue from Hillsborough to Orange. Iloanya has not yet refiled in Orange. In communications with opposing counsel to settle.

**Kirby Oil Company, Inc. v. Island One, Inc.**, Case No. 2009-CA-49 (Fla. 3rd Jud. Cir., Columbia County). IOI was sued for breach of contact. The case settled. IOI is to make monthly payments per settlement agreement.

**Edgar Baez v. Island One, Inc., d/b/a Resort Financial Specialists**, Case No. 10-CV-24072-FAM (US District Court Southern District of Florida). Forwarded to Baker & Hostetler November 19, 2010.

**Louran Alkoka v. Island One, Inc.**, Case No. 6:10-cv-00669-JA-DAB (US District Court Middle District of Florida). On December 4, 2009, EEOC issued a determination of no finding. Alkoka filed complaint within 90 days of EEOC determination; referred to Baker & Hostetler.

**Robert Hebert v. Island One, Inc.**, Case No. 11-30884CICI (Seventh Judicial Circuit Court of Florida, Volusia County), relating to timeshare interest purchase contract dispute.

*Insurance Cases with Active Litigation – personal injury cases handled by Insurance Counsel*

**Joanna Williams v Island One, Inc. d/b/a Liki Tiki Village and Island One Resorts Management Corporation d/b/a Liki Tiki Village**, Case No. 2010-CA-7702-0 (9th Jud. Cir., Orange County)

*Insurance Cases with Threatened Litigation – handled by Insurance Counsel*

| | |
|---|---|
| Patricia Cordaro Peltz | Rachel & Arielle Weis |
| Sandra Smith | Hayden Collins |
| Keinu Johnson | Mary Grabert |
| Charlene Schupbach | Jackie Woods |
| Sandra Clark | |

*Possible Claims*
**Maria Marsico** filed complaint No. 2010070724 with the Colorado Division of Real Estate on July 6, 2010 regarding her purchase of a Barefoot'n in the Keys at Old Town ("Resort") timeshare. Barefoot'n Development Company, LLC is the Developer and Island One Resorts Management Corporation is the management company for the Resort. Colorado closed the complaint without further action on October 26, 2010. Because the case was not settled, a future claim is possible.

**Crescent One, LLC**

**Litigation**
**Foreclosures**

**Crescent One, LLC v. Faulk**, Case No.: 2007-36366-CA-10 (Fla. 11th Jud. Cir., Miami-Dade County); timeshare foreclosure action: 15 timeshare estates; 21 Defendants. Status as of 9/29/2010: Final Judgments: 13; Settled: 1; Pending: 1

**Crescent One, LLC v. Oviedo**, Case No.: 2008-66987-CA-04 (Fla. 11th Jud. Cir., Miami-Dade County); Timeshare foreclosure action: 15 timeshare estates; 25 Defendants. Status as of 9/29/2010: Final Judgments: 0; Settled: 0; Pending: 15.

**Crescent One, LLC v. Andtade**, Case No.: 2008-66966-CA-15 (Fla. 11th Jud. Cir., Miami-Dade County); timeshare foreclosure action: 15 timeshare estates; 28 Defendants. Status as of 9/29/2010: Final Judgments: 0; Settled: 0; Pending: 15.

**Crescent One, LLC v. Gehring**, Case No.: 2008-74138-CA-30 (Fla. 11th Jud. Cir., Miami-Dade County); timeshare foreclosure action: 15 timeshare estates; 26 Defendants. Status as of 9/29/2010: Final Judgments: 11; Settled: 1; Pending: 12.

**Crescent One, LLC v. Kolvrat**, Case No.: 2008-64307-CA-32 (Fla. 11th Jud. Cir., Miami-Dade County); timeshare foreclosure action: 15 timeshare estates; 23 Defendants. Status as of 9/29/2010: Final Judgments: 10; Settled: 2; Pending: 3.

## SCHEDULE 4.14

### Compliance with Law

None

**SCHEDULE 4.15**

<u>Financial Statements</u>

The September 30, 2010 financial statements do not reflect GAAP adjustments that will be required as of December 31, 2010 in connection with FAS 152 and the AICPA Statement of Position 04-2, Accounting for Real Estate Time-Sharing Transactions, which may be material.

**SCHEDULE 4.16**

<u>Accounts Receivable</u>

None

**SCHEDULE 4.17**

<u>Timeshare Interests</u>

See Attached

Schedule 4.17
Timeshare Interests as of 12/29/10
Inventory

Sum of UnitWeeks

| Avail?/Sell Status | | resort | Site | Week 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TRUE | Encumbered | BL4 | 1 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 |
| | | BL4 | 2 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 |
| | | BAL | 1 | 17.0 | 16.0 | 8.0 | 11.0 | 12.0 | 10.0 | 2.0 | 1.0 | 3.0 | 13.0 | 1.0 | 1.0 |
| | | BII | 1 | 53.5 | 50.0 | 60.5 | 65.5 | 63.5 | 14.5 | 24.0 | 13.0 | 11.5 | 2.5 | 15.5 | 17.0 |
| | | BII | 2 | 45.5 | 46.0 | 48.0 | 46.0 | 50.5 | 13.5 | 3.0 | 0.5 | 1.0 | 2.0 | 2.0 | 1.0 |
| | | BSC | 2 | 3.0 | 2.0 | | 3.0 | 1.0 | 2.0 | 1.0 | 1.0 | 2.0 | 2.0 | 4.0 | 2.0 |
| | | CBR | 1 | 2.0 | | 2.0 | | 1.0 | | | | | 1.0 | | |
| | | CCN | 2 | 26.0 | 24.5 | 27.5 | 27.5 | 18.0 | 18.0 | 17.5 | 18.5 | 12.0 | 19.5 | 18.5 | 18.0 |
| | | CII | 1 | 3.0 | 4.5 | 5.0 | 5.0 | | 3.0 | | 0.5 | 0.5 | | | |
| | | CII | S | 1.0 | | 2.0 | 1.5 | | 0.5 | 1.0 | 2.0 | 1.0 | 1.0 | | |
| | | CRM | 1 | 10.0 | 12.0 | 13.5 | 13.0 | 12.5 | 12.0 | 15.5 | 13.0 | 19.0 | 12.0 | 12.5 | 11.5 |
| | | CRM | S | | | 1.0 | 0.5 | | | | | | 0.5 | | 0.5 |
| | | ORB | 2 | 6.5 | 5.0 | 4.5 | 4.5 | 1.5 | 27.0 | 8.5 | 7.0 | 2.5 | 5.0 | 2.0 | 6.0 |
| | | PCR | 1 | 6.0 | 3.5 | 4.0 | 5.0 | 2.0 | 3.0 | 1.5 | 1.5 | 1.0 | 1.0 | 2.0 | 0.5 |
| | | PCR | 2 | | 3.0 | 2.0 | 1.0 | | 5.0 | 2.0 | | 2.0 | 2.0 | | |
| | | PCR | S | 0.5 | | | | | 0.5 | | 1.0 | | | | |
| | | PII | 2 | | 0.5 | | | | | | | | | | |
| | Sold - Defaulted | PKY | 2 | 18.0 | 13.0 | 19.0 | 18.0 | 15.0 | 9.0 | 16.0 | 6.0 | 11.0 | 7.0 | 7.0 | 13.0 |
| | | BAL | 1 | 11.0 | 9.5 | 12.0 | 10.0 | 19.5 | 19.5 | 13.0 | 18.0 | 18.0 | 10.5 | 4.5 | 5.5 |
| | | BFN | 1 | 48.0 | 46.0 | 46.0 | 47.0 | 47.0 | 52.0 | 29.0 | 36.5 | 50.5 | 42.5 | 26.5 | 43.5 |
| | | BII | 2 | 39.0 | 50.0 | 52.5 | 44.5 | 45.5 | 45.5 | 33.0 | 35.5 | 36.0 | 33.0 | 28.0 | 30.0 |
| | | BSC | 1 | 7.0 | 7.0 | 4.0 | 4.0 | 9.0 | 10.0 | 4.0 | 6.0 | 4.0 | 4.0 | 3.0 | 6.0 |
| | | CBR | 1 | | | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | | | | 1.0 |
| | | CCN | 2 | 1.0 | 2.0 | 2.0 | 0.5 | 1.0 | 2.5 | 3.5 | 3.5 | 3.5 | 4.0 | 1.0 | 4.5 |
| | | CII | 1 | 2.0 | 2.0 | 0.5 | 0.5 | 4.5 | 2.5 | 3.5 | 5.5 | 3.0 | 5.5 | 1.5 | 6.5 |
| | | CII | 2 | 7.5 | 8.5 | 7.5 | 6.0 | 4.0 | 2.5 | | | | | 4.5 | |
| | | CII | S | 1.5 | 0.5 | 0.5 | 0.5 | | 0.5 | | | 0.5 | 1.5 | 0.5 | 1.5 |

4.17

Timeshare Interests as of 12/29/10

### Inventory

| Status | | Code | | 6.0 | 3.5 | 5.5 | 6.0 | 4.5 | 4.5 | 5.5 | 6.0 | 4.0 | 4.5 | 5.5 | 6.5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TRUE | Sold - Defaulted | CRM | 1 | | | | | | | | | | | | |
| | | ORB | 2 | 13.0 | 17.0 | 17.0 | 16.0 | 11.0 | 13.0 | 8.0 | 10.0 | | 12.0 | 8.0 | 11.0 |
| | | FGR | 1 | 3.0 | 2.0 | 2.0 | 4.0 | 3.5 | 4.0 | 3.0 | 1.5 | | | | |
| | | | 2 | 1.0 | 1.0 | 0.5 | 1.0 | | 1.5 | | 1.0 | | 0.5 | | 1.5 |
| | | | S | 1.0 | | | | | | | | | | 1.0 | |
| | | PII | 2 | 5.5 | 4.5 | 3.0 | 7.5 | 5.5 | 2.0 | 2.0 | 7.0 | 3.5 | 2.5 | 1.5 | 4.5 |
| | | PKY | 2 | 11.0 | 12.0 | 14.0 | 14.0 | 15.0 | 12.0 | 14.0 | 12.0 | 8.0 | 12.0 | 5.0 | 10.0 |
| | | BAL | 1 | 3.0 | 3.0 | 3.0 | 2.0 | 2.0 | 1.0 | 5.0 | 2.0 | 2.0 | 1.0 | 1.0 | 2.0 |
| | Unsold | BFN | 1 | 3.0 | 2.0 | 2.0 | 2.5 | 1.0 | 4.0 | 1.0 | 3.5 | 3.5 | 2.5 | 3.0 | 0.5 |
| | | BII | 1 | 6.0 | 8.5 | 12.0 | 5.0 | 5.0 | 9.5 | 5.0 | 5.0 | 5.0 | 5.0 | 7.0 | 5.0 |
| | | | 2 | 6.5 | 4.0 | 5.0 | 5.0 | 6.5 | 2.0 | 2.0 | 3.5 | 2.5 | 4.5 | 2.0 | 4.0 |
| | | BSC | 2 | | | | 3.0 | | | | 1.0 | | | | 3.0 |
| | | CCN | 2 | 2.0 | 2.0 | 1.0 | | 2.0 | 3.0 | 4.0 | 2.0 | 2.0 | 1.0 | 5.0 | 5.0 |
| | | ORB | 2 | 7.0 | 6.0 | 4.0 | 7.0 | 3.0 | | 0.5 | 0.5 | | | 1.5 | |
| | | FGR | 1 | 1.0 | | 1.0 | 1.0 | 1.0 | | | | | 0.5 | | |
| | | | S | | | 1.0 | 1.0 | | | | | | | | |
| | | PII | 2 | 0.5 | 1.5 | 1.5 | 0.5 | 0.5 | 1.0 | 5.0 | | 0.5 | | 0.5 | |
| | | PKY | 2 | 4.0 | 7.0 | 3.0 | 8.0 | 4.0 | 5.0 | | 1.0 | 1.0 | | 6.0 | 6.0 |
| FALSE | Encumbered | BAL | 2 | | | | | | | | | | | | 1.0 |
| | | BII | 1 | | | 1.0 | 1.5 | 0.5 | 1.0 | 0.5 | 0.5 | 0.5 | 0.5 | | 1.0 |
| | | | 2 | | | | | | | | | | | | 1.0 |
| | | BSC | 2 | 1.0 | | | | | | | | | | | |
| | | CCN | 2 | 1.0 | | | | | | | | | | | |
| | | ORB | 2 | | | | | | | | | | | | |
| | | PCR | 1 | | | | | | | | | 1.0 | | | |
| | Maintenance W/ | BAL | 2 | | | | | | | | | | | | |
| | | BSC | 2 | | | | | | | | | | | | |
| | | CBR | 1 | | | | | | | | | | | | |
| | | | S | | | | | | | | | | | | |
| | | CCN | 2 | | | | | | | | | | | | |
| | | ORB | 2 | | | | | | | | | | | | |
| | | PII | 2 | | | | | | | | | | | | |

Schedule 4.17
Timeshare Interests as of 12/29/10
Inventory

| | Maintenance VPKY | | 90.0 | 96.0 | 98.0 | 95.0 | 98.0 | 107.0 | 104.0 | 115.0 | 111.0 | 120.0 | 119.0 | 111.0 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FALSE | VPKY | 2 | | | | | | | | | | | | |
| Sold | BAL | 2 | 28.0 | 30.5 | 28.0 | 29.5 | 32.5 | 27.5 | 28.0 | 25.5 | 33.0 | 29.0 | 34.5 | 36.0 |
| | BFN | 1 | 147.5 | 146.0 | 136.5 | 137.5 | 136.5 | 179.0 | 186.5 | 200.5 | 188.0 | 194.0 | 206.0 | 188.5 |
| | BII | 1 | 134.0 | 125.0 | 118.5 | 123.0 | 129.5 | 159.5 | 186.5 | 185.0 | 185.0 | 184.0 | 192.5 | 189.0 |
| | | 2 | 35.0 | 37.0 | 39.0 | 34.0 | 34.0 | 33.0 | 39.0 | 37.0 | 40.0 | 40.0 | 39.0 | 35.0 |
| | BSC | 2 | 5.0 | 6.0 | 6.0 | 7.0 | 7.0 | 5.0 | 7.0 | 6.0 | 6.0 | 6.0 | 4.0 | 5.0 |
| | CBR | 1 | 6.0 | 8.0 | 7.0 | 7.0 | 6.0 | 7.0 | 7.0 | 8.0 | 8.0 | 7.0 | 8.0 | 8.0 |
| | | 5 | 28.0 | 29.0 | 30.0 | 32.0 | 31.0 | 32.0 | 33.0 | 33.0 | 33.0 | 33.0 | 32.0 | 33.0 |
| | CCN | 2 | 4.0 | 7.0 | 4.0 | 9.5 | 9.5 | 11.5 | 11.0 | 10.0 | 16.5 | 8.5 | 12.0 | 9.5 |
| | CI | 1 | 15.5 | 13.0 | 13.5 | 15.0 | 21.0 | 23.0 | 22.5 | 18.5 | 22.5 | 20.5 | 21.5 | 19.5 |
| | | 2 | 2.5 | 4.5 | 2.5 | 3.0 | 4.0 | 4.0 | 4.5 | 4.5 | 4.5 | 3.5 | 4.5 | 3.5 |
| | | 5 | 8.0 | 8.5 | 5.0 | 3.0 | 5.0 | 6.5 | 4.0 | 6.5 | 1.0 | 6.0 | 6.0 | 6.0 |
| | CRM | 1 | | | 1.0 | 2.5 | 3.0 | 5.5 | 2.0 | 2.5 | 3.0 | 1.5 | 2.0 | 0.5 |
| | ORB | 2 | 96.0 | 93.0 | 95.0 | 94.0 | 99.0 | 103.0 | 105.0 | 98.0 | 106.0 | 103.0 | 103.0 | 100.0 |
| | PCR | 1 | 19.5 | 23.0 | 22.5 | 22.0 | 21.5 | 2.0 | 18.0 | 22.0 | 27.0 | 21.0 | 25.5 | 22.5 |
| | | 2 | 11.0 | 13.5 | 12.5 | 10.5 | 14.0 | 15.0 | 15.0 | 16.0 | 16.0 | 14.0 | 16.5 | 16.0 |
| | | 5 | 2.0 | 2.0 | 6.0 | 4.0 | 6.0 | 1.0 | 3.0 | 5.0 | 6.0 | 4.0 | 3.0 | 6.0 |
| | PII | 2 | 17.5 | 18.0 | 19.5 | 16.0 | 18.0 | 22.0 | 22.0 | 17.0 | 20.5 | 21.5 | 22.0 | 19.5 |
| | PKY | 2 | 105.0 | 101.0 | 101.0 | 104.0 | 101.0 | 103.0 | 105.0 | 102.0 | 103.0 | 105.0 | 109.0 | 104.0 |
| Grand Total | | | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 |

| 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 |
| 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 |
| 15.0 | 15.0 | 15.0 | 9.0 | 4.0 | 13.0 | 11.0 | 12.0 | 18.0 | 16.0 | 10.0 | 5.0 | 5.0 | 18.0 | 1.0 | 4.0 |
| 3.0 | 2.0 | 16.0 | 23.0 | 20.5 | 58.0 | 60.0 | 60.5 | 49.5 | 63.0 | 20.0 | 17.0 | 16.5 | 3.0 | 18.5 | 19.5 |
| 13.5 | 21.0 | 16.0 | 16.5 | 18.0 | 46.0 | 47.5 | 45.0 | 49.0 | 53.0 | 13.0 | 15.0 | 18.0 | 2.5 | 2.5 | 16.5 |
| 2.0 | 3.5 | 1.5 | | | 1.0 | 2.0 | 1.0 | 1.0 | | | | | | | |
| | | | | | 2.0 | 4.0 | 6.0 | 3.5 | 5.0 | 5.0 | 5.0 | 3.0 | 2.5 | 5.0 | 3.0 |
| 1.0 | 4.0 | 3.0 | 4.5 | 4.5 | 2.0 | 15.0 | 17.5 | 6.0 | 5.0 | 3.0 | 3.0 | 6.0 | 5.0 | 4.0 | 5.0 |
| 1.0 | | 3.0 | 4.0 | 5.0 | 10.0 | 18.0 | 20.0 | 21.5 | 21.0 | 19.0 | 17.0 | 20.0 | 20.0 | 19.0 | 19.5 |
| 18.5 | 23.5 | 19.0 | 18.5 | 20.0 | 19.5 | 8.5 | 9.0 | 9.5 | 10.5 | 19.5 | 20.0 | 4.0 | 1.5 | | 0.5 |
| 1.5 | 1.0 | | 1.5 | 1.0 | 8.0 | 1.5 | 1.5 | 2.5 | 3.0 | 3.0 | 2.5 | 0.5 | 6.0 | 5.0 | 8.5 |
| | | | 0.5 | 11.5 | 1.0 | 9.0 | 9.5 | 8.5 | 10.0 | 9.0 | 9.0 | 9.0 | 1.0 | 1.5 | 2.0 |
| 11.5 | 10.5 | 12.0 | 13.5 | 1.0 | 8.5 | 1.5 | 1.5 | 3.0 | 3.0 | 3.0 | 2.5 | 2.0 | | | |
| | | | | | | | | | | | | | | | 3.0 |
| | | | | | 1.0 | | | | | | | | | | |
| 6.5 | 12.0 | 7.5 | 2.5 | 2.5 | 7.0 | 4.5 | 5.0 | 1.5 | 4.0 | 4.5 | 1.5 | 1.5 | 12.0 | 3.0 | |
| | 2.0 | 0.5 | 1.5 | 3.0 | 2.0 | 5.5 | 6.5 | 1.5 | 2.5 | 3.0 | | 1.5 | | | |
| 2.0 | 6.0 | 1.0 | | | 2.0 | 3.0 | | 1.0 | 1.0 | 3.0 | 2.0 | 1.0 | 5.0 | | 1.0 |
| 1.0 | | | | | | | 1.0 | 1.0 | 1.0 | | | | | | |
| 7.0 | 6.0 | 4.0 | 11.0 | 12.0 | 8.0 | 13.0 | 13.0 | 14.0 | 2.0 | 9.0 | 3.0 | 7.0 | 20.0 | 7.0 | 15.0 |
| 8.5 | 9.0 | 11.5 | 11.0 | 6.5 | 4.5 | 12.0 | 10.5 | 8.0 | 8.5 | 8.0 | 10.0 | 6.0 | 4.0 | 5.0 | 8.5 |
| 40.5 | 43.0 | 39.5 | 55.5 | 54.0 | 46.0 | 52.0 | 44.5 | 58.0 | 40.5 | 57.5 | 59.5 | 56.0 | 42.5 | 38.0 | 48.5 |
| 36.5 | 35.0 | 31.5 | 54.5 | 58.5 | 40.5 | 42.0 | 49.5 | 46.0 | 43.0 | 52.5 | 47.5 | 45.0 | 36.0 | 24.0 | 38.5 |
| 5.0 | 8.0 | 8.0 | 3.0 | 3.0 | 7.0 | 6.0 | 4.0 | 2.0 | 4.0 | 5.0 | 5.0 | 4.0 | 7.0 | 4.0 | 1.0 |
| | | | | 1.0 | 3.0 | 2.0 | 4.0 | 2.0 | | | | | | | 2.0 |
| | | 1.0 | 1.0 | | | | 1.0 | | | | 1.0 | 1.0 | 5.0 | 5.0 | 2.0 |
| 1.0 | 1.0 | 3.0 | 1.0 | 1.0 | 1.0 | | 1.0 | 2.0 | 2.0 | | | | | | |
| | 3.0 | | | | | | | | | 4.0 | 5.5 | 3.0 | 3.0 | 1.5 | 3.5 |
| 4.0 | 2.0 | 3.0 | 5.0 | 4.0 | 6.5 | 5.0 | 5.0 | 3.0 | 3.0 | 3.0 | 5.0 | 4.0 | 3.0 | 5.0 | 4.5 |
| 6.0 | 4.5 | 4.5 | 4.5 | 4.5 | 6.0 | 7.0 | 6.0 | 5.0 | 5.0 | 1.0 | 2.5 | 6.5 | | 1.0 | 1.0 |
| 0.5 | 0.5 | 0.5 | | 1.0 | 2.5 | | 0.5 | | 0.5 | | | 2.0 | | | |

## Schedule 4.17
### Timeshare Interests as of 12/29/10
#### Inventory

| 7.0 | 5.5 | 3.0 | 3.5 | 8.0 | 9.5 | 8.0 | 7.0 | 9.0 | 8.0 | 6.0 | 5.0 | 9.0 | 14.5 | 10.5 | 12.5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.0 | 3.0 | 2.0 | 18.0 | 10.0 | 2.0 | 0.5 | 14.0 | 15.0 | 6.0 | 9.0 | 6.0 | | 10.0 | 12.0 | 12.0 |
| 6.0 | 7.0 | 9.0 | 3.0 | 10.0 | 10.0 | 14.0 | 3.0 | 1.5 | 0.5 | 3.5 | 3.5 | 3.5 | | 3.5 | 5.0 |
| 3.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.5 | 1.0 | 1.0 | 2.0 | 1.0 | 1.0 | | 1.0 | | | 3.0 |
| 1.5 | | | | | 1.0 | | 1.0 | | | | 7.5 | 2.0 | 6.0 | 5.0 | 4.5 |
| 1.5 | 7.0 | 3.0 | 2.5 | 3.0 | 3.5 | 2.5 | 2.5 | 5.0 | 6.0 | 2.5 | 13.0 | 6.0 | 11.0 | 6.0 | 3.0 |
| 10.0 | 10.0 | 12.0 | 13.0 | 5.0 | 12.0 | 7.0 | 8.0 | 23.0 | 13.0 | 3.0 | 5.5 | 3.0 | | 2.0 | |
| 2.0 | 3.0 | 3.0 | | 2.0 | 1.0 | 2.0 | 3.0 | 4.0 | 2.0 | 3.0 | 1.0 | 2.5 | 1.0 | | 1.0 |
| 2.0 | 1.0 | 1.0 | 2.0 | 2.5 | 1.5 | 2.5 | 2.5 | 8.0 | 2.5 | 1.5 | 5.5 | 1.5 | 6.0 | 10.5 | 10.0 |
| 3.5 | 8.5 | 10.5 | 11.0 | 6.0 | 10.5 | 8.0 | 8.0 | 3.5 | 6.0 | 10.5 | 2.5 | 5.5 | 2.0 | 4.5 | 8.0 |
| 2.0 | 2.5 | 5.0 | 7.0 | 4.0 | 4.0 | 6.0 | 6.0 | 1.0 | 2.0 | 5.0 | 5.0 | | | | 2.0 |
| 2.0 | 1.0 | 1.0 | 3.0 | 2.0 | 1.0 | 2.0 | 1.0 | | | | | 1.0 | | | 2.0 |
| | 1.0 | 1.0 | | | 2.0 | 1.0 | 1.5 | 1.5 | 1.0 | 1.0 | | 2.0 | 2.0 | 3.0 | 1.0 |
| 2.0 | 2.0 | | 3.0 | 3.0 | 3.0 | 4.0 | 8.0 | 2.0 | 1.5 | | 2.0 | 1.0 | | | 3.0 |
| 1.0 | 2.0 | 0.5 | | 1.5 | 1.0 | 1.0 | 1.0 | 0.5 | 1.0 | 1.5 | 1.0 | | | 1.5 | |
| 1.0 | | 1.0 | | 1.0 | 1.0 | 1.0 | | 0.5 | | 0.5 | 1.0 | 1.0 | 1.0 | 4.0 | 1.0 |
| 5.0 | 3.0 | 1.0 | 4.0 | 0.5 | 7.0 | 6.0 | 4.0 | 2.0 | 2.0 | 2.0 | | 1.0 | 3.0 | 2.0 | 3.0 |
| | 2.0 | 2.0 | | 2.0 | | 1.0 | | | 0.5 | | 3.5 | | | 1.0 | |
| | | | | 1.0 | 1.0 | 1.0 | 0.5 | 0.5 | | | | | | | |
| | | | | 0.5 | 1.0 | 0.5 | | 2.0 | 1.0 | | | | | | 1.0 |
| 0.5 | 1.0 | | | | | | | | | | | | | | |
| 1.0 | | | | | | | 1.0 | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | 36.0 | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | 28.0 | | | | | | | | | | | | | |

Schedule 4.17
Timeshare Interests as of 12/29/10
Inventory

| 111.0 | 116.0 | 108.0 | 113.0 | 119.0 | 106.0 | 106.0 | 94.0 | 100.0 | 101.0 | 70.0 | 84.0 | 108.0 | 120.0 | 115.0 | 116.0 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 32.5 | 37.0 | 37.0 | 33.5 | 26.5 | 32.5 | 31.0 | 31.0 | 30.5 | 27.5 | 36.0 | 33.5 | 29.0 | 29.5 | 32.0 | 31.5 |
| 177.0 | 187.0 | 188.5 | 176.0 | 172.5 | 166.0 | 143.5 | 144.5 | 142.0 | 134.0 | 140.5 | 173.5 | 165.5 | 189.0 | 182.5 | 197.5 |
| 159.0 | 194.0 | 190.0 | 156.5 | 157.5 | 150.5 | 123.5 | 123.5 | 124.0 | 129.0 | 133.5 | 143.5 | 167.0 | 187.0 | 183.0 | 184.0 |
| 38.0 | 40.0 | 36.0 | 40.0 | 39.0 | 39.0 | 38.0 | 40.0 | 38.0 | 36.0 | 36.0 | 35.0 | 38.0 | 35.0 | 41.0 | 37.0 |
| 4.0 | 3.0 | 5.5 | 4.0 | 3.0 | 3.0 | 3.0 | 4.0 | 5.0 | 4.0 | 6.0 | 2.5 | 3.5 | 4.0 | 4.0 | 7.0 |
| 1.0 | 4.0 | 3.0 | 2.0 | 4.0 | 5.0 | 3.0 | | 1.0 | 4.0 | 5.0 | 3.0 | 4.0 | 2.0 | 4.0 | 7.0 |
| 29.0 | 28.0 | 28.0 | 23.0 | 16.0 | 14.0 | 10.0 | 9.0 | 11.0 | 17.0 | 20.0 | 113.0 | 28.0 | 32.0 | 30.0 | 32.0 |
| 9.0 | 11.5 | 9.0 | 8.0 | 6.5 | 8.5 | 8.0 | 8.0 | 9.5 | 9.0 | 6.0 | 7.5 | 12.0 | 10.0 | 6.5 | 9.5 |
| 21.0 | 21.0 | 21.5 | 15.5 | 18.5 | 10.0 | 10.5 | 11.5 | 11.0 | 10.5 | 12.0 | 21.5 | 20.0 | 21.5 | 22.0 | 18.5 |
| 4.0 | 5.0 | 5.0 | 2.5 | 1.0 | 2.5 | 1.0 | 2.5 | 3.0 | 3.5 | 1.5 | 3.0 | 4.5 | 4.5 | 4.5 | 4.5 |
| 3.0 | 8.5 | 1.5 | 6.0 | 10.0 | 6.0 | 6.0 | 6.5 | 7.5 | 7.0 | 6.0 | 4.5 | 7.0 | 9.0 | 8.0 | 5.5 |
| | | | 1.0 | -0.5 | | | | 1.5 | 1.0 | | | 2.5 | 1.0 | | 2.0 |
| 103.0 | 101.0 | 104.0 | 108.0 | 107.0 | 109.0 | 98.0 | 99.0 | 98.0 | 98.0 | 103.0 | 105.0 | 95.0 | 105.0 | 107.0 | 108.0 |
| 22.0 | 16.5 | 18.0 | 24.0 | 23.5 | 23.5 | 24.0 | 25.5 | 22.0 | 24.5 | 20.0 | 24.5 | 25.0 | 19.0 | 15.0 | 20.0 |
| 15.0 | 1.0 | 17.0 | 13.5 | 16.0 | 14.0 | 13.5 | 15.5 | 10.5 | 11.5 | 12.5 | 14.0 | 15.5 | 16.5 | 16.0 | 15.5 |
| 5.0 | 6.0 | 1.0 | 5.0 | 4.0 | 3.0 | 5.0 | 4.0 | 5.0 | 3.0 | 3.0 | 5.0 | 5.0 | 1.0 | 5.0 | 4.5 |
| 18.5 | 19.0 | 17.0 | 22.0 | 15.5 | 21.5 | 17.5 | 18.0 | 21.5 | 22.0 | 19.5 | 20.5 | 20.5 | 20.0 | 17.0 | 20.5 |
| 114.0 | 110.0 | 106.0 | 113.0 | 105.0 | 106.0 | 94.0 | 111.0 | 107.0 | 107.0 | 101.0 | 113.0 | 103.0 | 106.0 | 107.0 | 105.0 |
| 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 |

| | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 |
|---|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
| | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 |
| | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 |
| | 13.5 | 16.5 | 6.0 | 5.0 | 6.0 | 9.0 | 7.0 | 11.0 | 10.0 | 11.0 | 10.0 | 14.0 | 17.0 | 15.0 | 15.0 | 13.0 |
| | 11.0 | 14.0 | 19.0 | 18.5 | 19.0 | 25.0 | 24.0 | 60.0 | 64.5 | 79.0 | 61.5 | 57.5 | 52.0 | 58.5 | 61.5 | 63.0 |
| | 17.5 | | 22.0 | 21.0 | 17.0 | 15.0 | 18.0 | 51.5 | 44.0 | 49.0 | 54.5 | 48.0 | 48.0 | 53.5 | 47.5 | 50.0 |
| | 1.0 | 1.0 | | | | | | 1.0 | 1.0 | | 1.0 | | 1.0 | 2.0 | | 1.0 |
| | 5.0 | 5.0 | 4.0 | 5.0 | 7.0 | 6.0 | 7.0 | 6.0 | 5.0 | 2.0 | 5.0 | 4.0 | 5.0 | 6.0 | 5.0 | 5.0 |
| | 4.0 | 3.0 | 4.0 | 4.0 | 5.0 | 7.0 | | 3.0 | 5.0 | 5.0 | 8.0 | 5.0 | 4.0 | 7.0 | 7.0 | 5.0 |
| | | | | | | | 7.0 | | 5.0 | 14.0 | 15.0 | 13.0 | 16.0 | 12.0 | 9.0 | 10.0 |
| | 21.5 | 19.5 | 22.5 | 21.0 | 19.5 | 20.5 | 18.5 | 21.0 | 27.5 | 27.0 | 27.0 | 27.0 | 19.5 | 22.5 | 28.0 | 27.0 |
| | 2.0 | 2.0 | 1.5 | 2.5 | 1.0 | 2.0 | 10.5 | 3.0 | 4.0 | 4.5 | 1.5 | 4.5 | 2.5 | 1.5 | 5.5 | 5.0 |
| | 6.5 | | 0.5 | 0.5 | | 0.5 | 2.5 | 3.0 | 2.0 | 1.5 | 6.0 | 2.0 | | 1.0 | 2.0 | 1.5 |
| | 1.5 | 6.0 | 4.5 | 7.0 | 6.0 | 6.0 | 7.0 | 6.5 | 8.0 | 6.5 | | 11.0 | 10.5 | 8.5 | 11.0 | 7.0 |
| | 3.5 | | 3.0 | 2.0 | 2.5 | 3.0 | 2.0 | 3.0 | 2.5 | 2.5 | | 2.0 | 3.0 | | 1.0 | 2.0 |
| | 1.0 | 3.0 | | | | | | | | | 1.0 | | | 3.0 | | |
| | 2.0 | 1.0 | 1.5 | 3.5 | 2.0 | 2.5 | 1.5 | 3.0 | 2.5 | 6.0 | 6.5 | 8.5 | 9.0 | 5.0 | 7.5 | 4.5 |
| | 1.0 | | 0.5 | 1.5 | 1.5 | 1.5 | 3.0 | 2.5 | 4.0 | 6.0 | 4.0 | 5.5 | 5.0 | 5.0 | 5.0 | 6.5 |
| | | 3.0 | 1.0 | 1.0 | 1.0 | 2.0 | 1.0 | | 2.0 | 2.0 | 1.0 | 1.0 | 2.0 | 1.0 | 1.0 | 4.0 |
| | 3.0 | | 1.0 | | | | 1.0 | 1.0 | | 1.0 | | | | | | |
| | 6.5 | 6.5 | 5.0 | 5.0 | 7.5 | 13.0 | 16.0 | 10.0 | 13.0 | 6.0 | 14.0 | 16.0 | 14.0 | 17.0 | 19.0 | 23.0 |
| | 54.5 | 6.0 | 10.5 | 6.0 | 7.5 | 11.0 | 9.5 | 5.0 | 13.0 | 21.0 | 10.0 | 9.0 | 5.5 | 15.0 | 7.0 | 8.0 |
| | 47.5 | 49.5 | 62.5 | 63.5 | 60.0 | 64.0 | 58.0 | 48.0 | 48.5 | 39.5 | 41.0 | 48.0 | 48.0 | 55.0 | 53.5 | 60.0 |
| | 4.0 | 47.5 | 42.5 | 48.5 | 31.0 | 42.5 | 47.5 | 36.0 | 46.0 | 38.0 | 39.5 | 48.5 | 44.5 | 45.0 | 44.5 | 46.5 |
| | 1.0 | 1.0 | 2.0 | 1.0 | 3.0 | 3.0 | 1.0 | 1.0 | 4.0 | 2.0 | 4.0 | 4.0 | 9.0 | 6.0 | 5.0 | 9.0 |
| | 3.0 | | 1.0 | | | | | | 1.0 | | | 1.0 | 2.0 | 1.0 | | |
| | | 5.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 3.0 | 1.0 | | | | 1.0 | 1.0 | 1.0 |
| | 3.0 | 6.0 | 3.0 | 6.0 | 9.0 | 6.0 | 3.0 | 1.0 | | 5.0 | 6.5 | | 3.5 | 1.0 | 0.5 | 3.0 |
| | 4.0 | 8.0 | 3.0 | 3.0 | 7.5 | 9.0 | 5.5 | 4.5 | 6.0 | 11.0 | 7.5 | | 8.0 | 4.5 | 5.0 | 2.5 |
| | 4.5 | | 6.0 | 4.0 | | | 6.5 | 4.5 | | | 0.5 | 9.0 | | | | 10.0 |
| | 0.5 | 2.5 | 1.0 | 0.5 | | 0.5 | 0.5 | 0.5 | | 0.5 | | | 1.5 | 1.5 | 0.5 | 2.5 |

4.17

| 10.5 | 7.5 | 8.5 | 8.0 | 5.5 | 9.5 | 8.5 | 9.0 | 15.0 | 10.5 | 10.0 | 11.0 | 11.5 | 15.0 | 13.0 | 10.5 |
|------|-----|-----|-----|-----|-----|-----|-----|------|------|------|------|------|------|------|------|
| 10.5 | 1.0 | 7.0 | 5.0 | 6.0 | 6.0 | 11.0 | 17.0 | 12.0 | 14.0 | 16.0 | 15.0 | 11.0 | 10.0 | 1.0 | 1.0 |
| 11.0 | 8.0 | 2.5 | 2.0 | 1.0 | 2.0 | 0.5 | 2.0 | 3.0 | 14.0 | 2.0 | 3.0 | 2.5 | 2.0 | 4.5 | 0.5 |
| 2.0 | 3.0 | 2.5 | 3.0 | 0.5 | 4.5 | 0.5 | 2.5 | 3.5 | 1.5 | 2.0 | 2.5 | 2.5 | 0.5 | | 2.0 |
| 2.0 | 1.0 | 1.0 | 3.0 | | | 1.0 | 1.0 | | | | 1.0 | 1.0 | | | |
| 5.0 | 4.0 | 3.5 | 2.0 | 6.5 | 2.0 | 5.0 | 3.0 | | 6.0 | 4.5 | 4.5 | 5.5 | 3.5 | 5.0 |
| 10.0 | 19.0 | 9.0 | 13.0 | 9.0 | 19.0 | 21.0 | 15.0 | 5.0 | 18.0 | 16.0 | 14.0 | 9.0 | | 9.0 | 10.0 |
| 2.0 | 3.0 | 3.0 | 1.0 | 5.0 | 1.0 | 1.0 | 1.0 | 3.0 | 5.0 | | 3.0 | 2.0 | | 2.0 | 2.0 |
| 1.0 | 3.5 | 2.0 | | | 1.0 | 1.0 | 1.0 | 6.5 | 1.0 | 2.0 | 3.0 | 2.0 | | 2.0 | 2.0 |
| 9.5 | 6.5 | 4.5 | 6.0 | 5.5 | 6.0 | 6.0 | 3.0 | 6.5 | 6.5 | | 2.5 | 4.5 | | 6.0 | 5.0 |
| 5.0 | 5.0 | 2.0 | 4.5 | 6.5 | 7.5 | 4.5 | 4.0 | 7.0 | 4.0 | | 11.0 | 6.5 | | 13.5 | 7.5 |
| | | | | | | 1.0 | 1.0 | | 1.0 | | 8.0 | 1.0 | | 5.5 | 2.5 |
| 2.0 | 2.0 | 1.0 | 2.0 | 2.0 | | 1.0 | 1.0 | | | 3.0 | | | | | 1.0 |
| 2.0 | | | 3.0 | 1.0 | 3.0 | 1.0 | | 1.0 | | 1.5 | 1.0 | 2.0 | | 2.0 | 1.0 |
| 4.5 | 1.5 | 0.5 | 1.0 | 0.5 | | 0.5 | | 2.5 | 0.5 | | | | | 1.5 | 1.5 |
| 1.0 | 1.0 | 1.0 | | 1.5 | 1.0 | 1.5 | | | 2.0 | | | | | 1.0 | 1.0 |
| | | 0.5 | 0.5 | 0.5 | 1.0 | 1.0 | 1.0 | 1.0 | | 2.0 | 1.0 | 1.0 | | | 1.0 |
| 1.5 | 1.0 | 5.0 | 3.0 | 2.0 | 5.0 | 3.0 | 5.0 | | 7.0 | | 3.0 | 1.0 | | 5.0 | 4.0 |
| 3.0 | 2.0 | | | | | | | | 1.0 | | | | | 2.0 | |
| | | | | | | | | | | | | | | | |
| 1.0 | 1.0 | 1.5 | 1.0 | 0.5 | 1.5 | 3.0 | 1.0 | 1.5 | 1.0 | 0.5 | | | | 1.0 | |
| | 1.0 | 1.0 | 1.0 | 1.0 | | 1.0 | | | | | | | | | |
| | 1.0 | 1.0 | | 1.0 | | 1.0 | | | | 1.0 | | | | | |
| | | | | | | | | | | | | | | | |
| | | | 2.0 | | 2.0 | 10.0 | 8.0 | 12.0 | 14.0 | | | | | 36.0 | |
| | | | | | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | | | | | 10.0 | |
| | | | | | | 15.0 | 18.0 | | | | | | | | |
| | | | | | 40.0 | 24.0 | 28.0 | 24.0 | | | | | | | |
| | | | | | | 24.0 | | 24.0 | | | | | | | |

Timeshare Interests as of 12/29/10

| | | | | | | Inventory | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 112.0 | 114.0 | 116.0 | 112.0 | 106.0 | 99.0 | 24.0 | 36.0 | 24.0 | 36.0 | 93.0 | 96.0 | 93.0 | 91.0 | 91.0 |
| 30.5 | 28.5 | 35.0 | 34.0 | 29.0 | 31.5 | 30.5 | 26.0 | 20.0 | 67.0 | 33.0 | 36.5 | 25.0 | 31.5 | 33.0 |
| 181.0 | 168.5 | 168.5 | 165.0 | 159.0 | 166.5 | 148.5 | 134.0 | 130.5 | 146.5 | 144.0 | 149.0 | 137.0 | 133.5 | 122.5 |
| 157.5 | 152.0 | 152.0 | 168.5 | 162.5 | 155.5 | 129.0 | 131.0 | 130.5 | 122.0 | 120.5 | 127.0 | 123.0 | 127.0 | 122.5 |
| 39.0 | 42.0 | 38.0 | 41.0 | 41.0 | 42.0 | 31.0 | 24.0 | 32.0 | 27.0 | 38.0 | 33.0 | 36.0 | 39.0 | 34.0 |
| 2.0 | 3.0 | 3.0 | 1.0 | 2.0 | 1.0 | 2.0 | 3.0 | 4.0 | 2.0 | 1.0 | 2.0 | 1.0 | 1.0 | 3.0 |
| 4.0 | 3.0 | 3.0 | 2.0 | | | | | | | | | | | 2.0 |
| 29.0 | 29.0 | 27.0 | 24.0 | 27.0 | 30.0 | 17.0 | 9.0 | 8.0 | 18.0 | 17.0 | 13.0 | 18.0 | 23.0 | 19.0 |
| 6.5 | 6.5 | 8.0 | 9.5 | 8.5 | 8.0 | 6.5 | 4.5 | 4.5 | 4.5 | 5.0 | 9.0 | 6.5 | 3.5 | 2.5 |
| 19.5 | 18.5 | 19.5 | 17.5 | 15.0 | 9.0 | 12.0 | 16.0 | 10.5 | 13.5 | 12.5 | 15.5 | 20.0 | 15.5 | 11.0 |
| 3.5 | 3.5 | 4.0 | 4.5 | 4.0 | 2.0 | 1.5 | 3.0 | 3.0 | 3.0 | 3.0 | 3.5 | 2.5 | 2.5 | 1.0 |
| 7.0 | 4.5 | 5.5 | 7.0 | 8.0 | 6.5 | 2.5 | 7.0 | 9.0 | 8.5 | 7.5 | 5.5 | 7.0 | 5.5 | 6.5 |
| 0.5 | | 1.0 | | | | | | 0.5 | 1.0 | | 1.0 | | 1.0 | 1.0 |
| 104.0 | 106.0 | 105.0 | 99.0 | 97.0 | 101.0 | 80.0 | 70.0 | 80.0 | 69.0 | 109.0 | 107.0 | 109.0 | 105.0 | 100.0 |
| 23.5 | 24.0 | 23.5 | 23.5 | 24.0 | 23.5 | 23.0 | 27.0 | 21.0 | 18.5 | 19.5 | 18.0 | 22.0 | 18.0 | 18.5 |
| 15.0 | 15.0 | 12.0 | 14.5 | 14.0 | 13.5 | 12.0 | 11.5 | 11.5 | 8.5 | 10.5 | 9.5 | 13.0 | 10.0 | 7.5 |
| 4.0 | 4.0 | 5.0 | 5.0 | 4.0 | 5.0 | 5.0 | 3.0 | 3.0 | 5.0 | 5.0 | 5.0 | 4.0 | 4.0 | 2.0 |
| 19.0 | 17.5 | 19.5 | 19.5 | 19.5 | 19.5 | 17.0 | 21.0 | 18.0 | 21.0 | 17.0 | 22.0 | 20.0 | 19.0 | 20.5 |
| 108.0 | 106.0 | 108.0 | 103.0 | 102.0 | 94.0 | 91.0 | 64.0 | 72.0 | 60.0 | 109.0 | 104.0 | 106.0 | 99.0 | 89.0 |
| 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 |

| 45 | 46 | 47 | 48 | 49 | 50 | 51 | 52 | Grand Total |
|---|---|---|---|---|---|---|---|---|
| 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 780.0 |
| 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 780.0 |
| 14.0 | 11.0 | 10.0 | 16.0 | 16.0 | 11.0 | 1.0 | 4.0 | 446.0 |
| 68.5 | 23.0 | 29.0 | 62.0 | 75.0 | 62.0 | 18.0 | 19.5 | 1,994.0 |
| 50.0 | 18.5 | 20.0 | 47.0 | 54.0 | 47.5 | 1.0 | 3.5 | 1,423.5 |
|  |  |  |  | 1.0 | 1.0 |  |  | 16.0 |
| 4.0 | 5.0 | 3.0 | 3.5 | 4.0 | 4.0 | 3.0 | 3.0 | 189.5 |
| 6.0 | 8.0 | 3.0 | 5.0 | 5.0 | 5.0 | 4.0 |  | 186.0 |
| 8.0 | 14.0 | 11.0 | 11.0 | 11.0 | 17.0 |  |  | 308.5 |
| 20.5 | 20.0 | 21.5 | 27.5 | 27.5 | 28.5 | 21.0 | 20.0 | 1,116.0 |
| 9.0 | 9.5 | 11.0 | 5.5 | 5.0 | 2.5 | 0.5 | 2.0 | 200.0 |
| 3.0 | 3.0 | 3.0 | 3.0 | 2.0 | 2.5 | 12.0 | 14.0 | 54.5 |
| 11.0 | 9.5 | 20.0 | 21.0 | 10.0 | 11.0 | 1.0 | 0.5 | 537.0 |
| 3.0 | 2.0 | 3.0 | 2.0 | 2.0 | 2.0 |  |  | 79.5 |
|  |  | 1.0 |  |  | 1.0 |  |  | 7.0 |
| 7.0 | 4.0 | 1.0 | 6.5 | 10.5 | 7.5 | 4.0 | 2.5 | 269.5 |
| 5.0 | 5.5 | 3.0 | 6.0 | 7.0 | 5.0 |  | 1.0 | 163.0 |
| 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 2.0 |  | 3.0 | 79.0 |
|  |  |  |  |  |  |  |  | 4.0 |
|  |  |  |  | 1.0 |  |  |  | 10.0 |
| 16.0 | 5.0 | 12.0 | 19.0 | 21.0 | 19.0 | 13.0 | 4.0 | 594.0 |
| 11.0 | 9.5 | 9.5 | 13.5 | 9.5 | 12.5 | 2.5 | 5.0 | 473.0 |
| 44.5 | 56.0 | 56.0 | 56.0 | 45.0 | 52.0 | 38.5 | 31.0 | 2,514.0 |
| 48.0 | 42.5 | 40.5 | 56.0 | 42.0 |  | 37.0 | 34.0 | 2,192.5 |
| 2.0 | 3.0 | 7.0 | 6.0 | 5.0 | 4.0 | 3.0 | 4.0 | 241.0 |
|  |  |  |  |  | 2.0 |  |  | 27.5 |
| 1.0 | 1.0 | 2.0 | 3.0 | 2.0 | 2.0 | 2.0 | 1.0 | 26.0 |
|  |  |  |  | 2.0 | 2.0 | 5.0 |  | 109.0 |
| 1.0 | 1.0 |  | 3.0 | 1.5 | 1.5 | 2.5 | 1.5 | 151.0 |
| 3.0 | 4.5 | 4.0 | 0.5 | 6.5 | 8.5 | 6.0 | 4.5 | 306.0 |
| 5.5 | 0.5 | 0.5 | 7.5 | 1.5 | 1.0 | 0.5 | 1.0 | 41.0 |

Schedule 4.17
Timeshare Interests as of 12/29/10

| | | | | | | | | | Inventory |
|---|---|---|---|---|---|---|---|---|---|
| 8.0 | 6.0 | 2.0 | 1.0 | 5.0 | 8.0 | 1.0 | 6.5 | 3.0 | 392.0 |
| | | | | | 1.0 | | 8.0 | 1.0 | 356.0 |
| 12.0 | 21.0 | 8.0 | 11.0 | 13.0 | 19.0 | 3.0 | 8.0 | 8.0 | 585.0 |
| 3.0 | 1.5 | 3.0 | 1.0 | 3.0 | 3.5 | 3.0 | 0.5 | 1.5 | 116.0 |
| 1.5 | | 0.5 | | 2.0 | 3.5 | 1.0 | 1.0 | 3.0 | 73.0 |
| | | | 1.0 | | | | | | 17.0 |
| 3.5 | 7.0 | 3.0 | 4.0 | 5.0 | 2.0 | 5.5 | 4.0 | 205.0 |
| 17.0 | 19.0 | 16.0 | 9.0 | 12.0 | 14.0 | 7.0 | 2.0 | 607.0 |
| 2.0 | 3.0 | 2.0 | 3.0 | 5.0 | 2.0 | 1.0 | 112.0 |
| 7.0 | | 1.0 | 3.0 | 3.0 | 2.0 | 4.0 | 2.0 | 113.5 |
| 4.5 | 4.5 | 3.5 | 5.0 | 6.5 | 10.5 | 8.0 | 2.0 | 356.5 |
| 3.5 | 4.5 | 6.0 | 3.5 | 3.5 | 8.0 | 1.5 | 2.5 | 249.5 |
| 1.0 | | 1.0 | 2.0 | 1.0 | 1.0 | 46.0 |
| 1.0 | | | | | | 1.0 | 25.5 |
| | 2.0 | 3.0 | 3.0 | 2.0 | 2.0 | 3.0 | 1.0 | 123.0 |
| 0.5 | 2.5 | 0.5 | | 0.5 | 0.5 | 1.5 | 55.0 |
| 0.5 | | | | 1.0 | 1.0 | 1.0 | 30.0 |
| | | | 2.0 | 1.0 | | 12.0 |
| 0.5 | 1.0 | | 0.5 | 0.5 | 0.5 | 0.5 | 25.0 |
| 1.0 | 3.0 | 5.0 | 6.0 | 8.0 | 8.0 | 3.0 | 4.0 | 194.0 |
| | 1.0 | 1.0 | | | | 13.0 |
| | | | | | | 10.0 |
| 2.0 | | 1.0 | 1.0 | | 0.5 | 0.5 | 34.0 |
| | | 0.5 | 1.5 | | | 5.0 |
| | | 2.0 | | | | 4.0 |
| | | | | | | 4.0 |
| | | | | | | 1.0 |
| | | | | | | 1.0 |
| | 1.0 | | | | | 128.0 |
| | | | | | | 44.0 |
| | | | | | | 6.0 |
| | | | | | | 8.0 |
| | | | | | | 33.0 |
| | | | | | | 116.0 |
| | | | | | | 24.0 |

Timeshare Interests as of 12/29/10

| | | | | | | | | | Inventory |
|---|---|---|---|---|---|---|---|---|---|
| 96.0 | 109.0 | 103.0 | 90.0 | 96.0 | 96.0 | 114.0 | 119.0 | 120.0 | 5,363.0 |
| 24.0 | 32.5 | 31.5 | 28.5 | 29.5 | 27.5 | 35.5 | 35.0 | | 1,597.5 |
| 137.5 | 171.5 | 166.5 | 130.5 | 137.5 | 137.5 | 190.5 | 202.5 | | 8,495.5 |
| 120.5 | 159.5 | 158.5 | 118.0 | 124.0 | 117.5 | 185.5 | 184.5 | | 7,806.5 |
| 41.0 | 41.0 | 36.0 | 36.0 | 37.0 | 38.0 | 40.0 | 40.0 | | 1,936.0 |
| 3.0 | 2.0 | 3.0 | 4.5 | 4.0 | 2.0 | 3.0 | 4.0 | | 193.0 |
| 2.0 | | 5.0 | 3.0 | 1.0 | 2.0 | 4.0 | 8.0 | | 196.0 |
| 23.0 | 18.0 | 22.0 | 19.0 | 20.0 | 14.0 | 27.0 | 31.0 | | 1,286.0 |
| 8.5 | 7.5 | 6.5 | 4.0 | 3.0 | 2.5 | 8.5 | 10.5 | | 397.0 |
| 11.5 | 12.0 | 10.0 | 13.0 | 14.5 | 12.0 | 19.5 | 19.5 | | 846.0 |
| 2.0 | 1.5 | 1.5 | 2.5 | 1.5 | 1.5 | 4.5 | 4.0 | | 164.5 |
| 5.0 | 8.5 | 2.0 | 2.0 | 9.0 | 5.0 | 5.5 | 7.0 | | 319.0 |
| | | | 1.0 | 1.0 | 2.0 | 2.0 | 1.5 | | 40.5 |
| 104.0 | 98.0 | 104.0 | 102.0 | 100.0 | 94.0 | 105.0 | 107.0 | | 5,197.0 |
| 19.5 | 21.0 | 26.5 | 20.5 | 16.5 | 18.5 | 25.0 | 24.5 | | 1,120.5 |
| 12.5 | 11.0 | 14.5 | 11.0 | 8.5 | 8.5 | 16.0 | 13.0 | | 689.0 |
| 5.0 | 4.0 | 5.0 | 3.0 | 3.0 | 4.0 | 5.0 | 3.0 | | 204.0 |
| 20.0 | 17.0 | 21.0 | 19.5 | 18.5 | 21.5 | 18.0 | 19.5 | | 980.0 |
| 102.0 | 98.0 | 99.0 | 105.0 | 101.0 | 98.0 | 110.0 | 114.0 | | 5,309.0 |
| 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 1,177.0 | 61,204.0 |

## Schedule 4.17
### Pending

| Cont Date | Res | Cost | Purch Price | DP Rcvd | Down Due | Due Date | Equity Traded | Cash Received |
|---|---|---|---|---|---|---|---|---|
| 6/22/2010 | BSC | 6968.1 | $ 8,900.00 | $ 920.00 | $ 960.00 | 10/22/2010 | | |
| 6/24/2010 | ORB | 19607.1 | $ 8,900.00 | $ 1,635.00 | $ 239.00 | 10/24/2010 | | |
| 7/23/2010 | BII | 62251.1 | $ 9,900.00 | $ 950.00 | $ 1,030.00 | 2/15/2011 | | |
| 7/22/2010 | BII | 62278.1 | $ 8,400.00 | $ 1,774.00 | $ - | | | |
| 7/31/2010 | BII | 62293.1 | $ 8,600.00 | $ 700.67 | $ 226.34 | 1/24/2011 | | |
| 7/31/2010 | CII | 4735.1 | $ 10,500.00 | $ 1,066.40 | $ 1,149.60 | 1/20/2011 | | |
| 8/1/2010 | BII | 62296.1 | $ 8,400.00 | $ 1,626.15 | $ 147.85 | 2/1/2011 | | |
| 9/3/2010 | BII | 62863.1 | $ 7,490.00 | $ 760.00 | $ 230.00 | 2/3/2011 | | |
| 9/12/2010 | BII | 62493.1 | $ 8,600.00 | $ 1,621.00 | $ 192.00 | 1/12/2011 | | |
| 9/21/2010 | BII | 62527.1 | $ 8,400.00 | $ 100.00 | $ 787.00 | 11/1/2010 | | |
| 9/25/2010 | CII | 4765.1 | $ 19,600.00 | $ 4,052.11 | $ - | | | |
| 10/5/2010 | BII | 62572.1 | $ 8,900.00 | $ 827.00 | $ 1,047.00 | 2/5/2011 | | |
| 10/8/2010 | BII | 62586.1 | $ 8,400.00 | $ 989.00 | $ 789.00 | 2/8/2011 | | |
| 10/10/2010 | BII | 62596.1 | $ 8,400.00 | $ 887.00 | $ 665.25 | 2/15/2011 | | |
| 10/10/2010 | BII | 62599.1 | $ 7,500.00 | $ 864.00 | $ 727.00 | 12/12/2010 | | |
| 10/14/2010 | BII | 62615.1 | $ 5,500.00 | $ 1,100.00 | $ - | | | |
| 10/17/2010 | BII | 62623.1 | $ 8,400.00 | $ 724.01 | $ 1,047.99 | 2/17/2011 | | |
| 10/17/2010 | BII | 62626.1 | $ 7,100.00 | $ 1,180.00 | $ 339.00 | 1/17/2011 | | |
| 10/23/2010 | BII | 62640.1 | $ 8,400.00 | $ 986.00 | $ 788.00 | 2/23/2011 | | |
| 11/5/2010 | BSC | 7025.1 | $ 9,500.00 | $ 716.00 | $ 1,292.00 | 2/1/2011 | | |
| 11/6/2010 | BII | 62694.1 | $ 8,496.00 | $ 726.66 | $ 1,053.34 | 2/6/2011 | | |
| 11/12/2010 | BII | 62703.1 | $ 12,900.00 | $ 1,062.00 | $ 283.00 | 2/12/2011 | | |
| 11/13/2010 | BII | 62709.1 | $ 8,400.00 | $ 529.00 | $ 800.00 | 2/15/2011 | | |
| 11/21/2010 | BII | 62793.1 | $ 8,420.00 | $ 8,000.00 | $ 420.00 | 1/26/2011 | | |
| 11/27/2010 | BII | 62755.1 | $ 8,500.00 | $ 703.66 | $ 233.34 | 1/30/2011 | | |
| 11/29/2010 | BII | 62763.1 | $ 8,900.00 | $ 450.00 | $ 500.00 | 2/28/2011 | | |
| 12/1/2010 | BII | 62767.1 | $ 8,440.00 | $ 540.00 | $ 8,450.00 | 2/15/2011 | | |
| 12/3/2010 | BII | 62774.1 | $ 9,900.00 | $ 300.00 | $ 690.00 | 1/30/2011 | | |
| 12/8/2010 | BAL | 18646.1 | $ 22,300.00 | $ 4,380.00 | $ - | | $ 4,380.00 | |
| 12/9/2010 | BSC | 7099.1 | $ 17,551.00 | $ 9,150.00 | $ - | | $ 9,150.00 | |
| 12/13/2010 | BAL | 18652.1 | $ 24,700.00 | $ 15,888.00 | $ - | | $ 15,888.00 | |
| 12/14/2010 | BII | 62795.1 | $ 8,900.00 | $ 350.00 | $ 600.00 | 1/14/2011 | | |
| 12/18/2010 | BAL | 18657.1 | $ 23,500.00 | $ 13,500.00 | $ - | | $ 12,500.00 | |
| 12/19/2010 | ORB | 19788.1 | $ 8,900.00 | $ 900.00 | $ 973.00 | 2/5/2011 | | |
| 12/21/2010 | BII | 62816.1 | $ 17,850.00 | $ 2,642.00 | $ 150.00 | 2/20/2011 | $ 2,903.00 | $ 399.00 |
| 12/23/2010 | BSC | 7046.1 | $ 20,800.00 | $ 1,653.00 | $ 511.00 | 1/25/2011 | $ 1,653.00 | |
| 12/26/2010 | BII | 62826.1 | $ 13,900.00 | $ 250.00 | $ 2,650.00 | 1/15/2011 | | |
| 1/4/2011 | BII | 62855.1 | $ 8,402.00 | $ 1,195.00 | $ 578.00 | 2/15/2011 | $ 1,195.00 | |
| 1/8/2011 | BII | 62861.1 | $ 20,100.00 | $ 2,010.00 | $ - | | | |
| 1/9/2011 | BII | 62864.1 | $ 12,000.00 | $ 350.00 | $ 1,000.00 | 1/28/2011 | | |
| 1/13/2011 | BII | 62875.1 | $ 8,765.00 | $ 200.00 | $ 724.00 | 2/15/2011 | | |
| 1/14/2011 | BII | 62865.1 | $ 8,625.00 | $ 1,353.00 | $ 7,272.00 | 1/30/2011 | | |
| 1/15/2011 | BAL | 18675.1 | $ 21,450.00 | $ 13,845.00 | $ - | | $ 13,845.00 | |
| 1/15/2011 | BAL | 18674.1 | $ 26,450.00 | $ 16,650.00 | $ - | | $ 16,650.00 | |
| 3/15/2011 | BII | 62886.1 | $ 8,400.00 | $ 4,200.00 | $ - | | | |
| 1/15/2011 | BII | 62888.1 | $ 8,400.00 | $ 887.00 | $ - | | | |
| 1/16/2011 | BII | 62892.1 | $ 17,900.00 | $ 3,117.10 | $ - | | $ 3,117.10 | |
| 1/16/2011 | BII | 62890.1 | $ 16,000.00 | $ 7,500.00 | $ - | | $ 7,500.00 | |
| 1/16/2011 | BII | 62889.1 | $ 8,400.00 | $ 200.00 | $ 687.00 | 1/30/2011 | | |
| 1/16/2011 | BSC | 7062.1 | $ 8,900.00 | $ 2,000.00 | $ - | | | |
| 1/17/2011 | BII | 62896.1 | $ 8,400.00 | $ 887.00 | $ - | | | |
| 1/17/2011 | ORB | 19831.1 | $ 9,900.00 | $ 1,038.00 | $ - | | | |
| 1/18/2011 | ORB | 19832.1 | $ 10,600.00 | $ 6,600.00 | $ - | | $ 2,400.00 | $ 4,200.00 |
| 1/18/2011 | BII | 62897.1 | $ 7,140.00 | $ 332.00 | $ 6,808.00 | 2/15/2011 | | |
| 1/18/2011 | BII | 62898.1 | $ 15,900.00 | $ 3,298.00 | $ - | | | |
| 1/18/2011 | CII | 4803.1 | $ 12,500.00 | $ 1,307.00 | $ - | | | |
| 1/20/2011 | BII | 62900.1 | $ 9,050.00 | $ 955.00 | $ - | | | |
| 1/21/2011 | BII | 62901.1 | $ 16,250.00 | $ 1,700.00 | $ - | | $ 1,700.00 | |
| 1/22/2011 | PCR | 10765.1 | $ 17,350.00 | $ 8,950.00 | $ - | | $ 8,950.00 | |
| 1/22/2011 | BII | 62902.1 | $ 9,200.00 | $ 970.00 | $ - | | | |
| 1/22/2011 | BII | 62909.1 | $ 12,900.00 | $ 2,690.00 | $ - | | | |

4.17

## Pending

| Date | Code | Number | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1/23/2011 | BII | 62905.1 | $ 19,300.00 | $ 10,900.00 | $ - | | $ 10,900.00 | |
| 1/23/2011 | CII | 4805.1 | $ 99,100.00 | $ 27,577.00 | $ - | | $ 27,577.00 | |
| 1/23/2011 | BII | 62906.1 | $ 12,400.00 | $ 1,240.00 | $ - | | | |
| 1/23/2011 | BII | 62907.1 | $ 8,400.00 | $ 887.00 | $ - | | | |
| 1/24/2011 | BAL | 18678.1 | $ 22,800.00 | $ 13,000.00 | $ - | | $ 13,000.00 | |
| 1/25/2011 | BSC | 7063.1 | $ 8,900.00 | $ 5,882.50 | $ - | | $ 2,400.00 | $ 8,482.50 |
| 1/25/2011 | BII | 62908.1 | $ 8,400.00 | $ 890.00 | $ - | | | |
| 1/25/2011 | BII | 62909.1 | $ 12,941.00 | $ 6,742.50 | $ - | | | |
| 1/26/2011 | BII | 62910.1 | $ 21,900.00 | $ 8,925.00 | $ - | | $ 8,925.00 | |
| 1/26/2011 | ORB | 19896.1 | $ 8,900.00 | $ 8,900.00 | $ - | | | |
| 1/27/2011 | BII | 62918.1 | $ 9,400.00 | $ 990.00 | $ - | | | |
| 1/28/2011 | BII | 62920.1 | $ 8,400.00 | $ 895.00 | 879.00 | | $ 895.00 | |
| 1/28/2011 | BII | 62919.1 | $ 8,300.00 | $ 977.00 | | | | |

**Schedule 4.18**
**Resort Documents**

I.    The Cove On Ormond Beach a/k/a Plantation Cove, a condominium

    (a)    Public Offering Statement Text
    (b)    Description of Exhibits List
    (c)    Declaration of Condominium and all amendments
    (d)    Association Articles of Incorporation
    (e)    Association Bylaws
    (f)    2011 Estimated Operating Budget
    (g)    Resort Affiliation Agreement
    (h)    Supplemental Declaration of Use Restrictions
    (i)    Receipt for Timeshare Documents
    (j)    Survey, Floor and Plot Plans
    (k)    Statement of Condition
    (l)    Purchase Contract
    (m)    Purchaser Deposit Escrow Agreement
    (n)    Condominium Rules and Regulations
    (o)    Percentage Interest in the Common Elements
    (p)    Management Agreement
    (q)    Amended and Restated Cross Easement Agreement
    (r)    Cross Use Easement Agreement
    (s)    Purchase Contract Conversion Addendum
    (t)    Joinder and Consent to Supplemental Declaration of Use Restrictions
    (u)    Club Navigo Conversion Contract

II.    Cove II On Ormond Beach

    (a)    Public Offering Statement Text
    (b)    Description of Exhibits List
    (c)    Declaration of Covenants, Conditions and Restrictions
    (d)    Association Articles of Incorporation
    (e)    Association Bylaws
    (f)    2011 Estimated Operating Budget
    (g)    Resort Affiliation Agreement
    (h)    Master Declaration of Covenants, Conditions and Restrictions
    (i)    Shared Facilities Agreement
    (j)    Amended and Restated Cross Easement Agreement
    (k)    Management Agreement
    (l)    Managing Entity Affidavit
    (m)    Receipt for Timeshare Documents
    (n)    Survey, Floor and Plot Plans
    (o)    Purchase Contract
    (p)    Purchaser Deposit Escrow Agreement
    (q)    Ad Valorem Tax Escrow Agreement

III. **Liki Tiki Village I (a/k/a Bali International Club Resort, a condominium)**

    (a)    Public Offering Statement Text
    (b)    Description of Exhibits List
    (c)    Declaration of Condominium and all amendments
    (d)    Association Articles of Incorporation
    (e)    Association Bylaws
    (f)    2011 Estimated Operating Budget
    (g)    Resort Affiliation Agreement
    (h)    Supplemental Declaration of Use Restrictions
    (i)    Receipt for Timeshare Documents
    (j)    Survey, Floor and Plot Plans
    (k)    Purchase Contract
    (l)    Management Agreement
    (m)    Purchaser Deposit Escrow Agreement
    (n)    Condominium Rules and Regulations
    (o)    Percentage Interest in the Common Elements
    (p)    Amended & Restated Common Facilities Agreement
    (o)    Joinder and Consent to Supplemental Declaration of Use Restrictions
    (p)    Purchase Contract Conversion Addendum
    (q)    Club Navigo Conversion Contract

IV. **Liki Tiki Village II (a/k/a Isle of Bali II, a condominium)**

    (a)    Public Offering Statement Text
    (b)    Description of Exhibits List
    (c)    Declaration of Condominium and all amendments
    (d)    Association Articles of Incorporation
    (e)    Association Bylaws
    (f)    2011 Estimated Operating Budget
    (g)    Resort Affiliation Agreement
    (h)    Supplemental Declaration of Use Restrictions
    (i)    Amended and Restated Common Facilities Agreement
    (j)    Receipt for Timeshare Documents
    (k)    Management Agreement
    (l)    Survey, Floor and Plot Plans
    (m)    Purchase Contract
    (n)    Purchaser Deposit Escrow Agreement
    (o)    Condominium Rules and Regulations
    (p)    Percentage Interest in the Common Elements
    (q)    Joinder and Consent to Supplemental Declaration of Use Restrictions
    (r)    Purchase Contract Conversion Addendum
    (s)    Club Navigo Conversion Contract

V.  <u>Bryan's Spanish Cove, a condominium</u>

    (a)    Public Offering Statement Text
    (b)    Description of Exhibits List
    (c)    Declaration of Condominium and all amendments
    (d)    Association Articles of Incorporation
    (e)    Association Bylaws
    (f)    2011 Estimated Operating Budget
    (g)    Resort Affiliation Agreement
    (h)    Supplemental Declaration of Use Restrictions
    (i)    Receipt for Timeshare Documents
    (j)    Management Agreement
    (k)    Survey and Floor and Plot Plans
    (l)    Purchase Contract
    (m)    Purchaser Deposit Escrow Agreement
    (n)    Condominium Rules and Regulations
    (o)    Joinder and Consent to Supplemental Declaration of Use Restrictions
    (p)    Purchase Contract Conversion Addendum
    (q)    Club Navigo Conversion Contract

VI.  <u>O.R.B.I.T., a condominium</u>

    (a)    Public Offering Statement Text
    (b)    Description of Exhibits List
    (c)    Declaration of Condominium and all amendments
    (d)    Association Articles of Incorporation
    (e)    Association Bylaws
    (f)    2011 Estimated Operating Budget
    (g)    Resort Affiliation Agreement
    (h)    Supplemental Declaration of Use Restrictions
    (i)    Receipt for Timeshare Documents
    (j)    Management Agreement
    (k)    Survey and Floor and Plot Plans
    (l)    Purchase Contract
    (m)    Purchaser Deposit Escrow Agreement
    (n)    Condominium Rules and Regulations
    (o)    Joinder and Consent to Supplemental Declaration of Use Restrictions
    (p)    Purchase Contract Conversion Addendum
    (q)    Club Navigo Conversion Contract

VII.  <u>Parkway International (&Parkway International II), a condominium</u>

    (a)    Public Offering Statement Text*
    (b)    Description of Exhibits List*
    (c)    Declaration of Condominium and all amendments*
    (d)    Association Articles of Incorporation

(e)      Association Bylaws
(f)      2011 Estimated Operating Budget **
(g)     2011 Estimated Operating Budget ***
(h)     Resort Affiliation Agreement*
(i)       Supplemental Declaration of Use Restrictions*
(j)      Management Agreement and amendment
(k)     Receipt for Timeshare Documents*
(l)      Survey and Floor and Plot Plans **
(m)    Purchase Contract*
(n)     Purchaser Deposit Escrow Agreement*
(o)     Joinder and Consent to Supplemental Declaration of Use Restrictions*
(p)     Condominium Rules and Regulations
(q)     Purchase Contract Conversion Addendum*
(r)     Club Navigo Conversion Contract*
(s)     Floating Use Plan Rules and Regulations***


\*       Separate documents exist for Parkway International and Parkway International II
\*\*     Document exists for Parkway International only
\*\*\*   Document exists for Parkway International II only


VIII.   <u>The Charter Club of Naples Bay</u>

(a)      Public Offering Statement Text
(b)     Description of Exhibits List
(c)     Declarations of Condominium
(d)     Association Articles of Incorporation
(e)     Association Bylaws
(f)      2011 Estimated Operating Budget
(g)     Resort Affiliation Agreement
(h)     Supplemental Declaration of Use Restrictions
(i)       Management Agreement
(j)      Receipt for Timeshare Documents
(k)     Survey, Floor and Plot Plans
(l)      Purchase Agreement
(m)    Purchaser Deposit Escrow Agreement
(n)     Condominium Rules and Regulations
(o)     Percentage Interest in the Common Elements
(p)     Joinder and Consent to Supplemental Declaration of Use Restrictions
(q)     Purchase Contract Conversion Addendum


IX.    <u>Navigo Vacation Club</u>

(a)      Club Navigo Multisite Public Offering Statement
(b)     Club Navigo Exchange Disclosure Guide for the Navigo Vacation Club, Inc. 2010

(c)     Rules and Regulations for Club Navigo

(d)     Tabular Description of Component Site Accommodations

(e)     Managing Entity Affidavits

X.     **Barefoot'n in the Keys at Old Town, A Condominium**

(a)     Public Offering Statement Text

(b)     Receipt for Timeshare Documents

(c)     Description of Exhibit List

(d)     Declaration of Condominium and all amendments

(e)     Articles of Incorporation of Barefoot'n in the Keys at Old Town Condominium Association, Inc.

(f)     Bylaws of Barefoot'n in the Keys at Old Town Condominium Association, Inc.

(g)     Management Agreement

(h)     2011 Estimated Operating Budget

(i)     Floor and Plot Plans and Survey

(j)     Purchase Contract

(k)     Purchaser Deposit Escrow Agreement

(l)     Rules and Regulations

(m)     Ad Valorem Tax Escrow Agreement

(n)     Managing Entity Affidavit

XI.     **Crescent Resort On South Beach**

(a)     Public Offering Statement Text

(b)     Description of Exhibits Not Delivered

(c)     Declaration of Covenants, Conditions and Restrictions

(d)     Association Articles of Incorporation

(e)     Association Bylaws

(f)     Estimated Operating Budget

(g)     Resort Affiliation Agreement

(h)     Master Declaration of Covenants, Conditions and Restrictions

(i)     Management Agreement

(j)     Receipt for Timeshare Documents

(k)     Survey, Floor and Plot Plans

(l)     Purchase Contract

(m)     Purchaser Deposit Escrow Agreement

(n)     Ad Valorem Tax Escrow Agreement

(o)     Club Navigo Documents

# Exhibit "D"

1. LTV III Real Property Legal Description

2. Welcome Center Legal Description

Exhibit "D" - 1.  LTV III Real Property Legal Description

## Legal Description (LTV III/Expansion Property)

That portion of the East one-half (1/2) of the Southwest one-quarter (1/4) of Section 31, Township 24 South, Range 27 East, Orange County, Florida, lying North of the Public Road Right-of-Way for Bali Road (Old State Road No. 530) as recorded in O.R. Book 845, Page 454, Public Records of Orange County, Florida.

Exhibit "D" – 2.  Welcome Center Legal Description

## Legal Description (Welcome Center)

That portion of the East 1/2 of the Southwest 1/4 of Section 31, Township 24 South, Range 27 East, Orange County, Florida, lying South of the Public Road Right-of-Way for Bali Road (Old State Road No. 530) as recorded in O.R. Book 845, Page 454, of the Public Records of Orange County, Florida and lying North of the Public Road Right-of-Way for U.S. Highway No. 192 (New State Road No. 530) as recorded in O.R. Book 1763, Pages 272 and 273, of the Public Records of Orange County, Florida,

LESS AND EXCEPT:

Lot 1 and Tract A of LIKI TIKI VILLAGE III SOUTH, according to the Plat thereof recorded in Plat Book 71, Page 104, of the Public Records of Orange County, Florida.

# Exhibit "E"

## St. Croix Property Legal Description

<u>Legal Description (St. Croix)</u>

ALL RIGHT, TITLE AND INTEREST, if any, of St. Croix One, LLC, a U.S. Virgin Islands limited liability company, in the following Plots:

> Plot 28 (13.522 U.S. acre, more or less) of Estate Green Cay, East End Quarter "A," St. Croix, US Virgin Islands, as more fully shown on OLG Drawing No. 5106-A dated May 28, 1998 (as reduced to 13.313 acres by deduction as more fully shown on OLG Drawing No. A9-1-C008 dated January 15, 2008);

> Plot 28-A (0.172 U.S. acre, more or less) of Estate Green Cay, East End Quarter "A," St. Croix, US Virgin Islands, as more fully shown on OLG Drawing No. 5106-A dated May 28, 1998;

> Plot 57 (14.950 U.S. acre) of Estate Green Cay, East End Quarter "A", St. Croix, US Virgin Islands, as more fully shown on OLG Drawing No. 4489 dated October 20, 1988.

TOGETHER WITH:

> All of the Unit Weeks described on Schedule "1", attached hereto and incorporated herein by reference, established by the Vacation Club Declaration for Chenay Bay Beach Club dated October 04, 1999, recorded October 25, 1999 in Photocopy 705, page 110, Document No. 4716 (as amended, modified and supplemented from time-to-time), in the following condominium units:

> Unit No. 7 of the Chenay Bay Beach Club Condominium located at Plots 10-A and 10-C Estate Green Cay, East End Quarter "A" as established by the Chenay Bay Beach Club Condominium Declaration dated October 04, 1999, recorded October 25, 1999 in Photocopy 705, page 123, Document No. 4717 TOGETHER WITH 14.7059% undivided interest in the Common Areas and Facilities declared in said Declaration to be an appurtenance to the above-described Condominium Unit;

> Unit No. 9 of the Chenay Bay Beach Club Condominium located at Plots 10-A and 10-C Estate Green Cay, East End Quarter "A" as established by the Chenay Bay Beach Club Condominium Declaration dated October 04, 1999, recorded October 25, 1999 in Photocopy 705, page 123, Document No. 4717 TOGETHER WITH 14.7059% undivided interest in the Common Areas and Facilities declared in said Declaration to be an appurtenance to the above-described Condominium Unit;

> Unit No. 35 of the Chenay Bay Beach Club Condominium located at Plots 10-A and 10-C Estate Green Cay, East End Quarter "A" as established by the Chenay Bay Beach Club Condominium Declaration dated October 04, 1999, recorded October 25, 1999 in Photocopy 705, page 123, Document No. 4717 TOGETHER WITH 11.7647% undivided interest in the Common Areas and Facilities declared in said Declaration to be an appurtenance to the above-described Condominium Unit;

> Unit No. 36 of the Chenay Bay Beach Club Condominium located at Plots 10-A and l0-C Estate Green Cay, East End Quarter "A" as established by the Chenay Bay Beach Club

Condominium Declaration dated October 04, 1999, recorded October 25, 1999 in Photocopy 705, page 123, Document No. 4717 TOGETHER WITH 11.7647% undivided interest in the Common Areas and Facilities declared in said Declaration to be an appurtenance to the above-described Condominium Unit;

Unit No. 47 of the Chenay Bay Beach Club Condominium located at Plots 10-A and 10-C Estate Green Cay, East End Quarter "A" as established by the Chenay Bay Beach Club Condominium Declaration dated October 04, 1999, recorded October 25, 1999 in Photocopy 705, page 123, Document No. 4717 TOGETHER WITH 11.7647% undivided interest in the Common Areas and Facilities declared in said Declaration to be an appurtenance to the above-described Condominium Unit;

Unit No. 48 of the Chenay Bay Beach Club Condominium located at Plots 10-A and 10-C Estate Green Cay, East End Quarter "A" as established by the Chenay Bay Beach Club Condominium Declaration dated October 04, 1999, recorded October 25, 1999 in Photocopy 705, page 123, Document No. 4717 TOGETHER WITH 11.7647% undivided interest in the Common Areas and Facilities declared in said Declaration to be an appurtenance to the above-described Condominium Unit.

Unit No. 6 of the Chenay Bay Beach Club Condominium located at Plots 10-A, 10-C, 28-B, 28-C, 28-D and 28-E Estate Green Cay, East End Quarter "A" as established by the Chenay Bay Beach Club Condominium Declaration dated October 04, 1999, recorded October 25, 1999 in Photocopy 705, page 123, Document No. 4717 as amended by the First Amendment to Declaration effective February 14, 2008 TOGETHER WITH 9.26% undivided interest in the Common Areas and Facilities declared in said Declaration to be an appurtenance to the above-described Condominium Unit;

Unit No. 8 of the Chenay Bay Beach Club Condominium located at Plots 10-A, 10-C, 28-B, 28-C, 28-D and 28-E Estate Green Cay, East End Quarter "A" as established by the Chenay Bay Beach Club Condominium Declaration dated October 04, 1999, recorded October 25, 1999 in Photocopy 705, page 123, Document No. 4717 as amended by the First Amendment to Declaration effective February 14, 2008 TOGETHER WITH 9.26% undivided interest in the Common Areas and Facilities declared in said Declaration to be an appurtenance to the above-described Condominium Unit;

Unit No. 18 of the Chenay Bay Beach Club Condominium located at Plots 10-A, 10-C, 28-B, 28-C, 28-D and 28-E Estate Green Cay, East End Quarter "A" as established by the Chenay Bay Beach Club Condominium Declaration dated October 04, 1999, recorded October 25, 1999 in Photocopy 705, page 123, Document No. 4717 as amended by the First Amendment to Declaration effective February 14, 2008 TOGETHER WITH 9.26% undivided interest in the Common Areas and Facilities declared in said Declaration to be an appurtenance to the above-described Condominium Unit;

Unit No. 19 of the Chenay Bay Beach Club Condominium located at Plots 10-A, 10-C, 28-B, 28-C, 28-D and 28-E Estate Green Cay, East End Quarter "A" as established by the Chenay Bay Beach Club Condominium Declaration dated October 04, 1999, recorded October 25, 1999 in Photocopy 705, page 123, Document No. 4717 as amended by the First Amendment to Declaration effective February 14, 2008 TOGETHER WITH 7.407% undivided interest in the Common Areas and Facilities declared in said Declaration to be an appurtenance to the above-described Condominium Unit;

Unit No. 33 of the Chenay Bay Beach Club Condominium located at Plots 10-A, 10-C, 28-B, 28-C, 28-D and 28-E Estate Green Cay, East End Quarter "A" as established by the Chenay Bay Beach Club Condominium Declaration dated October 04, 1999, recorded October 25, 1999 in Photocopy 705, page 123, Document No. 4717 as amended by the First Amendment to Declamation effective February 14, 2008 TOGETHER WITH 7.407% undivided interest in the Common Areas and Facilities declared in said Declaration to be an appurtenance to the above-described Condominium Unit;

Unit No. 34 of the Chenay Bay Beach Club Condominium located at Plots 10-A, 10-C, 28-B, 28-C, 28-D and 28-E Estate Green Cay, East End Quarter "A" as established by the Chenay Bay Beach Club Condominium Declaration dated October 04, 1999, recorded October 25, 1999 in Photocopy 705, page 123, Document No. 4717 as amended by the First Amendment to Declamation effective February 14, 2008 TOGETHER WITH 7.407% undivided interest in the Common Areas and Facilities declared in said Declaration to be an appurtenance to the above-described Condominium Unit;

Unit No. 41 of the Chenay Bay Beach Club Condominium located at Plots 10-A, 10-C, 28-B, 28-C, 28-D and 28-E Estate Green Cay, East End Quarter "A" as established by the Chenay Bay Beach Club Condominium Declaration dated October 04, 1999, recorded October 25, 1999 in Photocopy 705, page 123, Document No. 4717 as amended by the First Amendment to Declamation effective February 14, 2008 TOGETHER WITH 7.407% undivided interest in the Common Areas and Facilities declared in said Declaration to be an appurtenance to the above-described Condominium Unit; and

Unit No. 42 of the Chenay Bay Beach Club Condominium located at Plots 10-A, 10-C, 28-B, 28-C, 28-D and 28-E Estate Green Cay, East End Quarter "A" as established by the Chenay Bay Beach Club Condominium Declaration dated October 04, 1999, recorded October 25, 1999 in Photocopy 705, page 123, Document No. 4717 as amended by the First Amendment to Declamation effective February 14, 2008 TOGETHER WITH 7.407% undivided interest in the Common Areas and Facilities declared in said Declaration to be an appurtenance to the above-described Condominium Unit.

Schedule "1" to Exhibit "A"

(Unit Weeks)

| Resort | Unit | Week | Odd/Even | Season | Unit Description |
|--------|------|------|----------|--------|------------------|
| CBR | 8 | 15 | E | Diamond Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 14 | O | Diamond Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 14 | E | Diamond Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 9 | O | Diamond Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 9 | E | Diamond Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 15 | O | Diamond Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 52 | E | Diamond Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 52 | O | Diamond Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 51 | O | Diamond Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 7 | O | Diamond Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 11 | E | Diamond Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 11 | O | Diamond Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 14 | E | Diamond Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 14 | O | Diamond Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 15 | E | Diamond Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 15 | O | Diamond Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 16 | E | Diamond Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 16 | O | Diamond Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 7 | E | Diamond Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 6 | O | Diamond Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 6 | E | Diamond Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 51 | E | Diamond Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 16 | E | Diamond Season | Deluxe 1 Bedroom 1 Bath |

| | | | | | |
|---|---|---|---|---|---|
| CBR | 19 | 14 | O | Diamond Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 16 | O | Diamond Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 14 | E | Diamond Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 33 | 16 | O | Diamond Season | Studio |
| CBR | 33 | 16 | E | Diamond Season | Studio |
| CBR | 33 | 15 | O | Diamond Season | Studio |
| CBR | 33 | 15 | E | Diamond Season | Studio |
| CBR | 33 | 51 | E | Diamond Season | Studio |
| CBR | 33 | 51 | O | Diamond Season | Studio |
| CBR | 34 | 13 | O | Diamond Season | Studio |
| CBR | 34 | 13 | E | Diamond Season | Studio |
| CBR | 34 | 16 | E | Diamond Season | Studio |
| CBR | 34 | 16 | O | Diamond Season | Studio |
| CBR | 34 | 51 | E | Diamond Season | Studio |
| CBR | 34 | 51 | O | Diamond Season | Studio |
| CBR | 34 | 15 | O | Diamond Season | Studio |
| CBR | 34 | 15 | E | Diamond Season | Studio |
| CBR | 35 | 10 | E | Diamond Season | Studio |
| CBR | 35 | 6 | O | Diamond Season | Studio |
| CBR | 35 | 6 | E | Diamond Season | Studio |
| CBR | 35 | 5 | O | Diamond Season | Studio |
| CBR | 35 | 5 | E | Diamond Season | Studio |
| CBR | 35 | 16 | E | Diamond Season | Studio |
| CBR | 35 | 16 | O | Diamond Season | Studio |
| CBR | 35 | 51 | E | Diamond Season | Studio |
| CBR | 35 | 51 | O | Diamond Season | Studio |
| CBR | 35 | 10 | O | Diamond Season | Studio |

| | | | | | |
|---|---|---|---|---|---|
| CBR | 36 | 51 | O | Diamond Season | Studio |
| CBR | 36 | 16 | E | Diamond Season | Studio |
| CBR | 36 | 16 | O | Diamond Season | Studio |
| CBR | 36 | 51 | E | Diamond Season | Studio |
| CBR | 6 | 35 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 6 | 34 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 6 | 34 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 6 | 35 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 7 | 35 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 7 | 34 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 7 | 34 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 7 | 33 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 7 | 33 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 7 | 35 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 27 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 26 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 17 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 17 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 33 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 33 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 32 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 32 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 29 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 29 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 27 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 9 | 33 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 9 | 35 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 9 | 33 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 9 | 35 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 9 | 30 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 9 | 30 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 9 | 1 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 9 | 1 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 9 | 17 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 30 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 32 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 31 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 31 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 34 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 30 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 29 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 29 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 28 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 27 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 28 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |

| | | | | | |
|---|---|---|---|---|---|
| CBR | 18 | 33 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 33 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 32 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 34 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 35 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 35 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 27 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 17 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 27 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 27 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 29 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 29 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 30 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 30 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 31 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 31 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 32 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 32 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 33 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 33 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 34 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 34 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 35 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 35 | O | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 17 | E | Emerald Season | Deluxe 1 Bedroom 1 Bath |
| | | | | | |
| CBR | 33 | 17 | E | Emerald Season | Studio |
| CBR | 33 | 33 | O | Emerald Season | Studio |
| CBR | 33 | 34 | E | Emerald Season | Studio |
| CBR | 33 | 34 | O | Emerald Season | Studio |
| CBR | 33 | 35 | E | Emerald Season | Studio |
| CBR | 33 | 35 | O | Emerald Season | Studio |
| CBR | 33 | 26 | E | Emerald Season | Studio |
| CBR | 33 | 26 | O | Emerald Season | Studio |
| CBR | 33 | 27 | E | Emerald Season | Studio |
| CBR | 33 | 27 | O | Emerald Season | Studio |
| CBR | 33 | 28 | E | Emerald Season | Studio |
| CBR | 33 | 28 | O | Emerald Season | Studio |
| CBR | 33 | 29 | E | Emerald Season | Studio |
| CBR | 33 | 29 | O | Emerald Season | Studio |
| CBR | 33 | 32 | E | Emerald Season | Studio |
| CBR | 33 | 32 | O | Emerald Season | Studio |
| CBR | 33 | 33 | E | Emerald Season | Studio |
| CBR | 33 | 17 | O | Emerald Season | Studio |
| CBR | 34 | 33 | E | Emerald Season | Studio |
| CBR | 34 | 32 | O | Emerald Season | Studio |
| CBR | 34 | 32 | E | Emerald Season | Studio |
| CBR | 34 | 31 | O | Emerald Season | Studio |
| CBR | 34 | 31 | E | Emerald Season | Studio |

| | | | | | |
|---|---|---|---|---|---|
| CBR | 34 | 30 | O | Emerald Season | Studio |
| CBR | 34 | 30 | E | Emerald Season | Studio |
| CBR | 34 | 29 | O | Emerald Season | Studio |
| CBR | 34 | 29 | E | Emerald Season | Studio |
| CBR | 34 | 28 | O | Emerald Season | Studio |
| CBR | 34 | 28 | E | Emerald Season | Studio |
| CBR | 34 | 27 | O | Emerald Season | Studio |
| CBR | 34 | 27 | E | Emerald Season | Studio |
| CBR | 34 | 26 | O | Emerald Season | Studio |
| CBR | 34 | 26 | E | Emerald Season | Studio |
| CBR | 34 | 34 | E | Emerald Season | Studio |
| CBR | 34 | 34 | O | Emerald Season | Studio |
| CBR | 34 | 35 | E | Emerald Season | Studio |
| CBR | 34 | 35 | O | Emerald Season | Studio |
| CBR | 34 | 33 | O | Emerald Season | Studio |
| CBR | 34 | 17 | E | Emerald Season | Studio |
| CBR | 34 | 17 | O | Emerald Season | Studio |
| CBR | 35 | 30 | E | Emerald Season | Studio |
| CBR | 35 | 29 | O | Emerald Season | Studio |
| CBR | 35 | 29 | E | Emerald Season | Studio |
| CBR | 35 | 28 | O | Emerald Season | Studio |
| CBR | 35 | 28 | E | Emerald Season | Studio |
| CBR | 35 | 27 | O | Emerald Season | Studio |
| CBR | 35 | 27 | E | Emerald Season | Studio |
| CBR | 35 | 26 | O | Emerald Season | Studio |
| CBR | 35 | 26 | E | Emerald Season | Studio |
| CBR | 35 | 17 | O | Emerald Season | Studio |
| CBR | 35 | 17 | E | Emerald Season | Studio |
| CBR | 35 | 30 | O | Emerald Season | Studio |
| CBR | 36 | 34 | E | Emerald Season | Studio |
| CBR | 36 | 33 | O | Emerald Season | Studio |
| CBR | 36 | 1 | E | Emerald Season | Studio |
| CBR | 36 | 1 | O | Emerald Season | Studio |
| CBR | 36 | 17 | E | Emerald Season | Studio |
| CBR | 36 | 17 | O | Emerald Season | Studio |
| CBR | 36 | 29 | E | Emerald Season | Studio |
| CBR | 36 | 29 | O | Emerald Season | Studio |
| CBR | 36 | 30 | E | Emerald Season | Studio |
| CBR | 36 | 30 | O | Emerald Season | Studio |
| CBR | 36 | 31 | E | Emerald Season | Studio |
| CBR | 36 | 31 | O | Emerald Season | Studio |
| CBR | 36 | 32 | E | Emerald Season | Studio |
| CBR | 36 | 32 | O | Emerald Season | Studio |
| CBR | 36 | 33 | E | Emerald Season | Studio |
| CBR | 36 | 34 | O | Emerald Season | Studio |
| CBR | 36 | 35 | E | Emerald Season | Studio |
| CBR | 36 | 35 | O | Emerald Season | Studio |
| CBR | 41 | 17 | E | Emerald Season | Studio |
| CBR | 41 | 17 | O | Emerald Season | Studio |

| | | | | | |
|---|---|---|---|---|---|
| CBR | 41 | 33 | O | Emerald Season | Studio |
| CBR | 41 | 33 | E | Emerald Season | Studio |
| CBR | 41 | 31 | O | Emerald Season | Studio |
| CBR | 41 | 31 | E | Emerald Season | Studio |
| CBR | 41 | 35 | E | Emerald Season | Studio |
| CBR | 41 | 35 | O | Emerald Season | Studio |
| CBR | 41 | 26 | E | Emerald Season | Studio |
| CBR | 41 | 26 | O | Emerald Season | Studio |
| CBR | 41 | 34 | E | Emerald Season | Studio |
| CBR | 41 | 34 | O | Emerald Season | Studio |
| CBR | 42 | 31 | E | Emerald Season | Studio |
| CBR | 42 | 31 | O | Emerald Season | Studio |
| CBR | 42 | 32 | E | Emerald Season | Studio |
| CBR | 42 | 32 | O | Emerald Season | Studio |
| CBR | 42 | 28 | O | Emerald Season | Studio |
| CBR | 42 | 28 | E | Emerald Season | Studio |
| CBR | 42 | 27 | O | Emerald Season | Studio |
| CBR | 42 | 27 | E | Emerald Season | Studio |
| CBR | 42 | 26 | O | Emerald Season | Studio |
| CBR | 42 | 26 | E | Emerald Season | Studio |
| CBR | 42 | 34 | O | Emerald Season | Studio |
| CBR | 42 | 35 | E | Emerald Season | Studio |
| CBR | 42 | 35 | O | Emerald Season | Studio |
| CBR | 42 | 34 | E | Emerald Season | Studio |
| CBR | 42 | 33 | E | Emerald Season | Studio |
| CBR | 42 | 33 | O | Emerald Season | Studio |
| CBR | 47 | 34 | O | Emerald Season | Studio |
| CBR | 47 | 34 | E | Emerald Season | Studio |
| CBR | 47 | 35 | O | Emerald Season | Studio |
| CBR | 47 | 35 | E | Emerald Season | Studio |
| CBR | 48 | 28 | O | Emerald Season | Studio |
| CBR | 48 | 28 | E | Emerald Season | Studio |
| CBR | 48 | 35 | O | Emerald Season | Studio |
| CBR | 48 | 35 | E | Emerald Season | Studio |
| CBR | 48 | 34 | O | Emerald Season | Studio |
| CBR | 48 | 34 | E | Emerald Season | Studio |
| | | | | | |
| CBR | 6 | 36 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 6 | 37 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 6 | 37 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 6 | 36 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 7 | 37 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 7 | 37 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 36 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 40 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 41 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 42 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 42 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 43 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |

| | | | | | |
|---|---|---|---|---|---|
| CBR | 8 | 43 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 44 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 44 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 36 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 41 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 45 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 45 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 48 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 50 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 50 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 40 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 39 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 39 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 9 | 36 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 9 | 36 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 42 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 43 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 44 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 44 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 45 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 45 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 39 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 40 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 49 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 49 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 39 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 41 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 41 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 40 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 38 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 43 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 42 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 38 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 37 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 37 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 44 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 42 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 40 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 40 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 39 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 39 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 36 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 36 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 44 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 48 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 48 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 49 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 49 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 41 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |

| | | | | | |
|---|---|---|---|---|---|
| CBR | 19 | 41 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 50 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 50 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 43 | O | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 42 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 43 | E | Pearl Season | Deluxe 1 Bedroom 1 Bath |
| | | | | | |
| CBR | 33 | 37 | O | Pearl Season | Studio |
| CBR | 33 | 37 | E | Pearl Season | Studio |
| CBR | 33 | 43 | E | Pearl Season | Studio |
| CBR | 33 | 38 | E | Pearl Season | Studio |
| CBR | 33 | 38 | O | Pearl Season | Studio |
| CBR | 33 | 42 | O | Pearl Season | Studio |
| CBR | 33 | 41 | E | Pearl Season | Studio |
| CBR | 33 | 49 | O | Pearl Season | Studio |
| CBR | 33 | 45 | O | Pearl Season | Studio |
| CBR | 33 | 45 | E | Pearl Season | Studio |
| CBR | 33 | 44 | O | Pearl Season | Studio |
| CBR | 33 | 44 | E | Pearl Season | Studio |
| CBR | 33 | 43 | O | Pearl Season | Studio |
| CBR | 33 | 50 | E | Pearl Season | Studio |
| CBR | 33 | 50 | O | Pearl Season | Studio |
| CBR | 33 | 42 | E | Pearl Season | Studio |
| CBR | 33 | 41 | O | Pearl Season | Studio |
| CBR | 33 | 39 | E | Pearl Season | Studio |
| CBR | 33 | 39 | O | Pearl Season | Studio |
| CBR | 33 | 40 | E | Pearl Season | Studio |
| CBR | 33 | 40 | O | Pearl Season | Studio |
| CBR | 33 | 48 | E | Pearl Season | Studio |
| CBR | 33 | 49 | E | Pearl Season | Studio |
| CBR | 33 | 48 | O | Pearl Season | Studio |
| CBR | 34 | 45 | E | Pearl Season | Studio |
| CBR | 34 | 45 | O | Pearl Season | Studio |
| CBR | 34 | 37 | O | Pearl Season | Studio |
| CBR | 34 | 38 | E | Pearl Season | Studio |
| CBR | 34 | 38 | O | Pearl Season | Studio |
| CBR | 34 | 39 | E | Pearl Season | Studio |
| CBR | 34 | 48 | E | Pearl Season | Studio |
| CBR | 34 | 48 | O | Pearl Season | Studio |
| CBR | 34 | 49 | E | Pearl Season | Studio |
| CBR | 34 | 49 | O | Pearl Season | Studio |
| CBR | 34 | 50 | E | Pearl Season | Studio |
| CBR | 34 | 50 | O | Pearl Season | Studio |
| CBR | 34 | 42 | O | Pearl Season | Studio |
| CBR | 34 | 43 | E | Pearl Season | Studio |
| CBR | 34 | 43 | O | Pearl Season | Studio |
| CBR | 34 | 42 | E | Pearl Season | Studio |
| CBR | 34 | 44 | O | Pearl Season | Studio |
| CBR | 34 | 44 | E | Pearl Season | Studio |

| | | | | | |
|---|---|---|---|---|---|
| CBR | 34 | 37 | E | Pearl Season | Studio |
| CBR | 34 | 41 | O | Pearl Season | Studio |
| CBR | 34 | 41 | E | Pearl Season | Studio |
| CBR | 34 | 40 | O | Pearl Season | Studio |
| CBR | 34 | 40 | E | Pearl Season | Studio |
| CBR | 34 | 39 | O | Pearl Season | Studio |
| CBR | 35 | 43 | E | Pearl Season | Studio |
| CBR | 35 | 43 | O | Pearl Season | Studio |
| CBR | 35 | 44 | E | Pearl Season | Studio |
| CBR | 35 | 44 | O | Pearl Season | Studio |
| CBR | 35 | 45 | E | Pearl Season | Studio |
| CBR | 35 | 39 | O | Pearl Season | Studio |
| CBR | 35 | 45 | O | Pearl Season | Studio |
| CBR | 35 | 42 | O | Pearl Season | Studio |
| CBR | 35 | 42 | E | Pearl Season | Studio |
| CBR | 35 | 39 | E | Pearl Season | Studio |
| CBR | 36 | 38 | E | Pearl Season | Studio |
| CBR | 36 | 48 | E | Pearl Season | Studio |
| CBR | 36 | 48 | O | Pearl Season | Studio |
| CBR | 36 | 50 | O | Pearl Season | Studio |
| CBR | 36 | 50 | E | Pearl Season | Studio |
| CBR | 36 | 38 | O | Pearl Season | Studio |
| CBR | 36 | 39 | E | Pearl Season | Studio |
| CBR | 36 | 49 | O | Pearl Season | Studio |
| CBR | 36 | 49 | E | Pearl Season | Studio |
| CBR | 36 | 39 | O | Pearl Season | Studio |
| CBR | 36 | 42 | E | Pearl Season | Studio |
| CBR | 36 | 42 | O | Pearl Season | Studio |
| CBR | 36 | 43 | E | Pearl Season | Studio |
| CBR | 36 | 43 | O | Pearl Season | Studio |
| CBR | 36 | 44 | E | Pearl Season | Studio |
| CBR | 36 | 44 | O | Pearl Season | Studio |
| CBR | 36 | 45 | E | Pearl Season | Studio |
| CBR | 36 | 45 | O | Pearl Season | Studio |
| CBR | 41 | 42 | E | Pearl Season | Studio |
| CBR | 41 | 42 | O | Pearl Season | Studio |
| CBR | 41 | 43 | E | Pearl Season | Studio |
| CBR | 41 | 43 | O | Pearl Season | Studio |
| CBR | 41 | 37 | O | Pearl Season | Studio |
| CBR | 41 | 38 | E | Pearl Season | Studio |
| CBR | 41 | 49 | E | Pearl Season | Studio |
| CBR | 41 | 49 | O | Pearl Season | Studio |
| CBR | 41 | 39 | O | Pearl Season | Studio |
| CBR | 41 | 39 | E | Pearl Season | Studio |
| CBR | 41 | 40 | O | Pearl Season | Studio |
| CBR | 41 | 40 | E | Pearl Season | Studio |
| CBR | 41 | 38 | O | Pearl Season | Studio |
| CBR | 41 | 36 | E | Pearl Season | Studio |
| CBR | 41 | 37 | E | Pearl Season | Studio |

| | | | | | |
|---|---|---|---|---|---|
| CBR | 41 | 36 | O | Pearl Season | Studio |
| CBR | 42 | 49 | O | Pearl Season | Studio |
| CBR | 42 | 49 | E | Pearl Season | Studio |
| CBR | 42 | 39 | E | Pearl Season | Studio |
| CBR | 42 | 38 | O | Pearl Season | Studio |
| CBR | 42 | 39 | O | Pearl Season | Studio |
| CBR | 42 | 40 | E | Pearl Season | Studio |
| CBR | 42 | 40 | O | Pearl Season | Studio |
| CBR | 42 | 42 | E | Pearl Season | Studio |
| CBR | 42 | 42 | O | Pearl Season | Studio |
| CBR | 42 | 43 | E | Pearl Season | Studio |
| CBR | 42 | 43 | O | Pearl Season | Studio |
| CBR | 42 | 44 | E | Pearl Season | Studio |
| CBR | 42 | 50 | E | Pearl Season | Studio |
| CBR | 42 | 50 | O | Pearl Season | Studio |
| CBR | 42 | 48 | O | Pearl Season | Studio |
| CBR | 42 | 45 | O | Pearl Season | Studio |
| CBR | 42 | 45 | E | Pearl Season | Studio |
| CBR | 42 | 48 | E | Pearl Season | Studio |
| CBR | 42 | 36 | E | Pearl Season | Studio |
| CBR | 42 | 36 | O | Pearl Season | Studio |
| CBR | 42 | 37 | E | Pearl Season | Studio |
| CBR | 42 | 37 | O | Pearl Season | Studio |
| CBR | 42 | 38 | E | Pearl Season | Studio |
| CBR | 42 | 44 | O | Pearl Season | Studio |
| CBR | 47 | 41 | O | Pearl Season | Studio |
| CBR | 47 | 40 | E | Pearl Season | Studio |
| CBR | 47 | 40 | O | Pearl Season | Studio |
| CBR | 47 | 41 | E | Pearl Season | Studio |
| CBR | 47 | 39 | O | Pearl Season | Studio |
| CBR | 47 | 48 | O | Pearl Season | Studio |
| CBR | 47 | 48 | E | Pearl Season | Studio |
| CBR | 47 | 39 | E | Pearl Season | Studio |
| CBR | 48 | 43 | O | Pearl Season | Studio |
| CBR | 48 | 43 | E | Pearl Season | Studio |
| CBR | 48 | 42 | O | Pearl Season | Studio |
| CBR | 48 | 42 | E | Pearl Season | Studio |
| CBR | 48 | 41 | O | Pearl Season | Studio |
| CBR | 48 | 41 | E | Pearl Season | Studio |
| CBR | 48 | 39 | O | Pearl Season | Studio |
| CBR | 48 | 39 | E | Pearl Season | Studio |
| CBR | 48 | 37 | O | Pearl Season | Studio |
| CBR | 48 | 37 | E | Pearl Season | Studio |
| CBR | 48 | 36 | O | Pearl Season | Studio |
| CBR | 48 | 36 | E | Pearl Season | Studio |
| CBR | 48 | 50 | E | Pearl Season | Studio |
| CBR | 48 | 45 | E | Pearl Season | Studio |
| CBR | 48 | 45 | O | Pearl Season | Studio |
| CBR | 48 | 50 | O | Pearl Season | Studio |

| | | | | | |
|---|---|---|---|---|---|
| CBR | 7 | 21 | E | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 46 | E | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 8 | 46 | O | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 9 | 23 | E | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 9 | 23 | O | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 9 | 22 | E | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 9 | 24 | E | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 9 | 24 | O | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 9 | 22 | O | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 22 | O | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 23 | E | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 23 | O | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 24 | E | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 24 | O | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 25 | O | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 22 | E | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 46 | E | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 46 | O | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 25 | E | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 47 | E | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 18 | 47 | O | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 46 | O | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 24 | O | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 21 | E | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 21 | O | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 22 | E | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 22 | O | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 23 | E | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 23 | O | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 24 | E | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| CBR | 19 | 46 | E | Ruby Season | Deluxe 1 Bedroom 1 Bath |
| | | | | | |
| CBR | 33 | 47 | E | Ruby Season | Studio |
| CBR | 33 | 46 | O | Ruby Season | Studio |
| CBR | 33 | 20 | E | Ruby Season | Studio |
| CBR | 33 | 19 | O | Ruby Season | Studio |
| CBR | 33 | 47 | O | Ruby Season | Studio |
| CBR | 33 | 46 | E | Ruby Season | Studio |
| CBR | 33 | 19 | E | Ruby Season | Studio |
| CBR | 33 | 20 | O | Ruby Season | Studio |
| CBR | 33 | 21 | E | Ruby Season | Studio |
| CBR | 33 | 21 | O | Ruby Season | Studio |
| CBR | 33 | 22 | E | Ruby Season | Studio |
| CBR | 33 | 22 | O | Ruby Season | Studio |
| CBR | 33 | 24 | E | Ruby Season | Studio |
| CBR | 33 | 24 | O | Ruby Season | Studio |
| CBR | 33 | 25 | E | Ruby Season | Studio |
| CBR | 33 | 25 | O | Ruby Season | Studio |

| | | | | | |
|---|---|---|---|---|---|
| CBR | 34 | 25 | E | Ruby Season | Studio |
| CBR | 34 | 24 | O | Ruby Season | Studio |
| CBR | 34 | 22 | E | Ruby Season | Studio |
| CBR | 34 | 21 | O | Ruby Season | Studio |
| CBR | 34 | 19 | O | Ruby Season | Studio |
| CBR | 34 | 19 | E | Ruby Season | Studio |
| CBR | 34 | 18 | O | Ruby Season | Studio |
| CBR | 34 | 18 | E | Ruby Season | Studio |
| CBR | 34 | 25 | O | Ruby Season | Studio |
| CBR | 34 | 24 | E | Ruby Season | Studio |
| CBR | 34 | 21 | E | Ruby Season | Studio |
| CBR | 34 | 20 | O | Ruby Season | Studio |
| CBR | 34 | 20 | E | Ruby Season | Studio |
| CBR | 34 | 22 | O | Ruby Season | Studio |
| CBR | 34 | 46 | E | Ruby Season | Studio |
| CBR | 34 | 46 | O | Ruby Season | Studio |
| CBR | 34 | 47 | E | Ruby Season | Studio |
| CBR | 34 | 47 | O | Ruby Season | Studio |
| CBR | 35 | 47 | E | Ruby Season | Studio |
| CBR | 35 | 46 | O | Ruby Season | Studio |
| CBR | 35 | 46 | E | Ruby Season | Studio |
| CBR | 35 | 23 | O | Ruby Season | Studio |
| CBR | 35 | 23 | E | Ruby Season | Studio |
| CBR | 35 | 22 | O | Ruby Season | Studio |
| CBR | 35 | 22 | E | Ruby Season | Studio |
| CBR | 35 | 21 | O | Ruby Season | Studio |
| CBR | 35 | 21 | E | Ruby Season | Studio |
| CBR | 35 | 20 | O | Ruby Season | Studio |
| CBR | 35 | 20 | E | Ruby Season | Studio |
| CBR | 35 | 19 | O | Ruby Season | Studio |
| CBR | 35 | 19 | E | Ruby Season | Studio |
| CBR | 35 | 25 | O | Ruby Season | Studio |
| CBR | 35 | 25 | E | Ruby Season | Studio |
| CBR | 35 | 47 | O | Ruby Season | Studio |
| CBR | 35 | 24 | E | Ruby Season | Studio |
| CBR | 35 | 24 | O | Ruby Season | Studio |
| CBR | 36 | 20 | O | Ruby Season | Studio |
| CBR | 36 | 20 | E | Ruby Season | Studio |
| CBR | 36 | 19 | O | Ruby Season | Studio |
| CBR | 36 | 19 | E | Ruby Season | Studio |
| CBR | 36 | 18 | O | Ruby Season | Studio |
| CBR | 36 | 18 | E | Ruby Season | Studio |
| CBR | 36 | 46 | E | Ruby Season | Studio |
| CBR | 36 | 46 | O | Ruby Season | Studio |
| CBR | 36 | 23 | O | Ruby Season | Studio |
| CBR | 36 | 21 | O | Ruby Season | Studio |
| CBR | 36 | 21 | E | Ruby Season | Studio |
| CBR | 36 | 22 | E | Ruby Season | Studio |
| CBR | 36 | 22 | O | Ruby Season | Studio |

| | | | | | |
|---|---|---|---|---|---|
| CBR | 36 | 23 | E | Ruby Season | Studio |
| CBR | 36 | 25 | O | Ruby Season | Studio |
| CBR | 36 | 25 | E | Ruby Season | Studio |
| CBR | 41 | 20 | E | Ruby Season | Studio |
| CBR | 41 | 46 | O | Ruby Season | Studio |
| CBR | 41 | 46 | E | Ruby Season | Studio |
| CBR | 41 | 25 | O | Ruby Season | Studio |
| CBR | 41 | 25 | E | Ruby Season | Studio |
| CBR | 41 | 21 | O | Ruby Season | Studio |
| CBR | 41 | 21 | E | Ruby Season | Studio |
| CBR | 41 | 20 | O | Ruby Season | Studio |
| CBR | 42 | 20 | E | Ruby Season | Studio |
| CBR | 42 | 20 | O | Ruby Season | Studio |
| CBR | 42 | 25 | E | Ruby Season | Studio |
| CBR | 42 | 25 | O | Ruby Season | Studio |
| CBR | 42 | 46 | E | Ruby Season | Studio |
| CBR | 42 | 46 | O | Ruby Season | Studio |
| CBR | 42 | 23 | O | Ruby Season | Studio |
| CBR | 42 | 23 | E | Ruby Season | Studio |
| CBR | 42 | 22 | O | Ruby Season | Studio |
| CBR | 42 | 22 | E | Ruby Season | Studio |
| CBR | 42 | 21 | O | Ruby Season | Studio |
| CBR | 42 | 21 | E | Ruby Season | Studio |
| CBR | 47 | 46 | O | Ruby Season | Studio |
| CBR | 47 | 46 | E | Ruby Season | Studio |
| CBR | 48 | 46 | E | Ruby Season | Studio |
| CBR | 48 | 46 | O | Ruby Season | Studio |
| CBR | 43 | 12 | E | Diamond Season | Studio |
| CBR | 43 | 11 | O | Diamond Season | Studio |
| CBR | 43 | 11 | E | Diamond Season | Studio |
| CBR | 43 | 10 | O | Diamond Season | Studio |
| CBR | 43 | 10 | E | Diamond Season | Studio |
| CBR | 43 | 12 | O | Diamond Season | Studio |
| CBR | 43 | 51 | O | Diamond Season | Studio |
| CBR | 43 | 52 | E | Diamond Season | Studio |
| CBR | 43 | 52 | O | Diamond Season | Studio |
| CBR | 43 | 51 | E | Diamond Season | Studio |
| CBR | 43 | 16 | O | Diamond Season | Studio |
| CBR | 43 | 16 | E | Diamond Season | Studio |

| | | | | | |
|---|---|---|---|---|---|
| CBR | 44 | 16 | E | Diamond Season | Studio |
| CBR | 44 | 13 | O | Diamond Season | Studio |
| CBR | 44 | 13 | E | Diamond Season | Studio |
| CBR | 44 | 12 | O | Diamond Season | Studio |
| CBR | 44 | 12 | E | Diamond Season | Studio |
| CBR | 44 | 11 | O | Diamond Season | Studio |
| CBR | 44 | 11 | E | Diamond Season | Studio |
| CBR | 44 | 10 | O | Diamond Season | Studio |
| CBR | 44 | 10 | E | Diamond Season | Studio |
| CBR | 44 | 9 | O | Diamond Season | Studio |
| CBR | 44 | 9 | E | Diamond Season | Studio |
| CBR | 44 | 7 | O | Diamond Season | Studio |
| CBR | 44 | 7 | E | Diamond Season | Studio |
| CBR | 44 | 6 | O | Diamond Season | Studio |
| CBR | 44 | 6 | E | Diamond Season | Studio |
| CBR | 44 | 5 | O | Diamond Season | Studio |
| CBR | 44 | 5 | E | Diamond Season | Studio |
| CBR | 44 | 4 | O | Diamond Season | Studio |
| CBR | 44 | 15 | O | Diamond Season | Studio |
| CBR | 44 | 15 | E | Diamond Season | Studio |
| CBR | 44 | 14 | O | Diamond Season | Studio |
| CBR | 44 | 14 | E | Diamond Season | Studio |
| CBR | 44 | 4 | E | Diamond Season | Studio |
| CBR | 44 | 16 | O | Diamond Season | Studio |
| CBR | 44 | 52 | E | Diamond Season | Studio |
| CBR | 44 | 51 | E | Diamond Season | Studio |
| CBR | 44 | 52 | O | Diamond Season | Studio |

| | | | | Diamond | |
|-----|----|----|---|----------------|--------|
| CBR | 44 | 51 | O | Season | Studio |
| | | | | | |
| CBR | 43 | 28 | E | Emerald Season | Studio |
| CBR | 43 | 28 | O | Emerald Season | Studio |
| CBR | 43 | 29 | E | Emerald Season | Studio |
| CBR | 43 | 29 | O | Emerald Season | Studio |
| CBR | 43 | 30 | E | Emerald Season | Studio |
| CBR | 43 | 30 | O | Emerald Season | Studio |
| CBR | 43 | 31 | E | Emerald Season | Studio |
| CBR | 43 | 31 | O | Emerald Season | Studio |
| CBR | 43 | 32 | E | Emerald Season | Studio |
| CBR | 43 | 32 | O | Emerald Season | Studio |
| CBR | 43 | 33 | E | Emerald Season | Studio |
| CBR | 43 | 33 | O | Emerald Season | Studio |
| CBR | 43 | 34 | E | Emerald Season | Studio |
| CBR | 43 | 34 | O | Emerald Season | Studio |
| CBR | 43 | 35 | E | Emerald Season | Studio |
| CBR | 43 | 35 | O | Emerald Season | Studio |
| CBR | 43 | 26 | E | Emerald Season | Studio |
| CBR | 43 | 27 | E | Emerald Season | Studio |
| CBR | 43 | 17 | O | Emerald Season | Studio |
| CBR | 43 | 17 | E | Emerald Season | Studio |
| CBR | 43 | 3 | O | Emerald Season | Studio |
| CBR | 43 | 27 | O | Emerald Season | Studio |
| CBR | 43 | 1 | E | Emerald Season | Studio |
| CBR | 43 | 1 | O | Emerald Season | Studio |
| CBR | 43 | 2 | E | Emerald Season | Studio |
| CBR | 43 | 2 | O | Emerald Season | Studio |
| CBR | 43 | 3 | E | Emerald Season | Studio |
| CBR | 43 | 26 | O | Emerald Season | Studio |
| CBR | 44 | 17 | O | Emerald Season | Studio |
| CBR | 44 | 26 | E | Emerald Season | Studio |
| CBR | 44 | 3 | O | Emerald Season | Studio |
| CBR | 44 | 3 | E | Emerald Season | Studio |
| CBR | 44 | 2 | O | Emerald Season | Studio |
| CBR | 44 | 2 | E | Emerald Season | Studio |
| CBR | 44 | 1 | O | Emerald Season | Studio |
| CBR | 44 | 26 | O | Emerald Season | Studio |
| CBR | 44 | 27 | E | Emerald Season | Studio |
| CBR | 44 | 17 | E | Emerald Season | Studio |
| CBR | 44 | 1 | E | Emerald Season | Studio |
| CBR | 44 | 27 | O | Emerald Season | Studio |
| CBR | 44 | 35 | E | Emerald Season | Studio |
| CBR | 44 | 34 | O | Emerald Season | Studio |
| CBR | 44 | 34 | E | Emerald Season | Studio |
| CBR | 44 | 33 | O | Emerald Season | Studio |
| CBR | 44 | 33 | E | Emerald Season | Studio |
| CBR | 44 | 32 | O | Emerald Season | Studio |

| | | | | | |
|---|---|---|---|---|---|
| CBR | 44 | 32 | E | Emerald Season | Studio |
| CBR | 44 | 31 | O | Emerald Season | Studio |
| CBR | 44 | 31 | E | Emerald Season | Studio |
| CBR | 44 | 30 | O | Emerald Season | Studio |
| CBR | 44 | 30 | E | Emerald Season | Studio |
| CBR | 44 | 29 | O | Emerald Season | Studio |
| CBR | 44 | 29 | E | Emerald Season | Studio |
| CBR | 44 | 28 | O | Emerald Season | Studio |
| CBR | 44 | 28 | E | Emerald Season | Studio |
| CBR | 44 | 35 | O | Emerald Season | Studio |
| | | | | | |
| CBR | 43 | 50 | O | Pearl Season | Studio |
| CBR | 43 | 36 | E | Pearl Season | Studio |
| CBR | 43 | 36 | O | Pearl Season | Studio |
| CBR | 43 | 37 | E | Pearl Season | Studio |
| CBR | 43 | 37 | O | Pearl Season | Studio |
| CBR | 43 | 41 | E | Pearl Season | Studio |
| CBR | 43 | 41 | O | Pearl Season | Studio |
| CBR | 43 | 42 | E | Pearl Season | Studio |
| CBR | 43 | 42 | O | Pearl Season | Studio |
| CBR | 43 | 43 | E | Pearl Season | Studio |
| CBR | 43 | 45 | O | Pearl Season | Studio |
| CBR | 43 | 45 | E | Pearl Season | Studio |
| CBR | 43 | 44 | O | Pearl Season | Studio |
| CBR | 43 | 44 | E | Pearl Season | Studio |
| CBR | 43 | 43 | O | Pearl Season | Studio |
| CBR | 43 | 49 | O | Pearl Season | Studio |
| CBR | 43 | 49 | E | Pearl Season | Studio |
| CBR | 43 | 48 | O | Pearl Season | Studio |
| CBR | 43 | 48 | E | Pearl Season | Studio |
| CBR | 43 | 50 | E | Pearl Season | Studio |
| CBR | 44 | 41 | E | Pearl Season | Studio |
| CBR | 44 | 40 | O | Pearl Season | Studio |
| CBR | 44 | 40 | E | Pearl Season | Studio |
| CBR | 44 | 38 | O | Pearl Season | Studio |
| CBR | 44 | 38 | E | Pearl Season | Studio |
| CBR | 44 | 37 | O | Pearl Season | Studio |
| CBR | 44 | 37 | E | Pearl Season | Studio |
| CBR | 44 | 36 | O | Pearl Season | Studio |
| CBR | 44 | 36 | E | Pearl Season | Studio |
| CBR | 44 | 41 | O | Pearl Season | Studio |
| CBR | 44 | 42 | E | Pearl Season | Studio |
| CBR | 44 | 50 | O | Pearl Season | Studio |
| CBR | 44 | 50 | E | Pearl Season | Studio |
| CBR | 44 | 49 | O | Pearl Season | Studio |
| CBR | 44 | 49 | E | Pearl Season | Studio |
| CBR | 44 | 48 | O | Pearl Season | Studio |
| CBR | 44 | 48 | E | Pearl Season | Studio |
| CBR | 44 | 42 | O | Pearl Season | Studio |

| | | | | | |
|-----|----|----|---|-------------|--------|
| CBR | 44 | 43 | E | Pearl Season | Studio |
| CBR | 44 | 43 | O | Pearl Season | Studio |
| CBR | 44 | 44 | E | Pearl Season | Studio |
| CBR | 44 | 45 | O | Pearl Season | Studio |
| CBR | 44 | 45 | E | Pearl Season | Studio |
| CBR | 44 | 44 | O | Pearl Season | Studio |
| | | | | | |
| CBR | 43 | 20 | O | Ruby Season | Studio |
| CBR | 43 | 18 | E | Ruby Season | Studio |
| CBR | 43 | 18 | O | Ruby Season | Studio |
| CBR | 43 | 25 | O | Ruby Season | Studio |
| CBR | 43 | 19 | E | Ruby Season | Studio |
| CBR | 43 | 19 | O | Ruby Season | Studio |
| CBR | 43 | 47 | O | Ruby Season | Studio |
| CBR | 43 | 47 | E | Ruby Season | Studio |
| CBR | 43 | 46 | O | Ruby Season | Studio |
| CBR | 43 | 46 | E | Ruby Season | Studio |
| CBR | 43 | 25 | E | Ruby Season | Studio |
| CBR | 43 | 24 | O | Ruby Season | Studio |
| CBR | 43 | 24 | E | Ruby Season | Studio |
| CBR | 43 | 23 | O | Ruby Season | Studio |
| CBR | 43 | 23 | E | Ruby Season | Studio |
| CBR | 43 | 22 | O | Ruby Season | Studio |
| CBR | 43 | 22 | E | Ruby Season | Studio |
| CBR | 43 | 21 | E | Ruby Season | Studio |
| CBR | 43 | 21 | O | Ruby Season | Studio |
| CBR | 43 | 20 | E | Ruby Season | Studio |
| CBR | 44 | 25 | E | Ruby Season | Studio |
| CBR | 44 | 24 | O | Ruby Season | Studio |
| CBR | 44 | 24 | E | Ruby Season | Studio |
| CBR | 44 | 23 | O | Ruby Season | Studio |
| CBR | 44 | 23 | E | Ruby Season | Studio |
| CBR | 44 | 22 | O | Ruby Season | Studio |
| CBR | 44 | 22 | E | Ruby Season | Studio |
| CBR | 44 | 21 | O | Ruby Season | Studio |
| CBR | 44 | 21 | E | Ruby Season | Studio |
| CBR | 44 | 20 | O | Ruby Season | Studio |
| CBR | 44 | 20 | E | Ruby Season | Studio |
| CBR | 44 | 19 | O | Ruby Season | Studio |
| CBR | 44 | 19 | E | Ruby Season | Studio |
| CBR | 44 | 18 | O | Ruby Season | Studio |
| CBR | 44 | 18 | E | Ruby Season | Studio |
| CBR | 44 | 25 | O | Ruby Season | Studio |
| CBR | 44 | 46 | E | Ruby Season | Studio |
| CBR | 44 | 46 | O | Ruby Season | Studio |
| CBR | 44 | 47 | E | Ruby Season | Studio |
| CBR | 44 | 47 | O | Ruby Season | Studio |

# Exhibit "F"

1.      BB&T Timeshare Interests Legal Description

        a.     LTV I
        b.     LTV II
        c.     Cove I
        d.     Charter Club

2.      LTV 1400 Legal Description

3.      Sales Center Legal Description

4.      Barefoot'n II Property Legal Description

Exhibit "F" – 1.a.  BB&T Timeshare Interests Legal Description (LTV I)

<u>Legal Description (Liki Tiki Village I)</u>

The following listed Unit Weeks in Bali International Resort Club, A Condominium, according to the Declaration of Condominium thereof, as recorded in O.R. Book 3325 at Page 521 et. seq., in the Public Records of Orange County, Florida (and all amendments, modifications and supplements to such instrument):

| Resort | Unit | | Week | Odd/Even |
|--------|------|-----|------|----------|
| BAL | 100 | A | 40 | E |
| BAL | 100 | A | 40 | O |
| BAL | 101 | A | 43 | E |
| BAL | 101 | A | 43 | O |
| BAL | 101 | B | 18 | E |
| BAL | 101 | B | 18 | O |
| BAL | 101 | B | 20 | E |
| BAL | 101 | B | 20 | O |
| BAL | 101 | D | 35 | E |
| BAL | 101 | D | 35 | O |
| BAL | 102 | A | 20 | E |
| BAL | 102 | A | 20 | O |
| BAL | 102 | A | 50 | E |
| BAL | 102 | A | 50 | O |
| BAL | 102 | B | 3 | E |
| BAL | 102 | B | 3 | O |
| BAL | 103 | A | 50 | E |
| BAL | 103 | A | 50 | O |
| BAL | 104 | A | 5 | E |
| BAL | 104 | A | 5 | O |
| BAL | 104 | A | 50 | E |
| BAL | 104 | A | 50 | O |
| BAL | 104 | B | 1 | E |
| BAL | 104 | B | 1 | O |
| BAL | 104 | B | 5 | E |
| BAL | 104 | B | 5 | O |
| BAL | 104 | B | 41 | E |
| BAL | 104 | B | 41 | O |
| BAL | 104 | C | 2 | E |
| BAL | 104 | C | 2 | O |
| BAL | 104 | C | 18 | E |
| BAL | 104 | C | 18 | O |
| BAL | 104 | D | 19 | E |
| BAL | 104 | D | 19 | O |
| BAL | 104 | D | 22 | E |
| BAL | 104 | D | 22 | O |
| BAL | 105 | A | 21 | E |
| BAL | 105 | A | 21 | O |

| | | | | |
|---|---|---|---|---|
| BAL | 105 | A | 22 | E |
| BAL | 105 | A | 22 | O |
| BAL | 105 | B | 7 | E |
| BAL | 105 | B | 7 | O |
| BAL | 105 | B | 42 | E |
| BAL | 105 | B | 42 | O |
| BAL | 106 | B | 41 | E |
| BAL | 106 | B | 41 | O |
| BAL | 106 | B | 42 | E |
| BAL | 106 | B | 42 | O |
| BAL | 106 | B | 45 | E |
| BAL | 106 | B | 45 | O |
| BAL | 106 | D | 48 | E |
| BAL | 106 | D | 48 | O |
| BAL | 200 | B | 5 | E |
| BAL | 200 | B | 5 | O |
| BAL | 200 | B | 36 | E |
| BAL | 200 | B | 36 | O |
| BAL | 200 | B | 37 | E |
| BAL | 200 | B | 37 | O |
| BAL | 200 | C | 43 | E |
| BAL | 200 | C | 43 | O |
| BAL | 200 | C | 50 | E |
| BAL | 200 | C | 50 | O |
| BAL | 200 | D | 3 | E |
| BAL | 200 | D | 3 | O |
| BAL | 200 | D | 36 | E |
| BAL | 200 | D | 36 | O |
| BAL | 201 | A | 20 | E |
| BAL | 201 | A | 20 | O |
| BAL | 201 | A | 41 | E |
| BAL | 201 | A | 41 | O |
| BAL | 201 | A | 44 | E |
| BAL | 201 | A | 44 | O |
| BAL | 201 | A | 48 | E |
| BAL | 201 | A | 48 | O |
| BAL | 201 | C | 5 | E |
| BAL | 201 | C | 5 | O |
| BAL | 201 | D | 41 | E |
| BAL | 201 | D | 41 | O |
| BAL | 202 | A | 25 | E |
| BAL | 202 | A | 25 | O |
| BAL | 202 | B | 22 | E |
| BAL | 202 | B | 22 | O |
| BAL | 202 | B | 29 | E |
| BAL | 202 | B | 29 | O |
| BAL | 202 | B | 30 | E |
| BAL | 202 | B | 30 | O |
| BAL | 202 | C | 1 | E |
| BAL | 202 | C | 1 | O |

| | | | | |
|---|---|---|---|---|
| BAL | 202 | C | 37 | E |
| BAL | 202 | C | 37 | O |
| BAL | 202 | D | 28 | E |
| BAL | 202 | D | 28 | O |
| BAL | 202 | D | 36 | E |
| BAL | 202 | D | 36 | O |
| BAL | 203 | A | 34 | E |
| BAL | 203 | A | 34 | O |
| BAL | 203 | A | 39 | E |
| BAL | 203 | A | 39 | O |
| BAL | 203 | A | 45 | E |
| BAL | 203 | A | 45 | O |
| BAL | 203 | C | 17 | E |
| BAL | 203 | C | 17 | O |
| BAL | 203 | C | 25 | E |
| BAL | 203 | C | 25 | O |
| BAL | 203 | D | 16 | E |
| BAL | 203 | D | 16 | O |
| BAL | 204 | A | 4 | E |
| BAL | 204 | A | 4 | O |
| BAL | 204 | A | 19 | E |
| BAL | 204 | A | 19 | O |
| BAL | 204 | A | 23 | E |
| BAL | 204 | A | 23 | O |
| BAL | 204 | A | 25 | E |
| BAL | 204 | A | 25 | O |
| BAL | 204 | A | 30 | E |
| BAL | 204 | A | 30 | O |
| BAL | 204 | A | 35 | E |
| BAL | 204 | A | 35 | O |
| BAL | 204 | B | 16 | E |
| BAL | 204 | B | 16 | O |
| BAL | 204 | C | 21 | E |
| BAL | 204 | C | 21 | O |
| BAL | 204 | C | 24 | E |
| BAL | 204 | C | 24 | O |
| BAL | 204 | C | 41 | E |
| BAL | 204 | C | 41 | O |
| BAL | 204 | C | 46 | E |
| BAL | 204 | C | 46 | O |
| BAL | 204 | C | 47 | E |
| BAL | 204 | C | 47 | O |
| BAL | 204 | C | 49 | E |
| BAL | 204 | C | 49 | O |
| BAL | 204 | C | 51 | E |
| BAL | 204 | C | 51 | O |
| BAL | 204 | D | 9 | E |
| BAL | 204 | D | 9 | O |
| BAL | 204 | D | 21 | E |
| BAL | 204 | D | 21 | O |

| | | | | |
|---|---|---|---|---|
| BAL | 204 | D | 46 | E |
| BAL | 204 | D | 46 | O |
| BAL | 204 | D | 47 | E |
| BAL | 204 | D | 47 | O |
| BAL | 205 | A | 20 | E |
| BAL | 205 | A | 20 | O |
| BAL | 205 | A | 44 | E |
| BAL | 205 | A | 44 | O |
| BAL | 205 | B | 17 | E |
| BAL | 205 | B | 17 | O |
| BAL | 205 | C | 44 | E |
| BAL | 205 | C | 44 | O |
| BAL | 205 | D | 3 | E |
| BAL | 205 | D | 3 | O |
| BAL | 205 | D | 18 | E |
| BAL | 205 | D | 18 | O |
| BAL | 205 | D | 22 | E |
| BAL | 205 | D | 22 | O |
| BAL | 205 | D | 28 | E |
| BAL | 205 | D | 28 | O |
| BAL | 205 | D | 31 | E |
| BAL | 205 | D | 31 | O |
| BAL | 205 | D | 32 | E |
| BAL | 205 | D | 32 | O |
| BAL | 205 | D | 46 | E |
| BAL | 205 | D | 46 | O |
| BAL | 206 | A | 37 | E |
| BAL | 206 | A | 37 | O |
| BAL | 206 | A | 39 | E |
| BAL | 206 | A | 39 | O |
| BAL | 206 | A | 40 | E |
| BAL | 206 | A | 40 | O |
| BAL | 206 | A | 41 | E |
| BAL | 206 | A | 41 | O |
| BAL | 206 | A | 48 | E |
| BAL | 206 | A | 48 | O |
| BAL | 206 | A | 49 | E |
| BAL | 206 | A | 49 | O |
| BAL | 206 | B | 4 | E |
| BAL | 206 | B | 4 | O |
| BAL | 206 | C | 6 | E |
| BAL | 206 | C | 6 | O |
| BAL | 207 | A | 16 | E |
| BAL | 207 | A | 16 | O |
| BAL | 207 | A | 43 | E |
| BAL | 207 | A | 43 | O |
| BAL | 207 | B | 1 | E |
| BAL | 207 | B | 1 | O |
| BAL | 207 | B | 23 | E |
| BAL | 207 | B | 23 | O |

| | | | | |
|---|---|---|---|---|
| BAL | 207 | B | 39 | E |
| BAL | 207 | B | 39 | O |
| BAL | 207 | B | 41 | E |
| BAL | 207 | B | 41 | O |
| BAL | 207 | B | 46 | E |
| BAL | 207 | B | 46 | O |
| BAL | 207 | C | 30 | E |
| BAL | 207 | C | 30 | O |
| BAL | 207 | C | 40 | E |
| BAL | 207 | C | 40 | O |
| BAL | 207 | C | 49 | E |
| BAL | 207 | C | 49 | O |
| BAL | 207 | D | 5 | E |
| BAL | 207 | D | 5 | O |
| BAL | 207 | D | 33 | E |
| BAL | 207 | D | 33 | O |
| BAL | 208 | A | 30 | E |
| BAL | 208 | A | 30 | O |
| BAL | 208 | A | 39 | E |
| BAL | 208 | A | 39 | O |
| BAL | 208 | B | 1 | E |
| BAL | 208 | B | 1 | O |
| BAL | 208 | B | 22 | E |
| BAL | 208 | B | 22 | O |
| BAL | 208 | B | 35 | E |
| BAL | 208 | B | 35 | O |
| BAL | 208 | B | 37 | E |
| BAL | 208 | B | 37 | O |
| BAL | 208 | B | 39 | E |
| BAL | 208 | B | 39 | O |
| BAL | 208 | D | 6 | E |
| BAL | 208 | D | 6 | O |
| BAL | 208 | D | 24 | E |
| BAL | 208 | D | 24 | O |
| BAL | 209 | A | 39 | E |
| BAL | 209 | A | 39 | O |
| BAL | 209 | A | 48 | E |
| BAL | 209 | A | 48 | O |
| BAL | 209 | B | 4 | E |
| BAL | 209 | B | 4 | O |
| BAL | 209 | B | 49 | E |
| BAL | 209 | B | 49 | O |
| BAL | 209 | C | 22 | E |
| BAL | 209 | C | 22 | O |
| BAL | 209 | C | 29 | E |
| BAL | 209 | C | 29 | O |
| BAL | 209 | C | 38 | E |
| BAL | 209 | C | 38 | O |
| BAL | 209 | C | 44 | E |
| BAL | 209 | C | 44 | O |

| | | | | |
|---|---|---|---|---|
| BAL | 209 | D | 21 | E |
| BAL | 209 | D | 21 | O |
| BAL | 209 | D | 31 | E |
| BAL | 209 | D | 31 | O |
| BAL | 210 | B | 24 | E |
| BAL | 210 | B | 24 | O |
| BAL | 210 | B | 37 | E |
| BAL | 210 | B | 37 | O |
| BAL | 210 | C | 19 | E |
| BAL | 210 | C | 19 | O |
| BAL | 210 | C | 40 | E |
| BAL | 210 | C | 40 | O |
| BAL | 210 | D | 20 | E |
| BAL | 210 | D | 20 | O |
| BAL | 210 | D | 41 | E |
| BAL | 210 | D | 41 | O |
| BAL | 210 | D | 42 | E |
| BAL | 210 | D | 42 | O |
| BAL | 211 | A | 20 | E |
| BAL | 211 | A | 20 | O |
| BAL | 211 | A | 21 | E |
| BAL | 211 | A | 21 | O |
| BAL | 211 | A | 29 | E |
| BAL | 211 | A | 29 | O |
| BAL | 211 | A | 33 | E |
| BAL | 211 | A | 33 | O |
| BAL | 211 | A | 48 | E |
| BAL | 211 | A | 48 | O |
| BAL | 211 | B | 41 | E |
| BAL | 211 | B | 41 | O |
| BAL | 211 | B | 43 | E |
| BAL | 211 | B | 43 | O |
| BAL | 211 | C | 1 | E |
| BAL | 211 | C | 1 | O |
| BAL | 211 | C | 2 | E |
| BAL | 211 | C | 2 | O |
| BAL | 211 | C | 39 | E |
| BAL | 211 | C | 39 | O |
| BAL | 211 | C | 43 | E |
| BAL | 211 | C | 43 | O |
| BAL | 211 | C | 45 | E |
| BAL | 211 | C | 45 | O |
| BAL | 211 | C | 50 | E |
| BAL | 211 | C | 50 | O |
| BAL | 211 | D | 4 | E |
| BAL | 211 | D | 4 | O |
| BAL | 211 | D | 36 | E |
| BAL | 211 | D | 36 | O |
| BAL | 211 | D | 42 | E |
| BAL | 211 | D | 42 | O |

| | | | | |
|---|---|---|---|---|
| BAL | 212 | A | 21 | E |
| BAL | 212 | A | 21 | O |
| BAL | 212 | A | 41 | E |
| BAL | 212 | A | 41 | O |
| BAL | 212 | A | 48 | E |
| BAL | 212 | A | 48 | O |
| BAL | 212 | A | 49 | E |
| BAL | 212 | A | 49 | O |
| BAL | 212 | A | 50 | E |
| BAL | 212 | A | 50 | O |
| BAL | 212 | B | 2 | E |
| BAL | 212 | B | 2 | O |
| BAL | 212 | B | 22 | E |
| BAL | 212 | B | 22 | O |
| BAL | 212 | C | 6 | E |
| BAL | 212 | C | 6 | O |
| BAL | 212 | C | 16 | E |
| BAL | 212 | C | 16 | O |
| BAL | 212 | C | 19 | E |
| BAL | 212 | C | 19 | O |
| BAL | 212 | C | 21 | E |
| BAL | 212 | C | 21 | O |
| BAL | 212 | C | 47 | E |
| BAL | 212 | C | 47 | O |
| BAL | 212 | D | 44 | E |
| BAL | 212 | D | 44 | O |
| BAL | 212 | D | 46 | E |
| BAL | 212 | D | 46 | O |
| BAL | 212 | D | 47 | E |
| BAL | 212 | D | 47 | O |
| BAL | 213 | A | 39 | E |
| BAL | 213 | A | 39 | O |
| BAL | 213 | B | 2 | E |
| BAL | 213 | B | 2 | O |
| BAL | 213 | B | 3 | E |
| BAL | 213 | B | 3 | O |
| BAL | 213 | B | 23 | E |
| BAL | 213 | B | 23 | O |
| BAL | 213 | B | 33 | E |
| BAL | 213 | B | 33 | O |
| BAL | 213 | B | 34 | E |
| BAL | 213 | B | 34 | O |
| BAL | 213 | B | 40 | E |
| BAL | 213 | B | 40 | O |
| BAL | 213 | C | 3 | E |
| BAL | 213 | C | 3 | O |
| BAL | 213 | C | 4 | E |
| BAL | 213 | C | 4 | O |
| BAL | 213 | C | 5 | E |
| BAL | 213 | C | 5 | O |

| | | | | |
|---|---|---|---|---|
| BAL | 213 | C | 16 | E |
| BAL | 213 | C | 16 | O |
| BAL | 213 | C | 42 | E |
| BAL | 213 | C | 42 | O |
| BAL | 213 | C | 45 | E |
| BAL | 213 | C | 45 | O |
| BAL | 213 | C | 48 | E |
| BAL | 213 | C | 48 | O |
| BAL | 213 | D | 1 | E |
| BAL | 213 | D | 1 | O |
| BAL | 213 | D | 6 | E |
| BAL | 213 | D | 6 | O |
| BAL | 213 | D | 38 | E |
| BAL | 213 | D | 38 | O |
| BAL | 213 | D | 45 | E |
| BAL | 213 | D | 45 | O |
| BAL | 214 | A | 22 | E |
| BAL | 214 | A | 22 | O |
| BAL | 214 | A | 39 | E |
| BAL | 214 | A | 39 | O |
| BAL | 214 | A | 47 | E |
| BAL | 214 | A | 47 | O |
| BAL | 214 | B | 20 | E |
| BAL | 214 | B | 20 | O |
| BAL | 214 | B | 29 | E |
| BAL | 214 | B | 29 | O |
| BAL | 214 | B | 43 | E |
| BAL | 214 | B | 43 | O |
| BAL | 214 | C | 21 | E |
| BAL | 214 | C | 21 | O |
| BAL | 214 | C | 29 | E |
| BAL | 214 | C | 29 | O |
| BAL | 214 | C | 47 | E |
| BAL | 214 | C | 47 | O |
| BAL | 214 | D | 19 | E |
| BAL | 214 | D | 19 | O |
| BAL | 214 | D | 23 | E |
| BAL | 214 | D | 23 | O |
| BAL | 214 | D | 49 | E |
| BAL | 214 | D | 49 | O |
| BAL | 300 | A | 18 | E |
| BAL | 300 | A | 18 | O |
| BAL | 300 | A | 33 | E |
| BAL | 300 | A | 33 | O |
| BAL | 300 | B | 33 | E |
| BAL | 300 | B | 33 | O |
| BAL | 300 | C | 18 | E |
| BAL | 300 | C | 18 | O |
| BAL | 300 | C | 20 | E |
| BAL | 300 | C | 20 | O |

| | | | | |
|---|---|---|---|---|
| BAL | 300 | C | 44 | E |
| BAL | 300 | C | 44 | O |
| BAL | 300 | D | 2 | E |
| BAL | 300 | D | 2 | O |
| BAL | 300 | D | 21 | E |
| BAL | 300 | D | 21 | O |
| BAL | 300 | D | 22 | E |
| BAL | 300 | D | 22 | O |
| BAL | 301 | A | 4 | E |
| BAL | 301 | A | 4 | O |
| BAL | 301 | A | 34 | E |
| BAL | 301 | A | 34 | O |
| BAL | 301 | A | 44 | E |
| BAL | 301 | A | 44 | O |
| BAL | 301 | B | 1 | E |
| BAL | 301 | B | 1 | O |
| BAL | 301 | B | 13 | E |
| BAL | 301 | B | 13 | O |
| BAL | 301 | B | 21 | E |
| BAL | 301 | B | 21 | O |
| BAL | 301 | B | 22 | E |
| BAL | 301 | B | 22 | O |
| BAL | 301 | B | 30 | E |
| BAL | 301 | B | 30 | O |
| BAL | 301 | B | 49 | E |
| BAL | 301 | B | 49 | O |
| BAL | 301 | C | 1 | E |
| BAL | 301 | C | 1 | O |
| BAL | 301 | C | 2 | E |
| BAL | 301 | C | 2 | O |
| BAL | 301 | C | 30 | E |
| BAL | 301 | C | 30 | O |
| BAL | 301 | C | 35 | E |
| BAL | 301 | C | 35 | O |
| BAL | 301 | C | 49 | E |
| BAL | 301 | C | 49 | O |
| BAL | 301 | D | 32 | E |
| BAL | 301 | D | 32 | O |
| BAL | 301 | D | 37 | E |
| BAL | 301 | D | 37 | O |
| BAL | 301 | D | 45 | E |
| BAL | 301 | D | 45 | O |
| BAL | 302 | A | 11 | E |
| BAL | 302 | A | 11 | O |
| BAL | 302 | A | 20 | E |
| BAL | 302 | A | 20 | O |
| BAL | 302 | A | 31 | E |
| BAL | 302 | A | 31 | O |
| BAL | 302 | A | 43 | E |
| BAL | 302 | A | 43 | O |

| | | | | |
|---|---|---|---|---|
| BAL | 302 | A | 48 | E |
| BAL | 302 | A | 48 | O |
| BAL | 302 | B | 5 | E |
| BAL | 302 | B | 5 | O |
| BAL | 302 | B | 18 | E |
| BAL | 302 | B | 18 | O |
| BAL | 302 | B | 42 | E |
| BAL | 302 | B | 42 | O |
| BAL | 302 | B | 43 | E |
| BAL | 302 | B | 43 | O |
| BAL | 302 | B | 47 | E |
| BAL | 302 | B | 47 | O |
| BAL | 302 | C | 28 | E |
| BAL | 302 | C | 28 | O |
| BAL | 302 | D | 23 | E |
| BAL | 302 | D | 23 | O |
| BAL | 302 | D | 29 | E |
| BAL | 302 | D | 29 | O |
| BAL | 302 | D | 35 | E |
| BAL | 302 | D | 35 | O |
| BAL | 303 | A | 2 | E |
| BAL | 303 | A | 2 | O |
| BAL | 303 | A | 18 | E |
| BAL | 303 | A | 18 | O |
| BAL | 303 | A | 23 | E |
| BAL | 303 | A | 23 | O |
| BAL | 303 | A | 29 | E |
| BAL | 303 | A | 29 | O |
| BAL | 303 | A | 32 | E |
| BAL | 303 | A | 32 | O |
| BAL | 303 | B | 17 | E |
| BAL | 303 | B | 17 | O |
| BAL | 303 | B | 29 | E |
| BAL | 303 | B | 29 | O |
| BAL | 303 | B | 34 | E |
| BAL | 303 | B | 34 | O |
| BAL | 303 | B | 40 | E |
| BAL | 303 | B | 40 | O |
| BAL | 303 | C | 2 | E |
| BAL | 303 | C | 2 | O |
| BAL | 303 | C | 22 | E |
| BAL | 303 | C | 22 | O |
| BAL | 303 | C | 29 | E |
| BAL | 303 | C | 29 | O |
| BAL | 303 | C | 38 | E |
| BAL | 303 | C | 38 | O |
| BAL | 303 | D | 4 | E |
| BAL | 303 | D | 4 | O |
| BAL | 303 | D | 19 | E |
| BAL | 303 | D | 19 | O |

| | | | | |
|---|---|---|---|---|
| BAL | 303 | D | 32 | E |
| BAL | 303 | D | 32 | O |
| BAL | 303 | D | 35 | E |
| BAL | 303 | D | 35 | O |
| BAL | 304 | A | 1 | E |
| BAL | 304 | A | 1 | O |
| BAL | 304 | A | 16 | E |
| BAL | 304 | A | 16 | O |
| BAL | 304 | A | 22 | E |
| BAL | 304 | A | 22 | O |
| BAL | 304 | A | 23 | E |
| BAL | 304 | A | 23 | O |
| BAL | 304 | A | 33 | E |
| BAL | 304 | A | 33 | O |
| BAL | 304 | A | 45 | E |
| BAL | 304 | A | 45 | O |
| BAL | 304 | A | 47 | E |
| BAL | 304 | A | 47 | O |
| BAL | 304 | B | 1 | E |
| BAL | 304 | B | 1 | O |
| BAL | 304 | B | 4 | E |
| BAL | 304 | B | 4 | O |
| BAL | 304 | B | 31 | E |
| BAL | 304 | B | 31 | O |
| BAL | 304 | B | 41 | E |
| BAL | 304 | B | 41 | O |
| BAL | 304 | B | 42 | E |
| BAL | 304 | B | 42 | O |
| BAL | 304 | B | 46 | E |
| BAL | 304 | B | 46 | O |
| BAL | 304 | C | 2 | E |
| BAL | 304 | C | 2 | O |
| BAL | 304 | C | 18 | E |
| BAL | 304 | C | 18 | O |
| BAL | 304 | C | 19 | E |
| BAL | 304 | C | 19 | O |
| BAL | 304 | C | 23 | E |
| BAL | 304 | C | 23 | O |
| BAL | 304 | C | 32 | E |
| BAL | 304 | C | 32 | O |
| BAL | 304 | C | 45 | E |
| BAL | 304 | C | 45 | O |
| BAL | 304 | D | 5 | E |
| BAL | 304 | D | 5 | O |
| BAL | 304 | D | 21 | E |
| BAL | 304 | D | 21 | O |
| BAL | 304 | D | 28 | E |
| BAL | 304 | D | 28 | O |
| BAL | 304 | D | 38 | E |
| BAL | 304 | D | 38 | O |

| | | | | |
|---|---|---|---|---|
| BAL | 304 | D | 48 | E |
| BAL | 304 | D | 48 | O |
| BAL | 305 | A | 34 | E |
| BAL | 305 | A | 34 | O |
| BAL | 305 | A | 38 | E |
| BAL | 305 | A | 38 | O |
| BAL | 305 | B | 36 | E |
| BAL | 305 | B | 36 | O |
| BAL | 305 | B | 37 | E |
| BAL | 305 | B | 37 | O |
| BAL | 305 | B | 40 | E |
| BAL | 305 | B | 40 | O |
| BAL | 305 | B | 47 | E |
| BAL | 305 | B | 47 | O |
| BAL | 305 | B | 48 | E |
| BAL | 305 | B | 48 | O |
| BAL | 305 | C | 2 | E |
| BAL | 305 | C | 2 | O |
| BAL | 305 | C | 19 | E |
| BAL | 305 | C | 19 | O |
| BAL | 305 | C | 38 | E |
| BAL | 305 | C | 38 | O |
| BAL | 305 | D | 36 | E |
| BAL | 305 | D | 36 | O |
| BAL | 305 | D | 43 | E |
| BAL | 305 | D | 43 | O |
| BAL | 305 | D | 45 | E |
| BAL | 305 | D | 45 | O |
| BAL | 305 | D | 46 | E |
| BAL | 305 | D | 46 | O |
| BAL | 305 | D | 50 | E |
| BAL | 305 | D | 50 | O |
| BAL | 306 | A | 6 | E |
| BAL | 306 | A | 6 | O |
| BAL | 306 | A | 21 | E |
| BAL | 306 | A | 21 | O |
| BAL | 306 | A | 25 | E |
| BAL | 306 | A | 25 | O |
| BAL | 306 | A | 36 | E |
| BAL | 306 | A | 36 | O |
| BAL | 306 | A | 42 | E |
| BAL | 306 | A | 42 | O |
| BAL | 306 | B | 1 | E |
| BAL | 306 | B | 1 | O |
| BAL | 306 | B | 20 | E |
| BAL | 306 | B | 20 | O |
| BAL | 306 | B | 21 | E |
| BAL | 306 | B | 21 | O |
| BAL | 306 | B | 45 | E |
| BAL | 306 | B | 45 | O |

| | | | | |
|-----|-----|---|----|---|
| BAL | 306 | B | 49 | E |
| BAL | 306 | B | 49 | O |
| BAL | 306 | B | 50 | E |
| BAL | 306 | B | 50 | O |
| BAL | 306 | C | 3 | E |
| BAL | 306 | C | 3 | O |
| BAL | 306 | C | 4 | E |
| BAL | 306 | C | 4 | O |
| BAL | 306 | C | 17 | E |
| BAL | 306 | C | 17 | O |
| BAL | 306 | C | 21 | E |
| BAL | 306 | C | 21 | O |
| BAL | 306 | C | 22 | E |
| BAL | 306 | C | 22 | O |
| BAL | 306 | C | 24 | E |
| BAL | 306 | C | 24 | O |
| BAL | 306 | C | 30 | E |
| BAL | 306 | C | 30 | O |
| BAL | 306 | C | 42 | E |
| BAL | 306 | C | 42 | O |
| BAL | 306 | C | 44 | E |
| BAL | 306 | C | 44 | O |
| BAL | 306 | D | 1 | E |
| BAL | 306 | D | 1 | O |
| BAL | 306 | D | 6 | E |
| BAL | 306 | D | 6 | O |
| BAL | 306 | D | 13 | E |
| BAL | 306 | D | 13 | O |
| BAL | 306 | D | 34 | E |
| BAL | 306 | D | 34 | O |
| BAL | 306 | D | 41 | E |
| BAL | 306 | D | 41 | O |
| BAL | 306 | D | 44 | E |
| BAL | 306 | D | 44 | O |
| BAL | 306 | D | 49 | E |
| BAL | 306 | D | 49 | O |
| BAL | 306 | D | 50 | E |
| BAL | 306 | D | 50 | O |
| BAL | 307 | A | 2 | E |
| BAL | 307 | A | 2 | O |
| BAL | 307 | A | 37 | E |
| BAL | 307 | A | 37 | O |
| BAL | 307 | A | 38 | E |
| BAL | 307 | A | 38 | O |
| BAL | 307 | A | 40 | E |
| BAL | 307 | A | 40 | O |
| BAL | 307 | A | 41 | E |
| BAL | 307 | A | 41 | O |
| BAL | 307 | A | 44 | E |
| BAL | 307 | A | 44 | O |

| | | | | |
|---|---|---|---|---|
| BAL | 307 | A | 45 | E |
| BAL | 307 | A | 45 | O |
| BAL | 307 | A | 48 | E |
| BAL | 307 | A | 48 | O |
| BAL | 307 | A | 49 | E |
| BAL | 307 | A | 49 | O |
| BAL | 307 | B | 1 | E |
| BAL | 307 | B | 1 | O |
| BAL | 307 | B | 2 | E |
| BAL | 307 | B | 2 | O |
| BAL | 307 | B | 16 | E |
| BAL | 307 | B | 16 | O |
| BAL | 307 | B | 18 | E |
| BAL | 307 | B | 18 | O |
| BAL | 307 | B | 19 | E |
| BAL | 307 | B | 19 | O |
| BAL | 307 | B | 21 | E |
| BAL | 307 | B | 21 | O |
| BAL | 307 | B | 29 | E |
| BAL | 307 | B | 29 | O |
| BAL | 307 | B | 38 | E |
| BAL | 307 | B | 38 | O |
| BAL | 307 | B | 40 | E |
| BAL | 307 | B | 40 | O |
| BAL | 307 | B | 42 | E |
| BAL | 307 | B | 42 | O |
| BAL | 307 | B | 43 | E |
| BAL | 307 | B | 43 | O |
| BAL | 307 | B | 44 | E |
| BAL | 307 | B | 44 | O |
| BAL | 307 | B | 45 | E |
| BAL | 307 | B | 45 | O |
| BAL | 307 | B | 48 | E |
| BAL | 307 | B | 48 | O |
| BAL | 307 | C | 2 | E |
| BAL | 307 | C | 2 | O |
| BAL | 307 | C | 5 | E |
| BAL | 307 | C | 5 | O |
| BAL | 307 | C | 36 | E |
| BAL | 307 | C | 36 | O |
| BAL | 307 | C | 37 | E |
| BAL | 307 | C | 37 | O |
| BAL | 307 | C | 38 | E |
| BAL | 307 | C | 38 | O |
| BAL | 307 | C | 42 | E |
| BAL | 307 | C | 42 | O |
| BAL | 307 | C | 43 | E |
| BAL | 307 | C | 43 | O |
| BAL | 307 | D | 1 | E |
| BAL | 307 | D | 1 | O |

| | | | | |
|---|---|---|---|---|
| BAL | 307 | D | 2 | E |
| BAL | 307 | D | 2 | O |
| BAL | 307 | D | 5 | E |
| BAL | 307 | D | 5 | O |
| BAL | 307 | D | 18 | E |
| BAL | 307 | D | 18 | O |
| BAL | 307 | D | 21 | E |
| BAL | 307 | D | 21 | O |
| BAL | 307 | D | 40 | E |
| BAL | 307 | D | 40 | O |
| BAL | 307 | D | 41 | E |
| BAL | 307 | D | 41 | O |
| BAL | 307 | D | 42 | E |
| BAL | 307 | D | 42 | O |
| BAL | 307 | D | 43 | E |
| BAL | 307 | D | 43 | O |
| BAL | 307 | D | 44 | E |
| BAL | 307 | D | 44 | O |
| BAL | 307 | D | 45 | E |
| BAL | 307 | D | 45 | O |
| BAL | 307 | D | 48 | E |
| BAL | 307 | D | 48 | O |
| BAL | 308 | A | 2 | E |
| BAL | 308 | A | 2 | O |
| BAL | 308 | A | 3 | E |
| BAL | 308 | A | 3 | O |
| BAL | 308 | A | 18 | E |
| BAL | 308 | A | 18 | O |
| BAL | 308 | A | 41 | E |
| BAL | 308 | A | 41 | O |
| BAL | 308 | A | 42 | E |
| BAL | 308 | A | 42 | O |
| BAL | 308 | A | 48 | E |
| BAL | 308 | A | 48 | O |
| BAL | 308 | A | 49 | E |
| BAL | 308 | A | 49 | O |
| BAL | 308 | B | 1 | E |
| BAL | 308 | B | 1 | O |
| BAL | 308 | B | 18 | E |
| BAL | 308 | B | 18 | O |
| BAL | 308 | B | 19 | E |
| BAL | 308 | B | 19 | O |
| BAL | 308 | B | 21 | E |
| BAL | 308 | B | 21 | O |
| BAL | 308 | B | 31 | E |
| BAL | 308 | B | 31 | O |
| BAL | 308 | B | 36 | E |
| BAL | 308 | B | 36 | O |
| BAL | 308 | B | 38 | E |
| BAL | 308 | B | 38 | O |

| | | | | |
|---|---|---|---|---|
| BAL | 308 | B | 40 | E |
| BAL | 308 | B | 40 | O |
| BAL | 308 | B | 41 | E |
| BAL | 308 | B | 41 | O |
| BAL | 308 | B | 42 | E |
| BAL | 308 | B | 42 | O |
| BAL | 308 | B | 43 | E |
| BAL | 308 | B | 43 | O |
| BAL | 308 | B | 45 | E |
| BAL | 308 | B | 45 | O |
| BAL | 308 | B | 46 | E |
| BAL | 308 | B | 46 | O |
| BAL | 308 | B | 48 | E |
| BAL | 308 | B | 48 | O |
| BAL | 308 | B | 49 | E |
| BAL | 308 | B | 49 | O |
| BAL | 308 | C | 4 | E |
| BAL | 308 | C | 4 | O |
| BAL | 308 | C | 18 | E |
| BAL | 308 | C | 18 | O |
| BAL | 308 | C | 19 | E |
| BAL | 308 | C | 19 | O |
| BAL | 308 | C | 20 | E |
| BAL | 308 | C | 20 | O |
| BAL | 308 | C | 29 | E |
| BAL | 308 | C | 29 | O |
| BAL | 308 | C | 36 | E |
| BAL | 308 | C | 36 | O |
| BAL | 308 | C | 41 | E |
| BAL | 308 | C | 41 | O |
| BAL | 308 | C | 42 | E |
| BAL | 308 | C | 42 | O |
| BAL | 308 | C | 43 | E |
| BAL | 308 | C | 43 | O |
| BAL | 308 | C | 46 | E |
| BAL | 308 | C | 46 | O |
| BAL | 308 | C | 49 | E |
| BAL | 308 | C | 49 | O |
| BAL | 308 | C | 50 | E |
| BAL | 308 | C | 50 | O |
| BAL | 308 | D | 1 | E |
| BAL | 308 | D | 1 | O |
| BAL | 308 | D | 5 | E |
| BAL | 308 | D | 5 | O |
| BAL | 308 | D | 6 | E |
| BAL | 308 | D | 6 | O |
| BAL | 308 | D | 22 | E |
| BAL | 308 | D | 22 | O |
| BAL | 308 | D | 38 | E |
| BAL | 308 | D | 38 | O |

| | | | | |
|---|---|---|---|---|
| BAL | 308 | D | 46 | E |
| BAL | 308 | D | 46 | O |
| BAL | 309 | A | 20 | E |
| BAL | 309 | A | 20 | O |
| BAL | 309 | A | 22 | E |
| BAL | 309 | A | 22 | O |
| BAL | 309 | A | 23 | E |
| BAL | 309 | A | 23 | O |
| BAL | 309 | A | 35 | E |
| BAL | 309 | A | 35 | O |
| BAL | 309 | A | 47 | E |
| BAL | 309 | A | 47 | O |
| BAL | 309 | A | 49 | E |
| BAL | 309 | A | 49 | O |
| BAL | 309 | B | 1 | E |
| BAL | 309 | B | 1 | O |
| BAL | 309 | B | 4 | E |
| BAL | 309 | B | 4 | O |
| BAL | 309 | B | 5 | E |
| BAL | 309 | B | 5 | O |
| BAL | 309 | B | 22 | E |
| BAL | 309 | B | 22 | O |
| BAL | 309 | B | 24 | E |
| BAL | 309 | B | 24 | O |
| BAL | 309 | B | 43 | E |
| BAL | 309 | B | 43 | O |
| BAL | 309 | B | 44 | E |
| BAL | 309 | B | 44 | O |
| BAL | 309 | C | 2 | E |
| BAL | 309 | C | 2 | O |
| BAL | 309 | C | 21 | E |
| BAL | 309 | C | 21 | O |
| BAL | 309 | C | 36 | E |
| BAL | 309 | C | 36 | O |
| BAL | 309 | C | 37 | E |
| BAL | 309 | C | 37 | O |
| BAL | 309 | C | 40 | E |
| BAL | 309 | C | 40 | O |
| BAL | 309 | C | 48 | E |
| BAL | 309 | C | 48 | O |
| BAL | 309 | D | 3 | E |
| BAL | 309 | D | 3 | O |
| BAL | 309 | D | 6 | E |
| BAL | 309 | D | 6 | O |
| BAL | 309 | D | 34 | E |
| BAL | 309 | D | 34 | O |
| BAL | 309 | D | 39 | E |
| BAL | 309 | D | 39 | O |
| BAL | 309 | D | 40 | E |
| BAL | 309 | D | 40 | O |

| BAL | 309 | D | 49 | E |
| --- | --- | --- | --- | --- |
| BAL | 309 | D | 49 | O |
| BAL | 309 | D | 50 | E |
| BAL | 309 | D | 50 | O |